# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION                                    No. MD 16-2695 JB/LF

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Request for Judicial Notice

in Support of Motion to Dismiss, filed November 18, 2016 (Doc. 71)("First JN Motion");

(ii) Defendants' Second Motion for Judicial Notice in Support of the Motion to Dismiss the

Consolidated Amended Complaint, filed February 23, 2017 (Doc. 91)("Second JN Motion");

(iii) Defendants' Third Motion for Judicial Notice in Support of the Motion to Dismiss the

Consolidated Amended Complaint, filed May 30, 2017 (Doc. 109)("Third JN Motion"); and (iv) the

Defendants' Motion to Dismiss the Consolidated Amended Complaint and Incorporated

Memorandum of Law, filed February 23, 2017 (Doc. 90)("MTD").  The Court held hearings on June

16, 2017 and July 20, 2017.  The primary issues are: (i) whether the Court may consider the items

presented in the First JN Motion, the Second JN Motion, and the Third JN Motion without

converting the MTD into one for summary judgment; (ii) whether the Court may exercise personal

jurisdiction over Reynolds American, Inc. for claims that were not brought in a North Carolina

forum; (iii) whether the Federal Trade Commission's Decision and Order, In re Santa Fe Nat.

Tobacco Co., No. C-3952 (FTC June 12, 2000), filed November 18, 2016 (Doc. 71)("Consent

Order"), requiring Defendant Santa Fe Natural Tobacco Company, Inc. to use a disclosure that "No

additives in our tobacco does **NOT** mean a safer cigarette" impliedly preempts the Plaintiffs'[1] claims

---

[1]There are twelve named Plaintiffs in this action: Jacques-Rene Hebert and Albert Lopez,
citizens of the State of Illinois; Sara Benson, a citizen of the State of Colorado; Justin Sproule and

to the extent that the Defendants' advertising misled the Plaintiffs into believing that Natural American cigarettes are safer or healthier than other cigarettes; (iv) whether "natural," "additive-free," and "substantially similar terms" mislead a consumer into believing: (a) that Natural American cigarettes are safer or healthier than other cigarettes, (b) that Natural American's menthol cigarettes do not include any additives; or (c) that Natural American cigarettes undergo fewer engineering processes than other cigarettes;  (v) whether the Defendants' use of those descriptors is protected commercial speech under the First Amendment to the Constitution of the United States of America; (vi) whether state law safe harbors shield the Defendants from liability; (vii) whether the Plaintiffs' unjust-enrichment claims fail, because: (a) the descriptors did not deceive consumers, so there is no injustice for equity to correct; (b) the Plaintiffs have an adequate legal remedy under the various state consumer statutes; or (c) state specific law otherwise bars them; (viii) whether the Plaintiffs' breach-of-express-warranty claims are barred, because: (a) the FDA-mandated disclosure and the menthol ingredient modify the warranty such that there is no breach; (b) the Plaintiffs' Consolidated Complaint, filed January 12, 2017 (Doc. 82)("Amended Complaint") does not serve as the requisite pre-litigation notice under California, Florida, Illinois, New Mexico, New York, and North Carolina law; and (c) the Plaintiffs failed to allege privity of contract with the Defendants as required by Florida, Illinois, and New York law; and (ix) whether the Memorandum of Agreement Between the United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), dated January 19, 2017, filed February 23, 2017 (Doc. 91-1)("Memorandum of Agreement), in which the Defendants

---

Joshua Horne, citizens of the State of Florida; Abigail Emmons and Ceyhan Haskal, citizens of the State of New Mexico; Rudolph Miller and Charlene Blevins, citizens of the State of North Carolina; Carol Murphy, a citizen of the State of Idaho; Robert Litwin, a citizen of the State of Maryland; and Francisco Chavez, a citizen of the State of California.  See Amended Complaint ¶¶ 12-23, at 4-11, filed January 12, 2017 (Doc. 82).

agree to remove the descriptors from its packaging and labeling, except for the term natural in its brand name, renders the Plaintiffs' request for injunctive relief moot.

The Court concludes that: (i) the Court may consider all but one of the documents the Defendants submit without converting the MTD into one for summary judgment, because the documents are incorporated in the Amended Complaint by reference, or they are government documents publically available and capable of ready and accurate determination; (ii) the Court lacks personal jurisdiction over Reynolds American, as to the claims filed outside of North Carolina; (iii) the Consent Order does not preempt the Plaintiffs' claims, because (a) a consent order is not a "law" under the Supremacy Clause, (b) the Consent Order -- as an agreement not to enforce a federal statute -- does not permit conduct; (c) the Consent Order only binds the parties to it, so does not bind all of the Defendants; and (d) the Consent Order covers only the Defendants' advertising, so cannot preempt the Plaintiffs' claims targeting the Defendants' labeling; (iv) the descriptors "natural," "organic," and "additive-free" would mislead a reasonable consumer into believing that: (a) Natural American Cigarettes are healthier or safer than other cigarettes, because decades of marketing have equated those terms with healthy products; and (b) Natural American menthol cigarettes have no additives, because menthol is a substance that a reasonable consumer would not know much about; (v) the First Amendment does not protect the Defendants' use of the descriptors at issue, because the state action doctrine precludes a First Amendment defense to the claims premised on mutual assent, and the government has a substantial interest in regulating deceptive commercial speech regarding tobacco products; (vi) the state-law safe harbors do not preclude relief, except in Illinois, because the Consent Order does not permit conduct, and the Ohio consumer protection claims are barred for state-specific reasons; (vii) Rule 8 allows pleading in the alternative, but New Jersey and Ohio law do not permit the Plaintiffs' unjust-enrichment claims, because the Plaintiffs cannot allege a

remuneration nor can they allege that they conferred a direct benefit on the Defendants; (viii) Florida, Illinois, and New York law preclude the Plaintiffs' express warranty claims, because the Plaintiffs Amended Complaint cannot serve as the requisite pre-litigation notice, and are independently defective under Florida and Illinois law, because there is no privity between the Plaintiffs and the Defendants; and (ix) the Plaintiffs' request for injunctive relief is not rendered moot, because the Memorandum of Agreement is subject to a lawsuit that might invalidate it. The Court therefore grants the MTD in part and denies it in part.

## **FACTUAL BACKGROUND**

The Court takes the facts from the Amended Complaint. As the Court must, it accepts all factual allegations in the Amended Complaint as true for the purposes of a motion to dismiss. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court may also consider facts judicially noticed on a motion to dismiss without converting the motion into one for summary judgment. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 322 (2007)("[C]ourts must consider the complaint in its entirety, as well as . . . matters of which a court may take judicial notice."); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1191 (D.N.M. 2013)(Browning, J.). The Court recites facts from the documents included in the First JN Motion, the Second JN Motion, and the Third JN Motion to the extent that the Court concludes that it can consider those documents. See infra § I ("The Court concludes that it may consider all of the documents, which the Defendants submit, except the FTC Letter, without converting the MTD into one for summary judgment.").

Santa Fe Tobacco is a New Mexico corporation that sells Natural American Spirit cigarettes and uniformly advertises them as "Natural" and "100% Additive Free." Amended Complaint ¶¶ 1, 24, 40, at 1, 12, 15. Those same descriptors appear on Natural American cigarettes' packaging.

Amended Complaint ¶ 4, at 2. The twelve named Plaintiffs believed that, based on those terms and others, Natural American cigarettes were "safer and healthier" than other cigarettes. Amended Complaint ¶¶ 12-23, at 4-11. Because of that belief, the Plaintiffs purchased Natural American cigarettes at a premium over other cigarettes. See Amended Complaint ¶¶ 11-23, at 3-11.

Reynolds American -- Santa Fe Tobacco's parent corporation -- is heavily involved in Natural American cigarette advertising, and approves "all decisions" that Santa Fe Tobacco makes "with respect to the marketing, design, and composition." Amended Complaint ¶ 28, at 12. Reynolds American actively monitors the publications in which Natural American cigarettes are advertised. See Amended Complaint ¶ 28, at 12-13. Santa Fe Tobacco's and Reynolds American's assets are identical, and Reynolds American "essentially controls" Santa Fe Tobacco's business initiatives, capital expenditures, and financial operations. Amended Complaint ¶ 35, at 13-14.

Natural American advertisements from 2013 through 2015 include images of water and plants, along with statements like: "When you work with the best materials, you don't need to add anything else. That's why we use only tobacco and water. We stick with premium quality, whole leaf natural tobacco that's 100% additive-free for a very simple reason -- it's all we need." Tobacco & Water Advertisement at 113-114, filed November 18, 2016 (Doc. 71-1)("Tobacco & Water Advertisement"). See Complaint ¶ 43, at 17-21. Advertisements from that period also state in large bold writing, "**100% ADDITIVE-FREE NATURAL TOBACCO,**" and advertisements include, in smaller writing, "No additives in our tobacco does **NOT** mean a safer cigarette." Tobacco and Water Advertisement (all caps, bold, and emphasis in original); Complaint ¶ 43, at 17-21(all caps, bold, and emphasis in original). In 2015, the Defendants launched a nationwide advertising campaign and targeted Sports Illustrated, Time, Field and Stream, Southern Living, Architectural Digest, Vanity Fair, and US Weekly magazines. See Amended Complaint ¶ 44, at 21. Regarding

that advertising campaign, a spokesman for Santa Fe Tobacco explained: "The aim is to drive brand awareness, highlight Natural American Spirit's 100-percent additive-free natural tobacco proposition."  Amended Complaint ¶ 45, at 21-22.

Natural American cigarettes are the most expensive major brand of cigarette.  See Complaint ¶ 88, at 36.  Reynolds American explains that the higher price stems from "its use of all natural, additive-free tobacco."  Complaint ¶ 89, at 36 (citing Reynolds American, Inc. Form 10-Q United States Securities and Exchange Commission Filing for the Quarterly Period Ended March 31, 2016, available at http://s2.q4cdn.com/129460998/files/doc_financials/2016/RAI-Q116-10-Q.pdf (last visited Oct. 28, 2017)).  Despite their higher price, Natural American cigarette sales increased eighty-six percent from 2009 through 2014, while cigarette sales in the United States of America declined overall by seventeen percent.  See Amended Complaint ¶ 45, at 22.  Its market share during a similar period "more than doubled."  Amended Complaint ¶ 45, at 22.  Between 2014 and 2015 alone, Natural American cigarette sales increased by 21.4%.  See Amended Complaint ¶ 45, at 22.

The Plaintiffs cite numerous studies regarding the popularity and consumer perceptions of cigarettes branded as "natural."  Amended Complaint ¶¶ 50-54, at 23-27.[2]  On August 27, 2015, the

---

[2]The Amended Complaint notes that, in 2007, researchers at the University of California performed a study regarding the ways in which smokers "down-play the risks" by determining that "natural" cigarettes are safer or healthier than other cigarettes containing chemicals.  Amended Complaint ¶ 50, at 23 (quoting McDaniel, Patricia A. & Ruth E. Malone, "I Always Thought They Were All Pure Tobacco": American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies, 16(6) Tobacco Control (2007), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2807204/.  The study, according to the Plaintiffs, concludes that tobacco companies seek to alleviate smokers' concerns about health by modifying products and describing them as "natural."  Amended Complaint ¶ 51, at 22-23.  The Amended Complaint notes that a study from the Schroeder Institute, a non-profit that researches tobacco and policy with a goal of reducing tobacco use, observes that consumers rely on companies' branding of cigarettes as "'natural, organic, and additive free,'" so such branding possibly encourages consumers to try a product that they otherwise would not try or to switch to Natural American cigarettes rather than quitting smoking.  Amended Complaint ¶ 52, at 24 (quoting Pearson, Jennifer L., et al., Misperceptions of harm among Natural American Spirit smokers: results from wave 1 of the

Food and Drug Administration ("FDA") sent a Warning Letter, filed November 18, 2016 (Doc. 71-1)(Ex. 8)("Warning Letter") to Santa Fe Tobacco asserting that some of the Defendants' cigarette labeling practices "explicitly and/or implicitly" represent that Natural American cigarettes do not contain certain materials, so they represent that Natural American cigarettes pose less of a risk than other tobacco products. Amended Complaint ¶ 58, at 28-29 (quoting Warning Letter at 2). Santa Fe Tobacco previously entered into a Consent Order with the FTC regarding its advertising practices, because the FTC had concerns that the Defendants' advertising mislead consumers into believing that "Additive-Free" or "Chemical-Free" cigarettes are safer or less harmful than other tobacco products. Consent Order at 1-10 [on CM/ECF at 10-19]. The Consent Order requires that, "beginning no later than (30) days after the date of service of this order," Santa Fe Tobacco's advertisements must display the warning: "No additives in our tobacco does NOT mean a safer cigarette." Consent Order, at 4 [at 13 on CM/ECF]. Among other requirements, this statement must be "[i]n the same style and type size as that required for health warnings for tobacco cigarettes." Consent Order at 3 [at 12 on CM/ECF]. A later "Assurance of Voluntary Compliance" stipulates that, effective March 1, 2010, all advertisements found in either "display or distribution" of any Santa Fe Tobacco cigarette made with organic tobacco should display the statement "Organic

Population Assessment of Tobacco and Health (PATH) study (2013-2014) at 1, Tobacco Control (Dec. 6, 2016)("Misperceptions"). The study further finds, according to the Plaintiffs, that 8.3 percent of other cigarette brand smokers believe that their brand is "less harmful than other brands" whereas 63.9 percent of Natural American smokers believe that their brand is less harmful. Amended Complaint ¶ 52, at 24 (quoting Misperceptions, at 1). Additionally, the study determines that Natural American smokers believe their brand is less harmful, because the branding has "natural" and "additive free" descriptors. Amended Complaint ¶ 52, at 25 (citing Misperceptions, at 1). In a recent survey of 1000 smokers in the United States, sixty percent believe that cigarettes without additives are safer to smoke than other cigarettes, and seventy-three percent think that cigarettes containing additives are more dangerous than cigarettes that do not contain additives. See Amended Complaint ¶ 53, at 25-26 (citing Cummings, K.M., et al., Are smokers adequately informed about the health risks of smoking and medicinal nicotine?, Nicotine & Tobacco Research 6(3), 333-340 (2004)).

tobacco does NOT mean a safer cigarette."  Assurance of Voluntary Compliance at 5-6 [on CM/ECF at 33-34], (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1)(ex. F)("Voluntary Compliance Agreement").

Neither the Plaintiffs nor the Defendants allege that Natural American cigarettes are in any way safer than other cigarettes.  See Amended Complaint ¶ 59, at 29.  One scientific study, according to the Plaintiffs, found that Natural American blue box cigarettes contain the highest level of polyclic aromatic hydrocarbons[3] of fifty United States cigarette brands tested.  See Amended Complaint ¶ 61, at 29 (citing An T. Vu et al., Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes, National Center for Biotechnological Information (July 30, 2015) available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4540633/).  Also according to the Plaintiffs, the Centers for Disease Control and Prevention found that Natural American cigarettes contain higher concentrations of both cadmium and mercury than the other fifty varieties of United States cigarettes tested.[4]  See Amended Complaint ¶ 62, at 30 (citing Mark R. Fresquez, R. Steven Pappas, and Clifford H. Watson, Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes, J. Analytical Toxicology, 37(5) 298-304 (2013)).  Another study evaluated the levels of "free-base" nicotine in United States cigarettes, and the Plaintiffs allege that it determined that Natural American cigarettes has a higher nicotine concentration than Camel, Marlboro, and

---

[3]Polycyclic aromatic hydrocarbons are "the sooty part of smoke or ash."  Polycyclic Aromatic Hydrocarbons (PAHs), Wisconsin Department of Health Services (March 13, 2017) available at https://www.dhs.wisconsin.gov/chemical/pah.htm (last accessed October 27, 2017).

[4]Cadmium and mercury are both heavy metals that have adverse health effects.  See Amended Complaint ¶ 62, at 30.  Cadmium is a carcinogen that is linked to chronic obstructive pulmonary disease and nephrotoxicity -- a toxicity of the kidneys.  See Amended Complaint ¶ 62, at 30.

Winston-brand cigarettes.[5]  Amended Complaint ¶ 66, at 31 (citing Pankow, J., Barsanti, K., & Peyton, D., <u>Fraction of Free-Base Nicotine in Fresh Smoke Particulate Matter from the Eclipse Cigarette by 1H NMR Spectroscopy</u>, Chem. Res. in Toxicology 16(1): 23-27 (2003)).

Although labeled as "additive free," the Defendants add menthol in certain varieties of Natural American cigarettes.  <u>See</u> Amended Complaint ¶ 68, at 31.  Natural American cigarettes are also "flue-cured," meaning that the Defendants process the tobacco with heat to secure the sugars, which synthetically lowers the cigarette smoke's pH[6] and makes it easier to inhale.  Amended Complaint ¶ 72, at 32.   The tobacco in the Defendants' cigarettes is artificially blended and modified, much like other cigarettes in the industry.  <u>See</u> Amended Complaint ¶¶ 73-74, at 33. Despite these alterations to the tobacco product, the Natural American cigarettes are labeled "Natural."  Amended Complaint ¶¶ 74-76, at 33.

## PROCEDURAL BACKGROUND

The Plaintiffs brought thirteen separate actions in eight federal district courts, alleging similar liability theories.  <u>See</u> <u>In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices Litig.</u>, 178 F. Supp. 3d 1377, 1378 (U.S. Jud. Pan. Mult. Lit. 2016)("Transfer Order").[7]  One Plaintiff with an action pending in the District of New Mexico, Ceyhan Haskal, moved for centralization under 28 U.S.C §

---

[5]Free-base nicotine is a basic form of nicotine that is more volatile, particularly when smoked.  <u>See</u> Amended Complaint ¶ 64, at 30.  Free-base nicotine is therefore more quickly absorbed into the lungs when smoking, and as a result, reaches the brain faster.  <u>See</u> Amended Complaint ¶ 64, at 30.  Elevated concentrations of free-base nicotine do not arise naturally.  <u>See</u> Amended Complaint ¶ 66, at 31.

[6]pH is a measure of hydrogen ion concentration in a solution, and signals a solution's acidity or alkalinity.  <u>See</u> Anne Marie Helmenstine, <u>pH Definition and Equation in Chemistry</u>, Chemistry Glossary Definition of pH at 1 (August 31, 2017) available at <u>https://www.thoughtco.com/definition-of-ph-in-chemistry-604605</u>.

[7]The Court now has sixteen separate actions before it.  <u>See</u> <u>In Re Santa Fe Natural Tobacco Co. Marketing and Sales Practice Litig.</u>, No. 16-2695 (Apr. 11, 2016).

1407.  See Transfer Order, 178 F. Supp. 3d at 1378.  Santa Fe Tobacco and Reynolds American

opposed centralization, but agreed that the District of New Mexico was an appropriate transferee

forum.  See Transfer Order, 178 F. Supp. 3d at 1378.  All responding Plaintiffs agreed on

centralization, but disagreed upon the transferee district.[8]  See Transfer Order, 178 F. Supp. 3d at

1378.  The Judicial Panel on Multidistrict Litigation concluded that the actions presented "involve

common questions of fact, and that centralization will serve the convenience of the parties," and

ordered consolidation.  Transfer Order, 178 F. Supp. 3d at 1378-79.  The Panel further concluded

that the District of New Mexico was an appropriate transferee district because: (i) Santa Fe Natural

Tobacco is headquartered in the District of New Mexico; (ii) key witnesses reside in the District of

New Mexico; (iii) four actions were pending in the District of New Mexico; (iv) the Defendants

agreed that the District of New Mexico provides a "convenient and accessible location for the

geographically dispersed litigation"; and (v) centralizing before the Court allowed the Panel "to

assign [the] litigation to an able and experienced jurist who has not had the opportunity to preside

over [a multidistrict litigation]."  Transfer Order, 178 F. Supp. 3d at 1379.

      **1.**        **The Motion to Dismiss.**

The Defendants move to dismiss all claims under rule 12(b)(6) of the Federal Rules of Civil

Procedure.  See MTD at 1.  The Defendants marshal ten arguments in favor of full or partial

---

[8]Section 1407 (c) provides as follows:

The panel shall give notice to the parties in all actions in which transfers for
coordinated or consolidated pretrial proceedings are contemplated, and such notice
shall specify the time and place of any hearing to determine whether such transfer
shall be made. . . .  The panel's order of transfer shall be based upon a record of such
hearing at which material evidence may be offered by any party to an action pending
in any district that would be affected by the proceedings under this section, and shall
be supported by findings of fact and conclusions of law based upon such record.

28 U.S.C. § 1407(c).

dismissal: (i) the Consent Order preempts the Plaintiffs' claims; (ii) the First Amendment shields the Defendants from liability; (iii) state statutory safe harbors protect the Defendants from the Plaintiffs' unfair and deceptive practice claims; (iv) the unfair and deceptive practice claims fail, because the Defendants' statements do not mislead a reasonable consumer; (v) the unjust-enrichment claims fail, because the Defendants' cigarette advertising is not misleading; (vi) unjust-enrichment is improperly pled, because the Plaintiffs either have a legal remedy or state law otherwise bars the claims; (vii) the Defendants did not breach an express warranty; (viii) the Plaintiffs did not give pre-litigation notice and fail to establish privity; (ix) the Plaintiffs' request for injunctive relief is rendered moot; and (x) the Court does not have specific or general personal jurisdiction over Reynolds America with respect to the Plaintiffs' claims who were not parties to the North Carolina suit. See MTD at 6-80.

Before addressing the Defendants' arguments, some context to the Plaintiffs' claims would aid in understanding the issues before the Court. The Plaintiffs allege that the Defendants packaging, labeling, and advertising deceived them in three ways. The three theories of deception are as follows:

(1)     **The Safer-Cigarette Theory**: the Plaintiffs argue that the use of the terms organic, natural, and additive-free mislead tobacco consumers into believing that Natural American cigarettes are safer and healthier. See Amended Complaint ¶¶ 4-8, 47-66, at 2-3, 22-31; MTD at 22-24.

(2)     **The Menthol Theory**: the Plaintiffs argue that, by labeling Natural Americans cigarettes with menthol "additive-free" and "natural," the Defendants mislead menthol consumers, because menthol is an additive. See Amended Complaint ¶¶ 10, 67-69 at 3, 31-32; MTD at 24-25.

(3)     **The Unprocessed-Cigarette Theory:** the Plaintiffs argue that, by labeling Natural American cigarettes as Natural, the Defendants mislead consumers into believing that Natural American cigarettes are not subjected to rigorous engineering processes during production. See Amended Complaint ¶¶ 9, 70-74, at 3, 32-33; MTD at 25.

Turning to the Defendants' arguments, first, the Defendants assert that the Consent Order

preempts the Plaintiffs' state law claims premised on the Safer-Cigarette Theory. See MTD at 6-7. According to the Defendants, the Consent Order "authorized Santa Fe [Tobacco]'s use of 'Additive Free' and all other 'substantially similar terms' (such as 'Natural')" in Santa Fe Tobacco's advertisement, as long as it also disclosed in those advertisements that no additives does not mean a safer cigarette. MTD at 6-7.[9] The Defendants conclude that, because the Consent Order authorized the terms, it preempts the Plaintiffs' state claims under the Supremacy Clause. MTD at 8-10 (citing Chamber of Commerce of United States v. Edmondson, 594 F.3d 742, 765 (10th Cir. 2010)).

The Defendants also declare that the Consent Order is not a "minimum 'floor' that state law can supplant." MTD at 14. They argue that the FTC, in making its determination, reconciled "competing interests" -- the speaker's right to make truthful representations versus the consumers' right not to be misled -- and that the Plaintiffs seek, with their state claims, to undercut the balance that the FTC struck. MTD at 14. According to the Defendants, the Consent Order, thus, does not set a floor, but creates a scale that the Supremacy Clause prevents from tipping toward the Plaintiffs. See MTD at 14.

The Defendants also assert that the FDA's Warning Letter does not undermine their preemption arguments. See MTD at 15. The Defendants note that, the Warning Letter states that Santa Fe Tobacco's advertising language violated the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387 ("Tobacco Control Act"). See MTD at 15. Nevertheless, the Defendants argue that the Warning Letter does not change the preemption analysis, because the Warning Letter does not state that the terms "Natural" and "Additive-Free" are false or misleading; rather, it requires the Defendants to obtain FDA approval before using those terms. MTD at 17. The

---

[9]The Defendants also argue that their use of the term "organic" does not give rise to liability, because the United States Department of Agriculture regulations govern the use of the term "organic," and the Assurance of Voluntary Compliance requires the Defendants to disclose that "Organic Tobacco does **NOT** mean a safer cigarette." MTD at 12 n.3 (emphasis in original).

Defendants also assert that the Warning Letter cannot overrule the Consent Order, because the Tobacco Control Act cannot reasonably "be construed as limiting or diminishing the authority of the Federal Trade Commission." MTD at 17 (quoting 21 U.S.C. § 387n(a)(1)). Although they concede that the Tobacco Control Act states that "'[a]ny advertising that violates' the Act 'is an unfair or deceptive act or practice,'" the Defendants maintain that the Warning Letter is not a "binding determination" that the Defendants have violated the Tobacco Control Act, nor does it abrogate the Consent Order. MTD at 17 (quoting 21 U.S.C. § 387n(a)(1)).

Second, the Defendants argue that the First Amendment shields them from liability. See MTD at 20. The Defendants contend that the First Amendment is relevant here, even though it typically protects speakers only from government action, because the First Amendment protects speakers also from state tort suits "that seek to stifle or punish protected speech." MTD at 20 (citing Snyder v. Phelps, 562 U.S. 443, 451 (2011); Hill v. Pub. Advocate of the U.S., 35 F. Supp. 3d 1347, 1357 (D. Colo. 2014)(Daniel, J.)). They then aver that Central Hudson & Gas Electric Corporation v. Public Service Commission of New York, 447 U.S. 557 (1980)("Central Hudson") demonstrates that they are shielded from liability, because: (i) their advertising is not misleading; (ii) there is no substantial interest in silencing the Defendants' speech; (iii) silencing the Defendants' speech does not advance a legitimate governmental interest; and (iv) the Plaintiffs' requests are not narrowly tailored. See MTD at 21.

The Defendants argue that their speech is "lawful" and "not misleading." MTD at 21. First, they aver that adult cigarette usage is lawful. See MTD at 21 (citing Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 564 (2001)). Second, they argue that the "natural" and "additive-free" labeling is not misleading, given their disclosure that: "No additives in our tobacco does **NOT** mean a safer cigarette." MTD at 21 (emphasis in original). Third, they assert that the Plaintiffs' three theories of

deception do not demonstrate that the Defendants' speech is inherently misleading. See MTD at 22. They contend that, under established caselaw, the First Amendment does not protect inherently misleading speech, and inherently misleading speech is speech that is incapable of being presented in a non-deceptive way such that it would be misleading under all circumstances. See MTD at 22 (citing Revo v. Disciplinary Bd. of the N.M. S. Ct., 106 F.3d 929, 933 (10th Cir. 1997); Bioganic Safety Brands, Inc. v. Ament, 174 F. Supp. 2d 1168, 1181 (D. Colo. 2001)(Babcock, J.)). The Defendants argue that "Natural" and "Additive-Free" can be presented in non-deceptive way, because the FTC-approved disclosure that additive-free cigarettes are not inherently healthier repudiates the inference that Natural American cigarettes are healthier than other cigarettes. MTD at 22-23. The Defendants also argue that it is not inherently misleading to label their menthol cigarettes "additive-free," because "consumers are not misled by a product's inclusion of an ingredient that serves as one of its primary distinguishing and desired characteristics." MTD at 24. They also argue that the "additive-free" labeling is not misleading, because it refers to additive-free tobacco and the menthol is added to the cigarette filters and not to the tobacco. MTD at 24. Finally, they assert that the "Natural" labeling is not misleading, even though the Defendants subject the cigarettes to an engineering process during production, because "Natural" is too expansive a concept to mislead any consumers. MTD at 25-26 (citing Grocery Assoc. v. Sorrell, 102 F. Supp. 3d 583 (D. Vt. 2015)(Reiss, C.J.)).

The Defendants next contend that there is not a substantial interest in silencing their speech, because it is truthful and the Government has no interest in preventing truthful speech. See MTD at 27. They also argue that preventing the Defendants from using "natural" and "additive-free" does not materially advance the Plaintiffs' interest in preventing consumer deception, because the FTC-mandated disclosure already prevents deception, so imposing liability will not "*further* advance their

interest . . . to a *material degree*."  MTD at 28-29 (emphasis in original).  Finally, the Defendants

argue that the relief requested is not narrowly tailored, because an additional disclosure would

suffice.  See MTD at 29-30.

Third, the Defendants argue that state safe harbors shield them from the Plaintiffs' statutory

claims.  See MTD at 30.  The Defendants argue that the California, Colorado, Florida Count 1,

Illinois, Massachusetts, Michigan, New York, Ohio, and Washington claims fail, because federal law

-- specifically, the Consent Order -- permits the Defendants' advertising, and the various states' safe

harbors foreclose liability for conduct that federal law permits.  See MTD at 31-35, 37-39.  The

Defendants also argue that the New Jersey and North Carolina claims fail, because those states' safe

harbors preclude liability for conduct that has been concretely or pervasively regulated, and,

according to the Defendants, the Consent Order "deal[t] specifically, concretely, and pervasively"

with their advertising.  MTD at 35-36, 38.

Fourth, the Defendants aver that fourteen of the Plaintiffs' nineteen state statutory claims fail,

because their advertising is not false or misleading to a reasonable consumer.  See MTD at 39-40.

The Defendants contend that a reasonable consumer would not believe that Natural American

cigarettes are healthier than other cigarettes based on the "Natural" and "Additive-Free" labeling,

because the labeling disclaims that their cigarettes are safer than other cigarettes.  MTD at 42-46.

Regarding the Menthol Theory, the Defendants also argue that "a reasonable consumer . . . could not

have been misled into believing that [Natural American] cigarettes labeled 'menthol' on the package

*would not* contain menthol."  MTD at 46 (emphasis in original).  Finally, the Defendants argue that a

reasonable consumer would not believe that the tobacco in Natural American cigarettes was

unprocessed even though Natural American cigarettes are labeled as "Natural," because "virtually *all*

manufactured products undergo some form of processing."  MTD at 47-48 (emphasis in original).

The Defendants also assert that four of the Plaintiffs' statutory claims fail, because the relevant statutes do not provide relief under these circumstances. See MTD at 49. They contend that: (i) the injunctive relief requested under the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510, is inappropriate, because injunctive relief requires a likelihood of future harm, and the Plaintiffs admit they will not purchase Natural American cigarettes again; (ii) the Plaintiffs' New Jersey Truth in Consumer Contract Warranty and Notice Act, N.J. Stat. Ann. § 56:12-14 ("TCCWNA"), claim fails, because a predicate act is needed, and there can be no predicate act, because the Defendants' advertising would not mislead a reasonable consumer; (iii) the Ohio Consumer Sales Practice Act, Ohio Rev. Code Ann. § 1345 ("OCSPA"), claim fails, because the Plaintiffs do not allege that they notified the Defendants of their unlawful conduct; and (iv) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 1345.02, ("ODTPA") claim fails, because that law does not create a private right of action for consumers. See MTD at 50-52.

Fifth, the Defendants contend that the unjust-enrichment claims fail, because the Plaintiffs have not alleged any misleading conduct. See MTD at 52. As an initial matter, the Defendants argue that the three transferor courts' choice-of-law approaches dictate that the laws of the twelve states where the Plaintiffs purportedly purchased their cigarettes govern the unjust-enrichment analysis. See MTD at 53-54. According to the Defendants, the unjust-enrichment claims fail, because the "Plaintiffs received precisely what they paid for -- cigarettes made with additive-free, natural tobacco -- and so there is no injustice to be remedied." MTD at 53.

Sixth, the Defendants argue that ten of the twelve unjust-enrichment claims fail, because the Plaintiffs have an adequate legal remedy -- a state law damages claim. See MTD at 55. The Defendants also argue that the Michigan, New Jersey, North Carolina, and Ohio unjust-enrichment claims fail, because the Plaintiffs do not allege that they directly purchased the Natural Americans

from any of the Defendants.  See MTD 60-61.  The Defendants also argue that the New Jersey unjust-enrichment claim fails, because it sounds in tort, and the New York unjust-enrichment claim fails, because it duplicates the Plaintiffs' statutory claims.  See MTD at 62-63.

Seventh, the Defendants argue that they did not breach an express warranty by selling menthol cigarettes.  See MTD at 64.  They argue that, under California and New York Law, a breach of an express warranty requires the Plaintiffs to have reasonably relied on a warranty, and the Plaintiffs did not do so here.  See MTD at 64.  The Defendants also argue that the Plaintiffs' breach-of-express-warranty claims fare no better under Colorado, Florida, Illinois, New Jersey, New Mexico, or North Carolina law, because those states require a court to read the "alleged express warranties" in conjunction with "potentially limiting language."  MTD at 65.  They argue that, thus, the "menthol" language "necessarily modified any warranty," such as the "Additive-Free tobacco" warranty to mean that "the product, in fact, contains menthol."  MTD at 66.

Eighth, the Defendants argue that the express warranty claims fail under California, Florida, Illinois, New Mexico, New York, and North Carolina law, because the Plaintiffs did not give the Defendants notice before filing suit.  See MTD at 66.  The Defendants assert that Florida, Illinois, and New York law preclude the express warranty claims, because "privity is required," and the Plaintiffs cannot establish privity.  MTD at 67.

Ninth, the Defendants argue that the Plaintiffs' request for injunctive relief is rendered moot.  See MTD at 68.  The Defendants maintain that, because they have entered a Memorandum of Agreement with the FDA, see Memorandum of Agreement, under which Santa Fe Tobacco will cease using "additive-free" and "natural" going forward (except for the "Natural" in the "Natural American Spirit" brand name), an injunction is inappropriate, because the Defendants have already

undertaken the action that the Plaintiffs have requested.  MTD at 68-69.[10]  The Defendants aver that

the Plaintiffs' requested injunction does not satisfy the mootness doctrine's voluntary-cessation

---

[10]The Memorandum of Agreement reads in relevant part:

[The FDA's Center for Tobacco Products ("CTP")] and Santa Fe [Tobacco] agree to the following steps and conditions:

    1.    Santa Fe will remove the phrase "Additive-Free" from all Natural American Spirit cigarette product labels, labeling, advertising, and promotional materials.

    2.    Santa Fe will remove the term "natural" from all Natural American Spirit cigarette product labels, labeling advertising, and promotional materials, except as provided in Paragraph Three (3) below.

    . . . .

    CTP recognizes that Santa Fe will need to coordinate with its vendors to print and implement new product labeling and advertising.  However, CTP expects that this process would be completed and that changes to the labels, labeling, advertising, and promotional materials would be implemented within seven (7) months from the date Santa Fe receives in writing the agreement reached between FTC and FDA regarding the necessity, and, if applicable, wording of a disclosure, and the process for effectuating it, as a result of the discussions among Santa FE, FTC, and FDA.  Following the seven (7) month deadline, Santa Fe will not utilize the terms "additive free" or "natural" except as allowed under Paragraph 3 of this Agreement on the labels, labeling, advertising, or promotional materials for Natural American Spirit cigarette products.

    . . . .

    3.    Santa Fe may retain the use of the term "Natural" in the "Natural American Spirit" brand name and trademarks.

    . . . .

If Santa Fe agrees to the conditions outlined above, CTP will commit to not initiating enforcement action against Santa Fe related to the August 27, 2015 Warning Letter during the Seven (7) month timeframe set forth in Paragraph 2.

exception,[11] because, if they resumed using "Natural" or "Additive-Free," the Defendants would expose themselves to an FDA enforcement action. MTD at 69-70 n.26. The Defendants argue, accordingly, that the Memorandum of Agreement renders "moot[] Plaintiffs' requests for injunctive relief." MTD at 68.

Tenth, the Defendants assert that the Court lacks personal jurisdiction over Reynolds American with respect to the five Plaintiffs'[12] claims who were not parties to the North Carolina suit. See MTD at 70. In sum, the Defendants argue that the Court lacks both specific and general personal jurisdiction over Reynolds America. See MTD at 73. Turning first to specific personal jurisdiction, they contend that Reynolds American has not purposefully directed its activities at any of the transferor court states. See MTD at 74. They argue that the Plaintiffs' allegation that Reynolds America is "intimately involved in the marketing, advertising, and overall business development," Amended Complaint ¶ 27, at 12, of Natural American cigarettes is conclusory, and that the "mere involvement in nationwide advertising" does not amount to the requisite directed activity, MTD at 74. Turning to general personal jurisdiction, the Defendants say that general personal jurisdiction is proper only in North Carolina, because Reynolds America has no continuous and systematic contacts with any other state. See MTD at 75. Specifically, they contend that Reynolds America "does not do business in any of the transferor States other than North Carolina, does not have any registered agents in any of those States, and does not employ[] any employees in

---

Memorandum of Agreement ¶¶ 1-3, at 1-3.

[11]Under the voluntary-cessation doctrine, a request for injunctive relief is not rendered moot when the party voluntarily stops the challenged conduct. See Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016). Nevertheless, a defendant's voluntary cessation may render a case moot, if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).

[12]Those five Plaintiffs are: Sproule, Miller, Haskal, Litwin, and Blevins.

any of those States. . . .  Nor does RAI maintain bank accounts in any of those states."  MTD at 75-76.  The Defendants also argue that Santa Fe Tobacco's contacts cannot be imputed onto Reynolds America.  <u>See</u> MTD at 76.  They contend that, to impute a subsidiary's contact onto a parent corporation, the parent company must control the subsidiary's day-to-day activities, and, here, the allegations that Reynolds America "'exercises control over [Santa Fe's] corporate decisionmaking' and involves itself in Santa Fe's business by treating it as 'an operating segment'" are conclusory.  MTD at 77 (quoting Amended Complaint ¶¶ 34-35, at 13-14)(brackets in MTD).   They add that Reynolds American is not involved in Santa Fe Tobacco's day-to-day operations nor is it controlling those operations.  <u>See</u> MTD at 78.

       2.    **<u>The Response</u>**.

The Plaintiffs responded by filing the Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint and Incorporated Memorandum of Law, filed April 6, 2017 (Doc. 98)("Response").  First, they contend that the Consent Order does not impliedly preempt their claim based on the Safer-Cigarette Theory, because: (i) the FTC's governing statute states that "remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by state or federal law," Response at 7, (emphasis omitted)(citing 15 U.S.C. § 57b(e)); and (ii) the Supreme Court rejected the same arguments that the Defendants bring, namely that an FTC Consent Order requiring a disclosure on a tobacco product impliedly preempts a state deceptive practices claim, <u>see</u> Response at 9 (citing <u>Altria Group, Inc. v. Good</u>, 555 U.S. 70, 89 (2008)("<u>Altria II</u>")).  The Plaintiffs also refute the Defendants' argument that the United States Department of Agriculture's regulations governing entities' use of "organic" preempts their Safer-Cigarette Theory premised on the term "organic."  Response at 15 (citing <u>Segedie v. Hain Celestial Grp., Inc.</u>, No. 14-5029, 2015 WL 2168374, at *2-7 (S.D.N.Y. May 7, 2015)(Roman, J.);

Jones v. ConAgra Foods, Inc., 912 F. Supp. 2d 889, 894-96 (N.D. Cal. 2012)(Breyer, J.); Brown v. Hain Celestial Grp., Inc., No. 11-3082, 2012 WL 3138013, at *6-12 (N.D. Cal. Aug. 1, 2012)(Beeler, J.)).

The Plaintiffs also aver that the First Amendment does not protect the Defendants from liability. See Response at 16. They argue broadly that dismissing their false and misleading marketing claims is inappropriate on a motion to dismiss as "such a determination [of falsehood] is for the trier of fact." Response at 16-17. The Plaintiffs also argue that the Central Hudson test does not apply to sellers or manufacturers who lie about a product in advertising. See Response at 18 (citing Fed. Trade Comm'n v. Wellness Support Network, Inc., No. 10-4879, 2014 WL 644749, at *10 (N.D. Cal. Feb. 19, 2014)(Spero, M.J.)). They continue, however, that, if Central Hudson applies, they still satisfy the test. See Response at 18. They argue that, under Central Hudson's first prong, the Defendants' advertising is misleading, so the Defendants' speech "does not merit any First Amendment protection." Response at 19. The Plaintiffs refute the Defendants' contention that they must show that the Defendants' speech is "inherently misleading," because they challenge the statute "as applied" to specific representations to Plaintiffs. Response at 20 (citing John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010)). The Plaintiffs also argue that, under Central Hudson, the government has a substantial interest in protecting consumers from deceptive business practices. See Response at 21.

The Plaintiffs next contend that no safe harbors protect the Defendants from liability. See Response at 23. First, they argue that, in Altria II, the Supreme Court determined that "FTC consent orders only 'enjoin enforcement' of 15 U.S.C. § 45 and should not be construed as authorizing any specific conduct," and that "agency nonenforcement of a federal statute is not the same as a policy of approval." Response at 23-24 (citing Altria II, 555 U.S. at 89-90). They argue that, therefore, the

Consent Order "simply enjoined the FTC from enforcing the FTC Act against Defendants so long as they complied with its terms." Response at 24. The Plaintiffs add that the Consent Order does not provide complete immunity from suit, because they allege both false advertising and false packaging, and the Consent Order applies only to advertising. See Response at 25-26. They also argue, in a similar vein, that the Consent Order does not address the use of "natural" and "organic," so the Consent Order cannot permit the Defendants' use of those terms. Response at 26. They contend that the Consent Order's catch-all "substantially similar terms" language does not capture "natural" and "organic," because the Consent Order does not list "those two key terms," and the exclusion "cannot be an oversight as the terms are literally contained in the names of the products" and the term "natural" was included in the original FTC investigation. Response at 27.[13]

The Plaintiffs argue that, even if the Consent Order governed the packaging, the Consent Order would not shield the Defendants from liability. See Response at 28. They aver that the Defendants "buried the [required] disclaimer in small text to avoid" consumer attention, flouting the Consent Order's "equal text size requirement"[14] in some instances -- particularly on the packaging.

---

[13]The Consent Order reads in relevant part that:

> [T]his provision shall not prohibit respondent from truthfully representing, through the use of such phrases as "no additives," "no chemicals," "additive-free," "chemical-free," "chemical-additive-free," "100% tobacco," "pure tobacco," or substantially similar terms, that a tobacco product has no additives or chemicals, where such representation is accompanied by the disclosure mandated by this provision.

Consent Order at 5 [at 14 on CM/ECF].

[14]The Consent Order requires the Defendants to "display in advertisements as specified below, clearly and prominently, the following disclosures (including the line breaks, punctuation, bold font and capitalization illustrated:

> In cigarette advertisements:

Response at 28. They add that the Defendants did not bold the word "not" on the packaging as the Consent Order commands. Response at 28.

The Plaintiffs argue that the Consent Order does not trigger any state safe harbors, because it does not permit the Defendants' conduct; rather, the Consent Order does not prohibit it. <u>See</u> Response at 30. The Plaintiffs continue that their statutory claims are meritorious, because the Defendants' advertising and packaging would mislead a reasonable consumer. <u>See</u> Response at 39. First, they aver that, in most of the relevant jurisdictions, a statement's capacity to deceive or mislead is a fact question, inappropriate for a motion to dismiss. <u>See</u> Response at 39-42 (citing <u>e.g.</u>, <u>Williams v. Gerber Prods. Co.</u>, 552 F.3d 934, 938-39 (9th Cir. 2008); <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, 708 F. Supp. 2d 1209, 1241 (D.N.M. 2010)(Browning, J.); <u>Foster v. Chattem, Inc.</u>, No. 14-0346, 2014 WL 3687129, at *3 (M.D. Fla. July 23, 2014)(Dalton, J.); <u>Biffar v. Pinnacle Foods Grp., LLC</u>, No. 16-0873, 2016 WL 7429130, at *8 (S.D. Ill. Dec. 26, 2016)(Herndon, J.). Second, they argue that reasonable consumers are not required to look beyond a cigarette package's frontal disclosures to uncover the cigarette's safety disclaimer on the package's side. <u>See</u> Response at 42-43. The Plaintiffs continue that, for many jurisdictions, the relevant reasonable consumer test is to analyze the marketing "as a whole" and not to zoom in on one disclaimer. Response at 48. <u>See</u> Response at 46-49.

Addressing some of the Defendants' state-specific arguments, the Plaintiffs argue that they

---

      No additives in our tobacco
      does **NOT** mean a safer cigarette

  In advertisement for any other tobacco product:

      No additives in our tobacco
      does **NOT** mean safer."

Consent Order at 4 [at 13 on CM/ECF] (emphasis in original).

are entitled to injunctive relief under Illinois law, because there is a "continuing risk to reasonable consumers." Response at 55. They also aver that, contrary to the Defendants' contention, they are not required to give pre-suit notice under Ohio law, because pre-suit notice is a procedural rule inapplicable in federal court. See Response at 59. They continue that, even if pre-suit notice was required, they satisfy the requirement, because their Amended Complaint provides sufficient written notice. See Response at 60. Responding to the Defendants' argument that the Plaintiffs do not have standing under Ohio law to sue under ODTPA, the Plaintiffs argue that the statute's express language grants them standing and that courts have affirmed that position. See Response at 61 (citing Schumacher v. State Auto Mut. Ins. Co., 47 F. Supp. 3d 618, 630-32 (S.D. Ohio 2014)(Spiegel, J.); Bower v. IBM, 495 F. Supp. 2d 837, 843 (S.D. Ohio 2004)(Rice, J.)).

The Plaintiffs continue that they have properly pled their unjust-enrichment claim. See Response at 62.[15] The Plaintiffs contend that the Defendants' argument that the Plaintiffs' available legal remedy bars their unjust-enrichment claim is premature under rule 8(d) at the motion-to-dismiss stage. See Response at 63 (citing In re Dial Complete Mktg. & Sales Practices Litig., No. 11-2263, 2013 WL 1222310, at *8 (D.N.H. March 26, 2013)(McAuliffe, J.)). They add that the Defendants "adequate remedy at law" arguments flout the presumption that state statutes should not be interpreted to displace common-law claims, unless there is specific legislative intent to the contrary. Response at 63. The Plaintiffs also argue that, under the common law for ten relevant states, their unjust-enrichment claims prevail, notwithstanding the Defendants' arguments to the contrary, because: (i) they request equitable relief distinct from a legal remedy; (ii) there was no express contract; (iii) statutory relief's availability does not bar equitable relief; or (iv) dismissal at

---

[15]The Plaintiffs agree with the Defendants that the substantive law of the state in which the cigarettes are purchased governs the unjust-enrichment claims. See Response at 62. The Court concludes that both parties are correct and applies the law of the forum in which the cigarettes were purchased.

the motion to dismiss stage is premature.  <u>See</u> Response at 63-68.  They argue that they have alleged

a direct benefit to the Defendants, sufficient to satisfy the unjust-enrichment standard in Michigan,

North Carolina, New Jersey, and Ohio, "in the form of a price premium, increased sales and

increased market share."  Response at 69.  The Plaintiffs add that, contrary to the Defendants'

argument that the Plaintiffs unjust-enrichment allegation fails in New Jersey because it sounds in

tort, New Jersey law has no such requirement and that, regardless, their claim is viable, "because it

could properly be construed as an equitable remedy" under rule 8(a)(3).  Response at 70.

The Plaintiffs also aver that they properly pled their breach-of-express-warranty claims.  <u>See</u>

Response at 72.  They contend that product labels create "actionable express warranties," that the

Defendants breached an express warranty by adding menthol to their "additive-free" cigarettes, and,

alternatively, that dismissal is premature.  Response at 72.  They also say that the Defendants had

adequate pre-litigation notice of the breach-of-express-warranty claims, because their Amended

Complaint put the Defendants on notice, the Defendants "have not been prejudiced, and they had an

opportunity to cure the defect -- they knew that their claims that their menthol cigarettes are '100%

Additive Free' are false."  Response at 73 (citing Amended Complaint ¶ 68, at 30).  The Plaintiffs

add that, even if they did not meet the pre-suit notice requirement, they meet several state law

exceptions to the notice requirement.  <u>See</u> Response at 74.  They argue that: (i) under New York law,

no notice is required for suits involving goods that people consume; (ii) under California law, the

notice requirement is inapplicable against manufacturers with whom consumers have not dealt; and

(iii) under North Carolina and Illinois law, filing a lawsuit meets the notice requirement.  <u>See</u>

Response at 74-75.

The Plaintiffs argue that the  Memorandum of Agreement does not render moot their

injunctive relief request, because the Memorandum of Agreement exists outside the Amended

Complaint's four corners.  See Response at 76.  They also contend that the Memorandum of Agreement does not cover the Plaintiffs' request that the term natural be removed from their packaging and labeling, so injunctive relief cannot be rendered moot. See Response at 76.

Finally, the Plaintiffs contend that the Court has personal jurisdiction over Reynolds American.  See Response at 77.  They argue that Reynolds American has substantial involvement in the activities giving rise to their claims.  See Response at 78.  They contend that: (i) Reynolds American has an integrated system where executives amongst the three Defendants collaborated; (ii) Reynolds American essentially controls Santa Fe Tobacco's operations, and the two entities share assets and board members; (iii) Santa Fe Tobacco's employees are considered Reynolds American employees; and (iv) Reynolds American is involved in and controls Santa Fe Tobacco's advertising campaign.  See Response at 78 (citing Amended Complaint ¶¶ 29, 35-36, at 13-14). They conclude that, because of Reynolds American's active participation in its subsidiaries, the Court has "specific personal jurisdiction over [the] parent company" -- Reynolds American. Response at 79.

### 3. The Reply.

On May 30, 2017, the Defendants replied to the Plaintiffs' Response.  See Defendants' Reply in Support of Motion to Dismiss the Consolidated Amended Complaint at 1, filed May 30, 2017 (Doc. 107)("Reply").  The Defendants maintain that the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory, because the Consent Order "authorizes the *exact* representations at issue here by *this* exact manufacturer."  Reply at 2 (emphasis in original).  They refute that Altria II undermines their argument, because, the Consent Order in this case, unlike the Consent Order in Altria II, "affirmatively permits" the terms at issue by stating that it will not prohibit terms such as natural or additive-free.  Reply at 4.  They also contend that, in Altria II, the United States of

America expressly disavowed any policy authorizing the terms at issue in an amicus brief.  See Reply at 5 (citing Brief for the United States as Amicus Curiae Supporting Respondents at 15, No. 07-562, 555 U.S. 70, available at https://goo.gl/6VvJzA).  The Defendants also refute that 15 U.S.C. § 57b(e) undercuts their preemption argument, because that statute applies only to FTC rules or an FTC cease-and-desist order and not to Consent Orders under 15 U.S.C. § 45(b).  See Reply at 6.  The Defendants also state that the Plaintiffs never pled an "organic-based" deception claim, but if they had pled one, such a theory would fail, because the Defendants have complied with regulations under the Organic Food Production Act, 7 U.S.C. § 6501(2), which allow advertising and labeling to have the term organic -- subject to certain conditions.  Reply at 9 (citing 7 U.S.C. § 6501(2)).

Turning to their First Amendment arguments, the Defendants maintain their previous arguments, see Reply at 10-13, and contend that the Plaintiffs' argument that Central Hudson does not apply to false or misleading advertising is flawed, because the Defendants found only one unpublished decision supporting that argument and that decision does not explain why the First Amendment protects commercial speech limitations imposed via government regulation, but leaves exposed the same speech via a lawsuit, see Reply at 11 n.7.  The Defendants also argue that the Plaintiffs address only one of Central Hudson's factors.  See Reply at 13.  They continue that the Plaintiffs' argument as to that one factor is flawed, because the Defendants' speech is not deceptive.  See Reply at 13.

The Defendants' reassert their arguments that state safe harbors shield them from liability, because the Consent Order permits their conduct.  See Reply at 14.  The Defendants also argue that the term "natural" falls within the Consent Order's purview, because an FTC letter confirms that "natural" is substantially similar to "additive free."  Reply at 15 (citing MTD at 8).  The Defendants also assert that, contrary to the Plaintiffs' position, the Court can conclude, on a rule 12(b)(6)

motion, whether a reasonable consumer would be misled. <u>See</u> Reply at 20 (citing <u>Fink v. Time Warner Cable</u>, 714 F.3d 739, 741 (2d Cir. 2013)(per curiam)). They continue that the packaging would not mislead a reasonable consumer, because the terms "natural" and "additive-free" do not, on their face, contradict the package's safety disclosure. Reply at 22. The Defendants also maintain that Santa Fe Tobacco manufactures cigarettes with additive-free tobacco and contends that the Plaintiffs' arguments that the "additive free" label is misleading, because menthol migrates into the tobacco post-production is incorrect as a matter of law, because the Plaintiffs concede that menthol "migration is *inevitable.*" Reply at 23 (emphasis in original)(citing Response at 52). Responding to state-specific refutations, the Defendants counter that pre-suit notice requirements are substantive law under <u>Erie R. Co. v. Tomkins</u>, 304 U.S. 64 (1938), so Ohio pre-suit notice law binds the Court here. <u>See</u> Reply at 25 (citing <u>Curry v. High Springs Family Practice Clinic & Diagnosis Ctr. Inc.</u>, No. 8-0008, 2008 WL 5157683, at *9 (N.D. Fla. Dec. 9, 2008)(Paul, J.)) They also contend that filing a complaint does not satisfy the notice requirement. <u>See</u> Reply at 25.

Turning to the Plaintiffs' unjust-enrichment claims, the Defendants argue that the Plaintiffs may not plead an unjust-enrichment claim in the alternative to a legal claim. <u>See</u> Reply at 27. First, the Defendants contend that the Plaintiffs' reliance on express-contract cases where the contract's existence was at issue doom their unjust-enrichment-in-the-alternative theory, because those cases do not speak to available statutory remedies. <u>See</u> Reply at 27. Second, the Defendants aver that courts have rejected unjust-enrichment-in-the-alternative theories in similar circumstances. <u>See</u> Reply at 28 (citing <u>In re Ford Tailgate Litig.</u>, No. 11-2953, 2014 WL 1007066, at *5 (N.D. Cal. March 12, 2014)(Seeborg, J.)).

The Defendants also contend that the Plaintiffs failed to give the requisite pre-suit notice for their breach-of-express-warranty claims. <u>See</u> Reply at 34. Regarding state specific statutes, the

Defendants argue that general knowledge of general facts giving rise to the lawsuit are insufficient under Illinois law to provide notice.  <u>See</u> Reply at 35.  They also contend that the exceptions to notice that the Plaintiffs invoke under Illinois, North Carolina, and New York Law are inapplicable, because those exceptions apply only in personal injury cases.  <u>See</u> Reply at 35.  The Defendants argue that, similarly, California's exception applies only to tort cases and not to contract cases.  <u>See</u> Reply at 36.

Regarding the Plaintiffs' requested injunctive relief, the Defendants note that they have not finalized changes to their label.  <u>See</u> Reply at 37-38.  The Defendants argue, however, that the requested relief is still rendered moot, because the label changes will occur by December, 2017, "long before this case reaches judgment."  Reply at 38.  <u>See</u> Reply at 37-38.  Regarding the voluntary-cessation doctrine, the Defendants argue that the Plaintiffs have pointed to no supportable reason to suggest that the Defendants would resume their prior labeling in the future.  <u>See</u> Reply at 38.  From that premise, the Defendants conclude that the voluntary cessation doctrine is inapplicable. <u>See</u> Reply at 38.

Finally, the Defendants argue that the Plaintiffs conceded that the Court does not have general personal jurisdiction over Reynolds American.  <u>See</u> Reply at 39.  They also argue that the Plaintiffs' allegations do not rise to the level needed for specific jurisdiction, because they do not plausibly support that Reynolds American benefitted from some purposive conduct directed at the forum state sufficient to establish consent to the forum's jurisdiction.  <u>See</u> Reply at 39.  They also argue that the Plaintiffs' cannot impute Santa Fe Tobacco's contacts onto Reynolds American, because Reynolds American does not have control or de facto dominance over Santa Fe Tobacco. <u>See</u> Reply at 39-40.  The Defendants argue that there is no exception to the normal jurisdictional rules for tobacco companies.  <u>See</u> Reply at 40.  They conclude that, therefore, the Court does not

have personal jurisdiction over Reynolds American.  <u>See</u> Reply at 40.

**4.        <u>The June 9, 2017 Hearing</u>.**

The Court held a hearing on June 9, 2017.  <u>See</u> Transcript of Motion Proceedings (taken June 9, 2017), filed June 16, 2017 ("June Tr.").  Taking each argument in turn, the Defendants began by arguing that FTC Consent Orders, even in light of <u>Altria II</u>, still have preemptive effect.  <u>See</u> June Tr. at 15:11-17 (Biersteker).  The Defendants maintain, as they argued in their Reply, that <u>Altria II</u> applies only to the consent order at issue in <u>Altria II</u> and not to consent orders generally.  <u>See</u> June Tr. at 15:24-16:5 (Biersteker).  Responding to the Court's observation that "the Supreme Court is so divided on preemption these days," June Tr. at 16:18-19 (Court), the Defendants noted that the Supreme Court focused on only the FTC cease and desist order at issue in <u>Altria II</u>, and did not "enunciate some sort of blanket rule that consent decrees cannot be afforded preemptive effect," June Tr. at 16:25-17:1 (Biersteker).  <u>See</u> June Tr. at 16:22-18:11 (Biersteker).  The Defendants also argued that, in contrast to the <u>Altria II</u> consent order, the parties have abided by the Consent Order at issue here, the FTC has not questioned the Consent Order's mandated disclosure, and the Consent Order here, unlike <u>Altria II</u>'s consent order, has language permitting the advertising language.  <u>See</u> June Tr. at 18:12-18 (Biersteker); <u>id.</u> at 19:17-20:19 (Biersteker).  The Court pressed that Consent Orders change based on different administrations, and it queried how a federal judge could choose, in a principled manner, which Consent Orders preempted state law and which did not.  <u>See</u> June Tr. 22:22-23:10 (Court); <u>id.</u> at 23:16-23 (Court).  The Defendants responded that, because federal regulatory action is generally given preemptive effect, the principled response would be to scrutinize Consent Orders on a case-by-case basis to determine whether the regulatory agency has considered the conduct at issue.  <u>See</u> June Tr. at 24:4-12 (Biersteker).

The Plaintiffs responded that caselaw clearly signals that the Consent Order does not preempt

their claims.  See June Tr. at 25:2-26:6 (Reese)(citing Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028 (D.N.M. 2016)(Browning, J.)).  They further averred that the Consent Order does not apply to the Defendants' cigarette labeling, because the Consent Order's text does not mention labeling, and the FTC's regulatory structure forbade them from regulating labeling when the Consent Order was entered.  See June Tr. at 29:1-7 (Reese).  The Plaintiffs also pressed their argument from briefing that 15 U.S.C. § 57b(e) precludes consent decrees from barring other litigation.  See June Tr. at 31:20-32:13 (Reese).

The Defendants responded that the Plaintiffs' statutory interpretation is flawed, because a different section governs FTC consent decrees.  See June Tr. at 33:10-13 (Biersteker).  The Defendants continued that, although the United States Court of Appeals for the First Circuit, in Good v. Altria, 501 F.3d 29 (1st Cir. 2007), adopted reasoning similar to the Plaintiffs' reasoning here, the Supreme Court did not adopt that reasoning in Altria II, so the Court should disregard the First Circuit's reasoning.  See June Tr. at 34:14-23 (Biersteker).  The Defendants added that the First Circuit's reasoning -- and the Plaintiffs' -- is flawed, because it ignores the statutory text.  See June Tr. at 33:24-34-9 (Biersteker).  The Defendants also argued that a reasonable consumer would know to look at the side of a cigarette pack for warnings given that the Surgeon General's warning on the side of a pack is adequate under the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-1341 ("FCLAA").  See June Tr. at 35:11-24 (Biersteker); 15 U.S.C. § 1331.

Turning full-force to the reasonable consumer arguments, the Defendants contended that the Court can consider whether the contested advertising language is deceptive or misleading as a matter of law under rule 12(b)(6), and the Court agreed.  See June Tr. at 39:4-9 (Court, Schultz).  The Defendants maintained their position from their briefing that no reasonable consumer would believe that additive-free menthol cigarettes would not contain menthol.  See June Tr. at 40:19-23 (Schultz).

The Court responded with an analogy and asked whether a reasonable consumer would be deceived if Coca-Cola bottle's front labeling stated that there was no sugar in the product, but the back labeling stated there was sugar.  See June Tr. at 42:5-15 (Court).  The Defendants replied that the important difference between its case and the Court's analogy is the particular wording on Natural American's labeling; they averred that the language "menthol-flavored" and "the ingredients are organic tobacco and menthol" would alert "a consumer who chooses a menthol cigarette."  June Tr. at 42:16-25 (Schultz).  The Defendants again stressed that the one-hundred-percent additive-free tobacco labeling is true, because the menthol is "part of the cigarette," but "not part of the tobacco," June Tr. at 43:15-16 (Schultz), yet conceded that, when the cigarette is smoked, inevitably the menthol "is part of and touches the tobacco," id. at 43:19-23 (Court, Schultz).  See June Tr. at 43:6-8 (Schultz).

The Plaintiffs responded that there is a body of caselaw ruling that a reasonable consumer is not required to turn around a label to verify whether a representation on the front is truthful.  See June Tr. at 51:25-52:7 (Wolchansky).  The Plaintiffs also argued that consumers may not know much about menthol.  See June Tr. at 79:18-24 (Wolchansky).  The Plaintiffs added that, even if the Court accepts the Defendants' argument that tobacco is separate from the menthol while the cigarette remains unsmoked, it is still disingenuous to suggest that the tobacco is additive-free when, "the minute that you light that cigarette," the menthol, the chemicals, and "everything in that cigarette goes into your mouth and into your lungs."  June Tr. at 53:18-54:4 (Wolchansky).  The Plaintiffs explained that menthol is an "organic molecule . . . derived from mint," although it "it can [also] be synthesized chemically in a lab," June Tr. at 64:13-16 (Schlesinger), it "acts as an anesthetic," id. at 56:18 (Schlesinger), "numbs the throat," id. at 56:23-24 (Schlesinger), and makes the smoke "inhalable," id. at 57:4 (Schlesinger).  See June Tr. at 56:15-57:9 (Schlesinger).  The Plaintiffs also

argued that the Honorable Judge Gladys Kessler of the United States District Court for the District of Columbia already determined that Natural American's use of "the term 'natural' is unlawful," because it suggests that it "confer[s] health benefits," and the Plaintiffs ask the Court to "enforce her order." June Tr. at 58:8-21 (Schlesinger). See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006)(Kessler, J.).

The Plaintiffs argued that the natural, additive-free, and organic advertising misleads consumers into believing Natural Americans are safer or healthier. See June Tr. at 65:19-24 (Wolchansky). They contended that the disclaimer "does not mean that the front of the pack isn't misleading," June Tr. at 67:5-6 (Wolchansky), because the disclaimer is "buried," id. at 67:25 (Wolchansky), as "tiny text on the side of the pack," id. at 67:22-23 (Wolchansky), underneath the barcode and is phrased in a double negative, see June Tr. at 67:18-68:15 (Wolchansky). The Plaintiffs added that the FDA's Warning Letter[16] buttresses their position, because it tells the

---

[16]The Warning Letter reads, in pertinent part:

Your product labeling for Natural American Spirit cigarettes, which uses the descriptors "Natural" and "Additive Free," represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco related disease or are less harmful than one or more other commercially marketed tobacco products. As such, these products are modified risk tobacco products. As such, these products are modified risk tobacco products. Because these products are sold or distributed to customers in the United States without an appropriate FDA order in effect under section 911(g) of the FD&C Act (21 U.S.C. § 387k(g)), these products are adulterated under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8))

. . . .

The violations discussed in this letter do not necessarily constitute an exhaustive list. You should immediately correct the violations that are referenced above, as well as violations that are the same as or similar to those stated above, and take any necessary actions to bring your tobacco products into compliance with the FD&C Act.

Defendants that "Natural and Additive-free represents explicitly and/or implicitly that the products or their smoke do not contain or are free from a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful."  June Tr. at 69:3-14 (Wolchansky)(quoting Warning Letter at 2).  The Plaintiffs continued that, in addition to the Warning Letter, peer-reviewed articles conclude that consumers believe that Natural American cigarettes are healthier based on the terms natural, organic, and additive-free.  See June Tr. at 70:19-22 (Wolchansky); id. at 72:23-73:4 (Wolchansky).  See also June Tr. at 74:17-23 (Wolchansky)(noting that 63.9 percent of Natural American smokers think that Natural American cigarettes are less harmful than other brands); id. at 76:14-20 (Wolchansky)(noting that sixty percent of consumers believe that removing additives from cigarettes make them less dangerous to smoke).  The Plaintiffs argued that the caselaw the Defendants cite is inapposite, because, in those cases, the disclaimer is prominent, unlike Natural American's disclaimer.  See June Tr. at 82:6-19 (Wolchansky).

Returning to the Menthol Theory, the Court, again emphasized its concerns that the one-hundred-percent additive-free labeling misleads consumers.  See June Tr. at 87:5-6 (Court).  It also posited that the "100% Additive-Free" and "Natural Tobacco" labeling is not on one line, but two lines, and that the Plaintiffs might argue that the labeling conveys two separate messages.  June Tr. at 87:12-22 (Court).  The Defendants disagreed and argued that the labeling conveys one message.  See June Tr. at 87:23-88:1 (Schultz).  The Court also noted that the package's disclaimer focuses only on the advertising's additive term "and doesn't really address the issue about the natural" term.  June Tr. at 89:23-24 (Court).  See June Tr. at 89:9-24 (Court).  It further noted that the advertising disclaimers diverge from the packaging disclaimers.  See June Tr. at 91:2-10 (Court).  The Defendants rejoined that the FTC Consent Order does not require a packaging disclaimer, so, by

Warning Letter at 2-3.

inserting any disclaimer at all, they went beyond FTC's requirements. <u>See</u> June Tr. at 91:23-92:3 (Schultz). The Defendants added that the Amended Complaint does not address the FTC disclaimer, and argued that a reasonable consumer looks at both the advertising labels and the disclaimer. <u>See</u> June Tr. at 92:13-93:3 (Schultz). They also argued that the disclaimer does not contradict the natural or additive-free language, but "helps to amplify the meaning." June Tr. at 94:4-9 (Schultz). They continued that "natural" is a word with no meaning under the reasonable consumer standard, because "it can have different meanings in different contexts," so it cannot have a "safer cigarette" meaning that the Plaintiffs ascribe to it. June Tr. at 96:1-9 (Schultz).

The Court disagreed and thought that natural had some meaning, otherwise corporations would not use it on products, but it was not convinced that the natural term necessarily signals to a reasonable consumer that the cigarettes are safer. <u>See</u> June Tr. at 100:19-101:5. The Plaintiffs argued that, even if natural does not have a precise and fixed meaning, it still suggests to a reasonable consumer that Natural American cigarettes are not produced through human alteration or engineering. <u>See</u> June Tr. at 102:16-20 (Schlesinger). The Plaintiffs persisted that the natural labeling conveys a message that the Defendants wrap up the tobacco from the plants and sell the product as-is, and that additives associated with tobacco products "are gone" from Natural American cigarettes. <u>See</u> June Tr. at 102:21-103:10 (Schlesinger). The Court responded that natural's meaning might turn on the product sold; for example, a natural marshmallow might be different from a natural orange. <u>See</u> June Tr. at 123:15-25 (Court). The Plaintiffs rejoined that the "natural here means safer and healthier, and it also means that it is manufactured in a way that is natural," but "the truth is, it's not." June Tr. at 124:1-4 (Wolchansky). The Plaintiffs conceded that a reasonable consumer does not think that natural means that the cigarettes are hand rolled, <u>see</u> June Tr. at 124:16-17 (Wolchansky), but argued that whether flue curing the cigarettes or packing the cigarettes

with nicotine is a "natural" processes "is a question of fact for a jury," June Tr. at 124:19-20 (Wolchansky). The Plaintiffs explained that, in its natural state, tobacco or cigarettes are uninhalable; it is only when the cigarettes are flue cured that cigarettes become inhalable. See June Tr. at 128:8-20 (Schlesinger). The Plaintiffs acknowledged that there is no defined meaning for what a natural manufacturing process is, but emphasized that no reasonable consumer believes that flue curing and the other processes, which the Defendants use to make their cigarettes, are natural. See June Tr. at 126:14-25 (Wolchansky). The Court concluded that it was inclined to let the Menthol Theory proceed, but to dismiss the other two theories. See June Tr. at 133:10-21 (Court).

Turning to the common-law claims, the Defendants argued that rule 8(b) does not allow the Plaintiffs to plead unjust enrichment in the alternative, because a federal rule of civil procedure cannot alter state substantive law. See June Tr. at 144:14-18 (Biersteker). They explained that equity fills in the gaps that legal remedies leave, and that, because the Plaintiffs have an available legal remedy from the state statutes, unjust enrichment is improperly pled. See June Tr. at 145:8-21 (Biersteker). The Defendants concluded that there is no dispute that legal statutory remedies exist. See June Tr. at 146:7-8 (Biersteker).

**5.      The Supplemental Brief**.

On June 30, 2017, the Plaintiffs filed a supplemental brief addressing several issues raised during the June Hearing. See Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss and Consolidated Amended Class Action Complaint and Incorporated Memorandum of Law at 1, filed June 30, 2017 (Doc. 117)("Supp. Brief"). They assert three arguments: (i) whether a reasonable consumer is misled is typically a fact question that survives a motion to dismiss; (ii) the Defendants' disclaimer arguments are misplaced; and (iii) they have adequately pled their complaint to survive the rule 12(b)(6) standard. See Supp. Brief at 1-4. First, they assert that the Court's

function is not to weigh the evidence, but to assess whether the Plaintiffs have plausibly stated a claim. See Supp. Brief. at 4 (citing Walker v. THI of N.M. at Hobbs Ctr., 803 F. Supp. 2d 1287, 1330 (D.N.M. 2011)(Browning, J.)). They also aver that "the unanimous weight of case law authority holds that use of terms 'natural,' 'organic,' or 'additive-free' do mislead consumers into believing that cigarettes so labeled are safer or healthier." Supp. Brief at 5 (citing Disc. Tobacco & Lottery, Inc. v. United States, 674 F.3d 509, 536 (6th Cir. 2012); United States v. Phillip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.); United States v. Philip, 477 F. Supp. 2d 191, 197-98 (D.D.C. 2007)(Kessler, J.); Hunter v. Philip Morris USA Inc., 364 P.3d 439 (Alaska 2015)).

Second, the Plaintiffs argue that consumers are misled notwithstanding the disclaimer. See Supp. Brief at 11 (citing Amended Complaint ¶ 52, at 25). They contend that, under longstanding false advertising law, representations must be viewed in the context of the packaging or advertising as a whole, see Supp. Brief. at 11 (citing Penrod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 250 (4th Cir. 2011)), and "how consumers view these claims . . . as a whole . . . are questions of fact not appropriate for resolution at this stage," Supp. Brief at 11. They also argue that the disclaimer is so obscured on the package that it ineffectively warns a reasonable consumer. See Supp. Brief. at 12. Finally, they argue that a reasonable consumer is "impervious to health warnings and disclaimers," because Natural American smokers had "certainly seen and ignored health disclaimers on the packs of other brands" before switching, so the Court "should give little, if any, weight" to the disclaimers in deciding the Motion to Dismiss. Supp. Brief at 13.

Third, the Plaintiffs clarify that they do not argue that natural is misleading "simply because manufacturing steps must be taken to put their tobacco in cigarette form"; rather, they argue that the Defendants manufacturing processes do not conform to a reasonable consumers' understanding of

the natural term.  Supp. Brief at 13.  They maintain that the term natural is misleading, because Natural Americans undergo flue-curing processing, artificial blending, and engineering to boost nicotine.  See Supp. Brief at 14 (citing Amended Complaint ¶¶ 63-66, 72-73, at 30, 32-33).  They conclude, thus, that it is plausible that a reasonable consumer would believe that Natural American cigarettes were less chemically enhanced and less nicotine-laced than other cigarettes.  See Supp. Brief at 14.

   **6.**   **The Supplemental Response**.

   The Defendants responded to the Supp. Brief on July 14, 2017.  See Defendants' Response to Plaintiffs' Supplemental Brief at 1, filed July 14, 2017 (Doc. 124)("Supp. Resp.").  The Defendants argue that the Court can, and must, rule on the reasonable consumer arguments on a Motion to Dismiss.  See Supp. Resp. at 2-3 (citing Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013)(per curiam)(ruling that it is "well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer")).  The Defendants also state that the administrative and academic findings on the Defendants' advertising do not bind the Court on a motion to dismiss, and many of their findings are inapposite, because the reports did not consider the warning disclosure or are not final determinations.  See Supp. Resp. at 6-7.  The Defendants also argue that the Court can disregard survey data as immaterial where a reasonable consumer would acknowledge that the advertising is not false or misleading.  See Supp. Resp. at 8. The Defendants aver that their disclaimer still wards against the Plaintiffs' deceptive arguments as to the natural term, even though the disclaimer does not mention natural, because the disclaimer makes clear that the cigarettes are not safer than any other cigarette.  See Supp. Resp. at 10.  The Defendants conclude that the Plaintiffs' Amended Complaint does not support the refined processing theory that the Plaintiffs assert in their Supp. Brief.  See Supp. Resp. at 11.

7.      **The July Hearing**.

The Court held a hearing on July 20, 2017.  See Transcript of Motion Proceedings (taken July 20, 2017), filed August 10, 2017 (Doc. 126)("July Tr.").  The Defendants argued that, as to four states' laws, the Plaintiffs' unjust-enrichment claims fail, because the Plaintiffs do not properly allege that the advertising conveys a direct benefit to the Defendants.  See July Tr. at 35:6-17 (Biersteker).  They add that unjust enrichment is a "gap filler," and it is likely that those four states' laws narrow the unjust-enrichment remedy, "because numerous legal remedies already exist for consumers who have suffered as a result of deceptive advertising."  July Tr. at 11-17 (Biersteker). The Plaintiffs rejoined that, as to Michigan, the direct benefit element is no longer required.  See July Tr. at 37:10-18 (Wolchansky)(citing In re Automotive Parts Antitrust Litig., 29 F. Supp. 3d 982, 1021 (E.D. Mich. 2014)(Battani, J.)).  They also countered that there are cases from the other three states that similarly obviate the direct-benefit requirement.  See July Tr. at 38:11-40:1 (Wolchansky)(citing Stewart v. Beam Global Spirits & Wine, Inc., 877 F. Supp. 2d 192 (D.N.J. 2012)(Hillman, J.); Paika v. General Motors Corp., No. 07-0892, 2009 WL 275761 (E.D. Cal. Feb. 5, 2009)(Darmell, J.)).

Regarding the pre-suit notice requirement for the express warranty claims, the Defendants admitted that the Amended Complaint alleges that the Plaintiffs performed "all conditions precedent to defendants' liability," July Tr. at 41:3-6 (Biersteker)(quoting Amended Complaint ¶ 456, at 104), but the Defendants contended that the Amended Complaint's allegation is "legally insufficient," July Tr. at 41:13-14 (Biersteker).  The Defendants added that filing the Amended Complaint is insufficient for pre-suit notice in Illinois, North Carolina, and New York.  See July Tr. at 43:11-14 (Biersteker).  They argue that the Plaintiffs' cases to the contrary are personal injury cases, so are inapplicable here.  See July Tr. at 43:14-15 (Biersteker); id. at 44:12-18 (Biersteker).  The Plaintiffs

countered that their Amended Complaint serves as pre-suit notice as do the FDA and FTC letters on these issues, see July Tr. at 48:12-13 (Wolchansky), and that "there is unquestionably knowledge here," July Tr. at 49:25-50:1 (Wolchansky).

Turning to the privity requirement, the Defendants admitted that three states grant an exception to the privity requirement, see July Tr. at 45:14-15 (Biersteker), but the Defendants averred that courts routinely dismiss express warranty claims "based on product packaging and labels," which involve economic loss, as here, July Tr. at 45:15-18 (Biersteker). The Plaintiffs rejoined that recent federal Florida cases have denied motions to dismiss for breaches of express warranties on similar facts. See July Tr. at 50:2-52:4 (Wolchansky)(citing Hill v. Hoover, 899 F. Supp. 2d 1259 (N.D. Fla. 2012)(Mickle, J.); Smith v. Wm. Wrigley Jr. Co., 663 F. Supp. 2d 1336 (S.D. Fla. 2009)(Cohn, J.); Garcia v. Kashi, 43 F. Supp. 3d 1359 (S.D. Fla. 2014)(Leonard, J.)). The Plaintiffs continued that other courts provide similar authority for their position. See July Tr. at 52:11-53:23 (Wolchansky)(citing Mednick v. Precor, Inc., No. 14-4231, 2014 WL 6474915 (N.D. Ill Nov. 13, 2014)(Leinenweber, J.); Baldwin v. Star Scientific, Inc., 78 F. Supp. 3d 724 (N.D. Ill. 2015)(Pallmeyer, J.); Mahoney v. Endo Health Solutions, Inc., No. 15-9841, 2016 U.S. Dist. LEXIS 94732 (S.D.N.Y. July 20, 2016)(Cote, J.)).

Turning to the injunctive relief requested, the Defendants conceded that the Memorandum of Agreement does not cover their use of "natural" in Natural American's brand name, so the requested injunctive relief, as to that specific use of natural, is not rendered moot. July Tr. at 55:4-56:24 (Biersteker). The Plaintiffs also argued that the Memorandum of Agreement is not a "final document," so it does not render moot their request for injunctive relief. July Tr. at 59:20-21 (Wolchansky). They continued that the FDA was recently sued over Santa Fe Tobacco's use of natural, and that litigation places the Memorandum of Agreement in jeopardy. See July Tr. at 60:3-

13 (Wolchansky); id. at 60:16-20 (Wolchansky); id. at 60:24-61:4 (Wolchansky). The Defendants rejoined that the Memorandum of Agreement "is final," July Tr. at 62:23-24 (Biersteker), but conceded that, if the pending lawsuit against the FDA is successful, "it would vacate the memorandum," July Tr. at 64:3-4 (Biersteker). They also asserted, however, that the Defendants will not "risk alienating the FDA" by contravening the Memorandum of Agreement. July Tr. at 66:6-11 (Biersteker).

The Court asked the Defendants whether, in light of the Plaintiffs' supplemental argumentation that, based on studies that terms, such as natural, mislead many consumers, it should reconsider its earlier inclination that the Plaintiffs' safer-cigarette theory is flawed. See July Tr. at 67:2-16 (Court); id. at 27:25-68:8 (Court). The Defendants countered that the studies, which the Plaintiffs present, do not stand for the proposition that the Plaintiffs suggest that they support. See July Tr. at 68:13-19 (Schultz). The Plaintiffs rejoined that, although they cite only one study in their Amended Complaint, there are numerous studies supporting their position and that they will file those studies with the Court. See July Tr. at 74:7-16 (Wolchansky).

**8.      Continued Oral Argument**.

On July 21, 2017, the Plaintiffs filed a Notice of Filing Hearing Exhibit, filed July 21, 2017 (Doc.125), which includes their Continued Oral Argument on Defendants' Motion to Dismiss, see Continued Oral Argument on Defendant's Motion to Dismiss, filed July 21, 2017 (Doc. 125-1)("Cont. Arg."). The Plaintiffs argue that a 2016 study supports their argument that Natural American cigarettes' disclaimers ineffectively warn consumers. See Cont. Arg. at 3 (citing Misperceptions, at 1-4). The Plaintiffs explain that the study concludes that many Natural American cigarette smokers believe that Natural American cigarettes are less harmful than other cigarettes, and, thus, the disclaimer ineffectively corrects consumers' perceptions. See Cont. Arg. at 3-4

(noting that 63.9 percent of Natural American cigarette smokers believe their brand is less harmful). The Plaintiffs also cite a 2007 study for the proposition that "consumers frequently conclude 'natural' cigarettes must be healthier, and tobacco companies have understood this for decades." Cont. Arg. at 4 (citing Patricia McDaniel & Ruth E. Malone, I Always Thought they were all Pure Tobacco: American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies, 16 Tobacco Control e7 (2007), available at http://www.ncbi.nlm.gov/pmc/articles/PMC2807204/). They continue that a 2004 survey demonstrates that sixty percent of smokers think that removing additives makes cigarettes safer. See Cont. Arg. at 5 (citing K.M. Cummings, Are Smokers Adequately Informed About the Health Risks of Smoking and Medicinal Nicotine?, Nicotine & Tobacco Research 6(3): S333-340 (2004)). They also aver that Reynolds American market research confirms that consumers believe that the additive-free descriptor conveys a safer or healthier message, and that a 2016 study reveals that the "100% Additive Free" descriptor communicates lower health risks to consumers. Cont. Arg. at 5. The Plaintiffs argue that, despite the healthier message that consumers perceive from Natural American's natural and additive-free descriptors, studies show that Natural American cigarettes have higher ash and heavy-metal levels than other cigarettes. See Cont. Arg. at 6.

The Plaintiffs also argue that several cases, not previously cited, support their position. See Cont. Arg. at 3, 10-19. For example, the Plaintiffs cite to Discount Tobacco City & Lottery, Inc., 674 F.3d 509 (6th Cir. 2012), for the proposition that "naturalists prefer" products with organic and natural labeling, "because they believe the product confer health advantages." Cont. Arg. at 3 (citing Discount Tobacco City & Lottery, Inc., 674 F.3d at 536). They also argue that the United States Court of Appeals for the Seventh Circuit has ruled that a literal falsehood is not required for liability to attach. See Cont. Arg. at 10 (citing Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 761 (7th Cir.

2014)("[The district court] appears to assume that a package cannot be misleading if it does not contain literal falsehoods. But that is not the law.")(alterations in original)). The Plaintiffs also argue that four federal district courts have determined that a natural descriptor misleads a reasonable consumer. See Cont. Arg. at 12-19 (citing Martin v. Tradewinds Beverage Co., No. 16-9249, 2017 U.S. Dist. LEXIS 72698 (C.D. Cal. Apr. 27, 2017)(Gutierrez, J.); In re Frito-Lay N. Am., Inc., No. 12-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)(Mauskopf, J.); Burton v. Hodgson Mill, Inc., No. 16-1081, 2017 WL 1282882 (S.D. Ill. Apr. 6, 2017)(Reagan, J.); Segedie v. Hain Celestial Grp. Inc., No. 14-5029, 2015 WL 2168374 (S.D.N.Y. May 7, 2015)(Roman, J.)).

Regarding their unjust-enrichment claims, the Plaintiffs argue that their allegations are viable in every state for various reasons. See Cont. Arg. at 23. They argue that: (i) it is premature to dismiss their unjust-enrichment claims at the rule 12(b)(6) stage in Massachusetts, Michigan, North Carolina, and Washington; (ii) their claims satisfy the requisite elements in New Jersey and New York; (iii) their Colorado claim may proceed as a restitution-based remedy; (iv) no New Mexico statute expressly bars their New Mexico claim; and (v) Ohio law allows the Plaintiffs to plead their unjust-enrichment claim in the alternative. See Cont. Arg. at 23. They also argue that, under New Jersey, North Carolina, and Ohio unjust-enrichment law, they do not need to show that the Defendants receive a direct benefit. See Cont. Arg. at 26-28 (citing Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 921 (4th Cir. 2003)(unpublished); Stewart v. Beam Global Spirits, 877 F. Supp. 3d 192, 200 (D.N.J. 2012)(Hillman, J.)). Finally, the Plaintiffs assert that the privity requirement does not bar their breach-of-express-warranty claims in Florida, New York, and Illinois, because the requirement is relaxed in packaging and economic damage cases. See Cont. Arg. at 32-35.

9.      **Supplemental brief on the Memorandum of Agreement.**

On November 29, 2017, the Defendants filed a supplemental brief concerning the Memorandum of Agreement.  See Santa Fe Natural Tobacco Company's Supplemental Brief in Support of Motion to Dismiss Responding to the Court's Question Regarding Status of Agreement with FDA Regarding NAS Product Labeling and Advertising, filed November 29, 2017 (Doc. 136)("Supp. Brief on Mem.").  The Defendants argue that they complied with the Memorandum of Agreement and are no longer utilizing additive-free and natural on their labeling, advertising, and promotional material except for natural in the Natural American brand name.  See Supp. Brief on Mem. ¶ 6, at 3.  They conclude that the Memorandum of Agreement's paragraph two does not require them to remove or recall products that still have the terms natural and additive-free on them.  See Supp. Brief on Mem. ¶ 7, at 3.

## LAW REGARDING RULE 12(B)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true

all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (2009)(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. <u>See Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570; <u>Mink v. Knox</u>, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." <u>Ridge at Red Hawk, LLC v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, __ F. Supp. 3d __, 2017 WL 4402422, at *9 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See also Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint" "central to [the plaintiff's] claim," and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court

improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186–87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x. 529, 534 n.4 (10th Cir. 2005)(unpublished).[17] In Douglas v. Norton, 167 F. App'x. 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Court analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x. at 704–05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements. See Mocek v. City of Albuquerque, No. Civ. 11-1009, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither

_____

[17]Nard v. City of Okla. City is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, Douglas v. Norton, How v. City of Baxter Springs, Good v. Fuji Fire & Marine, Ins. Co., Hodgson v. Farmington City, and FTC v. LoanPointe, LLC have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff only cited the statements to attack their reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired, in the Court's ruling. See Great Am. Co. v. Crabtree, No. 11-1129, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.). The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference, or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, No. 11-1009, 2013 WL 312881, at *50 (D.N.M. 2013)(Browning, J.)(refusing to consider statements that were not "central to [the Plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs' adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006–3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18

(D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

### LAW REGARDING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). "Adjudicative facts are simply the facts of the particular case." United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested. See Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). That judicial notice may be taken during any stage of the judicial proceeding includes the motion to dismiss stage. See 21 B C. Wright & K. Graham, Jr., Fed. Prac. & Proc. Evid. § 5110, at 294 & n.17 (2d ed. 2005). Moreover, while ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the Complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, No. 08–0756, 2009 WL 2482171, at *7 (D.N.M. July 27, 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)). Also, when considering a motion to dismiss, "the court is permitted to take judicial

notice of its own files and records, as well as facts which are a matter of public record." <u>Van Woudenberg v. Gibson</u>, 211 F.3d 560, 568 (10th Cir. 2000) <u>abrogated on other grounds</u>, <u>McGregor v. Gibson</u>, 248 F.3d 946, 955 (10th Cir. 2001). The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein. <u>See Tal v. Hogan</u>, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). The Court has previously judicially noticed news publications and public filings with the Securities and Exchange Commission. <u>See S.E.C. v. Goldstone</u>, 952 F. Supp. 2d at 1219-20; <u>In re Thornburg Mortg., Inc. Securities Litig.</u>, 2009 WL 5851089, at *3-4. <u>See also Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs</u>, __ F. Supp. 3d __, 2017 WL 4402422, at *18-19 (D.N.M. 2017)(Browning, J.)(ruling that the Court may take judicial notice of state court orders); <u>A.M ex rel. Youngers v. New Mexico Dep't of Health</u>, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

## <u>LAW REGARDING PREEMPTION</u>

Article VI, clause 2, of the Constitution provides that the United States of America's laws "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'" <u>Altria II</u>, 555 U.S. at 75 (quoting <u>Maryland v. Louisiana</u>, 451 U.S. 725, 746 (1981)). The Supreme Court has summarized the following situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).

As noted, preemption may be express or implied. See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case"). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." Altria II, 555 U.S. at 77. When the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). Preemption arguments are analyzed under rule 12(b)(6), 12(c), or 56. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012); Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013).[18]

---

[18]There may be a conflict between the United States Courts of Appeals regarding which rule governs a district court's review of preemption arguments. The United States Court of Appeals for the Fifth Circuit has noted that preemption is not a jurisdictional question, so rule 12(b)(1) is inappropriate. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012). Instead, it has held that

> Federal preemption is an affirmative defense that a defendant must plead and prove. Unless the complaint itself establishes the applicability of a federal-preemption defense -- in which case the issue may properly be the subject of a Rule 12(b)(6) motion -- a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

Fisher v. Haliburton, 667 F.3d at 609. See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013)("[T]he appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either Rule 12(b)(6) or for summary judgment."). The United States Court of Appeals for the Sixth Circuit has explained that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004). See Boler v. Earley, 865 F.3d 391, 400 n.3 (6th Cir. 2017)("We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court incorrectly addressed this issue as jurisdictional."). "Rather, the doctrine generally concerns the merits of the claim itself."

Determining express preemption's scope entails scrutinizing the statutory text in light of two presumptions. First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485. Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. at 485.

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486.

Implied conflict preemption is found when it is impossible for a private party to comply with

---

Trollinger v. Tyson Foods, Inc., 370 F.3d at 608. See also Metropolitan Edison Co. v. Pennsylvania Public Utility Com'n, 767 F.3d 335, 362 (3d Cir. 2014)(noting that "pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction" but that "'[d]octrines of federal pre-emption . . . may in some contexts be controlling' over 'the general rule of finality of jurisdictional determinations.'")(quoting Durfee v. Duke, 375 U.S. 106, 114 (1963)).

The United States Court of Appeals for the Ninth Circuit, however, has affirmed a case's dismissal on preemption grounds under rule 12(b)(1) without comment as to the appropriateness of that rule to preemption arguments. See Cedars-Sinai Medical Center v. National League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007). The United States Court of Appeals for the Seventh Circuit has also dismissed a claim under rule 12(b)(1) on preemption grounds, but only where the federal law preempted the state law claim, and the federal law did not provide a private right of action. Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 594-96 (7th Cir. 2001). The Tenth Circuit does not appear to have taken a definitive position on the issue. In Ryan v. Donley, 511 F. App'x 687 (10th Cir. Feb. 14, 2013), the Tenth circuit affirmed a district court's dismissal of a Whistleblower Protection Act, 5 U.S.C. §§ 1201-1209, claim pursuant to rule 12(b)(1) noting that "there can be no such claim, due to preemption by the Civil Service Reform Act." 511 F. App'x at 690. Dismissal for lack of subject matter under rule 12(b)(1) in that case appears proper, however, because the Civil Service Reform Act's "preemption" means that the Whistleblower Protection Act does not provide a private right of action, so there is no federal question jurisdiction. The Tenth Circuit has not otherwise commented on this issue.

both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

Obstacle preemption is one form of implied preemption. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). The Supreme Court instructed that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990). In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, in a five-to-four decision, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. Justice

Stevens, in dissent, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> [s]erves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard. See 537 U.S. at 70. In so doing, the Supreme Court considered and rejected an argument that the Coast Guard's decision not to adopt a regulation requiring propeller guards impliedly preempted state-law claims, which inflicted liability for lack of a propeller guard. See 537 U.S. at 65. It explained:

> The decision in 1990 to accept the subcommittee's recommendation to take no regulatory action left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur. This, however, is not such a case.

537 U.S. at 65.

In Altria II, the Supreme Court again considered the implied preemption doctrine and rejected the defendants' obstacle-preemption argument that the FCLAA, preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See 555 U.S. at 90-91. In Altria II, the plaintiffs filed suit against defendant cigarette manufactures for deceptively

marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See 555 U.S. at 73. The Supreme Court concluded that the FCLAA, which forbids state law from requiring or prohibiting language with respect to cigarette advertising and promotion, presented no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulated warning labels, and did not regulate false or misleading statements. See 555 U.S. at 82-83. The Supreme Court also considered whether an FTC guidance statement, which noted that "a factual statement of the tar and nicotine content . . . would not violate the FTC Act," impliedly preempted the Plaintiffs' claims. 555 U.S. at 87. The Supreme Court contemplated and rejected the cigarette manufacturers' argument that the FTC's statement "authorized them to use descriptors" such as "light or low tar," because the FTC statements did not require that cigarette manufacturers disclose their tar and nicotine yields, and the United States "Government itself disavows any policy authorizing the use of light and low tar descriptors." 555 U.S. at 88. Moreover, the Supreme Court determined that an FTC consent order that prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless they are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content" does not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement." 555. U.S. at 589 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state-law claims. See 555 U.S. at 90.

In Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co. rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 555 U.S. at 581. The Supreme Court held that

it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)("FDCA")].

Wyeth v. Levine, 555 U.S. at 581. In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, noting that the decision in that case is based on the substantive regulation's "complex and extensive" history at issue. 555 U.S. at 566. The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." 555 U.S. at 609. Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166–67).

Of particular import for the current status of implied obstacle preemption is Justice Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas continued:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional

purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

555 U.S. at 587. Justice Thomas emphasized that, when analyzing the federal statutes' or regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution. 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).[19]

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption. See Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion). In Arizona v. United States, 567 U.S. 387 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. See 567 U.S. at 398-99. The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." 567 U.S. at 406. With Justice Kagan taking no part in the

---

[19]Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), recently concluded, however, that federal law preempted inconsistent state laws on generic drug labeling, because it was impossible to comply with both federal law and the states' law. See 564 U.S. at 617–618. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case are distinguishable. See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

consideration or decision of the case, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." 567 U.S. at 406. The Supreme Court ruled that Congressional intent was clear; Congress had considered and rejected penalizing aliens who sought unauthorized employment. See 567 U.S. at 405. Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted. See 567 U.S. at 407.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption"). Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012). As the defendant in Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the United States invoked only conflict preemption to dismiss Colorado's claims against it. See 693 F.3d at 1222. "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted)). In Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the state of Colorado created a schedule for the United

States to follow in the destruction of hazardous waste stored in the state, in an attempt to prohibit the storage of hazardous waste within the state. See 693 F.3d at 1223. The Tenth Circuit held that the state statute creating this schedule conflicted with a federal statute, which mandated a deadline for the destruction of the materials. See 693 F.3d at 1224. The Tenth Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility with which Congress had intended in its deadline. See 693 F.3d at 1224. Because the Colorado deadline would interfere with the method that Congress had intended for the waste's disposal, the Tenth Circuit concluded that the state law is in conflict with the federal law, and therefore, that the federal law preempts Colorado's schedule. See 693 F.3d at 1224.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[20] If the Court finds only an opinion from the Court of

---

[20]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the

Appeals of New Mexico, the Court "certainly may and will consider the Court of Appeal[s'] decision in making its determination, [but] the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[21]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico law.  See

---

state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct; such predictions produce disparate results between cases filed in state and federal courts, because state supreme court precedent, even when it is outdated, usually binds state trial courts.  The factors to which a federal court should look before predicting that a state supreme court will overrule its precedent vary depending upon the case, but such factors consistently include: (i) the age of the state supreme court decision in question -- the younger the state case, the less likely departure is warranted; (ii) the doctrinal reliance, or lack thereof, that the state courts -- especially the state supreme court -- have placed on the state decision; (iii) apparent shifts away from the doctrine that the state decision articulates, especially more recent state supreme court decisions that explicitly call an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if most of the dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, if a federal court predicts that a state supreme court decision would be overruled, that decision is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[21]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the

Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[22]  Ultimately,

"the Court's task is to predict what the state supreme court would do."  Wade v. EMCASCO Ins.

State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[22]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres

too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the judge's identity pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court

notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in

which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp, 353 F.3d at 866. From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous

Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie doctrine instructs that federal courts must apply state substantive law and federal procedural law."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017)("Racher").  "If a federal rule of civil procedure answers the question in

---

formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

dispute, that rule governs our decision so long as it does not 'exceed[] statutory authorization or Congress's rulemaking power.'" Racher, 871 F.3d at 1162 (quoting Shady Grove Orthopedic Assocs. v. Allstate Ins. Co, 559 U.S. 393, 398 (2010)("Shady Grove")). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in Shady Grove, as laid out by Justice Stevens in his concurring opinion." Racher, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, i.e., it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher, 871 F.3d at 1163-64. A state law is substantive if after examining "the language and policy of the rule in question . . . the primary objective is directed to influencing conduct through legal incentives," and a state law is procedural if the law's purpose is to "achiev[e] fair, accurate, and efficient resolutions of disputes." Sims v. Great American Life Ins. Co., 469 F.3d 870, 883 (10th Cir. 2006). See Leon v. FedEx Ground Package Sys., Inc., 313 F.R.D. 615, 641 (D.N.M. 2016)(Browning, J.). The Tenth Circuit recently added: "If a state law 'concerns merely the manner and means' by which substantive rights are enforced, it is procedural, but if its application would 'significantly affect the result of litigation, it is substantive.'" Racher, 871 F.3d at

1164 (quoting <u>Guaranty Trust Co. v. York</u>, 326 U.S. 99, 109 (1945)).

## LAW REGARDING SEVERANCE UNDER RULE 21

A district court may sever a case under Rule 21 to "transfer one action while retaining jurisdiction over the other." <u>Chrysler Credit Corp. v. Country Chrysler, Inc.</u>, 928 F.2d 1509, 1519 (10th Cir. 1991)(citing <u>Wyndham Assoc. v. Bintliff</u>, 398 F.2d 614, 618 (2d Cir.1968)). Courts are mindful of judicial efficiency concerns, however, and might not sever and transfer a case when doing so results in two venues hearing virtually the same case based on the same set of facts. <u>See</u>, <u>e.g.</u>, <u>Gallery House, Inc. v. Yi</u>, 587 F. Supp. 1036, 1039-40 (N.D.Ill.1984)("When the most efficient administration of justice in a copyright infringement action compelled the continuation of the action against both defendants in a single forum, severance of the claim against one defendant as to whom transfer would have been permissible was inappropriate.").

> [T]he court must weigh carefully whether the inconvenience of splitting the suit outweighs the advantages to be gained from the partial transfer [and] should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issue to be litigated in two cases.

<u>Liaw Su Teng v. Skaarup Shipping Corp.</u>, 743 F.2d 1140, 1148 (5th Cir.1984), <u>overruled on other grounds by</u> <u>In re Air Crash Disaster Near New Orleans, La.. on July 9, 1982</u>, 821 F.2d 1147 (5th Cir.1987). When the granting of a motion to sever and transfer claims would require two separate sets of discovery proceedings with regard to events surrounding a single [event], and when the moving defendants were alleged to have acted singly and in concert with other defendants in the commission of securities law violations, severance prior to the completion of discovery was denied. <u>Sec. & Exchange Comm'n v. Nat'l Student Mktg. Corp.</u>, 360 F. Supp. 284, 296 (D.D.C. 1973)(Parker, J.).

## LAW REGARDING THE FIRST AMENDMENT

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This clause -- the Free Speech Clause -- may act as a shield to liability in instances where otherwise illegal or unlawful conduct implicates a party's freedom of speech. See Marsh v. Alabama, 326 U.S. 501, 509 (1946)(ruling that the Free Speech clause shielded a Jehovah's witness who distributed religious material on a company town's sidewalk from criminal trespass charges). "It is, of course, commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." Hudgens v. N.L.R.B., 424 U.S. 507, 513 (1976). State action, thus, is typically a prerequisite for First Amendment protections. See Hudgens v. N.L.R.B., 424 U.S. at 520-21.

### 1. The First Amendment and State Action.

For most of American history, enforcing the common law was not thought to implicate state action. See Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. 1650, 1656 (2009). In Coppage v. Kansas, 236 U.S. 1, 17 (1915), the Supreme Court ruminated:

> [I]t is self evident that, unless all things are held in common, some persons must have more property than others, it is from the nature of things impossible to uphold freedom of contract and the right of private property without at the same time recognizing as legitimate those inequalities of fortune that are the necessary result of the exercise of those rights.

Coppage v. Kansas, 236 U.S. at 17 overruled in part Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 187 (1941). After the New Deal, the state action doctrine underwent a radical transformation, and the Supreme Court ruled that various judicial actions amounted to state action where, previously, those actions likely would not have. See Shelley v. Kraemer, 334 U.S. 1, 18-19 (1948)(ruling that judicial enforcement of racially restrictive covenants is state action); New York Times Co. v.

Sullivan, 376 U.S. 254, 265 (1964)(holding that state adjudication of a libel lawsuit is state action);

Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991)("Our cases teach that the application of state

rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes

'state action'").  In Shelley v. Kraemer, the Supreme Court explained:

> The short of the matter is . . . the action of the States to which the [Fourteenth]
> Amendment has reference, includes action of state courts and state judicial officials.
> Although, in construing the terms of the Fourteenth Amendment, differences have
> from time to time been expressed as to whether particular types of state action may
> be said to offend the Amendment's prohibitory provisions, it has never been
> suggested that state court action is immunized from the operation of those provisions
> simply because the act is that of the judicial branch of the state government.

334 U.S. at 18.  Thus, as the Supreme Court has recently reaffirmed, the Free Speech Clause "can

serve as a defense in state tort suits."  Snyder v. Phelps, 562 U.S. 443, 451 (2011).  See N.A.A.C.P.

v. Claiborne Hardware Co., 458 U.S. 886 n.51 (1982)("Although this is a civil lawsuit between

private parties, the application of state rules of law by the Mississippi state courts in a manner

alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth

Amendment.")

The state action doctrine as applied to judicial enforcement of statutory and common-law

claims has limits.  See Solove & Richards, Rethinking Free Speech and Civil Liability, 109 Colum.

L. Rev. at 1664.  For example, the Supreme Court has limited the same state action rationale in the

property-law context.  See Hudgens v. N.L.R.B., 424 U.S. at 513; Lloyd Corp., Ltd. v. Tanner, 407

U.S. 551, 570 (1972).  In Hudgens v. N.L.R.B., the Supreme Court considered whether the First

Amendment protected union members picketing in a privately owned shopping center from a threat

of criminal trespass charges.  See Hudgens v. N.L.R.B., 424 U.S. at 508.  In considering that issue,

the Supreme Court explained:

> It is, of course, a commonplace that the constitutional guarantee of free speech is a
> guarantee only against abridgement by government, federal or state.  Thus, while

> statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

Hudgens v. N.L.R.B., 424 U.S. at 513 (citation omitted). In ruling that the First Amendment did not apply, the Supreme Court emphasized that: "In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on State action, not on action by the owner of private property used nondiscriminatorily for private purposes only." Hudgens v. N.L.R.B., 424 U.S. at 519 (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. at 567). See Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 547 (1972)("The First and Fourteenth Amendments are limitations on state action, not action by the owner of private property used only for private purposes."). The Supreme Court concluded, thus, that the First Amendment offered no protection to the picketers, because the shopping center was a private entity and not "the functional equivalent of a municipality." Hudgens v. N.L.R.B., 424 U.S. at 520.

The Supreme Court has also stated that private party conduct may be deemed state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing the private parties' conduct. 457 U.S. at 937. The Lugar v. Edmondson Oil Co., Inc. test's first prong -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the] Defendant's private decision." 457 U.S. at 940. The Supreme Court, in Lugar v. Edmondson Oil Co., Inc., further instructed that the second prong, identification of a defendant as a state actor, may arise, "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." 457 U.S. at 937.

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that the defendants unlawfully deprived the plaintiff of his property without due process under state law failed to state a claim under 42 U.S.C. § 1983. See 457 U.S. at 940. The Supreme Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action. See 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. See 457 U.S. at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co.,

457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[ ] an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar*, 457 U.S. at 936. . . . Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. *See id.* . . . Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004). According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, [see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts and weighing [of] evidence.'" Phelps v. Wichita Eagle–Beacon, 886 F.2d 1262, 1271 (10th Cir.1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722(1961)). In Gilmore v. City of Montgomery, the Supreme Court ruled that, although it was the Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised. The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."

Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir.1986)(unpublished).  In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action.  1986 WL 16606, at *1.  The Sixth Circuit concluded that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief."  1986 WL 16606, at *2.  The Sixth Circuit noted that the application of the state action test is a "very difficult and complex question[]," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action.  See 1986 WL 16606, at *2-3.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir.1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation")(internal quotation marks omitted)).  Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because while many functions may be traditionally

governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456. The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982). A court determines, under the nexus test, whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a

particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (internal quotation marks and citations omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook Cty., 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir.1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both *Carey v. Continental Airlines Inc.,* 823 F.2d 1402 (10th Cir. 1987), and *Lee v. Town of Estes Park,* 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey,* 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1429 (10th Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S. Ct. 65, 88 L.Ed.2d 53 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard. In *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." *Id.* at 1345.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453-56. The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." 49 F.3d at 1453. The Tenth Circuit ruled that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate private parties' acts that, if a state conducted, would be unconstitutional, through affirmative action. See Soldal v. Cook Cty., 506 U.S. at 60 n.4.

## 2. **Commercial Speech.**

The Supreme Court's First Amendment decisions create a rough hierarchy in the constitutional protection of speech. See Snyder v. Phelps, 562 U.S. at 452; R.A.V. v. St. Paul, 505 U.S. 377, 422 (1992)(Stevens, J. dissenting). "Core political speech occupies the highest, most

protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all." R.A.V. v. St. Paul, 505 U.S. at 422 (Stevens, J. dissenting). Commercial speech is "speech that does no more than propose a commercial transaction." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976). See Central Hudson, 447 U.S. at 561("The Commission's order restricts only commercial speech, that is, expression related solely to the economic interests of the speaker and its audience."). The following characteristics indicate that speech is commercial speech: (i) if the speech is contained in an advertisement; (ii) if it is made with an economic motive; or (iii) if it refers to a specific product. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1274 (10th Cir. 2000). A representation, however, is not automatically commercial speech because it contains one or more of the preceding characteristics. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274.

The Supreme Court, in Central Hudson, provided the analytical framework to determine what kind of commercial speech is entitled to First Amendment protection. See Central Hudson, 447 U.S. at 564. It explained:

> The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.

Central Hudson, 447 U.S. at 563. The government has, accordingly, the power to regulate deceptive or commercial speech related to an illegal activity, but less power to regulate lawful and non-misleading commercial speech. See Central Hudson, 447 U.S. at 564. Before proceeding to the Central Hudson balancing test, a court must perform a threshold inquiry to determine whether the speech is non-misleading and concerns lawful activity. See Central Hudson, 447 U.S. at 566. "At

the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." Central Hudson, 447 U.S. at 566. See Revo v. Disciplinary Bd. of the Supreme Court for the State of N.M., 106 F.3d 929, 932 (10th Cir. 1997)("Revo").

If a court determines that the speech is commercial, lawful, and not deceptive, the Court proceeds to a three-part balancing test. See Central Hudson, 447 U.S. at 564-66. "If the communication is neither misleading nor related to unlawful activity . . . we ask whether the asserted governmental interest is substantial. . . . [W]e must [next] determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Central Hudson, 447 U.S. at 564, 566. See Revo, 106 F.3d at 932. The Tenth Circuit has expressed the Central Hudson test in following manner:

> As a threshold inquiry under *Central Hudson,* we must determine whether the particular advertisement is protected speech -- *i.e.,* whether it concerns lawful activity and is not misleading. If not, the speech may be freely regulated. Protected commercial speech may also be regulated, but only if the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest.

Revo, 106 F.3d at 932 (citations omitted). "[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." Central Hudson, 447 U.S. at 565.

In considering the threshold inquiry -- whether the speech concerns lawful activity and is not misleading -- Supreme Court jurisprudence has drawn distinctions between misleading commercial speech, potentially misleading commercial speech, and truthful commercial speech. See e.g., In re

R.M.J., 455 U.S. 191, 203 (1982).[23]  Misleading commercial speech may be prohibited entirely without a Central Hudson analysis.  See In re R.M.J., 455 U.S. at 203.[24]  The Central Hudson balancing test, however, applies when the speech is potentially misleading or when it is truthful.  See In re R.M.J., 455 U.S. at 203. See also Revo, 106 F.3d at 933.  Potentially misleading speech occurs when "the information also may be presented in a way that is not deceptive." In re R.M.J., 455 U.S. at 203.  Commercial speech is not "potentially misleading" simply with the "rote invocation of the words"; the party asserting that the speech is potentially misleading must "point to . . . harm that is potentially real, not purely hypothetical."  Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, 512 U.S. 136, 146 (1994).  In contrast, inherently misleading speech is "incapable of being presented in a way that is not deceptive." Revo, 106 F.3d at 929.  In Revo, for example, the Tenth Circuit considered whether direct mailing advertisements from a personal injury attorney "inevitably convey a false message that soliciting lawyers are more experienced, tougher, more skillful, and better qualified than non-soliciting lawyers, notwithstanding the fact that the letters themselves make no reference to those attributes." Revo, 106 F.3d at 933. The Tenth Circuit concluded that the mailings could not be inherently misleading, because the defendants "offer[ed] no proof that some other qualified lawyer who could superbly represent

---

[23]Although In re R.M.J., considered commercial speech "in the context of advertising for professional services," In re. R.M.J., 455 U.S. at 203, Courts of Appeals have applied the case to other commercial speech contexts, see e.g., Discount Tobacco City & Lottery Inc., v. United States, 674 F.3d 509, 524 (6th Cir. 2012)(citing In re R.M.J., 455 U.S. at 203).

[24]Justice Marshall subsequently suggested, more broadly, that "[s]tates may prohibit actually or inherently misleading commercial speech entirely."  Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. 91, 111 (1990)(Marshall, J. concurring).  Whether speech is "actually misleading" requires a separate, factual inquiry from the inherently misleading analysis, and, if the record reveals that someone has been misled, the state can prohibit the speech entirely. See Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. at 111.  See also Revo, 106 F.3d at 933 ("In addition, the Board offers no evidence that anyone was actually deceived by Mr. Revo's letters.").

personal injury victims would nevertheless be misleading potential clients simply by sending a direct mail solicitation." 106 F.3d at 933. Thus, to determine whether speech is inherently misleading, the proper inquiry is to consider whether there are any circumstances under which the speech could be truthful; if it could possibly be truthful, the speech is not inherently misleading. See 106 F.3d at 933.

When applying the Central Hudson test, the Supreme Court and the Tenth Circuit have identified several substantial governmental interests in regulating speech. See Central Hudson, 447 U.S. at 568 (ruling that the government has a substantial governmental interest in energy conservation); Florida Bar v. Went For It, Inc., 515 U.S. 618, 625-26 (1995)(holding that "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers" is a substantial interest); Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 ("We have no difficulty in concluding that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest."); Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1070 (10th Cir. 2001)(holding that promoting temperance and supplying revenue are substantial governmental interests). The Supreme Court has concluded, however, that "the Government's interest in preserving state authority is not sufficiently substantial to meet the requirements of *Central Hudson*." Rubin v. Coors Brewing, Co., 514 U.S. 476, 486 (1995). See Matal v. Tam, 137 S. Ct. 1744, 1764 (2017)(ruling that "preventing speech expressing ideas that offend" is not a substantial governmental interest); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 70 (1983)(ruling that shielding citizens from offensive speech is not a substantial governmental interest); Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d at 1070 (holding that protecting nondrinkers from alcohol-related speech is not a substantial state interest); U.S. West, Inc. v. F.C.C., 182 F.3d 1224, 1235 (10th Cir. 1999)(ruling that protecting dissemination of private information

"does not necessarily rise to the level of a substantial state interest under *Central Hudson*").  In the

tobacco context, the Supreme Court has recognized that there is a substantial governmental interest

in preventing minors from using tobacco.  See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555

(2001).  "Unlike rational basis review, the Central Hudson standard does not permit [a court] to

supplant the precise interests put forward by the State with other suppositions."  Florida Bar v. Went

For It, Inc., 515 U.S. 618, 624 (1995)(quoting Edenfield v. Fane, 507 U.S. 761, 768 (1993)).

Central Hudson's third step -- determining whether the speech restriction directly and

materially advances the asserted government interest -- requires more than just "mere speculation or

conjecture" that the speech restriction will advance the interest.  Lorillard Tobacco Co. v. Reilly, 533

U.S. at 555.  "[R]ather, a governmental body seeking to sustain a restriction on commercial speech

must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to

a material degree."  Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Greater New Orleans,

527 U.S. 173, 188 (1999)).  To satisfy the third step,

> [w]e do not, however, require that "empirical data come . . . accompanied by a surfeit
> of background information. . . .  [W]e have permitted litigants to justify speech
> restrictions by reference to studies and anecdotes pertaining to different locales
> altogether, or even, in a case applying strict scrutiny, to justify restrictions based
> solely on history, consensus, and "simple common sense."

Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Florida Bar v. Went For It, Inc., 515 U.S.

at 628).  In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court considered whether a

regulation prohibiting smokeless tobacco or cigar advertising within a 1,000-foot radius of a school

or playground directly advances the governmental interest in preventing minors from using tobacco.

See 533 U.S. at 556-57.  The tobacco company argued, in part, that there is no link between the

regulation and the substantial governmental interest in preventing minor tobacco use, because the

government had only identified a problem with underage cigarette smoking and not a problem with

smokeless tobacco use.  See Lorillard Tobacco Co. v. Reilly, 533 U.S. at 556-57.   The company

further averred that the government could not prove that there is a causal link between advertising

and tobacco use.  See 533 U.S. at 557.   After considering those arguments, the Supreme Court

concluded that the regulation banning the advertising advances the governmental interest identified,

because many studies support the claim that minors' smokeless tobacco use has increased, and other

studies demonstrate a link between advertising and a demand for smokeless tobacco products. See

533 U.S. at 557-61.

In considering the final factor -- that the regulation is no more extensive than necessary to

serve the governmental interest -- the Supreme Court has cautioned that it is not a "least-restrictive-

means requirement." Board of Trustees of the State University of New York v. Fox, 492 U.S. 469,

478 (1989).  Rather, as "commercial speech [enjoys] a limited measure of protection, commensurate

with its subordinate position in the scale of First Amendment values," the "ample scope of

regulatory authority suggested . . . would be illusory if it were subject to a least-restrictive-means

requirement, which imposes a heavy burden on the State." Board of Trustees of the State University

of New York v. Fox, 492 U.S. at 477 (alteration in original).

> What our decisions require is a "'fit' between the legislature's ends and the means
> chosen to accomplish those ends," a fit that is not necessarily perfect, but reasonable;
> that represents not necessarily the single best disposition but one whose scope is "in
> proportion to the interest served," that employs not necessarily the least restrictive
> means but, as we have put it in the other contexts discussed above, a means narrowly
> tailored to achieve the desired objective.

Board of Trustees of State University of the New York v. Fox, 492 U.S. at 480 (citations omitted).

"It is far different, of course, from the 'rational basis' test used for Fourteenth Amendment equal

protection analysis." Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480.

> There it suffices if the law could be thought to further a legitimate governmental
> goal, without reference to whether it does so at inordinate cost. Here we require the
> government goal to be substantial, and the cost to be carefully calculated.  Moreover,

since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.

Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480.  See Utah Licensed

Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1066 (10th Cir. 2001)("Under *Central Hudson*, laws

restricting commercial speech are subject to an 'intermediate' level of scrutiny.").

In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court determined that a

tobacco advertising ban within 1,000 feet of schools or playgrounds in Massachusetts was not

reasonably fitted to the legislature's goal -- preventing minors' tobacco use.  See Lorillard Tobacco

Co. v. Reilly, 533 U.S. at 561.  The Lorillard Tobacco Co v. Reilly Court determined that the ban

was unreasonable, because, in effect, the ban would "prevent advertising in 87% to 91% of Boston,

Worcester, and Springfield Massachusetts." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 562.  The

Supreme Court reasoned:

> In some geographical areas, these regulations would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers. The breadth and scope of the regulations, and the process by which the Attorney General adopted the regulations, do not demonstrate a careful calculation of the speech interests involved.

533 U.S. at 562.  It concluded, therefore, that the government "has failed to show that the outdoor

advertising regulations . . . are not more extensive than necessary to advance the State's substantial

interest in preventing underage tobacco use." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 565.

## STATE LAW REGARDING UNFAIR AND DECEPTIVE PRACTICES

### 1.     California Law.

The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), prohibits

"any unlawful, unfair or fraudulent act or practice and unfair, deceptive, untrue or misleading

advertising."  Cal. Bus. & Prof. Code § 17200.  To bring suit under the UCL, a consumer must

demonstrate that she suffered injury in fact and lost money or property as a result of the unfair

competition.  See Kwikset Corp. v. Superior Court, 246 P.3d 877, 884 (Cal. 2011)  "Under the statute 'there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.'"  In re Tobacco II Cases, 207 P.3d 20, 29 (Cal. 2009).  "[C]laims of deceptive advertisements and misrepresentations" fall under the fraudulent variety of unfair competition.  In re Tobacco II Cases, 207 P.3d at 29.  "[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that members of the public are likely to be deceived.'"  In re Tobacco II Cases, 207 P.3d at 29 (quoting Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal. 2002)).  Whether the public is likely to be deceived "is judged by the effect [the challenged conduct] would have on a reasonable consumer," unless "the challenged conduct targets a particular disadvantaged or vulnerable group."  Puentes v. Wells Fargo Home Mortg., 160 Cal. App. 4th 638, 645 (2008)(citations omitted).  See Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016); Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d 513, 530 (Cal. 1998).

"A UCL action is equitable in nature; damages cannot be recovered. . . .  We have stated under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution."  In re Tobacco II Cases, 207 P.3d at 29 (quoting Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003)).

UCL liability is subject to a safe harbor.  See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co., 973 P.2d 527, 551 (Cal. 1999)("Cel-Tech"); Ebner v. Fresh, Inc., 838 F.3d at 963.  "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct."  Cel-Tech, 973 P.2d at 541.  "Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair."

<u>Cel-Tech</u>, 973 P.2d at 542. "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." <u>Cel-Tech</u>, 973 P.2d at 541.

### 2. **Colorado Law.**

The Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101-115 ("CCPA"), prohibits deceptive trade practices. <u>See</u> Colo. Rev. Stat. §§ 6-1-105, 6-1-113. Relevant to this Memorandum Opinion and Order, a deceptive trade practice occurs when

> in the course of the person's business . . . the person:
>
> (e)  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property;
>
> . . . .
>
> (g)  Represents that goods, food, services, or property are of a particular standard, quality or grade . . . if he knows or should know they are of another.

Colo. Rev. Stat. § 6-1-105(1)(e), (g). "A plaintiff may satisfy the deceptive trade practices requirement of section 6-1-105(1)(e) by establishing either a misrepresentation or that the false representation had the capacity or tendency to deceive, even if it did not." <u>Rhino Linings USA, Inc.</u> <u>v. Roby Mountain Rhino Lining, Inc.</u>, 62 P.3d 142, 147 (Colo. 2003)(en banc). A misrepresentation is "a false or misleading statement that induces the recipient to act or refrain from acting . . . [and] is made 'either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." <u>Rhino Linings USA, Inc. v.</u> <u>Roby Mountain Rhino Lining, Inc.</u>, 62 P.3d at 147 (quoting <u>Parks v. Bucy</u>, 211 P.638, 639 (Colo. 1922)). To establish liability under the CCPA, "any person," as Colo. Rev. Stat. § 6-1-102(6) defines, must demonstrate:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or

occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

Hall v. Walter, 969 P.2d 224, 235 (Colo. 1998)(en banc). See Alpine Bank v. Hubbell, 555 F.3d 1097, 1112 (10th Cir. 2009).

The CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." Colo. Rev. Code § 6-1-106(1)(a). "The plain meaning of the exclusion section of the [Colorado Consumer Protection Act] is that conduct *in compliance* with other laws will not give rise to a cause of action under section 6-1-106(1)(a)." Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d 47, 56 (Colo. 2001)(en banc)(emphasis in original). Only activities "specifically authorized by a regulation or another statute [are] exempt" from the safe harbor. Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56.

3.      **Florida Law.**

The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 ("FDUTPA"), prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. Trade or commerce includes "advertising . . . or distributing . . . any good or service, or any property . . . wherever situated." Fla Stat. § 501.203. "[U]nder FDUTPA, the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Carriuolo v. General Motors Co., 823 F.3d 977, 985-86 (11th Cir. 2016). See Soper v. Tire Kingdom, Inc., 124 So. 3d 804, 806 (Fla. 2013)(Canady, J. dissenting)("[C]onsumer claim[s] for damages under FDUTPA . . . require[] proof of: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages."). FDUTPA has two distinct prongs: an unfair practice prong and a deceptive prong. See

*PNR, Inc. v. Beacon Property Management, Inc.*, 842 So.2d 773, 777 (Fla. 2003). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So.2d at 777. A deceptive practice "occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." *State v. Beach Blvd. Automotive Inc.*, 139 So. 3d 380 (Fla. Dist. Ct. App. 2014)(citing *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So.2d at 777). *See* *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007). FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1).

4.     **Illinois Law.**

The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 ("ICFA"), prohibits

> unfair or deceptive acts or practices, including but not limited to the use . . . of any deception, fraud, . . . misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2. "[T]rade and commerce mean the advertising, offering for sale, sale, or distribution of any services and any property . . . and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 Ill. Comp. Stat. 505/(1)(f) (quotations omitted). To sustain a claim under the ICFA, a plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). *See* *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014).

The ICFA does not apply, however to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1). "The plain language of section 10b(1) requires that two separate conditions be present before a claim is barred." Price v. Philip Morris, Inc., 848 N.E. 2d 1, 36 (Ill. 2005). "First, a regulatory body or officer must be operating under statutory authority." Price v. Philip Morris, Inc., 848 N.E. 2d at 36. "Second, liability under the Consumer Fraud Act is barred by section 10b(1) only if the action or transaction at issue is 'specifically authorized by laws administered' by the regulatory body." 848 N.E. 2d at 36 (quoting 815 Ill. Comp. Stat. 505/10b(1)). In Price v. Philip Morris, the Supreme Court of Illinois determined that the FTC's use of the terms "low tar" and "ultra low tar" in its reports to Congress, did not "specifically authorize[] cigarette manufactures to use these terms in labeling or advertising." 848 N.E. 2d at 36. "Conduct is not specifically authorized merely because it has not been specifically prohibited." 848 N.E. 2d at 36. Moreover, "[c]onduct is not specifically authorized merely because it has been passively allowed to go on for a period of time without regulatory action being taken to stop it." 848 N.E. 2d at 36. The proper inquiry, instead, is to "look to the affirmative acts or expressions of authorization by the FTC." 848 N.E. 2d at 36. The Supreme Court of Illinois emphasized that "[t]he term 'specifically' indicates a legislative intent to require a certain degree of specificity or particularity in the authorization," see 848 N.E. 2d at 38, and that "mere compliance with applicable federal regulations is not necessarily a shield against liability under the Consumer Fraud Act," 848 N.E. 2d at 40. It concluded, however, that a regulatory body "may specifically authorize conduct . . . without engaging in formal rulemaking" and that while authorization must be specific "it need not be express." 848 N.E. 2d at 42. The Supreme Court of Illinois ruled, accordingly, that an FTC consent order "specifically authoriz[ing] all United States tobacco companies" to use "low,"

"lower," "reduced" and other similar words "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content" barred a plaintiff's claim under 815 Ill. Comp. Stat. 505/10b(1). 219 Ill. 2d at 265-66.

The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2 ("IUDTPA"), similarly prohibits deceptive practices performed "in the course of his or her business" that

> (5)     represents that goods or services have . . . benefits . . . that they do not have;
>
> . . . .
>
> (7)     represents that goods or services are of a particular standard [or] quality;
>
> . . . .
>
> (9)     advertises goods or services with intent not to sell them as advertised; and
>
> . . . .
>
> (12)    engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 Ill. Comp. Stat. 510/2(a)(5),(7),(9),(12).

IUDTPA does not apply to "conduct in compliance with orders or rules of or a statute administered by a Federal, state or local governmental agency." 815 Ill. Comp. Stat. 510/4(1). The Supreme Court of Illinois, in Price v. Phillip Morris, concluded that, for the same reasons articulated above, an FTC consent order specifically authorizing conduct bars plaintiffs' claims under 815 Ill. Comp. Stat. 510/4(1). See Price v. Phillip Morris, Inc., 848 N.E. 2d at 54.

> Because we have concluded that the 1971 and 1995 consent orders provided specific authorization to all industry members to engage in the conduct permitted by the orders, these orders fall within the scope of [815 Ill. Comp. Stat. 510/4(1)], even though [Philip Morris] was not a party to either consent order.

848 N.E. 2d at 54.

5.      **Massachusetts Law.**

Massachusetts law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws. Ch. 93A, § 2(a).  To establish a claim under Mass. Gen. Laws. Ch. 93A, § 2, a private plaintiff must show: "(1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice . . . (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice.  Auto Flat Car Crushers, Inc., 17 N.E.3d 1066, 1074-75 (Mass. 2014).  The statute "does not provide [a] definition for 'unfair practice,' and '[t]he existence of unfair acts and practices must be determined from the circumstances of each case.'"  477 Harrison Ave., LLC v. Jace Boston, LLC, 74 N.E.3d 1237, 1247 (Mass. 2017)(quoting Commonwealth v. Decotis, 316 N.E.2d 748, 754 (Mass. 1974)).  "A practice is unfair if it is 'within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; [and] . . . causes substantial injury."  Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 209 (Mass. 1997)(alterations in original)(citations omitted).  When construing acts that are purportedly deceptive, "Massachusetts courts . . . must be guided by interpretations of that term as found in the analogous Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a)(1)."  Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 487 (Mass. 2004).

> Historically, the standard test for deception prohibited by the FTC Act was whether the act or practice had the capacity or tendency to deceive the general public, rather than whether it was relied on or resulted in actual deception. . . .  The FTC later clarified that test as follows: "if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."  *Matter of Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 165 (1984).  This standard, more difficult to satisfy because it depends on the likely reaction of a reasonable consumer rather than an ignoramus, appears to have been applied by Federal courts ever since.

Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d at 487. "[A]n advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." 813 N.E.2d at 488.

Mass. Gen. Laws. Ch. 93A has a safe harbor, which reads: "Nothing in this Chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth of the United States." Mass. Gen. Laws. Ch. 93A, § 3.

> A defendant's burden in claiming the exemption "is a difficult one to meet. To sustain it, a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive."

Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548, 561 (Mass. 2008)(quoting Fleming v. National Union Fire Ins. Co., 837 N.E.2d 1113, 1121 (Mass. 2005)(emphasis in both). In Aspinall v. Philip Morris, Inc., 902 N.E.2d 421 (Mass. 2009)("Aspinall II"), the Supreme Judicial Court of Massachusetts considered how the exemption might apply where a tobacco company argued that an FTC consent order "'condoned,' 'authorized,' and 'permitted' the use of descriptors" on their cigarette packages. Aspinall II, 902 N.E.2d at 424. Citing the Supreme Court in Altria II, the Supreme Court of Massachusetts, noted that the 1971 consent order, which the Defendants invoked, "only *enjoined* conduct" and that "a consent order is binding only on the parties to the agreement." 902 N.E.2d at 424 (emphasis in original)(citing Altria II, 555 U.S. at 89 n.13). The Aspinall II Court concluded, therefore, that "the defendants point to nothing approaching a showing that the FTC has affirmatively permitted the use of descriptors." 902 N.E.2d at 425 (footnote omitted).

6.     **Michigan Law.**

The Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-902 ("MCPA"),

prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade

or commerce."  Mich. Comp. Laws § 445.903.  Relevant to this Memorandum Opinion and Order, it

defines the following practices as unlawful under the act:

> (a)     Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.
>
> . . . .
>
> (c)     Representing that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have.
>
> . . . .
>
> (e)     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
>
> . . . .
>
> (g)     Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.
>
> . . . .
>
> (s)     Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.
>
> . . . .
>
> (z)     Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

Mich. Comp. Laws § 445.903(a), (c), (e), (g), (s), (z).

The MCPA does not apply, however, to "transaction[s] or conduct specifically authorized

under laws administered by a regulatory board or officer acting under statutory authority of this state

or the United States."  Mich. Comp. Laws § 445.904(1)(a).  When considering whether the MCPA

applies, a court's focus should be directed at whether "the transaction at issue, not the alleged misconduct, is 'specifically authorized.'" Smith v. Globe Life Ins. Co., 597 N.W.2d 28, 37 (Mich. 1999). "When the Legislature said that transactions or conduct 'specifically authorized' by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute." 597 N.W.2d at 38.

### 7. New Jersey Law.

Under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1-56:8-206 ("NJCFA"), "[a] consumer who can prove (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees." Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011)(quotations omitted). See Harnish v. Widener University School of Law, 833 F.3d 298, 305 (3d Cir. 2016). An unlawful practice under the NJCFA is the

> use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged.

N.J. Stat. Ann. § 56:8-2. See Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1115. "A practice can be unlawful even if no person was in fact misled or deceived thereby." Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994). The Supreme Court of New Jersey has explained that the NJCFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the market place," and that the statute "is intended to 'be applied broadly in order to accomplish its remedial purpose, namely to root out consumer fraud.'" Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1114-15 (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 551

(N.J. 1997)).  "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use" of an unconscionable commercial practice may bring a lawsuit seeking, among other things, treble damages.  Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1116 (emphasis omitted)(quoting N.J. Stat. Ann. § 56:8-19).  Under the NJCFA, the test for deception turns on the perception of a reasonable consumer.  See Barry v. Arrow Pontiac, Inc., 494 A.2d 804, 810 (N.J. 1985)("[W]e are dealing with whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.")

The NJCFA is subject to a judicially created exception.  See Lemelledo v. Beneficial Mgmt. Corp. of America, 696 A.2d 546, 554 (N.J. 1997)("Lemelledo").  There is a "presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation." Lemelledo, 696 A.2d at 554.  "In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes."  696 A.2d at 554.

> It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility. If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation.

696 A.2d at 554.

### 8.      New Mexico Law.

The New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-3 ("NMUPA"), makes unlawful any "[u]nfair or deceptive trade practices [or] unconscionable trade practices in the conduct

of any trade or commerce." N.M. Stat. Ann. § 57-12-3. The NMUPA defines the term "unfair or

deceptive trade practice" as

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M. Stat. Ann. § 57-12-2D. The statute also provides examples of conduct that could potentially

violate the NMUPA. See N.M. Stat. Ann. §§ 57-12-2D(1)-(18) (stating that "unfair or deceptive

trade practice means . . . and includes. . ."). See also Stevenson v. Louis Dreyfus Corp., 1991-

NMSC-051, ¶ 14, 811 P.2d 1308, 1311 (1991)("After defining an unfair trade practice, the statute

then . . . list[s] examples of conduct which may constitute an unfair trade practice."). Relevant to

this Memorandum Opinion and Order are the following: "(5) representing that goods or services

have . . . benefits . . . that they do not have; . . . (8) disparaging the goods . . . of another by false or

misleading representations; . . . (14)     using . . . ambiguity as to a material fact . . . if doing so

deceives or tends to deceive. N.M. Stat. Ann. § 57–12–2D.

> A claim under the NMUPA has four elements:
>
> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Third, the conduct complained of must have occurred in the regular course of the represeter's trade or commerce. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d at 1311. "The 'knowingly

made' requirement is met if a party was actually aware that the statement was false or misleading

when made, or in the exercise of reasonable diligence should have been aware that the statement was

false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-

12. See Atherton v. Gopin, 2015-NMCA-003, ¶ 47, 340 P.3d 630, 640-41. Notably, a plaintiff need not prove detrimental reliance upon the defendant's representations. See Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35, 166 P.3d at 1098; Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶¶ 2, 20-23, 87 P.3d 545, 550-51. The Court has previously construed NMUPA and has noted that "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading" though "generally the question is a matter of fact." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170, 1193 (D.N.M. 2010)(Browning, J.). The Court has also concluded that a communication can mislead even if it is not false. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1194-95.

### 9. **New York Law.**

New York's Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law §§ 349-350-F-1("NYCPDAP"), bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a). To establish a NYCPDAP claim, "[a] plaintiff . . . must prove three elements: first, that the challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 731 N.E.2d 608, 611 (N.Y. 2000). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" Stutman v. Chemical Bank, 731 N.E.2d at 611-612 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 647 N.E.2d 741, 745 (N.Y. 1995)).

NYCPDAP has a safe harbor that precludes

any such action . . . that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are

interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

N.Y. Gen. Bus. Law § 349(d). Additionally "[i]n such an action it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York." N.Y. Gen. Bus. Law § 350-d.

## 10. North Carolina Law.

Under North Carolina law, "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1. "In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. North Carolina Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). See Bumpers v. Cmty. Bank of Northern Virginia, 747 S.E.2d 220, 226 (N.C. 2013). "In determining whether a representation is deceptive, its effect on the average consumer is considered." Pearce v. American Defender Life Ins., 343 S.E.2d 174, 180 (N.C. 1986).

The Supreme Court of North Carolina has eschewed applying N.C. Gen. Stat. § 75-1.1 to situations in which it would "create overlapping supervision, enforcement, and liability in [an] area, which is already pervasively regulated by state and federal statutes and agencies." HAJMM Co. v. House of Raeford Farms, Inc., 403 S.E.2d 483, 493 (N.C. 1991). See Champion Pro Consulting Group, Inc. v. Impact Sports Football, LLC, 845 F.3d 104, 110-111 (4th Cir. 2016). In Ellis v. Northern Star Co., 388 S.E.2d 127 (N.C. 1990), the Supreme Court of North Carolina recognized that, "[i]n limitation, we have held that certain transactions already subject to pervasive and intricate statutory regulation, such as securities transactions, were not intended by the legislature to be included within the scope of [N.C. Gen. Stat. § 75-1.1]." Ellis v. Norther Star Co., 388 S.E.2d at

131.  Construing a libel claim, the <u>Ellis v. Northern Star Co.</u> Court determined that such a pervasive statutory or regulatory scheme did not exist.  <u>See</u> 388 S.E.2d at 131.

### 11.  <u>Ohio Law</u>.

The OCSPA mandates that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."  Ohio Rev. Code Ann. § 1345.02(A).  Relevant to this Memorandum Opinion and Order "any of the following is deceptive: (1)   That the subject of a consumer transaction has . . . performance characteristics, accessories, uses, or benefits that it does not have; (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style prescription, or model, if it is not."  Ohio Rev. Code Ann. § 1345.02(B)(1)-(2).  "The CSPA 'is a remedial law which is designed to compensate for traditional consumer remedies and so must be liberally construed.'"  <u>Whitaker v. M.T. Automotive, Inc.</u>, 855 N.E. 2d 825, 829 (Ohio 2006)(quoting <u>Einhorn v. Ford Motor Co.</u>, 548 N.E.2d 933, 935 (Ohio 1990)).  "In general, the OCSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving."  <u>Johnson v. Microsoft Corp.</u>, 834 N.E. 2d 791, 800 (Ohio 2005).  "[C]ourts shall apply a reasonableness standard in determining whether an act amounts to deceptive, unconscionable, or unfair conduct."  <u>Shumaker v. Hamilton Chevrolet, Inc.</u>, 920 N.E.2d 1023, 1031 (Ohio Ct. App. 2009)(citations omitted).[25]

For a class-action plaintiff to state a claim under the OCSPA, the plaintiff must allege pre-litigation notice.  <u>See</u> <u>Marrone v. Philip Morris USA, Inc.</u>, 850 N.E. 2d 31, 33 (Ohio 2006).  For a court decision to provide adequate notice, the case must involve similar industries and conduct.

---

[25]The Court is aware that, under <u>Erie</u>, it is not bound to follow Court of Appeals of Ohio if the Court concludes that the Supreme Court of Ohio would decide the issue differently.  <u>See</u> <u>supra</u> n.21.  The Court will follow the Court of Appeals of Ohio's decision in <u>Shumaker v. Hamilton Chevrolet, Inc.</u>, however, because the Court has found no indication that the Supreme Court of Ohio would apply a contrary rule.

See Marrone v. Philip Morris USA, Inc., 850 N.E. 2d at 36.  See also id. ("[W]e hold that a consumer may qualify for class-action certification . . . only if the defendant's alleged violation of the Act is substantially similar to an act or practice previously declared to be deceptive.").

Ohio Rev. Code Ann. § 1345.02(A) is inapplicable if "a violation was an act or practice required or specifically permitted by federal trade commission orders."  Ohio Rev. Code Ann. § 1345.11.  In Marrone v. Philip Morris USA, Inc., the Supreme Court of Ohio noted that, "although the FTC is well aware of the years of litigation and debate over cigarette manufactures' marketing strategies, to date it has not directed manufacturers to refrain from using quantifier adjectives -- terms such as 'low.' 'lower,' and 'reduced' -- in describing tar and nicotine levels in advertisements for their cigarettes."  850 N.E. 2d at 38.

### 12.    Washington Law.

The Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010-19.86.920 ("WCPA"), prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash Rev. Code § 19.86.020.  "The purpose of the CPA is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition."  Panag v. Farmers Ins. Co. of Wash., 204 P.3d 885, 889 (Wash. 2008)(en banc)(citations omitted).  "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  Panag v. Farmers Ins. Co. of Wash., 204 P.3d at 889.  "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer."  204 P.3d at 895 (quoting Southwest Sunsites, Inc. v. F.T.C., 785 F.2d 1431, 1435 (9th Cir. 1986)).

The WCPA does not apply "to actions or transactions otherwise permitted, prohibited or regulated under laws administered by . . . any other regulatory body or officer acting under statutory authority of this state or the United States." Wash. Rev. Code § 19.86.170. "Exemption under the Consumer Protection Act is applied only after determining whether the specific action is permitted, prohibited, regulated or required by a regulatory body or statute." Vogt v. Seattle-First Nat. Bank, 817 P.2d 1364, 1370 (Wash. 1991)(en banc). "Overly broad construction of 'permission' may conflict with the legislature's intent that the Consumer Protection Act be liberally construed so that its beneficial purposes may be served." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1370. "The test articulated was whether under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1371. The Supreme Court of Washington ruled accordingly, that the Currency Comptroller's regulatory and supervisory authority alone did not preempt a claim under the WCPA. See Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1371.

### LAW REGARDING UNJUST ENRICHMENT

"A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1. "[T]he paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a. "The usual consequence of a liability in restitution is that the defendant must restore the benefit in question or its traceable product, or else pay money in the amount necessary to eliminate unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a.

1. **California Law.**

Under California law, "[a]n individual who has been unjustly enriched at the expense of another may be required to make restitution." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d 319, 326 (Cal. 2015). See Restatement (Third) of Restitution and Unjust Enrichment § 1. "Restitution is not mandated merely because one person has realized a gain at another's expense." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326. "Rather, the obligation arises when the enrichment obtained lacks any adequate legal basis and thus 'cannot conscientiously be retained.'" Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. b). "A person is unjustly enriched if the retention of the benefit would be unjust." Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 876 P.2d 1062, 1066 (Cal. 1994). "Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326. "When a person acts simply as she would have done in any event, out of duty or self-interest, she cannot equitably claim compensation from anyone who merely happens to benefit as a result." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 327.

2. **Colorado Law.**

"A person is unjustly enriched when he benefits as a result of an unfair detriment to another." Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008)(en banc)(citing Salzman v. Bacharach, 996 P.2d 1263, 1265 (Colo. 2000)(en banc)). "The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'" Lewis v. Lewis, 189 P.3d at 1141 (quoting Restatement (First) of Restitution § 1, cmt. a). "The scope of the remedy is broad,

cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." Robinson v. Colorado State Lottery Div., 179 P.3d 998, 1007 (Colo. 2008). "[A] party claiming unjust enrichment must prove that (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." Lewis v. Lewis, 189 P.3d at 1141. See Salzman v. Bachrach, 996 P.2d at 1266 n.2 (explaining that the Supreme Court of Colorado "reformulated the elements of unjust enrichment . . . to remove the test language that the defendant must appreciate and accept the benefit conferred"). Unjust enrichment "does not depend on any contract, oral or written," and "does not require any promise or privity between the parties." Salzman v. Bachrach, 996 P.2d at 1265. "A benefit denotes any form of advantage." Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 444 (Colo. 2000). "The notion of what is or is not unjust is an inherently malleable and unpredictable standard." DCB Const. Co., Inc. v. Central City Dev. Co., 965 P.2d 115, 120 (Colo. 1998)(quotations omitted). Accordingly, "[u]njust enrichment claims require that courts make extensive factual findings to determine whether a party has been unjustly enriched." Lewis v. Lewis, 189 P.3d at 1140. In analyzing the third prong, whether the defendant was unjustly enriched, the Supreme Court of Colorado has "looked to the intentions, expectations, and behavior of the parties to determine whether recovery in unjust enrichment is appropriate." Lewis v. Lewis, 189 P.3d at 1143. See Dudding v. Norton Frickey & Assocs., 11 P.3d at 444 ("Whether injustice results often will turn on whether a party engaged in some kind of wrongdoing.").

"[E]quity will not act if there is a plain, speedy, adequate remedy at law." Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d 835, 842 (Colo. 2004). See Dudding v. Norton Frickey & Assocs., 11 P.3d at 445 ("[C]ourts will refuse quantum meruit recovery when expressly contrary to

the provisions of the written contract between the parties."). "In the tort context, the recovery of damages does not automatically lead to a conclusion that a party had an adequate legal remedy that precludes further equitable relief." Harris Grp., Inc. v. Robinson, 209 P.3d 1188, 1205 (Colo. App. 2009).[26] If "[t]he objectives of the two remedies are different," such as when the plaintiff seeks to recover both for the harm done to him and to recover the defendant's ill-gotten gain, an unjust enrichment claim may still lie. Harris Grp., Inc. v. Robinson, 209 P.3d at 1205.

### 3.    Florida Law.

"The elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)(quoting Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc., 668 So. 2d 205, 207 (Fla. Dist. Ct. App. 1995). See Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012). "[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." Kopel v. Kopel, __ So. 3d __, 2017 WL 372074, at *5 (Fla. 2017)(ruling that an unjust-enrichment claim failed, "because there was no evidence of a benefit being conferred directly to Respondents, rather than indirectly to corporations owned by them"). "This Court is committed to the rule that where the only relief sought by a bill in equity is one for which a plain, adequate and complete remedy at law exists -- then a court of equity has no jurisdiction and a resort thereto is improper and unnecessary." Greenfield Villages v. Thompson, 44 So. 2d 679, 683 (Fla. 1950). From that principle, Courts of

---

[26] The Court is aware that, under Erie, it is not bound to follow Court of Appeals of Colorado if the Court concludes that the Supreme Court of Colorado would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Colorado's decision in Harris Grp., Inc. v. Robinson, however, because the Court has found no indication that the Supreme Court of Colorado would apply a contrary rule.

Appeal of Florida have noted that "a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment," but, "[o]f course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails." Real Estate Value Co., Inc. v. Carnival Corp., 92 So. 3d 255, 263 n.2 (Fla. Dist. Ct. App. 2012)(citing Hazen v. Cobb, 117 So. 853, 857-58 (Fla. 1928)).

4.  **Illinois Law**.

"The theory of unjust enrichment is based on a contract implied in law." People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d 165, 177 (Ill. 1992). "To recover under this theory, plaintiffs must show that [a] defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment." People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d at 177. See HPI Health Care Servs., Inc. v. Mt. Vernon Hops., Inc., 545 N.E.2d 672, 679 (Ill. 1989)("To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."); Cleary v. Philip Morris Inc., 656 F.3d 511, 516 (7th Cir. 2011). "Because unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d at 177 (quoting La Throp v. Bell Federal Savings & Loan Assoc., 370 N.E.2d 188, 195 (Ill. 1977)).

In adjudicating an unjust-enrichment claim against a tobacco company, the Seventh Circuit recounted:

> The plaintiffs' unjust enrichment theory rests on the allegation that they had a legal right to know about the true nature and hazards of cigarettes. The plaintiffs assert that the defendants violated this right by failing to disclose the full truth about cigarettes and that this failure to disclose was to the plaintiffs' detriment; and that

defendants' retention of the benefit -- the cigarette revenue -- violates the fundamental principles of justice, equity, and good conscience. It is crucial to note that the plaintiffs do not allege that they suffered any harm, that they relied on the defendants' marketing, or that they would have acted differently had the defendants been truthful about the cigarettes they were selling. In fact, not only do the plaintiffs not make these allegations, but the plaintiffs also explicitly disavow any such allegations, claiming that they are entirely unnecessary to support their theory of unjust enrichment. In other words, the plaintiffs assert that their unjust enrichment claim does not require proof of deception, causation, or actual harm with regard to individual members of the plaintiff class.

Cleary v. Phillip Morris Inc., 656 F.3d at 518. Emphasizing that an unjust-enrichment claim "must show a detriment -- and, significantly, a connection between the detriment and the defendant's retention of the benefit," the Seventh Circuit reasoned that there was no unjust enrichment, because,

> since the plaintiffs disclaim any need to allege either personal damages, deception, or reliance with regard to any member of the class, it is difficult to see how the defendants' retention of the revenue paid by a consumer is to that consumer's detriment. According to the plaintiffs, the class of people with a valid unjust enrichment claim would include the consumer who bought cigarettes and was never injured in any manner by his purchase. It would include the consumer who was satisfied by his cigarette purchase and planned to continue purchasing cigarettes. It would include the consumer who would not have acted any differently had he been fully informed about cigarettes, but bought them anyway regardless of the defendants' marketing. It would include the consumer who was not deceived by the marketing because he was personally aware of the true nature of cigarettes, but still bought cigarettes despite their addictive and harmful nature -- or even because of it.

Cleary v. Phillip Morris Inc., 656 F.3d at 519. The Seventh Circuit noted, however, that "[t]his would be a different case if there was a greater connection between the defendants' retention of the cigarette revenue and a detriment to the plaintiffs. For example, . . . if the revenue was obtained by deceiving the plaintiffs." Clearly v. Philip Morris, 656 F.3d at 519.

5. **Massachusetts Law.**

"A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable expectations of the parties.'" Metropolitan Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850

(Mass. 2013)(quoting Global Investors Agent Corp. v. National Fire Ins. Co., 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)). "The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations." Metropolitan Life Ins. Co. v. Cotter, 984 N.E.2d at 850 (citation omitted). "Considerations of equity and morality play a large part in constructing a quasi contract." Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985). "An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).[27] See Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 (1st Cir. 2005)("Unjust enrichment provides an equitable stopgap for occasional inadequacies in contractual remedies at law."); In re Lupron Marketing and Sales Practices Litig., F. Supp. 2d 148, 182 (D. Mass. 2003)(Stearns, J.)("[W]here a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable.").

### 6. **Michigan Law.**

"Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d 635, 640 (Mich. 1993)(quoting Restatement (First) of Restitution § 1). "Unjust enrichment is defined as the unjust retention of 'money or benefits which in justice and equity belong to another.'" Tkachik v. Mandeville, 790 N.W.2d 260, 266 (Mich. 2010)(quoting McCreary v. Shields, 52 N.W.2d 853, 855 (Mich. 1952)). "A claim alleging unjust enrichment requires that a plaintiff

---

[27]The Court is aware that, under Erie, it is not bound to follow the Appeals Court of Massachusetts if it concludes that the Supreme Judicial Court of Massachusetts would decide the issue differently. See supra n.21. The Court will follow the Appeals Court of Massachusetts' decision in Santagate v. Tower, however, because the Court has found no indication that the Supreme Judicial Court of Massachusetts would apply a contrary rule.

establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." Landstar Express America, Inc. v. Nexteer Automotive Corp., 900 N.W.2d 650, 657 (Mich. Ct. App. 2017)(citation omitted).[28] "Because this doctrine vitiates normal contract principles, the courts employ the fiction with caution, and will never permit it in cases where contracts, implied in fact, must be established, or substitute one promisor or debtor for another." Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d at 640 (quotations omitted). "[L]egislative action that provides an adequate remedy by statute precludes equitable relief." Tkachik v. Mandeville, 790 N.W.2d at 265.

7.     **New Jersey Law.**

"To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007)(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994)). See Thieme v. Aucoin-Thieme, 151 A.3d 545, 557 (N.J. 2016). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d at 723 (quoting VRG Corp. v. GKN Realty Corp., 641 A.2d at 526). "[E]quitable principles of estoppel or unjust enrichment . . . cannot be invoked to subvert [a] statutory scheme." Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). "It is a well settled rule that an

---

[28]The Court is aware that, under Erie, it is not bound to follow the Court of Appeals of Michigan if it concludes that the Supreme Court of Michigan would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Michigan's decision in Landstar Express America, Inc. v. Nexteer Automotive Corp., however, because the Court has found no indication that the Supreme Court of Michigan would apply a contrary rule.

express contract excludes an implied one." C.B. Snyder Realty Co. v. National Newark & Essex

Banking Co. of Newark, 101 A.2d 544, 553 (N.J. 1953).

## 8. **New Mexico Law.**

To prevail in unjust enrichment, "one must show that: (1) another has been knowingly

benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit

would be unjust." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.[29]

Equitable claims are not available if there is an adequate remedy at law. See Gen. Tel. Co. of the Sw.

v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715. See Sims v. Sims, 1996-NMSC-

078, ¶ 28, 930 P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at

law"). Additionally, the "hornbook rule [is] that quasi-contractual remedies . . . are not to be created

when an enforceable express contract regulates the relations of the parties with respect to the

disputed issue." Elliott Industries Ltd. P'ship v. BP America Production Co., 407 F.3d, 1091, 1117

(10th Cir. 2005)("Elliott Indus.").[30] In Elliott Indus., for example, the Tenth Circuit held that the

plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations preluded the

plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs'

expense. See 407 F.3d at 1117. The plaintiffs contended that the leases did not preclude their

---

[29]The Court is aware that, under Erie, it is not bound to follow the Court of Appeals of New Mexico if it concludes that the Supreme Court of New Mexico would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of New Mexico's decision in Ontiveros Insulation Co. v. Sanchez, however, because the Court has found no indication that the Supreme Court of New Mexico would apply a contrary rule.

[30]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir.2003). The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path. See Anderson Living Trust v. WPX Energy Production, LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.

unjust-enrichment claim, because they did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid."  407 F.3d at 1117.  The Tenth Circuit concluded, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships."  407 F.3d at 1117.

9.      **New York Law.**

Unjust enrichment is "a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."  Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012)(citations omitted).  "[I]n order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."   Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d at 746. See Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011).  "[A] plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d at 746.  See Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d at 1110-11 ("Mandarin's unjust enrichment claim fails for the same deficiency as its other claims -- the lack of allegations that would indicate a relationship between the parties.").  "A plaintiff need not," however, "be in privity with the defendant to state a claim for unjust enrichment."   Sperry v. Crompton Corp., 863 N.E.2d 1012, 1018 (N.Y. 2007).  Unjust-enrichment claims fail when a plaintiff has an adequate legal remedy. See Samiento v. World Yacht

Inc., 883 N.E.2d 990, 996 (N.Y. 2008). The Court of Appeals of New York has explained that "typical" unjust-enrichment cases "are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d at 1185.

### 10. North Carolina Law.

Under North Carolina law, unjust enrichment is established when "a party [has] conferred a benefit on the other party," the benefit is measurable, is not gratuitous, and is not "conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances." Booe v. Shadrick, 369 S.E.2d 554, 556 (N.C. 1988). See Wright v. Wright, 289 S.E.2d 347, 351 (N.C. 1982). An unjust-enrichment claim "is neither in tort nor contract," but lies in "quasi-contract or a contract implied in law." Booe v. Shadrick, 369 S.E.2d at 556. "The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff." Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 920 (N.C. 1992). "Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment." Whitfield v. Gilchrist, 497 S.E.2d 412, 415 (N.C. 1998).

### 11. Ohio Law.

"Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" Johnson v. Microsoft Corp., 834 N.E.2d 791, 799 (Ohio 2005)(quoting Hummel v. Hummel, 14 N.E.2d 923, 927 (Ohio 1938)). An unjust-enrichment claim's purpose "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." Johnson v. Microsoft Corp., 834

N.E. at 799.  "[A]n indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser."  Johnson v. Microsoft Corp., 834 N.E. at 799 (ruling that a defendant is not unjustly enriched where there was no economic transaction between the plaintiff and the defendant).  "To bring a cause within the jurisdiction of a court of equity, it is requisite that the primary right involved be an equitable right as distinguished from a legal right, or that the remedy at law as to the right involved is not full, adequate and complete."  State ex rel. Lien v. House, 58 N.E.2d 675, 678 (Ohio 1944).

**12.  Washington Law.**

"Unjust enrichment occurs when one retains money or benefits which in justice and equity belong to another."  Young v. Young, 191 P.3d 1258, 1262 (Wash. 2008)(en banc)(citation omitted). Under Washington law, unjust enrichment exists when: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment."  Young v. Young, 191 P.3d at 1262.  "Equitable relief is available only if there is no adequate legal remedy."  Orwick v. City of Seattle, 692 P.2d 793, 796 (Wash. 1984).  In Seattle Professional Engineering Employees Association v. Boeing Co., 991 P.2d 1126 (Wash. 2000)(en banc),  for example, the Supreme Court of Washington determined that the plaintiffs "are not entitled to pursue a remedy in equity" where they have an available statutory remedy.  Seattle Professional Engineering Employees Association v. Boeing Co., 991 P.2d at 1134.

**LAW REGARDING BREACHES OF EXPRESS WARRANTIES**

Under the Uniform Commercial Code ("UCC"), there are three ways in which a seller can make an express warranty.  See UCC § 2-313(1).

Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

UCC § 2-313(1)(a)-(c). An express warranty does not need to include "formal words such as warrant or guarantee," and the seller does not need to have "a specific intention to make a warranty." UCC § 2-313(2). Relevant to this Memorandum Opinion and Order, California, Colorado, Florida, Illinois, New Jersey, New Mexico, New York, and North Carolina have adopted the UCC § 2-313. See Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Fla. Stat. § 672.313; 810 Ill. Comp. Stat. 5/2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55–2–313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313.[31]

**1. California Law.**

The Supreme Court of California has noted that "[t]he key under [the UCC] is that the seller's statements -- whether fact or opinion -- must become part of the basis of the bargain." Hauter v. Zogarts, 534 P.2d 377, 383 (Cal. 1975). It explained:

> The basis of the bargain requirement represents a significant change in the law of warranties. Whereas plaintiffs in the past have had to prove their reliance upon specific promises made by the seller (Grinnell v. Charles Pfizer & Co. (1969) 274 Cal.App.2d 424, 440, 79 Cal.Rptr. 369), the Uniform Commercial Code requires no such proof.

---

[31]Other states have adopted the UCC § 2-313. The Court lists the states above, because those states are the only states at issue on the express warranty claims in this case.

Hauter v. Zogarts, 534 P.2d at 383-84.  "Privity is not required for an action based upon an express warranty."  Hauter v. Zogarts, 534 P.2d at 383 n.8 (Cal. 1975).  "Words of conduct relevant to the creation of an express warranty . . . shall be construed wherever reasonable as consistent with each other."  Cal. Com. Code § 2316(1).  A buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy."  Cal. Com. Code § 2607(3)(A).

## 2. Colorado Law.

Under Colorado law, it is not "necessary for an express warranty that 'the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty.'"  Palmer v. A.H. Robins Co., Inc., 684 P.2d 187, 208 (Colo. 1984)(quoting Colo. Rev. Stat. § 7-2-313(2)).  See Pegasus Helicopters, Inc. v. United Technologies Corp., 35 F.3d 507, 511 (10th Cir. 1994).  "Whether a particular statement constitutes an express warranty is generally an issue of fact."  Palmer v. A.H. Robins Co., Inc., 684 P.2d at 208.  In Palmer v. A.H. Robins Co., Inc., for example, the Supreme Court of Colorado determined that a doctor's representations about the greater effectiveness of an intrauterine device over birth control pills is sufficient to establish "affirmations of fact and product descriptions" upon which the plaintiff "relied" to constitute an express warranty.  684 P.2d at 208.  But see Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 645 (10th Cir. 1991)(suggesting that, under Colorado law, reliance is not a requirement for a breach-of-express-warranty claim).

A buyer must "notify" the seller "within a reasonable time after he discovers or should have discovered any breach . . . or be barred from any remedy."  Colo. Rev. Stat. § 4-2-607(3)(a).  See Palmer v. A.H. Robins Co., Inc., 684 P.2d at 205.  A person "notifies" a seller "by takzing such steps as may be reasonably required to inform the other in ordinary course, whether or not the other person

actually comes to know of it." Colo. Rev. Stat. § 4-1-202(d); See Palmer v. A.H. Robins Co., Inc., 684 P.2d at 205-06.

> The notice requirement in a breach of warranty action serves three purposes: (1) affording the seller an opportunity to correct any defect; (2) affording the seller an opportunity to prepare for negotiation and litigation; and (3) providing the seller a safeguard against stale claims being asserted after it is too late to investigate them.

Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206. "Compliance with the notice requirement is generally a condition precedent to recovery for a breach of warranty claim under the Uniform Commercial Code." Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206. See Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 847 (10th Cir. 1986). "As long as the buyer has given notice of the defect to his or her immediate seller, no further notification to those distributors beyond the immediate seller is required." Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206.

### 3.    **Florida Law.**

Florida Law states:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; (b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; and (c) [a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Fla. Stat. § 672.313(1)(a)-(c). "The decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." Royal Typewriter Co., v. Xerographic Supplies Corp., 719 F.2d 1092, 1100 (11th Cir. 1983). To recover under a breach-of-express-warranty theory, "[t]he buyer must within a reasonable

time after he or she discovers or should have discovered any breach notify the seller of breach."  Fla. Stat. § 672.607(3)(a).

4.      **Illinois Law**.

"[A]n express warranty . . . obligates the seller to deliver goods that conform to the affirmation, promise, description, sample or model."  Mydlach v. DaimlerChrysler Corp., 875 N.E.2d 1047, 1058 (Ill. 2007).  "If the seller delivers nonconforming goods, the warranty is breached at that time.  Even if the buyer is unaware that the goods, as delivered, do not conform to the seller's affirmation, promise, description, sample or model, the warranty has been breached."  Mydlach v. DaimlerChrysler Corp., 875 N.E.2d at 1058 (ruling that a promise from a manufacturer to repair and replace defective parts is not an express warranty, because such a promise "does not warrant that the vehicle will conform to some affirmation, promise, description, sample or model").  "The warranty arises only because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct."  Collins Co., Ltd. v. Carboline Co., 532 N.E.2d 834, 838 (Ill. 1988).

A buyer "must within a reasonable time after he discovery or should have discovered any breach notify the seller of the breach or be barred from any remedy."  810 Ill. Comp. Stat. 5/2-607(3)(a).  "In general, buyers . . . must directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty."  Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 589 (Ill. 1996).  That general requirement is subject to the following two exceptions: "(1) the seller has actual knowledge of the defect of the particular product; or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint alleging breach of UCC warranty."  Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 589.  "Only a consumer plaintiff who suffers a personal injury may satisfy the section 2–607 notice requirement by

filing a complaint stating a breach of warranty action against the seller." <u>Connick v. Suzuki Motor</u> <u>Co., Ltd.</u>, 675 N.E.2d at 590.

**5.**     <u>**New Jersey Law.**</u>

"[T]o state a claim for breach of express warranty under New Jersey Law, [a] plaintiff must allege (1) [the defendant] made an affirmation of fact, promise, or description about the produce; (2) this affirmation of fact, promise, or description became part of the basis of the bargain for the product; and (3) the product ultimately did not conform to the affirmation of fact, promise, or description."   <u>In re Avandia Marketing Sales Practices & Products Liability Litig.</u>, 558 F. App'x 171, 174 (3d Cir. 2014)(unpublished).[32] "[N]o specific intention to make a warranty is necessary if part of the basis of the bargain consists of the seller's affirmations of fact or descriptions of the goods." <u>Gladden v. Cadillac Motor Car Div., General Motors Corp.</u>, 416 A.2d 394, 396 (N.J. 1980)("Particular reliance on such statements of description or quality need not be shown."   In <u>Gladden v. Cadillac Motor Car Division General Motors Corporation.</u>, for example, the Supreme Court of New Jersey determined that representations concerning tires in an owner's manual constituted an express warranty, because a purchaser, after reading the manual, "could reasonably expect that the tire if used in accordance with the [company's] instructions would not become unrepairable or unserviceable within the first 40,000 miles of normal use." 416 A.2d at 397-98.

**6.**     <u>**New Mexico Law.**</u>

Under New Mexico law, a seller expressly warrants goods in a commercial transaction when it (i) makes an affirmation of fact or promise to the buyer "which relates to the goods and becomes

---

[32]The Court is not bound to follow a Third Circuit decision on matters of state law, but the Court concludes that it will follow this decision, because it has found no indication that the Supreme Court of New Jersey would apply a contrary rule, and because the Third Circuit has more experience with New Jersey law than the Court.

part of the basis of the bargain"; (ii) describes the goods in a way that "is made part of the basis of the bargain"; or (iii) provides a "sample or model which is made part of the basis of the bargain." N.M. Stat. Ann. § 55-2-313. "If the goods provided are not as warranted, the goods are in breach of warranty." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941. "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941 (quotations omitted)). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941.

In Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d 1081 (D.N.M. 2017)(Browning, J.), for example, the Court considered whether, under New Mexico's express warranty standard, the defendants had made any express affirmations or representations to the plaintiffs concerning chemical supplies purchased. See 248 F. Supp. 3d at 1153. The Court noted that, "aside from perfunctorily alleging in the Complaint that Rinchem Co. 'expressly' warranted the chemicals that it supplied," the plaintiffs did not explain the warranty or even identify "the warranty's precise terms." 248 F. Supp. 3d at 1153. The Court, accordingly, dismissed the plaintiffs' breach-of-express-warranty claim, because the Court could not conclude from the plaintiffs' conclusory allegations that the defendant had "made any express warranty." 248 F. Supp. 3d at 1153. See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1210-11 (D.N.M. 2011)(Browning, J.)(ruling that the plaintiffs had plausibly alleged an express warranty where the plaintiffs contended that the defendants had promised that two restored Volkswagen buses purchased would be "ready to go whether for daily driver or for cross-country trips" and "guaranteed . . . 100% satisfaction with the buses").

7. **New York Law.**

New York does not require the plaintiff to rely on the truth of the warrant for liability to attach.  See CBS Inc. v. Ziff-Davis Pub. Co., 553 N.E.2d 997, 1000-01 (N.Y. 1990).  Rather, "[t]he right to indemnification depends only on establishing that the warranty was breached."  CBS Inc. v. Ziff-Davis Pub. Co., 553 N.E.2d at 1001.  See Galli v. Metz, 973 F.2d 145, 150 (2d Cir. 1992).  Construing and distinguishing CBS Inc. v. Ziff-Davis Publishing Co., the United States Court of Appeals for the Second Circuit ruled: "Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach."  Galli v. Metz, 973 F.2d at 151.  See Rogath v. Siebenmann, 129 F.3d 261, 265 (2d Cir. 1997).[33]  "There can be no [express] warranty where there is no privity of contract," but "the technical privity requirement . . . should be dispensed with in a proper case in the interest of justice and reason."  Randy Knitwear, Inc. v. American Cyanamid Co., 181 N.E.2d 399,401 (N.Y. 1962).

8. **North Carolina Law.**

An express warranty breach "occurs when the goods fail in any respect to conform to the express warranty given [by] the seller."  Alberti Manufactured Homes, Inc., 407 S.E.2d 819, 825 (N.C. 1991).  "Absent privity of contract, there can be no recovery for breach of warranty, except in those cases where the warranty is addressed to an ultimate consumer or user."  Kinlaw v. Long Mfg. N.C., Inc., 259 S.E. 494, 498 (N.C. 1979).

> Authority from most other jurisdictions holds that a purchaser who relies upon a manufacturer's representations can recover for breach of an express warranty despite lack of privity.  The bound procedure whereby the purchaser claims against the

---

[33]The Court is not bound to follow a Second Circuit decision on matters of state law, but the Court concludes that it will follow this decision, because it has found no indication that the Court of Appeals of New York would apply a contrary rule, and because the Second Circuit has more experience with New York law than the Court.

retailer, the retailer against the distributor, and the distributor, in turn, against the manufacturer, is unnecessarily expensive and wasteful. We find no reason to inflict this drain on the court's time and the litigant's resources when there is an express warranty directed by its terms to none other than the plaintiff purchaser.

Kinlaw v. Long Mfg. N.C., Inc., 259 S.E.at 500-01. See Alberti v. Manufactured Homes, Inc., 407 S.E.2d at 825 ("[O]ur case law has recognized that a direct contractual relationship in the sale of the product itself is not a prerequisite to recovery for breach of express warranty against the manufacturer.").

A buyer must notify the seller "within a reasonable time after he discovers or should have discovered any breach . . . or be barred from any remedy." N.C. Gen. Stat. § 25-2-607(3)(a). In Maybank v. S. S. Kresge Co., 273 S.E.2d 681, 683 (N.C. 1981), the Supreme Court of North Carolina considered whether the "filing of the suit and accompanying service upon defendant" three years after a buyer discovers a defect falls within a reasonable time frame to give seller notice. Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. After emphasizing that reasonable time "can be determined only by examining the particular facts and circumstances of each case," the Supreme Court of North Carolina noted that there were two primary policy reasons fortifying the notice requirement. Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. First, notice "enabl[es] the seller to make efforts to cure the breach by making adjustments or replacements in order to minimize the buyer's damages and the seller's liability." Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. Second, notice "afford[s] the seller a reasonable opportunity to learn the facts so that he may adequately prepare for negotiation and defend himself in a suit." Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. Notwithstanding these strong policy reasons, the Supreme Court of North Carolina ruled that, "[a]lthough a delay of three years is, undoubtedly, a long time, we are unable to conclude that it is unreasonable as a matter of law under the facts of this case." Maybank v. S. S. Kresge Co., 273 S.E.2d at 685. "An injured lay consumer has no reason to know, until he consults a lawyer, that

under the terms of the Uniform Commercial Code he is required to give the seller notice that the item sold was not satisfactory."  Maybank v. S. S. Kresge Co., 273 S.E.2d at 685.  Ultimately, the Maybank v. S.S. Kresge Co. court determined that "[f]airness to the consumer dictates that he be given reasonable time to learn of and to comply with this requirement. While three years might be conceivably be per se unreasonable delay in a commercial context, differing considerations applicable in retail situations may mean that a delay of three years by a consumer in giving notice to retail seller is within the bounds of a reasonable time."  273 S.E.2d at 685.

## LAW REGARDING PERMANENT INJUNCTIONS

To attain a permanent injunction, a plaintiff must demonstrate:

(i) that it has suffered an irreparable injury; (ii) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (iv) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).  The Tenth Circuit has formulated that test as: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issues, will not adversely affect the public interest."  Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009).  See Klein-Becker USA, LLC v. Englert, 711 F.3d 1153, 1164 (10th Cir. 2013).  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion."  eBay, Inc. v. MercExchange, LLC, 547 U.S. at 391.  See Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 ("The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it.").  "An injunction is an extraordinary remedy to prevent future violations, and should be used sparingly."  Copar Pumice Co., Inc. v. Morris, No. 07-

0079, 2009 WL 5201799, at *15 (D.N.M. October 23, 2009)(Browning, J.)(citing Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 144 F.3d 1513, 1522 (10th Cir. 1997)).

"A district court may find irreparable harm 'based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer.'" Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 (quoting Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)). In Copar Pumice Co., Inc. v. Morris, for example, the Court denied a permanent injunction, because the plaintiff did not demonstrate that damages could not compensate the Fourth-Amendment search injury it had suffered. See 2009 WL 5201799, at *15. The Court further concluded that the plaintiff had "shown few, if any, damages other than attorney's fees and costs," and, accordingly, the extraordinary remedy sought -- a permanent injunction -- was inappropriate. 2009 WL 5201799, at *15.

Injunctive relief requested is subject to Article III mootness. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d 1174, 1190-91 (10th Cir. 2012); State of N.N. ex rel. New Mexico State Highway Dept. v. Goldschmidt, 629 F.2d 665, 669 (10th Cir. 1980). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979).

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies). . . . But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. . . . [T]he Supreme Court has historically recognized what are often called 'exceptions' to the general rule against consideration of moot cases, as where a plaintiff's status is 'capable of repetition yet evading review,' *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911), or where a defendant has ceased the challenged action but it is likely the defendant will 'return to his old ways' -- the latter often referred to as the voluntary cessation exception, *United States v. W.T. Grant Co.*, 345 U.S. 498, 515 (1911).

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239, 1242 (10th Cir. 2011). When injunctive relief does not redress plaintiffs' particular injuries, the injunctive relief requested is rendered moot. See WildEarth Guardians v. Public Service Co., 690 F.3d at 1191 (citing United States v. Vera-Flores, 496 F.3d 1177, 1180 (10th Cir. 2007)). Similarly, if the injunction would have no present-day effect, the injunctive relief request is also rendered moot. See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1257 (10th Cir. 2004)("The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect.").

 As already noted, mootness is subject to the voluntary-cessation exception. See Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016). Under that exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Brown v. Buhman, 822 F.3d at 1166. "This rule is designed to prevent gamesmanship. If voluntary cessation automatically mooted a case, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)). Nevertheless, a defendant's voluntary cessation may render a case moot, if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).

## LAW REGARDING PERSONAL JURISDICTION

When contested,[34] the party asserting the claim has the burden of proving personal jurisdiction. See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir.1995). To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process. See Doering v. Copper Mountain, Inc., 259 F.3d 1201, 1209-10 (10th Cir. 2001). Under due process, the Court's jurisdiction exists if the defendants have "minimum contacts" with the forum state, which may rest on specific or general personal jurisdiction, and the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." Dudnikov v. Chalk & Vermilion Fine Arts Inc., 514 F.3d 1063, 1070 (10th Cir. 2008)(quotation marks omitted). See Bristol-Myers, Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1779-80 (2017)("Bristol-Myers"); Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).

### 1.     Burden of Proof.

As already noted, the Plaintiff bears the burden of proving personal jurisdiction. See Wenz v. Memery Crystal, 55 F.3d at 1505. When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of facts that would support the assertion of jurisdiction. Wenz v. Memery Crystal, 55 F.3d at 1505. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavit." Behagen v. Amateur Basketball Ass'n, 744 F.2d 731, 733 (10th Cir. 1984). When, however, a defendant presents credible evidence through affidavits or other materials suggesting the absence of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a genuine dispute of material fact on the issue. See Doe v. Nat'l Med. Servs., 974 F.2d 143, 145 (10th Cir.1992). Only if the plaintiff meets the obligation of contesting the credible evidence that the

---

[34]Personal jurisdiction can be waived. See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).

defendant presents does the court resolve the factual disputes in the plaintiff's favor. See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733; Clark v. Meijer, Inc., 376 F. Supp. 2d 1077, 1082 (D.N.M.2004)(Browning, J.).

## 2. Due Process and Personal Jurisdiction.

The personal-jurisdiction due process analysis is two-fold. See Fabara v. GoFit, LLC, 308 F.R.D. 380, 400 (D.N.M. 2015)(Browning, J.). First, the defendant must have "minimum contacts" with the forum state such that it "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. at 473-76. Second, exercising personal jurisdiction over the defendant must comport with "traditional notions of fair play and substantial justice." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quotation marks omitted). A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court with either general or specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532-33 (10th Cir. 1996)(citations omitted).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo*: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078. Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir.2011).

For a court to exercise specific jurisdiction "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*." Bristol-Myers, 137 S. Ct. at 1780 (quoting Daimler AG v. Bauman, 134 S. Ct. at 754)(alterations and emphasis in Bristol-Myers). See Bristol-Myers, 137

S.Ct. at 1781 ("[T]here must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.")(quoting <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011)("<u>Goodyear</u>")); <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 472 (ruling that a court may assert specific jurisdiction "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.")(citations and quotation marks omitted). The Tenth Circuit has characterized this inquiry as a two part test: "[F]irst . . . the out-of-state defendant must have 'purposefully directed' its activities at residents in the forum state, and second, . . . the plaintiff's injuries must 'arise out of' defendant's forum-related activities." <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d at 1071. The Supreme Court has recently emphasized that, "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." <u>Bristol-Myers</u>, 137 S. Ct. at 1781. In the tort context, a defendant has "purposefully directed" his activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d at 1072 (quoting <u>Calder v. Jones</u>, 465 U.S. 783, 789-90 (1984)).

Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" <u>TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.</u>, 488 F.3d 1282, 1287-88 (10th Cir.2007)(quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 473, 478). The mere foreseeability of harm occurring in a particular forum will not support a finding of minimum contacts. <u>See</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S.at 295 (holding that,

although "an automobile is mobile by its very design and purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a forum state, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause"). "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297. As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook intentional actions that were expressly aimed at that forum state." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1077.

General personal jurisdiction jurisprudence has "followed a markedly different trajector[y]" than specific personal jurisdiction. Daimler AG v. Bauman, 134 S. Ct. at 757. The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum State. Daimler AG v. Bauman, 134 S. Ct. at 760. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). For corporations, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). In Daimler AG v. Bauman, the Supreme Court rejected an argument that "continuous or systematic" contacts within a forum state were, in and of themselves, sufficient to subject a corporation to general personal jurisdiction. See Daimler AG v. Bauman, 134 S. Ct. at 761-62. In so doing, the Supreme Court reemphasized that a corporation is most often exposed to general personal jurisdiction only if that entity is incorporated in the forum state or if the

forum state hosts the entity's principal place of business. See Daimler AG v. Bauman, 134 S. Ct. at

761.

> If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him does not offend "traditional notions of fair play and substantial justice." See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:

>> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

> Id. (brackets omitted); see also OMI Holdings, Inc., 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1167 (10th Cir. 2011). The Supreme Court has

recently emphasized that, among these factors, the primary concern "is 'the burden on the

defendant.'" Bristol-Myers, 137 S. Ct. at 1780 (quoting World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 292 (1980)). "Assessing this burden obviously requires a court to consider

the practical problems resulting from litigating in the forum, but it also encompasses the more

abstract matter of submitting to the coercive power of a State that may have little legitimate interest

in the claims in question." Bristol-Myers, 137 S. Ct. at 1780.

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of

interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

Bristol-Myers, 137 S. Ct. at 1780-81 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 294).

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M.2009)(Browning, J.), aff'd in part and rev'd in part, 382 F. Appx. 723 (10th Cir.2010), the Court considered whether it had personal jurisdiction over defendants who allegedly slandered, defamed, and caused the plaintiff -- Michael Silver -- distress, by posting a blog on the internet that portrayed him in a negative light. See 678 F. Supp. 2d at 1204. The Court determined that it did not have personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that McMullen "was significantly associated with the blog or controlled it in any way." 678 F. Supp. 2d at 1212. The Court also concluded that it did not have personal jurisdiction over the blog post's author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to New Mexico, and did not transact business there. See 678 F. Supp. 2d at 1211. The Court said that Brown's blog posts similarly did not establish personal jurisdiction, because

the blog is closer to an informative website than a commercial website. No services are offered, and Brown is not collecting revenue from the website. Brown does not interact with the people who post information on the blog. Brown, to the Court's knowledge, did not solicit negative postings on the website. Further, even though people in New Mexico can view the website, the blog is not a website that is directed solely at the people of New Mexico. The number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, according to the statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211-12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its decision as to Brown. See Silver v. Brown, 382 F. App'x. at 727-32. In an opinion that the Honorable Monrow G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and

Judges Broby and Ebel joined, the Tenth Circuit applied the three-part test from <u>Calder v. Jones</u> to conclude that the Court had personal jurisdiction over Brown. See <u>Silver v. Brown</u>, 382 F. App'x. at 727-32. Judge McKay first explained that the posting of the blog was "clearly an intentional act" designed to damage the plaintiff's reputation. 382 F. App'x. at 729. Second, Judge McKay said that Brown had "expressly aimed his blog at New Mexico," where Silver, his business, and the majority of his customers were located. 382 F. App'x. at 729. Judge McKay noted: "It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and [his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico." 382 F. App'x. at 729-30. Third, Judge McKay explained that Brown knew Silver would suffer the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business activities." 382 F. App'x. at 730.

In several other recent cases, the Court grappled with whether it could assert general or specific jurisdiction over non-individual entities. In <u>Fabara v. GoFit, LLC</u>, 308 F.R.D. 380 (D.N.M.2015)(Browning, J.), a plaintiff -- injured by an allegedly defective exercise ball in New Mexico -- brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma. See 308 F.R.D. at 408. The manufacturer moved to dismiss the complaint, under rule 12(b)(2), arguing that the Court lacked general jurisdiction because its contacts with New Mexico were neither continuous nor systematic. See 308 F.R.D. at 384. The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them. See 308 F.R.D. at 389. The Court rejected this theory, explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here." 308 F.R.D. at 397. The Court noted that the manufacturer had

almost no physical connections with New Mexico, and that its New Mexico internet sales -- roughly $20,000.00 over nine years -- were insufficiently "substantial" to support general jurisdiction.  308 F.R.D. at 402-03.

In Diener v. Trapeze Asset Management, Inc., No. 15-0566, 2015 WL 8332933 (D.N.M.)(Browning, J.), the Court considered whether it had specific jurisdiction over a Canadian asset-management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico.  See 2015 WL 8332933, at *1.  The Court concluded that it did not have specific jurisdiction for four primary reasons.  See 2015 WL 8332933, at *1. First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site."   2015 WL 8332933, at *15.  Second, the third-party listing was similarly passive.  See 2015 WL 8332933, at *15.  Third, the Court noted that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," noting that the alleged torts occurred in Canada.  2015 WL 8332933, at *17 (quoting Benton v. Cameco Corp., 375 F.3d 1070, 1077 (10th Cir. 2004)).  Fourth, the plaintiffs reached out to the defendants to create the contractual relationship, distinguishing the case from others finding purposeful availment.  See 2015 WL 8332933, at *17 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 473).

Finally, in Resource Associates Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free School Dist., 193 F. Supp. 3d 1200 (D.N.M. 2016)(Browning, J.), the Court considered whether it had personal jurisdiction over a union that had never conducted any business in New Mexico, had never sent a representative to New Mexico, and its only contacts with a New Mexico entity were via telephone and email correspondence that the New Mexico company had initiated.

<u>See</u> 193 F. Supp. 3d at 1239. Highlighting the contractual nature of the particular contacts at issue, and that due process may be satisfied in contractual relations if the defendant "'reache[s] out' to the forum state," the Court concluded it could not exercise personal jurisdiction over the union, because the union did not "not reach out to New Mexico to enter into an agreement"; rather, the New Mexico entity had initiated the communications and contract. 193 F. Supp. 3d at 1241-43 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 479-85).

## <u>ANALYSIS</u>

First, the Court concludes that it may properly consider all of the documents the Defendants request to be judicially noticed on a rule 12(b)(6) Motion, except the FTC Letter, because the United States has not publically recognized that document as its own. It concludes that the remaining documents may be properly considered, because they are either referenced in the Amended Complaint or are matters of public record. Second, the Court concludes that it lacks personal jurisdiction over Reynolds American vis-à-vis the Plaintiffs' claims brought in a non-North Carolina forum, because Reynolds American's involvement with its subsidiary, Santa Fe Tobacco -- <u>e.g.</u>, its asset and board member overlap -- is not so extensive as to make Santa Fe Tobacco Reynolds American's alter ego. Nevertheless, it will exercise its authority under 28 U.S.C. § 1631 to transfer the claims, instead of dismissing them. Third, the Consent Order does not preempt the Plaintiffs' claims premised on the Safer-Cigarette Theory, because the Consent Order is not law, and an agreement not to enforce a federal law does not evince a clear and manifest purpose to supplant all state-law deceptive-practice claims. Fourth, the Court concludes that Natural American cigarettes' labeling and advertising misleads a reasonable consumer under the Plaintiffs' Safer-Cigarette and Menthol Theories, but not under the Plaintiffs' Unprocessed-Cigarette Theory. Decades-long marketing campaigns have infused the terms natural and organic with safety and health connotations,

such that the Defendants' use of the terms would deceive a reasonable consumer. In addition, menthol is not such a common substance that a reasonable consumer would understand that menthol is an additive when faced with a disclosure directly to the contrary. The Court, however, dismisses the claims to the extent that they are premised on the Unprocessed-Cigarette Theory. Fifth, the First Amendment does not shield the Defendant from liability, in part, because the state action doctrine precludes liability for contract-type claims, and, in part, because the descriptors plausibly deceived the plaintiffs. Sixth, the states' safe harbors, except for Illinois', do not preclude liability for largely the same reasons that the Consent Order did not preempt the Plaintiffs' claims. The Ohio statutory claims, nevertheless, must be dismissed, because the Plaintiffs do not satisfy OSCPA's notice requirement, and because consumers do not have standing to sue under ODTPA. Seventh, New Jersey precludes unjust-enrichment relief, because the Plaintiffs cannot allege a remuneration, and Ohio Law preclude unjust-enrichment relief, because the Plaintiffs cannot allege a direct benefit. However, the remaining claims may be pled in the alternative. Eighth, the express warranty claims under Florida, Illinois, and New York law must be dismissed, because the Plaintiffs' Amended Complaint cannot serve as the requisite notice, and must also be dismissed under Florida and Illinois law, because the Plaintiffs lack privity with the Defendants. Ninth, the Plaintiffs' requested injunctive relief is not yet rendered moot, because ongoing litigation may invalidate the Memorandum of Agreement.

I.    **THE COURT MAY PROPERLY CONSIDER ALL BUT ONE DOCUMENT THAT THE DEFENDANTS HAVE SUBMITTED WITHOUT CONVERTING THE MOTION INTO ONE FOR SUMMARY JUDGMENT.**

The Defendants move for judicial notice of eighteen items, and they are:

(1)    The 2000 FTC Complaint filed against Santa Fe Tobacco. See In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952 Complaint ("FTC Complaint"), filed November 18, 2016 (Doc. 71-1)("First JN Motion Exhibits"); First JN Motion Exhibits at CM/ECF 2-4.

(2)	Natural American Spirit Advertising attached to the FTC Complaint.  <u>See</u> <u>In the Matter of Santa Fe Natural Tobacco Company, Inc.</u>, No. C-3952, Exhibits A-C, filed November 18, 2016 (Doc. 71-1)("FTC Complaint's exhibits"); First JN Motion Exhibits at CM/ECF 6-8.  The FTC Complaint's exhibits appear to be photocopied advertisings from magazines, and they advertise Natural American cigarettes as 100% free of chemical additives and natural.

(3)	The Consent Order.  <u>See</u> First JN Motion Exhibits at CM/ECF 10-19.

(4)	An FTC press release announcing a proposed settlement agreement between the FTC and Santa Fe Tobacco.  <u>See</u> FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads are Deceptive, issues April 27, 2000,  filed November 18, 2016 (Doc. 71-1)("Press Release 1"); First JN Motion Exhibits at CM/ECF 21-23.

(5)	An FTC press release announcing a proposed settlement agreement concerning Reynolds American's no-additive advertising.  <u>See</u> FTC Accepts Settlement of Charges that Ads for Winston "No Additive" Cigarettes are deceptive, issued March 3, 1999, filed November 18, 2016 (Doc. 71-1)("Press Release 2"); First JN Motion Exhibits at CM/ECF 25-27.

(6)	An Assurance of Voluntary Compliance between Reynolds American and various States Attorneys General.  <u>See</u> Assurance of Voluntary Compliance, (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1)("Assurance of Voluntary Compliance"); First JN Motion at Exhibits at 29-49.

(7)	Letter from Lisa Kopchik, an FTC attorney, to Robin Sommers, Santa Fe Tobacco's CEO, dated September 22, 1997.  <u>See</u> Advertising for Natural American Cigarettes File Number 972-3235, dated September 22, 1997, filed November 18, 2016 (Doc. 71-1)("FTC Letter"); First JN Motion Exhibits at CM/ECF 51-57.

(8)	A Food and Drug Administration Center for Tobacco Products Warning Letter to Santa Fe Tobacco, dated August 27, 2015.  <u>See</u> Warning Letter, dated; First JN Motion at CM/ECF 59-62.

(9)-(15)	Reproductions of Natural American cigarette labeling.  <u>See</u> Natural American Spirit Dark Green 84mm CPB at CM/ECF 64-69, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Dark Green Label"); Natural American Spirit Blue 84mm CPB at CM/ECF 71-76, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Blue Label"); Natural American Spirit Gold 84 mm CPB at CM/ECF 78-83, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Gold Label"); Natural American Spirit Turquoise 84mm CPB at CM/ECF 85-90, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Turquoise Label"); Natural American Spirit Green 84mm

CPB at CM/ECF 92-97, dated August 13, 2015, filed November 16, 2016 (Doc. 71-1)("Green Label"); Natural American Spirit Yellow 84 mm CPB at CM/ECF 99-104, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Yellow Label"); Natural American Spirit Perique Robust 84 mm CPB at CM/ECF 106-111, dated August 13, 2015, filed November 18, 2016 (Doc. 171-1)("Perique Label"), (collectively "Natural American Labels"); First JN Motion Exhibits at CM/ECF 64-111.

(16)     Natural American Tobacco and Water Advertising. <u>See</u> Tobacco & Water Advertisement; First JN Motion Exhibits at 113-14.

(17)     Memorandum of Agreement. <u>See</u> Second JN Motion at 1; Second JN Motion Exhibit at CM/ECF 2-3.

(18)     Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) dated May 9, 2017, filed May 30, 2017 (Doc. 109-1)("Staff Guidance Request"); Third JN Motion Exhibit at CM/ECF 2-4.

The Plaintiffs argue that items 17 and 18 are not judicially noticeable, but do not contest the first sixteen items. <u>See</u> Plaintiffs' Response in Opposition to Defendants' Second Motion for Judicial Notice at 2-4, filed April 6, 2017 (Doc. 97)("Second JN Resp."); Plaintiffs' Response in Opposition to Defendants' Third Motion to Take Judicial Notice at 1-2, filed June 7, 2017 (Doc. 111)("Third JN Resp."). The Court concludes that it may consider all of the documents, which the Defendants submit, except the FTC Letter, without converting the MTD into one for summary judgment.

Initially, the Court judicially notices the FTC Complaint, the FTC Complaint's Exhibits, the Consent Order, Press Release 1, Press Release 2, the Assurance of Voluntary Compliance, and the Warning Letter. The FTC Complaint, the FTC Complaint's Exhibits, and the Consent Order are matters of public record, so may be judicially noticed. <u>See</u> <u>Hodgson v. Farmington City</u>, 675 F. App'x 838, 840-41 (10th Cir. 2017)(unpublished)(concluding that a district court did not err "in taking judicial notice of public records from the parties' administrative and judicial proceedings"); <u>Stan Lee Media, Inc. v. Walt Disney Co.</u>, 774 F.3d 1292, 1298 n.2 (10th Cir. 2014); Stephen

Saltzburg, Michael M. Martin & Daniel J. Capra, <u>Federal Rules of Evidence Manual</u> § 201.02[3] at 201-7 (10th Ed. 2011)("The reliability of judicial records is not in question."). Those three documents were filed publicly in an administrative proceeding, and therefore are properly judicial noticed. <u>See</u> <u>In re Santa Fe Natural Tobacco Co.</u>, No. C-3952 (F.T.C. June 12, 2000). Independent from that determination, those three documents are properly judicially noticed, because they are available on a federal agency's website. <u>See</u> <u>New Mexico ex rel. Richardson v. Bureau of Land Management</u>, 565 F.3d 683, 702 n.22 (10th Cir. 2009)(ruling that judicial notice was proper for information referenced on two federal agency's websites); <u>O'Toole v. Northrop Grumman Corp.</u>, 499 F.3d 1218, 1215 (10th Cir. 2007)("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").[35] That the Court judicially notices the documents' existence, however, does not mean that the Court judicially notices the documents' content for the truth of the matter asserted. <u>See</u> Saltzburg, Federal Rules of Evidence Manual § 201.02[3], at 201-8 ("[A] court can take judicial notice that court filings contained certain allegations . . . , [b]ut the truth of these allegations and findings are not proper subjects of judicial notice."). Indeed, any party can file a document in a proceeding, but that does not mean that the document's contents are beyond reproach.

The Court also judicially notices Press Release 1, Press Release 2, the Assurance of Voluntary Compliance, and the Warning Letter, because they are available on a governmental website.[36] The Court does not, however, judicially notice the FTC letter. The Court could not locate

---

[35]<u>See</u> https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafecmp.htm (FTC Complaint); https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafeexhibitsac.pdf (FTC Complaint's Exhibits); https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafe.do.htm (Consent Order).

[36]<u>See</u> https://www.ftc.gov/news-events/press-releases/2000/04/ftc-accepts-settlements-charges-alternative-cigarette-ads-are (Press Release 1); https://www.ftc.gov/news-events/press-

that document on any website, and certainly not a government website.  Although the Defendants

argue that the FTC letter is a "matter of public record," First JN Motion at 3, they do not inform the

Court where the document may be publically located.  The Defendants also argue that judicial notice

is proper, because the FTC letter is an official "government document[]," First JN Motion at 3,

which appears true on the document's face; the letter is typed on FTC letterhead, it references file

number 972-3235, and Lisa Kopchik, an FTC attorney, has signed it,  FTC letter at 1, 3 (at 51, 53 on

CM/ECF).  Nevertheless, the test for judicial notice is whether an adjudicative fact is "capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned," Fed. R. Evid. 201(b)(2), and this source could be reasonably questioned, because the

FTC has not publically acknowledged it as its document, see Duprey v. Twelfth Judicial Dist. Court,

State of New Mexico, No. 08-0756, 2009 WL 2432483, at *2 (D.N.M. July 10,

2009)(Browning, J.)(ruling that a letter from a government employee to an aggrieved subordinate

was not judicially noticeable without converting the motion to dismiss into one for summary

judgment;  Abercrombie v. Aetna Health, Inc., 176  F. Supp. 3d  1202, 1213  n.13

(D. Colo. 2016)(Arguello, J.)(declining to take judicial notice of a Colorado Division of Insurance,

Department of Regulatory Agency's letter).

---

releases/1999/03/ftc-accepts-settlement-charges-ads-winston-no-additive-cigarettes (Press Release 2);https://oag.ca.gov/system/files/attachments/press_releases/n1865_santa_fe_natural_tobacco_co agreement.pdf (Assurance of Voluntary Compliance); https://www.fda.g ov/ICECI/ EnforcementActions/WarningLetters/2015/ucm459778.htm (Warning Letter).  Although the Assurance of Voluntary Compliance is from a state agency's website, documents from those sources are also properly judicially noticed.  See New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d at 702 n.22 (ruling that documents referenced in the New Mexico State Resource Advisory Council Minutes, which were available on the agency's website, were judicially noticeable).  In addition, the Amended Complaint references the Warning Letter, so it is also properly considered without converting the Motion into one for Summary Judgment.  See Amended Complaint ¶¶ 36, 58, at 14, 28-29.

The Court also concludes that it can consider the Natural American Labels and the Tobacco & Water Advertisement without converting the motion into one for summary judgment, because the Amended Complaint incorporates those documents by reference.  The Amended Complaint, in fact, reproduces pictures of the labeling and the advertising that the Defendants seek to introduce.  See Amended Complaint ¶¶ 40, 43, at 15, 19-21; First JN Motion at 4 (explaining that the Defendants seek to produce more legible pictures of the labeling and the second page of an advertisement featured in the Amended Complaint).    Moreover, Natural American cigarette's labeling and advertising is central to this case and the Plaintiffs have not disputed those documents' authenticity, so the Court may properly consider them without converting the MTD into one for summary judgment.  See Jacobsen v. Deseret Book Co., 287 F.3d at 941.

The Memorandum of Agreement is judicially noticeable.  The Plaintiffs contend that the Memorandum of Agreement cannot be a matter of public record, because it is not published in the Federal Registry, it is not a government report, or a government press release, and it is stamped "Confidential - Not for Public Disclosure."  Second JN Resp. at 2-3.  The Defendants rejoin that, by producing a copy of the Memorandum of Agreement in response to a Freedom of Information Act ("FOIA") request, the FDA made the document a matter of public record.  See Second JN Reply at 1.  The Court concludes that the Memorandum of Agreement is a matter of public record, despite its confidential label and even though it is still not publically available online, because the FOIA disclosure makes the document "capable of accurate and ready determination by resort to [a] source[] whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  See New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 110 n.8 & 9 (2d Cir. 2014)(ruling that an official disclosure made in response to a FOIA request typifies the kind of document judicially noticeable); In re American Apparel, Inc. Shareholder Litig., 855 F. Supp. 2d 1043, 1064 (C.D. Cal.

2012)(Morrow, J.)("Because plaintiffs obtained the documents by making a FOIA request, the court will take judicial notice of them as matters of public record.").

The Plaintiffs also argue, however, that, even if the document is judicially noticeable, the Defendants want the Court to judicially notice the Memorandum of Agreement's contents for their truth value -- "a task inappropriate at the 12(b)(6) stage." Second JN Resp. at 4. In their MTD, the Defendants cite the Memorandum of Agreement to support their argument that injunctive relief is rendered moot, because they have already taken steps to the stop the actions that, purportedly, entitle the Plaintiffs to injunctive relief. See MTD at 68-69. The Court agrees with the Plaintiffs that it cannot consider the contents of the Memorandum of Agreement for the truth of the matters asserted therein. See Tal v. Hogan, 453 F.3d at 1265 n.24; Saltzburg, Federal Rules of Evidence Manual § 201.02[3], at 201-8 ("[A] court can take judicial notice that court filings contained certain allegations . . . , [b]ut the truth of these allegations and findings are not proper subjects of judicial notice."). The Memorandum of Agreement, however, speaks only to the parties' intent, which has truth value only to that intent. See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1088 (10th Cir. 2001)(citing United States v. Montana, 199 F.3d 947, 950 (7th Cir. 1999)(explaining that "performative . . . utterances . . . illustrated by a promise, offer, or demand -- commit the speaker to a course of action [and] are not within the scope of the hearsay rule, because they do not make any truth claims")). Within the Memorandum of Agreement, Santa Fe Tobacco commits to removing certain terms from its labels and advertising, and the FDA commits to "not initiating enforcement action" if Santa Fe Tobacco agrees to the Memorandum of Agreement's terms. Memorandum of Agreement at 1-2. The Court will not consider the Memorandum of Agreement for its truth value.

Finally, the Court judicially notices the Staff Guidance Request. In the document, the FTC advises the Defendants that it cannot say whether the phrases "Tobacco Ingredients: Tobacco and Water" and "Tobacco Filler Ingredients: Tobacco and Water" trigger the Consent Order's disclosure requirement, because the legal analysis turns on "an examination of the entire advertisement," so it cannot offer legal advice regarding the two phrases in a vacuum. Staff Guidance Request at 2. The FTC warns, however, that those phrases likely trigger the Consent Order's disclosure obligation. See Staff Guidance Request at 2. The FTC also notes that, if the Defendants modified their disclosure to "Natural American Spirit cigarettes are not safer than other cigarettes," the FTC would not recommend an enforcement action "*as long as* the disclosure was displayed clearly and prominently." Staff Guidance Request at 3 (emphasis in original). The Court judicially notices the Staff Guidance Request, because it is available on the FTC's website.[37]

## II. THE COURT LACKS PERSONAL JURISDICTION OVER REYNOLDS AMERICAN WITH RESPECT TO THE PLAINTIFFS' CLAIMS THAT WERE NOT FILED IN NORTH CAROLINA.

The Defendants argue that the Court has jurisdiction only over those claims against Reynolds American filed in North Carolina, because Reynolds American is headquartered and incorporated there, and Reynolds American otherwise lacks the minimum contacts necessary for specific or general jurisdiction in the other forums. See MTD at 71, 73-74. They also aver that the Plaintiffs cannot impute Reynolds American's subsidiaries' contacts onto it, because Reynolds American does not substantially controls its subsidiary's day-to-day activities. See MTD at 76-77.

The Court's jurisdiction in an MDL is coextensive with the transferor courts' jurisdiction. See, e.g., In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 297 n.11 (3d Cir. 2004).

---

[37]See https://www.ftc.gov/system/files/documents/advisory_opinions/letter-mary-engle-associate-director-division-advertising-practices-mark-s-brown-esq/rai-santa_fe_staff_advisory_opinion_and_incoming_request_5-9-17.pdf.

Accordingly, the Court must assess personal jurisdiction with respect to the Defendants' contacts to the forums in which the Plaintiffs filed suit. See, e.g., In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d at 297 n.11. To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process. See Doering v. Copper Mountain, Inc., 259 F.3d at 1209-10.

The Defendants argue that asserting personal jurisdiction over the claims filed against Reynolds American outside of North Carolina would violate Due Process. See MTD at 72. The personal-jurisdiction due process analysis is two-fold. See Fabara v. GoFit, LLC, 308 F.R.D. at 400. A defendant must have "minimum contacts" with the forum state such that it "should reasonably anticipate being haled into court there," Burger King Corp. v. Rudzewicz, 471 U.S. at 473-76, and exercising personal jurisdiction over the defendant must comport with "traditional notions of fair play and substantial justice," Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quotation marks omitted). A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court with either general or specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d at 1532-33 (citations omitted).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo:* in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078.

The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum state. Daimler AG v. Bauman, 134 S. Ct. at 760. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). For corporations, "the place of incorporation and

principal place of business are 'paradig[m] . . . bases for general jurisdiction." <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760 (quoting <u>Goodyear</u>, 564 U.S. at 924).

The Court agrees with the Defendants that it cannot assert general personal jurisdiction over Reynolds American except for the Plaintiffs' claims that were filed in North Carolina. <u>See</u> <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760; Amended Complaint ¶¶ 12-13, 15, 18, 20-22, at 4-11 (alleging that Herbert, Benson, Emmons, Murphy, Chavez, Horne, and Lopez filed suit in the United States District Court for the Middle District of North Carolina). Reynolds American is a North Carolina corporation with its principal place of business in North Carolina, so it is at home in that state and subject to general personal jurisdiction for the claims asserted in a North Carolinian forum. <u>See</u> Amended Complaint ¶ 25, at 12. The Court cannot assert general personal jurisdiction over the claims alleged against Reynolds American originally filed in other states. <u>See</u> Amended Complaint ¶¶ 14, 16-17, 19, 23 at 5-9, 11.[38]

The Court also agrees with the Defendants that it cannot assert specific personal jurisdiction over Reynolds American regarding the remaining Plaintiffs' claims. The specific-jurisdiction inquiry is also a two-part test: "[F]irst . . . the out-of-state defendant must have purposefully directed its activities at residents in the forum state, and second, . . . the plaintiff's injuries must arise out of' defendant's forum-related activities." <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d at 1071 (quotations omitted). <u>See</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 472. "For specific jurisdiction, a defendant's general connections with the forum are not enough." <u>Bristol-Myers</u>, 137 S. Ct. at 1781. In the tort context, a defendant has "purposefully directed" his activities at a state or

---

[38]Although language in <u>Daimler AG v. Bauman</u> suggests that general jurisdiction over a corporation could be asserted in states where the Defendant corporation is not incorporated or headquartered in the state, see <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760-61, the Court reads <u>Daimler AG v. Bauman</u> as generally foreclosing that possibility except in unusual circumstances not present here. <u>See</u> <u>Bristol-Myers</u>, 137 S. Ct. 1780 ("[O]nly a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State.")(quotations omitted).

its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at the state; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in that state. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1072 (quoting Calder v. Jones, 465 U.S. at 789-90).

Reynolds American's alleged activities -- "intimate[] involve[ment] in the marketing, advertising, and overall business development of Natural American cigarettes," Amended Complaint ¶ 27, at 12 -- do not establish that it directed its activities at the non-North Carolina states. See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op, 17 F.3d 1302, 1305 (10th Cir. 1994)(ruling that placing advertisements in national newspapers or journals do not amount to purposeful contact with a state). More explicit allegations demonstrating that Reynolds American targeted a specific state with its publications could potentially establish that it directed its activities at those states, but those allegations are not present in the Amended Complaint.

Nor may Reynolds American's subsidiaries' contacts be substituted for the ones that Reynolds American lacks. To impute a subsidiary's contacts onto a parent, the subsidiary must be the parent's general agent or alter ego. See Benton v. Cameco Corp., 375 F.3d 1070, 1081 (10th Cir. 2004)(ruling that an allegation of parent and subsidiary officer overlap was insufficient to impute subsidiary contacts onto the parent); Daimler AG v. Bauman, 134 S. Ct. at 759 ("[S]everal Courts of Appeals have held that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego."). The Plaintiffs allege that: (i) Reynolds American has service agreements with its subsidiaries, which enable executive collaboration; (ii) Reynolds American considers Santa Fe Tobacco an operating segment; (iii) Reynolds Americans assets are Santa Fe Tobacco's assets; (iv) Reynolds American controls Santa Fe's financial operations; (v) board members and other employees overlap; (vi) Reynolds

American controls pricing and owns its subsidiaries executive offices and manufacturing facilities; and (vii) Reynolds American reports Santa Fe Tobacco's financial statements in SEC filings.  See Response at 78; Amended Complaint ¶¶ 29, 35, at 13-14.  Although those allegations demonstrate that Reynolds American exhibits influence over its subsidiaries, influence alone is insufficient to demonstrate that the subsidiary is an alter ego.  Parent companies typically monitor a subsidiary's performance, supervise its finances, and oversee some decisions.  See Willis v. Government Emps. Ins. Co., No. 13-0280, 2016 WL 3946782, at *5 (D.N.M. February 1, 2016)(Gonzales, J.).  In contrast, a subsidiary is an alter ego if it is a mere "instrumentality of the parent."  Key v. Liquid Energy Corp., 906 F.2d 500, 503 (10th Cir. 1990).  Construing state corporate law, the Tenth Circuit's analysis in Luckett v. Bethlehem Steel Corp., 618 F.2d 1373 (10th Cir. 1980), is instructive.  In that case, the Tenth Circuit concluded that a subsidiary was not a parent's alter ego even though the parent owned seventy percent of the subsidiary's stock, appointed ten of the subsidiary's managers, some of whom had managerial posts at the parent as well, and had contracted to give the subsidiary technical services and manufacturing equipment.  See Luckett v. Bethlehem Steel Corp., 618 F.2d at 1378; Good v. Fuji Fire & Marine, Ins. Co., 271 F. App'x 756, 759 (10th Cir. March 27, 2008)(unpublished)(ruling that a parent company owning twenty percent of the stock in a subsidiary was insufficient to impute the subsidiary's contacts onto the defendant for personal jurisdiction); Thompson v. THI of New Mexico at Casa Arena, No. 05-1331, 2008 WL 5999653, at *26 (D.N.M. December 24, 2008)(Browning, J.)(ruling that a subsidiary was not a parent's alter ego, in part, because it "was not intimately involved in the day-to-day operations" and "was independently financially stable and able to maintain its payroll").  The Tenth Circuit's conclusion applies with equal force here; although board members and assets overlap, and Reynolds American

supervises other aspects of its subsidiary, those facts are insufficient to create an alter-ego or general agency relationship.

Although the Court lacks personal jurisdiction as to those claims, there is still the question of the appropriate remedy. The Court notes that it can, under rule 21, sever the defective claims filed against Reynolds American and transfer that action to a North Carolina federal court, if the transfer "is in the interest of justice." 28 U.S.C. § 1631. See Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms . . . sever any claim against a party."); Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1214 (Browning, J.)("[A] district court may sever a case under Rule 21 to transfer one action while retaining jurisdiction over the other.")(citation and quotation omitted). A North Carolina federal court could exercise general personal jurisdiction over the claims. The Plaintiffs, however, have not argued for severance and transfer, so the Court would be acting sua sponte. The Court has authority, however, to sever and to transfer sua sponte. See Fed. R. Civ. P. 21; Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006). The Court also has discretion to transfer, but the Tenth Circuit has indicated that the Court must weigh whether it is in the interests of justice to transfer a claim instead of dismissing it without prejudice. See Trujillo v. Williams, 465 F.3d at 1222-23.

There are three factors that the Court must consider on an "interests of justice" analysis: (1) whether the claims would be time barred; (2) the claims' merit; and (3) whether the original action was filed in good faith rather than after the Plaintiff realized or should have realized that the forum was improper. See Trujillo v. Williams, 465 F.3d at 1223 n.16. Many of the claims have merit as discussed below. The Court also concludes that the Plaintiffs filed their claims on the good-faith belief that they could establish contacts through Santa Fe Tobacco's actions.

As to the final factor, the Plaintiffs allege that the statute of limitations is equitably tolled under the discovery rule, i.e., the named and unnamed Plaintiffs could not have known of the deception, so the limitations period does not trigger until the plaintiffs discover the deception, and because the Defendants concealed their deception. See Amended Complaint ¶¶ 96-102, at 38-39. They also allege that the Defendants are estopped from relying on a statute of limitation defense, because the Defendants actively concealed "the true nature, quality, and character" of Natural American cigarettes. Amended Complaint ¶ 104, at 29. See id. at ¶¶ 103-05, at 39. The Court does not assess the merits of those allegations, but it notes that the applicable statute-of-limitations period for the consumer protection statutes, unjust-enrichment claims, and express warranty claims range from two to six years. See, e.g., Ohio Rev. Code. Ann. 1345.10 ("An action . . . may not be brought more than two years after the occurrence of the violation . . . ."); Mich. Comp. Laws 445.911(7) ("An action under this section shall not be brought more than 6 years after the occurrence . . . ."); Halver v. Welle, 266 P.2d 1053, 1057 (Wash. 1954)(holding that statute of limitations for unjust enrichment is three years); Alloway v. General Marine Inds., LP, 695 A.2d 264 270-71 (N.J. 1997)(holding that statute of limitations for breach of express warranty is four years). Of the named plaintiffs who did not file in the Middle District of North Carolina, Sproule filed earliest, on September 30, 2015, in the Southern District of Florida. See Amended Complaint ¶ 14, at 5. Even assuming that his claims were tolled under the discovery rule, the statute of limitations triggered more than two years ago, so would preclude, at least, his OCSPA claim. See Ohio Rev. Code. Ann. 1345.10. However, there is nothing in the Amended Complaint or the judicially noticed documents to suggest that the Defendants would be equitably estopped from asserting a statute of limitations defense. There is also nothing within the Amended Complaint suggesting when the Plaintiffs actually discovered their injuries, which may have been long before the named plaintiffs' complaints

were filed.   Accordingly, the statute of limitations would likely defeat some, if not many, of the named Plaintiffs' claims.   The Court concludes that, on balance, the interest of justice favor severance and transfer -- many of the claims have merit, the Plaintiffs filed in good faith, and there is a risk that the statute of limitations would bar those claims.

The Court accordingly will sever the claims, creating a new action, and transfer that new action under 28 U.S.C. § 1631.   That statute provides that when the court transfers an action, that "action . . . shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631.   The action will be transferred to the Middle District of North Carolina and shall proceed as if it had been filed in the Middle District of North Carolina originally.[39]   Although transferred, it appears that the Plaintiffs may file a Notice of Potential Tag-Along Actions with the MDL Clerk of the Panel, and have the claims reconsolidated here.   See MDL Rule 7.1(a)

---

[39]The Court notes two federal cases that have held that an MDL transferee court may not transfer claims under 28 U.S.C. § 1631, which were consolidated under 28 U.S.C. § 1407.   In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig., 190 F. Supp. 3d 1100, 1122-23 (S.D. Fla. 2016)(Marra, J.); In re Camp Lejeune North Carolina Water Contamination Litig., __ F. Supp. 3d __, 2016 WL 7049038 at *9 n.68 (N.D. Ga. 2016)(Thrash, J.). In so holding, they rely on Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998)("Lexecon").   Lexecon, however, is inapposite.   There, the Supreme Court determined that an MDL transferee court could not transfer an MDL-consolidated case back to itself for trial, pursuant to 28 U.S.C. 1404(a) because it would interfere with Congress's clear command in 28 U.S.C. § 1407(a) that the MDL panel "shall . . . remand[] . . . at or before the conclusion of such pretrial proceeds to the district from which it was transferred." 28 U.S.C. § 1407(a).   See Lexecon, 523 U.S. at 34-35.   In so holding, the Supreme Court emphasized that 28 U.S.C. § 1407(a)'s "shall" language "creates an obligation impervious to judicial discretion," and the district court could not interfere with the MDL Panel's obligation.   Lexecon, 523 U.S. at 35.
28 U.S.C. § 1631's language, however, also includes the obligatory "shall" language.   28 U.S.C. § 1631.   The 28 U.S.C. § 1404(a) language, at issue in Lexecon, does not.   See 28 U.S.C. § 1404(a).   When faced with this obligation, the Court must transfer, if it is in the interest of justice.   In so holding, the Court notes that 28 U.S.C. § 1631 was enacted after the 28 U.S.C. 1407.

**III.   THE CONSENT ORDER DOES NOT PREEMPT THE PLAINTFFS' CLAIMS PREMISED ON THE SAFER-CIGARETTE THEORY.**

The Defendants move to dismiss the Plaintiffs' claims, asserting that federal law impliedly preempts the state-law claims premised on the Safer-Cigarette Theory. See MTD at 6. The Court first considers below express preemption and then turns to implied preemption. It ultimately concludes that the Consent Order does not preempt the Plaintiffs' claims.

**A.   THE FCLAA DOES NOT EXPRESSLY PREEMPT THE PLAINTIFFS' CLAIMS, BECAUSE THE PLAINTIFFS ALLEGE DECEPTION.**

In analyzing preemption, there is an "assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Medtronic, Inc. v. Lohr, 518 U.S. at 485. See Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518, 523 (1992)(applying a "presumption against the pre-emption of state police power regulations"). The fundamental standard for preemption is Congress' intent. See Wyeth v. Levine, 555 U.S. at 565. Unless it is evident that Congress intended to preempt state law causes of action, primarily where "Congress has 'legislated . . . in a field which the States have traditionally occupied,'" there is a presumption that the federal legislation does not displace the states' police powers. Medtronic, Inc. v. Lohr, 518 U.S. at 485 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Consumer protection law -- including cigarette advertising regulations -- is a field traditionally reserved for the states' historic police powers. See Packer Corp. v. State of Utah, 285 U.S. 105, 108 (1932)("[T]he state may, under the police power, regulate the business of selling tobacco products and the advertising connected therewith."); Lorillard Tobacco Co. v. Reilly, 533 U.S. at 541-42 ("Because 'federal law is said to bar state action in [a] fiel[d] of traditional state regulation,' namely, advertising, we 'wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of

Congress.'")(quoting Packer Corp. v. State of Utah, 285 U.S. at 108)(internal citation omitted)).

Commonly, when there is more than one way to read the text of a preemption clause, courts "accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). To prevail on their Motion to Dismiss, the Defendants must overcome a "strong presumption against pre-emption." Cipollone v. Liggett Grp., Inc. 505 U.S. at 518.

While neither party raises express preemption under FCLAA or under the FTC's authority over advertising and promotion, the Court deems it prudent to discuss the FCLAA. In 1965, Congress enacted the FCLAA in response to the Surgeon General's conclusion that cigarette smoking is harmful. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 513-14. The FCLAA mandates that every cigarette pack sold in the United States have a warning label stating that cigarette smoking is dangerous to health, and may cause death from cancer and other diseases. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 513-14. In the process, Congress expressly preempted state laws that may add supplemental requirements to the federally required warning. See 505 U.S. at 514. In 1969, Congress amended the FCLAA via the Public Health Cigarette Smoking Act of 1969, which strengthened the required warning and broadening the preemption provision. See Cipollone v. Liggett Group, Inc., 505 U.S. at 520. Congress has continued to amend the FCLAA, and, today, the FCLAA contains two express preemption provisions: 15 U.S.C. § 1334(a)-(b). The FCLAA's first preemption clause -- 15 U.S.C. § 1334(a) -- prohibits states from requiring additional statements on cigarette packages "relating to smoking and health" in an attempt to shield manufacturers from state labeling laws and their attendant costs. 15 U.S.C. § 1334(a); Altria II, 555 U.S. at 78. The FCLAA's second preemption clause -- 15 U.S.C. § 1334(b) -- states that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the

advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."  15 U.S.C. § 1334(b); Altria II, 555 U.S. at 78-79.

The FCLAA's labeling requirement, along with its preemption provisions, demonstrate Congress' intent that the FCLAA's mandated warnings are necessary and sufficient to promote Congress' goal.  See Altria II, 555 U.S. at 79.  Thus, states may not obstruct interstate commerce by implementing cigarette labeling rules based on the belief that federally mandated warnings are inadequate.  See Altria II, 555 U.S. at 79.  Cipollone v. Liggett Group Inc. is instructive and involved a smoker and spouse who brought suit against cigarette manufacturers after contracting lung cancer. See Cipollone v. Liggett Grp. Inc., 505 U.S. at 528-29.  In ruling that the FCLAA does not preempt the plaintiffs' claims arising from a false advertising allegation, the Supreme Court derived a distinction between state laws premised on smoking and health and those based upon fraudulent misrepresentations.  See Cipollone v. Liggett Group Inc., 505 U.S. at 528-29.

> Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely on a single, uniform standard: falsity.  Thus, [the FCLAA's express preemption clause] "based on smoking and health," fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements.

Cipollone v. Liggett Group Inc., 505 U.S. at 528-29.  Here, the FCLAA does not expressly preempt the Plaintiffs' claims, because their claims are premised on fraudulent misrepresentations. Indeed, the Defendants, rightfully, do not argue that the FCLAA expressly preempts the Plaintiffs' claims.

## B.  THE CONSENT ORDER DOES NOT IMPLIEDLY PREEMPT THE PLAINTIFFS' CLAIMS.

Implied conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  See Pharm.

Research and Mfrs. Of Am. V. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle preemption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). Whether an obstacle is sufficient for preemption purposes "is a matter of judgment, to be informed by examining the federal [law] as a whole and identifying its purpose and intended effects." Barber ex rel. Barber v. Colo. Dep't of Rev., 562 F.3d 1222, 1232 (10th Cir. 2009).

The Defendants do not argue that it is impossible to comply with both the Consent Order and state law. See MTD at 9-15. Instead, they contend that state law liability erects an obstacle to a federal objective. See MTD at 9-15. The Court concludes that the Consent Order does not impliedly preempt the Plaintiffs' claims for four reasons. First, the Consent Order cannot preempt state law, because it was not subject to the APA's or the FTC Act's rigorous procedural requirements for promulgating regulations. Second, even if a consent order could preempt state law without going through the APA or FTC procedural requirements, an agreement not to enforce a federal law does not evince intent to preclude all state law liability. Third, assuming that the Consent Order had preemptive effect, it would only bind parties to the agreement, so the consent order would only prohibit the plaintiffs from bringing suit against Santa Fe Tobacco. Finally, if the Consent Order had preemptive effect, it would only preempt the Plaintiffs' claims that target Natural American advertising and not their labeling, because the Consent Order does not govern labeling.

The Supreme Court has ruled that federal regulations preempt state laws. See Capital Cities Cables, Inc. v. Crisp, 467 U.S. 691, 699 (1984). Some United States Courts of Appeals have held that consent orders have preemptive force. See Motion to Dismiss at 11 (relying on, among others, Feikema v. Texaco, Inc., 16 F.3d 1408, 1416 (4th Cir. 1994); Gen. Motors Corp. v. Abrams, 897 F.2d 34, 39 (2d Cir. 1990)). The United States Court of Appeals for the Fourth Circuit, in Feikema v. Texaco, Inc., explained that when an agency "'acting within valid statutory authority . . . enters

into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law.'" Feikema v. Texaco, Inc., 16 F.3d at 1416 (emphasis omitted). Similarly, in Gen. Motors Corp. v. Abrams, the Second Circuit held that an FTC "'consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt state legislation.'" Gen. Motors Corp. v. Abrams, 897 F.2d at 39.

The Courts of Appeals do not, however, uniformly hold that consent orders grant preemptive effect. For example, the Fifth Circuit, relying on a United States Court of Appeals for the Eleventh Circuit case, has ruled that, "[a]s far as preemption is concerned, a voluntary consent decree has the same effect on state law as does a voluntary affirmative action program -- none." Dean v. City of Shreveport, 438 F.3d 448, 464 (5th Cir. 2006)(citing In re Birmingham Reverse Discrimination Employment Litig., 833 F.2d 1492, 1501 (11th Cir. 1987)). The Seventh Circuit has similarly suggested that a consent decree does not have preclusive effect, unless subjected to the APA's rigorous procedural requirements. See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d 445, 454 (7th Cir. 1990).

> Because neither the state nor the consumers were parties to the FTC's case, it is hard to understand how the decree could blot out their claims based on state law. Whether the decree has such an effect should depend on whether it was adopted by the agency as its own policy following the procedures the APA requires; then the preemption would come from substantive rules rather than the parties' assent.

Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d at 454. The First Circuit, in expressing its skepticism that consent orders preempt state law, expanded on the Seventh Circuit's proposition that procedural protections must be recognized before agency action will acquire preemptive effect:

> Unlike many other exercises of agency authority, formal rulemaking comes with a host of procedural protections under the Administrative Procedure Act ("APA"), such as notice of the proposed rule, an opportunity for interested parties to participate, a statement of the basis and purpose of any rule adopted, and its

publication in the Federal Register. 5 U.S.C. § 533 (2007). Limiting the preemptive power of federal agencies to exercises of formal rulemaking authority, then, ensures that the states will have enjoyed these protections before suffering the displacement of their laws. *See, e.g., Wabash Valley Power Ass'n,* 903 F.2d at 453-54; Richard J. Pierce, Jr., *Regulation, Deregulation, Federalism and Administrative Law,* 46 U. Pitt. L.Rev. 607, 664-65 (1985).

Good v. Altria Grp., Inc., 501 F.3d at 51. "This reasoning has particular force in the case of the FTC Act, which imposes procedural requirements on the Commission's rulemaking powers that exceed those of the APA. 15 U.S.C. §§ 57(c)-(e)." Good v. Altria Grp., Inc., 501 F.3d at 51. Accordingly, the First Circuit ruled that "we do not believe that the FTC can preempt state-law actions arising out of particular practices simply by entering into a consent order allowing them to continue." Good v. Altria Grp., Inc., 501 F.3d at 53. The United States Court of Appeals for the Third Circuit has ruled in accord with both the First and Seventh Circuits. See Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 245 (3d Cir. 2008)("We decline to afford preemptive effect to less formal measures lacking the fairness and deliberation which would suggest that Congress intended the agency's action to be a binding and exclusive application of state law.")(quotations omitted). It reasoned:

> Regularity of procedure -- whether it be the rulemaking and adjudicatory procedures of the APA or others which Congress may provide for a particular purpose -- not only ensures that state law will be preempted only by federal law, as the Supremacy Clause provides, but also imposes a degree of accountability on decisions which will have the profound effect of displacing state laws, and affords some protection to the states that will have their laws displaced and to citizens who may hold rights or expectations under those laws.

Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d at 245.

The Court finds the First, Third, Fifth, Seventh, and Eleventh Circuits' reasoning persuasive and concludes that the Consent Order should not and does not preempt state law. A voluntary agreement -- in short, a contract -- between two parties, even when one is a federal agency, cannot "blot out" a dual sovereign's law without procedural safeguards. Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d at 454. A consent order is no more than a voluntary

agreement between two parties. See Arvin Indus., Inc. v. Maremont Corp., No. IP 72-C-585, 1973 WL 784, at *3 (S.D. Ind. Mar. 9, 1973). Absent procedural protections, it follows that state law would be subject to an agency's caprice, so long as the agency could find some accommodating private party. Agencies inclinations, moreover, may change with administrations. In addition to the policy reasons that the Third Circuit articulated, the Court's interpretation is in accord with the Supremacy Clause's text that "the Laws" shall be supreme. See David S. Rubenstein, The Paradox of Administrative Preemption, 38 Harv. J.L. & Pub. Pol'y 267, 286 (2015)(arguing that "reading [the Supremacy Clause] in its textual, historical, and structural context rather plainly shows that it was intended to mean federal statutes -- and exclusively so"); Michael D. Ramsey, The Supremacy Clause, Original Meaning, and Modern Law, 74 Ohio St. L.J. 559, 564-65 (2013)(arguing that "law," as used in the Supremacy Clause, means "laws enacted through the Bicameralism and Presentment Clauses of Article I, Section 7"). Lawmaking requires more than mutual assent between two parties. Although the Consent Order here underwent some form of notice and comment, see Santa Fe Natural Tobacco Company, Inc. Analysis to Aid Public Comment, 65 Fed. Reg. 26.211-01 (May 5, 2000), that procedure is optional, it is not subject to the APA's informal rulemaking standards, and it does not require the agency to respond to public comments, compare 16 C.F.R. § 2.34(c) ("The Commission retains the discretion to issue . . . a Final Decision and Order, incorporating the order contained in a consent agreement, in appropriate cases before seeking public comment.") with 5 U.S.C. § 553(c); Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015)("An agency must consider and respond to significant comments received during the period for public comment."); Sorenson Commc'n, Inc. v. F.C.C., 567 F.3d 1215, 1222 (10th Cir. 2009), nor is it as strict as the rulemaking standard that the FTC must meet to promulgate a regulation on unfair or deceptive acts or practices, see 15 U.S.C. § 57a(b)(1) (requiring, inter alia, that, before

prescribing a rule, the FTC allow notice and comment, provide an opportunity for an informal hearing, and provide a statement of basis and purpose). An APA rulemaking, for example, requires a statement of basis and purpose, which summarizes a rule's purpose and reason for adoption, and is, thus, a "very significant portion of a regulation when an issue arises as to its application and scope." United States v. Frontier Airlines, Inc., 563 F.2d 1008, 1013 (10th Cir. 1977). The Consent Order, on the other hand, has no such statement. A statement of basis and purpose "reveals and explains the perceived necessity for the rule" and does not leave the court "to guess at the reasoning process of the agency," Colorado Health Care Ass'n v. Colorado Dept. of Social Servs., 842 F.2d 1158, 1170 (10th Cir. 1988). With no such statement of basis and purpose, the Court is left to guess the Consent Order's scope and purpose. The Court concludes that the minimal notice and comment the Consent Order underwent are insufficient procedural safeguards to elevate the Consent Order to law that can have preemptive effect.[40]

Even if, however, a consent order could preempt state law, this Consent Order still fails to preempt the Plaintiffs' claim. The preemption analysis' guiding star is the FTC's intent and purpose. See Medtronic, Inc. v. Lohr, 518 U.S. at 485. The Consent Order mandates that Santa Fe Tobacco "display in advertisements," which use such phrases as "no additives, no chemicals, additive-free, chemical-free, chemical-additive-free, 100% tobacco, pure tobacco, or substantially similar terms," a

---

[40]Some academic commentators have suggested a similar holding. See Peter L. Strauss, Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for An Essential Element, 53 Admin L. Rev. 803, 849-50 (2001)("An agency that well understood the approaches explored here would restrict itself to using its guidance, interpretive and policy documents in a precedential way. It would never claim for them the force that we associate with statutes."); Richard J. Pierce Jr., Regulation, Deregulation, Federalism, and Administrative Law: Agency Power to Preempt State Regulation, 46 U. Pitt. L. Rev. 607, 611 (1985)("An agency should provide each state potentially affected by its action notice and an opportunity to participate in any proceeding in which the agency is considering a preemptive action."). Cf. Kent Barnett, Improving Agencies' Preemption Expertise with Chevmore Codification, 83 Ford. L. Rev. 587, 601 (2014)(noting that congressional language "strongly suggests that the OCC must preempt through formal adjudication or formal rulemaking under the APA").

disclosure that "[n]o additives in our tobacco does **NOT** mean a safer cigarette." Consent Order § 1, at 4-5 [at CM/ECF at 13-14] (quotations omitted)(emphasis in original). In a subsequent press release, the FTC's Director of its Bureau of Consumer Protection noted that "[t]he new disclosures should make it clear that . . . cigarettes without additives are not safe to smoke." Press Release 1 at 1. The Defendants argue that the FTC's intent with the Consent Order was to authorize the terms listed, so long as the disclosure mandated accompanies them. See MTD at 10-11. From that premise, they argue that imposing state liability for use of those terms erects an obstacle to the FTC's intent. See MTD at 11.

In analyzing those arguments, the Court proceeds with the backdrop of the presumption against preemption. The Defendants highlight the press release to contend that the Consent Order's purpose is to authorize the contested descriptors, or, potentially, to explain that the terms cannot be deceptive with the disclosure included. The Court perceives a potential different purpose evidenced from the press release: health and safety. The Director of the FTC's Bureau of Consumer Protections on-the-record comments demonstrate this. She writes: "These cigarettes are marketed with a natural aura, but they're neither healthy nor safe," and concludes with "[t]he fact is, there's no such thing as a safe smoke." Press Release 1 at 1 (quotations omitted). Even her comment that addresses how the disclosures should cure the advertising's deceptiveness is phrased in terms of overall cigarette safety. She says that the disclosures "make it clear that . . . cigarettes without additives are not safe to smoke." Press Release 1 at 1. Press Release 1 suggests, thus, that the Consent Order's purpose is to convey to consumers that cigarettes are unsafe. If health and safety is the Consent Order's purpose, the Consent Order poses no obstacle to the plaintiffs' deception-based claims, because the duty to refrain from making fraudulent statements diverges from a duty to warn. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 528-29.

Assuming, however, that the Consent Order's purpose is, as the Defendants' contend, to authorize the contested terms, the Plaintiffs' claims are still not preempted. Altria II offers the appropriate guidance. In that case, the Supreme Court considered the implied preemption doctrine and rejected the defendants' obstacle-preemption claim that the FCLAA preempted a state statute similar to the statutes at issue in this case, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See 555 U.S. at 90-91. In Altria II, the plaintiffs alleged that the defendant cigarette manufacturers deceptively marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See 555 U.S. at 73. The Supreme Court concluded that the FCLAA, which forbids state laws from requiring or prohibiting language with respect to cigarette advertising and promotion, presents no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulates warning labels, and does not regulate false or misleading statements. See 555 U.S. at 82-83. Moreover, the Supreme Court determined that an FTC consent order, which prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless those terms are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content," did not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement." 555. U.S. at 89 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state-law claims. See 555 U.S. at 90.

The FTC Consent Order at issue in Altria II is similar to the Consent Order here. See In the Matter of American Brands, Inc., 79 F.T.C. 255, 1971 WL 128779 (August 20, 1971). It orders that:

> [R]espondent American Brands, Inc. . . . . cease and desist from:
>
>> Stating in advertising that any cigarette manufactured by it, or the smoke therefrom, is low or lower in "tar" by use of the words "low," "lower," or "reduced" or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure.

In the Matter of American Brands, Inc., 79 F.T.C. 255, 1971 WL 128779, at *3.  The Consent Order

here is similar in that it prohibits descriptors, unless a disclosure accompanies them.  It reads:

> IT IS ORDERED that . . . [t]hese disclosures shall be displayed . . . in any
> advertisement that, through the use of such phrases as no additives, no chemicals,
> additive-free, chemical-free, chemical-additive-free, 100% tobacco, pure tobacco, or
> substantially similar terms, represents that a tobacco product has no additives or
> chemicals.

Consent Order at 5.  The Defendants argue that the two Consent Orders' texts materially differ in

that the Altria II order is "purely prohibitive, requiring the respondent to 'cease and desist from'"

using descriptors unless a disclosure accompanies them, Reply at 4 (quoting In the Matter of

American Brands, Inc., 1971 WL 128779, at *3), whereas the Consent Order here "affirmatively

permits" descriptors by "specifically stating that it 'shall not prohibit'" the use of descriptors so long

as the required disclosure is included, Reply at 4 (quoting Consent Order at 5).

The language difference between the two orders is not enough to distinguish this case from

Altria II.  Both consent orders prohibit descriptors unless a mandated disclosure accompanies them.

Alternatively, using the Defendants' chosen rhetoric, both Consent Orders authorize those

descriptors if a disclosure accompanies them.  That authorization was insufficient for the Supreme

Court in Altria II, so cannot be sufficient for the Court here.  The Defendants' attempt to distinguish

Altria II ultimately pivots on the Consent Orders' slightly different language -- the Altria II consent

order phrases its order in terms of ceasing and desisting, and the Consent Order does not.  Although

the language enjoining the conduct might be slightly stronger in the Altria II order, the effect of the

two orders is the same -- prohibiting conduct, unless a disclosure accompanies it.  That language

difference does not persuade the Court that the FTC's "clear and manifest purpose" with the Consent

Order was to supplant all state law deception claims, whereas the FTC had no such purpose with the

Altria II consent order.  Medtronic, Inc. v. Lohr, 518 U.S. at 485.

The Defendants' other attempt to distinguish Altria II is equally unpersuasive. They argue that Altria II's reasoning relies, in part, on decades of post-consent-order enforcement actions demonstrating that the FTC had no policy authorizing the descriptors at issue in Altria II. See Reply at 4-5. They argue that, in contrast, here, no such history exists. See Reply at 5. In Altria II, however, the Supreme Court's historical analysis had no bearing on its consent-order analysis; rather, the Supreme Court conducted a historical analysis to rebut the tobacco companies' argument that the FTC has a longstanding regulatory policy of authorizing the use of "light" and "low tar" descriptors. See Altria II, 555 U.S. at 87-89 n.13 ("Even if such a regulatory policy could provide a bases for obstacle pre-emption, petitioners' description of the FTC's actions in this regard are inaccurate."). Also, an agency's subsequent history is not the most reliable evidence of the agency's intent when it enters a consent order, because an agency's goals, policies, and personnel change with administrations. Finally, subsequent history is not a factor on which a court may conclude that preemption exists. See Medtronic, Inc. v. Lohr, 518 U.S. at 485-86 ("Congress' intent, of course is primarily discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole.")(quotations omitted); Altria II, 555 U.S. at 87 ("Even if such a regulatory policy could provide a basis for obstacle pre-emption . . .").[41]

Assuming, however, that the Consent Order preempts the Plaintiffs' claims premised on the Safer-Cigarette Theory, they would only preempt those claims against Santa Fe Tobacco. A consent order cannot impliedly preempt claims against third parties. See Altria II, 555 U.S. at 89 n.13

---

[41]The Defendants' reliance on Mulford v. Altria Grp. Inc., 506 F. Supp. 2d 733 (D.N.M. 2007)(Vazquez, J.), see MTD at 13-14, is misplaced, given that it construes the same consent order as Altria II does, and the Supreme Court's 2008 interpretation is binding, whereas Mulford v. Altria Group. Inc.'s interpretation is not.

("And a consent order is in any event only binding on the parties to the agreement. For all of these reasons, the consent order does not support the conclusion that respondents' claim is impliedly pre-empted.").[42] Cf. Liberty Bank F.S.B. v. D.J. Christie, Inc., 681 F. App'x 664, 668 (10th Cir. 2017)("[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party."). Reynolds American was not a party to the Consent Order, so the Plaintiffs' claims against that entity are not preempted.

Finally, even if the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory, it would preempt that claim only vis-à-vis the Defendants' advertisements, and not the Defendants' cigarette packaging and labeling. The Consent Order applies only to "advertisements." Consent Order at 4, [at 13 on CM/ECF] ("[R]espondent . . . shall display in advertisements . . . ."). The Defendants urge the Court to overlook the conspicuous absence of "packaging and labeling" from the Consent Order, because the "FTC could have imposed restrictions on [Natural American cigarette] packaging, but chose not to -- evidencing a conclusion that packaging did not present cause for concern." Reply at 10. The Court declines to read in the phrase "packing and labeling" into the Consent Order. The preemption test hinges on the agency's intent, which primarily turns on the Consent Order's language and structure. See Medtronic, Inc. v. Lohr, 518 U.S. at 485-86. The absence of language, accordingly, suggests an intent not to preempt claims based on those absent terms. See Bates v.

<hr />

[42]The Supreme Court's holding here is somewhat ambiguous. The wording suggests two possible readings. First, it could mean that all non-parties to the agreement can pursue state law claims against all parties and non-parties to the agreement without the consent order preempting their claims. Under that reading, the Plaintiffs' claims would not be preempted, because they were not parties to the Consent Order. The other plausible reading is that non-parties claims against parties to the agreement can be preempted, but nonparties claims against non-parties cannot be preempted. The Court concludes that the second reading is the Supreme Court's most likely meaning. The first meaning limits a consent order's preemptive effect to such a degree that a consent order would almost never preempt state law claims. Although the Court concludes that consent orders should have limited preemptive effect, it determines that it is unlikely that the Supreme Court would make such an expansive holding without more elaboration.

Dow Agrosciences, LLC, 544 U.S. at 449 (ruling that when the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption"). Although conceivable that the FTC chose not to include packaging and labeling in the Consent Order, because it was not concerned with the packages' deceptiveness, the Defendants offer no plausible explanation why that might be so, see Reply at 10, and, moreover, agency indifference cannot amount to preemption.

The Consent Order also cannot preempt the Plaintiffs' Safer-Cigarette Theory claims premised on the word organic.[43] Contrary to the Defendants' position that the Plaintiffs do not allege an organic-premised claim, see MTD at 12; Reply at 8-9, the Plaintiffs' Amended Complaint alleges that "[t]his misleading message is further reinforced through the use of the term 'Organic' on many of the labels and advertisements," Amended Complaint ¶ 6, at 2, and each Count re-alleges and incorporates by reference each preceding paragraph, see e.g., Amended Complaint ¶¶ 135, 150, 170 at 46, 49, 53. The Defendants do not argue that the Consent Order preempts such claims, but, instead contend that USDA regulations, 7 C.F.R. §§ 205.01-699, and the Organic Foods Product Act, 7 U.S.C. §§ 6501-24 ("OFPA") preempts those claims. See MTD at 12 n.3; Reply at 9-10. The Defendants specifically argue that their use of organic is "consistent with OFPA regulations." Reply at 9 (emphasis omitted). Consistency and preemption, however, are not equivalent concepts.

Because the Defendants do not specify which preemption doctrine they are invoking, the Court considers both express and implied preemption. First, the OFPA and 7 C.F.R. §§ 205.01-699 do not contain any express preemption provisions implicating state tort, contract, or consumer

---

[43]If the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory claims, it would encompass the claims premised on the word natural. The Court concludes that natural is a "substantially similar term" to "additive-free," because natural's plain meaning would suggest that a tobacco product "has no additives or chemicals." Consent Order at 5. See Black's Law Dictionary at 1126 (9th Ed. 2009)("Brought about by nature as opposed to artificial means. Inherent; not acquired or assumed.").

protection claims, so the Plaintiffs' claims premised on the term "organic" are not expressly preempted. See In re Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litig., 621 F.3d 781, 792 (8th Cir. 2010)("In re Aurora"). Second, the Court considers implied field preemption. Field preemption exists if "[f]ederal statutory directive provide a full set of standards" or if "Congress occupies an entire field." Arizona v. United States, 567 U.S. at 401. See US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324-25 (10th Cir. 2010)("Field preemption occurs when a 'state law . . . regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."). "When conducting a field preemption analysis, we must first identify the legislative field that the state law at issue implicates." US Airways, Inc. v. O'Donnell, 627 F.3d at 1325. Congress designed the OFPA to "establish national standards governing the marketing of certain agricultural products as organically produced products" and to "assure customers that organically produced products meet a consistent standard." 7 U.S.C. § 6501(1)-(2). The Court concludes that the legislative field implicated in this analysis is the regulation of organic product marketing. See In re Aurora, 621 F.3d at 788. "Having identified the legislative field at issue, we must next evaluate whether Congress intended to occupy the field to the exclusion of the states." US Airways, Inc. v. O'Donnell, 627 F.3d at 1325. "[T]he purpose of Congress must be clear as we presume that 'Congress does not cavalierly pre-empt state-law causes of action.'" US Airways, Inc. v. O'Donnell, 627 F.3d at 1325 (quoting Medtronic, Inc. v. Lohr, 518 U.S. at 485). Construing claims that several companies deceptively labeled their milk as organic, the United States Court of Appeals for the Eighth Circuit recently considered whether the OFPA field preempted those state-law claims. See In re Aurora, 621 F.3d at 789, 793-94. Noting that the OFPA "requires states to seek approval from the USDA only if the State wishes to operate an organic certification program," the Eighth Circuit determined that "OFPA more modestly [than the Occupational Safety and Health

Act of 1970] contemplates a certification program designed to effect national standards and to eliminate the preexisting 'havoc for the industry' caused by balkanized state regulations," and, therefore OFPA's regulatory scheme is not so pervasive as to suggest field preemption. In re Aurora, 621 F.3d at 793-94. See Segedie v. Hain Celestial Grp., Inc., No. 14-5029, 2015 WL 2168374, at *4 (S.D.N.Y. May 7, 2015)(Roman, J.). This reasoning persuasive. Merely establishing a national certification program, in and of itself, does not overcome the presumption against preemption. Moreover, the statute itself contemplates that the states may impose stricter standards than the federal program. See 7 U.S.C. § 6507(b). The Court concludes, accordingly, that that the plaintiffs' organic-premised claims are not field preempted.

Impossibility and obstacle preemption similarly do not bar the Plaintiffs' organic-based claims. The OFPA allows products to be labeled organic if they are "produced and handled without the use of synthetic chemicals," and are produced on land that has not been exposed to synthetic chemicals for at least three years preceding harvest of the product. U.S.C. 7 § 6504 (1)-(2). See 7 C.F.R. §§ 205.101, 2502.202-207, 205.236-40. It is possible for the Defendants to adhere to these requirements without deceptively suggesting that their cigarettes are healthier than other cigarettes, so impossibility preemption is foreclosed. Regarding obstacle preemption, OFPA's purpose, as recounted previously, is to "establish national standards governing the marketing of certain agricultural products as organically produced products" and to "assure customers that organically produced products meet a consistent standard." 7 U.S.C. § 6501(1)-(2). To effect that goal, Congress seeks to create a standardized, national certification process. See 7 U.S.C. §§ 6503-6507; In re Aurora, 621 F.3d at 794-95. State-law claims premised on a manufacturer's purported deception pose no obstacle to that effect. As the Eighth Circuit explains:

> [P]reemption of state consumer protection law may actually diminish consumer
> confidence that organic products meet consistent standards as consumers become

aware that otherwise meritorious claims are being preempted because the certifying agent has not suspended the certification in spite of clear facts to the contrary. Similarly, although broad factual preemption may increase organic production in the short term, consumers may well elect to avoid paying the premium for organic products upon realizing preemption grants organic producers a de facto license to violate state fraud, consumer protection, and false advertising laws with relative impunity, because the OFPA's only remedy for noncompliance is recourse to the USDA for revocation of certification and possibly for a civil penalty.

In re Aurora, 621 F.3d at 798. The Plaintiffs organic-premised claims are, thus, not preempted.

## IV. DECEPTIONS BASED ON THE PLAINTIFFS' SAFER-CIGARETTE AND MENTHOL THEORIES MISLEAD A REASONABLE CONSUMER, BUT DECEPTIONS PREMISED ON THE UNPROCESSED-CIGARETTE THEORY DO NOT.

The Defendants contend that fourteen of the Plaintiffs' nineteen statutory claims fail, because the Plaintiffs have not plausibly alleged that a deception premised on the Plaintiffs' three theories misleads a reasonable consumer. See MTD at 39-40. The Court concludes that the reasonable consumer standard governs those fourteen statutes. See Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d 513, 530 (Cal. 1998)(ruling that a reasonable consumer standard governed California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL")); Williams v. Gerber Products Co., 552 F.3d at 938 (holding that California's UCL, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("CFAL"), and California's Consumer Legal Remedies Act, Cal. Civ. Code § 1770 ("CCLRA"), require a deception to mislead a reasonable consumer);[44] PNR, Inc. v.

---

[44]The Supreme Court of California has not determined the standard for the California CFAL, or CCLRA. The Ninth Circuit's state law interpretations bind Ninth Circuit district courts absent "any subsequent indication from the [state supreme court] that our interpretation was incorrect." Kona Enterp., Inc. v. Estate of Bishop, 229 F.3d 877, 884 n.7 (9th Cir. 2000). The Court concludes that, although the Ninth Circuit binds the Ninth Circuit lower courts on state law matters, it does not bind the Court, because the rationale, which binds the district courts on state law matters, is that Ninth Circuit decisions bind its lower courts. See Kona Enterp., Inc. v. Estate of Bishop, 229 F.3d at 884 n.7; Hasbrouck v. Texaco, Inc., 663 F.2d 930, 933 (9th Cir. 1981)("District Courts are bound by the law of their own circuit."). That reasoning does not apply to the Court, because it sits in the Tenth Circuit. The Court, nevertheless, concludes that the Ninth Circuit's state law interpretation is persuasive here, and also concludes that the Supreme Court of California would determine that the

Beacon Props. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003)(holding that a deception occurs under FDUTPA if a consumer, acting reasonably under the circumstances, is misled); Barbara's Sales, Inc. v. Intel Corp., 879 N.E.2d 910, 927 (Ill. 2007)(ruling that the ICFA is subject to a reasonable consumer standard); Aspinall v. Philip Morris Cos., 813 N.E.2d at 487-88 (ruling that a reasonable consumer standard governs Massachusetts General Laws, Chapter 93A); Dix v. American Bankers Life Assur. Co. of Fla., 415 N.W. 2d 206, 209 (Mich. 1987)("It is sufficient, [under the MCPA], if the class can establish that a reasonable person would have relied on the representations."); Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 655 A.2d 417, 430 (N.J. 1995)(ruling that the NJCFA is subject to an average consumer test); N.M. Stat. Ann. § 57-12-4 ("[I]n construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts."); FTC v. LoanPointe, LLC, 525 F. App'x 696, 700 (10th Cir. 2013)(unpublished)("Under the FTC Act, a practice is deceptive if it entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.")(citation omitted); Stutman v. Chemical Bank, 731 N.E.2d 608, 611-12 (N.Y. 2000)("Whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances.")(quotation omitted); Marshall v. Miller, 276 S.E.2d 937, 939 (N.C. 1981)("It is established by earlier decisions of this Court that federal decisions interpreting the FTC Act may be used as guidance in determining the

---

reasonable consumer test applies to California's CFAL and CCLRA, because the great weight of California appellate authority has determined such a test would apply and the Supreme Court of California has held that a reasonable consumer standard applies, under the UCL -- a similar statute to the CFAL and CCLRA. See, e.g., Lavie v. Procter & Gamble Co., Cal. Rptr. 2d 486, 494 (Cal. Ct. App. 2003); Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d at 530. Cf. Kasky v. Nike, Inc., 45 P.3d 243, 304 (Cal. 2002)("We have also recognized that these laws prohibit not only advertising which is false, but also advertising . . . which has a capacity, likelihood or tendency to deceive or confuse the public."); In re Tobacco II Cases, 207 P.3d at 29.

scope and meaning of [N.C. Gen Stat.] 75-1.1.");[45] <u>Struna v. Convenient Food Mart</u>, 828

N.E.2d 647, 661 (Ohio Ct. App. 2005)("[C]ourts shall apply a reasonableness standard in

determining whether an act amounts to deceptive unconscionable or unfair conduct.");[46] <u>Panag v.</u>

<u>Farmers Ins. Co. of Washington</u>, 204 P.3d 885, 894 (Wash. 2009)(en banc)("A plaintiff need not

show the act in question was intended to deceive, only that it had a capacity to deceive a substantial

portion of the public.").

    The plaintiffs articulate three theories of deception. These theories have already been

discussed, <u>see</u> <u>supra</u> at 11, but, in brief summary, the three theories are:

(1)    **The Safer-Cigarette Theory**: the Plaintiffs argue that the use of the terms organic, natural, and additive-free mislead tobacco consumers into believing that Natural American cigarettes are safer and healthier. <u>See</u> Amended Complaint ¶¶ 4-8, 47-66, at 2-3, 22-31; MTD at 22-24.

(2)    **The Menthol Theory**: the Plaintiffs argue that, by labeling Natural Americans cigarettes with menthol "additive-free" and "natural," the Defendants mislead menthol consumers, because menthol is an additive. <u>See</u> Amended Complaint ¶¶ 10, 67-69 at 3, 31-32; MTD at 24-25.

(3)    **The Unprocessed-Cigarette Theory:** the Plaintiffs argue that, by labeling Natural American cigarettes as Natural, the Defendants mislead consumers into believing that Natural American cigarettes are not subjected to rigorous

---

[45]The Supreme Court of North Carolina has not determined the standard for North Carolina General Statute 75-1.1. The Court concludes, however, that the Supreme Court of North Carolina would adopt a reasonable consumer standard, because it has signaled that it would use federal courts' interpretations of the FTC Act, 15 U.S.C. § 45(a), to guide its decision making, and several federal courts have adopted the a reasonable consumer standard for the FTC Act. <u>See</u> <u>FTC v.</u> <u>LoanPointe, LLC</u>, 525 F. App'x at 700 ("Under the FTC Act, a practice is deceptive if it entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.")(citation omitted); <u>Farrin v. Thigpen</u>, 173 F. Supp. 2d 427, 439 (M.D.N.C. 2001)(Osteen, J.)("[A]n advertisement is deceptive . . . if it is likely to mislead consumers, acting reasonably under the circumstances.")(citation omitted).

[46]The Court is aware that, under <u>Erie</u>, it is not bound to follow Court of Appeals of Ohio if it concludes that the Supreme Court of Ohio would decide the issue differently. <u>See</u> <u>supra</u> n.21. The Court will follow the Court of Appeals of Ohio's decision in <u>Struna v. Convenient Food Mart</u>, however, because the Court has found no indication that the Supreme Court of Ohio would apply a contrary rule.

engineering processes during production.  <u>See</u> Amended Complaint ¶¶ 9, 70-74, at 3, 32-33; MTD at 25.

The Defendants marshal three attacks against the Plaintiffs' three theories of deception.  <u>See</u> MTD at 42-49.  First, they argue the Safer-Cigarette Theory is implausible, because a reasonable consumer would read the disclaimer stating that "no additives does **NOT** mean a safer cigarette" and would understand from that disclaimer that Natural American cigarettes were not safer or healthier.  <u>See</u> MTD at 42-43 (emphasis in original).  Second, they argue that the Menthol Theory is implausible, because a reasonable consumer knows that menthol cigarettes contain menthol, so would understand that the no-additive term does not encompass menthol.  <u>See</u> MTD at 46-47.  Third, they argue that the Unprocessed-Cigarette Theory is implausible, because a reasonable consumer would know that Natural American cigarettes are subjected to engineering processes.  <u>See</u> MTD at 47-49.[47]  The Court addresses each argument in turn.

At the outset, the Court determines that it is plausible that a reasonable consumer, seeing the terms organic, natural, and additive free, would erroneously believe that Natural American cigarettes are safer or healthier than other cigarettes.  In pleading their Safer-Cigarette Theory, the Plaintiffs

---

[47]The Plaintiffs rejoin that whether a reasonable consumer would be deceived is a question of fact ordinarily not decided on a Motion to Dismiss.  <u>See</u> Response at 39-42 (citing <u>Williams v. Gerber Prods. Co.</u>, 522 F.3d at 939-40; <u>Foster v. Chattem, Inc.</u>, No. 14-0346, 2014 WL 3687129, at *3 (M.D. Fla. July 23, 2014)(Dalton, J.); <u>Biffar v. Pinnacle Foods Grp., LLC</u>, No. 16-0873, 2016 WL 7429130, at *8 (S.D. Ill. Dec. 26, 2016)(Herndon, J.); <u>Santosuosso v. Gibbs Ford, Inc.</u>, 1992 Mass. App. Div. 167, 170 (1992)); Supp. Brief at 4-10.  Although those cases suggest that the inquiry is usually more appropriate for summary judgment, none of them foreclose deciding the issue on a motion to dismiss.  Moreover, none are binding on the Court, and the Court declines to follow them.  There is nothing in the statutes suggesting that they are insulated from a motion to dismiss or that the Court should forego the Supreme Court mandated plausibility analysis.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555.  The Court cannot weigh evidence on a rule 12(b)(6) motion, but determining whether the Plaintiffs have plausibly stated a claim does not require weighing the evidence.  Rather, the question is whether a reasonable consumer could plausibly be deceived in the manner in which the Plaintiffs allege.  Courts frequently determine this question at the motion to dismiss stage, <u>see</u>, <u>e.g.</u>, <u>Fink v. Time Warner Cable</u>, 714 F.3d 739, 741 (2d Cir. 2013); <u>Carrea v. Dreyer's Grand Ice Cream, Inc.</u>, 475 F. App'x 113, 115 (9th Cir. 2012), and the Court does so here.

rely heavily on several social science studies, which conclude that Natural American smokers are far more likely to believe that their brand is healthier than other cigarette brands, because of those descriptors.  <u>See</u> Amended Complaint ¶¶ 50-54, at 23-27; Supp. Arg. at 4-6.  For example, one study concludes that "[n]early 1 million US adult smokers prefer" Natural American cigarettes and they "are 22 times more likely than other smokers to believe that their brand is less harmful than other cigarette brands," leading the study authors to conclude that Natural American smokers may choose that brand because of the "descriptors organic, natural, and additive free on product packaging and advertising."  Amended Complaint ¶ 52, at 25 (citing <u>Misperceptions</u> at 3).  As surely as a Ph.D. cannot be swapped for an Article III commission, an academic study cannot take the place of the Court's judgment on a rule 12(b)(6) motion.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense.").  There is a possibility that all of the consumers studied were unreasonable consumers and unreasonably believed that Natural Americans were healthier, because of the cigarettes' descriptors.  Moreover, the subjective beliefs of the consumers studied, even if those consumers are generally reasonable, cannot blindly be swapped for the reasonable consumer's beliefs.

The Court concludes that, nevertheless, the Plaintiffs' allegations, accepted as true, advance their Safer-Cigarette Theory from a mere possibility into the realm of plausibility.  The terms natural and organic have long been used across the country to convey products' health benefits.  <u>See</u>, <u>e.g.</u>, <u>Discount Tobacco City & Lottery, Inc. v. United States</u>, 674 F.3d 509, 536 (6th Cir. 2012)("[C]ommon sense dictates the conclusion that [naturalists] prefer such products precisely because they believe that natural and organic products confer health advantages over conventional products.");  <u>FTC v. Garvey</u>, 383 F.3d 891, 895 (9th Cir. 2004)(noting that the defendants had

conflated an "all natural" diet with a "healthier, more active lifestyle"); Covington v. Arizona Beverage Co., LLC, 2009 WL 10668916, at *1 (S.D. Fla. September 11, 2009)(Seitz, J.)(concluding that "Natural" labeling would lead "consumers to believe that Defendants' products are healthier than others on the market"); Noble v. 93 University Place Corp., 303 F. Supp. 2d 365, 375 (S.D.N.Y. 2003)(Scheindlin, J.)("In the instant case, a credulous consumer would believe that food labeled 'organic' or 'natural' . . . is healthier than regular food."); National Nutritional Foods Ass'n v. Whelan, 492 F. Supp. 374, 378 (S.D.N.Y. 1980)(Sofaer, J.)("[A]dvocates of health foods have managed to convince a significant portion of the population that organically grown food is more nutritious and safer than 'regular' food."). Additives have also long been known to or believed to potentially increase health risks. See, e.g., Guttman v. Ole Mexican Foods, Inc., 2016 WL 9107426, at *3 (N.D. Cal. August 1, 2016)(Gilliam, J.)(noting that settlement removing additives from a food product "provides substantial health benefits to all purchasers"); Barnes v. American Tobacco Co., 984 F. Supp. 842, 870 (E.D. Pa. 1997)(Newcomer, J.)(ruling that additives used in cigarettes "increase the risk of harm" to smokers). With that backdrop, the reasonable consumer is not expected to defy decades of marketing, which has conveyed that natural, organic, and additive-free products are healthier. Two federal agencies' findings buttress the Court's conclusion, as both the FDA and the FTC determined that the Defendants' descriptors conveyed a message that their cigarettes were less harmful than other cigarettes. See FTC Complaint ¶ 5, at 2; Warning Letter at 2. See also United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.)(enjoining a cigarette manufacturer from advertising its cigarettes as "natural," among other descriptors, which "implicitly or explicitly convey to the smoker and potential smoker that they are less hazardous to health than full flavor cigarettes").

The Defendants do not contest that the descriptors convey to a reasonable consumer that Natural American cigarettes are healthier than other cigarettes. Rather, they contend that the disclaimer cures any deception. See MTD at 42-46. The Plaintiffs rejoin that a reasonable consumer is still misled, because the packaging's disclaimer is hidden. See Response at 44 (citing e.g., Williams v. Gerber Products Co., 552 F.3d at 939; Ackerman v. Coca-Cola Co., No. 09-0395, 2010 WL 2925955, at *6-7, *16 (E.D.N.Y. July 21, 2010)(Gleeson, J.); Lam v. Gen. Mills, Inc., 859 F. Supp. 2d 1097, 1105 (N.D. Cal. 2012)(Conti, J.); Wilson v. Frito Lay N. Am., Inc., No. 12-1586, 2013 WL 1320468, at *12 (N.D. Cal. Apr. 1, 2013)(Conti, J.); Jou v. Kimberly Clark Corp., No. 13-3075, 2013 WL 6491158, at *1, *5 (N.D. Cal. December 10, 2013)(Corely, MJ.)). In Williams v. Gerber Products Co., the Ninth Circuit concluded that a reasonable consumer should not "be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box," because "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging." Williams v. Gerber Products Co., 552 F.3d at 939-40. The United States District Court cases that the Plaintiffs cite largely reiterate the Ninth Circuit's conclusion. See Ackerman v. Coca-Cola Co., 2010 WL 2925955, at *16 ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by vitamin water's labeling and marketing."); Lam v. General Mills, Inc., 859 F. Supp. 2d at 1105 ("Likewise, here, the Fruit Snacks' ingredients list cannot be used to correct the message that reasonable consumers may take from the rest of the packaging."); Wilson v. Frito-Lay N. Am., Inc., 2013 WL 1320468, at *13 ("Even though the nutrition box could resolve any ambiguity, the Court cannot conclude as a matter of law, in the context of a Rule 12(b)(6) motion, that no reasonable consumer would be deceived."); Jou v. Kimberly-Clark Corp.,

2013 WL 6491158, at *9 ("Thus, under *Williams*, Defendant cannot rely on disclosures on the back or side panels of the packaging to contend that any misrepresentation on the front of the packaging is excused."). Those cases turn on the presence of curative information in an ingredients list.[48] Here, the disclaimer is not an ingredient listed where "reasonable consumers expect . . . more detailed information about the product that confirms other representations on the packaging," Williams v. Gerber Products Co., 552 F.3d at 939-40; instead, the disclosure is divorced from the ingredients, and, unlike an ambiguous ingredient term, the disclosure is a clear statement that "no additives does **NOT** mean a safer cigarette." A reasonable consumer would understand that statement to modify the labeling's "additive-free" descriptor. Moreover, a reasonable consumer would look on the packages' sides and top for disclosures such as the one contained on Natural American's packaging. Product packaging commonly has additional information about the product on the back and sides, so a reasonable consumer would look there for disclaimers or qualifying information. A reasonable consumer would not look on the bottom of packaging in the same way, because relevant information is rarely there. That observation is not to say that a reasonable consumer is expected to understand every piece of information disclosed on a package's sides. The Court agrees with Williams v. Gerber Products Co.'s reasoning that some information may be too ambiguous to provide a reasonable consumer curative information. Here, however, there is no ambiguity. The disclaimer is clear and express.

The Plaintiffs also contend that the disclosure is hidden, tucked under barcode, so a reasonable consumer cannot be expected to find it. The Court agrees with this argument to a point.

---

[48]Jou v. Kimberly-Clark Corp. stands for the broader proposition that no side-packaging writing can cure deceptive labeling on the front. See 2013 WL 6491158, at *9 The Court concludes that the Honorable Jacqueline Corley, United States Magistrate Judge for the United States District Court of the Northern District of California, construed Williams v. Gerber Products Co., 552 F.3d at 939-40 too expansively, because Williams v. Gerber Products Co.'s language is cabined to ingredients lists and not to all side-packaging disclosures.



Above are two representative packages that the Court judicially noticed. See Gold Label at CM/ECF 78-83; Turquoise Label at CM/ECF 85-90. The disclaimer is located on the right-hand side, underneath the bar code, and, although it is not in the most prominent location, the disclaimer is legible, the Defendants have made the font color white on packaging where white text stands out, and black where black text stands out, and the disclaimer is not buried in a paragraph of text; instead, it is a single, separate sentence. See Gold Label at CM/ECF 78-83; Turquoise Label at CM/ECF 85-90. See also American Labeling at 64-111 on CM/ECF. On just those facts, the Court would conclude that a reasonable consumer would be expected to locate, read, and understand the disclosure.

Cigarettes are often sold, however, in a manner such that a consumer cannot inspect the packaging in detail before purchasing, e.g., the cigarettes are kept locked in a display next to or behind the counter. The display shows the cigarette pack's front, but not the sides or back. A store clerk sometimes does not even hand the cigarette pack to the consumer before purchase, but places the pack directly in a shopping bag. Based on this, even though a reasonable consumer would inspect other items before purchase, it is not clear that they would have the opportunity to inspect

Natural American cigarettes' labeling. Accordingly, the Court cannot conclude that the package's disclosure would cure a deception inflicted upon a reasonable consumer.

The Plaintiffs do not argue that a reasonable consumer would miss the disclosures on the Defendants' advertising, see Response at 43, and the Court concludes that a reasonable consumer would read and comprehend the advertising disclosures. Unlike the packaging, the advertisement's disclaimer is in a prominent location boxed over the Surgeon General's Warning, and a reasonable consumer would spot it easily. See Tobacco & Water Advertisement at 114 on CM/ECF.

Although a reasonable consumer would understand from the disclosure that the lack of additives does not make Natural American cigarettes healthier, that disclaimer says nothing about the natural or organic descriptors. As explained above, those two terms have an independent connotation that a product is healthier or safer. See, e.g., Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d at 536; Noble v. 93 University Place Corp., 303 F. Supp. 2d at 375. The Defendants' conflate the natural and additive-free terms, see Reply at 22, and also argue that "the disclosure plainly disclaims any notion that Natural American cigarettes are safer than alternatives," Supp. Resp. at 10. The Court disagrees. The Defendants' argument asks for a hefty inference in light of the disclosure's specificity. The disclaimer states: "No additives in our tobacco does **NOT** mean a safer cigarette." FTC Consent Order at 4. It says nothing about natural; it says nothing about organic. Specific language communicates a specific meaning and a reasonable consumer interprets it with that specific meaning. Cf. In re Universal Service Fund Telephone Billing Practice Litig., 619 F.3d 1188, 1218 (10th Cir. 2010)(ruling that specific terms in a contract governs the contract's meaning). The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer.

Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer. The crux of the Defendants' arguments against the Plaintiffs' Menthol Theory is that a reasonable consumer would know that menthol cigarettes contain menthol -- an additive. See MTD at 46. From that premise, they argue that an additive-free descriptor would not be deceptive, because a reasonable consumer knows that she is purchasing a menthol cigarette. See MTD at 46. That argument assumes, however, that a reasonable consumer is so secure in her knowledge that menthol is an additive that an express representation to the contrary, on a heavily regulated product, see Phillip Morris, Inc. v. Reilly, 312 F.3d 24, 26 (1st Cir. 2002), does not mislead her into thinking that menthol is not an additive. Menthol's properties are not commonly known, even among cigarette users. See Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes, Food and Drug Administration, 70-71 (2013) available at https://www.fda.gov/downloads/ScienceResearch/SpecialTopics/PeerReview ofScientificInformationandAsse/UCM361598.pdf (reporting that menthol users held diverging beliefs on menthol's health and addictive risks). Before this case, the Court did not know much, if anything, about menthol. It knew that it gave a smoother, milder smoking experience, and increased a cigarette's appeal and enjoyment to a broader consumer base, but it did not know what menthol is or whether it is a natural substance or additive. See June Tr. at 54:21 (Court)("What is menthol?"); id. at 64:10-12 (Court)("But menthol, what is it? Is it a plant? Is it a chemical that science has invented? What exactly is menthol?").[49] The Court concludes that it is plausible that a reasonable consumer would not know whether menthol naturally occurs in tobacco. Many goods have naturally occurring qualities that are prominently labeled separately on the good. For example, caffeine

---

[49]As explained above, Menthol is an organic molecule derived from mint. See June Tr. at 13-15 (Schlesinger).

naturally occurs in coffee.  See Gwendolyn Prothro, The Caffeine Conundrum: Caffeine Regulation in the United States, 27 Cumb. L. Rev. 65, 66 (1996).  Moreover, even if a reasonable consumer knows that menthol is an additive, it is nonetheless plausible that an additive-free descriptor undermines her knowledge, because menthol is an uncommon good.  Unlike the Defendants' reasonable consumer examples, e.g., a reasonable consumer knows that almond milk contains no dairy milk and that veggie bacon contains no pork, see MTD at 47, menthol is not milk or bacon; its inherent qualities are not well known.  It is plausible that, faced with a contrary descriptor, the reasonable consumer would conclude that her preconceived notions about menthol are mistaken.  Indeed, she could conclude that menthol is a type of tobacco or tobacco grown in a specific location, such as perique tobacco.[50]

The ingredient's list on the product's back, which itemizes tobacco and menthol separately, does not dispel the deception.  Without an unambiguous signal that the ingredients list is countermanding another representation on the package, "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."  Williams v. Gerber Products Co., 552 F.3d at 940.  The Ninth Circuit's reasoning in Williams v. Gerber Products Co. is persuasive to the Court, and it concludes that the state Supreme Courts would also find it persuasive; the reasonable consumer is not hyper-vigilant and does not expect the product's packaging to deceive her.   Ingredient itemization does not offer the same clear signal that the FTC-mandated disclosure does.  It does not, for example, state that "Menthol is an additive."  In this case, the packaging indicates only that organic menthol and organic tobacco are ingredients.  There are many reasons why a reasonable consumer would conclude that the ingredients list does not contradict the additive-free descriptor.  For example, a

---

[50]Perique tobacco is a type of tobacco associated with Louisiana.

reasonable consumer could presume that the FDA requires cigarette packaging to separately label menthol. Moreover, faced with conflicting representations, one clear and the other ambiguous, the reasonable consumer follows the clear one. Cf. In re Universal Service Fund Telephone Billing Practice Litig., 619 F.3d at 1218.[51]

---

[51]In concluding that the Safer-Cigarette and Menthol Theory may proceed, the Court notes a recent decision in which the Seventh Circuit, reviewing an opinion that the Honorable Lynn Adelman, United States District Judge for the Eastern District of Wisconsin wrote, reversed a district court's class-action settlement approval arising from Subway sandwich's purportedly deceptive conduct. See In re: Subway Footlong Sandwich Marketing and Sales Practices Litigation, 869 F.3d 551 (7th Cir. 2017)("Subway"). In Subway, the plaintiffs alleged that Subway had deceived them with their foot-long sandwich marketing campaign, because, sometimes, the bread was not 12 inches in length. See Subway, 869 F.3d at 553-54. The plaintiffs sought an injunctive class certification under rule 23(b)(2), and the district court approved a class-action settlement, which commanded Subway to institute procedures for four years to keep their bread measured at least 12 inches long. See 869 F.3d at 554. The Seventh Circuit, however, vacated that class-action settlement agreement, because it yielded no meaningful relief for the class. See 869 F.3d at 556. The Seventh Circuit reasoned that, regardless of sandwich length, consumers received the same food amount based on the bread's weight, Subway Sandwiches' standardized meat and cheese portions, and its liberal food topping policy. See 869 F.3d at 556. It also reasoned that the settlement's new bread-measuring protocols did nothing for the class, because "there's *still* the same small chance that Subway will sell a class member a sandwich that is slightly shorter than advertised," so "the injunctive relief approved by the district judge is utterly worthless" and the class-action "should have been dismissed out of hand." 869 F.3d at 556-57 (emphasis in original).

It is the Court's understanding that Subway never filed a motion to dismiss. See In re Subway Footlong Sandwich Marketing and Sales Practices Litig., No. 13-2439 (E.D. Wis. 2013)(Dkt.). It is clear that Judge Adelman thought the Subway case lacked merit, see In re Subway Footlong Sandwich Marketing and Sales Practices Litig., 316 F.R.D. 240, 242-43, 246-47 (E.D. Wis. 2016)(Adelman, J.), but Subway never filed a motion to dismiss the complaint, so the district court was never invited to pass on the wisdom of the case. The Seventh Circuit's opinion puts all district judges in a difficult position. If the defendant does not file a motion to dismiss and enters into a settlement, most district judges will not, sua sponte, dismiss a case because it is not a "good" case; such a dismissal will likely be reversed by most Courts of Appeals. The Court is inclined to think that the Subway case is unique and does not conclude that district courts have any roving, inherent ability to decide which class actions "should . . . [be] dismissed out of hand" as the Seventh Circuit suggests. Subway 869 F.3d at 557.

In any case, even at 30,000 feet, given that the Court is allowing two of the Plaintiffs' theories to proceed, the Court concludes that the Court should not dismiss the case as "utterly worthless" that "should . . . [be] dismissed out of hand." Subway 869 F.3d at 557. The Court allows the case to proceed, albeit with one theory of deception dismissed.

The packaging's and advertising's "natural" descriptors do not, however, plausibly mislead a reasonable consumer into believing that Natural American tobacco is less processed than tobacco in other cigarettes. As the Court discusses below, natural is a word with many meanings. See infra, at 188. Any meaning is, thus, context dependent. A reasonable consumer comes to the market with a degree of background knowledge. See Ibarrola v. Kind, LLC, 83 F. Supp. 3d 751, 757 (N.D. Ill. 2015)(Ellis, J.). In this case, a reasonable consumer knows that tobacco undergoes engineering processes before it is sold in cigarettes. Such awareness is clear from visually comparing a tobacco leaf to a cigarette. In order to mislead a reasonable consumer, the descriptor at issue must, thus, rebut the reasonable consumer's background knowledge. The natural descriptor found on Natural American cigarette's advertising and labeling is not enough to negate a reasonable consumer's understanding that turning tobacco into cigarettes requires processing, nor is it enough to suggest that Natural American tobacco undergoes less processing than other cigarette's tobacco. The term natural most often modifies "tobacco" on the Defendants' products and advertising. See Natural American Labeling at 64-111 on CM/ECF; Tobacco & Water Advertisement at 114 on CM/ECF. With that context, the natural descriptor says little, if anything, about the engineering processes; it says something about the type of tobacco. The Defendants' other use of natural is in the brand name: Natural American Spirit. Construing similar statutes, other federal courts have determined that brand names carry less persuasive impact on a reasonable consumer than other product labeling. See, e.g., Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861, 874 (N.D. Cal. 2012)(Beeler, J.)(noting that the Froot Loops and Crunch Berry brand names did not deceive a reasonable consumer into believing that those cereals contained real fruit); Shaker v. Nature's Path Foods, Inc., No. 13-1138, 2013 WL 6729802, at *5 (C.D. Cal. December 16, 2013)(Wu, J.)("Aside from the fact that the 'OPTIMUM®' used here is a registered brand name, any reasonable consumer

would understand that the word is not a specific and objective representation."); <u>Howard v. Bayer</u> <u>Corp.</u>, 2011 WL 13224118, at *1 (E.D. Ark. July 22, 2011)(Marshall Jr., J.)("A reasonable consumer of any medicine or medicine medicine-like substance such as vitamins would not stop with the brand name."). The underlying rationale is that reasonable consumers know that brand names are often creative and that substantive information about the product is less likely to be located there. Although conceivable that the natural term and the surrounding American Indian imagery communicates to some consumers that Natural American cigarette's tobacco is less processed than other cigarette's tobacco, the Court concludes that a reasonable consumer would not believe that Natural American tobacco is less processed from the brand name alone.

## V.    THE FIRST AMENDMENT DEFENSE FAILS.

The Defendants argue that the First Amendment shields them from all liability. <u>See</u> MTD at 20. Their First Amendment defense fails, however, for two reasons. First, the state action doctrine precludes the claims premised on contract-related theories. Second, the tort-related claims may proceed, because those claims pass the <u>Central Hudson</u> balancing test. The Court considers each in turn.

### A.    THE STATE ACTION DOCTRINE PRECLUDES THE DEFENDANTS' FIRST AMENDMENT DEFENSE FOR THE PLAINTIFFS' CONTRACT-RELATED CLAIMS, BECAUSE CONSENSUAL CONTRACTUAL RELATIONS DO NOT IMPLICATE STATE ACTION.

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[52] This clause -- the Free Speech Clause -- may act as a shield to liability when otherwise illegal or unlawful conduct implicates a party's freedom of speech. <u>See</u> <u>Marsh v. Alabama</u>, 326 U.S. at 509 (ruling that the Free Speech Clause shielded a Jehovah's Witness who distributed religious material

---

[52]The First Amendment is applicable to the states and their state legislatures via the Fourteenth Amendment's due process clause. <u>See</u> <u>Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.</u>, 425 U.S. 748, 749 n.1. (1976)

on a company town's sidewalk from criminal trespass charges).  "It is, of course, [] commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."  Hudgens v. N.L.R.B, 424 U.S. at 513.  State action, thus, is typically a prerequisite for First Amendment protections.  See Hudgens v. N.L.R.B, 424 U.S. at 520-21.

For most of American history, enforcing the common law was not thought to implicate state action.  See Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. 1650, 1656 (2009); Coppage v. Kansas, 236 U.S. at 17 overruled in part Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 187 (1941).  After the New Deal, however, the state action doctrine underwent a radical transformation, and the Supreme Court ruled that various judicial actions amounted to state action where, previously, those actions likely would not have.  See Shelley v. Kraemer, 334 U.S. 1, 18-19 (1948)(ruling that judicial enforcement of racially restrictive covenants is state action);  New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964)(holding that state adjudication of a libel lawsuit is state action); Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991)("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action.'").  Thus, as the Supreme Court has recently reaffirmed, the Free Speech Clause "can serve as a defense in state tort suits."  Snyder v. Phelps, 562 U.S. 443, 451 (2011).  See N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 n.51 (1982)("Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment.").  The Supreme Court has also held that promissory estoppel claim, "enforced through the official power of the . . . courts," amounts to state action.  Cohen v. Cowles Media Co., 501 U.S. at 668.  In a similar vein, the Tenth Circuit has determined that a dispute over property rights, which arise from positive statutory law implicates

state action.  See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 968.  See also L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 30 n.2 (1st Cir. 1987).

The state action doctrine as applied to judicial enforcement of common-law claims has limits. See Solove & Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. at 1664. For example, the Supreme Court has limited the same state action rationale in the common-law property-law context.  See Hudgens v. N.L.R.B., 424 U.S. at 513; Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 570 (1972).  In Hudgens v. N.L.R.B., the Supreme Court considered whether the First Amendment protects union members picketing in a privately owned shopping center from a threat of criminal trespass charges.  See 424 U.S. at 508.  In considering that issue, the Supreme Court explained:

> It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state.  Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

Hudgens v. N.L.R.B., 424 U.S. at 513 (citation omitted).  In ruling that the First Amendment did not apply, the Supreme Court emphasized: "In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on State action, not on action by the owner of private property used nondiscriminatorily for private purposes only."  Hudgens v. N.L.R.B., 424 U.S. at 519 (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. at 567).  See Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 547 (1972)("The First and Fourteenth Amendments are limitations on state action, not action by the owner of private property used only for private purposes.").  The Supreme Court concluded, thus, that the First Amendment offers no protection to the picketers, because the shopping center was a private entity and not "the functional equivalent of a municipality."  Hudgens v. N.L.R.B., 424 U.S. at 520.  But see

Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 968 (ruling that adjudicating property rights arising from statutory law "satisfies the state action requirement").

Several United States Courts of Appeals have determined that state action is also not implicated when a court adjudicates a dispute between two parties that arises from a consensual contractual relationship. See, e.g., United Egg Producers v. Standard Brands, Inc., 44 F.3d 940, 943 (11th Cir. 1995)("United Egg"). In United Egg, for example, one private party to a settlement agreement challenged the settlement agreement on First Amendment grounds. See United Egg, 44 F.3d at 942. The Eleventh Circuit concluded that the state action doctrine barred the First Amendment defense. See 44 F.3d at 943. Although noting that Shelly v. Kraemer "held that court enforcement of an agreement between private parties can, in some circumstances, be considered governmental action," the Eleventh Circuit cabined that decision to "the racial discrimination context." 44 F.3d at 943. It explained: "That parties be able to enter into enforceable settlement agreements as a means of ending controversies is a good thing. And we, in the absence of compelling authority, are slow to interfere with or to undercut settlements of commercial disputes." 44 F.3d at 943. The Third Circuit has similarly explained that there are two categories of state action cases: "cases in which state courts enforced the right of private persons to take actions which are permitted but not compelled by law and . . . cases in which state courts enforced laws which require or forbid certain actions to be taken." Parks v. "Mr. Ford", 556 F.2d 132, 135 n.6a (5th Cir. 1977). In the first category of cases "state action has been found when the doctrine of Shelley and Barrows [v. Jackson, 346 U.S. 249 (1953)], has been found applicable, and that doctrine has been limited to cases involving racial discrimination," and, in the second category of cases, "state action has been found routinely." Parks v. "Mr. Ford", 556 F.2d at 135 n.6a. See Democratic Nat. Committee v. Republican Nat. Committee, 673 F.3d 192, 204 (3d Cir. 2012)("Although a court's enforcement of a

consent decree can constitute state action under *Shelley*, . . . [t]he Supreme Court has declined to find state action where the court action in question is a far cry from the court enforcement in *Shelley*.")(citing <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004-05 (1982)); <u>Naoko Ohno v. Yuko Yasuma</u>, 723 F.3d 984, 998 (9th Cir. 2013)("In the context of First Amendment challenges to speech-restrictive provisions in private agreements or contracts, domestic judicial enforcement of terms that could not be enacted by the government has not ordinarily been considered state action.")

In sum, state action exists if the dispute is tort-related or if the rights arise from a state statute, but does not exist if the dispute arises from a contractual relationship or involves common-law property rights, unless a non-judicial state actor is involved or if racial discrimination is implicated. One way to conceive of the state action test is to question whether consent existed for the underlying private relationship at issue. If yes, there is no state action. If no, state action exists.

With that test in mind, the state statutory claims implicate state action. <u>See</u> <u>Cardtoons, L.C. v. Major League Baseball Players Ass'n</u>, 95 F.3d at 968. The unjust-enrichment claims also implicate state action, because unjust enrichment arises from an absence of a consensual contractual relationship. <u>See</u> Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b ("Unjust Enrichment is enrichment that lacks an adequate legal basis. . . . Broadly speaking . . . [it involves a transaction] that is *nonconsensual*.")(emphasis in original). <u>Cf.</u> <u>Cohen v. Cowles Media Co.</u>, 501 U.S. at 668 (ruling that a promissory-estoppel claim implicates state action). The express warranty claim, however, arises from a consensual contractual relationship -- consumer contracts -- so they do not implicate state action. The First Amendment, therefore, is not a defense for the express warranty claims.

**B. THE FIRST AMENDMENT DOES NOT PRECLUDE THE STATUTORY AND UNJUST-ENRICHMENT CLAIMS BASED ON THE PLAINTIFFS' THREE THEORIES, BECAUSE NATURAL AMERICAN CIGARETTES' DESCRIPTORS ARE INHERENTLY OR ARE IN FACT MISLEADING.**

The speech at issue is commercial speech. As noted previously, the Supreme Court's First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. See Snyder v. Phelps, 562 U.S. at 452. Commercial speech occupies a middle tier of protected speech, see Zaurderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 637 (1985), and the following characteristics indicate that speech is commercial: (i) if the speech is contained in an advertisement; (ii) if it is made with an economic motive; (iii) or if it refers to a specific product. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274. The parties agree that the speech at issue is commercial, see MTD at 20; Response at 18, and the Court agrees. The speech is made with an economic motive, refers to a specific product, and some of it is contained within an advertisement. See Amendment Complaint ¶ 43, at 17-20 (displaying the print advertisements with the contested speech); id. ¶ 44, at 21-22 (alleging that the Defendants used the terms "additive-free" and "natural" as part of an advertisement campaign to increase sales)

There is a four-part test to determine whether the First Amendment shields commercial speech from governmental intervention. First, a court must determine "whether the particular advertisement is protected speech -- *i.e.*, whether it concerns lawful activity and is not misleading." Revo, 106 F.3d at 932. If the speech is inherently misleading, "the speech may be freely regulated." Revo, 106 F.3d at 932. If the speech is not misleading or is only potentially misleading, the state may regulate the speech as long as "the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." Revo, 106 F.3d at 932 (citations omitted).

In considering the threshold inquiry -- whether the speech concerns lawful activity and is not misleading -- there is a distinction between inherently misleading speech, in-fact misleading speech, and potentially misleading speech. <u>See</u> <u>In re R.M.J.</u>, 455 U.S. at 203 ("[W]hen the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions."). Inherently misleading speech is "incapable of being presented in a way that is not deceptive." <u>Revo</u>, 106 F.3d at 929. In <u>Revo</u>, for example, the Tenth Circuit considered whether direct mailing advertisements from a personal injury attorney "inevitably convey a false message that soliciting lawyers are more experienced, tougher, more skillful, and better qualified than non-soliciting lawyers, notwithstanding the fact that the letters themselves make no reference to those attributes." 106 F.3d at 933. The Tenth Circuit concluded that the mailings could not be inherently misleading, because the defendants "offer[ed] no proof that some other qualified lawyer who could superbly represent personal injury victims would nevertheless be misleading potential clients simply by sending a direct mail solicitation." 106 F.3d at 933. Thus, to determine whether speech is inherently misleading, the proper inquiry is to consider whether there are any circumstances under which the speech could be truthful; if it could possibly be truthful, the speech is not inherently misleading. <u>See</u> 106 F.3d at 933.

"Natural," "organic," and "additive-free" descriptors attached to Natural American cigarettes are not inherently misleading under <u>Central Hudson</u> and <u>Revo</u> with respect to the Safer-Cigarette Theory. Natural, organic, and additive-free do not, inherently, mean healthy or safe. <u>See</u> Oxford English Dictionary (online ed. 2017)(defining natural as "[e]xisting in or derived from nature; not made or caused by humankind"); <u>id.</u> (defining organic as "[r]elating to or derived from living matter"); <u>id.</u> (defining additive-free as "(especially of food), containing no additives"). The Court

- 183 -

concludes that a cigarette manufacturer could create, package, and sell cigarettes that were natural, organic, and additive-free without lying. The most ready example is a manufacturer who grows tobacco, wraps it up, and sells it.

The Menthol Theory, however, imposes liability for inherently misleading speech. This analysis diverges from the above, because additive-free's meaning exists in direct conflict with the menthol's presence in the cigarette. Menthol is an additive. Therefore an additive-free cigarette cannot have menthol. It is not possible for some other cigarette manufacturer to produce a menthol cigarette that is additive free and truthfully advertise it as such.

To rebut that conclusion, the Defendants argue that the menthol is added to the cigarette filters, and not the tobacco, so the additive-free natural tobacco label is truthful, because the menthol is not added to the tobacco. See MTD at 24. The Defendants admit, however, that, when the cigarette is smoked, inevitably the menthol intermingles with the tobacco. See June Tr. at 43:19-23 (Court, Schultz). See June Tr. at 43:6-8 (Schultz). The Court concludes that this eventual commingling makes the menthol modifier inherently misleading. The Court cannot see how another cigarette manufacturer could create a cigarette with menthol in the filter that never commingles with the tobacco. The Defendants' final argument that any misunderstanding could be dispelled through a new disclosure, see MTD at 24-25, misapprehends the inherently misleading test. The Court cannot assume in new disclosures otherwise no speech would be inherently misleading. Any assumed disclosure could cure deception with a simple explanation that the inherently misleading speech is a lie.

Finally, the descriptors are not inherently misleading with respect to the Unprocessed-Cigarette Theory. The analysis largely mirrors the Safer-Cigarette Theory analysis above. It is possible that a cigarette manufacturer could create a cigarette, label it natural, and not subject it to

rigorous engineering processes.  As explained, a cigarette company could harvest the tobacco, roll it up without adding anything to it, and sell it.  Accordingly, under <u>Revo</u>, that modifier is not inherently misleading.

Those conclusions do not end the Court's analysis, however.  A court may also forego the remaining <u>Central Hudson</u> factors if the commercial speech is, in fact, misleading.  <u>See</u> <u>In re R.M.J.</u>, 455 U.S. at 203 ("[W]hen the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions."); <u>Peel v. Attorney Registration and Disciplinary Com'n of Ill.</u>, 496 U.S. at 111 (1990)(Marshall, J. concurring)("States may prohibit actually or inherently misleading commercial speech entirely."); <u>Revo</u>, 106 F.3d at 933 ("In addition, the Board offers no evidence that anyone was actually deceived by Mr. Revo's letters.").  The Court concludes that the Plaintiffs plausibly allege that they or others were in fact misled under the Safer-Cigarette Theory.  As the Tenth Circuit's language in <u>Revo</u> suggests, the in-fact test diverges from whether a consumer or reasonable consumer is misled under the same theory; the standard here is subjective instead of objective.  The Plaintiffs allege that the Defendants uniformly advertise and label their cigarettes as natural and additive-free, <u>see</u> Amended Complaint ¶¶ 42-43, at 16, and have done so throughout the Defendants' history, <u>see</u> Amended Complaint ¶ 44, at 21; the Natural American Labels and Tobacco & Water Advertisement judicially noticed, support that allegation, <u>see</u> First JN Motion at 1-2.  The Court concludes that it is plausible that, because of the Defendants' pervasive advertising campaign and uniform labeling, the Plaintiffs were exposed to those terms when they purchased their Natural American cigarettes.  The Plaintiffs also allege that a study supports the finding that "smokers . . . frequently concluded that 'natural' cigarettes must be healthier or safer than cigarettes containing chemicals."  Amended Complaint ¶ 50, at 23 (citing McDaniel, Patricia A.

& Ruth E. Malone, <u>I Always Thought They Were All Pure Tobacco</u>: <u>American Smokers'</u> <u>Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies</u>, 16 Tobacco Control e7 (2007), available at http://www.ncbi.nlm.nih.gov/p mc/articles/PMC2807204/.  <u>See</u> <u>id.</u> ¶ 52, at 24 ("Consumers believe that cigarettes marketed with [natural, organic, and additive-free] and similar descriptors are significantly more appealing, healthier or less harmful than packages without these descriptors.").  Another study which they cite also concludes that over sixty percent of Natural American smokers believed their brand was less harmful than other cigarette brands.  <u>See</u> Amended Complaint ¶ 52, at 24 (<u>Misperceptions</u> at 1).  Finally, the plaintiffs allege that Natural American cigarettes are not safer or healthier than other cigarette brands.  <u>See</u> Amended Complaint ¶ 59, at 29.  Based on the foregoing allegations, the Court concludes that it is plausible that the named plaintiffs were deceived into believing that Natural Americans cigarettes were safer or healthier than other cigarettes, because of Natural Americans branding and advertising.  <u>See</u> Amended Complaint ¶¶ 12-23, at 4-11.  The advertising and labeling disclosures do not undermine this conclusion, because there is no evidence that the plaintiffs read those disclosures.  Moreover, even if they had read them, the disclosures speak only to the "no additive" modifier and not to the "organic" or "natural" terms.  Natural American Labeling at 64-111 on CM/ECF; Tobacco and Water Advertising at 114 on CM/ECF.

Assuming that the Defendants' representations vis-à-vis the Menthol Theory were not inherently misleading, they were in fact misleading.  Menthol cigarettes were also uniformly advertised and packaged as "additive-free."  <u>See</u> Amended Complaint ¶¶ 42-43, at 16.  <u>See also</u> Dark Green Label; Green Label.  As explained above, the terms menthol and "additive-free" are at odds.  The Court concludes it is plausible that the plaintiffs were deceived pursuant to the Menthol Theory.

The Court also concludes that the Plaintiffs were deceived pursuant to their Unprocessed-Cigarette Theory. The Unprocessed-Cigarette Theory's nub is that the term natural suggests that Natural American cigarettes are subjected to fewer engineering processes than other cigarettes. The Amended Complaint lacks allegations that the plaintiffs believed that Natural American cigarettes were less processed than other cigarettes. See Amended Complaint ¶¶ 12-23, at 4-11. Nevertheless, the Court concludes that it is plausible that the term "natural" alone would lead these particular plaintiffs, although not a reasonable consumer, to believe that Natural American cigarettes are subjected to fewer engineering processes than other cigarettes.

C.      **THE FIRST AMENDMENT DEFENSE ALSO FAILS, BECAUSE EACH OF THE PLAINTIFFS' THEORIES SATISFIES THE <u>CENTRAL HUDSON</u> TEST.**

Assuming that the three theories are not inherently or factually misleading, those theories satisfy <u>Central Hudson</u>'s intermediate scrutiny threshold. If speech is potentially misleading or not misleading, the state may regulate the speech as long as "the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." <u>Revo</u>, 106 F.3d at 932 (citations omitted). <u>See</u> <u>Central Hudson</u>, 447 U.S. at 564.

When adjudicating the <u>Central Hudson</u> test, the Supreme Court and the Tenth Circuit have identified several substantial governmental interests in regulating speech. <u>See</u> <u>Central Hudson</u>, 447 U.S. at 568 (ruling that the government has a substantial governmental interest in energy conservation); <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 625-26 (1995)(holding that "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers" is a substantial interest); <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256 F.3d 1061, 1070 (10th Cir. 2001)(holding that promoting temperance and supplying revenue are

substantial governmental interests). In the tobacco context, the Supreme Court has recognized that there is a substantial governmental interest in preventing minors from using tobacco. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001). "Unlike rational basis review, the Central Hudson standard does not permit [a court] to supplant the precise interests put forward by the State with other suppositions." Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 (1995)(quoting Edenfield v. Fane, 507 U.S. 761, 768 (1993)).

The Plaintiffs argue that there is a substantial governmental interest in protecting consumers from misleading speech, see Response at 19, 21, and the Court agrees that this interest suffices, see Central Hudson, 447 U.S. at 564; Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. at 650. The Defendants argue that there is no substantial interest in preventing deception under the Unprocessed-Cigarette Theory, because the term "natural" has no ascertainable meaning. See MTD at 28. The Defendants continue that the only way there could be a substantial interest in regulating that term would be if there is an interest in prohibiting every manufacturer of natural products. See MTD at 28. The Court concludes, however, that the government has an interest in regulating a word with an underdeterminate meaning. Although perhaps less dangerous than representations that are demonstrably false, words with many meanings or unclear meanings have a capacity to mislead, because consumers can interpret them in ways that do not reflect reality.

Central Hudson's next step -- determining whether the speech restriction directly and materially advances the asserted government interest -- requires more than just "mere speculation or conjecture" that the speech restriction will advance the interest. Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555. "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to

a material degree." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Greater New Orleans

Broadcasting Assoc., Inc. v. United States, 527 U.S. at 188). To satisfy the third step,

> [w]e do not, however, require that "empirical data come . . . accompanied by a surfeit of background information. . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense."

Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Florida Bar v. Went For It, Inc., 515 U.S.

at 628). In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court concluded that a

regulation banning smokeless tobacco advertising within 1,000 feet of schools advances a

governmental interest in protecting minors from using tobacco, because many studies support the

proposition that minors' smokeless tobacco use has increased, and other studies demonstrate a link

between advertising and a demand for smokeless tobacco products. See 533 U.S. at 557-61.

Similarly, here, the Plaintiffs have alleged that several studies indicate that consumers

connect natural, organic, and additive-free with a healthier product, see Amended Complaint ¶¶ 50-

54, 23-27, so implementing an injunction requiring the Defendants to remove those terms or

awarding money damages, which would likely lead to the Defendants removing or modifying those

terms, would advance the government's interest in protecting consumers from that deceptive speech.

Comparable reasoning holds true in the Menthol and Unprocessed-Cigarette Theory contexts as well,

because removing or modifying the additive-free and natural terms directly targets the deception and

would relieve it entirely. A consumer would not believe that a cigarette is additive-free or natural

without those terms present. The Defendants contend, however, that money damages or an

injunction do not materially advance the interest in protecting consumers from deception, because:

(i) the pre-existing disclosures cure any deception whether Natural American cigarettes are safer or

healthier; and (ii) the menthol labeling puts menthol purchasers on notice that they are purchasing

cigarettes with additives, even though the cigarettes are labeled with "no additives." In sum, they argue that there is no deception. Regarding the pre-existing disclosures, again, the disclosures refer only to the "no additive" descriptor, and not the "organic" or "natural" descriptors, so an injunction or damages would still materially advance the government's interest in dissuading deception arising from the natural and organic adjectives. Moreover, while disclosures or disclaimers usually dispel some deception, some representations are so misleading that disclaimers cannot dispel the misleading information, see Pearson v. Shalala, 164 F.3d 650, 659 (D.C. Cir. 1999), and some disclosures' size and placement limit their effectiveness, see F.T.C. v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 43 (D.C. Cir. 1985)("This fine-print legend, moreover, often appears in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements."). The Court concludes that, in light of the disclosures' placement underneath the barcode and divorced from the Surgeon General's warning, money damages or an injunction would materially advance the state's interest even as to the "additive-free" term, because a substantial number of consumers would not think to look there for that disclosure, or would not even see the disclaimer until after they were deceived into paying a premium for Natural American cigarettes. The Defendants' menthol labeling argument fails, because it assumes that a majority of menthol purchasers are so secure in their knowledge that menthol is an additive that an express representation to the contrary does not mislead them into thinking that menthol is not an additive.[53]

---

[53]The Court notes here that many menthol users are young, inexperienced smokers. See Michael Freiberg, The Minty Taste of Death: State and Local Options to Regulate Menthol in Tobacco Products, 64 Cath. U. L. Rev. 949, 951 (2015)("Menthol is consumed by nearly half of all youth smokers.")(citing National Survey on Drug Use and Health, Use of Menthol Cigarettes, at 2-3 (2009) available at https://archive.samhsa.gov/data/2k9/134/134MentholCigarettes.htm (noting that "[p]ast month use of menthol cigarettes was more likely among smokers who started in the past 12 months than among longer term smokers")). The Court concludes that menthol smokers' relative youth or inexperience makes it more likely that governmental interference would materially advance

In considering the final factor -- that the regulation is no more extensive than necessary to serve the governmental interest -- the Supreme Court has cautioned that it is not a "least-restrictive-means requirement." Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 478 (1989). Rather, as "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," the "ample scope of regulatory authority suggested . . . would be illusory if it were subject to a least-restrictive-means requirement, which imposes a heavy burden on the State." Board of Trustees of State University of New York v. Fox, 492 U.S. at 477 (alteration in original). The money damages requested meet this requirement. Money damages encourage the Defendants to add additional disclosures or move their current disclosures to a more prominent location, lest they be exposed to additional liability. Yet moving or adding disclosures might not be enough to fully serve the governmental interest in protecting consumers from the deceptions at issue, See Pearson v. Shalala, 164 F.3d at 659 (holding that some deceptions are so misleading that explanatory disclosures do not cure the deception), so an injunction, depending on whether the deceptive speech may be cured by disclosures, might also meet this requirement, see In re R.M.J., 455 U.S. at 203. At this stage in the litigation, the Court cannot decide on the pleadings alone whether an injunction would be more prohibitive than necessary, but it is plausible that it would not be. Accordingly, the Court concludes that the Plaintiffs' deception theories meet the Central Hudson standard, and the First Amendment is no bar to their case.

## VI. THE STATE STATUTES' SAFE HARBORS, EXCEPT FOR ILLINOIS' DO NOT BAR RELIEF.

The Defendants contend that the state statutes the Plaintiffs invoke are subject to safe harbors, which protect conduct that federal law or policy authorizes from liability. See MTD at 31.

their stated goal of dispelling deception, because younger and inexperienced smokers are less likely to know what menthol is.

They contend that the Consent Order authorizes the descriptors challenged, so the Plaintiffs' claims are barred.  See MTD at 31.  The Court concludes that the Illinois statutes bar the Plaintiff's claims insomuch as they are premised on the "additive-free" descriptor, but the remaining state statutes do not.

### A.  CALIFORNIA'S SAFE HARBOR DOES NOT BAR RELIEF.

The Supreme Court of California has determined that the UCL is subject to a safe harbor that, "[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination."  Cel-Tech, 973 P.2d at 541.  "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct."  Cel-Tech, 973 P.2d at 541.  "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful."  Cel-Tech, 973 P.2d at 541.  Since Cel-Tech, California Courts and federal courts reviewing California law have extended the safe harbor doctrine to CLRA and California's False Advertising law.  See Parent v. MillerCoors LLC, No. 15-1204, 2015 WL 6455752, at *4 (S.D. Cal. October 26, 2015)(Curiel, J.); Lopez v. Nissan N. Am., Inc., 135 Cal. Rptr. 3d 116, 134 (Cal. Ct. App. 2011).[54]

In Cel-Tech the Supreme Court of California explained that "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair," and that, conversely, "courts may not use the unfair competition law to condemn actions the Legislature permits."  Cel-Tech, 973 P.2d at 542.  The question in this case is whether the Consent Order permits the descriptors at issue

---

[54]The Supreme Court of California has not determined whether the safe harbor should be extended to the CLRA and California's False Advertising Law.  The Court concludes that the Supreme Court of California would extend the safe harbor to those two laws, because the great weight of authority interpreting those laws has extended the safe harbor to them, and the Supreme Court of California's rationale for creating a safe harbor to the UCL, i.e., the UCL's sweeping scope cannot be used to contradict the Legislature's express legislation to the contrary, applies with equal force to the CLRA and the False Advertising Law.

or prohibits them. California caselaw provides little guidance on that distinction, but the test appears to be one of degree and context. For example, legislation expressly immunizing conduct from liability amounts to permission, whereas a robbery law's failure to prohibit murder does not amount to permission to commit murder. See Cel-Tech, 973 P.2d at 541. Here, the Consent Order is an agreement that, subject to certain conditions, the FTC will not bring an enforcement action. The Consent Order is, thus, not as clearly permissive as the express immunity from suit is, but it also diverges from the robbery example, because the order bears directly on the Defendants' actions.

Bearing that test in mind, the Court concludes that the Supreme Court of California would rule that the Consent Order does not authorize the Defendants' allegedly misleading conduct. Although the context suggests that the Consent Order permits the descriptors, the Consent Order's degree of permission is dispositive. As already explained, the Consent Order does not expressly authorize conduct; it states only that the agency will not to bring an enforcement action. An agreement not to enforce conveys, at best, a minimum level of approval and, at worst, indifference. Moreover, a consent order is far more fragile than express legislative authorization. Agencies might disagree, as the FDA and FTC have in this case, or the agency may later change its position for some other reason. Accordingly, an agreement not enforce does not amount to permission. This conclusion is in accord with other federal and State Supreme Court cases. See, e.g., United States v. Philip Morris USA Inc., 566 F.3d 1095, 1125 (D.C. Cir. 2009)("Although the FTC never prevented Defendants from using misleading descriptors, 'agency nonenforcement of a federal statute is not the same as a policy of approval.'")(quoting Altria II, 555 U.S. at 89); Aspinall II, 902 N.E.2d at 424-26 (citing Altria II, 555 U.S. at 89 n.13). The Court concludes, thus, that the UCL's, the CLRA's, and California's false advertising law's safe harbors do not bar relief.

**B. COLORADO'S, FLORIDA'S, MASSACHUSETTS', MICHIGAN'S, NEW JERSEY'S, NEW MEXICO'S, NEW YORK'S, NORTH CAROLINA'S, AND WASHINGTON'S SAFE HARBORS DO NOT BAR RELIEF.**

The Defendants also contend that Colorado, Florida, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina, and Washington law bar relief for largely the same reason that California law does. See MTD at 32-39. Each of those states provides a safe harbor similar to California's. See Colo. Rev. Code § 6-1-106(1)(a); Fla Stat. § 501.212(1) Mass. Gen. Laws. Ch. 93A, § 3; Mich. Comp. Laws § 445.904(1)(a); Lemelledo, 696 A.2d at 554; N.M. Stat. Ann. § 57-12-7; N.Y. Gen. Bus. Law § 349(d), § 350-d; Ellis v. Norther Star Co., 388 S.E.2d at 131; Wash. Rev. Code § 19.86.170. After considering the states' Supreme Court caselaw on their respective safe harbors, the Court concludes that these safe harbors do not apply for largely the same reasons it concluded that the California safe harbors did not apply. The Court considers each state briefly in turn.

### 1. Colorado Law Does Not Bar Relief.

The CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." Colo. Rev. Code § 6-1-106(1)(a). The Supreme Court of Colorado has ruled that, "given the broad remedial purpose of the CCPA," the safe harbor "exempts only those actions that are 'in compliance' with other laws" and that "[c]onduct amounting to deceptive or unfair trade practices, however, would not appear to be in 'compliance' with other laws." Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56. That ruling suggests that unfair or deceptive conduct never meets the safe harbor exception. Even if, however, the safe harbor is not so narrow, the reasoning applicable to the California safe harbor applies here, too. As the Supreme Court of Colorado explained

> the purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would

otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid conflict between laws, not to exclude form the Act's coverage that is regulated by another statute or agency.

Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56. Compliance with a Consent Order, which represents that a federal agency has agreed not to enforce a statute, does not demonstrate that conduct is allowed under the Act -- it demonstrates only that which it represents, namely, that, subject to certain conditions, the agency will not enforce the statute.

## 2. **Florida Law Does Not Bar Relief**.

FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law." Fla Stat. § 501.212(1). The Supreme Court of Florida has not interpreted the Safe Harbor's bounds. The Court concludes that, if confronted with the issue, the Supreme Court of Florida would rule that an agreement not to enforce does not amount to "specifically permit[ing]" conduct. Fla. Stat. § 501.212(1). The Defendants direct the Court to two federal cases and a state case for the opposite conclusion, but those cases are inapposite, because they deal with an express authorization and not an agreement not to enforce. See MTD at 33 (citing Pye v. Fifth Generation Inc., No. 14-0493, 2015 WL 5634600, at *4 (N.D. Fla. September 23, 2015)(Hinkle, J.); Prohias v. Pfizer, Inc., 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007)(Jordan, J.); Prohias v. AstaZeneca Pharm., L.P., 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007)).

## 3. **Massachusetts Law Does Not Bar Relief**.

Mass. Gen. Laws. Ch. 93A has a safe harbor, which reads: "Nothing in this Chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth of the United States." Mass. Gen. Laws. Ch. 93A, § 3. In a factually similar case, the Supreme Judicial Court of Massachusetts determined that an FTC consent order only enjoined conduct and, therefore, "the defendants point to

nothing approaching a showing that the FTC affirmatively permitted the use of descriptors." <u>Aspinall II</u>, 902 N.E.2d at 425. The Court concludes that the Supreme Judicial Court of Massachusetts would rule similarly here.

### 4. **Michigan Law Does Not Bar Relief.**

The MCPA does not apply to "transaction[s] or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). The Supreme Court of Michigan has not given clear guidance on the safe harbor except that a court's focus should be directed at whether "the transaction at issue, not the alleged misconduct, is 'specifically authorized.'" <u>Smith v. Globe Life Ins. Co.</u>, 597 N.W.2d at 37. Accordingly, the Court cannot properly focus on whether the purported deception was authorized, but instead must properly focus on whether the labeling and advertising was specifically authorized. With that only guidance in mind, the Court concludes that, if confronted with the issue, the Supreme Court of Michigan would rule that an agreement not to enforce does not amount to "specifically authoriz[ing]" conduct. Mich. Comp. Laws § 445.904(1)(a). The federal case that the Defendants cite is unpersuasive, because its conclusion rests on the "FTC's regulatory scheme impliedly authoriz[ing]" the descriptors a cigarette company used. <u>Flanagan v. Altria Group, Inc.</u>, No.05-71697, 2005 WL 2769010, at *6 (E.D. Mich. October 25, 2005)(Edmunds, J.). The statute does not contemplate implicit authorization, only specific authorization. <u>See</u> Mich. Comp. Laws § 445.904(1)(a). Moreover, even if the statute encompassed implicit authorization, the Court concludes that the Supreme Court of Michigan would not read its safe harbor so expansively to exclude MCPA claims merely because the federal government had regulated in the area.[55]

---

[55]The Court also notes that the Supreme Court, in <u>Altria II</u>, rejected the reasoning used in

### 5. New Jersey Law Does Not Bar Relief.

The NJCFA is subject to a judicially created exception. See Lemelledo, 696 A.2d at 554. There is a "presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation." Lemelledo, 696 A.2d at 554. "In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." Lemelledo, 696 A.2d at 554. "We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility." 696 A.2d at 554. "If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation." Lemelledo, 696 A.2d at 554. Given this precedent, the Court concludes that an agreement not to enforce does not conflict with the New Jersey CFA so "patent[ly] and sharp[ly]" as to bar liability. Lemelledo, 696 A.2d at 554.

### 6. New Mexico Law Does Not Bar Relief.

The NMUPA shields "actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States." N.M. Stat. Ann. § 57-12-7. In interpreting that provision, the Supreme Court of New Mexico has held that "expressly" means "directly and distinctly stated or expressed *rather than implied or left to inference.*" Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 38, 227 P.3d at 83 (emphasis in original)(citation omitted). In Truong v. Allstate Ins. Co., the Supreme Court of New Mexico concluded that the Superintendent of Insurance did not "expressly permit" a form of claims handling where the Superintendent of Insurance stated

_____

Flanagan v. Altria Grp., Inc., albeit in its preemption analysis and not in a MCPA analysis.

"only that the claims appear to have been handled properly and that no claims handling abuses were noted," and that these statements were not the same as "an affirmative finding of proper handling." 2010-NMSC-009, ¶ 39, 227 P.3d at 83.  Given that precedent, the Court concludes that the Supreme Court of New Mexico would rule that an agreement not to enforce does not amount to express permission, because it requires an inference.

The New Mexico False Advertising Law notes that "it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission."  N.M. Stat. Ann. § 57-15-4.  The Supreme Court of New Mexico has not construed this exception, nor has any other court.  The Court concludes, however, that the Supreme Court of New Mexico would rule that the safe harbor does not apply where the rule or regulation is only an agreement not to enforce.

### 7.	New York Law Does Not Bar Relief.

N.Y. Gen. Bus. Law § 349(d) and N.Y. Gen. Bus. Law § 350-d preclude suit for conduct that "is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission."   N.Y. Gen. Bus. Law § 349(d); N.Y. Gen. Bus. Law § 350-d (quoted language in both).  The Court of Appeals of New York has not interpreted either of those statutes nor could the Court locate New York Supreme Court, Appellate Division cases interpreting the safe harbors.  Several New York federal courts, however, have reasoned that the safe harbors cover "rules and regulations," which does not include informal agency action.  See, e.g., Greene v. Gerber Products Co., __F. Supp. 3d__, 2017 WL 3327583, at *21-22 (E.D.N.Y. 2017)(Brodie, J.).  At least one other New York federal court has concluded that the safe harbor analysis overlaps with a constitutional preemption analysis.  See Stewart v. Riviana Foods, Inc., No.16-6157, 2017 WL 4045952, at *4-5 (S.D.N.Y. September 11, 2017)(Roman, J.).   The Court concludes that, if

confronted with the issue, the Court of Appeals of New York would adopt the reasoning of those federal courts and rule that the Consent Order is not a rule or regulation, or that an agreement not to enforce a federal statute does not meet the conduct required for the safe harbor.

### 8. North Carolina Law Does Not Bar Relief.

In Ellis v. Northern Star Co., the Supreme Court of North Carolina recognized that, "[i]n limitation, we have held that certain transactions already subject to pervasive and intricate statutory regulation, such as securities transactions, were not intended by the legislature to be included within the scope of [N.C. Gen. Stat. § 75-1.1]." Ellis v. Northern Star Co., 388 S.E.2d at 131. Although the cigarette industry has been subject to regulation, the Court declines to extend this limited exception to an industry that, to the Court's knowledge, no North Carolina court has exempted from the statute. Moreover, the Court concludes it is unlikely that the Supreme Court of North Carolina would extend the doctrine in a context that the Supreme Court has rejected in the preemption field.

### 9. Ohio Law Does Not Bar Relief.

Ohio Rev. Code Ann. § 1345.02(A) is inapplicable if "a violation was an act or practice required or specifically permitted by federal trade commission orders." Ohio Rev. Code Ann. § 1345.11. In Marrone v. Philip Morris USA, Inc., the Supreme Court of Ohio noted that the "Ohio's consumer-protection laws defer to FTC pronouncements," but it concluded that, "although the FTC is well aware of the years of litigation and debate over cigarette manufactures' marketing strategies, . . . it appears that the FTC has neither permitted nor forbidden characterizations like 'low' tar." Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 38. With that conclusion it implicitly recognized that an FTC consent order enjoining descriptor use, unless disclosures accompany the descriptors, does not permit descriptor use. Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 38 (citing Flanagan v. Altria Group, Inc., 2005 WL 2769010, at *3-5). The Court is

concludes that, although the holding is dicta, the Supreme Court of Ohio would follow its conclusion from <u>Marrone v. Philip Morris USA, Inc.</u> and rule that the Consent Order does not permit the descriptor use here.

### 10. <u>Washington Law Does Not Bar Relief</u>.

The WCPA does not apply "to actions or transactions otherwise permitted, prohibited or regulated under laws administered by . . . any other regulatory body or officer acting under statutory authority of this state or the United States." Wash. Rev. Code § 19.86.170. The Supreme Court of Washington has stated that "[e]xemption under the Consumer Protection Act is applied only after determining whether the specific action is permitted, prohibited, regulated or required by a regulatory body or statute." <u>Vogt v. Seattle-First Nat. Bank</u>, 817 P.2d 1364, 1370 (Wash. 1991)(en banc). It has also noted that an "[o]verly broad construction of 'permission' may conflict with the legislature's intent that the Consumer Protection Act be liberally construed so that its beneficial purposes may be served." <u>Vogt v. Seattle-First Nat. Bank</u>, 817 P.2d at 1370. "The test articulated was whether under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Vogt v. Seattle-First Nat. Bank</u>, 817 P.2d at 1371. Based on that precedent, the Court concludes that the Supreme Court of Washington would rule that an agreement not to enforce does not amount to permission under the safe harbor nor does the state statute stand as an obstacle to the FTC's purpose.

### C. ILLINOIS SAFE HARBORS BAR RELIEF FOR CONDUCT THE CONSENT ORDER SPECIFIES.

Although the Court concludes broadly that the Consent Order does not establish a safe harbor for the Defendants' conduct under other States' law, the Supreme Court of Illinois dictates a

different outcome.[56]  Under Illinois law, the IFCA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1).  Also under Illinois law, the IUDTPA does not apply to "conduct in compliance with orders or rules of or a statute administered by a Federal, state or local governmental agency." 815 Ill. Comp. Stat. 510/4(1).  In Price v. Philip Morris, the Supreme Court of Illinois concluded that an FTC consent order enjoining the use "low," "lower," "reduced," and other similar words "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content" barred a plaintiff's claim under 815 Ill. Comp. Stat. 505/10b(1) and under 815 Ill. Comp. Stat. 510/4(1) -- the two safe harbors.  Price v. Philip Morris, 848 N.E.2d at 50, 53.  The Court concludes that Price v. Philip Morris controls the Illinois' claims outcome.  The Consent Order, however, governs only Natural American cigarette's advertising and not its labeling.  Accordingly, the Court dismisses the Plaintiffs' Illinois claims to the extent that they are premised on the theory that the terms "natural" and "additive-free" in the Defendants' advertising mislead a reasonable consumer into believing that Natural American cigarettes are safer or healthier than other cigarettes .

### D.    THE COURT DISMISSES IN PART THE IUDTPA CLAIM AND THE OHIO STATUTORY CLAIMS FOR INDEPENDENT STATE REASONS.

The Defendants argue that the Plaintiffs' IUDTPA, TCCWNA, OCSPA, and ODTPA claims fail for independent state reasons.  The Court concludes that the Plaintiffs have adequately pled their TCCWNA claim, but that the other three claims fail.  The Court considers each claim in turn.

---

[56]The Court disagrees with that court's conclusions for the reasons articulated in its analysis under California law, but is nevertheless bound by the Supreme Court of Illinois.

### 1. The IUDTPA Claim for Injunctive Relief Fails, Because the Plaintiffs Will Not Suffer a Future Harm From the Deception at Issue.

The Defendants argue that the Plaintiffs' claim for injunctive relief under IUDTPA fails, because the Plaintiffs cannot allege likelihood of future harm to themselves. See MTD at 49-50. According to the Defendants, now that the Plaintiffs know of the deception, the Defendants' sales and marketing practices cannot ever harm them again. See MTD at 50. In so arguing, the Defendants rely on several cases, including a Seventh Circuit decision, which ruled that, under IUDTPA, "[s]ince [the plaintiff] is now aware of [the defendant's deceptive] sales practices, he is not likely be harmed by the practices in the future," and, therefore, the plaintiff "is not entitled to injunctive relief." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 740-41 (7th Cir. 2014). See MTD at 49-50 (citing Aliano v. Louisville Distilling Co., LLC, 115 F. Supp. 3d 921, 928 (N.D. Ill. 2015)(Aspen, J.); Robinson v. Toyota Motor Credit Corp., 735 N.E.2d 724, 735 (Ill. App. Ct. 2000)); Reply at 24-25.

IUDTPA provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable." 815 Ill. Comp. Stat. 510/3. The Supreme Court of Illinois has agreed with the Defendants' reasoning and has ruled that plaintiff consumers who know of the purported deception "can avoid it," and, thus, "are not persons who are likely to be damaged by the defendants' conduct in the future." Glazewksi v. Coronet Ins. Co., 483 N.E.2d 1263, 1267 (Ill. 1985)(quotations omitted)(concluding that the "plaintiffs are not eligible for injunctive relief"). See Brooks v. Midas-International Corp., 361 N.E.2d 815, 821 (Ill. App. Ct. 1977)("Whatever harm plaintiff may suffer from the advertisements has already occurred. The trial court, therefore was correct in ruling that such practices by defendant are not likely to damage plaintiff."); Kljajich v. Whirlpool Corp., No. 15-5980, 2015 WL 8481973, at *4-5 (N.D. Ill. December 10, 2015)(Eve, J.).

The Plaintiffs counter that, although the class representatives know of the deception, putative class members can still be deceived, so they still have standing to sue. See Response at 55 (citing Leiner v. Johnson & Johnson Consumer Cos., No. 15-5876, 2016 WL 128098, at *1 (N.D. Ill. January 12, 2016)). The Court concludes that the Supreme Court of Illinois would not agree with the Plaintiffs. Although not expressly considering the argument, in Glazewki v. Coronet Ins. Co., the Supreme Court of Illinois considered class-action representatives' suit for injunctive relief and determined that, because the representative plaintiffs knew of the deception, injunctive relief was foreclosed. See Glazewki v. Coronet Ins. Co., 483 N.E.2d at 1267. Leiner v. Johnson & Johnson Consumer Cos. does not bind the Court, and, even if it bound the Court, the case is inapposite, because it pivots on Article III standing requirements to bring a suit for injunctive relief under IUDTPA. See Leiner v. Johnson & Johnson Consumer Cos., 2016 WL 128098, at *1. In contrast, the Defendants here argue that the Plaintiffs have not sufficiently pled one of IUDTPA's elements, i.e., likelihood of future harm.[57] Accordingly, the Court dismisses the IUDTPA claim, Illinois Count II, for injunctive relief.

### 2. The Plaintiffs Have Adequately Pled their TCCWNA Claim, Because They Have Plausibly Alleged a Predicate Violation Under the NJCFA.

The Defendants argue that the Plaintiffs' TCCWNA claim fails, because they have not alleged a predicate statutory violation. See MTD at 50. They contend that the only predicate

---

[57]The Court notes the Plaintiffs' argument that Illinois' courts' interpretations gut the statute, because a plaintiff suing under IUDTPA will always know of the deception by the time he brings suit, so will never qualify for injunctive relief. That conclusion is false, because some deceptive conduct leads to repeated, hard-to-verify harms, such as deceptive billing practices. See Brennan v. AT&T Corp., No.04-0433, 2006 WL 306755, at *5 (S.D. Ill. February 8, 2006)(Herndon, J.). As that court reasoned, although a consumer might recognize incorrect charges once, it is not guaranteed that the consumer will recognize incorrect charges in the future. See Brennan v. AT&T Corp., 2006 WL 306755, at *5 ("Although it is true that Crawford recognized the Defendant's charges in the past, she may not be so fortunate in the future -- particularly when a charge may appear as nothing more than one line in a lengthy phone bill from another provider.").

possible is the Plaintiffs' NJCFA claim and, because the Plaintiffs fail to demonstrate that the Defendants' representations would deceive a reasonable consumer, that predicate claim fails. See MTD at 51. The Court concludes, however, that the Plaintiffs have plausibly alleged a NJCFA violation, see supra 163-77, so the Plaintiffs TCCWNA may proceed.

### 3. The Plaintiffs have not Pled OSCPA's Substantive Notice Requirement, so the Court Dismisses the OSCPA Claim.

Under the OSCPA, a consumer qualifies for class-action relief only when a supplier acts in the face of prior notice that its conduct was deceptive. See Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 34, 38 (citing Ohio Rev. Code Ann. § 1345.09(B)). "The prior notice may be in the form of (1) a rule adopted by the Attorney General . . . or (2) a court decision made available for public inspection by the Attorney General." Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 34. For a court decision to qualify as Notice, the prior court decision must be substantially similar to the cause of action brought. See Marrone v. Philip Morris USA, Inc., 850 N.E. at 36, 38 ("Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA."). The requisite notice must be in the plaintiffs' complaint. See Volbers-Klarich v. Middletown Mgt., Inc., 929 N.E.2d 434, 502 (Ohio 2010); In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012)(Frost, J.); Johnson v. Microsoft Corp., 802 N.E. 2d 712, 720 (Ohio Ct. App. 2003) aff'd, 834 N.E. 2d 791 (Ohio 2005).

Here, the Plaintiffs have not pled a specific court decision or Attorney General adopted rule to put the Defendants on notice. See Amended Complaint ¶¶ 395-411, at 95-98. The Plaintiffs contend, however, that such notice requirement is inapplicable here, because the requirement is procedural, so "ha[s] no effect in federal court." Response at 59 (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)). According to Plaintiffs, because the pre-suit notice requirement is procedural and conflicts with rule 23, rule 23 must prevail. Response at 59-60.

"In diversity cases, the Erie doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher, 871 F.3d at 1162. "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[] statutory authorization or Congress's rulemaking power.'" Racher, 871 F.3d at 1162 (quoting Shady Grove, 559 U.S. at 398). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in Shady Grove, as laid out by Justice Stevens in his concurring opinion." Racher, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, i.e., it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher, 871 F.3d at 1163-64. A state law is substantive if after examining "the language and policy of the rule in question . . . the primary objective is directed to influencing conduct through legal incentives," and a state law is procedural if the law's purpose is to "achiev[e] fair, accurate, and efficient resolutions of disputes." Sims v. Great American Life Ins. Co., 469 F.3d 870, 883 (10th Cir. 2006). See Leon v. FedEx Ground Package Sys., Inc., 313 F.R.D. 615, 641 (D.N.M. 2016)(Browning, J.). The Tenth Circuit recently added: "If a state law 'concerns merely the manner and means' by which substantive rights

are enforced, it is procedural, but if its application would 'significantly affect the result of litigation, it is substantive.'" Racher, 871 F.3d at 1164 (quoting Guaranty Trust Co. v. York, 326 U.S. 99, 109 (1945)).

Rule 23 does not directly conflict with the Ohio class-action pre-suit notice requirement. Rule 23 governs when a federal court may certify a class action. Fed. R. Civ. P. 23. Rule 23, however, does not purport to create a class action's only requisite procedural elements. Rule 23(b)'s language is framed permissively: "A class action may be maintained . . . ." Fed. R. Civ. P. 23(b) (emphasis added). Accordingly, both the federal conditions and the state condition can be met, so rule 23 and Ohio's pre-suit notice law may exist "side by side." Racher, 871 F.3d at 1163 (citations omitted).[58]  Because there is no direct conflict, the Court proceeds under Erie. See Racher, 871 F.3d at 1163.

Under Erie, "federal courts sitting in diversity apply state substantive law and federal procedural law." Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996). Ohio federal courts construing Ohio's Consumer Sales Practice Act's notice requirement have determined that the rule is substantive, because it "is intimately interwoven with the substantive remedies available under the OSCPA." In re Whirlpool, 2010 WL 2756947 at *2 (citing Shady Grove, 559 U.S. at 429 (Stevens, J., concurring). See McKinney v. Bayer Corp., 744 F. Supp. 2d at 748-49; Phillips v. Philip Morris Cos., 290 F.R.D. 476, 480-81 (N.D. Ohio 2013)(Lioi, J.). The In re Whirlpool court

_____

[58]The Court notes that some Ohio federal courts have concluded that Ohio's class-action pre-suit notice requirement directly conflicts with rule 23. See e.g., McKinney v. Bayer Corp., 744 F. Supp. 733, 748 (N.D. Ohio 2010)(O'Malley, J.); In re Whirlpool Corp. Front-Loading Washer Products Liability Litig., No. 08-65000, 2010 WL 2756947, at *1 (N.D. Ohio July 12, 2010)(Gwin, J.)("In re Whirlpool") judgment vacated on other grounds, 559 U.S. 901 (2013). The Court disagrees with their conclusions, because they interpret the rule's language that "[a] class action may be maintained" to suggest that rule 23 prescribes the exclusive requirements for class actions. Fed. R. Civ. P. 23(b). See In re Whirlpool, 2010 WL 2756947 at *1. "May" is a permissive term. It expresses both discretion and uncertainty. An action may proceed, but it does not mean that it must proceed.

explained that Ohio Rev. Code § 1345.09 "purports to define substantive rights and remedies by creating a cause of action for defrauded consumers," and the pre-suit notice requirement "applies only to 'a violation of Chapter 1345 of the [Ohio] Revised Code' -- indicating its substantive nature." In re Whirlpool, 2010 WL 2756947 at *2 (quoting Ohio Rev. Code § 1345.09). The notice rule, thus, is much more like an element to the claim and not a procedural requirement. See In re Whirlpool, 2010 WL 2756947 at *2. The Court agrees that Ohio's pre-suit notice requirement is substantive. First, because the requirement applies only to Ohio's Consumer Sales Practice Act, it acts more like a claim's element than a procedural hurdle. See Phillips v. Philip Morris Cos., 290 F.R.D. at 481. Second, pre-suit notice's purpose is typically to convince parties to negotiate before litigation, and "thus the primary objective is directed to influencing conduct through legal incentives." Sims v. Great American Life Ins. Co., 469 F.3d at 883. See Baber v. Edman, 719 F.2d 122, 123 (5th Cir. 1983)(concluding that a pre-suit notice requirement's purpose is to give parties an "opportunity to settle in advance of expensive litigation"). Finally, the rule, much like a statute of limitations, even though seemingly procedural, "significantly affect[s] the result of litigation," because failure to plead notice defeats the claim. Racher, 871 F.3d at 1164 (quoting Guaranty Trust Co. v. York, 326 U.S. at 109). Accordingly, the pre-suit notice requirement is substantive, and the Court must apply it. The Plaintiffs have not pled the pre-suit notice requirement, so the Court dismisses the Plaintiffs' OCSPA claim without prejudice with leave to plead, as required, the notice needed.

4. **The Plaintiffs' ODTPA Claim Fails, Because Consumers Do Not Have Standing to Sue Under That Statute.**

The Defendants argue that the ODTPA claim fails, because many Ohio Courts have concluded that the statute does not grant consumers standing to sue. See MTD at 52. The Plaintiffs counter that, notwithstanding the cases to the contrary, the statute's express language "affirmatively

grants the plaintiffs standing" as other federal courts have recognized. Response at 61. The statute provides that: "A person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action." Ohio Rev. Code Ann. § 4165.03(A)(2). "Person means an individual, corporation, government . . . . or any other legal or commercial entity." Ohio Rev. Code Ann. § 4165.01(D). The Supreme Court of Ohio has not yet resolved the consumer standing issue, and there is a recognized split in authority on the topic, although the split lopsidedly favors the Defendants. See Terlesky v. Fifth Dimension Inc., 2015 WL 7254189, at *2 (S.D. Ohio November 17, 2015)(Dlott, J.); Phillips v. Philip Morris Cos., 290 F.R.D. at 482 (collecting cases). Many courts that reason a consumer has no standing to sue, despite the statute defining "person" as an "individual," conclude that the Ohio statute "is substantially similar to Section 43(a) of the Lanham Act and the Lanham Act protects the interests of a purely commercial class that does not include individual consumers." Terlesky v. Fifth Dimension Inc., 2015 WL 7254189, at *2. See, e.g., In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 874 (S.D. Ohio 2012)(Frost, J.); Dawson v. Blockbuster, Inc., 2006 WL 1061769, at *4 (Ohio App. Ct. March 16, 2006), cert. denied, 852 N.E.2d 190 (Ohio 2006). Other courts, looking to the statute's language have concluded that the "any other legal or commercial entity" language in Ohio Rev. Code Ann. § 4165.01(D) qualifies the definition of individual such that it commands that the individual must be involved in commercial activity. See e.g., Phillips v. Philip Morris Cos., 290 F.R.D. at 483; Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 650 (N.D. Ohio 2012)(Polster, J.). The Court concludes that Supreme Court of Ohio would adopt the majority position, because it "often look[s] to federal court interpretation of federal statutes analogous to Ohio Statutes," Williams v. Akron, 837 N.E.2d 1169, 1176 (Ohio 2005), and the Lanham Act, which is analogous to ODTPA, has been interpreted to bar consumer standing, see Phillips v. Philip Morris Cos., 290 F.R.D. at 483-84. The Court also

concludes that the minority position is incorrect, because it renders the OCSPA superfluous "as both statutes [would] regulate the same type of conduct." Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 650 (N.D. Ohio 2012). In so ruling, the Court is mindful that, when sitting in diversity, a federal district judge should strive to ensure that a forum's location should not dictate a claim's outcome. See Butt v. Bank of Am., N.A., 477 F.3d at 1179. Given the majority position, if this case had been brought in Ohio, it is highly likely that the claim would be dismissed for lack of standing. The Court, accordingly dismisses the ODTPA claim.

**VII.  THE PLAINTIFFS' NEW JERSEY AND OHIO UNJUST-ENRICHMENT CLAIMS FAIL, BECAUSE THE PLAINTIFFS CANNOT PLEAD A REMUNERATION FOR THE NEW JERSEY CLAIM AND THEY CANNOT PLEAD A DIRECT BENEFIT FOR THE OHIO CLAIM.**

The Defendants argue that the some or all of the Plaintiffs unjust-enrichment claims fail for four reasons. First, the Defendants argue that all of the unjust-enrichment claims fail, because the plaintiffs have not pled an injustice -- there was no deception. See MTD at 52. Second, they assert that nine of twelve unjust-enrichment claims fail, because the Plaintiffs have an adequate legal remedy. See MTD at 53. Third, they contend that four of twelve fail, because the Plaintiffs did not directly confer a benefit to the Defendants. See MTD at 53. Finally, they conclude that two of twelve claims fail for state-specific reasons. See MTD at 53. The Court determines that the Plaintiffs have pled an injustice, and that unjust enrichment may be pled in the alternative under rule 8. The New Jersey and Ohio claims fail, however, for state specific reasons.

**A.  THE PLAINTIFFS HAVE PLED AN INJUSTICE, BECAUSE THERE ARE TWO PLAUSIBLE THEORIES OF DECEPTION.**

The Defendants argue that the Plaintiffs have failed to plausibly allege a deception, so the Plaintiffs' unjust-enrichment claims fail, because there has been no injustice. See MTD at 54-55. The Court concludes, however, that there are two plausible theories of deception. See supra at 163-

77.  Accordingly, the Defendants' argument fails as to the Safer-Cigarette and Menthol Theories. The Court dismisses the Plaintiffs' unjust-enrichment claims to the extent that they rely on the Unprocessed-Cigarette Theory.

###   B.   THE PLAINTIFFS UNJUST-ENRICHMENT CLAIMS MAY BE PLED IN THE ALTERNATIVE EVEN THOUGH AN ADEQUATE LEGAL REMEDY MAY EXIST UNDER THE STATUTORY SCHEME.

The Defendants argue that, under Colorado, Florida, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, and Washington law, the Plaintiffs' unjust-enrichment claims fail, because the Plaintiffs' have an adequate and available legal remedy.[59]  See MTD at 55-60.[60]  The Plaintiffs counter that, under rule 8(d) of the Federal Rules of Civil Procedure, they may plead in the alternative their equitable claims.  See Response at 63.  They also argue that, for state-specific reasons, their unjust-enrichment claims do not fail.  See Response at 64-69.

There is no binding Tenth Circuit precedent construing pleading in the alternative equitable claims under the Federal Rules of Civil Procedure, so the Court writes on a clean slate.  Rule 8(d)(2) provides that: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d)(2).  Rule 8(d)(3) states: "A party may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).   Some United States District Courts have concluded that

---

[59]The Court recognizes that Plaintiffs pursuing unjust enrichment may also seek a legal remedy, which would obviate the available legal remedy argument.  See Restatement (Third) of Restitution and Unjust Enrichment.  The Plaintiffs, however, seek an equitable remedy with their unjust-enrichment claims.  See Amended Complaint ¶¶ 175, 193, 215, 248, 265, 288, 314, 341, 373, 394, 426, 449, at 54, 57, 62, 68, 71, 76, 81, 86, 91, 95, 99-100, 103.

[60]In their MTD, the Defendants argue that the New Mexico unjust-enrichment claim failed for the same reason, see MTD at 58, but in their Reply, they withdrew argument on that ground, see Reply at 27 n.17.

equitable claims premised on the same factual deception as a consumer protection claims are not, under rule 8, alternative theories of relief. See In re Ford Tailgate Litig., No. 11-2953, 2014 WL 1007066, at *5 (N.D. Cal. March 12, 2014)(Seeborg, J.)("[W]here the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief, but rather is duplicative of those causes of action.")(quoting Licul v. Volkswagen Grp. of Am., Inc., No. 13-61686, 2013 WL 6328734, at *7 (S.D. Fla. December 5, 2013)(Cohn, J.)). The Court disagrees with the conclusion that an unjust-enrichment claim cannot be an alternative theory, under federal law, if it is premised on the same factual predicates. Cf. Sylvia v. Wisler, __ F.3d __, 2017 WL 5622916, at *10 (10th Cir. 2017)("[T]he same relationship between a client and her attorney may conceivably provide the basis for claims sounding in both contract and tort. . . . [T]here is nothing in the federal rules or in Kansas practice that prevented Mr. Sylvia from pleading in the alternative claims sounding in both tort and contract."); Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1273 (D.N.M. 2014)(Browning, J.)(rejecting a proposed rule that an unjust-enrichment claim must be dismissed under New Mexico law "when the claim involves the issues that are the subject of a contract"). For example, in the consumer protection or tort context, though the purported deception might be the same, the damages theory diverges. Unjust enrichment focuses on the Defendants' ill-gotten gains, whereas a tort theory focuses on the Plaintiffs' loss. See In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. 2d at 192 n.11; Harris Grp., Inc. v. Robinson, 209 P.3d at 1205. The Court concludes that such a divergence is enough to amount to an alternative theory under rule 8(d). The Court, thus, declines to hold that rule 8(d) necessarily forecloses pleading an equitable claim in the alternative, because factual predicates overlap.

Nevertheless, the Court must consider whether rule 8(d) allows plaintiffs to plead equitable theories in the alternative regardless whether state law precludes such a pleading. Many United States District Courts have held that rule 8 governs, unless state law provides an exclusive remedy. See, e.g., In re Light Cigarettes Marketing Sales Practices Litigation, 751 F. Supp. 2d 183, 192 (D. Me. 2010)(Woodcock, J.)(noting that, under rule 8(d)(2), pleading in the alternative fails "when the legal cause of action provides an exclusive remedy" and collecting cases); Maalouf v. Salomon Smith Barney, Inc., No. 02-4770, 2003 WL 1858153, at *7 (S.D.N.Y. April 10, 2003)(Scheindlin, J.). Thus, when a contract arguably covers the equitable claim's scope, i.e., a plaintiff sues for breach of contract and unjust enrichment based on the same factual predicates, many court have held that equitable claims may be pled in the alternative only if it is reasonably likely that the party will challenge the contract's validity. See Solo v. United Parcel Serv. Co., 819 F.3d 788, 796 (6th Cir. 2016); Maalouf v. Salomon Smith Barney, Inc., 2003 WL 1858153, at *7; Herazo v. Whole Foods Market, Inc., No. 14-61909, 2015 WL 4514510, at *3 (S.D. Fla. July 24, 2015)(Moreno, J.).

With that backdrop in mind, the Court concludes that, under Shady Grove, the court must apply rule 8(d). Rule 8(d) allows expansive alternative pleading and state law prohibits alternative pleading of equitable claims if there is an adequate remedy at law, so the two are in conflict. See, e.g., Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d 835, 842 (Colo. 2004)("[E]quity will not act if there is a plain, speedy, adequate remedy at law."); Greenfield Villages v. Thompson, 44 So.2d 679, 683 (Fla. 1950); Tkachik v. Mandeville, 790 N.W.2d 260 265 (Mich. 2010); Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). The Court, thus, must determine whether the federal rule violates the Rules Enabling Act by abridging, modifying, or enlarging a substantive right. There are two possible interpretations of the rule that an adequate legal remedy bars equitable

relief.  First, it could mean that, as part of providing a statutory, i.e., legal, remedy, the state legislature displaced judge-made remedies like unjust enrichment.  See In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. at 192.  Second, it could mean that equitable relief is unnecessary, because a legal claim exists, which makes pleading equitable relief redundant. Regarding the first possible interpretation, if a state legislature displaces all unjust enrichment claims rooted in consumer deception, then such claims will never survive a motion to dismiss for failure to state a claim; rule 8 would have no bearing on the analysis.  Regarding the second possible interpretation, however, if state rules regarding the adequacy of remedies at law serve only to eliminate duplicative pleading, then such state rules conflict with rule 8(d).  Applying rule 8(d) would grant the Plaintiffs a procedural right that would be unavailable in state court, i.e., the right to plead legal and equitable theories in the alternative.  Granting the Plaintiffs a procedural right does not violate the Rules Enabling Act, which prohibits the Federal Rules of Civil Procedure from abridging, enlarging, or modifying substantive rights.  Allowing the Plaintiffs to plead in the alternative does not create a new claim or permit double recovery, because, the legal claim will either prove meritorious and the equitable claim will be dismissed, or the legal claim will fail and the equitable claim will proceed.

The Court concludes that the state laws at issue serve only to eliminate duplicative pleading, so rule 8 applies.  Surveying the consumer protection statutes at issue, none bar common-law equitable relief.  See Colo. Rev. Stat. Ann. §§ 6-1-101-115; Fla. Stat. § 501.201-213; Mass. Gen. Laws Ch. 93A §§ 1-11; Mich. Comp. Laws §§ 445.901-922; N.J. Stat. Ann. § 56:8-1-56:8-206; N.Y. Gen. Bus. Law §§ 349-350-F-1; N.C. Gen. Stat. § 75-1-42; Ohio Rev. Code Ann. § 1345.01-13; Wash Rev. Code § 19.86.010-920.  Indeed, many explicitly note that the statutes do not circumscribe the common law or other state laws.  See Colo. Rev. Stat. § 6-1-105(c); Fla. Stat. § 501.213; Mich.

Comp. Laws § 445.916; N.Y. Gen. Bus. Law § 350-e(1); Ohio Rev. Code Ann. § 1345.13. Because none create an exclusive remedy, the adequate-legal-remedy rule must be construed as eliminating duplicative claims, and rule 8 applies.[61]

Under rule 8(d), the Court will not dismiss the Plaintiffs' equitable claims at this stage, because rule 8(d)(3)'s plain language allows them. It reads: "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Rule 8(d)(2) also provides that claims may be pled in the alternative. See Fed. R. Civ. P. 8(d)(2). The Plaintiffs may, therefore, plead both equitable and legal relief, although they may not, under state law, ultimately recover under both theories. See In re Dial Complete Marketing and Sales Practices Litig., 2013 WL 1222310, at *8-9 ("[C]onsistent with Federal Rules, Plaintiffs have simply pled their claims in the alternative . . . the mere fact that plaintiffs have pled arguable inconsistent theories is not, standing alone, a sufficient basis to dismiss one of those claims."); In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. 2d at 192 ("At this stage, the Plaintiffs may assert multiple and duplicative legal and equitable claims for relief."); In re Celexa and Lexapro Marketing and Sales Practices Litig., 751 F. Supp. 2d 277, 297 (D. Mass. 2010)(Gorton, J.)("[I]t is inappropriate to

---

[61]In so ruling, the Court notes its Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244 (D.N.M. 2014)(Browning, J.)("Abraham"). In that case, the Court considered whether plaintiffs could pursue an unjust-enrichment claim when a contract covered the same subject matter. See Abraham, 20 F. Supp. 3d at 1278. It concluded that unjust enrichment is foreclosed, under New Mexico law, when a plaintiff can pursue a contract claim, and there is no allegation that something is preventing the plaintiff from recovering under contract. See Abraham, 20 F. Supp. 3d at 1284. In that case, the plaintiffs did not argue whether rule 8 applied. The Court notes some tension in that case and this ruling, but the Court there was construing New Mexico law, and not rule 8. In addition, the Court determined there that the unjust-enrichment claim was prudently dismissed, because recovery on the contract claim against one party was highly likely, and preserving the equity claim would inflict an injustice on a third party who would otherwise be dismissed from the action. See 20 F. Supp. 3d at 1284-85. In contrast, here, the unjust enrichment is not targeting a third party, and the Defendants will remain in the action even if the Court dismissed the unjust-enrichment claims.

dismiss equitable remedies at the pleading stage on this basis. Under the Federal Rules of Civil Procedure, plaintiffs have the prerogative to plead alternative and even conflicting theories."); In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(Greenaway, J.)("Plaintiffs, however, are clearly permitted to plead alternative theories of recovery. Consequently, it would be premature at this stage of the proceedings to dismiss the . . . unjust enrichment claims on this basis.")[62]

**C.    IF RULE 8 DID NOT APPLY, THE FLORIDA, MASSACHUSETTS, MICHIGAN, NEW JERSEY, NEW YORK, NORTH CAROLINA, AND WASHINGTON CLAIMS WOULD FAIL, BECAUSE THE PLAINTIFFS HAVE AN ADEQUATE LEGAL REMEDY, BUT THE OHIO AND COLORADO CLAIMS WOULD NOT.**

Although the Court concludes that the Plaintiffs may plead their equitable claims in the alternative, the Court considers below whether state law would allow the unjust-enrichment claims to be pled in the absence of rule 8. It concludes that, under the appropriate state laws, except for Colorado's and Ohio's, the Plaintiffs claims would be dismissed. The Court considers each state briefly in turn.

**1.    The Colorado Unjust-Enrichment Claim Would Succeed Regardless of Rule 8, Because the Plaintiffs Request a Remedy Unavailable Under the Statute.**

The Supreme Court of Colorado has ruled that "equity will not act if there is a plain, speedy, adequate remedy at law." Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d at 842. The Defendants argue that the Plaintiffs' Colorado unjust-enrichment claim must be dismissed, because the CCPA, which the Plaintiffs' invoke, amounts to a plain, speedy, and adequate remedy at law. See MTD at 56 (citing Francis v. Mead Johnson & Co., No. 10-0701, 2010 WL 5313540, at *9 (D. Colo. December 17, 2010)(Kane, J.)(dismissing an unjust-enrichment claims "because the CCPA

---

[62]The Court also concludes that the Defendants' argument that the unjust-enrichment claim must be independently dismissed in New York as duplicative fails, because of rule 8. The New York State rule is procedural, because it deals with duplicative pleading, so rule 8 governs.

provides an adequate legal remedy.")). The Defendants acknowledge that an unjust-enrichment claim may, nonetheless, proceed under Colorado law if the legal claim sounds in tort, and the equitable and legal claims seek alternative remedies, but argue that the Plaintiffs have not demonstrated that the equitable relief they seek diverges from the sought after legal remedy. See Reply at 28-29 (citing L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc., 125 F. Supp. 3d 1155, 1175-76 (D. Colo. 2015)(Krieger, J.)). Although the Supreme Court of Colorado has not decided whether diverging legal and equitable remedies allow an equitable claim to move forward when an adequate legal claim, sounding in tort, covers the same conduct, the Court concludes that the Supreme Court of Colorado would follow the Court of Appeals of Colorado decision in Harris Grp., Inc. v. Robinson, which concluded that, "[i]n the tort context, the recovery of damages does not automatically lead to a conclusion that a party had an adequate legal remedy that precludes further equitable relief." Harris Grp., Inc. v. Robinson, 209 P.3d at 1205. The Plaintiffs request restitution for their Colorado unjust-enrichment claim. See Amended Complaint ¶ 193, at 57. The CCPA's statutory language, however, expressly prohibits class action recovery for damages. See Colo. Rev. Stat. Ann. § 6-1-113(2)("Except in a class action . . . any person who, in a private civil action, is found to have engaged in . . . any deceptive trade practice . . . shall be liable . . . equal to . . . : The amount of actual damages sustained."). Friedman v. Dollar Thrifty Automotive Grp., Inc., 2015 WL 4036319, at *3-6 (D. Colo. July 1, 2015)(Daniel, J.)(concluding "that monetary damages are barred in class actions under the CCPA"); Martinez v. Nash Finch Co., 886 F. Supp. 2d 1212, 1218-19 (D. Colo. 2012)(Krieger, J.)("[T]he CCPA creates no statutory liability for a defendant in a private class action.").[63] Because the CCPA claim provides no monetary remedy, and unjust

---

[63]The Court acknowledges a Court of Appeals of Colorado decision that notes, in dicta, that the CCPA "does not preclude class members from bringing an action for actual damages." Robinson v. Lynmar Racquet Club, Inc., 851 P.2d 274, 278 (Colo. Ct. App. 1993). The Court

enrichment provides one, the two claims offer diverging remedies. The Court concludes, accordingly, that the Supreme Court of Colorado would determine that the CCPA does not provide an adequate legal remedy, so the Plaintiffs may plead in the alternative their unjust-enrichment claim.

### 2. The Florida Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under FDUTPA.

Florida law prohibits equitable relief if "a plain, adequate and complete remedy at law exists." Greenfield Villages v. Thompson, 44 So.2d 679, 683 (Fla. 1950). The Defendants argue that FDUTPA is an adequate legal remedy that bars unjust-enrichment relief. See MTD at 56-57. Florida state and federal courts are split on this issue with no clear guidance from the Supreme Court of Florida. See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc., 427 F. App'x 714, 722 (11th Cir. 2011)(unpublished), rev'd in part on other grounds, 824 F.3d 1311 (11th Cir. 2014); Matthews v. American Honda Motor Co., No. 12-60630, 2012 WL 2520675, at *2 (S.D. Fla. June 6, 2012)("[B]ecause Matthews' unjust enrichment claim is predicated on the same wrongful conduct as her FDUTPA claim, she does not lack an adequate legal remedy."); Williams v. Bear Stearns & Co., 725 So.2d 397, 400 (Fla. Dist. Ct. App. 1998)(concluding that, "if adequate legal remedies exist, equitable remedies are not available . . . does not apply to claims for unjust enrichment")(citing Mobil Oil Corp. v. Dade County Esoil Management Co., Inc., 982 F. Supp. 873, 880 (S.D. Fla. 1997)(Highsmith, J.)); Harris v. Nordyne, LLC, 2014 WL 12516076, at *7 (S.D. Fla. 2014)(Bloom, J.)(collecting cases). The Defendants argue that the ruling from Williams v. Bear Stearns & Co. stems from a federal district court's misinterpretation of ThunderWave, Inc. v.

---

concludes, however, that the Supreme Court of Colorado would disregard that conclusion, because the Court of Appeals was interpreting old statutory language and the new language more clearly bars actual damage relief for class-action members. See Martinez v. Nash Finch Co., 886 F. Supp. 2d at 1219.

Carnival Corp., 954 F. Supp. 1562, 1566 (S.D. Fla. 1997)(Moreno, J.), which concludes only that the economic-loss doctrine does not apply to unjust-enrichment claims. See Reply at 29 n.20.

The Court concludes that the Florida court's rulings that the adequate-legal-remedy doctrine does not apply to unjust enrichment provide no sound reasoning for such a bright-line exception. See, e.g., Williams v. Bear Stearns & Co., 725 So.2d at 400. Although not in this specific context, the Supreme Court of Florida has ruled that, "[w]here the Legislature has created such a clear remedy for a specifically identified evil, a court of equity will enforce that remedy." Manatee Cty. V. Town of Longboat Key, 365 So.2d 143, 147 (Fla. 1978). The Court concludes that this Supreme Court of Florida case is controlling, and, if faced with this issue, it would dismiss the Plaintiffs' Florida unjust-enrichment claim, because FDUTPA provides an adequate remedy for the harm the plaintiffs alleged. In so ruling, the Court is mindful that FDUTPA provides recovery for actual damages, see Fla. Stat. Ann. § 501.211(2), and restitution and actual damages are identical in this case, see Carriulo v. General Motors Co., 823 F.3d 977, 986 (11th Cir. 2016)(defining FDUTPA damages as "the value of the product as promised minus the value of the product delivered").

> ### 3. The Massachusetts Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy under Mass. Gen. Laws. Ch. 93A.

"An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).[64] Two federal courts facing an unjust-enrichment claim have determined that "the existence of [the Plaintiff's] statutory claim for unfair and deceptive acts and practices precludes her from bringing equitable

---

[64]The Court is aware that, under Erie, it is not bound to follow the Appeals Court of Massachusetts if it concludes that the Supreme Judicial Court of Massachusetts would decide the issue differently. See supra n.21. The Court will follow the Appeals Court of Massachusetts' decision in Santagate v. Tower, however, because the Court has found no indication that the Supreme Judicial Court of Massachusetts would apply a contrary rule.

claims for unjust enrichment and money had and received." Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012)(Gorton, J.).  See Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 487 (D. Mass. 2015)(Woodlock, J.).  The damage and restitutionary remedy requested appears to be identical in this case.  See Mass. Gen. Laws. Ch. 93A § 9(1); Amended Complaint ¶ 265, at 71.  The Court concludes that, if faced with this case, the Supreme Judicial Court of Massachusetts would follow these district court decisions and conclude that the presence of an adequate legal remedy in the form of Mass. Gen. Laws. Ch. 93A, § 2(a) precludes unjust-enrichment relief.

### 4.    The Michigan Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy under MCPA.

According to the Supreme Court of Michigan, "[L]egislative action that provides an adequate remedy by statute precludes equitable relief."  Tkachik v. Mandeville, 790 N.W.2d at 265.  "A remedy at law, in order to preclude a suit in equity, must be complete and ample, and not doubtful and uncertain."  Tkachik v. Mandeville, 790 N.W.2d at 265 (citation omitted).  "[T]o preclude a suit in equity, a remedy at law, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances."  Tkachik v. Mandeville, 790 N.W.2d at 265 (citation omitted).   The MCPA provides that class-action plaintiffs may bring an action for actual damages, see Mich. Comp. Law Ann. § 445.911(3)(a), which is identical to the restitutionary remedy requested, see Amended Complaint ¶ 288, at 76.  The Court concludes, accordingly, that there is an adequate, complete and ample, legal remedy available, and that the Supreme Court of Michigan would, therefore, dismiss the Plaintiffs' Michigan unjust-enrichment claim.

### 5. The New Jersey Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under NJCFA.

"[E]quitable principles of estoppel or unjust enrichment . . . cannot be invoked to subvert [a] statutory scheme." Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). The NJCFA provides the remedy that the Plaintiffs seek for unjust enrichment: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful." N.J. Stat. Ann. § 56:8-2.11. See Amended Complaint ¶ 314, at 81. The underlying harm alleged is also the same. Compare Amended Complaint ¶ 295 at 77 with Amended Complaint ¶ 308, at 80. The Court concludes that, if faced with this case, the Supreme Court of New Jersey would conclude that the presence of an adequate legal remedy in the form of NJCFA precludes unjust-enrichment relief.

### 6. The New York Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under NYCDPAP and N.Y. Gen. Bus. Law § 350.

The New York Court of Appeals has ruled that unjust enrichment does not lie if the "plaintiffs have an adequate remedy at law." Samiento v. World Yacht Inc., 883 N.E.2d at 996. Moreover, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d at 1185. In Samiento v. World Yacht Inc., the Court of Appeals of New York dismissed an unjust-enrichment claim, because a New York labor law provided an adequate remedy at law. 883 N.E.2d at 996. See Response at 67-68. The Court concludes that the Court of Appeals of New York would conclude similarly here that NYCPDAP and N.Y. Gen. Bus. Law § 350 provide an adequate remedy at law and would dismiss the unjust-enrichment claim. The lower New York court cases that the Plaintiffs cite do not persuade the Court otherwise, because one turns on an adequate legal remedy under contract, which is a separate inquiry, and the other case turns on whether an unjust-enrichment claim

failed, because the plaintiff had already been compensated for her harm.  See Response at 67 (citing TOT Payments, LLC v. First Data Corp., 9 N.Y.S.3d 44, 45 (N.Y. App. Div. 2015); Farina v. Bastianich, 984 N.Y.S.2d 46, 50 (N.Y. App. Div. 2014)).

**7.      The North Carolina Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under North Carolina Law.**

"The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff."  Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 920 (N.C. 1992)(concluding that a statutory remedy did not provide relief to plaintiffs, so their unjust-enrichment claim could proceed).  The Plaintiffs argue that it would be premature to dismiss the unjust-enrichment claim.  See Response at 68 (citing Thompkins v. Key Health Medical Solutions, Inc., No. 12-0613, 2015 WL 1292228, at *10 (M.D.N.C. March 23, 2015)(Peake, M.J.)("In this case, numerous North Carolina statutes appear to provide adequate remedies for the wrongs alleged.  Regardless, because discovery has yet to illuminate the exact nature of the transactions between Plaintiffs and Defendant, it would be premature to foreclose Plaintiffs' claims."), report adopted, 2015 WL 3902340, at *1 (M.D.N.C. June 24, 2015)(Beaty, J.)).  The Court concludes that the Supreme Court of North Carolina would not follow that opinion.  Thompkins v. Key Health Medical Solutions, Inc. provides no reasoning for why a claim may proceed to discovery when an adequate legal remedy is available.  The Court concludes that allowing discovery is inconsistent with Twombly and Iqbal if the law does not allow both claims to be pled.  The Court has concluded that the North Carolina statutory scheme plausibly provides the Plaintiffs a remedy, so it likewise concludes that the Court should dismiss the North Carolina unjust-enrichment claim.  See Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d at 920.

8.      **The Ohio Unjust-Enrichment Claim Prevails, Because the Plaintiffs' Legal Remedy Under OSCPA Is Not Complete or Adequate.**

"To bring a cause within the jurisdiction of a court of equity, it is requisite that the primary right involved be an equitable right as distinguished from a legal right, or that the remedy at law as to the right involved is not full, adequate and complete." State ex rel. Lien v. House, 58 N.E.2d 675, 678 (Ohio 1944). The OSCPA provides that class-action plaintiffs may bring an action for rescissionary and actual damages. See Ohio Rev. Code Ann. §1345.09(B); Felix v. Ganley Chevrolet, Inc., 49 N.E.3d 329, 334-35 (Ohio 2015). In this case, such relief is identical to the restitutionary remedy requested. See Amended Complaint ¶ 426, at 99-100. The Court, however, concluded, supra, that the OSCPA must be dismissed without prejudice for failure to give the requisite notice. The Court concludes that a defect in that pleading demonstrates that the legal remedy is not necessarily full, adequate, and complete. The Court notes that there is some caselaw from federal courts noting that a legal claim's viability has no bearing on whether a legal remedy is available, see, e.g., In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 843 (S.D. Ohio 2012)("[T]he plaintiff has an adequate remedy at law even if his . . . claim is ultimately unsuccessful), but the Court concludes that Supreme Court of Ohio would not follow that ruling. Equity is meant to fill in the gaps where law fails. See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1282 (D.N.M. 2014)(Browning, J.)("Equity stepped in when the remedy at law -- the contract theory -- was not a viable option for recovery."). Barring equitable claims in the alternative is meant to block equity from working an injustice by inflicting double damages on the defendant. See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d at 1282 ("[E]quity will not work an additional injustice."). Where the legal remedy is unavailable, however, the potential for double recovery vanishes. Here, the OSCPA legal remedy might ultimately fail. The Court concludes that, at this early stage in the litigation, where a legal remedy appears uncertain, the

Supreme Court of Ohio would conclude that a viable equitable claim premised on the same or similar conduct is not foreclosed. Cf. Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d at 1284 (concluding that an unjust-enrichment claim could proceed under New Mexico law when a plaintiff alleges "that there is something preventing his recovery on the contract claim."). The Court concludes, accordingly, that the legal remedy is not complete or ample, and that the Supreme Court of Ohio would, therefore, not dismiss the Plaintiffs' unjust-enrichment claims on this ground.

### 9. The Washington Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under WCPA.

"Equitable relief is available only if there is no adequate legal remedy." Orwick v. City of Seattle, 692 P.2d 793, 796 (Wash. 1984). In Seattle Professional Engineering Employees Ass'n v. Boeing Co., 991 P.2d 1126 (Wash. 2000)(en banc)("Boeing Co."), for example, the Supreme Court of Washington determined that the plaintiffs "are not entitled to pursue a remedy in equity" where they have an available statutory remedy under Wash. Rev. Code § 49.52.40. See Boeing Co., 991 P.2d at 1134. The Court concludes that, if faced with this case, the Supreme Court of Washington would similarly decide that the WCPA's availability precludes unjust-enrichment relief, because, as in Boeing Co., the Plaintiffs have a statutory remedy available that provides them identical legal and equitable relief.

### D. THE COURT DISMISSES THE NEW JERSEY UNJUST-ENRICHMENT CLAIM, BECAUSE THE PLAINTIFFS CANNOT PLEAD REMUNERATION.

The Court concludes that the Plaintiffs' New Jersey unjust-enrichment claim fails, because they cannot allege one of the requisite elements. See MTD at 62. "To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007)(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994)). See Thieme

v. Aucoin-Thieme, 151 A.3d 545, 557 (N.J. 2016). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d at 723(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d at 526). The Plaintiffs cannot plead that they expected remuneration-- i.e., money paid for services rendered -- so their claim fails.

E.     **THE COURT DISMISSES THE OHIO UNJUST-ENRICHMENT CLAIM, BUT NOT THE MICHIGAN, NEW JERSEY, OR NORTH CAROLINA UNJUST-ENRICHMENT CLAIMS, FOR THE INDEPENDENT REASON THAT THE PLAINTIFFS HAVE NOT ALLEGED A DIRECT BENEFIT.**

The Defendants move to dismiss the Michigan, New Jersey, North Carolina, and Ohio unjust-enrichment claims for the independent reason that the Plaintiffs do not allege that the Defendants received a direct benefit from the Plaintiffs. See MTD at 60. The Plaintiffs, however, allege that the Defendants "received a direct benefit" from the Plaintiffs "in the form of a price premium, increased sales, and increased market share." Amended Complaint ¶¶ 282, 310, 390, 422, at 75, 80-81, 95, 99. The Court determines that the Supreme Courts of Michigan, New Jersey, and North Carolina would accept the Plaintiffs' allegations of an indirect benefit from increased market share, but that the Supreme Court of Ohio would not. Accordingly, the Ohio unjust-enrichment claim fails for the independent reason that the defendants received no direct benefit.

1.     **Increased Market Share Satisfies Michigan's Indirect-Benefit Requirement.**

Under Michigan Law, the Defendants must receive a benefit, but it need not be direct. See Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d 635, 641 (Mich. 1993)("Kammer"). In Kammer, the Supreme Court of Michigan permitted an unjust-enrichment claim from a sub-contractor to proceed against a defendant school, because the sub-contractor's

work "indirectly provided defendant a benefit." 504 N.W.2d at 641. There was, however, direct contact between the two parties, and the defendant school assured the sub-contractor plaintiff that the defendant would be paid from bonds. See 504 N.W.2d at 641. The Kammer court, accordingly, concluded that "equity demands plaintiff to be permitted to go forward with this court for those damages that arose after certification . . . and verbal assurances of protection by the bonds." 504 N.W.2d at 641. The Defendants cite A&M Supply Co. v. Microsoft Corp., 2008 WL 540883, at *2 (Mich. Ct. App. February 28, 2008) for its holding that indirect Microsoft product purchases did not establish the requisite direct benefit under Michigan Law. See A&M Supply Co. v. Microsoft Corp., 2008 WL 540883, at *2. See also In re Refrigerant Compressors Antitrust Litig., 2013 WL 1431756, at *26 (E.D. Mich. April 9, 2013)(Cox, J.)(dismissing an unjust-enrichment claim, because "[a]ny benefit the IP Plaintiffs conferred would be on others in the chain of distribution from whom they purchased, not on Defendants"); MTD at 60 n.17. The Court does not conclude that the Supreme Court of Michigan's Kammer decision imposes such an onerous direct-benefit requirement. As already explained, in Kammer, the Supreme Court of Michigan affirmed that an indirect benefit met the requisite unjust-enrichment requirement. See 504 N.W.2d at 641. The Court of Appeals of Michigan's reasoning in A&M Supply Co. v. Microsoft Corp. narrowing Kammer to situations where the plaintiff and defendant have direct contact with each other is not grounded in a convincing principle. See 2008 WL 540883, at *2. How a discussion between the plaintiff and the defendant makes a benefit more direct is unclear, and indicates a reliance requirement and not a direct-benefit requirement.

The Court also concludes that, based on the Amended Complaint's allegations, the Defendants plausibly received a benefit in the form of increased market share. See Amended Complaint ¶¶ 282, 310, 390, 422, at 75, 80-81, 95, 99. The Plaintiffs contend that the Defendants

launched an aggressive marketing campaign in 2015 to highlight "Natural American Spirit's 100-percent additive-free natural tobacco proposition," Amended Complaint ¶ 44, at 21-22, and sold 900 million more cigarettes in 2015 than 2014 for a total of 4.8 billion cigarettes, Amended Complaint ¶ 45(c), at 22. Although the Amended Complaint does not indicate how large the cigarette market is overall, it is plausible that the sale of 900 million more cigarettes would result in increased market share. It is unclear if the Plaintiffs made similar market-share allegations in the cases that the Defendants' cite. Accordingly, the Court concludes that the Supreme Court of Michigan would not dismiss the unjust-enrichment claim for a lack of a direct benefit.

### 2. Increased Market Share Satisfies New Jersey's Unjust-Enrichment Test.

The Supreme Court of New Jersey has not determined whether a direct-benefit requirement exists for unjust-enrichment claims, but a New Jersey appellate court has recognized that unjust enrichment "involve[s] some direct relationship between the parties." Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 335 (NJ. Super. Ct. App. Div. 1966). See Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 724 (D.N.J. 2011)(Martini, J.)("[T]he plaintiff [must] allege a sufficiently direct relationship with the defendant to support the [unjust-enrichment] claim."); Cooper v. Samsung Electronics America, Inc., No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. September 30, 2008)(Linares, J.)("Here, although Cooper alleges that Samsung was unjustly enriched through the purchase of the television, there was no relationship conferring any direct benefit on Samsung . . . as the purchase was through a retailer."). In contrast, in Stewart v. Beam Global Spirits & Wine, 877 F. Supp. 2d 192, 200 (D.N.J. 2012)(Hilliman, J.), the Honorable Judge Noel Hillman, United States District Judge for the District of New Jersey, determined that a direct-benefit allegation is not required where the defendant has "engaged in fraudulent conduct and misrepresented" a product "through a direct nationwide advertising and marketing scheme." 877 F. Supp. 2d at 200. Judge

Hillman reasoned that the relationship requirement "simply reflects the need to curtail the reach of this equitable remedy . . . to prevent a finding of liability in cases where the defendant had absolutely no course of dealings with, and no other demonstrated connection to, the plaintiff." 877 F. Supp. 2d 192 at 200. He determined that the direct-benefit requirement is "inequitable" particularly when the "Plaintiffs cannot seek a remedy directly from the [retailer] based on misrepresentations allegedly made by" the Defendants, as the retailers did not make the misrepresentations. 877 F. Supp. 2d 192 at 200.

> Accordingly, this Court finds that where a plaintiff alleges that a defendant manufacturer has made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retails sales could have the effect of increasing the amount of wholesale sales to the manufacturer, it is plausible that a plaintiff can show evidence of a sufficiently direct relationship between the parties under New Jersey law.

877 F. Supp. 2d 192 at 200. The Court concludes that this reasoning is persuasive and concludes that the Supreme Court of New Jersey would adopt its reasoning for this particular case, i.e., allegations of manufacturer misrepresentations. See 877 F. Supp. 2d 192 at 200 n.6 (noting that the Supreme Court of New Jersey affirmed a class certification under factually similar circumstances in Lee v. Carter-Reed Co., L.L.C., 4 A.3d 561 (N.J. 2010), although the court did not address the direct-benefit element specifically). The cases the Defendants cite are not misrepresentation cases, nor is there evidence that the plaintiffs alleged that the direct benefit conferred was increased market share. See MTD at 61 n.18.

### 3.      North Carolina's Unjust-Enrichment Requirement is satisfied.

The Supreme Court of North Carolina has not determined whether unjust enrichment requires a direct benefit. The Court of Appeals of North Carolina, however, has ruled that a plaintiff must show that "she conferred a benefit directly on defendant." Effer v. Pyles, 94 S.E.2d 149, 152 (N.C. Ct. App. 1989). See Baker v. Const. Co., Inc. v. City of Burlington, 683 S.E.2d 790 (table), 2009

WL 3350747, at *7 (N.C. Ct. App. 2009). In arguing that no direct-benefit requirement exists, the Plaintiffs cite Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 921 (4th Cir. 2003)(unpublished)(per curiam)(before Williams, J., Michael J., and Shed, J.), which asserts that Effer v. Pyles was misguided, and that the Supreme Court of North Carolina, in Embree Construction Group. Inc. v. Rafcor, Inc., 411 S.E.2d at 923, subsequently "suggest[ed] a broader approach to unjust enrichment than is indicated by *Effer's* 'direct benefit' rule." Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x at 921. The Fourth Circuit held that, "[u]nder North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction." Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x at 921. The Fourth Circuit's conclusion that Embree Construction Group. Inc. v. Rafcor, Inc. created a broader direct-benefit approach persuades the Court. The Supreme Court of North Carolina, in Embree Construction. Group. Inc. v. Rafcor, Inc., determined that a contractor plaintiff could maintain an unjust-enrichment action against a third party bank with whom the contractor had no contract. See 411 S.E.2d at 919, 922. The benefit relayed to the third-party bank was "the security for which [the bank] had bargained" for with another party -- "a completely constructed building." See 411 S.E.2d at 919. The contractor plaintiff, however, had no direct relations with the bank, but that lack of relationship was immaterial to the Supreme Court of North Carolina. See 411 S.E.2d at 919, 922. The Court concludes that Embree Contr. Grp. Inc. v. Rafcor, Inc.'s holding signaled that an indirect benefit is sufficient in North Carolina for an unjust-enrichment claim to prevail. Because the Plaintiffs conferred an indirect benefit on the Defendants in the form of increased market share, their North Carolina unjust-enrichment claim is not defeated on this ground.

### 4. The Plaintiffs Do Not Satisfy Ohio's Direct-Benefit Test.

The Supreme Court of Ohio has clearly stated that "an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon the defendant by the purchaser." Johnson v. Microsoft Corp., 834 N.E.2d 791, 799 (Ohio 2005). When "no economic transaction occur[s] between" the plaintiff and the defendant, the plaintiff "cannot establish that [the defendant] retained any benefit 'to which [it] is not justly entitled.'" Johnson v. Microsoft Corp., 834 N.E.2d at 799 (quoting Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co., 141 N.E.2d 465, 467 (Ohio 1957)). The Court concludes that Johnson v. Microsoft Corp. controls, and the Court dismisses the Plaintiffs' unjust-enrichment claim, because the Plaintiffs are indirect purchasers who had no direct economic transaction between themselves and the Defendants.

## VIII. THE COURT DISMISSES THE PLAINTIFFS' FLORIDA, ILLINOIS, AND NEW YORK EXPRESS WARRANTY CLAIMS.

The Defendants move to dismiss the Plaintiffs' express warranty claims for three reasons. First, they argue that limiting language modifies any express warranty so that there was no breach. Second, they argue that a subset of the express warranty claims must be dismissed, because the Plaintiffs failed to allege the requisite pre-litigation notice. Finally, they aver that another subset of the express warranty claims must be dismissed, because the Plaintiffs have not alleged privity of contract. The Court concludes that the Defendants have not identified limiting language to the express warranties, but it dismisses the Florida, Illinois, and New York claims, because the Plaintiffs have either failed to allege pre-litigation notice or privity.

**A. THE DEFENDANTS HAVE NOT IDENTIFIED LIMITING LANGUAGE IN THE EXPRESS WARRANTIES THAT WOULD QUALIFY THOSE CLAIMS FOR DISMISSAL.**

The Plaintiffs contend that the cigarettes' product labels, including the descriptors at issue -- i.e., additive-free, natural, and organic -- create an actionable express warranty. See Response at 72. The Defendants argue that, under California and New York law, the express warranty claims fail for the same reasons that the packaging and advertising would not mislead a reasonable consumer. See MTD at 64-65. The Court declines to adopt that line of reasoning for the same reasons it rejected their reasonable consumer arguments as articulated above.

The Defendants also argue that California, Colorado, Florida, Illinois, New Jersey, New York, New Mexico, and North Carolina law foreclose the express warranty claims, because warranties must be read as "reasonabl[y] consistent with potentially limiting language." MTD at 65 (citing Cal. Com. Code § 2316(1); Colo. Rev. Stat. § 4-2-316(1); Fla. Stat. § 672.316(1); 810 Ill. Comp. Stat. Ann. § 5/2-316(1); N.J. Stat. Ann. 12A:2-316(1); N.M. Stat. Ann. § 55-2-316(1); N.Y. U.C.C. Law § 2-316(1); N.C. Gen. Stat. § 25-2-316(1)). According to the Defendants, the menthol descriptor is limiting language and necessarily modifies the warranty such that it could not be read "as promising the absence of menthol." MTD at 66. From that premise, they contend that "no reasonable consumer" would rely on a promise that menthol cigarettes did not contain menthol. MTD at 66. See Reply at 34. This assertion is another re-packaging of the Defendants' reasonable-consumer arguments. The Defendants' key inference again, which the Court does not accept, is that a reasonable consumer would know that menthol is an additive. The Court has already concluded that a reasonable consumer could read the no-additive term and conclude that menthol is not an additive. The menthol descriptor, thus, does not reasonably limit the no-additive term, and the Defendants' argument fails.

## B. THE FLORIDA, ILLINOIS, AND NEW YORK EXPRESS WARRANTY CLAIMS FAIL, BECAUSE THE AMENDED COMPLAINT CANNOT SERVE AS THE REQUISITE PRE-LITIGATION NOTICE.

The Defendants' argue that the Plaintiffs failed to give pre-litigation notice in California, Florida, Illinois, New Mexico, New York, and North Carolina. See MTD at 66. Under those states' laws, a buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(A). See Fla Stat. § 672.607(3)(a); 810 Ill. Comp. Stat. 5/2-607(3)(a); N.M. Stat. Ann. § 55-2-607(3)(a); N.Y. U.C.C. Law § 2-607(3)(a); N.C. Gen. Stat. § 25-2-607(3)(a). The Plaintiffs argue that the Defendants had actual knowledge that their menthol cigarettes were not one hundred percent additive free, and that the Amended Complaint is sufficient to put the Defendants' on notice. See Response at 73. The Court disagrees with the Plaintiffs' first argument. Actual knowledge of the deception does not suffce, because, in every state but Illinois, the plaintiff has a burden to provide notice, so the Defendants' general awareness cannot meet the requirement. See Cal. Com. Code § 2607(3)(a); Fla Stat. § 672.607(3)(a); N.M. Stat. Ann. § 55-2-607(3)(a); N.Y. U.C.C. Law § 2-607(3)(a); N.C. Gen. Stat. § 25-2-607(3)(a).[65] Regarding whether the Amended Complaint suffices for notice, the Court concludes that it provides sufficient notice for the California, New Mexico, and North Carolina claims, but not for the Florida, Illinois, or New York claims.

Under California law, a buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(a). See David v. Winn Automotive, Inc., 2016 WL 4506069, at *7 (Cal. Ct.

---

[65]For Illinois, the Court does not adopt the argument for state specific reasons explained below.

App. August 29, 2016)(unpublished)(ruling that rescission notice was not requisite breach notice); Cardinal Health 301, Inc. v. Tyco Electronics Corp., 87 Cal. Rptr. 3d 5, 21-22 (Cal. Ct. App. 2008)(ruling that notice by filing a lawsuit was insufficient as a matter of law).[66]   The notice requirement's purpose is "to allow the defendant opportunity for repairing the defective item, reducing damages, avoiding defective products, and negotiating settlements." Pollard v. Saxe & Yolles Dev. Co., 525 P.2d 88, 92 (Cal. 1974)(ruling that four-year delay in notice was unreasonable).  In an opinion construing similar language in a previously codified breach-express-warranty notice requirement, the Supreme Court of California concluded that "[t]he notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt." Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1963).  It explained: "The injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings." Greenman v. Yuba Power Products, Inc., 377 P.2d at 900 (ruling that a plaintiff consumer who did not give timely notice of an express warranty breach was not barred from bringing an express warranty suit). See Zapata Fonseca v. Goya Foods Inc., No. 16-2559, 2016 WL 4698942, at *6 (N.D. Cal. September 8, 2016)(Koh, J.); Hydroxycut Marketing and Sales Practices Litig., 801 F. Supp. 2d 993, 1009 (S.D. Cal. 2011)(concluding that a plaintiffs' allegation that all "conditions precedent, including notice" had been met satisfied the pre-litigation notice requirement, because notice "is not strictly required under the laws of a number of states" and, in a number of states, "the filing of a complaint can serve as

---

[66] The Court is aware that, under Erie, it is not bound to follow Court of Appeals of California if it concludes that the Supreme Court of California would decide the issue differently.  See supra n.21.  The Court will follow the Court of Appeals of California's decisions in David v. Winn Automotive, Inc. and Cardinal Health 301, Inc. v. Tyco Electronics Corp., however, because the Court has found no indication that the Supreme Court of California would apply a contrary rule.

notice."). The Court concludes that the Supreme Court of California would follow its precedent from Greenman v. Yuba Power Products, Inc. and would not require more notice than the Plaintiffs have already given.[67]

Florida law states: "The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Fla. Stat. Ann. § 627.607(3)(a). Florida federal courts interpreting this statute have ruled that plaintiffs need not give notice to a product's manufacturer, because the statute requires only seller notification. See Felice v. Invicta Watch Co. of Am., Inc., No. 16-62772, 2017 WL 3336715, at *6 (S.D. Fla. August 4, 2017)(collecting cases)(Rosenberg, J.); Fla Stat. Ann. § 672.103(1)(d) (defining seller as "a person who sells or contracts to sell goods"). But see General Matters, Inc. v. Paramount Canning Co., 382 So.2d 1262, 1264 (Fla. Dist. Ct. App. 1980)(dismissing an express warranty claim where a plaintiff failed to notify a manufacturer). The Court concludes that the statute refers to seller notification and not to manufacturer notification, because the statute states seller and the statute's definition of seller does not encompass the manufacturer. It concludes, however, that Plaintiffs' allegation that it has met "[a]ll conditions precedent" to an express warranty claim is too conclusory to meet the statute's notice requirement and that the Supreme Court of Florida would conclude the same. Amended Complaint ¶ 456, at 104. Although the plaintiffs are not suing the seller, the

---

[67] The Defendants cite In re Mentor Corp. ObTape Transobturator Slings Products Liability Litig., No. 12-0238, 2015 WL 5468791, at *2 (M.D. Ga. September 16, 2015)(Land, C.J.) for the conclusion that Greenman v. Yuba Power Products, Inc. stands only for the proposition that "procedural requirements of a warranty claim cannot defeat strict products liability in tort." In re Mentor Corp. ObTape Transobturator Slings Products Liability Litig., 2015 WL 5468791, at *2. See Reply at 36. The Court disagrees with the Defendants. The Supreme Court of California addresses express warranty requirements regardless of alternative liability theories in Greenman v. Yuba Power Products, Inc., and the case's strict liability discussion explains an alternative rationale for its conclusion and not an exclusive one. See Greenman v. Yuba Power Products, Inc., 377 P.2d at 900 ("Moreover, to impose strict liability . . . it was not necessary for plaintiff to establish an express warranty.").

statute's language is unequivocal; seller notice is required or an express warranty claim is barred. See Fla. Stat. Ann. § 627.607(3)(a); Felice v. Invicta Watch Co. of Am., Inc., 2017 WL 3336715, at *6 (noting that the plaintiff gave notice to the seller even though the seller was not a named defendant). The Plaintiffs have not alleged that they notified the seller, so the claim fails.

Illinois law similarly requires a buyer to give notice to the seller of a breach within a reasonable time or be barred from recovery. See 810 Ill. Comp. Stat. 5/2-607(3)(a). This notice is not required when "(1) the seller has actual knowledge of the defect of the particular product; or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 589 (Ill. 1996). Generalized knowledge about the product defect stemming from third party concerns "is insufficient to fulfill the plaintiffs' UCC notice requirement." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 590. The manufacturer must be "somehow apprised of the trouble with the particular product purchased by a particular buyer." Connick v. Suzuki Motor Co., Ltd, 675 N.E.2d at 590. "Only a consumer plaintiff who suffers a personal injury may satisfy the section 2-607 notice requirement by filing a complaint stating a breach of warranty action." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 590. The Court concludes that the Plaintiffs meet neither of those exceptions. Although the Defendants may have had generalized knowledge that their labeling and advertising might be deceptive, they had no knowledge of the particular buyers at issue. Moreover, the injury here is not a personal injury.

New Mexico also prohibits express warranty claims absent notice to the seller within a reasonable time. See N.M. Stat. Ann. § 55-2-607(3)(a). No New Mexico case has determined whether filing a complaint satisfies the notice requirement. See Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 11, 389 P.3d 1050, 1054. The Supreme Court of New Mexico has explained, however:

> a person notifies or gives notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. . . . The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. . . . The notification which saves the buyer's rights under this article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

State ex Rel Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 746 P.2d 645, 648-49 (citing N.M. Stat. Ann. § 55-1-201(26), now codified at § 55-1-202). When there is no definitive Supreme Court of New Mexico interpretation, New Mexico courts often look to out-of-state authorities. See Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 11, 389 P.3d at 1054 ("Because the UCC is a uniform law of interstate application, we turn to out-of-state authorities."). As explored above, California has removed the notice requirement when plaintiffs sue manufacturers for injuries, and, as explored below, North Carolina has determined that complaints may serve as the requisite notice. See Greenman v. Yuba Power Products, Inc., 377 P.2d at 900; Maybank v. S.S. Kresge Co., 273 S.E.2d at 683-84. The Court has previously concluded that the Supreme Court of New Mexico would relax UCC standards for lawsuits in light of potential consumer harm. See Bhandari v. VHA Southwest Community Health Corp., No. 09-0932, 2011 WL 4669848, at *24 (D.N.M. March 30, 2011)(Browning, J.). The Court determines that the Supreme Court of New Mexico is likely to agree with the Supreme Court of California's reasoning that notice should not be required in these suits, because "[t]he injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings." Greenman v. Yuba Power Products, Inc., 377 P.2d at 900. The Court also concludes that notice via the Amended Complaint serves the purposes that the Supreme Court of New Mexico has identified, namely, that notice must "open[] the way for normal settlement through negotiation." State ex Rel Concrete Sales & Equip. Rental Co.,

Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 746 P.2d at 648-49. Filing a complaint often triggers settlement negotiations. The Court concludes, accordingly, that the Supreme Court of New Mexico would follow the Supreme Court of California and would not require notice beyond the Amended Complaint.

New York law requires that the buyer provide notice to the seller within a reasonable time after discovering the breach of an express warranty. See N.Y. U.C.C. Law § 2-607(3)(a). The New York Supreme Court, Appellate Division, has eliminated the requirement in "situations involving goods sold for human consumption." Fischer v. Mead Johnson Labs., 41 A.D.2d 737, 737 (N.Y. App. Div. 1973). The decision involves, however, a plaintiff's personal injury, which at least one court has distinguished on those grounds. See In re 5-Hour ENERGY Marketing and Sales Practices Litig., No. 13-2438, 2015 WL 12734796, at *9 (C.D. Cal. January 22, 2015)(Gutierrez, J.). The Court concludes that Fischer v. Mead Johnson Labs is not correctly cabined to only personal injury cases, as it contemplates all cases "grounded on tortious elements," Fischer v. Mead Johnson Labs., 41 A.D.2d at 737 (citing Kennedy v. Woolworth Co., 205 A.D. 648, 649 (N.Y. App. Div. 1923)), but the Court is also not convinced that the Court of Appeals of New York would write in an exception to the statute's clear language to benefit a purchaser, which currently does not allow a complaint to suffice for notice in manufacturer-consumer cases. The Court of Appeals of New York has not expressed the same willingness to modify the UCC for public policy concerns as the Supreme Court of New Mexico has. See Borcre Leasing Corp. v. General Motors Corp. (Allison Gas Turbine Div.), 645 N.E.2d 44*8, 1196 (N.Y. 1995)("Having foregone protecting itself with UCC warranties, plaintiff should not be permitted to fall back on tort when it has failed to preserve its . . . remedies." (ellipses in original)(quotations omitted)). The Court concludes, accordingly, that it should dismiss the New York express warranty claim.

North Carolina also requires that the buyer give notice within a reasonable time after the buyer discovers the breach to recover under an express warranty theory.  See N.C. Gen. Stat. § 25-2-607(3)(a).  The Supreme Court of North Carolina has ruled that filing a lawsuit may serve as notice.  See Maybank v. S.S. Kresge Co., 273 S.E.2d at 683-684.  It has also ruled that the reasonable time requirement is relaxed in consumer defective-goods cases that have caused personal injury or where the seller has, regardless of notice, had a reasonable opportunity to learn the facts so that the seller may defend himself.  See Maybank v. S.S. Kresge Co., 273 S.E.2d at 684 (ruling that a notice delay of three years was reasonable in a consumer-defect personal-injury case).  The Court concludes that the reasonable notice requirement should be relaxed here too, even though it is not a personal injury case, because the same rationale in personal injury cases applies here: "the damage has already occurred and is irreversible." Maybank v. S.S. Kresge Co., 273 S.E.2d at 684.  There is no chance that the Defendants can fix the deception; the cigarettes have already been purchased and consumed.  The Court concludes, accordingly, that it should not dismiss the North Carolina express warranty claim on the notice requirement ground.

### C.   THE COURT DISMISSES THE FLORIDA AND ILLINOIS EXPRESS WARRANTY CLAIMS FOR LACK OF PRIVITY.

The Defendants argue that the Court should dismiss the Plaintiffs' express warranty claims from Florida, Illinois, and New York for lack of privity.  See MTD at 67.  The Plaintiffs rejoin that there is an exception to the privity requirement under all three states' laws for labeling deceptions.  See Response at 75.  The Court of Appeals of New York has concluded that privity is not required against a manufacturer or the advertiser for economic loss, so the Court does not dismiss the Plaintiffs' New York claim on that ground.  See Randy Knitwear, Inc. v. American Cyanamid Co.,

181 N.E.2d 399, 400-02 (N.Y. 1962); <u>Mahoney v. Endo Health Solutions, Inc.</u>, No. 15-9841, 2016 WL 3951185, at *6 (S.D.N.Y. July 20, 2016)(Cote, J.).[68]

The Supreme Courts of Florida and Illinois have not decided the issue.[69] Lower state and federal courts in those states are divided. <u>Compare</u> <u>Hill v. Hoover</u>, 899 F. Supp. 2d 1259, 1266 (N.D. Fla. 2012)(Mickle, J.); <u>Northern Ins. Co. of N.Y. v. Silverton Marine Corp.</u>, No.10-0345, 2010 WL 2574225, at *2 (N.D. Ill. June 23, 2010)(Zagel, J.); <u>Intergraph Corp. v. Stearman</u>, 555 So.2d 1282, 1283 (Fla. Dist. Ct. App. 1990) <u>with</u> <u>Mednick v. Precor, Inc.</u>, No. 14-3624, 2014 WL 6474915, at *5 (N.D. Ill. November 13, 2017)(Leinenweber, J); <u>Smith v. Wm. Wrigley Jr. Co.</u>, 663 F. Supp. 2d 1336, 1343 (S.D. Fla. 2009)(Cohn, J.); <u>Cedars of Lebanon Hosp. Corp. v. European X-ray Distributors of America, Inc.</u>, 444 So.2d 1068, 1072 (Fla. Dist. Ct. App. 1984); <u>Fischetti v. American Isuzu Motors, Inc.</u>, 918 So.2d 974, 976 (Fla. Dist. Ct. App. 2005). Neither statute governing express warranties discusses privity with manufacturers, and the Court has, in the past, noted that vertical-privity issues are proper for judicial resolution. <u>See</u> Fla. Stat. § 672.313; 810 Ill. Comp. Stat. 5/2-601-616; <u>Bellman v. NXP Semiconductors USA, Inc.</u>, 248 F. Supp. 3d at 1151 (D.N.M. 2017).

The Supreme Court of Florida's jurisprudence regarding privity has been relatively murky. In <u>Manheim v. Ford Motor Co.</u>, 201 So.2d 440, 442 (Fla. 1967), it ruled that "[o]ur Court has

---

[68]Some federal cases suggest that <u>Randy Knitwear, Inc. v. American Cyanamid Co.</u> is no longer good law, because the New York legislature ratified the UCC after the decision. <u>See</u> <u>Koenig v. Boulder Brands, Inc.</u>, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014)(Ramos, J.); <u>Ebin v. Kangadis Food Inc.</u>, No. 13-2311, 2013 WL 6504547, at *6 (S.D.N.Y. December 11, 2013)(Rakoff, J.). The Court disagrees that the UCC displaces the Court of Appeals of New York's determination on vertical privity, because the UCC does not govern vertical privity with manufacturers, and the Court has already determined that vertical privity issues are properly judicially resolved. <u>See</u> <u>Bellman v. NXP Semiconductors USA, Inc.</u>, 248 F. Supp. 3d 1081, 1151 (D.N.M. 2017)(Browning, J.).

[69]The Supreme Court of Illinois expressly declined to address the issue. <u>See</u> <u>Collins Co., Ltd. v. Carboline Co.</u>, 532 N.E.2d 834, 837, 841 (Ill. 1988).

become aligned with those courts holding that an action may be brought against a manufacturer notwithstanding want of privity," but it later walked back that holding in <u>Kramer v. Piper Aircraft Corp.</u>, 520 So. 2d 37, 39 (Fla. 1988), clarifying that it had created a strict liability action in tort, which had supplanted the no-privity requirement in breach-of-implied-warranty cases. <u>See</u> <u>Cedars of Lebanon Hosp. Corp. v. European X-Ray Distributors of Am., Inc.</u>, 444 So. 2d 1068, 1070-71 (discussing Florida's history with the privity requirement); <u>Smith v. Wm. Wrigley Jr. Co.</u>, 663 F. Supp. 2d at 1342-43. The Supreme Court of Illinois' jurisprudence has been similarly ambiguous. In <u>Collins Co. Ltd. v. Carboline Co.</u>, the Supreme Court of Illinois left "a door at least slightly ajar for future extension of some warranties in appropriate circumstances to nonprivity plaintiffs," but refused to decide the issue. <u>Collins Co. Ltd. v. Carboline Co.</u>, 532 N.E. 2d at 842. <u>See</u> <u>Szajna v. General Motors Corp.</u>, 503 N.E.2d 760, 766 (Ill. 1986)(noting that "the professed neutrality of" the UCC on the privity requirement "should not be viewed as an invitation to the courts to abolish the privity requirement . . . [n]or should it be viewed as a prohibition against further development in that direction."). It has, however, ruled that privity must exist for breach of implied warranties when the harm alleged is economic loss. <u>See</u> <u>Rothe v. Cadillac, Inc.</u>, 518 N.E.2d 1028, 1029-30 (Ill. 1988). Given the reticence that the Supreme Courts of both states have expressed toward modifying the privity requirement, the Court concludes that neither would do away with the privity requirement to breach-of-express-warranty claims producing pure economic loss. The Court, accordingly, dismisses the Illinois and Florida express warranty claims for lack of privity.

## IX. THE PLAINTIFFS' REQUESTS FOR INJUNCTIVE RELIEF ARE NOT RENDERED MOOT.

The Plaintiffs request an injunction prohibiting the Defendants from advertising Natural American cigarettes as natural and additive free. <u>See</u> Amended Complaint ¶ 159, at 50, Prayer for Relief ¶ C, at 105. The Defendants argue that the Plaintiffs' request is rendered moot, because the

Defendants have entered into a Memorandum of Agreement with the FDA, which requires them to cease using those terms, except for the natural term in their brand name. See MTD at 68; Memorandum of Agreement ¶¶ 1-2, at 1. The Plaintiffs counter that their requested injunction extends to enjoining the Natural American brand name, so the Memorandum of Agreement does not entirely render moot their request. See Response at 76. They also contend that the Memorandum of Agreement is subject to an ongoing lawsuit in the United States District Court for the Southern District of Florida, which, if successful, would invalidate the Memorandum of Agreement. See July Tr. at 60:3-13 (Wolchansky); id. at 61:3-12 (Wolchansky); Sproule v. United States Food and Drug Administration, No. 17-80709 (S.D. Fla. 2017)(Rosenberg, J.). At the July Hearing, the Defendants conceded that, if the pending lawsuit against the FDA is successful, "it would vacate the memorandum," July Tr. at 64:3-4 (Biersteker). The Defendants represent, however, that "Santa Fe is no longer utilizing the phrases 'Additive Free' and 'Natural' in the NAS cigarette product labels, labeling, advertising, and promotional materials . . . and Santa Fe is in compliance with the [Memorandum of] Agreement." Supp. Brief on FDA Agreement ¶ 6, at 3.

Injunctive relief requests are subject to Article III mootness. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d at 1190-91; Ex rel. New Mexico State Highway Dept. v. Goldschmidt, 629 F.2d at 669. A case is rendered moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Cty. of L.A. v. Davis, 440 U.S. at 631 (1979)(quotations omitted). The Tenth Circuit has explained:

Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies). . . . But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. . . . [T]he Supreme Court has historically recognized what are often called 'exceptions' to the general rule against consideration of moot cases, as where a plaintiff's status is 'capable of

repetition yet evading review,' *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911), or where a defendant has ceased the challenged action but is likely the defendant will 'return to his old ways' -- the latter often referred to as the voluntary cessation exception, *United States v. W.T. Grant Co.*, 345 U.S. 498, 515 (1911).

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1242.  When injunctive relief does not redress plaintiffs' particular injuries, the injunctive relief requested is rendered moot.  See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d at 1191 (citing United States v. Vera-Flores, 496 F.3d at 1180).  Similarly, if the injunction would have no present-day effect, the injunctive relief requested is also rendered moot.  See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d at 1257 ("The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect.").

As already noted, mootness is subject to the voluntary-cessation exception.  See Brown v. Buhman, 822 F.3d at 1166.  Under that exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Brown v. Buhman, 822 F.3d at 1166.  "This rule is designed to prevent gamesmanship.  If voluntary cessation automatically mooted a case, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. at 91).  Nevertheless, a defendant's voluntary cessation may render a case moot if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. at 91).

The Memorandum of Agreement would render moot the Plaintiffs' requested injunctive relief, except for an injunction on the term Natural in the brand name.  See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d at 1257.  The ongoing litigation challenging the Memorandum of Agreement's validity, see Sproule v. United States Food and Drug Administration, No. 17-80709 (S.D. Fla. 2017)(Rosenberg, J.), casts doubt, however, on the Memorandum of Agreement's permanency.  Absent that agreement, the Defendants' promise to remove the terms is just that -- a promise.  As such, the Defendants "carr[y] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," and the Court concludes the Defendants have not carried that burden.  Brown v. Buhman, 822 F.3d at 1166. There is no evidence, for example, that, absent the Memorandum of Agreement, it would be prohibitively expensive for the Defendants to change their labeling or to restart an advertising campaign.  The Court, accordingly, denies the Defendants' request to dismiss the injunctive relief requested.

**IT IS ORDERED** that: (i) the Defendants' Request for Judicial Notice in Support of Motion to Dismiss, filed November 18, 2016 (Doc. 71) is granted in part and denied in part; (ii) the Defendants' Second Motion for Judicial Notice in Support of The Motion to Dismiss the Consolidated Amended Complaint, filed February 23, 2017 (Doc. 91) is granted; (iii) the Defendants' Third Motion for Judicial Notice in Support of the Motion to Dismiss the Consolidated Amended Complaint, filed May 30, 2017 (Doc. 109) is granted; and (iv) the requests in the Defendants' Motion to Dismiss the Consolidated Amended Complaint and Incorporated Memorandum of Law, filed February 23, 2017 (Doc. 90) are granted in part and denied in part.  The Court: (i) judicially notices the 2000 FTC Complaint filed against Santa Fe Tobacco, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952 Complaint, filed November 18, 2016

(Doc. 71-1); the Native American Spirit Advertising attached to the FTC Complaint, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952, Exhibits A-C, filed November 18, 2016 (Doc. 71-1); the Decision and Order, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952, filed November 18, 2016 (Doc. 71-1); FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads are Deceptive, issued April 27, 2000, filed November 18, 2016 (Doc. 71-1); FTC Accepts Settlement of Charges that Ads for Winston "No Additive" Cigarettes are deceptive, issued March 3, 1999, filed November 18, 2016 (Doc. 71-1); Assurance of Voluntary Compliance, (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1); Warning Letter, dated August 27, 2015, filed November 18, 2016 (Doc. 71-1); Memorandum of Agreement Between The United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), (dated January 19, 2017), filed February 23, 2017 (Doc. 91-1)("Memorandum of Agreement"); Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) dated May 9, 2017, filed May 30, 2017 (Doc. 109-1); (ii) severs and transfers the Plaintiffs' claims, which were not originally brought in a North Carolina forum against Reynolds American Inc., to the Middle District of North Carolina; (iii) dismisses with prejudice California Count I (CLRA), California Count II (CFAL), California Count III (UCL), Colorado Count I (CCPA), Florida Count I (FDUTPA), Illinois Count I (ICFA), Illinois Count II (IUDTPA), Massachusetts Count I (Mass. Gen. Law. 93A), Michigan Count I (MCFA), New Jersey Count I (NJCFA), New Mexico Count I (NMUPA), New Mexico Count II (NMFAL), New York Count I (N.Y. Gen. Bus. Law § 349), New York Count II (N.Y. Gen. Bus. Law § 350), North Carolina Count I (N.C. Gen. Stat. § 75-1.1), Ohio Count I (OCSPA), Ohio Count II (ODTPA), Washington Count I (WCPA) to the extent that those counts are premised on a theory of deception that a reasonable consumer would

believe that the terms natural and additive-free suggest that Natural American cigarettes are less processed than other cigarettes; (iv) dismisses with prejudice Illinois Count I (ICFA) and Illinois Count II (IDUTPA) to the extent those claims are premised on the theory that a reasonable consumer would believe that the terms "additive-free" and "natural" in the Defendants' advertising suggest that Natural American cigarettes are safer or healthier; (v) dismisses with prejudice Illinois Count II (IUDTPA) to the extent that it requests injunctive relief; (vi) dismisses Ohio Count I (OSCPA) without prejudice; (vii) dismisses with prejudice Ohio Count II (ODTPA), New Jersey Count III (Unjust Enrichment), Ohio Count III (Unjust Enrichment); and (viii) dismisses with prejudice the Nationwide Count I (Express Warranty) to the extent that it is premised on Florida, Illinois, and New York law. All other requests for relief from the Defendants' Motion to Dismiss The Consolidated Complaint and Incorporated Memorandum of Law, filed February 23, 2017 (Doc. 90) are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Scott P. Schlesinger
Jonathan Gdanski
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorneys for Plaintiffs Justin Sproule, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

> *Attorney for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Randi McGinn
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

> *Attorney for Plaintiffs Anthony Dunn, Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Patrick Scott, Russell Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Jacques-Rene Herbert,  Sara Benson, Justin Sproule, Rudolph Miller, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, Abigail Emmons, Charlene Blevins, Scott Johnston, Jason Cole, and Rachel King*

Kathleen J. Love
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

> *Attorney for Plaintiffs Anthony Dunn, Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Patrick Scott, Russell Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli,*

*Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Jacques-Rene Herbert,  Sara Benson, Justin Sproule, Rudolph Miller, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, Abigail Emmons, and Charlene Blevins.*

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Melissa Wolchansky
Charles D Moore
Halunen Law
Minneapolis, Minnesota

--and--

Michael Robert Reese
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich LLC
Albuquerque, New Mexico

*Attorneys for Plaintiff Anthony Dunn*

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Reed C. Bienvenu
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

> *Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, and Nick Vadis*

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

> *Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

> *Attorney for Theodore Rothman*

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

> *Attorney for Theodore Rothman, Danae Grandison, Michael Laboon, and Dave Moyer*

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

> *Attorney for Plaintiff Russell Brattain*

Daniel L. Warshaw
Alexander R. Safyan
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

*Attorneys for Plaintiff Shannon White*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

*Attorney for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

John Allen Yanchunis, Sr.
Scott W. Weinstein
Keith R. Mitnik
Marisa Kendra Glassman
Morgan & Morgan, PA
Fort Myers, Florida
Orlando, Florida
Tampa, Florida

*Attorneys for Plaintiff Ashley Waldo*

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

*Attorney for Plaintiff Timothy Ruggiero*

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Islands

*Attorney for Plaintiff Desire Gudmundson*

Matthew David Schultz
Levin Papantonio Thomas P.A.
Pensacola, Florida

*Attorney for Plaintiff Scott Johnston*

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

*Attorney for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Peter J. Biersteker
David B. Alden
David M. Monde
Paul Courtney Huck, Jr.
Sharyl Reisman
Mark R. Seiden
Charles R. A. Morse
David Craig Kiernan
Michael Fraser Stoer
Jennifer Bunting-Graden
William D Coglianese
Jon Gregory Heintz
Jordan Von Bokern
Joseph R Coburn
Noel J. Francisco
Troy A. Fuhrman
Jones Day
San Francisco, California
Washington, DC
Atlanta, Georgia
Miami, Florida
Tampa Florida
New York, New York
Cleveland, Ohio

*Attorneys for the Defendants*