# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES          No. MD 16-2695 JB/LF
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' oral request for a 30(b)(6) deposition, <u>see</u> Transcript of Proceedings at 9:7-9 (Schultz)(taken June 13, 2018), filed July 4, 2018 (Doc. 196)("Tr."); (ii) the Defendants' oral request for responses to their written discovery requests before depositions, <u>see</u> Tr. at 18:23-25 (Monde); and (iii) the Letter from Jonathan R. Gdanski to the Court at 2 (dated April 23, 2018), filed July 24, 2018 (Doc. 198)("April 23 Letter"). The Court held a status conference on June 13, 2018. The primary issues are: (i) whether the Court should grant the Plaintiffs' request to depose a corporate representative to determine why the Defendants' use of predictive coding failed to produce hundreds of thousands of potentially responsive documents; (ii) whether the Court should grant the Defendants' request to require the Plaintiffs to produce discovery materials in advance of depositions; and (iii) whether the Court should impose time, place, and manner restrictions on the Defendants' fact-witness interviews. The Court will grant the deposition and discovery requests, because the Defendants agreed to a deposition, and the Plaintiffs agreed to turn over discovery before the depositions. The Court will not, however, impose time, place, and manner restrictions on the Defendants' fact-witness interviews, because the interviews are already finished, and the Plaintiffs' requests are not adequately tailored to the harms alleged.

## FACTUAL BACKGROUND

The Court briefly summarizes the factual background for context. A more thorough discussion can be found in its Memorandum Opinion and Order at 4-9, 288 F. Supp. 3d 1087, 1128-32, filed December 21, 2017 (Doc. 146)("MOO"). The Plaintiffs are consumers who have purchased Natural American Spirit cigarettes. See Consolidated Complaint ¶¶ 12-23, at 4-11, filed January 12, 2017 (Doc. 82)("Complaint"). They contend that they bought those cigarettes at a price premium, because advertisements and branding, which describe the cigarettes as "Natural," "Additive-Free," and "Organic," led them to erroneously believe that Natural American cigarettes are safer and healthier than other cigarette brands. Complaint ¶¶ 4-6, at 2. See id. ¶¶ 12-23, at 4-11. The Plaintiffs also allege that the "Additive-Free" branding led them to think incorrectly that the Natural American menthol-variety cigarettes are additive-free.[1] Complaint ¶ 10, at 3. See id. ¶¶ 12-23, at 3-11.

## PROCEDURAL BACKGROUND

Early in this case, the Court entered an Order for the Discovery of Electronically Stored Information, filed September 27, 2016 (Doc. 55)("ESI Order"). See ESI Order at 1. In it, the Court notes that "[t]he parties . . . agree to identify the methodologies used to search the text of ESI," ESI Order at 1, and also that "[t]he Parties agree to meet and confer to determine search methodologies and protocols to be used in connection with the Parties' production of ESI," ESI Order at 6. Additionally, the Court observes that, "[i]n an effort to control costs and reduce the volume of ESI that is not relevant to the matter, the Parties may filter ESI, potentially including"

---

[1]Menthol is a cigarette additive. See Complaint ¶ 10, at 3; MOO at 173 n.49, 288 F. Supp. 3d at 1234 n.49 ("Menthol is an organic molecule derived from mint.").

the following methods: (i) spam filtering; (ii) using search terms; and (iii) removing duplicates. ESI Order at 6.

    **1.**    **<u>April 13 Letter</u>.**

On April 13, 2018, Melissa Weiner -- an attorney for the Plaintiffs -- sent a letter to David Monde -- an attorney for the Defendants -- detailing "a massive discovery failure affecting the entire corpus of the Defendants' discovery production to Plaintiffs." Letter from Melissa Weiner to David Monde at 1, dated April 13, 2018, filed July 24, 2018 (Doc. 197)("April 13 Letter"). According to Ms. Weiner, Mr. Monde informed the Plaintiffs in a meet and confer that the Defendants "have had problems with 'predictive coding' as a way of identifying responsive and non-responsive emails, leading to an 'underproduction' of relevant materials." April 13 Letter at 1. Ms. Weiner also notes that Mr. Monde informed the Plaintiffs that: (i) the Defendants became aware of the discover deficiency "within the last 7-10 days"; (ii) the Defendants' awareness arose during the course of deposition preparations; (iii) the Defendants have not yet identified the full scope of the issue, but Mr. Monde wanted to inform Plaintiffs' counsel before a week had passed after the problem's identification; (iv) the Defendants' counsel "have identified significant problems with email production -- specifically, relevant and responsive emails . . . that were not but should have been produced"; (v) the Defendants are running "audits on particular witnesses in an attempt to produce relevant documents in light of the upcoming depositions"; and (vi) the Defendants' counsel "still do not know the entire scope of the issue" nor can they give a "timeline or solution for remedying the failure." April 13 Letter at 1. Ms. Weiner says that "[t]he audits for the three deponents set to be deposed this week indicated that you failed to produce more than 50,000 responsive documents relating to those witnesses alone." April 13 Letter at 1.

Ms. Weiner contends that the Defendants' discovery failure is particularly alarming given that the "Plaintiffs' counsel first raised the email deficiency . . . in October of 17," and that, at the time, Mr. Monde was "dismissive" of the Plaintiffs' counsel's concerns. April 13 Letter at 2. Ms. Weiner also argues that the use of predictive coding violates the ESI Order, because the Defendants did not alert the Plaintiffs or their designated ESI Liaison that they were using such a methodology. See April 13 Letter at 2. She contends that the Plaintiffs "remain in the dark as to where the failure occurred, why it occurred, and its full extent," and that the Defendants "still have not provided any details currently being employed to correct" the discovery failure, resulting in prejudice. April 13 Letter at 2. Accordingly, Ms. Weiner requests "immediate discovery on Defendants' discovery process employed from the outset of this case, including depositions and written discovery," and that the "Defendants compensate Plaintiffs' counsel for the time and resources expended in connection with Plaintiffs' review of Defendants' defective and non-responsive previous production sets." April 13 Letter at 3. She argues that such a remedy will ensure that "re-review of withheld documents is undertaken properly" and that the Defendants will "diligently and competently" comply with their discovery obligations. April 13 Letter at 3.

### 2. **The April 23 Letter.**

On April 23, 2018, Jonathan Gdanski, an attorney for the Plaintiffs, sent the Court a letter detailing the Defendants' discovery issue. See April 23 Letter at 1 ("On April 2, 2018, Plaintiffs learned that potentially hundreds of thousands of Defendants' documents that are responsive to Plaintiffs' initial discovery requests, have not yet been produced."). Mr. Gdanski further informs the Court that the Defendants have not yet responded to the April 13 Letter and that they are concerned about some of the Defendants' case investigation efforts. See April 23 Letter at 1-2.

According to Mr. Gdanski, class representatives have reported that the Defendants' attorneys "have been contacting various individuals, including Plaintiffs' family members, old schoolmates, and business acquaintances to ask about Plaintiffs' background and smoking history." April 23 Letter at 2 ("Their efforts border on harassment.").  Mr. Gdanski requests that the Court enter an order, similar to one that a state judge entered in an <u>Engle</u> progeny case,[2] requiring "anyone who represent[s] a tobacco-defendant who conducts an interview of any potential fact witness" to give "a business card and advise the person whom the interviewer represents" at the interview's inception.  Letter at 2.  Mr. Gdanski also requests that the order set "time, place and manner restrictions," and require the interviewer to provide a notice for the interviewee to sign, acknowledging that the interviewer had told the interviewee who he or she represented.  Letter at 2.

