# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

No. MD 16-2695 JB/LF

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██ ███ ███ █████ ██ ████ █ ██ █ ███ █

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[1]On January 15, 2018, the Court issued an Ex Parte Memorandum Opinion and Order, filed January 15, 2018 (Doc. 157)("Ex Parte MOO"). In it, the Court requested the Plaintiffs to propose redactions, if any were necessary to protect confidential information. <u>See</u> Ex Parte MOO at 1, n.1. The Plaintiffs moved the Court to seal the Ex Parte MOO, but, if the Court was not inclined to seal the Ex Parte MOO, they proposed redactions. <u>See</u> Motion to Seal Documents at 1-2, filed January 25, 2018 (Doc. 161)("Motion to Seal"). The Court granted in part and denied in part the Motion to Seal, ruling that it would make public a redacted version of the Ex Parte MOO. <u>See</u> Order to Seal Certain Documents at 1, filed February 14, 2018 (Doc. 173). This Memorandum Opinion and Order is the redacted version of the Ex Parte MOO.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

**FACTUAL BACKGROUND**

The Court briefly summarizes the factual background for context. A more thorough discussion may be found in its Memorandum Opinion and Order at 4-9, 2017 WL 6550897, at *2-4, filed December 21, 2017 (Doc. 146)("MOO"). The Plaintiffs are a group of consumers who have purchased Natural American Spirit cigarettes. See Consolidated Complaint ¶¶ 12-23, at 4-11, filed January 12, 2017, (Doc. 82)("Complaint"). They contend that they bought those cigarettes at a price premium, because advertisements and branding described the cigarettes as "natural," "Additive-Free," and "organic," which led them to erroneously believe that Natural American cigarettes are safer and healthier than other cigarette brands. Complaint ¶¶ 4-6, at 2. See id. ¶¶ 12-23, at 4-11. The Plaintiffs also allege that the "Additive-Free" branding led them to incorrectly think that the Natural American menthol-variety cigarettes are additive free.[2] Complaint ¶ 10, at 3. See id. at 12-23, at 3-11.

**PROCEDURAL BACKGROUND**

The Plaintiffs brought suit in several jurisdictions alleging a variety of consumer protection and common-law claims premised on unlawful deception. See In re Santa Fe Nat.

---

[2]Menthol is a cigarette additive. See Complaint ¶ 10, at 3; MOO, at 173 n.49, 2017 WL 6550897, at *78 n.49 ("Menthol is an organic molecule derived from mint.").

Tobacco Co. Mktg. & Sales Practices Litig., 178 F. Supp. 3d 1377, 1378 (U.S. Jud. Pan. Mult. Lit. 2016)("Transfer Order"). One Plaintiff moved for multidistrict litigation centralization under 28 U.S.C. § 1407. See Transfer Order, 178 F. Supp. 3d at 1378. The Judicial Panel on Multidistrict Litigation concluded that the actions presented "involve common questions of fact, and that centralization will serve the convenience of the parties," and ordered consolidation. Transfer Order, 178 F. Supp. 3d at 1378-79.

On May 20, 2016, the Plaintiffs submitted Plaintiffs' Joint Application for Appointment of Plaintiffs' Leadership Structure and Incorporated Memorandum of Law, filed May 20, 2016 (Doc. 15)("Plaintiffs' Leadership Petition"), requesting that the Court appoint Mr. Schlesinger, Mr. Yanchunis, and Ms. Weiner[3] co-lead counsel. See Plaintiffs' Leadership Petition at 2-3. The Plaintiffs represented to the Court that the co-lead counsel arrangement was best able to represent the proposed classes' interest for four reasons. See Plaintiffs' Leadership Petition at 4-7. First, all of the Plaintiffs' counsel agreed to the leadership structure, so, according to the Plaintiffs, the Court is obliged to approve the structure "based on the concept of 'private ordering.'" Plaintiffs' Leadership Petition at 4 (quoting Manual for Complex Litigation § 21.11 (4th ed. 2004)). Second, they contend that the proposed co-lead counsel are eminently qualified in both tobacco litigation and consumer protection litigation -- both relevant practice areas for this lawsuit. See Plaintiffs' Leadership Petition at 5-11. Third, the Plaintiffs' counsel represent that they can work cooperatively together. See Plaintiffs' Leadership Petition at 6. Finally, they argue that the leadership structure will preserve class resources by eliminating duplicative work. See Plaintiffs' Leadership Petition at 7.

The Court subsequently held a hearing on May 24, 2016. See Transcript of Scheduling

---

[3]Ms. Weiner was known as Ms. Wolchansky at the time. She has since changed her last name.

Conference, taken May 24, 2016, filed June 1, 2016 (Doc. 34)("May Tr."). Mr. Yanchunis began by noting that the Court had asked the Plaintiffs to propose a leadership structure for this complex case, and, after meeting in person, the Plaintiffs' counsel had agreed to a "consensus structure" that combined the talent and experience of tobacco litigation lawyers and consumer class-action lawyers. May Tr. at 26:8-22 (Yanchunis). Accordingly, the Plaintiffs had chosen Mr. Schlesinger, Mr. Yanchunis, and Ms. Weiner as co-lead counsel; Mr. Schlesinger brought tobacco litigation experience, and Mr. Yanchunis and Ms. Weiner brought to bear their consumer class-action acumen. See May Tr. at 26:24-25 (Yanchunis); Plaintiffs Leadership Petition at 7-11. Mr. Yanchunis then explained that their leadership agreement had methodically mapped out each firm's responsibilities to match that firm's experience in order to conserve class resources. See May Tr. at 28:4-16 (Yanchunis). For example, the Plaintiffs had divided up "client vetting, research trial experts, [and] discovery" between the firms "so that there's not overlapping of work." May Tr. at 28:8-11 (Yanchunis).

The Court expressed some concern with appointing co-lead counsel. See May Tr. at 29:7-8 (Court). It asked Mr. Yanchunis whether he had ever had a case with that number of co-leads. See May Tr. at 29:7-8 (Court). Mr. Yanchunis had worked with co-leads before see May Tr. at 29:9-14 (Yanchunis) and noted that, although he had never worked with or Mr. Schlesinger or Ms. Weiner before this case, "in our time up until now, I can work with [both of them]," May Tr. at 30:13-14 (Yanchunis). The Court asked whether there was any downside to three co-leads, as opposed to just one lead, and Mr. Yanchunis said he could think of none. See May Tr. at 29:21-23 (Court, Yanchunis). He added that, in terms of billing, "on the plaintiffs' side of a class case, we work not based upon the hour," but upon the result; "[w]e do not get paid for our labor unless we are successful." May Tr. at 42:22-25 (Yanchunis).