### 3.      <u>June 11 Letter</u>.

Mr. Monde responds to the April 13 Letter and the April 23 Letter.  Letter from David Monde to Melissa Weiner at 1, dated June 11, 2018, filed July 24, 2018 (Doc. 199)("June Letter").  Mr. Monde states that the Defendants' document production failure stems "from use of predictive coding rather than manual review" and that they have now produced all responsive,

---

[2]<u>Engle</u> progeny refer to a group of tobacco cases that stem from a class-action suit seeking damages against tobacco companies for injuries caused by smoking cigarettes.  <u>See</u> <u>In re Engle Cases</u>, 767 F.3d 1082, 1088 (11th Cir. 2014).  To distill a decades-long, procedural history: (i) a Florida trial court certified a 700,000 person class; (ii) a Florida jury determined the following "common core" findings: (a) smoking causes at least some diseases; (b) cigarettes with nicotine are addictive, and (c) tobacco companies had engaged in some conduct that permitted a punitive damages award; (iii) the Supreme Court of Florida decertified the class, reversing a $145 billion class-wide punitive damages award; but (iv) held that the class plaintiffs could sue individually for damages, and that the jury's common core findings would have a res judicata effect if the class plaintiffs filed their actions individually within one year of the Supreme Court of Florida's decision.  <u>In re Engle Cases</u>, 767 F.3d at 1088-89.  The <u>Engle</u> progeny refer to the cases that class plaintiffs filed within the specified one-year period.  <u>See</u> <u>In re Engle Cases</u>, 767 F.3d at 1089.  <u>See</u> <u>also</u> Bruce Weber, <u>H.A. Engle, Tobacco Plaintiff, Dies at 89</u>, N.Y. Times, July 24, 2009, https://www.nytimes.com/2009/07/24/us/24engle.html.

non-privileged documents. June Letter at 1. Mr. Monde apologizes for failing to discuss with the Plaintiffs in advance the Defendants' intent to use predictive coding, but notes that their initial, incomplete, production "was unintentional." June Letter at 1-2. Mr. Monde details that the Defendants have taken the following steps since April 2, 2018, to "resolve the incomplete initial production and minimize the impact to the discovery schedule": (i) the Defendants have prioritized supplemental production based on defense witnesses "already scheduled for depositions"; (ii) the Defendants offer short deposition postponements, if the Plaintiffs desire them; and (iii) "the documents in our rolling supplemental production were de-duped[3] to minimize your need to review multiple copies of the same document." June Letter at 2. Mr. Monde also notes that all defense-witness depositions, with the exception of two, will be taken before the close of fact discovery, and that the two exceptions are unrelated to the discovery issues. See June Letter at 2. It follows, according to Mr. Monde, that, although the Plaintiffs have alleged prejudice, the Plaintiffs have not provided any prejudice specifics. See June Letter at 2. Mr. Monde signals the Defendants' willingness to accommodate additional depositions or to extend the deadline for Plaintiffs' expert reports. See June Letter at 2.

Mr. Monde contends that the Defendants used predictive coding "on a subset of documents" to "meet the production schedule and because the ESI search terms generated a very large number" of "irrelevant and not responsive" documents. June Letter at 3. He notes that the manual review "corroborates" that the "ESI search terms" generated many irrelevant documents and that the Defendants initially refrained from producing "all of the documents that contained ESI search terms," because such a production would "have resulted in the classic document dump, with responsive material buried within vast quantities of irrelevant documents." June

---

[3]De-duped stands for de-duplicate, which means that multiple copies of the same document are removed. See De-Dupe, at 1, Wikitionary https://en.wiktionary.org/wiki/de-dupe.

Letter at 3. Mr. Monde notes that the Defendants did not use predictive coding for two subsets of discovery: (i) in instances where requests "were sufficiently narrow that we searched for specific documents in locations where we believed in good faith the responsive documents would reside"; and (ii) in some instances they did a manual review regardless of ESI search terms. June Letter at 3. Mr. Monde details that they used predictive coding on: (i) "Marketing Emails and Attachments"; (ii) "Trade-Marketing E-files"; and (iii) a set of 300,000 miscellaneous documents. June Letter at 3-4. Mr. Monde contends that, although the Plaintiffs' raised, in October, 2017, "a generic concern" about the number of emails produced, the Defendants held a good-faith belief on December 22, 2017, that they had produced all non-privileged responsive documents. June Letter at 3. Mr. Monde attests that, once they identified the issue, they did a manual, human review of the three document categories upon which they previously executed a predictive coding review. See June Letter at 3.

Mr. Monde also contends that their investigators had acted properly with fact witnesses. See June Letter at 4. He contends that, "[e]ven before you asked us to do it, our investigators presented to each potential witness a business card stating that the investigator works on behalf of Santa Fe Natural Tobacco Company." June Letter at 4. Mr. Monde argues that a witness notice form, as the Plaintiffs request, would be "unnecessary and potentially confusing." June Letter at 4. He also contends that all interviews have been already completed, unless additional persons are newly identified in depositions. See June Letter at 4. Accordingly, Mr. Monde represents that "we remain happy to address any witness or interview-specific concerns you may have." June Letter at 4.

4.    **The Status Conference**.

The Court held a status conference.  <u>See</u> Tr. at 3:1 (Court).  The Plaintiffs contended that, due to the Defendants' use of predictive coding, they did not timely receive discovery, and that, "even in light of Mr. Monde's letter, . . . we don't know how or why" the Defendants' initial discovery methodology failed to properly produce documents.  Tr. at 7:1-3 (Schultz).  According to the Plaintiffs,

> in all candor, we don't know at this point, what went wrong, why it went wrong, whether it's been corrected, because we've not been privy to what they've done to correct it either. . . .  So we just want to get to the bottom of it, Judge, and know whether there is an issue, and, if so, how to address it.  The last thing we want is more delay in the case.

Tr. at 8:13-20 (Schultz).  The Court asked what remedy the Plaintiffs seek.  <u>See</u> Tr. at 9:2-3 (Court).  The Plaintiffs asked for "a short corporate rep deposition and find out what happened."  Tr. at 9:9-10 (Schultz).  The Plaintiffs noted that, after conducting the requested deposition, they may request additional relief based on what they learned.  <u>See</u> Tr. at 10:17-21 (Schultz)("Maybe we would find out we don't need any relief. . . .   But, of course, we would like to find out for ourselves.").

The Court stated that, given the June Letter, it was inclined to see "a two-hour 30(b)(6) deposition" as a "fairly reasonable proposition."  Tr. at 11:20-22 (Court).  The Defendants explained that, once they discovered the issue, they: (i) promptly notified the Plaintiffs; (ii) took steps to rectify it; (iii) attempted to find solutions with the Plaintiffs to keep discovery on schedule; and (iv) had worked amicably with the Plaintiffs.  <u>See</u> Tr. at 12:3-16:5 (Monde).  The Defendants argued that, based on the steps taken, they did not see how the Plaintiffs could have incurred any prejudice.  <u>See</u> Tr. at 16:6-7 (Monde).  Nevertheless, the Defendants agreed that a

deposition, such as the one the Court suggested, would be appropriate. <u>See</u> Tr. at 12:3 (Monde)("I agree with that, Judge."); <u>id.</u> at 16:25-17:3 (Court, Monde).