Mr. Schlesinger agreed with Mr. Yanchunis' representations. <u>See</u> May Tr. at 43:18-19 (Schlesinger). He noted that he "really encouraged those that came from the consumer class action side to join." May Tr. at 44:3-4. Mr. Schlesinger reasoned that tobacco companies' defense counsels typically have tremendous manpower at their disposal, and he thought that his tobacco-litigation firm could better match the Defendants' wealth of resources by joining forces with consumer class-action firms. <u>See</u> May Tr. at 44: 5-14 (Schlesinger). He concluded that "I don't see any reason why myself, John, and Melissa would ever disagree and put out separate ideas about how to proceed." May Tr. at 44:20-22 (Schlesinger).

The Defendants took no official position on the leadership structure, but conveyed concern that co-lead counsel would produce inefficiencies by duplicating efforts. <u>See</u> May Tr. at 32:23-33:3 (Monde). The Defendants noted, however, that it had not been difficult so far to negotiate with three co-lead Plaintiffs' counsel. <u>See</u> May Tr. at 33:23-24 (Monde). The Court subsequently granted the Plaintiffs' Leadership Petition and appointed Mr. Schlesinger, Mr. Yanchunis, and Ms. Weiner co-lead counsel. <u>See</u> Order Granting Joint Application for Appointment of Plaintiffs' Leadership Structure at 1, filed May 24, 2017 (Doc. 24) )("Leadership Order"); May Tr. at 45:5-8 (Court).

On May 1, 2017, the parties jointly moved to continue the Defendants' Motion to Dismiss hearing, set for May 12, 2018. <u>See</u> Joint Motion to Continue and Extend Briefing Deadline at 1, filed May 1, 2017 (Doc. 100)("Joint Motion"). Although not contained in the Joint Motion, ███████████████████████████████████ <u>See</u> Notice Regarding Motion to Continue Hearing and Extend Briefing Deadline at 1, filed May 2, 2017 (Doc. 21)("Joint Motion Response"); ████████████████████████████

████████████████████████████████████████████

The following day, Mr. Schlesinger filed a Joint Motion Response to notify the Court that, although his electronic signature appeared on the Joint Motion, he had not authorized it.  <u>See</u> Joint Motion at 1.  He also notified the Court that he did not agree to continue the Motion to Dismiss hearing to allow for ███████████████████████████████████████ ████████████████████████████  <u>See</u> Joint Motion at 1.



---

[4]The Court ordered regular status conferences be held every sixty days. <u>See</u> Case Management Order No. 2, filed June 17, 2016 (Doc. 37).

[5]The Court will discuss those arguments in greater detail in a forthcoming Memorandum Opinion and Order on the

[6]Mr. Monde is an attorney for the Defendants.

- 7 -

1.    **The Motion**.

Mr. Schlesinger subsequently filed the Motion, ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████ █ ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ █ █████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

    ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████
_____

██ █████████████████████████████████████████████████████████
████████████

██ ██████████████████████████████████████████████████████████
███



2.    **<u>The Response</u>**.









**3.    The Hearing.**[10]

---

[11]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.









### 4.    The Motion to Withdraw.

After the hearing on the Motion, Mr. Yanchunis moved to withdraw as "Counsel for Plaintiffs and the Class in this action pursuant to Local Rule 9010-2(c)."  Motion to Withdraw as Counsel at 1, filed January 3, 2017 (Doc. 148)("Motion to Withdraw").  He also states that he seeks to withdraw as co-lead counsel and from any pending motions seeking relief from the Court.  See Motion to Withdraw at 1.  He concludes that a number of lawyers and their firms will continue to represent the Plaintiffs.  See Motion to Withdraw at 1.

### LAW REGARDING CLASS-ACTION COUNSEL

"Class counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).  The adequacy-of-counsel analysis was traditionally conducted under rule 23(a)(4), but, since the 2003 amendments, that analysis has "now been moved entirely to

rule 23(g)."  Anderson Living Trust v. WPX Energy Production, LLC, 306 F.R.D. 312, 383

(D.N.M. 2015)(Browning, J.).  See Sheinberg v. Sorensen, 606 F.3d 130, 132 (3d Cir. 2010).

The advisory committee's notes clarify:

> The rule thus establishes the obligation of class counsel, an obligation that may be
> different from the customary obligations of counsel to individual clients.
> Appointment as class counsel means that the primary obligation of counsel is to
> the class rather than to any individual members of it.  The class representatives do
> not have an unfettered right to fire class counsel.  In the same vein, the class
> representatives cannot command class counsel to accept or reject a settlement
> proposal.  To the contrary, class counsel must determine whether seeking the
> court's approval of a settlement would be in the best interests of the class as a
> whole.

Fed. R. Civ. P. 23 advisory committee's note to the 1998 amendments.  Professor William B.

Rubenstein of Harvard Law School explains that "class counsel, once appointed, is now the

paramount representative of the class, not the class representatives."  1 William B. Rubenstein,

Newberg on Class Actions § 3:82, at 430 (5th ed. 2012).  "The Advisory Committee note

implies, quite strongly, that it is class counsel who speaks for the class, not the class

representatives."  Rubenstein, supra, at 430-31.  Rule 23 makes clear that it is the court's

responsibility, and not the class representatives', to monitor class counsel's performance.  See

Rubenstein, supra, at 431 ("The Advisory Committee note essentially acknowledges that Rule

23(g) is aimed at responding to the fiction inherent in the conventional pretense that the class

representative monitored class counsel.  Rule 23(g) shifts this counsel-monitoring function from

the class representatives to the court. . . .");  Fed R. Civ. P. 23(g)(1)-(h)(4)(endowing the court

with the responsibility to oversee class counsel's fees and nontaxable costs, and to determine

whether class counsel can fairly and adequately represent the class' interests).