Although the Court suggested a two-hour deposition, the Plaintiffs requested a three-hour one, because Mr. Schultz was not an ESI expert. <u>See</u> Tr. at 17:13-14 (Schulz). The Defendants agreed to a three-hour deposition. <u>See</u> Tr. at 17:23-24 (Monde). The Plaintiffs also noted that they would request that the Defendants cover the deposition's cost, because its need arose through no fault of their own. <u>See</u> Tr. at 17:16-20 (Schultz). The Court noted that it would not "make any ruling" on the cost issue now, but that it would be inclined to grant such reimbursement should the deposition cause any expenses. Tr. at 18:8-12 (Court). The Defendants represented that the Plaintiffs "won't need to ask for those, Judge." Tr. at 18:13 (Monde).

The Defendants requested that the Plaintiffs commit to giving the Defendants "discovery materials," meaning responses to written discovery requests, "at least seventy-two hours in advance of depositions." Tr. at 18:22-25 (Monde). <u>See id.</u> at 15:16-24 (Monde). The Defendants noted that they had previously offered the Plaintiffs the opportunity to give those discovery responses on a rolling basis, but now represented that "we do need to get them sufficiently in advance" of depositions "to be able to make meaningful use of them." Tr. at 19:2-5 (Monde). The Plaintiffs represented that they thought such a request was reasonable and that they "will do [their] best to get these materials over to Mr. Monde at least 72 hours before each Plaintiffs' deposition." Tr. at 19:12-17 (Haberman).

## LAW REGARDING 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

[A] party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with

reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30(b)(6). As a general matter, a corporation may designate any person as a corporate representative if he or she can meet the necessary criteria to satisfy rule 30(b)(6). See Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., No. 06-1165, 2007 WL 5704041, at *5 (D.N.M. October 24, 2007)(Browning, J.)(discussing how, sometimes, it may be necessary for a corporation to designate former employees as a rule 30(b)(6) deponent); 7 James Wm. Moore et al., Moore's Federal Practice § 30.25[3], at 30-71 (3d ed. 2018)("There is no rule that would prevent corporate counsel, or even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent."). "Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject." Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999).

Courts have split whether to allow parties to use 30(b)(6) depositions to explore facts underlying legal claims and theories. Compare JPMorgan Chase Bank v. Liberty Mut. Ins. Co., 209 F.R.D. 361, 362 (S.D.N.Y. 2002)(Rakoff, J.)(denying the discovery request seeking the "defendants' mental impressions, conclusions, opinions, and legal theory") and SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y.1992)(Leisure, J.)(asserting that "the proposed Rule 30(b)(6) deposition constitutes an impermissible attempt by defendant to inquire into the mental processes and strategies of the SEC"), with EEOC v. Caesars Entm't, Inc., 237 F.R.D. 428, 432-34 (D. Nev. 2006)(Leen, M.J.)(denying the "defendant's request for a protective order

to limit the scope of Rule 30(b)(6) deposition questioning to preclude inquiry into the factual bases for defendant's asserted position statements and affirmative defenses"), and In Re Vitamins Antitrust Litigation, 216 F.R.D. 168, 171-74 (D.D.C. 2003)(Hogan, C.J.)(allowing 30(b)(6) facts and admissions in corporation's antitrust submission to European Commission, stating: "Bioproduct[']s argument that the Rule 30(b)(6) discovery is unnecessary and duplicative is without merit."). The Court has held that the better rule is to allow parties to craft rule 30(b)(6) inquiries similar to contention interrogatories, because this rule will ultimately lead to fewer disputes about what subject matter is permitted in 30(b)(6) depositions and advances the policy underlying the rules favoring disclosure of information. See Radian Asset Assur., Inc. v. Coll. of the Christian Bros., 273 F.R.D. 689, 691-92 (D.N.M. 2011)(Browning, J.)("Radian"). If the Court limits rule 30(b)(6) depositions as the Southern District of New York has, courts would have to referee endless disputes about what is permitted and what is not. Moreover, rule 30(b)(6)'s plain language does not limit the deposition in the way that the Southern District of New York has done. See Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information known or reasonably available to the organization."). Rule 26(b)(1) states:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Rule 30(b)(6) is not "otherwise limited," but unlimited. The Court sees no great problem with allowing overlap between the sorts of information obtained through

contention interrogatories and 30(b)(6) depositions. While counsel will have to carefully prepare the 30(b)(6) representative, they must always do so.

The Court has written extensively about rule 30(b)(6). See, e.g., Radian, 273 F.R.D. at 691-92. In Skyline Potato Co., Inc. v. Tan-O-On Marketing, Inc., 2012 WL 3150385, at *7-8 (D.N.M. July 30, 2012), for example, the Court concluded that a company was required to provide a new rule 30(b)(6) corporate representative, because the initial representative could not "adequately respond to the five topics the Notice of Deposition specifies." Skyline Potato Co., Inc. v. Tan-O-On Marketing, Inc., at 2012 WL 3150385, at *8 (citing Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999)("To satisfy, Rule 30(b)(6), the corporate deponent has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf.")). In another case, the Court considered the scope of rule 30(b)(6) questioning. See Peshlakai v. Ruiz, 2014 WL 459650, at *25-27 (D.N.M. Jan. 9, 2014)(Browning, J.). It ruled that a party's proper course, should the deposing party begin to question the 30(b)(6) witness beyond the scope of stated deposition topics is to

> state on the record that the witness is no longer a rule 30(b)(6) designee for that topic. [The company] must then provide a witness to answer that question. If [the company] does not mind the Plaintiffs asking the witness, as a fact witness, the question, the deposition can proceed as a fact witness deposition for a few questions. If [the company] does not believe the witness is prepared to answer as a fact witness, it may object and insist that the witness be noticed as a fact witness.

Peshlakai v. Ruiz, 2014 WL 459650, at *27. The Court has also ruled that rule 30(b)(6) topic notices may take a form similar to contention interrogatories. See S.E.C. v. Goldstone, 2014 WL 4349507, at *37-38 (D.N.M. Aug. 23, 2014)(Browning, J.)(citing Radian, 273 F.R.D. at 691). The Court has also held that naming an individual in their official capacity "achieves nothing in

terms of making it easier to depose him under rule 30(b)(6)." Tavasci v. Cambron, 2017 WL 3173011, at *29 (D.N.M. May 31, 2017)(Browning, J.). The Court so ruled, because a party may not "serve a rule 30(b)(6) deposition notice" on "an individual," and a party may also not instruct a company to name a particular individual as its rule 30(b)(6) representative. Tavasci v. Cambron, 2017 WL 3173011, at *29.

## LAW REGARDING RULE 34

Rule 34 governs "Producing Documents, Electronically Stored Information, and Tangible Things, or Entering Onto Land, for Inspection and Other Purposes." Fed. R. Civ. P. 34. The rule's subdivision (a) outlines the scope of discoverable items, and subdivision (b) outlines the procedures to be followed for requesting items, see Fed. R. Civ. P. 34(b)(1), objecting to requests, see Fed. R. Civ. P. 34(b)(2)(C), and producing "documents or electronically stored information," Fed. R. Civ. P. 34(b)(2)(E). Rule 34(b)(2)(E) provides:

> (E)    *Producing the Documents or Electronically Stored Information.* Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>
> (i)    A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;
>
> (ii)    If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms; and
>
> (iii)    A party need not produce the same electronically stored information in more than one form.