Class counsel's duty to "fairly and adequately protect the interest of the class," requires

class counsel to avoid a conflict of interest with the class.  Fed. R. Civ. P. 23(a).  The United

States Court of Appeals for the Tenth Circuit has held that avoiding a conflict of interest with the class is essential for class counsel to remain legally adequate: "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Rutter & Willbanks, Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002)(citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)). In Rutter & Willbanks, Corp. v. Shell Oil Co., the Tenth Circuit determined that a conflict of interest did not exist when class counsel represented a class that was divided into multiple subgroups for distribution of a settlement. See 314 F.3d at 1188. The settlement's objectors argued that class counsel was conflicted, because it represented each of the subgroups collectively, but the subgroups had conflicting interests. See 314 F.3d at 1188. The Tenth Circuit explained that, to the extent the different subgroups interests' were in conflict, the conflict would motivate class counsel only to seek the largest overall award so that all of its clients could be adequately compensated. See 314 F.3d at 1188. Additionally, in In re Integra Realty Res., Inc., 262 F.3d 1089 (10th Cir. 2001), the Tenth Circuit determined that class counsel's receipt of attorneys' fees in a settlement agreement does not place class counsel's interests regarding the settlement in conflict with the class, and thus providing attorneys' fees does not render class counsel's representation inadequate. See 262 F.3d at 1112.

On the other hand, the Tenth Circuit has concluded that class representatives were in conflict with a class when they demanded a fifteen-percent consultant's fee for their services as representatives. See Carpenter v. Boeing, Co., 456 F.3d 1183, 1204 (10th Cir. 2006)("Carpenter"). In Carpenter, the class representatives publicly stated that they were privy

to "privileged conversations with class counsel," which the district court found "strengthened its initial conclusion that they put their own interests above those of the class." 456 F.3d at 1204. Accordingly, the Tenth Circuit affirmed the district court's removal of the class representatives, concluding that they "would not 'fairly and adequately protect the interests of the class' as required by Rule 23(a)(4)". <u>See</u> 456 F.3d at 1204 (quoting Fed. R. Civ. P. 23(a)(4)).

Professors Charles Alan Wright and Arthur Miller advise that, "[w]hen the court reviews the quality of the representation under Rule 23(a)(4), . . . it will consider the quality and experience of the attorneys for the class." 7A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1769.1, at 443 (4th Ed. 2010). <u>See</u> <u>Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions</u>, Duke Law Center for Judicial Studies at 48 (2018)(forthcoming)("<u>2018 Amendment Guidelines</u>")("[W]hen one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)."); Fed. R. Civ. P. 23(g)(1)-(4). "[T]he class attorney must be qualified, experienced and generally able to conduct the proposed litigation. In sum, the lawyer must be willing and able to vigorously prosecute the action." Wright and Miller, <u>supra</u> § 1769.1, at 444. "The competence of counsel may be shown by the quality of the briefs, as well as the arguments presented by the attorneys during the early stages of the case." Wright and Miller, <u>supra</u> § 1769.1, 445-47. "[M]ere allegations that the class attorney is inexperienced or incompetent will not suffice to demonstrate inadequacy if other evidence suggests that the attorney is competent." Wright and Miller, <u>supra</u> § 1769.1, at 453. "[A]ny conduct that suggests that class counsel may have been engaging in unethical behavior is relevant in determining the adequacy of the representation." Wright and Miller, <u>supra</u> § 1769.1, at 469.

Frequently in MDLs, more than one applicant seeks to be appointed class counsel. <u>See</u>

2018 Amendment Guidelines at 48-49.  See MDL Standards and Best Practices, Duke Law Center for Judicial Studies, at 29 (2014)("MDL Best Practices")("Depending on the size and complexity of the case, it may be appropriate to appoint more than one individual to serve as lead counsel.").  When that occurs, the Court must "appoint the applicant best able to represent the interests of the class."  Fed. R. Civ. P. 23(g)(2).  See 2018 Amendment Guidelines at 49.  The rule has been interpreted such that courts may appoint multiple lawyers and firms as class counsel under rule 23(g).  See 2018 Amendment Guidelines at 49.  "[C]ourts recognize that often the combined human and economic resources of multiple firms will be essential to assure effective and adequate representation of the class."  2018 Amendment Guidelines at 49.  "MDL transferee judges, who must appoint plaintiff leadership at the outset of the proceedings, have often adopted the Rule 23(g) factors as qualifications for leadership roles."  2018 Amendment Guidelines, at 51 (citing In re Oil Spill by the Oil Rig "Deepwater Horizon", MDL No. 2179 (E.D. La. March 5, 2012)(Doc. 5960)(Barbier, J.).  The benefit to adopting the rule 23(g) standards in an MDL is that "a Rule 23 appointment comes with a Rule text and an established jurisprudence that articulates and interprets the duties of class counsel vis-à-vis the court and the putative class."  2018 Amendment Guidelines at 53.  The appointment of interim class counsel under rule 23(g)(3) is particularly appropriate when multiple lawyers compete to represent the class.  See  2018 Amendment Guidelines at 49 n.30.  But see MDL Best Practices at 29 ("Appointing a committee to support lead counsel is usually more effective than staffing the litigation with numerous co-lead counsel, which can lead to delays in decision making and unnecessary duplication of effort.").  Interim appointment "[a]llows the transferee judge to utilize case management techniques, such as ordering the appointed plaintiffs' leadership group . . . to file a consolidated class action complaint."  2018 Amendment Guidelines at 49

n.30.

There has been general recognition in MDLs that "the ability to communicate and cooperate with others in the leadership structure, and with non-appointed attorneys" is vitally important. 2018 Amendment Guidelines at 62. To be sure, while "Interim Class Counsel appointed under Rule 23(g)(1) or (g)(3) are not fiduciaries toward other counsel (the duty of adequate representation, under Rule 23, runs to the class)," it is still vital for attorneys with leadership roles in MDLs to be collegial. 2018 Amendment Guidelines at 62. Courts have, thus, advised MDL lead counsels to "seek consensus . . . when making decisions that may have a critical impact on the litigation." 2018 Amendment Guidelines at 63.