Fed. R. Civ. P. 34(b)(2)(E). There is confusion among courts and commentators regarding the meaning of and the relationship between (E)(i) and (E)(ii), hinging on whether the term

"documents," as used in (E)(i), includes ESI.[4]  The Court has concluded that provisions (E)(i) and (E)(ii) apply to distinct, mutually exclusive categories of discoverable information: documents -- a term that does not include ESI -- governs (E)(i), while (E)(ii), but not (E)(i) governs ESI.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 298 F.R.D. 514, 520-26 (D.N.M. 2014)(Browning, J.).

1.       The Evolution of Rule 34 from 1970 to 2006.

Before 1970, rule 34 made no mention of ESI -- by that name or any other -- and allowed only for "the inspection and copying or photographing . . . of any designated documents, papers, books, accounts, letters, photographs, objects, or tangible things."  Fed. R. Civ. P. 34 (1964) (amended 1970).  Although it would have been possible for courts to shoehorn the developing ESI technology into one of those categories, in 1970, the federal judiciary recognized the emerging importance of electronic record storage, and the rule was amended to the following: "Any party may . . . inspect and copy[] any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form). . . ."  Fed. R. Civ. P. 34(a) (2000)(amended 2006)(emphasis added). "Documents" was no longer one of several classes of discoverable material, but had become the catchall term for virtually all discoverable material.[5]  The advisory committee notes "make[]

_____

[4]"The rules of statutory construction apply to the Federal Rules. . . ."  In re Kubler, No. 11-0048, 2012 WL 394680, at *11 (D.N.M. Jan. 25, 2012)(Browning, J.).  Accord Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, (1993)(applying the expressio unius est exclusion alterius canon when interpreting rule 9(b) of the Federal Rules of Civil Procedure); Hillis v. Heineman, 626 F.3d 1014, 1017-18 (9th Cir. 2010)("This same principle of statutory construction applies to interpreting the Federal Rules of Civil Procedure.").

[5]Only "tangible things" remained outside of the "inclusive description of documents" that the new rule furnished.  Fed. R. Civ. P. 34(a), advisory committee's notes on 1970 amendment (1970)(amended 2006).

clear that Rule 34 applies to electronic data compilations," Fed. R. Civ. P. 34 advisory committee's notes, and, as technology advanced, courts properly allowed for discovery of ESI under the same procedural framework provided for all other forms of "documents," e.g., Bills v. Kennecott Corp., 108 F.R.D. 459, 461 (D. Utah 1985)(Greene, J)("It is now axiomatic that electronically stored information is discoverable under Rule 34 of the Federal Rules. . . .").

In 1980, with ESI growing in prominence but hard copy discovery still predominant, subdivision (b) of the rule was amended to add the requirement that "[a] party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Fed. R. Civ. P. 34(b), para. 3 (2000)(amended 2006). The reason for this amendment was to put an end to the "apparently not rare" practice of "deliberately . . . mix[ing] critical documents with others in the hope of obscuring significance." Fed. R. Civ. P. 34 advisory committee's notes (quoting Section of Litigation of the American Bar Association, Report of the Special Committee for the Study of Discovery Abuse, 22 (1977)). See United States v. O'Keefe, 537 F. Supp. 2d 14, 19 (D.D.C. 2008)(Facciola, J.)("The Rule was amended in 1980 to prevent the juvenile practice whereby the producing party purposely rearranged the documents prior to production in order to prevent the requesting party's efficient use of them."); In re Sulfuric Acid Antitrust Litig., 231 F.R.D. 351, 363 (N.D. Ill. 2005)(Cole, J.)(stating that the provision is designed to prevent litigants from "deliberately mixing critical documents with masses of other documents to hide their existence or obscure their significance")(citing Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc., 104 F.R.D. 23, 36 (N.D. Ill.1984)(Shadur, J.)).

Over time, courts began to interpret the amended rule 34(b) to impose affirmative requirements on all massive productions of documents, with the logic being that the enormity of

a production, alone, could render it useless to the requesting party even without any deliberate mixing on the part of the producing party. See Pass & Seymour, Inc. v. Hubbell Inc., 255 F.R.D. 331, 334 (2008)(Peebles, M.J.)(noting the disfavor that courts have shown to the "dumping of massive quantities of documents, with no indexing or readily apparent organization, in response to a document request from an adversary"). The amendment had the effect of requiring the producing party to produce documents in an organized, comprehensible arrangement -- either by specifically indexing each document to the request to which it was responsive, or, failing that matching, by producing the documents with the business' filing system or other organizational structure still intact and usable by the requesting party, thus "minimiz[ing] the burden of production while maintaining the internal logic reflecting business use." SEC v. Collins & Aikman Corp., 256 F.R.D. 403, 409 (S.D.N.Y. 2009)(Scheindlin, J.). See CooperVision, Inc. v. CIBA Vision Corp., 2007 WL 2264848, at *4 (E.D. Tex. August 6, 2007) (Hines, M.J.)("[P]roduction of records as kept in the usual course of business ordinarily will make their significance pellucid. That is the overarching purpose of the rule."). The usual course of business -- in the days of warehousing large numbers of hard copy documents -- meant giving the requesting party free access to the facility without any culling or reviewing for responsiveness by the producing party.

In the ESI context, the new 34(b)(E)(ii) requirement serves another purpose. In addition to regulating the organization of production, it allows courts to specify, or at least restrict, the form -- i.e., the file formatting -- of the individual artifacts of ESI being produced. Requiring production of ESI in the usual course of business is widely interpreted to mean turning over computer files in their "native form" -- the format in which they were kept with the party before the commencement of litigation -- or some agreed-upon alternative. Williams v. Sprint/United

Mgmt. Co., 230 F.R.D. 640, 648-49 (D. Kan. 2005)(Waxse, M.J.). See Fed. R. Civ. P. 34(a) (2002)(amended 2006)(providing that "data compilations" must be "translated, if necessary, by the respondent through detection devices into reasonably usable form"). Cf. The Sedona Principles 44-46 cmts. 13.a-c (2004).[6] Although this interpretive spin on 34(b)(E)(ii) was not perfect -- it had the effect of reading out the alternative requirement of labeling production to correspond to categories in the requests, which cannot easily be construed to bear on file formatting -- it served the purpose in the absence of an alternative basis for regulating the form of ESI production.

From 1980 until the 2006 amendments, courts applied the organized production requirement to both hard copy documents and ESI, because, (i) as a textual matter, the term "documents," as defined parenthetically in rule 34(a), still included "data compilations from which information can be obtained," Fed. R. Civ. P. 34 advisory committee's notes to the 1970 amendment; (ii) the evil that the 1980 amendment was designed to combat -- hiding important information in a blizzard of irrelevant material, or jumbling the production's organization to render diligent examination impracticable -- could just as easily thwart ESI discovery, especially in the days before the widespread availability of optical character recognition ("OCR") search technology; and (iii) there being, at that time, no other basis in the rule for regulating the file formatting of ESI production, reading out the 34(b)(E)(iii) requirement would leave producing parties free to turn over ESI in whatever form they wanted -- even if it meant deliberately converting ESI from its easily accessible native format into an inconvenient, obscure, or expensive one.