"The transferee judge should also keep in mind that leadership needs may change over time." MDL Best Practices at 27. MDL Best Practices admonishes that "the transferee judge should not appoint more than three attorneys to serve as lead counsel in any matter, in light of the potential for inefficiencies and ineffective decision making." MDL Best Practices at 29. Best Practice 3C(iii) suggests that: "The Transferee judge should direct counsel to identify cases in which they have served in a similar leadership capacity, describe their experience in managing complex litigation and their knowledge of the subject matter, and provide information about the resources they have available to contribute to the litigation." MDL Best Practices at 36. It also suggests that the transferee judge consider what other "ongoing professional commitments" potential lead counsel might have that will compete for their attention. MDL Best Practices at 36. While the transferee judge should take into account the attorneys proposed leadership structure, "[c]ourts have a fundamental obligation to ensure that the proceedings will be fairly and efficiently conducted, regardless of the private arrangement among the parties." MDL Best Practices at 38-39. "The transferee judge should appoint lead counsel who have excellent

management skills." MDL Best Practices at 40. "Lead counsel should have prior experience in managing multidistrict and other complex litigation or have demonstrated sufficient skill and experience[] to manage a complex proceeding." MDL Best Practices at 41. "Multidistrict litigation requires consistent and dedicated oversight and management, and those serving in leadership roles must be able and willing to make the litigation a priority throughout the course of the proceedings." MDL Best Practices at 42.

"The transferee judge should not hesitate to reconstitute the leadership team if it becomes necessary." MDL Best Practices at 49. The Manual for Complex Litigation reiterates that point: "An attorney may be removed from a position as lead, liaison, or class counsel, or (in an extreme case) from further participation in the case entirely." Manual for Complex Litigation (Fourth) § 10.154, at 19 (2004)("Complex Litigation Manual"). It also notes that "such a [demotion or removal], however, may disrupt the litigation, may cause significant harm to the client's case and the reputation of the attorney or law firm, and can conflict with a party's right to counsel of its choosing." Complex Litigation Manual, supra, § 10.154, at 19. Before removing counsel, "the court should consider ordering that notice be given to the class under Rule 23(d)(2) to enable class members to express their views concerning their representation or to intervene in the action." Complex Litigation Manual, supra, § 10.154, at 19. "[S]ome courts have authorized discovery by the opposing party to determine whether class counsel's behavior satisfies ethical standards." Wright and Miller, supra, § 1769.1, at 469 (citing Stavrides v. Mellon Nat. Bank & Trust Co., 60 F.R.D. 634 (W.D. Pa. 1973)(McCune, J.). Other courts have allowed "limited discovery into fee arrangements." Wright and Miller, supra, § 1769.1, at 469-70 (citing Klein v. Henry S. Miller Residential Serv. Inc., 82 F.R.D. 6 (N.D. Tex. 1978)(Porter, J.)).

In assessing the adequacy of class counsel, the Court has previously concluded that

experience with the particular causes-of-action at issue is highly relevant to its adequacy-of-counsel analysis.  See Daye v. Community Financial Serv. Centers, LLC, 313 F.R.D. 147, 179 (D.N.M. 2016)(Browning, J.)("Daye").  For example, in Daye, the consumer plaintiffs brought Truth in Lending Act, 15 U.S.C. §§ 1601-67f ("TILA") and New Mexico Unfair Practice ("UPA") claims.  See Daye, 313 F.R.D. at 152.  The Court concluded that the plaintiffs' attorneys were adequate counsel -- even, perhaps, more-than-adequate counsel -- highlighting that "[t]hey have extensive experience litigating TILA and UPA cases, and in bringing class actions, including class actions under the TILA and the UPA."  Daye, 313 F.R.D. at 179.

## LAW REGARDING DISCOVERY

Rule 34 governs discovery requests for tangible objects and states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>
> > **(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
> >
> > **(B)** any designated tangible things; or
>
> **(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Discovery's proper scope is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ."  Fed. R. Civ. P. 26(b)(1).  The factors that bear upon proportionality are: "the importance of the issues at stake in

the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26 (b)(1).

Discovery's scope under rule 26 is broad. See Gomez v. Martin Marietta Corp., 50 F.3d at 1520; Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[15] "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, No. 11-1119, 2012 WL 3860744, at *1 (D.N.M. August 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. 00-7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of

---

[15]McGee v. Hayes is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that McGee v. Hayes, has persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

both plaintiff and defendant." <u>Gomez v. Martin Marietta Corp.</u>, 50 F.3d at 1520 (internal quotation marks omitted).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery and injected courts deeper into the discovery process. See <u>Simon v. Taylor</u>, No. 12-0096, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.). Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996). The 2000 amendments made the following changes, shown here with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant ~~to the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.</u> Relevant ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language. This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery. Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language. Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44–45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. *See Discovery and Disclosure Practice*, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about**

**organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. *See 8 Federal Practice & Procedure* § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. *Cf. Crawford-El v. Britton*, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis. The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to "add teeth" to the relevance standard instead of narrowing that standard. Fed. R. Civ. P. 26 advisory committee's notes. It is not surprising that the Supreme Court of the United States of America and Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial. Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings about the rules, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of

information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations and footnote omitted)(alteration in original).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing discovery's substantive scope and injecting courts further into the discovery process.  The 2015 amendment made notable deletions and additions, both of which emphasized the need to make discovery proportional to the needs of the case.  See Fed. R. Civ. P. 26(b)(1).  Rule 26(b)(1), provides :

> (1)    Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)~~ <u>and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.</u>

Fed. R. Civ. P. 26(b)(1)(alterations added).

The Committee Notes state that the first deletion does not make a substantive change. Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in standard discovery that including it would be "clutter." Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[16]

On the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[17] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery. As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery." The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision. . . ." The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments. It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable." Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise

---

[16]The Court regrets this deletion. Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language. The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents. The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in advisory notes' thicket. What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case. This deletion might incrementally increase unnecessary litigation rather than shorten it. Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[17]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades. If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this change is.

within the scope of discovery.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. The deletion, therefore, did not necessarily change discovery's scope, but clarified it. Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." State Farm Mutual Auto. Ins. Co. v. Fayda, No. 14-9792, 2015 WL 7871037, at *2 (S.D.N.Y. 2015)(Francis IV, M.J.)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept. Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality. See Fed. R. Civ. P. 26(b)(2)(C)(iii) (pre-2015 version). The proportionality requirement was relocated to 26(b)(1) to address the "explosion"[18] of information that "has been exacerbated by the advent of e-discovery."[19]   Fed. R. Civ. P. 26(b) advisory committee's note to 2015

---

[18]It is unclear to the Court whether the "explosion" of e-discovery has made discovery harder or easier. In many situations, algorithms and search engines have replaced associates and paralegals, and brought greater accuracy and efficiency to discovery. The days of searching warehouses of documents by looking at them one-by one have been a bigger burden then today's e-discovery.