---

[6]The Sedona Principles are a set of best practice recommendations for e-discovery. See The Sedona Principles (Second Edition): Accommodating the 2006 E-Discovery Amendments, 3 Fed. Cts. L. Rev. 63, 64 (2009).

## 2. __The 2006 Amendments.__

The 2006 amendments altered both the rule's scope and procedural portions. <u>See</u> Fed. R. Civ. P. 34 (2006)(amended 2007). Rule 34(a) now reads:

(a) **In General.** A party may . . .

  (1)    . . . inspect, copy, test, or sample the following items . . .

   (A)    any designated documents <u>or</u> electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained . . . or

   (B)    any designated tangible things. . . .

Fed. R. Civ. P. 34(a) (emphasis added). ESI -- now referenced by that name -- is no longer lumped into an expansive parenthetical definition of "documents" under the heading of "other data compilations," but instead placed alongside documents in a three-item list. This change was not haphazard, stylistic, or unintentional. <u>See</u> Fed. R. Civ. P. 34 advisory committee's notes.

Lawyers and judges interpreted the term "documents" to include electronically stored information because it was obviously improper to allow a party to evade discovery obligations on the basis that the label had not kept pace with changes in information technology. But it has become increasingly difficult to say that all forms of electronically stored information, many dynamic in nature, fit within the traditional concept of a document.

Fed. R. Civ. P. 34 advisory committee's notes.

The production procedure in subsection (b) was also amended, retaining the "usual course of business or . . . organiz[ation] and label[ing]" requirement for "documents" in the newly styled (E)(i), and creating a new standard -- that ESI must be produced "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms" -- in the new (E)(ii). Fed. R. Civ. P. 34(b)(2)(E). These two provisions have widely been recognized as codifying the organization-versus-form distinction that earlier cases draw. "[T]he term 'form'

relates to the diverse types of electronically stored information such as file types ('.pdf') or various storage means. The comments do not refer to the term 'form' as encompassing the organization of all of a party's production." Suarez Corp. Indus. v. Earthwise Techs., Inc., 2008 WL 2811162, at *2 (W.D. Wash. July 17, 2008)(Bryan, J.). See Diesel Mach. Inc. v. Manitowoc Crane, Inc., No. 09-4087, 2011 WL 677458, at *3 (D.S.D. February 16, 2011)(Lange, J.).

Of course, just because not all ESI fits into the genus "documents," it does not follow that none of it does; a large portion of ESI, such as electronic mail transmissions or electronic memoranda, would seem to fit comfortably into the everyday definition of documents. Likewise, while textually and purposively the new (E)(ii) does not apply to hard copy documents -- (E)(ii) regulates the form of production, which for hard copy documents is always paper -- it is not obvious why the old requirements, now embodied in (E)(i), should not continue to apply to ESI. Put another way, it is reasonable to read (E)(i) and (E)(ii) as supplementary, rather than alternative, at least for those items that seem to be both documents and ESI. There is something to be gained from imposing basic organization requirements onto massive productions of ESI; artifacts of ESI can be jumbled beyond usefulness -- by dumping them out of their file directories and onto the requesting party -- just as easily as hard copy documents can.

The vast majority of courts have treated (E)(i) and (E)(ii) as supplementary rather than alternative, applying (E)(i)'s organized production requirement to ESI the same way they had before the 2006 amendments, and adding the (E)(ii) form requirement on top of the requirements of (E)(i).[7] See, e.g., Diesel Mach. Inc. v. Manitowoc Crane, Inc., 2011 WL 677458, at *3.

---

[7]While not directly in conflict, there is some tension between the Court's decision in Radian Asset Assur., Inc. v. College of Christian Bros. of N.M., 2010 WL 4928866, at *6 (D.N.M. Oct. 22, 2010)(Browning, J.)("Radian II"), and the interpretation of rule 34(b)(2)(E) that the Court adopts here. In Radian II, the Court assumed, without much analysis, that rule 34(b)(2)(E)(i) applies to ESI. See 2010 WL 4928866, at *6. In that case, the Court

(holding that ESI was not produced in the usual course of business and thus must be labeled to correspond to categories in the requests); SEC v. Collins & Aikman Corp., 256 F.R.D. at 413 (holding that ESI produced in the course of an investigation, "which is by its very nature not routine or repetitive, cannot fall within the scope of the usual course of business," and requiring the SEC to label their responsive ESI by category); MGP Ingredients, Inc. v. Mars, Inc., 2007 WL 3010343, at *3 (N.D.N.Y. Oct. 15, 2007)(Waxse, J.)(stating explicitly that (E)(i) controls the production of ESI). See also Mark S. Sidoti et al., Form and Manner of Production Under FRCP 34, 52 DRI For the Defense 61 (2010)("This section gives the producing party the option to produce documents (including, of course, ESI) as they are 'kept in the usual course of business'. . . .").

Portions of the advisory committee notes on the 2006 amendments support that interpretation. For example, the committee advises that "a Rule 34 request for production of

---

analyzed the production of ESI tape backups under (E)(i) before deciding the issue on other grounds. See 2010 WL 4928866, at *6. Radian Asset, the requesting party, argued that the defendant College could not produce its ESI as it was kept in the usual course of business as (E)(i) requires. See 2010 WL 4928866, at *6. The Court assumed, as did the parties in their arguments, that (E)(i) applies, and stated that it was unconvinced by Radian Asset's argument that, because the College transferred its ESI to a third party before subpoenaing it back, the College could not produce its records in the same way in which they were maintained before it transferred them. See 2010 WL 4928866, at *6. The Court stated: "Merely transferring material between parties, however, does not necessarily alter how it was kept." 2010 WL 4928866, at *6. The Court concluded: "Thus, the fact that the CSF ESI is stored, in part, on tape backups does not, without more, suggest that the ESI is not in the same state as it was 'kept in the usual course of business.'" 2010 WL 4928866, at *6 (quoting Fed. R. Civ. P. 34(b)(2)(E)(i)). The Court stated that rule 34 is a default rule, and that the Court can order the producing party to meet additional or alternative obligations. See 2010 WL 4928866, at *7. The Court stated: "Consequently, even if the CSF ESI was not kept on tape backups in the course of business, the Court may order that the tapes be produced." 2010 WL 4928866, at *7. The Court also required the College to produce affidavits or declarations stating that the ESI was kept in the usual course of business. See 2010 WL 4928866, at *9. Thus, while the Court does not have any reason to question what the Court did in Radian, it might have analyzed the result differently if it had been presented squarely with the issue in this case and done the analysis here.

documents should be understood to encompass, and the response should include, electronically stored information <u>unless discovery in the action has clearly distinguished between electronically stored information and documents</u>," reflecting the reality that items of ESI are routinely referred to as documents in common parlance -- and, before 2006, were included in the legal term of art. Fed. R. Civ. P. 34 advisory committee's notes (emphasis added).  Most confusingly of all, the term "documents" has a different definition in other rules:

> [T]he term used in Rule 34(a)(1) appears in a number of other amendments, such as those to Rules 26(a)(1), 26(b)(2), 26(b)(5)(B), 26(f), <u>34(b)</u>, 37(f), and 45. . . . References to documents appear in discovery rules <u>that are not amended</u>, including Rules 30(f), 36(a), and 37(c)(2). <u>These</u> references should be interpreted to include electronically stored information as circumstances warrant.