[19]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs. Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins. Co., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. 11-0260, 2012 WL 592874, at *11–12 (D.N.M. 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended. It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already. It is also unclear what was wrong with the old goal of discovery of being largely self-executing. The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs, and rewrite these new sections to use the correct language. Older lawyers must be particularly

amendment. Describing how e-discovery is the driving factor in the 2015 amendment, the

Committee Notes state:

> The burden or expense of proposed discovery should be determined in a realistic way. This includes the burden or expense of producing electronically stored information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the

addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on

discovery through increased reliance on the common-sense concept of proportionality."[20]  Chief

---

alert to read and learn the new rules, read the comments, and understand the thrust of the drafting.  Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection. In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

[20] The Rules Enabling Act, 28 U.S.C. §§ 2071-2077, empowers the federal courts to prescribe rules for the conduct of their business. See 28 U.S.C. § 2071.  The Judicial Conference -- the policy making body of the federal judiciary -- has overall responsibility for formulating those rules.  See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/yearend/year-endreports.aspx ("2015 Year–End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration.  See 2015 Year-End Report, at 5-6.  Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee. Campbell and David Levi, Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments.  See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committeereports/advisory-committee-rules-

Justice John Roberts, 2015 Year–End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report").  He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need." 2015 Year-End Report at 7.  This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information."  State Farm Mutual Auto. Ins. Co. v. Fayda, 2015 WL 7871037, at *2 (internal quotation marks omitted).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  See Dao v. Liberty Life Assurance Co. of Boston, No. 14-4749, 2016 WL 796095, at *3 (N.D. Cal. February 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); Williams v. U.S. Envt'l Servs., LLC, No. 15-0168, 2016 WL

civil-procedure-may-2013. After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6.  Because Congress did not intervene by December 1, the new rules took effect. Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments.  See Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U. Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone, at 1, The New Mexico Trial Lawyer (Jan. /Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

617447, at *1 n.2 (M.D. La. February 16, 2016)(Bourgeois, M.J.). In general, "the parties' responsibilities [] remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense. Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment. See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope. Instead of being Aristotelian and trying to draft rules, the drafters largely opted to make federal judges Plato's enlightened guardians. They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors. They have dropped all discovery disputes into judges' laps. The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Rule 34 allows a party to serve requests to produce certain items "on any other party . . . in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1)(emphasis added). See Hickman v. Taylor, 329 U.S. at 504 (explaining that rule 34 "is limited to parties to the proceeding, thereby excluding their counsel or agents"). Applying this standard, courts have

found that corporations control documents in their subsidiaries' hands, clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands. See Simon v. Taylor, No. 12-0096, 2014 WL 6633917, at *35 (D.N.M. November 18, 2014)(Browning, J.)(citing United States v. Stein, 488 F. Supp. 2d 350, 360-62 (S.D.N.Y. 2007)(Kaplan, J.)); CSI Inv. Partners II, L.P. v. Cendant Corp., 2006 WL 617983, at *6 (S.D.N.Y. March 13, 2006)(Eaton, M.J.)(compelling a client's attorney to disclose documents in the attorney's possession regarding the attorney's representation of that particular client, but only insofar as the documents were relevant). An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control. See, e.g., Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue, 839 F.2d 131, 140-41 (3d Cir. 1988)(stating that where "agent-subsidiary can secure documents of the principal-parent to meet its own business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J. 1991)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control). Applying that standard, the Court, in Simon v. Taylor, determined that a racing commission had legal control over test samples from horses, because the commission "has the legal right to have those horses' samples tested upon demand." 2014 WL 6633917, at *35. In another case, the Court concluded that an oil company had control over the payroll records a third-party payroll company possessed, because the oil company had the practical ability to request that payroll company, which it contracted with, to produce those payroll records on demand. See Landry v. Swire Oilfield Serv. LLC, No. 16-0621, 2018 WL 279749, at *33 (D.N.M. January 3, 2018)(Browning, J.).

Courts have specifically considered whether clients control information in their attorneys'

hands.  Because a client has the right "to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control."  Am. Soc. For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.).  See Poppino v. Jones Store Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)("It is quite true that if an attorney for a party comes into possession of a document as attorney for that party his possession of the document is the possession of the party.")(emphasis in original).  Consequently, a party may be required to produce a document that it has given to its attorney when the document relates to the attorney's representation of that client on a specific matter.  See In re Ruppert, 309 F.2d 97, 98 (6th Cir. 1962)(per curiam); Hanson v. Garland S.S. Co., 34 F.R.D. 493, 495 (N.D. Ohio 1964)(Connell, J.)(concluding that witness statements taken by a party's attorney in preparation of the case were within the party's control and subject to production under rule 34 on a proper showing); Kane v. News Syndicate Co., 1 F.R.D. 738, 738-39 (S.D.N.Y. 1941)(Mandelbaum, J.)(determining that a plaintiff in an action for copyright infringement could require the defendants' attorneys to produce a document from which the plaintiff hoped to ascertain whether material had been obtained from his copyrighted works).

> The mere fact, however, that the attorney for a party has possession of a document does not make his possession of the document the possession of the party.  The paper may be one of his private papers which he had before the relation of attorney and client was established.  It is inconceivable that he should be required to produce such a paper for the inspection of his client's adversary.  The paper which he has in his possession may be the property of some other client.  It is inconceivable that he should be compelled to produce the document belonging to another client because the adversary of one of his clients demands it.

Poppino v. Jones Store Co., 1 F.R.D. at 219.  See Hobley v. Burge, 433 F.3d 946 (7th Cir. 2006)(observing that a party may not have had control over its former attorney's documents); Ontario Inc. v. Auto Enterprises, Inc., 205 F.R.D. 195 (E.D. Mich. 2000).  Simply put, if a

person, corporation, or a person's attorney or agent can pick up a telephone and secure the document, that individual or entity controls it. See Simon v. Taylor, 2014 WL 6633917, at *34 ("Control is defined as the legal right to obtain documents upon demand.").