Fed R. Civ. P. 34 advisory committee's notes (emphases added).  Professor John K. Rabiej explains: "[T]he term documents usually includes ESI but only in discovery rules that [were] not amended [in 2006]. . . .  The limitation excludes Rule 34, which was amended."  John K. Rabiej, <u>Rabiej on Production of ESI</u>, Emerging Issues 2628, at *2 (July 29, 2008)(second and third alterations in original)(quotations omitted). He continues:

> [S]ubparagraph (E)(i) applies *only* to the production of hard-copy documents, while subparagraph (E)(ii) *exclusively* governs the production of ESI. . . .
>
> . . . .
>
> The drafters of the e-discovery amendments to Rule 34 recognized that the procedures in subparagraph (E)(i), which were written to apply to hard-copy documents, did not neatly fit ESI and had to be modified to apply to ESI.  In particular, though the procedures in subparagraph (E)(i) work well with paper documents, which generally can be produced in only one form, they are not as effective with ESI, which can exist in different forms.  Accordingly, the rulemakers crafted <u>alternative, mutually exclusive</u> procedures in subparagraph (E)(ii) that are designed to apply specifically to ESI, not to supplement the procedures in subparagraph (E)(i).
>
> . . . .

Though lawyers and judges have long interpreted "documents" to include ESI, Rule 34(a)(1)(A) and the accompanying Committee Note make clear that ESI is separate from and distinguishable from documents. . . . *ESI is not a subset of documents; it is a new category* in addition to documents.

Rabiej, supra at *1-2 (emphasis added)(citing Report of Advisory Committee on Civil Rules to Committee on Rules of Practice and Procedure, July 25, 2005, found in House Document 109-105, at 157-58 (2006)(memorializing that the Committee decided to recommend making "electronically stored information" separate from "documents"); See Richard L. Marcus, E-Discovery & Beyond: Toward a Brave New World or 1984?, 25 Rev. Litig. 633, 649 (2006)("Recognizing 'electronically stored information' as a separate object of discovery" and noting that "[t]reating [ESI] as one subcategory of documents . . . seems not to acknowledge its centrality, [while u]nder the revised rule, it may not be recognized as central, but it is at least recognized as co-equal to documents").

Professor Rabiej explains that there are "substantial practical differences between the two production procedures." Rabiej, supra at *2 (quoting Fed. R. Civ. P. 34). Namely, while (E)(i) document production gives the producing party the right to choose[8] whether to produce "in the

---

[8]There is some disagreement in the caselaw how absolute this right is -- i.e., whether a producing party that keeps its files jumbled in the usual course of its business has any further organization obligation. See, e.g., In re Sulfuric Acid Antitrust Litig., 231 F.R.D. 351, 362-63 (N.D. Ill. 2006)(Cole, M.J.); National Jewish Health v. WebMD Health Servs. Grp., Inc., 305 F.R.D. 247, 255 (D. Colo. 2014)(Daniel, J.). The producing party bears the burden of showing, however, by more than an unsupported representation to the Court, that the manner of production is the manner in which the documents are kept in the usual course of business. See Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. 535, 540-41 (D. Kan. 2006)(Waxse, M.J.).

On the one hand, a business has an incentive to keep documents organized in some fashion to maximize a company's day-to-day efficiency. Of course, documents are sometimes misfiled or misplaced in the usual course of business -- mistakes happen. On the other hand, some companies have no discernible filing system. Stacks of paper pile up throughout the office with little rhyme or reason.

With that backdrop, the Court looks to the rule's text, which states that documents must be produced "as they are kept in the usual course of business." Fed. R. Civ. P. 34(E)(i). It does not say the documents must be produced as they are kept in the usual course of a reasonable

usual course of business" or to "label . . . to correspond to the categories in the request," (E)(ii) puts the ball in the requesting party's court by first giving them the option to "specify a form for producing" ESI. Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii). It is only if the requesting party declines to specify a form that the producing party is offered a choice between producing in the form "in which it is ordinary maintained" -- native format -- or "in a reasonably useful form or for" Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii). A second major difference is that, while (E)(ii)'s ordinary form option is a good match to (E)(i)'s usual course of business option -- in that both allow the producing party to minimize production costs by simply turning over what he has, as is -- (E)(ii)'s "reasonably useful form" option seems to fall far short of (E)(i)'s labeling option in terms of its immediate usefulness to the requesting party. Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii). Both Professor Rabiej and the advisory committee notes imply that, if ESI is produced in a non-text searchable format -- or at least if it cannot be readily converted to a text-searchable format -- it most likely is not "reasonably usable." Cf. Fed. R. Civ. P. 34 advisory committee's notes ("If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature."); Rabiej, supra, at *3 ("Determining whether production of ESI in a form other than in its native file format represents a 'reasonably usable form' will depend on the circumstances of each case. . . . [E]lectronic .tiff images are not word text-

---

business or of an optimally efficient business. The Court concludes that, if the producing party represents through an affidavit that the jumbled documents were produced as they are kept in the usual course of business, rule 34 is satisfied. This ruling does not offend rule 34's primary purpose, which, as noted above, is to dissuade parties from purposefully shuffling relevant documents into the proverbial ten-thousand-card deck. If there is no intent to jumble, the rule's purpose is not thwarted.

searchable, [but] . . . can be converted to word text-searchable images using an Optical Character Recognition software program.").

<h3 style="text-align:center">ANALYSIS</h3>

The Court will grant both the Plaintiffs' request for a 30(b)(6) deposition and the Defendants' request that the Plaintiffs give the Defendants discovery at least seventy-two hours before their scheduled depositions. The Court is inclined to enforce discovery agreements. See, e.g., Landry v. Swire Oilfield Servs., LLC, 323 F.R.D. 360, 400 (D.N.M. 2018)(Browning, J.). Here, the parties agreed to each other's requests, so the Court will enforce those agreements. The Court will not, however, impose time, place, and manner restrictions on the Defendants' fact-witness interviews, because the interviews are already finished, and because the Plaintiffs' requested restrictions are not adequately tailored to the harms alleged.

**I.      THE COURT WILL ENFORCE THE PARTIES' AGREEMENT, ALLOWING THE PLAINTIFFS ONE, THREE-HOUR 30(b)(6) DEPOSITION TO INQUIRE INTO THE DEFENDANTS' DISCOVERY METHODOLOGY.**

As a result of a predictive-coding issue, the Defendants did not produce all relevant, non-privileged discovery. See April 13 Letter at 1. Consequently, the Plaintiffs request one, three-hour 30(b)(6) deposition "to find out what happened" and to uncover "whether the fix is good enough" to remedy the error. Tr. at 10:19-20 (Schultz). The Defendants agreed to such a deposition. See Tr. at 17:23-25 (Court, Monde). The Court will enforce the discovery agreement between the two parties. See Landry v. Swire Oilfield Servs., L.L.C., 323 F.R.D. at 400 ("The Court . . . will not upset an agreement between the two parties."); Federal Deposit Insurance Corp. v. LSI Appraisal LLC, 2014 WL 12561102, at *3 (C.D. Cal. July 21, 2014)(Carter, J.)("[P]rivate agreements should be considered and honored by the courts."); U-Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd., 2013 WL 1249702, at *3 (D. Nev. March

26, 2013)(Hoffman, M.J.)(enforcing a stipulation to an additional deposition); <u>Evans v. VonFeldt</u>

<u>Realtors, Inc.</u>, 1989 WL 31398, at *1 (D. Kan. March 30, 1989)(Crow, J.)("Obviously, other

discovery is allowed upon the parties' own agreement.").[9]  <u>See also</u> <u>Milazza v. KG Enterprises,</u>

<u>Inc.</u>, 1999 WL 1327394, at *2 ("If parties did not resolve most discovery matters by consent and

stipulation the court would be inundated with discovery motions.").  Rule 29 also allows such an

agreed-to deposition to occur without the Court's authorization:

> Unless the court orders otherwise, the parties may stipulate that:
>
> (a)     a deposition may be taken before any person, at any time or place,
>          on any notice, and in the manner specific -- in which event it may
>          be used in the same way as any other deposition.