## LAW REGARDING THE WORK-PRODUCT DOCTRINE

The work-product doctrine, which the Supreme Court first recognized in Hickman v. Taylor, "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. at 510. "Unlike the attorney-client privilege, the work-product doctrine is distinguishable from the testimonial . . . privileges." United States v. Ary, 518 F.3d 775, 783 n.4 (10th Cir. 2008). See In re Qwest Commc'n Int'l. Inc., 450 F.3d 1179, 1184 n.3 (10th Cir. 2006). "The work-product doctrine is codified in Fed. R. Civ. P. 26(b)(3) and is therefore excepted from Fed. R. Evid. 501." United States v. Ary, 518 F.3d at 783 n.4.

Rule 26(b)(3) governs work-product issues, see Frontier Ref. Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 702 n.10 (10th Cir. 1998), and it states, in relevant part:

> (A) *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) *Protection Against Disclosure.* If the court orders discovery of those

> materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).

"[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1358 (D.N.M. 2002)(Smith, M.J.)(citing United States v. Nobles, 422 U.S. at 238). The attorney-work-product doctrine "is intended only to guard against divulging the attorney's strategies and legal impressions. . . ." Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995).

Whether a communication falls within the attorney-client privilege should precede any inquiry into whether the work-product protection applies. See Upjohn Co. v. United States, 449 U.S. 383, 397 (1981). The work-product protection is broader in scope and reach than the attorney-client privilege, because the privilege extends only to client communications, while work-product protections encompass much more than client communications. See United States v. Nobles, 422 U.S. at 238. Rule 26(b)(3), however, permits disclosure of documents and tangible things constituting attorney work product, albeit only upon a showing of substantial need and inability to obtain the substantial equivalent without undue hardship. See Fed. R. Civ. P. 26(b)(3). The focus of the determination whether a document falls within the work-product protection is whether "the motivating purpose" behind its creation was to aid in litigation or possible future litigation. In re Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 676 (D. Kan. 2005)(O'Hara, J.).

"'Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation. This type of work product receives less protection than

opinion work product. Opinion work product is, basically, the mental impressions of the attorney.'" Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 651 (D.N.M. 2007)(Browning, J.)(quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)(Joyner, M.J.)). "The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived." Anaya v. CBS Broad., Inc., 251 F.R.D. at 651 (citing Kovacs v. Hershey Co., No. 04-01881, 2006 WL 2781591, at *10 (D. Colo. Sept. 26, 2006)(Wiley, J.)).

The Court has determined that the work-product doctrine shielded documents or other items on several occasions. In S.E.C. v. Goldstone, 301 F.R.D. 593 (D.N.M. 2014)(Browning, J.), for example, the Court invoked the work-product doctrine when it blocked the defendants from asking a Securities and Exchange Commission deponent about several topics related to an ongoing enforcement action against Thornburg Mortgage Inc. See S.E.C. v. Goldstone, 301 F.R.D. at 664. It reasoned that the deposition topic sought communications made in anticipation of litigation, because the SEC had already filed a complaint against Thornburg Mortgage "or was contemplating doing so." S.E.C. v. Goldstone, 301 F.R.D. at 664. See Murphy v. Gorman, 271 F.R.D. 296, 322 (D.N.M. 2010)(Browning, J.)(concluding that a law firm did not need to disclose a "Trust agreement and the conclusions, opinions, or legal theories" that the firm had developed about that agreement, because it is "the central issue in the litigation"). See also Anaya v. CBS Broadcasting, Inc., 251 F.R.D. 645, 654 (D.N.M. 2007)(Browning, J.). In contrast, it has determined that a deposition is not work product. See Abila v. Funk, No. 14-1002, 2016 WL 5376323, at *6 (D.N.M. September 20, 2016)(Browning, J.)("In its plainest sense . . . a deposition -- sworn testimony taken in front of numerous other persons -- cannot be the 'attorney's strategies and legal impressions.'")(quoting

Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995)).  See also Sanchez v. Matta, 229 F.R.D. 649, 659 (D.N.M. 2004)(Browning, J.)(ruling that questions an attorney posed to interviewees are protected by the work-product doctrine, because it "tend[s] to directly or indirectly show [the attorney's] thoughts, opinions or strategies.").

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401-03).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez–Castro, No. 10-2072, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).

## LAW REGARDING THE ADMISSIBILITY OF EVIDENCE

Relevant evidence is admissible, unless the Constitution, a federal statute, the Federal Rules of Evidence, or another rule prescribed the Supreme Court provides otherwise.  See Fed. R. of Evid. 402.  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").  If evidence is relevant, the non-offering party bears the burden of

invoking a counterrule that justifies the evidence's exclusion. <u>See</u> Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, <u>Federal Rules of Evidence Manual</u> § 402.02, at 402-2 (10th Ed. 2011). At the constitutional level, relevant evidence is most commonly excluded by the Fourth, Fifth, and Sixth Amendments to the Constitution of the United States. <u>See</u> <u>e.g.</u>, <u>Weeks v. United States</u>, 232 U.S. 383 (1914); <u>Massiah v. United States</u>, 377 U.S. 201 (1964); <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>United States v. Wade</u>, 388 U.S. 218 (1967); <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976). Various federal statutes exclude relevant evidence, but the most frequently invoked is the wiretapping statute, 18 U.S.C. §§ 2510-20. <u>See</u> Saltzburg, <u>supra</u> § 402.02, at 402-4. United States Courts of Appeal have determined that rule 402 contains an exhaustive, as opposed to an exemplary, list of legal sources that may exclude relevant evidence. <u>See</u> <u>e.g.</u>, <u>United States v. Lowery</u>, 166 F.3d 1119, 1125 (11th Cir. 1999)("Local rules of federal courts are not listed in Rule 402, either. As a result, otherwise admissible evidence cannot be excluded based upon local rules."); <u>United States v. Condon</u>, 170 F.3d 687, 690 (7th Cir. 1999).