Fed. R. Civ. P. 29(a).  The Court is not "order[ing] otherwise," so the parties may agree to this

deposition. Fed. R. Civ. P. 29.  <u>See</u> <u>U-Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd.</u>, 2013

WL 1249702, at * 3 ("Any argument suggesting that parties cannot stipulate to depositions in

excess of ten (10) via a stipulation to extend discovery is misplaced.").  Finally, in the Court's

Case Management Order, the Court indicated that "[a]dditional depositions" would be allowed

"by agreement of the parties."  Case Management Order No. 2 § 4(D), at 6, filed June 17, 2016

(Doc. 37).  Accordingly, the Court will enforce the agreement between the two parties, allowing

the Plaintiffs one, three-hour rule 30(b)(6) deposition.

---

[9]The rationale underlying this principle is simple: if the parties could not rely on courts to enforce discovery agreements, there would be little incentive for parties to make them.  <u>See</u> <u>Milazzo v. KG Enterprises, Inc.</u>, 1999 WL 1327394, at *2 (D.N.H. Feb. 16, 1999)(Muirhead, M.J.).  <u>See also</u> <u>Angell v. Shawmut Bank Connecticut Nat. Ass'n</u>, 153 F.R.D. 585, 590 (M.D.N.C. 1994)(Eliason, M.J.)("Private agreements save time and expense for the parties and valuable court time as well.").

## II. THE COURT WILL ENFORCE THE PARTIES' AGREEMENT THAT THE PLAINTIFFS PRODUCE THEIR RESPONSES TO THE DEFENDANTS' WRITTEN DISCOVERY REQUESTS BEFORE THE DEPOSITIONS OF PLAINTIFFS' WITNESSES.

The Defendants ask the Plaintiffs to deliver responses to the Defendants' written discovery requests at least seventy-two hours before the depositions of the Plaintiffs' witnesses, so that the Defendants may "make meaningful use" of the responses at the depositions. Tr. at 18:23-19:5 (Monde)("[T]hat works to the benefit of both sides, because it would eliminate any potential need to reopen the deposition because of late-received materials."). See Tr. at 15:16-24 (Monde). The Plaintiffs agreed to "do our best to get these materials over to Mr. Monde at least 72 hours before each Plaintiffs' deposition." Tr. at 19:15-17 (Haberman). As explored above, the Court will enforce discovery agreements between parties. See supra, § 1. Again, rule 29 allows the parties to make such agreements. See Fed. R. Civ. P. 29(b). See also Fed. R. Civ. P. 33(b)(2) ("A shorter or longer time [to respond to interrogatories] may be stipulated to under Rule 29."); Fed. R. Civ. P. 34(b)(2)(A) ("A shorter or longer time [to respond to requests for production] may be stipulated to under Rule 29.").

The Court notes that the Plaintiffs' statement that they will "do our best" to meet the Defendants' requested deadline is not an ironclad commitment to meet the requested seventy-two hour deadline. Tr. at 19:15-17 (Haberman). Nevertheless, based on the parties' history of good-faith collaborative attempts to resolve discovery issues, the Court does not sense any gamesmanship. See Tr. at 14:16-18 (Monde); id. at 15:23-16:5 (Monde); id. at 19:12-15 (Haberman). Based on the language and that good-faith history, the Court concludes that there is an agreement that the Plaintiffs would deliver their responses to the Defendants' written discovery requests before the depositions such that the Defendants could use the Plaintiffs' responses during depositions. The Court will enforce that agreement.

Even if there were not an agreement, however, the Court could extend or shorten deadlines on. See United States v. Board of County Comm'rs of County of Dona Ana, 2010 WL 520281, at *2 (D.N.M. 2010)(Browning, J.)(extending requests for production and interrogatory deadlines by one day). Rule 34 states: "The party to whom the request [for production] is directed must respond in writing within 30 days. . . . A shorter or longer time may be stipulated to under Rule 29 or be ordered by the court." Fed. R. Civ. P. 34(b)(2)(A). Similarly, rule 33 states: "The responding party must serve its answers and any objections within 30 days after being served with interrogatories. A shorter or longer time may be stipulated to under Rule 29 or be ordered by the Court." Fed. R. Civ. P. 33(b)(2).

The Plaintiffs acknowledge that the Defendants' request is a reasonable one. See Tr. at 19:8-9 (Schultz)("Well, I will say Mr. Haberman is in charge of that, but it certainly sounds reasonable to me."); id. at 19:12-13 (Haberman)("Mr. Monde's request seems reasonable."). The Defendants also argue that such a seventy-two hour deadline helps both parties, "because it would eliminate any potential need to reopen" discovery to account for "late-received materials." Tr. at 19:4-5 (Monde). Based on the Plaintiffs' acknowledgement that the Defendants' request is reasonable and based on the possibility that further delay might result if the Defendants' request is not honored, the Court concludes that granting the Defendants' request would be appropriate even if the Plaintiffs did not agree to the request.. The Plaintiffs must make a good-faith attempt to produce responses to the Defendants' written discovery requests at least seventy-two hours in advance of the depositions of the Plaintiffs' witnesses.

III.     **THE COURT WILL NOT ORDER THE DEFENDANTS TO ADHERE TO ANY FACT-WITNESS INTERVIEW PROCEDURES.**

The Plaintiffs request that the Court "establish parameters" to which the Defendants must adhere when interviewing fact witnesses.[10]  See April 23 Letter at 2.  Specifically, they ask the Court to order the Defendants' investigators to: (i) provide the interviewee with a business card; (ii) advise the interviewee who the investigator represents; (iii) present a notice to the witness that says "I was advised that the person who interviewed me on this date represents one or more tobacco companies that are defendants in the matter referenced above"; and, (iv) should the interviewee decline to be interviewed, require the interviewer to record that the interviewee declined the interview.  April 23 Letter at 2.  The Plaintiffs also request that the Court enter time, place, and manner restrictions on interviews, but they do not specify how they would want the interviews to be restricted.  See April 23 Letter at 2.  The Plaintiffs' requests stem from reports of acts purportedly "border[ing] on harassment" in the form of "knocking on doors at night, well-past the close of business," and "linger[ing] outside homes."  April 23 Letter at 2.

The Plaintiffs do not identify the power that the Court can invoke to establish the requested procedures.  The Court, moreover, could not independently identify such an authority in the Federal Rules of Civil Procedure.[11]  Admittedly, the Court has some inherent power to

---

[10]The parties do not use the term fact witnesses, but the Court refers to them as fact witnesses, because the Plaintiffs' describe them as "Plaintiffs' family members, old schoolmates, and business acquaintances to ask about Plaintiffs' background and smoking history."  April 23 Letter at 2.