## **ANALYSIS**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**I.** ████████████████████████████████████████████████████
████████████████████████████

The Federal Rules of Civil Procedure use the word "party" throughout. <u>See</u> <u>e.g.</u>, Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."); Fed. R. Civ. P. 26(a)(1) ("[A] party must, without awaiting a discovery request, provide to other parties."). ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.[21]

Because of that reality, the many discovery rules that use the word "party" or "parties" do

---

[21]As noted, Mr. Yanchunis has moved to withdraw, but the Court still lists him here, because the Court has not granted that Motion. ████████████████████████████
████████████████████████████████████████████████
███████████████████████

not -- by their plain language -- apply to the attorneys.  See, e.g., Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 37(a)(1)-(3).  As they are not parties, the attorneys do not have the right, under the rules, to any discovery in this case.  Cf. Hickman v. Taylor, 329 U.S. at 391 ("[Discovery] is available in all types of cases at the behest of any party, individual or corporate, plaintiff or defendant.")(emphasis added).  They could file a separate suit and become parties, but they are not parties now.  When the rules' drafters want to distinguish between parties and attorneys, they know how to do so.  See e.g., Fed. R. Civ. P. 5(b)(1) ("If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party."); Fed. R. Civ. P. 11(c)(1) ("If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule."); Fed. R. Civ. P. 4(a)(1)(A)-(C) ("A summons must: name the court and the parties; . . . state the name and address of the plaintiff's attorney. . . ."); Fed. R. Civ. P. 16(a) ("In any action, the court may order the attorneys and any unrepresented parties to appear. . . .").  Thus, there is no sound basis to conclude that the attorneys have discovery rights in this case. ███████████████████████

████████████████████████████████████████████████████████████████

Work-product protections prohibit a party from discovering items from another party prepared by the party or its representative.  See Fed. R. Civ. P. 26(b)(3)(A) ("[A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative.")(emphasis added).[22]  Certainly, the "party" referred to in

---

[22]The work-product doctrine's history supports the interpretation that the attorneys cannot invoke that doctrine here.  In first recognizing the work-product doctrine, the Supreme Court emphasized that work-product protections sprang from an attorney's duty to his or her client. See Hickman v. Taylor, 329 U.S. at 510-11.

Fed. R. Civ. P. 26(b)(3)(A) also bars a party's attorney from obtaining items that were prepared in anticipation of litigation by the other side, but the rule acts as a bar when the party's attorney is acting on the party's behalf. █████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ The Court is likely to enforce agreements between parties. See e.g., Landry v. Swire Oilfield Servs., LLC, No. 16-0621, 2018 WL 279749, at *33 (D.N.M.

---

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests.

Hickman v. Taylor, 329 U.S. at 510-11. See United States v. Nobles, 422 U.S. 225, 238 (1975)("At its core, the work-product doctrine shelters the mental process of the attorney, providing a privileged area within which he can analyze and prepare his client's case.").



2018)(Browning, J.)("The Court, accordingly, will not upset an agreement between two parties. . . .").   It does so, because parties need to know that discovery agreements will be honored.   If agreements are not honored, parties are dis-incentivized from entering those agreements -- not to mention cooperation in general -- requiring more judicial oversight in discovery.  <u>Cf.</u> Robert Cooter & Thomas Ulen, <u>Law and Economics</u> at 305 (6th ed. 2012)("By enforcing promises, contract law enables people to make credible commitments to cooperate with each other.").   Thus, judicial intervention here curbs the need for more extensive judicial intervention down the road, and Congress, in other contexts, has encouraged judicial efficiency. <u>See</u> <u>McCarthy v. Madigan</u>, 503 U.S. 140, 145 (1992)(noting that Congress fashioned administrative exhaustion requirements to "promot[e] judicial efficiency").

On the other hand, the Court has a right to this information. <u>See</u> Fed. R. Civ. P. 23(g)(1)(C) ("[T]he court . . . may order potential class counsel to provide information on any subject pertinent to the appointment.").   The Court, thus, has the power to compel the production of all the requested material if it is a benefit to the Court's appointment determination.   Hence, any discovery in this case should help the Court decide which attorney best "fairly and adequately represent[s] the interests of the class." Fed. R. Civ. P. 23(g)(4).



██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████  Fed. R. Civ. P. 23(g)(4).   <u>See</u>

Fed. R. Civ. P. 23(g)(1)(B); Petition for Leadership at 4; Motion to Remove at 3; Second Motion to Remove at 6.  If more than one applicant seeks to be class counsel, "the court must appoint the applicant best able to represent the interests of the class."  Fed. R. Civ. P. 23(g)(2).  Factors the Court must consider are:

> (i) The work counsel has done in identifying or investigating potential claims in the action;

> (ii) Counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> (iii) Counsel's knowledge of the applicable law; and

> (iv) The resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  An attorney's conflict of interest with class members bears on the counsel's adequacy.  <u>See</u> e.g., <u>Rutter & Willbanks, Corp. v. Shell Oil Co.</u>, 314 F.3d at 1188.  Otherwise, the Tenth Circuit has not had an occasion to discuss what other matters might influence the 23(g)(1)(A) analysis, but Professors Wright and Miller suggest that the quality of the briefs and oral argument, in addition to whether proposed class counsel has engaged in unethical behavior, are all relevant to the Court's determination.  <u>See</u> Wright and Miller, <u>supra</u>, § 1769.1, at 445-47, 469.

As suggested above, the Court has the power to order discovery on the proposed class counsel's adequacy.  The Court derives this power from rule 23(g)(1)(C), which states that "the

court . . . may order potential class counsel to provide information on any subject pertinent to the appointment." Fed. R. Civ. P. 23(g)(1)(C). The 2003 advisory committee notes provide that the Court may order production of information pertinent to the rule 23(g)(1)(A)(i)-(iv) factors. See Fed. R. Civ. P. 23(g)(1)(C) (2003 advisory committee notes)("The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic.").[23] The rule does not, however, specify to whom the Court may order production of the relevant material. See Fed. R. Civ. P. 23(g) ("[T]he court . . . may order potential class counsel to provide information . . . ."). A question arises from the rule's silence: whether the Court may order production of pertinent material to an adversarial group or may it only order production on the Court. The advisory committee notes are similarly silent on this point, but observe that, "[s]ome information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality." Fed. R. Civ. P. 23(g)(2003 advisory committee notes). The committee notes, thus, do not forbid the information from being disclosed to adversarial groups, but advise the Court to approach disclosure to another side with caution.