[11]Although there may not be a specific rule granting the Court the power to limit interview procedures, the Court notes that the New Mexico Rules of Professional Conduct require that, when communicating

> on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the

control and manage discovery, see, e.g., Barnhill v. Boilermakers Nat. Health and Welfare Fund, 2011 WL 5396064, at *2 (D. Kan. Nov. 8, 2011)(Rushfelt, M.J.), but the Supreme Court of the United States of America has warned that such inherent powers "must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority," Degen v. United States, 517 U.S. 820, 823 (1996). The Court is particularly wary here of crafting interview procedures, because the Defendants are already taking some of the steps that the Plaintiffs have requested. Specifically, the Defendants' investigators are already "present[ing] to each potential witness a business card stating that the investigator works on behalf of Santa Fe Natural Tobacco company" and, according to the Defendants, that information is "reinforced at the outset of each encounter." June Letter at 4. Without any assertion or evidence of investigators failing to properly inform fact witnesses of whom they represent, the Court declines to exercise its inherent power to order the Defendants to issue notices before each interview. Given the Defendants' representations, the requested notice is unnecessary and possibly cumbersome paperwork.

Regarding the purported acts "border[ing] on harassment," April 23 Letter at 2, the Court will not, at this time, order time, place, and manner restrictions. First, such an order may be unnecessary; the Defendants represent that their interviews are complete, unless depositions reveal additional fact witnesses, see June Letter at 4, and the Plaintiffs did not raise this issue at

lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

N. M. R. Prof'l Cond. 16-403. See D.N.M.L.R.-Civ. 83.9 (stating that the New Mexico Rules of Professional Conduct apply to attorneys practicing in the United States District Court for the District of New Mexico). Moreover, lawyers who retain investigators must "make reasonable efforts to ensure" that their investigators' conduct is "compatible with the professional obligations of the lawyer." N. M. R. Prof'l Cond. 16-503(A)-(B).

all at the Status Conference, only in the pre-conference letter.  Second, a time, place, and manner order is an intrusive command, given that the Court would be invoking its inherent authority. For context, a deposition has flexible time restrictions.  An attorney may question a witness for "one day of 7 hours," and a court must "allow additional time" if more time is "needed to fairly examine the deponent."  Fed. R. Civ. P. 30(d)(1).  To be sure, depositions usually take place during business hours, and, based on the Plaintiffs' representations, the Court's best guess is that the Plaintiffs seek an order limiting these fact witness interviews to business hours.  "[K]nocking on doors at night" without forewarning may be impolite in modern America, but the Court also recognizes that, unlike a witnesses' availability for a formal deposition, some witnesses may be available for informal interviews only at night, after business hours.  Moreover, investigators looking into a fact witness may not have that witness' telephone number or email address to set up an interview time beforehand.  Equipped only with an address, those investigators may be forced to knock on doors at night when people are more likely to be home; during business hours most people are, understandably, at work.  Without additional facts, the Court will not hamstring the Defendants' investigators by imposing time or manner restrictions.  See April 23 Letter at 2.

The Court also concludes that it will not, at this time, impose restriction on where the investigators can conduct interviews.  In the deposition context, Courts may impose place restrictions, but typically only when the requesting party demonstrates an "undue burden or expense."  Begay v. United States, 2018 WL 443325, at *2 (D.N.M. Jan. 15, 2018)(Browning, J.).  The Plaintiffs have made no such showing here.  Moreover, it is unclear what restrictions the Plaintiffs seek.  When a deponent seeks a restriction on where a deposition may be held, he or she usually requests that the deposition be held at his or her residence or workplace.  See Begay v. United States, 2018 WL 443325, at *2.  Here, the interviews are

already being held at these witnesses' homes.  <u>See</u> April 23 Letter at 2.  Accordingly, the Court will not impose a place restriction.

While the Plaintiffs raise this issue in the letters, they did not raise it at the status conference.  The Plaintiffs' failure to discuss the issue at the status conference suggests that the investigation procedures are not a major problem.  Nevertheless, if the Plaintiffs still want relief, they are free to file a motion with a more robust accounting of what they perceive the problem to be.

**IT IS ORDERED** that: (i) the Plaintiffs' oral request for a 30(b)(6) deposition, is granted; (ii) the Defendants' oral request for responses to their written discovery requests seventy-two hours before depositions of the Plaintiffs' witnesses, is granted; and (iii) the Plaintiffs' request in the Letter from Jonathan R. Gdanski to the Court at 2 (dated April 23, 2018), filed July 24, 2018 (Doc. 198), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

> *Attorneys for Plaintiffs Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Justin Sproule, Rudolph Miller, Joshua Horne, Albert Lopez, Charlene Blevins, Jason Cole, and Rachel King*

Scott P. Schlesinger
Jonathan Gdanski
Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

> *Attorneys for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Michael Robert Reese
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich, LLC
Albuquerque, New Mexico

--and--

Melissa Weiner
Pearson, Simon & Warshaw, LLP
Minneapolis, Minnesota

--and--

Charles D Moore
Halunen Law
Minneapolis, Minnesota

       *Attorneys for Plaintiff Anthony Dunn*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Reed C. Bienvenu
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

> *Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, and Nick Vadis*

Charles S. Zimmerman
Zimmerman Reed
Scottsdale, Arizona

--and--

Caleb Marker
Zimmerman Reed
Manhattan Beach, California
--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

--and--

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

> *Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Charles S. Zimmerman
Zimmerman Reed
Scottsdale, Arizona

--and--

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

> *Attorneys for Plaintiffs Jacques-Rene Herbert, Sara Benson, Carol Murphy, Francisco Chavez, Abigail Emmons, and Joshua Horne*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

--and--

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

> *Attorneys for Theodore Rothman*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

> *Attorneys for Danae Grandison, Michael Laboon, and Dave Moyer*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

--and--

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

     *Attorneys for Plaintiff Russell Brattain*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Daniel L. Warshaw
Alexander R. Safyan
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

     *Attorneys for Plaintiff Shannon White*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

     *Attorneys for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

John Allen Yanchunis, Sr.
Marisa Kendra Glassman
Morgan & Morgan, PA
Tampa, Florida

--and--

Scott W. Weinstein
Morgan & Morgan, PA
Fort Myers, Florida

--and--

Keith R. Mitnik
Morgan & Morgan, PA
Orlando, Florida

> *Attorneys for Plaintiff Ashley Waldo*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

> *Attorneys for Plaintiff Timothy Ruggiero*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Island

     *Attorneys for Plaintiff Desire Gudmundson*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Matthew David Schultz
Levin Papantonio Thomas  P.A.
Pensacola, Florida

     *Attorney for Plaintiff Scott Johnston*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, P.A.
Albuquerque, New Mexico

--and--

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

     *Attorneys for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Peter J. Biersteker
William D Coglianese
Jon Gregory Heintz
Jordan Von Bokern
Washington, DC
Jones Day

--and--

David B. Alden
Joseph R Coburn
Cleveland, Ohio
Jones Day

--and--

David M. Monde
Michael Fraser Stoer
Jennifer Bunting-Graden
Atlanta, Georgia
Jones Day

--and--

Paul Courtney Huck, Jr.
Miami, Florida
Jones Day

--and--

Sharyl Reisman
Mark R. Seiden
Charles R. A. Morse
New York, New York
Jones Day

--and--

David Craig Kiernan
San Francisco, California
Jones Day

--and--

Troy A. Fuhrman
Tampa Florida
Jones Day

  *Attorneys for the Defendants*