Notwithstanding that cautionary language, the Court concludes that Fed. R. Civ. P. 23(g)(1)(C) allows the Court to order production of pertinent materials to an adverse party or group. Although the Court may discharge its duty to appoint adequate class counsel by direct review of pertinent materials without disclosure to an adversary, the Tenth Circuit has repeatedly held that district courts -- and appellate courts -- make the best decisions

---

[23]The paragraph (1)(C) topics to which the 2003 advisory committee notes refer were later recodified at rule 23(g)(1)(A)(i)-(iv). Compare Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) with Fed. R. Civ. P. 23(g)(1)(c)(i) (2003); Fed. R. Civ. P. 23(g) (2007 committee notes).

when the adversarial process informs those courts' decisions.  See, e.g., Kerns v. Bader, 663 F.3d 1173, 1182 (10th Cir. 2011)("That course bears the advantage of allowing the adversarial process to work through the problem and culminate in a considered district court decision. . . ."); Hill v. Kemp, 478 F.3d 1236, 1251 (10th Cir. 2007)("Our system of justice, after all, is not a self-directed inquisitorial one; to avoid error, we are dependent on the full development of issues through the adversarial process and the initial testing of ideas in trial courts where advocates have an opportunity to present more than thin briefs and fifteen minute oral arguments.").  When two attorneys jockey for class-counsel appointment, the Court has a duty to appoint the lawyer "best able" to represent the class.  Fed. R. Civ. P. 23(g)(2).  The Court concludes that it is best able to discharge that duty when the adversarial process informs that decision.  Accordingly, it determines that the best reading of rule 23(g)(1)(C) allows the Court to order production of pertinent material to an adverse party, so that the adverse party can present informed argument why appointing certain counsel might or might not be in the classes' best interest.[24]

---

[24] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Under rule 37, the Court may compel discovery if a party does not produce documents that parties properly request under rule 34 and rule 26.  See Fed. R. Civ. P. 37(a)(3)(iv).  Under rule 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1).  Rule 34 provides that "a party may serve on any other party a request within the scope of Rule 26(b)."  Fed. R. Civ. P. 34(a). ███████████████████████████████████████████████

████████████████  Parties may obtain attorney documents from another party via rule 26 and rule 34, because parties possess or control their attorney's documents as long as those documents relate to the client's case.  See Fed. R. Civ. P. 34(a)(1); XTO Energy, Inc. v. ATD, LLC, 2016 WL 1730171, at *24 (D.N.M. April 1, 2016)(Browning, J.)("XTO Energy")("Because a client has the right 'to obtain copies of documents gathered or created by its attorneys *pursuant to their representation of that client*, such documents are clearly within the client's control.'")(quoting Am. Cos. For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.)("Ringling

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ Relevant to the Court's class-counsel appointment determination is:

(i)     The work counsel has done in identifying or investigating potential claims in the action;

(ii)    Counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)   Counsel's knowledge of the applicable law; and

(iv)    The resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). ████████████████████████

██████████████████████████   ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

─────────────────────────

Bros.")(emphasis in Ringling Bros. and XTO Energy). █████████████

███████████████████████████████████████
███████████████████████████████████████
████████████████████

██████ ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████





██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████

**II.** ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████    ████████
█████████████  ████████████████████████████████████
████████████████████████████████  ████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████



- 53 -



**IT IS ORDERED** that █████████████████████████████████



UNITED STATES DISTRICT JUDGE

The Court also recognizes that Mr. Yanchunis moves to withdraw from the case.  See Motion to Withdraw at 1.  The Court has not yet granted the Motion to Withdraw and has wide discretion to grant or deny that motion.  See Gamez v. Country Cottage Care & Rehab., 377 F. Supp. 2d 1101, 1102 (D.N.M. 2005)(Browning, J.)("The Court has wide discretion in granting or denying an attorney's motion to withdraw representation.").

See Jenkins v. Weinshienk, 670 F.2d 915, 919 (10th Cir. 1982)(noting that, "since [an attorney] has files pertinent to litigation properly before Judge Weinshienk, that federal just must have power -- hence jurisdiction -- to decide whether the attorney should be required to relinquish them" upon a motion to withdraw).

*Counsel:*

Scott P. Schlesinger
Jonathan Gdanski
Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

> *Attorneys for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Randi McGinn
Kathleen J. Love
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

> *Attorney for Plaintiffs Anthony Dunn, Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Patrick Scott, Russell Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Jacques-Rene Herbert, Sara Benson, Justin Sproule, Rudolph Miller, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, Abigail Emmons, Charlene Blevins, Scott Johnston, Jason Cole, and Rachel King*

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Michael Robert Reese
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich, LLC
Albuquerque, New Mexico

--and--

Melissa Weiner
Charles D Moore
Halunen Law
Minneapolis, Minnesota

 *Attorneys for Plaintiff Anthony Dunn*

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Reed C. Bienvenu
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

 *Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael*
  *Yang, Doug Pyle, and Nick Vadis*

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

     *Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

--and--

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

     *Attorney for Theodore Rothman*

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

     *Attorney for Danae Grandison, Michael Laboon, and Dave Moyer*

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

     *Attorney for Plaintiff Russell Brattain*

Daniel L. Warshaw
Alexander R. Safyan
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

     *Attorneys for Plaintiff Shannon White*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

*Attorney for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

John Allen Yanchunis, Sr.
Scott W. Weinstein
Keith R. Mitnik
Marisa Kendra Glassman
Morgan & Morgan, PA
Fort Myers, Florida
Orlando, Florida
Tampa, Florida

*Attorneys for Plaintiff Ashley Waldo*

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

*Attorney for Plaintiff Timothy Ruggiero*

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Islands

*Attorney for Plaintiff Desire Gudmundson*

Matthew David Schultz
Levin Papantonio Thomas P.A.
Pensacola, Florida

*Attorney for Plaintiff Scott Johnston*

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

*Attorney for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Peter J. Biersteker
David B. Alden
David M. Monde
Paul Courtney Huck, Jr.
Sharyl Reisman
Mark R. Seiden
Charles R. A. Morse
David Craig Kiernan
Michael Fraser Stoer
Jennifer Bunting-Graden
William D Coglianese
Jon Gregory Heintz
Jordan Von Bokern
Joseph R Coburn
Noel J. Francisco
Troy A. Fuhrman
Jones Day
San Francisco, California
Washington, DC
Atlanta, Georgia
Miami, Florida
Tampa Florida
New York, New York
Cleveland, Ohio

*Attorneys for the Defendants*