# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

No. MD 16-2695 JB/LF

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Class Certification, filed July 23, 2020 (Doc. 278)("Certification Motion"); (ii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 277)("Motion to Exclude Dr. Dennis"); (iii) the Plaintiff's Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D, DABT, filed July 23, 2020 (Doc. 282)("Motion to Exclude Dr. Garner"); (iv) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. Joannes Evangelista Steenkamp, filed July 23, 2020 (Doc. 283)("Motion to Exclude Dr. Steenkamp"); (v) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed July 23, 2020 (Doc. 284)("Motion to Exclude Dr. Teece"); (vi) the Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Kent Van Liere, filed July 23, 2020 (Doc. 286)("Motion to Exclude Dr. Van Liere"); (vii) the Plaintiffs' Motion to Exclude the Opinions and Testimony of W. Kip

---

[1]On September 1, 2023, the Court issued a Sealed Memorandum Opinion and Order, (Doc. 394)("Sealed MOO"). In it, the Court requested that the parties propose redactions, if any are necessary to protect confidential information. See Sealed MOO at 1, n.1. In response to the Court's request, the parties propose that the Court redact portions of the Sealed MOO. See Email from Melanie Stambaugh (dated September 15, 2023) filed September 17, 2023 (Doc. 401); Letter from David M. Monde (dated September 15, 2023), filed September 17, 2023 (Doc. 402). This public version of the Memorandum Opinion and Order is the redacted version of the Sealed MOO. The Court has made no other changes to the public opinion other than the redactions.

Viscusi, filed July 23, 2020 (Doc. 290)("Motion to Exclude Dr. Viscusi"); (viii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jennifer Pearson and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 303)("Motion to Exclude Dr. Pearson"); and (ix) Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jean-Pierre Dubé and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 291)("Motion to Exclude Dr. Dubé"). The Court held a five-day evidentiary hearing from December 14, 2020, to December 18, 2020. Clerk's Minutes, filed December 14, 2020 (Doc. 340); Clerk's Minutes, filed December 15, 2020 (Doc. 341); Clerk's Minutes, filed December 16, 2020 (Doc. 342); Clerk's Minutes, filed December 17, 2020 (Doc. 343); Clerk's Minutes, filed December 18, 2020 (Doc. 344). The primary issues before the Court are: (i) whether the Plaintiffs' twenty-one proposed classes and subclasses satisfy the requirements in rule 23 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23. For the reasons discussed below, the Court concludes that some, but not all, of the Plaintiffs' proposed classes and subclasses satisfy rule 23. Accordingly, the Court grants in part and denies in part the Certification Motion.

## FINDINGS OF FACT

Both the Plaintiffs and the Defendants have submitted proposed findings of fact. See Plaintiff's Requested Findings of Fact and Conclusions of Law, filed February 26, 2021 (Doc. 361)("Plaintiffs' FOF"); Defendants' Proposed Findings of Fact and Conclusions of Law Regarding Plaintiffs' Motion for Class Certification, filed February 26, 2021 (Doc. 362)("Defendants' FOF"). The Court has considered carefully all proposed facts, and accepts some of them, rejects others, and finds some facts that no party brought to its attention.[2] The

---

[2]The Court is not required to make formal findings of fact in ruling on a class certification motion. See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or

Court also liberally judicially notices background facts. <u>See</u> Fed. R. Evid. 201. All of these findings of fact are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage. <u>See</u> <u>Abbott v. Lockheed Martin Corp.</u>, 725 F.3d 803, 810 (7th Cir. 2013); <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 313 (3d Cir. 2008); <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 366 (4th Cir. 2004); <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 306 F.R.D. 312, 320 (D.N.M. 2015)(Browning, J.), <u>adhered</u> <u>to</u> <u>on</u> <u>reconsideration</u>, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.). The Court sets forth its findings of fact below.

### 1.   **The Litigation and Parties.**

1.     This case addresses the alleged mass deception of Natural American Spirit cigarettes ("Natural American cigarettes"), that Defendants Santa Fe Natural Tobacco Company ("Santa Fe Tobacco"), R.J. Reynolds Tobacco Company ("R.J. Reynolds Tobacco") and Reynolds American, Inc. ("Reynolds American" or "RAI")(collectively, "the Defendants"), made and marketed. Plaintiffs' FOFs ¶ 5, at 2 (asserting this fact). <u>See</u> Second Consolidated Amended Class Action Complaint ¶ 1, at 1, filed November 1, 2018 (Doc. 219)("SAC")); Defendants' Answer to the Second Consolidated Amended Class Action Complaint ¶ 1, at 1, filed December 10, 2018 (Doc. 225)("Second Amended Answer").

2.     The Plaintiffs allege that the Defendants have capitalized on the misperception that cigarettes made with "natural" tobacco that is "additive-free" may be less harmful than other

---

conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); <u>id.</u> Advisory Committees Notes to 2007 Amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.' This change reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples."). The Court has elected to make findings of fact to show the parties as much as possible how the Court has reached its conclusions.

cigarettes.  Plaintiffs' FOFs ¶ 6, at 2 (asserting this fact).  See SAC ¶ 3, at 2.

       **a.**    **The Defendants.**

3.    Reynolds American is a North Carolina corporation whose principal place of business is in Winston-Salem, North Carolina.  See SAC ¶ 26, at 12; Second Amended Answer ¶ 25, at 6, filed February 28, 2018 (Doc. 171)("First Amended Answer").  See also Defendants' FOFs ¶ 1, at 4.

4.     The Court has jurisdiction over Reynolds American only as to claims brought in a North Carolina forum.  See Memorandum Opinion and Order at 3, filed December 21, 2017 (Doc. 146)("MTD MOO"); Defendants' FOFs ¶ 1, at 4.

5.    "Reynolds American remains a Defendant only as to claims brought in a North Carolina forum and participates here only as to those claims against it over which the Court has personal jurisdiction."  Defendants' FOFs n.1, at 1 (citing MTD MOO at 3).

6.    Santa Fe Tobacco is a New Mexico corporation whose principal place of business is in Santa Fe, New Mexico.  See SAC ¶ 25, at 12; Second Amended Answer ¶ 25, at 6; Defendants' FOFs ¶ 2, at 4; Plaintiffs' FOFs ¶ 326, at 81.

7.    RJR Tobacco is a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina.  SAC ¶ 27, at 12; Second Amended Answer ¶ 27, at 6; Defendants' FOFs ¶ 3, at 4.

8.    Both Santa Fe Tobacco and RJR Tobacco are Reynolds American's subsidiaries. See SAC ¶¶ 25-26, at 12; Second Amended Answer ¶¶ 25-26, at 6.

       **b.**    **The Plaintiffs and Proposed Classes.**

9.    The Plaintiffs seek certification of the following classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida

Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico Class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass.  See SAC ¶¶ 107-127, at 28-43 (defining classes); Second Amended Answer ¶ 107-127, at 30-32; Plaintiffs' FOFs ¶ 1, at 1.

10.    The Plaintiffs seek certification of the State menthol subclasses only in the alternative to the Nationwide Menthol Subclass.  See Plaintiffs' FOFs ¶ 1, at 1.  See also SAC ¶ 127, at 43; Second Amended Answer ¶ 127, at 32.

11.    Plaintiff Jacques-Rene Hebert seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in California," "in Illinois," "in Massachusetts," "in Michigan," "in New York," and "in Ohio."  SAC ¶ 107, 110-12, 115, 117, at 28.  See Second Amended Answer ¶¶ 59, at 15; Defendants' FOFs ¶ 5, at 4.

12.    Plaintiff Sara Benson seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Colorado."  SAC ¶¶ 13, 108, at 4-5, 39; Second Amended Answer ¶¶ 13, 108, at 3, 30; Defendants' FOFs ¶ 6, at 4-5.

13.    Plaintiff Justin Sproule seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Florida."  SAC ¶ 109, at 39.  See Second Amended Answer ¶ 109, at 30; Defendants' FOFs ¶ 7, at 5.

14.    Plaintiff Abigail Emmons seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in New Jersey."  SAC ¶ 113, at 40.  See Second Amended Answer ¶ 113, at 30; Defendants' FOFs ¶ 8, at 5.

15.     Plaintiff Ceyhan Haksal seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in New Mexico."  SAC ¶ 114, at 41.  See Second Amended Answer ¶ 114, at 31; Defendants' FOFs ¶ 9, at 5.

16.     Plaintiff Rudolph Miller seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in North Carolina."  SAC ¶ 116, at 41.  See Second Amended Answer ¶ 116, at 31; Defendants' FOFs ¶ 10, at 5.

17.     Plaintiff Clive Pontusson seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Washington."  SAC ¶ 118, at 41.  See Second Amended Answer ¶ 118 at 31; Defendants' FOFs ¶ 11, at 5.

18.     Plaintiff Francisco Chavez seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in California."  SAC ¶ 119, at 42.  See Second Amended Answer ¶ 119, at 31; Defendants' FOFs ¶ 12, at 5.

19.     Plaintiff Joshua Horne seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in Colorado," "in Florida," and "in New Mexico." SAC ¶¶ 120-21, 124, at 42.   See Second Amended Answer ¶¶ 120-21, 124, at 31-32; Defendants' FOFs ¶ 13, at 5.

20.     Plaintiff Albert Lopez seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in Illinois."  SAC ¶ 122, at 42.  See Second Amended Answer ¶ 122, at 32; Defendants' FOFs ¶ 14, at 6.

21.     Plaintiff Robert Litwin seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in New Jersey" and "in New York." SAC ¶¶ 123, 125, at 42-43.  See Second Amended Answer ¶¶ 123, 125, at 32; Defendants' FOFs ¶ 15, at 6.

22.     Plaintiff Charlene Blevins seeks to represent a class of "[a]ll persons who

purchased Natural American Spirit menthol cigarettes in North Carolina."  SAC ¶ 126, at 43.
See Second Amended Answer ¶ 126 at 32; Defendants' FOFs ¶ 16, at 5.

23.     Plaintiffs Francisco Chavez, Joshua Horne, Albert Lopez, Robert Litwin, and
Charlene Blevins also seek to represent a subclass defined as "[a]ll persons who purchased
Natural American Spirit menthol cigarettes in the United States [("Nationwide Menthol
Class")]."  SAC ¶ 127, at 43.  See Second Amended Answer ¶ 127, at 32; Defendants' FOFs ¶
17, at 6.

24.     The members of the proposed state-specific classes are all persons who have
purchased Natural American cigarettes in New Jersey, Illinois, Colorado, Florida, New Mexico,
California, Washington, North Carolina, New York, Massachusetts, Michigan, and Ohio.  See
SAC ¶¶ 107-18, at 39-41; Second Amended Answer ¶¶ 107-18, at 30-31; Plaintiffs' FOFs ¶ 2, at
1; Defendants' FOFs ¶ 18, at 6.

25.     The members of the proposed state-specific menthol sub-classes are all persons
who have purchased Natural American menthol cigarettes in California, Colorado, Florida,
Illinois, New Jersey, New Mexico, New York, and North Carolina.  See SAC ¶¶ 119-26, at 42-
43; Second Amended Answer ¶¶ 119-26, at 31-32; Plaintiffs' FOFs ¶ 2, at 1; Defendants' FOFs
¶ 19, at 6.

26.     The members of the proposed Nationwide Menthol Class are all persons who
have purchased Natural American menthol cigarettes in the United States.  See SAC ¶ 127, at 43;
Second Amended Answer ¶ 127, at 32; Plaintiffs' FOFs ¶ 2, at 1; Defendants' FOFs ¶ 20, at 6-7.

27.     The Plaintiffs propose the following class periods:

- September 30, 2009 to the present for the Nationwide Menthol
  Subclass, New York Class, New Mexico Class, New Jersey Class,
  Michigan Class, and Massachusetts Class;

- September 30, 2010 to the present for the Illinois Class;

- September 30, 2011 to the present for the California Class, Florida Class, and Washington Class;

- September 30, 2012 to the present for the Colorado Class; and

- September 30, 2013 to the present for the Ohio Class.

Defendants' FOFs ¶ 22, at 7.  See Plaintiffs' FOFs ¶ 3, at 1-2.  See also Certification Motion at 3, n.1.

### 2.    **Natural American Cigarettes.**

28.    Santa Fe Tobacco began selling Natural American cigarettes in 1985.  See Expert Report of David J. Teece ¶ 46, at 35 (dated August 16, 2019), filed October 8, 2020 (Doc. 315-1)("Teece Report").  See Defendants' FOFs ¶ 23, at 7 (asserting this fact); Plaintiffs' FOF ¶ 70, at 16.

29.    Santa Fe Tobacco has marketed itself as a company committed to producing high-quality products in an environmentally conscious manner.  See Teece Report, ¶¶ 46, 50, at 35-36. Defendants' FOFs ¶ 24, at 7.

30.    Santa Fe Tobacco "only uses selected tobaccos that meet specific quality standards and does not use 'tobacco additives, tobacco preservatives, tobacco flavoring, or scrap tobacco' . . . ." Teece Report ¶ 50, at 36 (no citation for quotation).  See Defendants' FOFs ¶ 25, at 7.

31.    Santa Fe's founders believed that an additive-free cigarette would prove less harmful than the brands produced by large tobacco manufacturers, which contained added chemicals.  See Plaintiffs' FOFs ¶ 71, at 16; Expert Report by Robert N. Proctor at 11-12 (dated May 17, 2019), filed July 23, 2020 (Doc. 280-1)("Proctor Report")

32.     Santa Fe sells a variety of styles of Natural American cigarettes with different features in different colored packs.  See Transcript of Class Certification Hearing at 680:24-25 (dated December 16, 2020), filed January 4, 2021 (Doc. 347)(Belasic)("December 16 Tr.")(noting that there are thirteen Natural American cigarette styles); Defendants' FOFs ¶ 26, at 7 (asserting this fact).  See also Proctor Report at 82 (explaining the different pack colors' meanings).

33.     Brands achieve success primarily through positioning -- "the act of designing the company's offering and image to occupy a distinctive place in the mind of the target market" -- which involves "differentiating the company's marketing offer so it will give consumers more value than competitors' offers," and identifying "points of difference," or "attributes or benefits consumers strongly associate with a brand, positively evaluate, and believe that they could not find to the same extent with a competitive brand."  Expert Report by Timothy Dewhirst at 5 (dated May 17, 2019), filed July 23, 2020 (Doc. 280-7)("Dewhirst Report").  See Plaintiffs' FOFs ¶ 113, at 25.

34.     Collectively, this marketing concepts is known as a brand's primary points of differentiation ("PPOD").  See Plaintiffs' FOFs ¶ 114, at 25; Dewhirst Report at 5.

35.     Natural American's PPOD, at least until 2017, has been "100% additive-free natural tobacco" and, for its organic line, "organic."  Plaintiffs' FOFs ¶ 114, at 25; Dewhirst Report at 5.  See Presentation, Consumer Engagement Research & Business Case at 6 (dated April, 2014), filed July 23, 2020 (Doc. 280-15)(listing "Additive Free," "All Natural Tobacco," "100% Whole Leaf," "Organic Blend," and "Premium Quality," as Natural American's most recalled messaging); Presentation, 2014 -- Strategic Plan for NAS Background (undated) at 21-24, filed July 23, 2020 (Doc. 280-3); December 16 Tr. at 631:1-632:5 (Cummings, Gdanski); id.

at 797:3-20 (Cummings, Gdanski); id. at 798:20-799:1 (Cummings, Gdanski); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/11) at 7, filed July 23, 2020 (Doc. 281-2) ("2011 10-K")(stating that Natural American cigarettes are "differentiated from key competitors through its use of all natural, additive-free tobacco")[3]; Reynolds American Inc. Form 10-K (fiscal year ended 12/31/12) at 7, filed July 23, 2020 (Doc. 281-3)("2012 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/13) at 7, filed July 23, 2020 (Doc. 281-4)("2013 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/14) at 7, filed July 23, 2020 (Doc. 281-5)("2014 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/15) at 7, filed July 23, 2020 (Doc. 281-6)("2015 10-K")(same); Plaintiffs' FOFs ¶¶ 125-27, at 28-29 (citing Video Deposition of Kimberly Gonzales at 60:12-21 (taken April 10, 2018), filed July 23, 2020 (Doc. 281-12)("Gonzales Depo.")(Gonzales, Schultz); id. at 160:5-17 (Gonzales, Schultz); id. at 168:6-13 (Gonzales, Schultz)).

36.     Natural American's brand identity, including other elements of Natural American labels and advertising -- which together form Santa Fe's "campaignable umbrella" and include themes like "Made with Organic Tobacco," "Tobacco and Water," and "Grown on American Soil" -- support the company's PPODs.  Plaintiffs' FOFs ¶¶ 128-29, at 29; 2015-2016 Brand Equity Team Op Plan at 4, filed July 23, 2020 (Doc. 281-13).

37.     In 1999, Santa Fe marketing executive Henry Sicignano wrote to the company's

---

[3]"The federal securities laws require publicly reporting companies to disclose information on an ongoing basis . . . .  [D]omestic companies must submit annual reports on Form 10-K . . . [, which] provides a comprehensive overview of the company's business and financial condition and includes audited financial statements."  Form 10-K, United States Securities and Exchange Commission, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k (last visited November 11, 2022).

president and board of directors: "[O]ur 'positioning' is what our brand stands for . . . what makes Natural American Spirit unique . . . why our product is better than other premium brands," and "'100% Additive-Free Natural Tobacco' is unmistakably the primary point of differentiation that has come to define our brand."  Memorandum from Henry Sicignano to Robin Sommers and the SFNTC Board of Directors (dated January 20, 1999) at 6, filed July 23, 2020 (Doc. 281-1) (ellipses in original).  See Plaintiffs' FOFs ¶ 116, at 26.

38.     During the class periods, Santa Fe has uniformly labeled every pack of Natural American Cigarettes as "natural," including in the brand name -- Natural American Spirit Cigarettes -- and corporate name -- Santa Fe Natural Tobacco Company.  Plaintiff's FOF ¶ 30, at 8.  See Plaintiffs' FOFs ¶ 117, at 26; Dewhirst Report at 20.

39.     The term "natural" is "central to both the brand name and that of its producer," and is "the fundamental differentiating feature of the product offering."  Dewhirst Report at 20.  See Plaintiffs' FOFs ¶ 118, at 26.

40.     Santa Fe Tobacco used the phrase "100% additive-free natural tobacco" on its packaging to describe the tobacco used in Natural American cigarettes from 1985 until 2017.  Declaration of Kara A. Calderon ¶¶ 9-10, at 2 (dated June 25, 2020), filed July 23, 2020 (Doc. 291-10)("Calderon Decl.").   See Defendants' FOFs ¶ 27, at 8 (asserting this fact); Plaintiffs' FOF ¶ 31, at 8; id. ¶ 100, at 22 (citing Image of Natural American Spirit Cigarette Packs, filed July 23, 2020 (Doc. 280-12)).

41.     In many instances, the labels included the descriptor "'tobacco & water,'" and would state in prominent, bold font: "'TOBACCO & WATER: 100% ADDITIVE-FREE NATURAL TOBACCO.'"  Plaintiffs' FOFs ¶ 110, at 24 (quoting Dewhirst Report at 42-43).

42.     Some labels and advertising also included language highlighting that Natural

American cigarettes were "'organic'" in addition to consisting of "'100% additive-free natural tobacco.'"  See Plaintiffs' FOFs ¶ 111, at 25; Dewhirst Report at 43.

43.     The descriptor "'100% additive-free natural tobacco'" was one of the most frequently used labels in Natural American cigarette advertisements.  See Plaintiffs' FOFs ¶ 112, at 25; Videotaped Deposition of David DePalma at 60:12-16 (taken June 6, 2018), filed July 23, 2020 (Doc. 280-14)("DePalma Depo.")(DePalma, Schultz).

44.     These descriptors, coupled with increased advertising, were a key part of the Natural American brand's strategic growth plan to drive consumers' trial of and ultimate conversion to the product.  See Plaintiffs' FOFs ¶¶ 120-22, at 26-27; Presentation, 2013 Strategic Plan -- Functional Reviews: SFNTC Marketing at 4, 7 (undated), filed July 23, 2020 (Doc. 281-7); Dewhirst Report at 38.

45.     These descriptors were so important, that Santa Fe considered not being able to use them as some of the brand's key risks, and planned on using substitute descriptors, such as a leaf logo, to represent respect for the environment.  See Plaintiffs' FOFs ¶ 123, at 27; 2014 -- Strategic Plan for NAS Background at 3, 5 (undated), filed July 23, 2020 (Doc. 280-3); 2015 -- Strategic Plan (dated July 2014) at 24, filed July 23, 2020 (Doc. 281-8); Meeting Invitation from David DePalma to Susanne Lippert (dated March 12, 2014), at 2, filed July 23, 2020 (Doc. 281-10).

46.     The labels did not, and do not, vary from state to state.  See Plaintiffs' FOFs ¶ 101, at 22; Video Deposition of Stephanie Trujillo at 152:1-9 (taken April 11, 2018), filed July 23, 2020 (Doc. 280-13)(Schultz, Trujillo); id. at 155:10-15 (Schultz, Trujillo).

47.     Santa Fe sought to capitalize on the country's "'increasing demand for healthier products.'"  See Plaintiffs' FOFs ¶ 91, at 21 (quoting Proctor Report at 26).

48.     The use of natural and additive-free labels were "'key points of differentiation' that 'drove trial and sales of the product at a premium price.'"  Plaintiffs' FOFs ¶ 108, at 2 (quoting Dewhirst Report at 2).

49.     Similarly, Reynolds American, Inc. concluded in 2009 that "'[o]rganic elevates the total proposition and serves as a halo for the entire brand,'" and in 2011 that "'[t]he additive-free blend is the core of our portfolio. The organic styles act as a 'halo' to the brand . . . .'" Plaintiffs' FOFs ¶ 233, at 56(quoting Santa Fe Natural Tobacco Company Presentation at 3, filed July 23, 2020 (Doc. 281-25)).

50.     "Defendants 'focus[ed] on the Organic line proposition as an additional point of differentiation to strengthen and elevate the existing additive-free, natural tobacco product point of difference for NAS.'"  Plaintiffs' FOFs ¶ 234, at 57 (quoting 2014 Strategic Plan for NAS at 7, filed July 23, 2020 (Doc. 280-3)).

51.     The organic line of Natural American cigarettes "offers adult cigarette consumers who value smoking but are more wholesome an alternative to traditional cigarettes."  Plaintiffs' FOFs ¶ 236, at 57 (quoting Market SWOT Analysis Year 2015, at 8, filed July 23, 2020 (Doc. 281-35)).

52.     Santa Fe Tobacco supported its PPODs "by promoting harmonious aspects of brand identity, such as the company's focus on sustainability and 'eco-consciousness.'" Plaintiff's FOFs ¶ 131, at 30 (quoting Dewhirst Report at 2, 45).  See Dewhirst Report at 47-50).

53.     Natural American cigarettes' packaging, which Santa Fe Tobacco designed to give a natural look and feel -- by, for example, using recycled card stock and avoiding plastics -- reinforces the core message that Natural American cigarettes are natural and additive-free.  Plaintiffs' FOFs ¶ 134, at 31 (citing Dewhirst Report at 25).

54.     Santa Fe Tobacco's advertising, which included images of "clean sunny fields, healthy farming, and customers being in safe hands," Plaintiffs' FOFs ¶ 135, at 31 (quoting Proctor Report at 26) suggests "links to organic farming and organic foods . . . [and] fuses a sense of environmental responsibility ('healthy earth') with personal responsibility ('healthy body')," Plaintiffs' FOFs ¶ 136, at 31 (quoting Proctor Report at 39).  See Plaintiffs' FOFs ¶¶ 135-36, at 31 (citing Proctor Report at 64, 79).

55.     Defendants' have also advertised Natural American cigarettes by juxtaposing branded cigarette packages with carrots and language reading: "You might expect to find it at the farmer's market."  Plaintiffs' FOFs ¶ 231, at 55.  See December 16 Tr. at 815:21-816:4 (Cummings, Gdanski).

56.     Santa Fe Tobacco's marketing campaigns targeted consumers focused on lifestyles of health and sustainability, who have a "'[c]lear connection of personal and planetary health -- [which] drives purchase of natural products and highest likelihood to think that the environment affects their health.'"  Plaintiffs' FOFs ¶¶ 137-38 (quoting Presentation, Lifestyles of Health and Sustainability at 7 (dated March 14, 2013), filed July 23, 2020 (Doc. 281-15))(first alteration in Plaintiffs' FOFs)(citing Untitled American Spirit Presentation Notes at 4 (dated May 30, 2018), filed July 23, 2020 (Doc. 281-14)).

57.     Santa Fe Tobacco uses Native American imagery -- like the Tobacco Chief, the Thunderbird and the typographical logo -- on Natural American's packaging to "evoke a sense of spiritual connection" to the brand, to which consumers connect personally.  Presentation on Branding Recommendations at 77 (undated), filed July 23, 2020 (Doc. 281-17).  See Plaintiffs' FOFs ¶ 139, at 32.

58.     The Thunderbird, for example, appears at the top of the packaging, and "has

'prominent significance in Native American culture' and 'is a constant reminder of our shared belief that tobacco should be enjoyed in its *natural* state, *without any additives*.'"  Plaintiffs' FOFs ¶ 140, at 32 (quoting Branding Guidelines at 2 (undated), filed July 23, 2020 (Doc. 281-18))(italics in Plaintiffs' FOFs).

59.     Native American imagery has been a part of the Natural American brand identity since its earliest days, and implies that Natural American tobacco and Native American tobacco are equivalent, reinforcing consumers' perception that Natural American cigarettes are natural, despite differences between the two tobacco types' production processes and consumption.  See Dewhirst Report at 26; Plaintiffs' FOFs ¶ 141, at 32.

60.     Such imagery thus implies that Natural American cigarettes have a reduced risk of harm, since there is "'virtually no record of lung cancer anywhere in the world prior to the rise of the modern industrial cigarette.'"  Plaintiffs' FOFs ¶ 142, at 32 (quoting Proctor Report at 26).

61.     Santa Fe Tobacco spent an estimated "$223 million on marketing between 2009 and 2014, and noted in 2013 and 2013, that their per-pack marketing spend 'far exceeds competition.'"  Dewhirst Report at 17.  See Plaintiffs' FOFs ¶ 157, at 36.

62.     In the fourth quarter of 2013, Natural American print ads reached more than 78.7 million tobacco consumers in an effort to enhance awareness of the "100% additive-free natural tobacco" PPOD.  Gonzales Depo. at 75:8-23.  See Gonzales Depo. at 182:16-183:6; Plaintiffs' FOFs ¶¶ 160-61, at 37.

63.     Participants in advertisement concept studies, when shown Natural American advertisements, felt that the advertisements conveyed that Natural American cigarettes were "'safer,' 'healthier,' 'free of chemicals,' 'pure,' and 'clean'".  Plaintiffs' FOFs ¶ 243, at 58 (quoting Expert Report of K. Michael Cummings at 15 (dated May 10, 2019), filed July 23, 2020

(Doc. 280-6)("Cummings Report")).

64.     In response to consumers' beliefs that Natural American cigarettes are less harmful, Defendants train their employees to eliminate common misconceptions, including that a cigarette can be healthy or that no-additives or organic labeling means a safer cigarette.  See Report of Prof. Joannes Evangelista ("Jan-Benedict") Steenkamp, PhD, MSc, BSc at 88, filed October 8, 2020 (Doc. 317-1)("Steenkamp Report"); Presentation, Natural American Spirit Portfolio at 3, July 23, 2002 (Doc. 281-22); Plaintiffs' FOFs ¶ 244, at 59.

65.     Santa Fe Tobacco's 2016 consumer marketing budget (i.e., excluding trade marketing) was $78 million.  See DePalma Depo. at 54:10-20 (DePalma, Schultz); Plaintiffs' FOFs ¶ 159, at 37.

66.     By the late 1990s, the tobacco industry took notice of Natural American cigarettes' health-based appeal, with several tobacco companies commissioning research to determine the impact of all-natural labeling on Natural American brand appeal.  See Plaintiffs' FOFs ¶¶ 80-86, at 19-20; Proctor Report at 15-17; C.I. Highlights (dated November, 1994) at 2-3, filed January 8, 2021 (Doc. 350-29); Notes/Excerpts from Santa Fe New Clips at 7-10, filed January 8, 2021 (Doc. 305-30)("Santa Fe News Clips"); Competitive Assessment Report, filed January 8, 2021 (Doc. 350-31); American Spirit Market Analysis at 2, filed January 8, 2021 (Doc. 350-32).

67.     For example, Brown and Williamson's research found that one of Natural American's key selling points was the perception that Natural American cigarettes were less harmful.  See Plaintiffs' FOFs ¶ 80, at 19; Proctor Report at 17.

68.     In 1994, a confidential memo from Philip Morris noted that "'American spirit smokers said the cigarettes were "healthier and less addictive because of the absence of

additives.'"'  Plaintiffs' FOFs ¶ 84, at 19 (quoting C.I. Highlights at 2).

69.    Philip Morris also recognized that Natural Americans marketed their cigarettes, and that consumers perceived them, as safer, because "'they were additive free and therefore . . . more healthful . . . .'"  Plaintiffs' FOFs ¶ 86, at 20 (quoting Proctor Report at 23).

70.    In 1996, R.J. Reynolds' competitive surveillance recognized that Natural American's "'growing popularity' was due to an 'increasing demand for healthier products, especially in light of recent revelations that tobacco companies add several unsavory chemicals to their cigarettes.'"  Plaintiffs' FOFs ¶ 82, at 19 (quoting American Spirit Market Analysis at 4).

71.    R.J. Reynolds attempted to capitalize on the success of Natural American cigarettes by launching its Winston Natural brand, which it advertised as containing "'No Additives'" and "'No Bull.'"  Plaintiffs' FOFs ¶ 87, at 20 (quoting Proctor Report at 17).

72.    In 2002, Reynolds American Inc. ("RAI") purchased Santa Fe, believing the company "was 'in an excellent position' to handle 'the pressure . . . against the tobacco industry as a whole because of its continued use of additives,' and that it should emphasize to as substantial 'a cross section of the smoking public as possible' that Natural American Spirit Cigarettes are 'additive free.'"  Plaintiffs' FOFs ¶¶ 92-93, at 21 (quoting Memorandum on Product Modification from Dick Shepherd to Rick Sanders at 7 (dated October 14, 2002), filed July 23, 2020 (Doc. 280-10)).

73.    Although R.J. Reynolds, the second-largest tobacco company in the United States at the time, now owned Santa Fe Tobacco, Santa Fe Tobacco, projected an image as a small company focused on environmental sustainability, which, when compared to large tobacco companies, gave the company the credibility to sell 'natural' and 'additive-free' cigarettes that consumers perceived as less harmful.  See Plaintiffs' FOFs ¶ 132, at 30 (citing Untitled Santa Fe

Natural American Presentation at 4-5, filed July 23, 2020 (Doc. 281-9)).

74.    Other brands, like Winston Natural, were less successful than Natural American cigarettes because smokers were more skeptical of health claims coming from "Big Tobacco." Proctor Report at 42 n.112.  See Plaintiffs' FOFs ¶ 133, at 30.

75.    Although not as successful, Winston's No Additives marketing campaign in the 1990s resulted in the brand's first market share gain in 25 years.  See Proctor Report at 17; Plaintiffs' FOFs ¶ 180, at 40.

**3.    <u>Natural American Cigarettes and Federal Regulatory Bodies</u>.**

76.    As early as 1990, Santa Fe Tobacco became "'aware that some regulatory authorities may construe the statement '100% Additive-Free Natural Tobacco' to read as an implied health claim.'"  Plaintiffs' FOFs ¶ 241, at 58 (no citation given for quotation).

77.    In April, 2000, Santa Fe Tobacco entered into a consent agreement, <u>see</u> Agreement Containing Consent Order at 1-10, filed July 23, 2020 (Doc. 291-10 at 6)("Consent Order"), with the Federal Trade Commission ("FTC"), which requires Santa Fe Tobacco to add a disclaimer informing consumers that Natural American cigarettes are not safer than other cigarettes.  See Calderon Decl. ¶¶ 9-10, at 2.

78.    In a press release, the Director of the FTC's Bureau of Consumer Protection states that "[t]he new disclosures should make it clear that . . . cigarettes without additives are not safe to smoke.  The fact is, there's no such thing as a safe smoke."  FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads Are Deceptive, at 21 (dated April 27, 2000), filed November 18, 2016 (Doc. 71-1).  See Defendants' FOFs ¶ 32, at 8 (asserting this fact).

79.    In its MTD MOO, the Court concludes that a reasonable consumer who has an opportunity to inspect a Natural American cigarette package would be expected to see and read

the disclaimer, and understand from it that the lack of additives in Natural American cigarettes does not make Natural American cigarettes safer than other cigarettes.  See MTD MOO at 172; Defendants' FOFs ¶ 33, at 9 (asserting this fact).

80.    Pursuant to the Consent Order, Santa Fe Tobacco included a disclaimer on their tobacco products that read: "No additives in our tobacco does NOT mean safer."  Consent Order at 5 (capitalization in original).

81.    All Natural American cigarette advertisements and packages that Santa Fe Tobacco distributed between July 20, 2000, and September 30, 2017, included a disclaimer that read: "'No additives in our tobacco does NOT mean a safer cigarette.'"  Calderon Decl. ¶ 10, at 2 (capitalization in original).  See Consent Order at 5; Defendants' FOFs ¶ 30, at 8 (quoting Calderon Decl. ¶ 10, at 2)(asserting this fact); id. ¶ 78, at 18.

82.    The disclaimer is limited to additives and "'says nothing about the natural or organic descriptors.'"  Plaintiffs' FOFs ¶ 255, at 61 (quoting MTD MOO at 172).

83.    In March, 2010, Santa Fe entered into an Assurance of Voluntary Compliance with the National Association of Attorney Generals.  See Assurance of Voluntary Compliance at 1-10, filed July 23, 2020 (Doc. 291-10 at 19)("Voluntary Compliance").

84.    In the Voluntary Compliance, Santa Fe Tobacco acknowledged the Attorney Generals' concerns that "consumers may be misled" by Santa Fe Tobacco's advertising certain Natural American cigarettes as containing "'organic'" or "'100% organic'" tobacco.  Voluntary Compliance at 1 (no citation for quotation).

85.    In the Voluntary Compliance, the Attorney Generals state that they "believe that the advertisements are deceptive and misleading in violation of the Master Settlement Agreement and Consent Decree as well as various state consumer protection laws."  Voluntary Compliance

at 1.

86.     In entering into the Voluntary Compliance, Santa Fe Tobacco states that it believes its advertisements are true and not misleading, but it is in the parties' best interest to enact the agreement rather than proceed to litigation.  See Voluntary Compliance at 1.

87.     In accordance with the Voluntary Compliance agreement, from March 31, 2010, through the present, Santa Fe Tobacco has used a second disclaimer on all advertisements for organic Natural American cigarettes, which reads: "Organic tobacco does NOT mean a safer cigarette."  Calderon Decl. ¶ 12, at 2 (capitalization in original).  See Defendants' FOFs ¶¶ 34-35, at 9 (asserting this fact); id. ¶ 78, at 18.

88.     On August 21, 2015, the Food and Drug Administration ("FDA") published a study, titled Additive-Free and Natural Descriptors and Disclaimer Influence on Smokers' Perceptions of Natural American Spirit Cigarettes, filed July 23, 2020 (Doc. 280-4)("FDA NAS Study"), which concluded that a disclaimer, that "No additives in our tobacco does NOT mean a safer cigarette," did not offset the effect of "100% Additive-Free Natural Tobacco" and "natural" descriptors on consumers' opinions, and that tested Natural American cigarette products conveyed "modified risk to consumers."  FDA NAS Study at 3 (capitalization in original); Plaintiffs' FOFs ¶ 37, at 10; id. ¶ 255, at  61; Expert Report by Jennifer Pearson at 13 (dated May 12, 2019), filed July 23, 2020 (Doc. 280-5)("Pearson Report").

89.     The FDA reached the same conclusion in its review of Nat Sherman-branded cigarettes, which features natural descriptors and the same disclaimer.  See Plaintiffs' FOFs ¶ 256, at 61; Pearson Report at 13-14.

90.     The FDA also concluded that, conversely to expectations, "'[w]hen the disclaimer was present on the pack label, consumers rated comparative exposure *lower* than when the

disclaimer was absent.'"  Plaintiffs' FOFs ¶ 257, at 62 (quoting FDA 2015 Nat Sherman Report at 2, filed July 23, 2020 (Doc. 287-4)).

91.    On August 27, 2015, as a result of its conclusions in the FDA NAS Study, the FDA sent a warning letter advising the Defendants that their use of the terms "natural" and "additive-free" on Natural American cigarettes' labeling "represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products."  Plaintiffs' FOFs ¶ 103, at 22-23 (asserting this fact)(citing Second Consolidated Amended Class Action Complaint ¶ 59, at 28, filed November 1, 2018 (Doc. 219)("Second Amended Complaint")).  See Plaintiffs' FOFs ¶ 189, at 42; Second Amended Answer ¶ 59, at 15.

92.    In January, 2017, the Defendants entered into a Memorandum of Agreement Between The United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), at 31-32, filed July 23, 2020 (Doc. 291-10)("Memo. of Agreement"), with the FDA.  See Defendants FOFs ¶ 37, at 9 (asserting this fact); Plaintiffs' FOFs ¶ 31, at 8.

93.    Pursuant to the Memo. of Agreement, Santa Fe Tobacco stopped using the terms "natural" and "additive-free" on its Natural American packaging, and in its advertisements, except for in the brand name Natural American Spirits, Santa Fe Natural Tobacco, and all associated trademarks.  Memo. of Agreement ¶¶ 1-3, at 1.  See Defendants FOFs ¶ 37, at 9 (asserting this fact); Plaintiffs' FOFs ¶ 31, at 8; id. ¶ 104, at 23.

94.    The Memo. of Agreement allows Santa Fe Tobacco to use the statements "Tobacco Ingredients: Tobacco & Water" or "Tobacco Filler Ingredients: Tobacco & Water."

Defendants FOFs ¶ 37, at 9 (citing Memo. of Agreement at ¶ 2, at 31).

95.     Since 2013, Santa Fe Tobacco had begun "'measuring whether consumers would view "Ingredients: Tobacco & Water" as synonymous with "additive-free."'"  Plaintiffs' FOFs ¶ 148, at 34 (quoting Dewhirst Report at 17).

96.     "Tobacco and water" labeling "seems to rule out other ingredients" and gives consumers the impression that Natural American cigarettes are additive-free.  Draft Presentation, Qualitative Research Findings: 2016 NAS DM Creative Testing at 3 (dated September, 2015), filed July 23, 2020 (Doc. 281-26)("Creative Testing").  See Dewhirst Report at 31 ("[M]ore than 60% of ad viewers equated 'Ingredients: Tobacco and Water' with 'additive-free.'"); Plaintiffs' FOFs ¶ 50, at 35.

97.     In light of the Memo. of Agreement, Santa Fe Tobacco sought the FTC's view whether the "Tobacco & Water" statements would require a disclaimer, and whether the FTC would accept Santa Fe Tobacco's proposal to modify the disclaimer under the Consent Order to state: "Natural American Spirit cigarettes are not safer than other cigarettes."  Calderon Decl. ¶ 15, at 4.  See Defendants' FOFs ¶ 38, at 10 (asserting this fact).

98.     In a May 9, 2017, guidance letter, the FTC states that "whether a claim is reasonably conveyed in an advertisement requires an examination of the entire advertisement, and an assessment of the overall net impression(s) conveyed."  Letter from Mark K. Engle to Mark S. Brown, Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) at 34-36 (dated May 9, 2017), filed July 23, 2020 (Doc. 291-10)("FTC Informal Guidance").

99.     The FTC also expressed concern that "[l]ooking solely at the [Tobacco & Water] phrases. . . raises concerns that, depending on the context, consumers could reasonably interpret

advertisements containing the phrases at issue to mean that Santa Fe Natural American Spirit cigarettes contain no additives or chemicals."  FTC Informal Guidance at 35.

100.    In addition, the FTC noted that Santa Fe Tobacco's phrases "are very similar to '100% tobacco' and 'pure tobacco' -- each of which specifically triggers the cigarette disclosure."  FTC Informal Guidance at 35 (no citation for quotation).

101.    The FTC concluded that it could not "definitively opine" whether Santa Fe Tobacco's "Tobacco & Water" descriptor would trigger the disclosure requirement under the Consent Order.  FTC Informal Guidance at 35.  See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

102.    Nevertheless, the FTC agreed that Santa Fe Tobacco's proposed modified disclaimer -- that "Natural American Spirit cigarettes are not safer than other cigarettes" -- would "convey the core message that Santa Fe Tobacco cigarettes are not safer than other cigarettes" and would be acceptable under the Consent Order.  FTC Informal Guidance at 36.  See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

103.    The FTC stated that it had no issue with the modified disclaimer, so long as it was displayed on advertisements subject to the Consent Order.  See FTC Informal Guidance at 36. See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

104.    On October 1, 2017, Santa Fe Tobacco stopped using the phrase "100% additive-free natural tobacco" in its packaging and advertisements  Calderon Decl. ¶ 15, at 4.  See Defendants' FOFs ¶ 36, at 9 (asserting this fact).

105.    When Santa Fe Tobacco stopped using the phrase "100% additive-free natural tobacco," it modified the disclaimer on its advertisements and packaging to read: "Natural American Spirit cigarettes are not safer than other cigarettes."  Calderon Decl. ¶ 15, at 4.  See

Defendants' FOFs ¶ 36, at 9 (asserting this fact).

106.    Santa Fe Tobacco also substituted the natural and additive-free descriptors with a descriptor that states that the tobacco's ingredients are "tobacco & water."  Defendants' FOFs ¶ 78, at 18 (citing Calderon Decl. ¶ 15).

107.    Santa Fe Tobacco has not used additive-free or natural descriptors on Natural American cigarette packages distributed since October 1, 2017, or on advertisements or promotional materials published since that date.  Calderon Decl. ¶ 16, at 4.  See Defendants' FOFs ¶ 40, at 10 (asserting this fact).

108.    The word "natural" nevertheless remains on the label, as it is a part of Natural American's brand name.  Plaintiff's FOFs ¶¶ 151-52, at 35 (citing Dewhirst Report at 38); Defendants' FOFs ¶ 78, at 18 (citing Calderon Decl. ¶ 15).

109.    Since October 1, 2017, Santa Fe Tobacco has included the "not safer" disclaimer on all advertisements that the Consent Order covers and on all Natural American cigarette packages.  Calderon Decl. ¶¶ 17-18, at 4-5.  See Defendants' FOFs ¶ 41, at 10 (asserting this fact).

110.    Consumers will not necessarily have seen these disclaimers before purchasing Natural American cigarettes.  See Defendants' FOFs ¶ 80, at 19 (quoting Plaintiffs' Reply in Support of Motion for Class Certification at 17 n.13, filed November 19, 2020 (Doc. 331)("Certification Reply").

111.    A reasonable consumer holding a cigarette pack "'would be expected to locate, read, and understand the disclosure.'"  Defendants' FOFs ¶ 81, at 19 (quoting MTD MOO at 170-72).

4. __Cigarettes and Health__.

112. "'Cigarettes today cause about 500,000 deaths per year just in the United States, and that number has grown significantly over time.'"  Plaintiffs' FOFs ¶ 4, at 2 (quoting Proctor Report at 2).

113. Cigarettes are as addictive as heroin and cocaine.  See Plaintiffs' FOFs ¶ 47, at 12; Proctor Report at 9.

114. Nicotine[4] causes cigarette addiction via the inhalation of cigarette smoke through the lungs to the brain.  See Plaintiffs' FOFs ¶ 46, 48, at 12; Proctor Report at 7-8.

115. The tobacco industry has worked to make cigarette smoke progressively easier to inhale, and carefully calibrates the nicotine content of cigarettes to create and sustain addiction. See Plaintiffs' FOFs ¶¶ 45, 48, at 12; Proctor Report at 6.

116. Natural American cigarettes are not less harmful than other cigarettes.  See Plaintiffs' FOFs ¶ 41, at 10; id. ¶ 262, at 62; id. ¶ 268, at 65 (citing Warning Letter from Ann Simoneau, Director, Office of Compliance and Enforcement, Center for Tobacco Products, Food & Drug Administration, to Michael Little, President, Santa Fe Natural Tobacco Company, Inc. (dated August 27, 2015), filed July 23, 2020 (Doc. 287-6)("FDA Warning Letter")(concluding that there is no scientific support for the claim that Natural American cigarettes are safer of healthier than other cigarettes); id. ¶ 274-75, at 66 (quoting Cummings Report at 9).

117. Natural American cigarettes may be more harmful than other cigarette brands because, on average, they deliver more free-base nicotine --which makes them on average at

---

[4]Nicotine is an addictive chemical found naturally in the tobacco plant.  See U.S. Food & Drug Administration, Nicotine Is Why Tobacco Products Are Addictive, https://www.fda.gov/tobacco-products/health-effects-tobacco-use/nicotine-why-tobacco-products-are-addictive (last visited October 5, 2022).

least as addictive as other cigarettes -- and certain carcinogenic compounds than most other cigarettes.  See Plaintiffs' FOFs ¶ 41, at 10; id. ¶ 263, at 62; Transcript of Class Certification Hearing at 541:5-542:4 (taken December 15, 2020), filed January 4, 2021 (Doc. 345)("December 15 Tr.")(Cummings).

118.    The FDA and Centers for Disease Control and Prevention (CDC) found that, among fifty mainstream U.S. cigarette brands, blue packs of Natural American cigarettes yielded the highest total concentration of polycyclic aromatic hydrocarbons,[5] with yields 60% to 170% higher than the average yield of all cigarettes analyzed.  See Plaintiffs' FOFs ¶ 270, at 65-66 (citing An T. Vu, Kenneth M. Taylor, Matthew R. Holman, Yan S. Ding, Bryan Hearn & Clifford H. Watson, Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes, 28 Chem. Rsch Toxicology 1616, 1623 (2015), filed July 23, 2020 (Doc. 287-7)).

119.    Compared to fifty U.S. cigarette brands, Natural American cigarettes "'had the highest mean concentrations for cadmium and mercury.'"[6]  Plaintiffs' FOFs ¶ 271, at 66 (quoting Mark R. Fresquez, R. Steven Pappas & Clifford H. Watson, Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes at 8, Author Manuscript (2013), filed July 23, 2020 (Doc. 287-8)).

---

[5]Polycyclic aromatic hydrocarbons are "a class of known carcinogenic compound in cigarette smoke" that "do not occur naturally in the tobacco plant; rather, they are formed through incomplete combustion during the smoking process."  Plaintiffs' FOFs ¶ 270, at 65.

[6]"Cadmium is both a known carcinogen and associated with chronic obstructive pulmonary disease and nephrotoxicity."  Plaintiffs' FOFs ¶ 272, at 66 (quoting Mark R. Fresquez et al., Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes, filed July 23, 2020 (Doc. 287-8)).   "Mercury causes a wide array of well-known, deleterious health effects."  Plaintiffs' FOFs ¶ 273, at 66 (quoting Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes).

120.    Santa Fe Tobacco has internally "acknowledged the higher concentrations of harmful and potentially harmful chemicals isolated in the smoke of NAS cigarettes," compared to other R.J. Reynolds and non-R.J. Reynolds brands.  Plaintiffs' FOFs ¶ 264, at 63 (quoting Cummings Report at 6).

121.    In an "internal comparison of deliveries of harmful constituents in Natural American Spirit Cigarettes versus those in the leading competitive brands," only Natural American cigarettes delivered more than 40mg of tar, and all 10 Natural American brands delivered more nicotine than other leading brands, and more 1,3-butadiene[7] than all but one competitor.  Plaintiffs' FOFs ¶¶ 265-67, at 63-64 (citing Santa Fe Tobacco Presentation on Harmful & Potentially Harmful Constituents (HPHCs), filed July 23, 2020 (Doc. 287-5)).

**5.    Natural American Sales and Growth.**

122.    While overall cigarette consumption in the United States is declining, Natural American cigarette sales have been increasing.  See Proctor Report at 2.  See Figure 1.



*Data Source:* Sources: RAI 10Ks; Santa Fe Causal Reports; Calderon Dep. Ex. 28G; BAT Annual Report 2019

<u>Figure 1</u>: Sales trends in Natural American cigarettes (blue) and sales trends for cigarettes in the rest of the industry (red).  Plaintiffs' FOFs ¶ 7, at 3 (citing Proctor Report at 2).

123.    As of May 2018, Santa Fe had 13 million people on its active mailing list.  <u>See</u> Plaintiffs' FOFs ¶ 96, at 21; Videotaped Deposition of Andrew Huyett at 163:15-16 (taken June 15, 2018), filed July 23, 2020 (Doc. 280-11)("Huyett Depo.").

124.    Natural American "'is the only growing brand of conventional cigarette, with sales increasing by double digit percentages every year.'"  Plaintiffs' FOFs ¶ 165, at 37 (quoting Proctor Report at 42).

125.    This growth occurred because of Natural American Cigarettes' brand differentiation, which includes "everything '[f]rom our core proposition of additive free . . . to organic styles.'"  Plaintiffs' FOFs ¶ 166, at 38 (quoting Untitled American Spirit Presentation Notes at 3).

126.    Santa Fe Tobacco's PPODs are the "first motivators" that lead consumers to try Natural American cigarettes, with the "natural," "additive-free," and "organic" PPODs accounting for 74% of consumers' initial trials.  Plaintiffs' FOFs ¶¶ 167-68, at 38 (quoting Gonzales Depo. at 123:14-124:2, and citing Dewhirst Report at 6).

127.    In the mid-1990s, between 89% and 100% of surveyed Natural American consumers indicated that the "absence of additives" was the "primary" reason for trying the brand.  Plaintiffs' FOFs ¶ 169, at 38 (quoting Untitled Survey Documentations at 1207-08, filed July 23, 2020 (Doc. 281-30)).

128.    That number reached 100% in April, 1996.  <u>See</u> Plaintiffs' FOFs ¶ 170, at 38; Paid Sample Request at 8878, filed July 23, 2020 (Doc. 281-31).

129.    "[T]he 'vast majority' of consumers who usually smoke Natural American Spirit

Cigarettes 'claim to choose the brand because it is "100% No Additives" or "All Natural."'" Plaintiffs' FOFs ¶ 171, at 38-39 (quoting Zoom Insights Summary of Learning at 4643, filed July 23, 2020 (Doc. 281-32)).

130.    Natural, additive-free, and organic labeling increases consumers' health benefit perception and drives both purchases of Natural American cigarettes and consumers' willingness to pay a premium.  See December 15 Tr. at 504:1-23 (Cummings, Gdanski); id. at 528:4-11 (Cummings); id. at 594:3-11 (Cummings); December 16 Tr. at 630:1-631:14 (Cummings, Gdanski); id. at 628:17-629:11 (Cummings, Gdanski); Plaintiffs' FOFs ¶ 157, at 36.

131.    Natural American cigarettes would not have their current product differentiation or market standing if consumers had not believed that their products were safer and healthier than other cigarettes.  See December 15 Tr. at 594:3-7 (Cummings); Plaintiffs' FOFs ¶ 157, at 36.

132.    The majority of mentholated Natural American smokers chose the brand because of its 100% no additives and all-natural claims.  See Tr. at 796:5 (Cummings); Plaintiffs' FOFs ¶ 162, at 37.

133.    R.J. Reynolds has noted that Natural American cigarettes "'appeal to smokers turned on by a new-agey alternative consciousness and who are concerned about their health, even if resigned to their addiction.'"  Plaintiffs' FOFs ¶ 241, at 58 (quoting Notes/Excerpts from Santa Fe Newsclips at 9, filed July 23, 2020 (Doc. 287-1)).

134.    Santa Fe Tobacco President Robin Sommers, in a discussion on additive-free cigarettes, stated: "'People are going to smoke, I don't care what you do, so let's make the best product for people who have chosen to smoke or can't stop smoking.'"  Plaintiffs' FOFs ¶ 242, at 58 (quoting Notes/Excerpts from Santa Fe Newsclips at 9)

135.    Claims that Natural American cigarettes are "manufactured by a socially responsible company" are "low driver[s]" of smoker's repurchasing the brand.  Plaintiffs' FOFs ¶ 178, at 40 (quoting 2015 Buyer Research Guide at 70-72, filed July 23, 2020 (Doc. 279-30).

136.    Conversely, descriptors like additive-free, natural, and organic, are "High Drivers" of future purchase intent, with 39% of Natural American smokers ranking additive-free as the reason for their purpose, and 74% of buyers stating that additive-free, natural, and organic descriptors were the main reason for their first purchase.  Plaintiffs' FOFs ¶ 215, at 50 (quoting 2015 Buyer Research Guide at 70).

137.    Out of 2,063 surveyed Natural American purchasers, 189 said that additive-free and natural descriptors drove future purchasing intent, and 137 indicated that a premium-quality brand, a term that strongly correlates with all-natural and additive-free tobacco, drove future purchasing intent.  See Plaintiffs' FOFs ¶ 216, at 50; 2015 Buyer Research Guide at 70-72; December 16 Tr. at 827:12-25 (Cummings, Gdanski).

138.    Many of those who smoke Natural American brands believe their product may be healthier or safer for them compared to other brands.  See Plaintiffs' FOFs ¶ 182, at 41; id. ¶ 193, at 44; id. ¶ 195, at 44-45; id. ¶ 197, at 45; id. ¶ 205, at 46; December 15 Tr. at 528:20-530:24 (Cummings, Gdanski); Pearson Report at 3, 5-8; December 16 Tr. at 846:17-847:12 (Gdanski, Pearson).

139.    Natural American smokers are 22 times more likely than smokers of other brands to believe that their brand of cigarettes may be less harmful than others.  See Plaintiffs' FOFs ¶ 196, at 45; Pearson Report at 7.

140.    Similarly, 67% of Natural American mellow smokers and 55% of Natural American full-bodied smokers believed that the cigarettes that they smoked were less harmful

than other brands.  Plaintiffs' FOFs ¶ 185, at 42; December 15 Tr. at 531:22-532:1 (Cummings); id. at 535:19-38:5 (Cummings, Gdanski).

141.    63.9% of Natural American cigarette smokers believe their preferred brand may be less harmful than other brands.  See Plaintiffs' FOFs ¶ 206, at 46; December 16 Tr. at 883:8-17 (Pearson).

142.    Descriptors like organic, natural, and additive-free in Natural American cigarettes' marketing reduce non-smokers', former smokers', and current smokers' perceived harm associated with the cigarette brand compared to other brands.  See Plaintiffs' FOFs ¶ 202, at 45; id. ¶ 207, at 46; id. ¶ 237, at 57; Pearson Report at 9, 15; December 16 Tr. at 870:18-871:21 (Pearson); id. at 880:4-7 (Pearson); id. at 887:5-12 (Pearson); id. at 898:23-899:14 (Pearson).

143.    Natural American cigarettes' warnings and disclaimers on their packaging and in their marketing are "'not effective in correcting product misperceptions.'"  Plaintiffs' FOFs ¶ 259, at 62 (quoting Cummings Report at 5).

144.    Disclaimers about cigarettes' safety, even when "blown up to the size of the Surgeon General's warning and shown to survey participants," do not offset misperceptions of cigarettes' harms.  Plaintiffs' FOFs ¶ 203, at 46.  See Plaintiffs' FOFs ¶ 254, at 61; December 16 Tr. at 832:-893:4 (Pearson); id. at 953:13-19 (Pearson); Pearson Report at 19.

145.    In 1967, the FTC concluded that a recently added cautionary statement on cigarette packs did not have a discernible effect on cigarette consumption.  See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 546:3-19 (Cummings).

146.    The FTC released a similar study in 1981 that analyzed warnings that were included on cigarette packages beginning in 1970, which determined that they failed to inform

consumers about smoking's hazards, and that consumers did not notice or read the warnings. See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 547:2-11 (Cummings).

147. This pattern continues to the present day, with few smokers being able to tell what the warnings are and otherwise not looking at or reading the warnings. See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 548:4-17 (Cummings).

148. "For a health warning and/or disclaimer to be effective it needs to be noticed, read, cognitively processed and remembered." Cummings Report at 18. See Plaintiffs' FOFs ¶ 260, at 62.

149. "'[W]hile consumers might be able to accurately report 'additive-free' cigarettes are no less harmful than other cigarettes, they still harbor the belief that these products *might* be less harmful than other brands.'" Plaintiffs' FOFs ¶ 252, at 61 (quoting Pearson Report at 18).

150. Text-only, black and white warnings are comparatively less impactful than in-color graphic warnings. See Plaintiffs' FOFs ¶ 248, at 60; December 15 Tr. at 554:15-25 (Cummings).

151. "In general, small text-only warnings on the side of packs are associated with lower levels of awareness and recall compared to larger, more prominent warnings located on the face of cigarette packs." Pearson Report at 18. See Plaintiffs' FOFs ¶ 249, at 60; December 16 Tr. at 874:18-878:10 (Schultz, Pearson); id. at 892:4-893:4 (Pearson); Transcript of Class Certification Hearing at 953:13-19 (taken December 17, 2020), filed January 4, 2021 (Doc. 348)(Pearson, Reisman)("December 17 Tr.").

152. "Corrective statements concerning misconceptions about tobacco products are rarely effective at correcting the emotional basis of beliefs about tobacco products." Plaintiffs' FOFs ¶ 251, at 61 (citing Pearson Report at 18).

153.    It is frequently impossible for a consumer to review a cigarette pack's warnings before purchasing, as vendors store packs typically behind the counter with only the front visible, and so a package's disclosure does not necessarily "cure a deception inflicted upon a reasonable consumer."  MTD MOO at 172.  See Plaintiffs' FOFs ¶ 250, at 60-61.

154.    Standardized packing reduces perceptions that Natural American Cigarettes are safer.  See Plaintiffs' FOFs ¶ 204, at 46; Pearson Report at 16.

155.    Defendants' consumer perception studies determined that their consumers "perceived Natural American Spirit Cigarettes as 'safer, healthier, less harmful, fewer chemicals, cleaner, pure, [and] not bad for you.'"  Plaintiffs' FOFs ¶ 212, at 49 (quoting Tr. at 506:18-23 (Cummings)).

156.    Reynolds' advertising campaign analysis in 2014 and 2017 revealed that at least 21% of consumers thought that Natural American cigarettes were better or safer than other cigarettes.  See Plaintiffs' FOFs ¶ 213, at 49; December 15 Tr. at 636:15-21 (Cummings).

**6.    Consumer Perception of Cigarettes**

157.    In 1953, tobacco industry leaders met at the Plaza Hotel in New York City to plan a response to growing evidence that cigarette smoke caused disease, especially lung cancer.  See Plaintiffs' FOFs ¶ 51, at 12; Proctor Report at 6.

158.    That meeting launched an industry movement to deceive the public, including with claims that cigarettes with certain design features were safer than conventional cigarettes. See Plaintiffs' FOF ¶ 53, at 13; Proctor Report at 5.

159.    Since the 1950s, the tobacco industry has used advertising to combat and create doubt regarding the public health community's scientific research showing that smoking was harmful, and smeared and belittled those who wrote about smoking's dangers and publicized the

tobacco industry's marketing manipulation.  See Plaintiffs' FOFs ¶¶ 54, 60 at 13-14; December 15 Tr. at 554:1-557:13 (Cummings, Gdanski); id. at 559:1-260:22 (Cummings, Gdanski) id. at 592:2-18 (Cummings).

160.    During the 1970s and 1980s, the public became increasingly concerned about the presence of chemicals in food, water, and cigarettes, and in 1994, the release of the tobacco industry's previously confidential list of 600 cigarette additives lent credence to these fears.  See Plaintiffs' FOFs ¶¶ 72-73, at 16-17; Proctor Report at 12, 28; December 16 Tr. at 627:5-628:3 (Cummings).

161.    The publicity of this cigarette additives list  "'made it easier to believe that the true horror of cigarettes lay in their myriad additives.'"  Plaintiffs' FOFs ¶ 74, at 17 (quoting Proctor Report at 28).

162.    Adults in the United States believe commonly that cigarette additives are primarily responsible for cigarettes' harmful aspects, and that natural or additive-free cigarettes are or may be less harmful than other brands.  See Plaintiffs' FOFs ¶ 193, at 44; Pearson Report at 3; December 16 Tr. at 846:17-847:12 (Pearson, Schultz).

163.    Phrases like "'100% Additive Free' and 'Made with Organic Tobacco' communicated reduced harm to experimental study participants."  Plaintiffs' FOFs ¶ 199, at 45 (quoting Pearson Report at 10-11).

164.    " 'Consumers perceive[] cigarettes marketed as 'natural' or 'additive-free' as less harmful, and this influence[s] their perceptions of advertising claims and intention to purchase, controlling for other factors.'"  Plaintiffs' FOFs ¶ 200, at 45 (quoting Pearson Report at 14).

165.    "Nearly half of smokers believe that organic and additive-free cigarettes may be less harmful than other brands."  Plaintiffs' FOFs ¶ 206, at 46 (citing December 16 Tr. at 883:8-

17 (Pearson)).

166.    Youth similarly rate cigarette labels that use the term 'natural' as "significantly more appealing to people their age and less harmful than packages without this term."  Plaintiffs' FOFs ¶ 201, at 45 (quoting Pearson Report at 14).

167.    Over the twentieth century, the tobacco industry developed a number of features intended to induce consumers to smoke cigarettes they perceived as safer, including: (i) toasted leaves, ostensibly to drive off poison; (ii) menthols and milds, to reduce irritation; (iii) king-sized and filtered cigarettes, to trap poisons; (iv) low-tars, lights, and ultralights, to reduce the toxic dose; and (v) natural, organic, and additive-free labels, to yield cleaner smoke.  See Plaintiffs' FOFs ¶ 55, at 13; Proctor Report at 6-7; id. at 28-42; MTD MOO at 167-68 ("The terms natural and organic have long been used across the country to convey products' health benefits.").

168.    These product features and labels did not make cigarettes any safer.  See Plaintiffs' FOFs ¶ 55, at 13; Proctor Report at 6-7; id. at 28-42.

169.    The tobacco industry uses descriptors like natural, low-tar, additive-free, or ultralight, to target smokers who are thinking of quitting.  See Plaintiffs' FOFs ¶ 68, at 16; December 15 Tr. at 523:19-524:9 (Cummings, Gdanski).

170.    Beginning in the 1950s, filtered cigarettes' popularity grew -- from 2% market share to 99.7% market share today -- as a result of tobacco industry efforts to respond to the growing public awareness of cigarette smoking's health risks.  See Plaintiffs' FOF ¶ 56, at 13-14; December 15 Tr. at 515:4-20 (Cummings), id. at 566:11-19 (Cummings).

171.    The use of these features and advertising methods marks a campaign of health reassurance, as part of which tobacco companies, instead of addressing frankly cigarette smoking's health risks, provide smokers a "'psychological crutch and the self rationale to

continue smoking.'"   Plaintiffs' FOF ¶ 58, at 14 (quoting December 15 Tr. at 573:X23-24(Cummings))

172.   The tobacco industry knew that these features were effective at maintaining smokers' health misconceptions, noting, for instance, that "the 'illusion of filtration' -- in other words, what the consumer believes -- 'is as important as the fact of filtration."   Plaintiffs' FOFs ¶ 59, at 14 (quoting December 15 Tr. at 586:16-22 (Cummings)).

173.   The tobacco industry created a "wallpaper effect" of cigarette advertising, meaning it was impossible for consumers to escape the industry's advertising.   See Plaintiffs' FOFs ¶ 61, at 15 (quoting December 15 Tr. at 567:20-24 (Cummings)).

174.   In 1984, the American Tobacco Company commissioned a study of attitudes toward cigarettes made from additive-free tobacco, and found that the additive-free label had "'significant appeal'" due to the phrase's health implications.   Plaintiffs' FOFs ¶ 76, at 18 (quoting Proctor Report at 20).

175.   The American Tobacco study also indicated that smokers needed "'reassurances'" and that, particularly when combined with fine-tobacco and natural-ingredients marketing themes, a no-additives label could appeal to half of all smokers.   Plaintiffs' FOFs ¶ 77, at 18 (quoting Proctor Report at 19).

176.   The tobacco industry knew that advertising cigarettes as pure and clean implied a healthier product.   See Plaintiffs' FOFs ¶ 88, at 20; December 15 Tr. at 579:7-581:25 (Court, Cummings, Gdanski).

177.   Between the 1970s and 1990s, several major tobacco companies -- including R.J. Reynolds, Brown and Williamson, Philip Morris, Lorillard, and Nat Sherman -- developed or planned to develop cigarettes with natural, organic, or additive-free attributes, intended to reach

smokers with health concerns or to demonstrate the product's wholesomeness.  See Plaintiffs' FOFs ¶ 79, at 18; Proctor Report at 14-17.

178.    Philip Morris explored developing an all-natural cigarette in the 1990s, and concluded that "'"Natural" has never been a more compelling word than it is today -- in areas of nutrition and health.  Its expanded meaning in advertising and labelling has become a by-word for quality and wholesomeness.'"  Plaintiffs' FOFs ¶ 78, at 18 (quoting Proctor Report at 16 (quoting Philip Morris, Additive-Free (1988), https://www.industrydocumentslibrary .ucsf.edu/tobacco/docs/#id=lgnb0106)).

179.    When Winston released its No Additives campaign in the 1990s, surveyed smokers stated commonly that the word natural meant healthier or less harmful.  See Proctor Report at 18; Plaintiffs' FOFs ¶ 180, at 41.

180.    The tobacco industry has never publicly acknowledged that their marketing causes consumers to use their products, but internally has noted that marketing is the key to brand sales and market share.  See Plaintiffs' FOFs ¶ 63-64, at 15; December 15 Tr. at 502:22-503:2 (Cummings, Gdanski).

181.    Natural American has also internally celebrated the effect of their marketing on sales.  See Plaintiffs' FOFs ¶ 64, at 15; December 15 Tr. at 503:19-504:5 (Cummings, Gdanski).

182.    In 2001, the National Cancer Institute released a monograph concluding that:

> 1.    Advertisements of filtered and low-tar cigarettes were intended to reassure smokers (who were worried about the health risks of smoking) and were meant to prevent smokers from quitting based on those same concerns.
>
> 2.    Advertising and promotional efforts were successful in getting smokers to use filtered and low-yield cigarette brands.
>
> 3.    Internal tobacco company documents demonstrate that the

cigarette manufacturers recognized the inherent deception of advertising that offered cigarettes as "Light" or "Ultra-Light," or as having the lowest tar and nicotine yields.

National Cancer Institute, Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine at 233, NCI Monograph 13 (November 2001).  See Plaintiffs' FOFs ¶ 69, at 16.

183.     These conclusions are reflected in the 2012 Surgeon General's Report, which concludes that "[t]here is strong empirical evidence that tobacco companies' advertising and promotions affect awareness of smoking and of particular brands, the recognition and recall of cigarette advertising, attitudes about smoking, intentions to smoke, and actual smoking behavior."  Office of the Surgeon General, Preventing Tobacco Use Among Youth and Young Adults at 508 (2012).  See Plaintiffs' FOFs ¶ 69, at 16.

184.     In 2015, the FDA's Center for Tobacco Products conducted a study "to determine whether Natural American Spirit cigarette products" using natural and additive-free descriptors on the packaging "conveyed modified risk to consumers."  FDA NAS Study at 2.  See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact).

185.     The FDA NAS Study concludes: "Overall, the descriptors elicited statistically significant findings on consumer ratings of risk, harm, and exposure. The presence of the descriptors caused consumers to rate the product lower in terms of comparative risk, comparative harm, absolute exposure, and comparative exposure."  FDA NAS Study at 2.  See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact); id. ¶ 186, at 42.

186.     The 2015 FDA Study also analyzes the disclaimers on Natural American cigarettes -- that "No additives in our tobacco does NOT mean a safer cigarette" -- and concludes:

Consistent with multiple copy tests completed by FDA for enforcement, the results here indicate that disclaimers fail to offset descriptors' effects on consumer perceptions. When informed by the disclaimer that 'no additives' does not mean a safer cigarette, consumers rated perceptions of the product the same as consumers who did not see the disclaimer statement about additives.

2015 FDA Study at 2.  See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact); id. ¶ 187-88, at 42.

### 7.   Expert Witness Qualifications

### a.   K. Michael Cummings, Ph.D's Qualifications.

187.   Dr. Cummings, trained in public health and health education, has decades of experience in the areas of tobacco use and cancer, smoking behavior, initiation, cessation, relapse, and its relationship to various diseases, particularly cancer.  See December 15 Tr. at 496:19-25 (Cummings).  See Plaintiffs' FOFs ¶ 11, at 4 (asserting this fact).

188.   Dr. Cummings is a professor at the Medical University of South Carolina, and co-leads the university's Tobacco Research Program.  See Defendants' FOFs ¶ 57, at 14 (citing Cummings Report at 2).

189.   Dr. Cummings is an expert in understanding how consumers perceive different tobacco products, and how risk perceptions of tobacco products influence smokers' willingness to take up using certain tobacco products or certain brands of cigarettes.  See December 15 Tr. at 497:23-498:4 (Cummings); Plaintiffs' FOFs ¶ 11, at 4 (asserting this fact).

190.   As of May, 2019, Dr. Cummings testified in tobacco litigation as an expert plaintiffs' witness more than 150 times in federal and state courts.  See Defendants' FOFs ¶ 58, at 14-15 (citing Cummings Report at 5).

191.   Dr. Cummings has over 500 peer-reviewed publications, 95% of which have focused on smoking and health. See December 15 Tr. at 511:7-11 (Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

192.    Dr. Cummings has authored numerous papers dealing with smokers' perceptions of tobacco products, including their marketing.  See December 15 Tr. at 512:7-11 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

193.    Dr. Cummings has published on why smokers select cigarettes marketed as natural and additive free.  See December 15 Tr. at 513:9-20 (Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

194.    Dr. Cummings has studied smokers' brand selection in the context of their desires to smoke a product that they believe is safer or better for them.  See Plaintiffs' FOFs ¶ 66, at 15; December 15 Tr. at 514:18-22 (Cummings, Gdanski).

195.    Dr. Cummings has participated in the writing and editing of multiple United States Surgeon General reports on smoking.  See December 15 Tr. at 517:5-8 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 13, at 4 (asserting this fact).

196.    He also has been a reviewer and contributor to the numerous monographs[8] the National Cancer Institute publishes.  See December 15 Tr. at 521:11-19 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 13, at 4 (asserting this fact).

197.    Dr. Cummings has spent considerable time reviewing and studying tobacco industry documents. See December 15 Tr. at 496:12-22 (Cummings); Plaintiffs' FOFs ¶ 14, at 4 (asserting this fact).

198.    This work includes studying tobacco industry marketing documents such as advertising campaigns and business plans.  See December 15 Tr. at 501:9-502:1 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 14, at 4 (asserting this fact).

───────────────

[8]Monographs are "very similar to Surgeon General reports, but they were very topical on specific issues like smoking cessation or guidelines for doctors and how doctors could work more effectively with their patients."  December 15 Tr. at 517:5-8 (Cummings).

199.    He has reviewed the marketing documents regarding Natural American cigarettes. See December 15 Tr. at 502:2-5 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

200.    The core question Dr. Cummings addresses is whether there is common evidence that Natural American cigarette consumers have been deceived or misled by Natural American marketing. See December 15 Tr. at 527:15-19 (Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

201.    Some Natural American cigarette smokers perceive those cigarettes are healthier, safer, and better for them. See December 15 Tr. at 528:4-11 (Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

202.    Dr. Cummings' opinions are based on public health and academic studies, government reports and studies, as well as the Defendants' internal business records. See December 15 Tr. at 529:2-4 (Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

203.    There is broad support for the conclusion that the natural, additive-free, and organic descriptors used in Natural American cigarettes' labeling and marketing are deceptive and misleading. See December 15 Tr. at 529:2-9 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

204.    Dr. Cummings noted how the same conclusion from multiple sources using different methods to study the issue lends reliability to that conclusion. See December 15 Tr. at 529:15-530-3 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

**b.    Dr. Proctor's Qualifications.**

205.    Robert Proctor, Ph.D., is a Professor of the History of Science at Stanford University. See Plaintiffs FOF ¶ 18, at 5.

206.    Dr. Proctor is a leading authority on tobacco industry conduct.  See Plaintiffs FOF ¶ 18, at 5.

207.    Dr. Proctor was a scientific reviewer of the 2014 United States Surgeon General's fiftieth anniversary report on the health consequences of smoking.  See Plaintiffs FOF ¶ 18, at 5.

208.    Dr. Proctor provides a historical overview of the tobacco industry's decades-long fraudulent health reassurance campaigns.  See Plaintiffs FOF ¶ 19, at 6.

209.    Dr. Proctor's opinion is that the Defendants' use of "natural," "additive-free," and their substitutes in the labeling and advertising of Natural American cigarettes implies that those cigarettes are less harmful than others.

c.    **Jennifer Pearson, Ph.D's Qualifications.**

210.    Dr. Pearson has a doctorate in social and behavioral health from Johns Hopkins University.  See Plaintiffs FOF ¶ 20, at 6.

211.    Dr. Pearson is an Associate Professor at the School of Community Health Services at the University of Nevada, and was previously an Adjunct Assistant Professor at the Johns Hopkins Bloomberg School of Public Health.  See Plaintiffs FOF ¶ 20, at 6; Defendants' FOFs ¶ 52, at 13 (citing December 16 Tr. at 831:3-832:13 (Pearson)).

212.    Between 2009 to 2017, Dr. Pearson worked at Truth Initiative, which describes itself as "'America's largest nonprofit public health organization committed to making tobacco use and nicotine addiction a thing of the past.'"  Defendants' FOFs ¶ 53, at 13 (quoting Truth Initiative, Who We Are, https://truthinitiative.org/who-we-are (last visited November 25, 2022).

213.    Dr. Pearson's experience with the tobacco industry includes serving as contributing editor to the 2016 Surgeon General's Report on smoking and health, as deputy editor of Nicotine and Tobacco Research, a major publication in her field, and as program co-

chair for the Society for Research on Nicotine and Tobacco.  See Plaintiffs FOF ¶ 21, at 6.

214.    Dr. Pearson has authored six publications relating to Natural American cigarettes.
See Plaintiffs FOF ¶ 22, at 6.

215.    Work for the first two of these publications took place before Dr. Pearson
performed any work for this case.  See Plaintiffs FOF ¶ 22, at 6.

216.    All of the scientific literature underpinning Dr. Pearson's research -- with the
exception of internal FDA work product -- has been subject to peer review.  See Plaintiffs FOF
¶ 23, at 6; id. ¶ 194, at 44.

217.    Dr. Pearson also relies on peer-reviewed, published experimental and
observational studies.  See Plaintiffs' FOFs  ¶ 198, at 45.

218.    The methods Dr. Pearson uses are the same methods she teaches her students.
See Plaintiffs FOF ¶ 23, at 6.

### d.    Dr. Dewhirst's Qualifications.

219.    Timothy Dewhirst, Ph.D., is an Associate Professor and Senior Research Fellow
in Marketing and Public Policy in the Department of Marketing and Consumer Studies at the
University of Guelph.  See Plaintiffs FOF ¶ 25, at 7.

220.    Dr. Dewhirst has contributed to National Cancer Institute monographs on the
issues of smoking in health.  See Plaintiffs FOF ¶ 25, at 7.

221.    These contributions focused on the tobacco industry's marketing and advertising
of filtered, light, and low tar cigarettes.  See Plaintiffs FOF ¶ 25, at 7.

### e.    Jean-Pierre Dubé, Ph.D's Qualifications.

222.    Dr. Dubé, is the Sigmund E. Edelstone Professor of Marketing at the University of
Chicago Booth School of Business.  See Plaintiffs FOF ¶ 27, at 8; Defendants' FOFs ¶ 59, at 15.

223.    Dr. Dubé has taught graduate level classes concerning conjoint analysis, consumer demand, and willingness-to-pay.  See Plaintiffs FOF ¶ 28, at 8.

224.    Dr. Dubé has been retained by for-profit corporations to perform conjoint analyses to determine consumer preferences for the purposes of measuring willingness-to-pay and demand.  See Plaintiffs FOF ¶ 28, at 8.

225.    Dr. Dubé has published extensively in peer-reviewed journals regarding the use of conjoint analysis to assess consumer demand and willingness-to-pay in connection with particular product features.  See Plaintiffs FOF ¶ 28, at 8.

      **f.**        **J. Michael Dennis, Ph.D's Qualifications.**

226.    Dr. Dennis is a Senior Vice President at the National Opinion Research Center at the University of Chicago, where he oversees the group's online panel survey research business.  See Defendants' FOFs ¶ 62, at 15 (citing Rebuttal Expert Report of J. Michael Dennis, Ph.D. ¶ 6, at 2, filed July 23, 2020 (Doc. 277-1)("Dennis Report")).[9]

---

[9]Rule 702 of the Federal Rules of Evidence governs an expert's admissibility:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    **(b)**    the testimony is based on sufficient facts or data;

    **(c)**    the testimony is the product of reliable principles and methods; and

    **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her

opinions is reliable, and that his or her opinion fits the facts of the case, and thus will be helpful to the fact finder.  See Norris v. Baxter Healthcare Corp., 397 F.3d 878, 881 (10th Cir. 2005). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the case's facts, i.e., whether it is helpful to the trier of fact.  See v. Merrell Dow Pharmaceuticals, 509 U.S. 594-95 (1993)("Daubert"); Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  In Daubert, the Supreme Court of the United States of America articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert, 509 U.S. at 594-95.  The Court also is to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness adequately has accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

"Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

The Court denies the Motion to Exclude Dr. Dennis.  The Plaintiffs offer Dr. Dennis' testimony in rebuttal of Dr. Van Liere's testimony.  See Dennis Report ¶ 2, at 2.  The Defendants dispute that Dr. Dennis reached appropriately his conclusions that: (i) Dr. Van Liere should have used a conjoint analysis instead of a direct-question design; (ii) Dr. Van Liere's survey introduced possible recall bias; (iii) Dr. Van Liere should not have used open-ended questions for some data points, and should not have used closed questions for other data points; and (iv) Dr. Van Liere did not pre-test his survey questions.  Motion to Exclude Dr. Dennis at 8-12.

g.      **Kent Van Liere, Ph.D's Qualifications.**

227.   Dr. Van Liere[10] is the Managing Principal of Van Liere Consulting Inc. and between

2006 and 2017, was Vice President, Senior Vice President, and then Managing Director at NERA

---

In essence, the Defendants argue that Dr. Dennis did not rely on sufficient facts and data, did not conduct his own survey, and misunderstands the Plaintiffs' core allegations.   See Motion to Exclude Dr. Dennis at 16-33.  They also argue that Dr. Dennis was incorrect in his opinion that Dr. Van Liere did not pretest his survey, because Dr. Van Liere in fact conducted a pre-test.   See Motion to Exclude Dr. Dennis at 33-34.  Finally, they argue that Dr. Dennis' opinions are not relevant or helpful to the Court in deciding class certification issues, because his testimony does not explain how any of the issues which he identifies impact Dr. Van Liere's conclusions.   See Motion to Exclude Dr. Dennis at 34-36.

     Regarding relevance, to the extent that the Court has concluded that Dr. Van Liere's expert testimony is relevant to the Court, the Court concludes that Dr. Dennis' testimony critiquing Dr. Van Liere's methodology also is relevant, because it affects the weight the Court should afford Dr. Van Liere's testimony.  See Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996)("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility.").   Regarding reliability, the Court first notes that Dr. Dennis has demonstrated extensive experience in survey design.  See Dennis Report ¶¶ 4-18, at 2-7.  In preparing his report, Dr. Dennis indicates that he relied on the Van Liere Report, Dr. Van Liere's survey report, as well as all materials the Defendants provides on which Dr. Van Liere relied. See Dennis Report at 45.  The Court agrees with the Plaintiffs, who argue that Dr. Dennis' role as a rebuttal witness means that the materials on which he must rely to critique a survey are different from the materials on which Dr. Van Liere must rely to create his survey in the first place, and do not require Dr. Dennis to create his own survey.  See Plaintiff's Opposition to Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis at 15, filed October 8, 2020 (Doc. 308)("Motion to Exclude Dr. Dennis Opposition")(citing Aviva Sports v. Fingerhut Direct Mktg., 829 F. Supp. 2d 802, 835 (D. Minn. 2011)(Ericksen, J.); In re Cessna 208 Series Aircraft, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009)(Vratil, J.)).  The Defendants have not sought to attack Dr. Dennis' credentials or qualifications to scrutinize a survey's methodology, and the Court concludes, therefore, that they have not demonstrated that his methods are unreliable.  Accordingly, the Court denies the Motion to Exclude Dr. Dennis.

[10]The Court denies the Motion to Exclude Dr. Van Liere.  The Plaintiffs raise three arguments in support of their assertion that Dr. Van Liere's testimony is irrelevant, unreliable, and inadmissible: (i) his survey, which analyzes consumers' motives and intent in purchasing Natural American cigarettes, is not relevant to the Court at the class certification stage, and does not measure materiality; (ii) his survey methodology is flawed, because he did not properly code certain responses, did not control properly for bias, and used open-ended survey questions; (iii) a conjoint-analysis is the appropriate methodology instead of Dr. Van Liere's survey methodology.

Economic Consulting, where he is currently a Special Consultant.  See Defendants' FOFs ¶ 67, at 16

(citing Expert Report of Dr. Ken Van Liere ¶ 1, at 1, filed July 23, 2020 (Doc. 277-2)("Van Liere

Report")).

228.    Dr. Van Liere has forty years of experience designing, conducting, and analyzing

hundreds of consumer surveys for corporations and government agencies, which measure consumers'

opinions and behaviors regarding products and services, including purchasing, branding, positioning,

market segmentation, and product features.  See Defendants' FOFs ¶ 67, at 16 (citing Van Liere

Report ¶ 4, at 5).

229.    Dr. Van Liere has served as an expert in cases involving allegedly deceptive

advertising and trademark and patent infringement.  See Defendants' FOFs ¶ 67, at 16 (citing Van

Liere Report ¶ 5, at 5).

---

See Motion to Exclude Dr. Van Liere at 6-24.  The Court disagrees that Dr. Van Liere's expert
opinions are irrelevant and unreliable.

Regarding relevance, the Plaintiffs argue that Dr. Van Liere's survey is irrelevant,
because any discussion on materiality is a merits issue and not relevant to whether common
questions support the Plaintiffs' claims, and that, in any event, he does not measure materiality in
his survey.  See Motion to Exclude Dr. Van Liere at 8-12.  As the Court discusses in its analysis
below, whether the Plaintiffs can use common proof to establish their claims and satisfy the rule
23 requirements requires considering why consumers purchased Natural American cigarettes.
Dr. Van Liere's survey results address whether consumers uniformly associate the challenged
labels with certain health benefits, which is relevant to determining whether the Plaintiffs will be
able to meet their burden.  Accordingly, the Court does not exclude Dr. Van Liere's opinions on
this ground.

Additionally, to the extent that the Plaintiffs disagree with Dr. Van Liere's coding
method or content that a conjoint methodology is a more appropriate method for determining
consumer preferences, see Motion to Exclude Dr. Van Liere at 12-25, the Court concludes that
these questions are better suited for cross-examination and are not a barrier to admissibility.  Dr.
Van Liere explains thoroughly his methodologies for survey design and survey reporting -- with
reference to applicable industry standards, see, e.g., Van Liere Report ¶ 37 n.25, at 28, and the
Court concludes that the Plaintiffs have not demonstrated that Dr. Van Liere's implementation of
that methodology departs significantly from those standards such that his methods are unreliable.
Accordingly, the Court concludes that Dr. Van Liere's expert opinions are relevant and reliable,
and it will not exclude them.

### h.   David Teece, Ph.D's Qualifications.

230.    Dr. Teece[11] is a business professor at the Haas School of Business at the University of

California, Berkeley, and has written over 200 books and articles on brand valuation and strategic

_____

[11]The Court grants in part and denies in part the Motion to Exclude Dr. Teece.  The Defendants offer Dr. Teece as an expert in the fields of economics and business strategy.  See Motion to Exclude Dr. Teece at 1.  Specifically, the Plaintiffs seek to exclude seven of Dr. Teece's opinions:

- The market share of various cigarette brands demonstrates that descriptors such as "additive free" and "natural" are not drivers of sales of Natural American Spirit ("NAS") products (Teece Report at 4-14);

- The lack of a decrease in NAS market share after disclaimers were added to NAS packaging or after certain descriptors were removed from NAS packaging demonstrates that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 14-20);

- Wholesale and retail pricing of NAS products demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 20-34);

- The premium pricing of NAS products was the result of NAS brand equity and defendants' marketing efforts (Teece Report at 35-51);

- There is variability among NAS product users with respect to the reasons for their purchases and the product attributes they value (Teece Report at 51-54); and

- The methodology of the proposed conjoint analysis of Plaintiffs' expert, Dr. Jean-Pierre Dubé, is unreliable or improper (Teece Report at 66-81)[.]

Motion to Exclude Dr. Teece at 1-2.  As the Supreme Court notes in Kumho Tire Co. v. Carmichael, the Daubert factors apply to testimony based on technical and specialized knowledge, but are flexible and not a definitive checklist.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 141, 150.

        Dr. Teece has presented himself as an expert in the field of industrial organization, business strategy, and public policy.  See Teece Report ¶ 1, at 1.  In the Teece Report, he indicates that he bases his conclusions "on the pleadings, deposition testimony and materials produced in this litigation, public source materials, and [his] background and knowledge of economics, including industrial organization, business strategy, and the economics of innovation."  Teece Report ¶ 6, at 2.  The Court groups his opinions into two categories: the first

- 48 -

management, among other topics.  See Defendants' FOFs ¶ 71, at 17 (citing Teece Report ¶¶ 1-2, at 1).

### i.    Charles D. Garner, Ph.D's Qualifications.

231.    Dr. Garner[12] is the Vice President of Next Generation Products/Submission and Engagement in Scientific and Regulatory Affairs at the RAI Services Company.  See Expert Witness

---

six involve business strategy and customer values, while the seventh opinion involves Dr. Dubé's damages model.  See Teece Report at 4-81.

The Plaintiffs contest Dr. Teece's opinions on the basis that he relied primarily on market share to reach his conclusions, and that he did not consider differences in how certain comparator brands marketed themselves or how consumers viewed them.  See Motion to Exclude Dr. Teece at 10-15.  The Court considers these arguments to be more appropriate for cross-examination rather than as requiring exclusion of Dr. Teece's opinions.  Similarly, although Dr. Teece's assertion that he reaches his conclusions based on his "'common sense,'" Motion to Exclude Dr. Teece at 16 (quoting Deposition of David Teece (taken January 30, 2020) at 79:11-23, filed October 8, 2020 (Doc. 312-2)(Schultz, Teece)). may weaken his conclusions' strength, what is common sense to Dr. Teece, a business-strategy professional, is not the same common sense that a jury could reach on its own.  It is this sort of common sense that courts have concluded does not require expert testimony to explain.  See ,e.g., Dahlberg v. MCT Transp. LLC, 2012 WL 8945006, at *3 (D.N.M. July 20, 2012)(Scott, M.J.); Newsome v. Tull, 2019 WL 5197566, at *4 (W.D. Okla. August 6, 2019)(Heaton, J.).

Regarding Dr. Teece's opinion that Dr. Dubé's opinion and methodologies are not reliable, the Court concludes that the Dr. Teece and the Defendants have not demonstrated that he is familiar with conjoint analyses.  Although the Court is willing to accept Dr. Teece's expert testimony regarding drivers of Natural American's popularity and brand growth as an expert in business strategy, he does not explain in his report what qualifies him to critique a damages methodology or that he has familiarity with the methodology Dr. Dubé employs.  Accordingly, the Court will exclude Dr. Teece's seventh opinion that Dr. Dubé's methodology in unreliable. Because the Court concludes that Dr. Teece's first six opinions are sufficiently reliable, the Court will not exclude those opinions.

[12]The Court denies the Motion to Exclude Dr. Garner.  The Plaintiffs have moved under Daubert to exclude Dr. Garner's expert opinions and testimony in their entirety.  See Motion to Exclude Dr. Garner at 1-17.  They argue that Dr. Garner's opinions regarding menthol in Natural American cigarettes are not reliable under Daubert, because they are "based solely upon his say-so" and without "scientifically reliable support."  Motion to Exclude Dr. Garner at 9.  The Plaintiffs also argue that Dr. Garner's definition of an "additive" fails the second Daubert prong, because it is a "personal definition" which will not aid the Court.  Motion to Exclude Dr. Garner at 15.

First, the Plaintiffs argue that Dr. Garner is not qualified to give an opinion on whether

menthol is an additive, because he has "no special qualifications by training, education or experience in what constitutes an 'additive.'" Motion to Exclude Dr. Garner at 10. In response, the Defendants cite Dr. Garner's Ph.D. in toxicology, decades of work experience in "tobacco product evaluation," and publications on topics including "the relative difference in risk . . . between menthol and non-menthol cigarettes." Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Charles D. Garner at 10, filed October 8, 2020 (Doc. 316)("Motion to Exclude Dr. Garner Opposition") The Court agrees that Dr. Garner's background as a toxicologist and in the tobacco industry is sufficient to qualify him to opine on what constitutes an additive. See Garner Report at 2-3.

Second, the Plaintiffs assert that Dr. Garner's opinions are not reliable, because they are not based "'good grounds'" under Daubert, and instead consist of "semantics and review of cherry-picked literature." Motion to Exclude Dr. Garner at 10 (quoting Daubert, 509 U.S. at 596). In response, the Defendants state that Dr. Garner's methodology is reliable because he has "reviewed peer-reviewed literature, government reports, and industry and regulatory practice." Motion to Exclude Dr. Garner Opposition at 10. The Plaintiffs state that Dr. Garner invented his own definition of "additive" which is "squarely at odds with federal law." Motion to Exclude Dr. Garner at 11. They further contend that, by doing so, Dr. Garner has provided "a legal conclusion in the guise of an expert opinion." Motion to Exclude Dr. Garner at 11. To the extent that Dr. Garner's definition of a filter additive as opposed to a tobacco additive contradicts the FDA's definition of an additive, the Court concludes that this argument does not impugn the reliability of Dr. Garner's opinion, and therefore goes instead to its weight and not to its admissibility. The Court also is satisfied that Dr. Garner's review of the relevant literature is sufficient to render his opinion reliable. Further, to the extent that the Plaintiffs argue that Dr. Garner's definition of "additive" will not assist the Court, because the Court has already found its own definition, Motion to Exclude Dr. Garner at 15, the Court concludes that this does not render Dr. Garner's opinion irrelevant. Although the Court reaches a conclusion about what constitutes an additive in its MTD MOO, see MTD MOO at 184, that there exist alternative definitions is relevant in considering whether consumers interpret language like additive-free uniformly.

Finally, Plaintiffs attack Dr. Garner's opinion that menthol cigarettes do not increase harm to smokers as unreliable, because "he provides no articulable standard upon which he bases this opinion." Motion to Exclude Dr. Garner at 15. The Plaintiffs cite research contradicting Dr. Garner's testimony, including studies on the addictiveness of menthol cigarettes. Motion to Exclude Dr. Garner at 15-16. Dr. Garner cites to scientific studies indicating that menthol does not show carcinogenic properties. See Garner Report at 7 (citing J.D. Heck, A Review and Assessment of Menthol Employed as a Cigarette Flavoring Ingredient, 48 Food & Chem. Toxicology S1, S10 (2010); U.S. FDA, Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes (2013)). To the extent that the Plaintiffs dispute this conclusion with evidence of their own, that assertion goes to weight and not to admissibility.

Ultimately, the Court is satisfied that Dr. Garner's opinions and testimony are reliable and relevant under the Daubert criteria. Dr. Garner's education and background do not render him unqualified to provide testimony on what an additive is or whether menthol is particularly harmful to a cigarette smoker, as these inquiries are within his "scientific," "technical," and

Report of Charles D. Garner, Ph.D., DABT at 1, filed October 8, 2020 (Doc. 316-1)("Garner Report").

232.    Dr. Garner received his Ph.D. in pharmaceutical sciences with a focus on toxicology and pharmacology from Wayne State University in 1994.  See Garner Report at 3.

233.    Dr. Garner has nearly twenty-five years of experience in tobacco product evaluation and harm reduction, and has worked with menthol and menthol-style cigarettes.  See Garner Report at 1.

**j.    W. Kip Viscusi, Ph.D's Qualifications.**

234.    Dr. Viscusi[13] is the University Distinguished Professor of Law, Economics, and Management at Vanderbilt University.  See Report of Professor W. Kip Viscusi (dated September 6, 2019) ¶ 1, at 1, filed October 8, 2020 (Doc. 313-1)("Viscusi Report").

_____

"specialized knowledge."    Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999). Accordingly, the Court denies the Motion to Exclude Dr. Garner.

[13]The Court denies the Motion to Exclude Dr. Viscusi.  The Defendants have engaged Dr. Viscusi to opine on how consumers evaluate the health risks associated with smoking and what role labels like natural and additive-free play in making cigarette purchasing decisions.  See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. W. Kip Viscusi at 1, filed October 8, 2020 (Doc. 313); Viscusi Report ¶ 3, at 2.  The Plaintiffs attack Dr. Viscusi's opinions as biased and unreliable.  See Motion to Exclude Dr. Viscusi at 10-14.

The Plaintiffs argue that Dr. Viscusi cites largely to his own work, some of which he created in anticipation of litigation.  See Motion to Exclude Dr. Viscusi at 12.  They also argue that his citations to his book, Smoking: Making the Risky Decision, are unreliable, because he presented the book to tobacco companies for review, and that it "likely contains wording contributed by the lawyers defending the tobacco companies."  Motion to Exclude Dr. Viscusi at 13-14.  Finally, they argue that other courts and scientists have questioned Dr. Viscusi's methodologies, and that it is unreliable "ipse dixit masquerading as scientific methodology." Motion to Exclude Dr. Viscusi at 14 (citing Discount Tobacco City & Lottery, Inc. v United States, 674 F.3d 509, 526 n.4, 567 (6th Cir. 2012); Paul Slovic, Rejoinder: The Perils of Viscusi's Analyses of Smoking Risk Perceptions, J. Behav. Decision Making (March 2000)).

The Court concludes that the Plaintiffs have not shown that these criticisms render Dr. Viscusi's opinions unreliable.  Experts often conduct studies in anticipation of litigation, and this does not render their methodologies inherently unreliable.  Dr. Viscusi additionally has disclosed

235.     Dr. Viscusi holds a master's in public policy and a Ph.D. in economics from Harvard University, among other degrees.  See Declaration of W. Kip Viscusi, Ph.D. ¶ 2, at 1, filed October 8, 2020 (Doc. 313-2).

236.     Dr. Viscusi previously has testified as an expert witness for the defense in tobacco litigation in the United States and Canada.  See Viscusi Report ¶ 1, at 1.

237.     His research focuses on how consumers make decisions which involve risk regarding products like household chemicals and tobacco, as well as regulatory responses to risks.  See Viscusi Report ¶ 2, at 2.

**h.      Joannes Evangelista Steenkamp, Ph.D's Qualifications.**

238.     Dr. Steenkamp[14] is the C. Knox Massey Distinguished Professor of Marketing at the Kenan-Flagler Business School at the University of North Carolina at Chapel Hill.  See Steenkamp Report at 1.

---

these industry connections.  See Declaration of W. Kip Viscusi, Ph.D ¶ 15, at 6, filed October 8, 2020 (Doc. 313-2).  Similarly, with regard to Dr. Viscusi's book, the Plaintiffs have not shown any factual basis for their assertion that it "likely contains wording contributed by the lawyers defending the tobacco companies."  Motion to Exclude Dr. Viscusi at 13-14.  To the extent that these criticisms show a potential for Dr. Viscusi's opinions to be biased, the Court considers these to be matters for the weight to be afforded his opinions.  Additionally, to the extent that other courts and researchers have critiqued Dr. Viscusi's methodology, the Court notes that he asserts that his books and studies have been peer-reviewed, see Viscusi Report ¶ 18 & n.7, at 11, and he has referred to a substantial list of studies and documents outside of his own work, see Viscusi Report ¶ 4, at 2-5.  On this basis, the Court does not conclude that Dr. Viscusi's work is unreliable, and denies the Motion to Exclude Dr. Viscusi.

[14]The Court grants in part and denies in part the Motion to Exclude Dr. Steenkamp.  The Plaintiffs ask the Court to exclude Dr. Steenkamp's opinions that:

1.      NAS packaging has never implied that NAS products are safer or healthier than other cigarettes (Steenkamp Report at 8-9 ¶¶ 1-3, 81-82, 85-91);

2.      Market shares of NAS and other brands of cigarettes with similar descriptors demonstrate that descriptors such as "additive free" and

"natural" are not drivers of NAS sales (id. at 9-10 ¶ 5-6, 72-76, 93-96);

3.      NAS sales have been driven by a group of brand attributes such as authenticity, environmental initiatives, and personal selling efforts (id. at 9-10 ¶¶ 4 & 7, 25-51, 57-59, 70-72, 75-77, 80, 96-97);

4.      Dr. Dewhirst incorrectly concludes that descriptors such as "additive free," "natural," and "organic" are drivers of NAS sales (id. at 9-10 ¶¶ 5-7, 63-70, 79-81, 84, 90-93);

5.      The price premium for NAS products are not the result of descriptors such as "additive free" and "natural" (id. at 9-10 ¶ 5-6, 91-93);

6.      Dr. Dewhirst incorrectly concludes that "academic research has found that the natural product descriptor is associated with being more nutritious, healthier, safer, etc., and consumers express a willingness to pay more for such products." (id. at 81-82); and

7.      Dr. Pearson incorrectly concludes that there is an association between descriptors such as "additive free" and "natural" and health (Steenkamp Report at 83-84).

Motion to Exclude Dr. Steenkamp at 3.  With regard to Steenkamp's assertion that Natural American's labeling does not imply that Natural American cigarettes are healthier, the Plaintiffs note correctly that Dr. Steenkamp does not refer to any scientific studies to support this proposition, but rather relies on the history of the disclaimer's presence on the cigarettes' packaging, as well as the FTC opinion and deposition testimony regarding Santa Fe's call centers and the messaging they provided consumers regarding health.  See Motion to Exclude Dr. Steenkamp at 8-9; Steenkamp Report at 84-90.  Although the Court recognizes Dr. Steenkamp's expertise in marketing, that he cites only to evidence surrounding the Santa Fe's marketing strategy but not to how consumers understood that strategy undermines his reliability on this point.

The Plaintiffs next argue that Dr. Steenkamp's opinion -- based on industry competitors' market share -- that additive-free labels do not drive sales is unreliable, because he looks only at market share and not at other variables that could impact the competitors' success.  The Court has addressed a similar argument in considering the Motion to Exclude Dr. Teece, and concludes that the Plaintiffs' arguments regarding whether market share is a sufficient measurement to determine whether additive-free language impacts a company's success is a question better suited for cross-examination.  The Court therefore will not exclude Dr. Steenkamp's opinion on this point.

The Plaintiffs next argue that Dr. Steenkamp's suggestion that Natural American cigarettes' success results from various brand attributes is unreliable, because he relies on anecdotal evidence that features such as Natural American cigarettes' authenticity and environmentalism are part of a consumer trend.  The Court agrees that the sources which Dr.

239.    Dr. Steenkamp received his bachelors in economics, masters in business administration, and Ph.D. in marketing from Wageningen University in the Netherlands.   See Steenkamp Report at 1, 98.

----

Steenkamp cites to support the proposition that Natural American's success reflect a rise in consumers' appreciation for authenticity is unsupported by scientific evidence.  As the Plaintiffs note, Dr. Steenkamp cites an interview with a former Campbell Soup Chief Executive Officer, a Nielsen article about craft beer's success, and blog posts about why consumers like craft beer, evidence which is dubious to support the assertion that consumers prefer authentic products.  See Steenkamp Report at 70-71.  Even assuming that evidence supports a showing that consumers prefer authentic products, aside from describing Natural American's labels, Dr. Steenkamp does not cite evidence to support a conclusion that the brand's authenticity has driven its success.

Regarding the brand's environmentalism, as the Plaintiffs note, Dr. Steenkamp provides evidence on consumer preferences regarding a variety of Natural American attributes, including its environmental impact.  See Motion to Exclude Dr. Steenkamp at 20 (citing Steenkamp Report at 68).  To the extent that the Plaintiffs disagree that the data show that environmentalism drives sales, that is a question of the evidence's weight.  Additionally, to the extent that the Plaintiffs argue that the Court should exclude Dr. Steenkamp's criticisms of Dr. Dewhirst's opinions on the basis that they do not consider certain attributes or rely improperly on certain studies, see Motion to Exclude Dr. Steenkamp at 23-24, the Court concludes that, as a rebuttal witness with expertise in marketing, Dr. Steenkamp may proffer his opinions on these areas of weakness in Dr. Dewhirst's analysis.

Finally, the Plaintiffs argue that Dr. Steenkamp's opinion that authenticity drives Natural American sales, opposing Dr. Dewhirst's opinion that natural and additive-free labels drive sales, is improper, because Dr. Steenkamp has shown no evidence that authenticity drives sales.  See Motion to Exclude Dr. Steenkamp at 24-25.  The Plaintiffs also argue that the Court should not permit Dr. Steenkamp to rebut Dr. Dewhirst's and Dr. Pearson's opinions that natural and additive-free labels are associated with health, and that Dr. Pearson's studies involving disclaimers are flawed.  See Motion to Exclude Dr. Steenkamp at 25-27.  The Court reiterates its conclusion above that Dr. Steenkamp has not demonstrated with reliable evidence that authenticity drives sales, and will exclude his rebuttal of Dr. Dewhirst's opinion on that point.  Regarding Dr. Steenkamp's rebuttal opinions regarding the association that natural and additive-free labels have with health, as well as Dr. Pearson's conclusions on disclaimers, the Court agrees with the Defendants that Dr. Steenkamp has considered reliable materials in reaching these conclusions.  See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Joannes Evangelista Steenkamp at 19-25, filed October 8, 2020 (Doc. 317)("Motion to Exclude Dr. Steenkamp Opposition").  The Court concludes, therefore, the Plaintiffs' objections go more properly to his opinions' weight.  In summary, the Court excludes opinions one and three -- to the extent that it focuses on authenticity driving Natural American's sales -- but does not exclude opinions two, four, five, six, and seven -- to the extent that these opinions do not rely on Dr. Steenkamp's opinions regarding authenticity.

240.     Dr. Steenkamp has 35 years of experience in branding, consumer behavior, global marketing, and market research methods.  See Steenkamp Report at 2.

241.     Dr. Steenkamp and has been active in the food industry and has presented at over one-hundred conferences on topics of marketing strategy, branding, private labels, global marketing, consumer behavior, and retailing.  See Steenkamp Report at 1.

242.     Dr. Steenkamp's research has received over 46,000 citations.  See Steenkamp Report at 3.

**8.     Damages Model.**

243.     Dr. Dubé[15] proposes designing and conducting a conjoint survey to measure "Class Members' preferences for cigarette product features."   Expert Report of Professor Jean-

---

[15]The Plaintiffs proffer Dr. Dubé's testimony and opinions regarding a conjoint analysis model that the Plaintiffs argue can calculate class-wide damages -- an element which must be satisfied for the Court to certify the proposed class.  The Defendants ask the Court to exclude Dr. Dubé's testimony entirely, because they contend that Dr. Dubé's damages theory is not tailored to the Plaintiffs' theories of liability, see Motion to Exclude Dr. Dubé at 14, because Dr. Dubé proposes to conduct the conjoint survey after the Court rules on class certification, see Motion to Exclude Dr. Dubé at 3, because Dr. Dubé has not yet determined several aspects of his conjoint survey analysis, see Motion to Exclude Dr. Dubé at 27, and because Dr. Dubé proposes a "willingness to pay" model instead of modeling the effect on market prices as the measure of damages, and thereby does not measure the supply side of the market, Motion to Exclude Dr. Dubé at 3.  The Plaintiffs assert that Dr. Dubé's proposed methodology is tied directly to the Plaintiffs' theory of injury, that numerous courts have accepted this methodology to certify deceptive labelling classes, and that the Defendants' arguments go to the weight, but not admissibility, of Dr. Dubé's testimony.  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Jean-Pierre Dubé at 1-3, filed October 8, 2020 (Doc. 311)("Motion to Exclude Dr. Dubé Opposition").  The Court concludes that Dr. Dubé's expert testimony and opinions are admissible, and will deny the Motion to Exclude Dr. Dubé.

The Defendants contend that the Court should exclude Dr. Dubé's testimony, because it is not tailored to the Plaintiffs' theories of liability.  The Defendants rely heavily on In re ConAgra Foods, Inc., 202 F.R.D. 537 (C.D. Cal. 2014)(Morrow, J.), to assert that the Plaintiffs' damages expert must tailor their damages model to the Plaintiffs' theory of liability.  The Defendants' reliance on In re ConAgra Foods, Inc., is, however, inapposite in this context.  See 202 F.R.D. at 549-50.  While the Defendants are correct in asserting that the Honorable Judge Margaret Morrow, United States District Judge for the United States District Court for the

Central District of California, concludes in In re ConAgra Foods, Inc. that the plaintiffs' expert did not propose a damages model tied to the plaintiffs' liability theory, this analysis occurred in the course of class certification, not in terms of a challenge to the proposed expert's admissibility.  See 202 F.R.D. at 578-79.  In a Daubert motion, the Court's task is to assess whether the proposed expert is reliable and helpful to the trier of fact, see Daubert, 509 U.S. at 594-95, and, if the expert's proposed damages model is reliable and helpful to the trier of fact, the Court will then determine if it is sufficient under Rule 23(b)(3) to certify the class.

Moreover, the Defendants ask the Court to exclude Dr. Dubé's testimony, because he has not yet conducted his conjoint survey, he only has proposed a damages model.  The Defendants' argument is similarly unavailing.  Several courts have held that a damages expert need not perform their analysis at the class certification stage.  See In re Scotts EZ Seed Litigation, 304 F.R.D. 397, 413 (S.D.N.Y. 2015)(Briccetti, J.)("[N]othing in Comcast requires an expert to perform his analyses at the class certification stage.")(emphasis in original); Chavez v. Blue Sky Nat. Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010)("At class certification, plaintiff must present 'a likely method for determining class damages,' though it is not necessary to show that his method will work with certainty at this time.")(quoting In re Tableware Antitrust Litigation, 241 F.R.D. 644, 652 (N.D. Cal. 2007)(Walker, J.).

The Defendants also challenge Dr. Dubé's choice of variables, and allege that Dr. Dubé has not yet determined several aspects of his conjoint survey analysis.  The Plaintiffs assert, to the contrary, that Dr. Dubé "lists the product features he intends to study: (i) brand name and style; (ii) shelf price; and (iii) labeling claims."  Motion to Exclude Dr. Dubé Response at 23.  The Plaintiffs also assert that at the class certification stage, they need only present a likely method for determining class damages, and that Dr. Dubé is intentionally able modify the parameters of his survey.  See Jones v. ConAgra Foods, Inc., 2014 WL 2702726, at *19 N.D. Cal. June 12, 2014)(stating that the plaintiffs need only supply a likely method for determining class damages, and that they do not need to assert a model with certainty).  Moreover, the Plaintiffs assert that, "because [Dr. Dubé] will perform a marketplace simulation that accounts for competing brands and actual prices, Professor Dubé does in fact account for the supply side of the market," as conjoint analysis requires.  Motion to Exclude Dr. Dubé Response at 30.  Dr. Dubé also accounts for the supply side of the market by accounting for purchase choices between competing brands.  See Motion to Exclude Dr. Dubé Response at 30-31.  The Court concludes that, because Dr. Dubé considers competing brands, Dr. Dubé adequately accounts for the supply side of the market, and thus, his survey is not an improper conjoint analysis.  See e.g., In re NJOY, Inc. Consumer Class Action Litigation, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015)(noting that an expert's conjoint analysis is insufficient where it does not consider what price consumers are willing to pay in a functioning market).

Ultimately, the Court concludes that Dr. Dubé's opinions and testimony are reliable and helpful to the trier of fact.  Many courts have accepted conjoint analyses as permissible methods for calculating damages.  See, e.g., Khoday v. Symantec Corp., 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015)(Tunheim, J.)(citing cases).  Further, the issues that the Defendants' raise with Dr. Dubé's methodologies can be raised on cross-examination and go towards the weight rather than the admissibility of Dr. Dubé's opinions and testimony.  See Khoday v. Symantec Corp., 93 F. Supp. 3d at 1082; TV Interactive Data Corp. v. Sony Corp., 929 F. Supp. 2d 1006, 1021 (N.D. Cal. 2013)(Spero, J.)("The Court notes from the outset, however, that Sony's criticism of the

Pierre H. Dubé at ¶¶ 17-20, (dated May 15, 2019), filed July 23, 2020 (Doc. 291-1)("Dubé Report"). See Defendants' FOFs ¶ 60, at 15 (asserting this fact); id. ¶ 325, at 81 (asserting this fact). See also Plaintiffs' FOFs ¶ 29, at 8; id. ¶ 283, at 68.

244.    Conjoint analysis is a marketing research technique for estimating how consumers value a product's individual attributes, based on consumer surveys in which respondents are asked to choose between certain combinations of product features. See Dubé Report ¶ 45, at 16; Defendants' FOFs ¶ 326, at 81 (asserting this fact).

245.    Dr. Dubé has not yet finalized a survey design or conducted the survey; he opines only on whether a method exists to determine economic damages on a class-wide basis using common evidence. See Dubé Report ¶ 2, at 2; Defendants' FOFs ¶ 60, at 15 (asserting this fact).

246.    Dr. Dubé's proposed model measures the value of the challenged descriptors -- natural, organic, and additive free -- which he would then use to calculate class-wide damages using two different metrics: willingness to pay and price premium. See Expert Report of Professor Jean-Pierre H. Dubé at ¶¶ 17-20, (dated May 15, 2019), filed July 23, 2020 (Doc. 291-1)("Dubé Report"); Defendants' FOFs ¶ 60, at 15 (asserting this fact). See also Plaintiffs' FOFs ¶ 283, at 68 (asserting this fact).

247.    Dr. Dubé's first proposed measure of class-wide damages is the price premium, which measures the difference between the price that class members actually paid for Natural American cigarettes and the price they would have paid but for the challenged claims on the labels. See Dubé Report ¶ 23; Plaintiffs' FOFs ¶ 284, at 68 (asserting this fact).

---

survey designs is more appropriate for consideration by a jury, rather than the Court on a *Daubert* motion.")

## PROCEDURAL BACKGROUND

The Court reviews below the motions that the parties have filed in this case regarding class certification.  The Court first summarizes the motions regarding class certification.  Next, the Court summarizes the motions regarding expert testimony.

**1.      Certification Motion.**

The Plaintiffs seek damages from the Defendants based on consumer protection, warranty, and unjust enrichment claims.  See Certification Motion at 5.  The Plaintiffs seek to certify twenty-one classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass.  See Certification Motion at 6.  The Plaintiffs seek specific state menthol subclasses certification only in the alternative to the Nationwide Menthol Subclass.  See Certification Motion at 6 n.3.  The Plaintiffs contend that the Defendants' labeling on Natural American cigarettes conveys to consumers that Natural American cigarettes are less harmful than other cigarettes.  See Certification Motion at 3.  The Plaintiffs contend that they present common questions whether: (i) the Defendants' marketing and labeling of Natural American cigarettes was uniform and commonly presented to class members; and (ii) the Defendants' labelling misled reasonable consumers that Natural American cigarettes may be less harmful than other cigarettes.  See Certification Motion at 4.  The Plaintiffs also contend that they present common evidence to the issues at hand and that the common questions predominate over any

individualized issues.  See Certification Motion at 4.  Moreover, the Plaintiffs argue that class-wide damages can be calculated based on a common methodology for each class member.  See Certification Motion at 4.

### a. Rule 23(a).

At the outset, the Plaintiffs note that, in seeking class certification, they must satisfy each of rule 23(a) of the Federal Rules of Civil Procedure's requirements, and at least one of rule 23(b)'s requirements.  See Certification Motion at 42 (citing Fed. R. Civ. P. 23).  First, the Plaintiffs argue each of the ways that they meet rule 23(a)'s requirements.  See Certification Motion at 42-50; Fed. R. Civ. P. 23(a).  Next, the Plaintiffs argue that they meet rule 23(b)(2) and (3)'s requirements.  See Certification Motion at 50-85; Fed. R. Civ. P. 23(b).

### i. Numerosity.

First, the Plaintiffs argue that the proposed classes are sufficiently numerous to justify certification.  See Certification Motion at 43.  The Plaintiffs note that, to satisfy the numerosity requirement, they must demonstrate that "'the class is so numerous that joinder of all members is impracticable.'"  Certification Motion at 43 (quoting Fed. R. Civ. P. 23(a)(1)).  The Plaintiffs contend that they satisfy this standard, because evidence that the Defendants sold "over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018" suggests that there likely are millions of class members, and at least tens of thousands of class members in each State for which the Plaintiffs seek certification.  Certification Motion at 43-44.  Joinder of millions, or even tens of thousands, of claims would likely be impossible, the Plaintiffs argue and, therefore, the Plaintiffs satisfy rule 23(a)(1)'s numerosity requirement.

ii.    **Commonality**.

Second, the Plaintiffs contend that, to demonstrate commonality, they must show that there are common questions between the Plaintiffs, and "common answers that 'would resolve an issue that is central to the validity of each of one of the claims in one stroke.'"  Certification Motion at 44 (citing Menocal v. Geo Grp., Inc., 882 F.3d 905, 916 (10th Cir. 2018)).  Here, the Plaintiffs contend that the question of the Defendants' false advertising is common to all of the Plaintiffs, because: (i) the question of whether the Defendants' statements are false, deceptive, or misleading can be determined without regard to the Plaintiff's individual circumstances; (ii) the Plaintiffs can prove the claims through common evidence; (iii) the Defendants' conduct and scienter does not differ between the Plaintiffs and class members; and (iv) the amount of the Plaintiffs' injuries will not vary by different class members.  See Certification Motion at 45. Moreover, the Plaintiffs specifically point to seven common questions that are central to the litigation:

- Defendants' practices in labeling and marketing NAS Cigarettes as "natural" and "additive-free" tends to mislead reasonable consumers into believing that NAS Cigarettes may be less harmful than other cigarettes;

- Defendants engaged in deceptive or misleading acts or practices by labeling NAS Cigarettes as "natural" and "additive-free";

- NAS Menthol Cigarettes are in fact "additive-free" given that they contain the additive menthol;

- NAS Cigarettes are less harmful than other cigarettes;

- As a result of Defendants' misrepresentations, class members suffered an ascertainable loss;

- Class members either paid a price premium for the NAS Cigarettes that they would not have paid but for the false labeling and marketing of the NAS Cigarettes or would not have purchased them at all.

- Defendants should be enjoined from continuing to sell NAS Cigarettes as currently labeled.

Certification Motion at 45-46.  Further, the Plaintiffs explain that common evidence regarding labeling, marketing, and economic damages will answer each of the common questions, and that, therefore, the Plaintiffs have satisfied rule 23(a)(2)'s commonality prong.  See Certification Motion at 46.

### iii.   Typicality.

Third, the Plaintiffs attest that the class representatives' claims are typical of the represented class.  See Certification Motion at 47.  The Plaintiffs contend that their claims are typical, "because they are all based on the same underlying conduct and legal theories." Certification Motion at 47.  Specifically, the Plaintiffs' claims are all based on being regular purchases of Natural American cigarettes, which the Defendants uniformly marketed and labeled.  See Certification Motion at 47.  Moreover, the Plaintiffs "paid the premium price for NAS Cigarettes specifically as a result of their belief that they may be less harmful than competing cigarettes."  Certification Motion at 47.  Consequently, the Plaintiffs contend that they satisfy rule 23(a)(3)'s typicality prong. See Certification Motion at 47.

### iv.   Adequacy.

Finally, the Plaintiffs argue that their proposed classes "'will fairly and adequately protect the interests of class.'"  Certification Motion at 48 (citing Fed. R. Civ. P. 23(a)(4)).  The Plaintiffs contend that the proposed classes are adequate representatives, because "they all have the same claims: they paid money for NAS Cigarettes that they would not have paid but for Defendants' false, deceptive, and misleading advertising and breach of warranty."  Certification Motion at 48.  The Plaintiffs argue that, because their interests wholly are aligned with the

proposed class, they are vigorously prosecuting the action, they have adequate counsel, and they adequately represent the proposed class.  See Certification Motion at 48-49.

   **b.**  **Rule 23(b)(3).**

   Plaintiffs note that, in order for the Court to certify a class, they must satisfy both rule 23(a) and at least one prong of rule 23(b).  See Certification Motion at 42.  Plaintiffs contend that they satisfy rule 23(b)(3), because they satisfy both rule 23(b)(3)'s predominance and superiority requirements.  See Certification Motion at 50-84.  In the alternative, Plaintiffs contend they satisfy rule 23(b)(2).  See Certification Motion at 85.

   **i.**  **Predominance.**

   Plaintiffs note that, to satisfy rule 23(b)(3)'s predominance element, they must demonstrate that "'questions common to the class predominate over those questions that are individualized.'"  Certification Motion at 50 (quoting Payne v. Tri-State Care Flight, LLC, 332 F.R.D. 611, 665 (D.N.M. 2019)(Browning, J.)).  Plaintiffs contend that they satisfy the predominance element, because Plaintiffs can prove the elements of Plaintiffs claims -- which are generally similar from State to State -- with common evidence.  See Certification Motion at 51.  The Plaintiffs contend: "Objective questions, or questions focusing on the defendants' conduct, are the driving issues for all of Plaintiffs' claims here."  Certification Motion at 51. First, the Plaintiffs note that, generally, State consumer protection statutes require that the Plaintiffs prove that the Defendants' marketing is likely to mislead a reasonable consumer.  See Certification Motion at 51.  Second, the Plaintiffs argue that unjust enrichment claims can be treated similarly where "'there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not.'"  Certification Motion at 52 (quoting In re Checking Account Overdraft Litig., 286 F.R.D. 645, 657 (S.D. Fla. 2012)

(King, J.)).   Finally, the Plaintiffs contend that breach-of-warranty claims require the same common proof as consumer fraud claims.  See Certification Motion at 52.

Next, the Plaintiffs attest that they will determine class-wide damages through a common methodology.  See Certification Motion at 53.  The Plaintiffs contend that their expert, Jean-Pierre H. Dubé, can use a conjoint analysis[16] to determine class-wide economic damages.  See Certification Motion at 56.  Moreover, the Plaintiffs state that Dr. Dubé can conduct a choice-based conjoint analysis to measure individual class members' injuries.  See Certification Motion at 59.  The Plaintiffs also explain that they will use common proof to make out claims for each subclass and summarize the relevant state laws for each proposed subclass.  See Certification Motion at 60-84.

### ii.    Superiority.

The Plaintiffs also argue that a class action suit is superior to other methods of adjudicating the controversy.  See Certification Motion at 84 (citing Fed. R. Civ. P. 23(b)(3)).  First, the Plaintiffs contend that their claims are "negative value claims" in which the cost of litigation exceeds the likely recovery unless the claims are aggregated.  See Certification Motion at 84.  The Plaintiffs assert that each class member's claim amounts to only a few dollars per purchase and class members "have little interest in individually controlling the prosecution of separate actions."  Certification Motion at 85. The Plaintiffs further argue that there is no other litigation concerning the same subject matter outside this case, that concentrating the claims in a

---

[16]Conjoint analysis is "a survey-based statistical technique used in market research that helps determine how people value different attributes . . . that make up an individual product or service."  Conjoint Analysis, Wikipedia, https://en.wikipedia.org/wiki/Conjoint_analysis (last visited January 21, 2022).

single forum is desirable, and that trial is manageable, because cases will either "return to the home jurisdiction for trial or will be consolidated."  Certification Motion at 85.

        **c.**      **Rule 23(b)(2).**

The Plaintiffs also contend that they meet rule 23(b)(2)'s requirements, because the class members' injuries are sufficiently similar so that the litigation can address all injuries without differentiating between class members.  See Certification Motion at 86.  The Plaintiffs argue that the Court can certify classes seeking injunctive relief alongside classes seeking damages, so long as the classes are separately and independently certifiable.  See Certification Motion at 86.  The Plaintiffs attest that an injunction prohibiting the Defendants from marketing their cigarettes as natural is appropriate and requests the Court certify a class pursuant to rule 23(b)(2) for injunctive relief.  See Certification Motion at 88.

        **2.**      **Certification Opposition.**

The Defendants oppose the Plaintiffs' Certification Motion.  See Defendants' Opposition to Plaintiffs' Motion for Class Certification at 1, filed October 8, 2020 (Doc. 315)("Certification Opposition").  The Defendants argue that the Plaintiffs do not demonstrate a feasible method of identifying potential class members or a feasible method of calculating the damages each class member has suffered.  See Certification Opposition at 1.  Further, the Defendants contend that the Plaintiffs' claim for injunctive relief is moot, because the Defendants already have stopped using many of the complained about descriptors, and added a sentence on their cigarette packaging stating: "'Natural American Spirit cigarettes are not safer than other cigarettes.'"  Certification Opposition at 3 (no citation for quotation provided).  The Defendants also argue that the Plaintiffs lack standing to certify an injunctive-relief class, because no named Plaintiff

alleges that he or she is currently misled about Natural American cigarettes' safety, or is in danger of being misled in the future.  See Certification Opposition at 3.

      **a.**      **Ineligibility for Class Certification.**

The Defendants argue that several of the Plaintiffs' claims are ineligible for class certification.  See Certification Opposition at 17.  First, the Defendants attest that the Court has dismissed the unjust enrichment claim for the New Jersey subclass, and, therefore, certification for that claim is improper.  See Certification Opposition at 17.  Second, the Defendants contend that the Court dismissed the Plaintiffs' claim pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 I.L.C.S. 510, ("IUDTPA"), insofar as the Plaintiffs seek injunctive relief, and the IUDTPA does not allow for monetary relief, so the Court cannot certify a class for this claim.  See Certification Opposition at 17.  Third, the Defendants argue that the Court has dismissed the "sole Ohio claim" under the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01 et seq, ("OCSPA"), because the Plaintiffs did not satisfy the State's notice requirement.  Certification Opposition at 18.  Fourth, the Defendants argue that the New Mexico Plaintiffs have "'no private right of action'" under the New Mexico False Advertising Act, N.M.S.A. §59A-16-4 ("NMFAA").  Certification Opposition at 18-19 (quoting Ahlgrim v. Keefe Grp., LLC, 2016 WL 9819520, at *4 (D.N.M. Oct. 19, 2016)(Fouratt, J.), adopted, 2016 WL 7246110 (D.N.M. Nov. 30, 2016)(Browning, J.)).  Fifth, the Defendants argue that monetary damages are barred in class actions under the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq., ("CCPA").  See Certification Opposition at 19 (citing Friedman v. Dollar Thrifty Auto. Grp., Inc., 2015 WL 4036319, at *6 (D. Colo. July 1, 2015)(Daniel, J.).  Sixth, the Defendants attest that "a damages class is unavailable under the New Mexico Unfair Practices Act[, N.M.S.A. § 57-12-1 through § 57-12-24]('NMUPA') because that statute privileges named plaintiffs over

absent class members with respect to claims for damages" and that, therefore, a class action is not a superior method of adjudication for such claims. Certification Opposition at 19.

### b.    Rule 23(a).

Moreover, the Defendants argue that the Plaintiffs do not satisfy rule 23(a)'s threshold requirements. See Certification Opposition at 20 (citing Fed. R. Civ. P. 23(a)). The Defendants concede that the Plaintiffs can demonstrate numerosity and adequacy, but contend that the Plaintiffs do not demonstrate commonality and typicality. See Certification Opposition at 20.

### i.    Commonality.

The Defendants argue that the Plaintiffs' claims "hinge on individual issues -- namely, which representations (including disclaimers) potentially millions of consumers saw, and how each consumer understood and responded to each of them." Certification Opposition at 20. The Defendants contend that, of the seven common questions which the Plaintiffs identify, four of them -- the first, second, fifth, and sixth -- can be resolved "only individually, by assessing what representations each putative class member actually saw over time, how she understood them, whether and when she saw or was exposed to a disclaimer, what considerations she relied upon in buying NAS cigarettes, and whether she in fact paid a premium." Certification Opposition at 21. According to the Defendants, two other proposed common questions that the Plaintiffs present -- the third and fourth -- are not central to the validity of the Plaintiffs' claim, because they can be answered only by analyzing a class member's perception of Natural American cigarettes. See Certification Opposition at 21. Finally, according to the Defendants, the Plaintiffs' seventh common question is not common to class members, because many class members do not have standing for injunctive relief to contend that the Defendants should be

enjoined from selling Natural American cigarettes as currently labeled.  <u>See</u> Certification Opposition at 21.

### ii.   <u>Typicality</u>.

The Defendants also contend that the Plaintiffs' representative class members' claims are not typical of absent class members' claims.  <u>See</u> Certification Opposition at 22.  The Defendants argue that class members' hinge on unique circumstances, namely, how each individual person perceived Natural American cigarettes' labelling.  <u>See</u> Certification Opposition at 22.  Further, the Defendants attest that certain representative class members' claims are subject to one or more unique defenses, which is detrimental to the class' interests, because the class representative might spend time litigating that defense at the expense of the common issues.  <u>See</u> Certification Opposition at 22.  First, the Defendants contend that three representative class members have stated that they have continued buying Natural American cigarettes, even after filing suit, which "expressly acknowledge[es] their belief that NAS cigarettes are not healthier or safer than others."  Certification Opposition at 23.  Second, the Defendants argue that two representative class members admit that they did not pay a premium price for Natural American cigarettes.  <u>See</u> Certification Opposition at 23.  The Defendants contend that, because several representative class members' claims are subject to unique defenses, the Plaintiffs have failed to demonstrate that representative class members' claims are typical of all class members.  <u>See</u> Certification Opposition at 24.

### c.   <u>Rule 23(b)(3)</u>.

In addition to arguing that the Plaintiffs do not meet rule 23(a)'s requirements, the Defendants also contend that the Plaintiffs do not meet rule 23(b)(3)'s requirements.  <u>See</u> Certification Opposition at 24.  First, the Defendants argue that the Plaintiffs do not demonstrate

that there are common issues that predominate over individual issues. See Certification Opposition at 24. Second, the Defendants argue that a class action lawsuit is not a superior method of resolving the Plaintiffs' claims, because the individualized inquiries dominate. See Certification Opposition at 24-25.

### i.  Predominance.

At the outset, the Defendants argue that the Plaintiffs have not demonstrated that the members of their proposed class are ascertainable. See Certification Opposition at 25. The Defendants contend that the class must be "'currently and readily ascertainable based on objective criteria.'" Certification Opposition at 25 (quoting Abraham v. WPX Production Productions, LLC, 317 F.R.D. 169, 254 (D.N.M. 2016)(Browning, J.)). Here, the Defendants attest, the Plaintiffs have not "even *proposed* a method of ascertaining class members, much less proven with evidentiary support that any method 'will be successful.'" See Certification Opposition at 26 (quoting Abraham v. WPX Production Productions, LLC, 317 F.R.D. at 258)(emphasis added in Certification Opposition). The Defendants note that individual class members would have purchased Natural American cigarettes from retailers rather than from any Defendant and that the Plaintiffs have no proposed way of demonstrating that individuals have purchased Natural American cigarettes at all. See Certification Opposition at 26-27. That is, the Defendants contend that, because Plaintiffs have no way to "reliably identify" Natural American cigarette purchasers, the class is not ascertainable. Certification Opposition at 27. Moreover, determining who purchased Natural American cigarettes would require individualized inquires and would dominate over common issues in the case. See Certification Opposition at 27.

Moreover, the Defendants contend that, even if the Plaintiffs could demonstrate that their proposed class is ascertainable, the Plaintiffs claims still require individualized inquiries. See

Certification Opposition at 30.  The Defendants argue that "there is a division within the class between those who saw the pre-October 1, 2017 descriptions and those who saw the descriptors on advertisements and products distributed from October 1, 2017 to the present," after which time Natural American cigarette packages no longer stated that they were "natural" and "additive-free," and contained a disclaimer that "'Natural American Spirit cigarettes are not safer than other cigarettes.'" Certification Opposition at 31 (no quotation for citation).  Additionally, the Defendants contend that whether a consumer saw the disclaimer, what advertising a consumer saw on the Natural American cigarette packaging, and whether the consumer was misled by the packaging, will differ among individual consumers.  See Certification Opposition at 32.  The Defendants note that several named Plaintiffs interpret the word "natural" in different ways, indicating that the individual consumers' perception of the Defendants' advertising is something that must be ascertained on an individual level.  Certification Opposition at 38.  The Defendants also note that the Plaintiffs attempt to use survey data to support their claim that the Natural American cigarette packaging is misleading, but the Defendants' expert, Dr. Kent Van Liere, demonstrates that surveys show the opposite.  See Certification Opposition at 39, 41.

The Defendants also contend that the Plaintiffs' "statutory and unjust-enrichment claims . . . will require overwhelming individualized inquiries into the materiality of Defendants' alleged misrepresentations."  Certification Opposition at 42.  The Defendants argue that the Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. § 501.201, ("FDUTPA"), the Illinois Consumer Fraud Act, 815 I.L.C.S. 505/1 ("ICFA"), Massachusetts Chapter 93A, the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2.11 ("NJCFA"), the New Jersey Truth-in-Consumer Contract, Warranty & Notice Act, N.J. Stat. Ann., § 56:12-14 ("TCCWNA"), the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1

("NCUDTPA"), and the Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.010 ("WCPA"), all require individual proof.  <u>See</u> Certification Opposition at 45-50.

Moreover, the Defendants contend that all of the Plaintiffs' unjust enrichment claims require individualized proof.  <u>See</u> Certification Opposition at 50.  Notably, the Defendants contend that, in each of the ten relevant states -- California, Colorado, Florida, Illinois, Massachusetts, Michigan, New Mexico, New York, North Carolina, and Washington -- courts have foreclosed class certification for unjust enrichment claims.  <u>See</u> Certification Opposition at 51 (citing <u>Oshana v. Coca-Cola Co.</u>, 472 F.3d 506 (7th Cir. 2006); <u>Payne v. Tri-State CareFlight, LLC</u>, 332 F.R.D. at 703; <u>Abla v. Brinker Rest. Corp.</u>, 279 F.R.D. 51, 58 (D. Mass. 2011) (Tauro, J.); <u>Kelley v. Microsoft Corp.</u>, 251 F.R.D. 544, 559 (W.D. Wash. 2008)(Pechman, J.), <u>certification withdrawn</u>, No. C07-0475 MJP, 2009 WL 413509 (W.D. Wash. Feb. 18, 2009); <u>Kunzelmann v. Wells Fargo Bank, N.A.</u>, 2013 WL 139913, at *9 (S.D. Fla. Jan. 10, 2013)(Middlebrooks, J.); <u>Weiner v. Snapple Beverage Corp.</u>, No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *2 (S.D.N.Y. Aug. 5, 2010)(Cote, J.); <u>Dudding v. Norton Frickey & Assocs.</u>, 11 P.3d 441, 445 (Colo. 2000)(en banc); <u>Jackson v. Wal-Mart Stores, Inc.</u>, 2005 WL 3191394, at *5 (Mich. Ct. App. Nov. 29, 2005); <u>Harrison v. Wal-Mart Stores, Inc.</u>, 2004 WL 5202760, at ¶¶ 32-33 (N.C. Super. Ct. Mar. 5, 2004); <u>Savaglio v. Wal-Mart Stores, Inc.</u>, 2003 WL 25676640 (Cal. Super. Ct. Nov. 6, 2003)).  The Defendants contend that, because individualized inquiries will be required to evaluate seven of the statutory and ten of the unjust enrichment claims, common questions are not dominant and, therefore, the Court should not certify the class.  <u>See</u> Certification Opposition at 57.

The Defendants contend, then, that the Plaintiffs would have only six statutory claims for five potential classes remaining:

- the California Class and California Menthol Subclass, which assert claims under California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750), False Advertising Law (Cal. Bus. & Prof. Code § 17500), and Unfair Competition Act (Cal. Bus. & Prof. Code § 17200);

- the Michigan Class, which asserts a claim under the Michigan Consumer Protection Act (Mich. Comp. Laws § 445.901); and

- the New York Class and New York Menthol Subclass, which assert claims under New York General Business Law §§ 349 and 350.

Certification Opposition at 57. The Defendants further contend that, for proposed classes to be certified under the remaining statutes, the Plaintiffs must make a threshold showing that the "Defendants' 'alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation would have been material to reasonable persons.'" Certification Opposition at 58 (quoting Jones v. ConAgra Foods, Inc., No. C 12-01633 CRB, 2014 WL 2702726, at *1 (N.D. Cal. June 13, 2014)(Breyer, J.)). The Defendants argue that the Plaintiffs do not demonstrate that the Defendants' conduct is material to consumers. See Certification Opposition at 58-60. Specifically, the Defendants argue that the Plaintiffs "have failed to show that any of the challenged terms carries a uniform message of comparative health," and, therefore, the Plaintiffs do not show that any misperception is material to class members. Certification Opposition at 61. The Defendants contend that both the Plaintiffs' expert, Dr. Jennifer Pearson, and the Defendants' expert, Dr. Van Liere, have produced reports and given testimony that "demonstrates that Plaintiffs cannot prove that any safer-cigarette belief was material on a classwide basis." Certification Opposition at 62. The Defendants further argue that several named Plaintiffs demonstrate that misperceptions about Natural American cigarettes' health is not material to their decision to purchase the cigarettes, because they admit that they continue purchasing the cigarettes even after this litigation' start. See Certification Opposition at

63.   With regard to the Plaintiffs' Menthol Theory, the Defendants argue that the Plaintiffs cannot show materiality, because the Plaintiffs "have not attempted to explain why the location of the menthol -- or whether it is deemed a tobacco additive -- would be significant to the decisions of a reasonable person, let alone established that it is significant to consumers classwide." Certification Opposition at 64.

The Defendants further attest that, under the applicable choice-of-law rules, the substantive law that applies to each of Plaintiffs' claims is the law of the State in which a consumer purchased Natural American cigarettes.  See Certification Opposition at 66.  The Defendants argue that, because the substantive statutes of the States differ, the "material differences in the States' laws predominate over common questions." Certification Opposition at 66.  The Defendants contend that the Plaintiffs incorrectly argue that New Mexico law alone governs their express warranty claims, but even if it did, the Plaintiffs cannot use common proof to demonstrate that:

> (1) until 2017, NAS menthol cigarettes expressly warranted that they contain "additive free" tobacco; (2) consumers "do not know what menthol is" and whether it is an additive; and (3) because some menthol migrates from the cigarette filters (where it is placed during manufacturing) into the tobacco, that menthol amounts to an additive and so Defendants breach the warranty.

Certification Opposition at 70 (no citation for quotation).

Finally, the Defendants contend that the Plaintiffs have not put forth a valid method for calculating damages and, thus, individualized inquires will predominate over common questions. See Certification Opposition at 72.  The Defendants attest that "Under *Comcast* [*Corp. v. Behrend*, 569 U.S. 27 (2013)], Plaintiffs 'must be able to isolate the price premium associated with misleading consumers' in the 'particular fashion' underlying their 'specific theor[ies] of liability,'" Certification Opposition at 72 (quoting In re ConAgra Foods, Inc., 302 F.R.D. 537,

579 (C.D. Cal. 2014)(Morrow, J.))(first alteration added; second alteration in the Certification Opposition, but not in In re ConAgra Foods, Inc.), and that the Plaintiffs have not demonstrated a valid way to calculate the price premium which consumers paid for Natural American cigarettes because of their supposed health value, see Certification Opposition at 72. First, the Defendants contend that, under their theory that consumers purchased Natural American cigarettes because they believed they were safer, the Plaintiffs "damages model must identify how much the price of NAS cigarettes was inflated by a belief that NAS cigarettes are or may be safer and healthier -- and nothing else." Certification Opposition at 75. The Defendants argue that the Plaintiffs' expert, Dr. Dubé, concedes that his damages model cannot do that. See Certification Opposition at 75. Second, the Defendants contend that the Plaintiffs have not set forth a valid damages model for their theory that the use of the phrase "additive-free" is misleading, because "Dr. Dubé's model will simply assess the entire price premium attributable to the 'additive-free' descriptor, and not the premium attributable to the specific belief underlying the Menthol Theory." Certification Opposition at 78 (no citation for quotation). Further, the Defendants contend that Dr. Dubé's model does not account for the Plaintiffs' claim that additive-free has two misleading meanings: first, that Natural American cigarettes are safer and, second, that there are no additives. See Certification Opposition at 78.

The Defendants also maintain that the Plaintiffs' damages model only calculates consumers' willingness to pay. See Certification Opposition at 79. The Defendants contend that "[t]he 'proper measure of damages in a consumer class action case is . . . . The amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received.'" (quoting In re 5-Hour Energy Mktg. & Sales Pracs. Litig., No. ML13-2438 PSG (PLAx), 2017 WL 2559615, at *10 (C.D. Cal. June 7, 2017)(Gutierrez, J.)). Based on this

measure of damages, the Defendants claim that damages should be calculated based on Natural American cigarettes' market value rather than on what Natural American cigarette consumers are willing to pay.  See Certification Opposition at 79.

### ii.    Superiority.

Next, the Defendants contend that a class action lawsuit is not superior to other methods of resolving the Plaintiffs' claims.  See Certification Opposition at 82.  The Defendants argue that this class action lawsuit would be "unmanageable," because of individualized issues regarding class membership, information a consumer received, the consumers' perceptions of advertising, and what injury each consumer suffered as a result of the Defendants' conduct.  See Certification Opposition at 82.  Consequently, the Defendants argue that the Court should not certify the Plaintiffs' proposed classes pursuant to rule 23(b)(3).  Certification Opposition at 83.

### d.    Rule 23(b)(2).

The Defendants also contend that the Court should not certify the Plaintiffs' proposed classes pursuant to rule 23(b)(2).  See Certification Opposition at 83.  First, the Defendants contend that the request for injunctive relief is moot, because the Defendants no longer use the descriptors "natural" and "additive-free" pursuant to an agreement with the Food and Drug Administration ("FDA").  Certification Opposition at 84 (no citation for quotation).  The Defendants also argue that the Plaintiffs' sought injunctive relief for the Defendants to cease "(1) the use of 'natural' in the 'Natural American Spirits' brand name; (2) the 'organic' descriptor; and (3) the 'tobacco & water' descriptors" is moot, because the Defendants now include a disclaimer on their packaging stating: "Natural American Spirit cigarettes are not safer than other cigarettes."  Certification Opposition at 84 (no citation for quotations).  The Defendants also attest that the Plaintiffs do not have standing for their injunctive relief claims, because the class

members cannot demonstrate that they are suffering a continuing injury or are in danger of being injured in the future.  See Certification Opposition at 86.  Consequently, the Defendants contend that the Plaintiffs have not demonstrated that they have standing for their injunctive relief claims and, accordingly, that the Court should not certify their class pursuant to rule 23(b)(2).  See Certification Opposition at 90.

> ### 3.     Certification Reply.

The Plaintiffs reply.  See Certification Reply.  At the outset, the Plaintiffs contend that the Defendants' argument that the Plaintiff's IUDTPA, NMFAA, and NMUPA claims cannot be certified is wrong.  See Certification Reply at 2.  First, the Plaintiffs contend that money damages are available under the IUDTPA, contrary to the Defendants' assertion.  See Certification Reply at 2 (citing Thrope v. State of Ohio, 173 F.R.D. 483, 490 (S.D. Ohio 1997)(Spiegel, J.)).  Second, the Plaintiffs contend that "'the [Illinois] Consumer Fraud and Deceptive Business Practices Act authorizes recovery of damages from violations of the Uniform Deceptive Trade Practices Act.'"  Certification Reply at 2-3 (quoting Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1014-15 (N.D. Ill. 1993)(Conlon, J.)(alteration in Certification Reply but not in Dorr-Oliver Inc. v. Fluid-Quip, Inc.).  Next, the Plaintiffs contend that there is a private right of action for consumers under the NMFAA.  See Certification Reply at 3 (citing Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶¶ 9-10, 144 N.M. 464, 467-68, 188 P.3d 1215, 1218).  Finally, the Plaintiffs contend that certification is proper under the NMUPA, even if statutory damages are not available to individual litigants.  See Certification Reply at 3 (citing Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. 147, 171-74 (D.N.M. 2016)(Browning, J.) (certifying NMUPA class)).

### a.    Rule 23(a).

The Plaintiffs further contend that they satisfy rule 23(a)'s requirements.    <u>See</u> Certification Reply at 3.  The Plaintiffs contend that they satisfy rule 23(a)'s commonality and typicality requirements.  <u>See</u> Certification Reply at 3, 6.  Consequently, the Plaintiffs contend that class certification is proper.  <u>See</u> Certification Reply at 3, 6.

### i.    Commonality.

First, the Plaintiffs argue that their claims do not hinge on individualized issues and attest that a "single common question may satisfy the commonality requirement."  Certification Reply at 4 (citing <u>Menocal v. GEO Grp., Inc.</u>, 882 F.3d at 914).  The Plaintiffs contend that the question whether the Defendants' uniform marketing practices are misleading to a reasonable consumer is central to their claims.  <u>See</u> Certification Reply at 4.  Moreover, the Plaintiffs contend that several common questions exist, including whether consumers paid a price premium, whether the Court should enjoin the Defendants' marketing practices, whether the Defendants' marketing practices led reasonable consumers to believe that Natural American cigarettes are less harmful, and what economic damages are attributable to the Defendants' marketing practices.  <u>See</u> Certification Reply at 4.  The Plaintiffs also refute the Defendants' argument that individualized issues dominate, because the Plaintiffs contend that courts routinely consider whether representations "on a product's packing 'raise[] the common question of whether the packaging would mislead a *reasonable consumer.*'"  Certification Reply at 5 (quoting <u>Broomfield v. Craft Brew All., Inc.</u>, No. 17-CV-01027-BLF, 2018 WL 4952519, at *5 (N.D. Cal. Sept. 25, 2018)(Freeman, J.)(alteration and emphasis added in Certification Reply, but not in <u>Broomfield v. Craft Brew Alliance, Inc.</u>).  Moreover, the Plaintiffs attest that the Defendants' contention that individual questions outweigh common questions is directed

improperly at rule 23(a)'s commonality requirement and is properly suited for consideration as an issue of predominance.  See Certification Reply at 6 n.3.

### ii.      **Typicality.**

Next, the Plaintiffs contend that "commonality and typicality rise or fall together." Certification Reply at 6 (citing Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. at 440; and Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 661).  The Plaintiffs argue that the class representatives' claims are typical, because they will demonstrate with common evidence that Natural American cigarettes mislead reasonable consumers, and this issue does not involve analysis of individual consumers' subjective thoughts.  See Certification Reply at 7.  The Plaintiffs also argue that the fact that consumers m ay have continued smoking Natural American cigarettes after the litigation's beginning does not make the Class Representatives' claims atypical, and that "the testimony of two Plaintiffs that they subjectively *believe* they did not pay a price premium is irrelevant."  Certification Reply at 8 (emphasis in original).

### b.      **Rule 23(b)(3).**

The Plaintiffs contend that they satisfy rule 23(b)(3)'s requirements.  See Certification Reply at 9.  The Plaintiffs first argue that individual issues do not predominate.  See Certification Reply at 9.  Next, the Plaintiffs contend that a class action is superior to individual actions.  See Certification Reply at 44.

### i.      **Predominance.**

The Plaintiffs first respond to the Defendants' argument that the proposed classes are not readily ascertainable.  See Certification Reply at 9.  The Plaintiffs contend that, under rule 23(c) of the Federal Rules of Civil Procedure, a court's certification order need only "'define the class and the class claims, issues, or defenses,'" Certification Reply at 9 (quoting Fed. R. Civ. P.

23(c)(1)(B)), and that the class be defined by "objective criteria," Certification Reply at 9 (quoting Anderson Living Tr. v. Energen Res. Corp, No. 13-cv-00909-WJ-CG, 2019 WL 6618168, at *8 (D.N.M. Dec. 5, 2019)(Johnson, C.J.)).  Instead, the Plaintiffs contend that the district court has discretion to determine a case's method for trial based on the facts of the case, including class certification.  See Certification Reply at 10 (citing Davoll v. Webb, 194 F.3d 116 (10th Cir. 1999)).  Here, the Plaintiffs argue, the Plaintiffs' proposed class definitions are based on objective criteria: "whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the NAS Cigarette product(s), and (iii) when they purchased the NAS Cigarette product(s)."  Certification Reply at 11.  The Plaintiffs contend that they can identify class members at the claims administration stage by using sworn affidavits, claim forms, receipts, and other purchase records.  See Certification Reply at 11.

Second, the Plaintiffs contend that the Defendants are incorrect to assert that class members may have seen different marketing representations.  See Certification Reply at 13.  The Plaintiffs assert that, on the whole, the Defendants' marketing of Natural American cigarettes gave the impression that the cigarettes may be less harmful than other cigarettes.   See Certification Reply at 13.  Moreover, the Plaintiffs contend that, in consumer protection cases, courts should "'presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging.'"  Certification Reply at 14 (quoting Davidson v. Apple, Inc., No. 16-CV-04942-LHK, 2018 WL 2325426, at *18 (N.D. Cal. May 8, 2018)(Koh, J.).  The Plaintiffs also argue that the statements on Natural American cigarettes with which the Plaintiffs take issue "are all the same or substantially similar," and convey the same marketing message that Natural American cigarettes may be safer than other cigarettes. Certification Reply at 14.

Finally, the Plaintiffs contend that they will present common evidence to demonstrate that "the reasonable consumer's understanding of Defendants' misrepresentations connotes a cigarette that may be less harmful, *including that such understanding is not impacted by any disclaimer*." Certification Reply at 15 (emphasis in original).  The Plaintiffs also emphasize that, at the class certification stage, they do not have to prove that they will prevail on their theory, but only demonstrate that there is common evidence in support of their argument.  See Certification Reply at 15.  The Plaintiffs argue that the Defendants' contention that the Plaintiffs do not show commonality is merely an attack on the merits of the Plaintiffs' claims.  See Certification Reply at 16-17.  The Plaintiffs also attest that the Defendants "are improperly asking to strip the trier of fact the opportunity to consider Plaintiffs' experts' conclusions about the effect of Defendants' product claims, and instead substitute in Defendants' experts' conclusions."  Certification Reply at 19.

Next, the Plaintiffs contend that the Defendants are incorrect in arguing that state specific statutes require individualized proof of deception or causation.  See Certification Reply at 19.  First, the Plaintiffs contend that, under their theory of recovery, they need demonstrate only that an objective, reasonable consumer would find that Natural American cigarettes are less harmful or that the consumer would pay a price premium for Natural American cigarettes.  See Certification Reply at 19-20.  The Plaintiffs argue that, under the FDUTPA, the Plaintiffs do not need to prove that every class member purchased Natural American cigarettes because of the deceptive marketing, and thus, the cases that the Defendants cited are inapposite.  See Certification Reply at 20 (citing Green v. McNeil Nutritionals, LLC, Case No. 2004-0379-CA, 2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005), and Philip Morris USA Inc. v. Hines, 883 So. 2d 292 (Fla. Dist. Ct. App. 2003)).  Second, the Plaintiffs contend that the ICFA does not

require individualized proof, because, under the ICFA, the Plaintiffs need to demonstrate only "that there is a uniform material representation seen by class members . . . and that class members paid more for the product at issue as a result." Certification Reply at 21 (citing In re ConAgra Foods, Inc., 90 F. Supp. 3d at 996). Third, the Plaintiffs contend that Massachusetts Chapter 93A does not require individualized proof and that the First Circuit, instead, has recognized that a "price premium theory of causation, such as that proffered by Plaintiffs here, is cognizable under Chapter 93A." Certification Reply at 22 (citing Lee v. Conagra Brands, Inc., 958 F.3d 70, 80-81 (1st Cir. 2020)). Fourth, the Plaintiffs attest that they do not need individualized proof under the NJCFA, because, as the Defendants concede, the NJCFA requires a showing of only a causal relationship between the Defendants' conduct and the consumers' injury. See Certification Reply at 23. Fifth, the Plaintiffs argue that they do not need individualized proof under the TCCWNA, because "[t]he statute includes no reliance requirement, and there is no need to prove a causal connection on an individual basis." Certification Reply at 24 (citing Browne v. Capital One Bank (USA), N.A., No. A-2102-19T1, 2020 WL 4045271, at *7 (N.J. Super. Ct. App. Div. July 20, 2020)). Sixth, the Plaintiffs contend that the WCPA does not require individualized proof, because the WCPA recognizes a theory of causation that turns on a price premium, which the Plaintiffs allege here. See Certification Reply at 24.

Moreover, the Plaintiffs contend that individualized inquires do not predominate in their unjust enrichment claims. See Certification Reply at 25. First, the Plaintiffs address the Defendants' argument that common questions will "'rarely, if ever, predominate' in an unjust enrichment claim" by noting that the Tenth Circuit upheld class certification for an unjust enrichment claim in Menocal v. GEO Group, Inc., 882 F.3d at 925. Certification Reply at 25

(quoting Certification Opposition at 50).  The Plaintiffs also attest that courts in "every other district and state whose laws are implicated in this case have also certified classes bringing claims for unjust enrichment."  Certification Reply at 25.  The Plaintiffs contend that the unjust enrichment elements are essentially the same in every State and require the Plaintiffs to show only that: (i) the Defendants received a benefit; (ii) at the Plaintiffs' expense; (iii) under circumstances that would make it unjust for the Defendants to retain the benefit without commensurate compensation.  See Certification Reply at 25 (citing Menocal v. GEO Grp., Inc., 882 F.3d at 926).  Moreover, the Plaintiffs contend that, because the claims rely on the Defendants' misconduct, common questions predominate.  See Certification Reply at 25.  The Plaintiffs also note that they are not pursuing class certification for a claim under the NCUDTPA.  See Certification Reply at 31 n.25.

Next, the Plaintiffs contend that the Defendants are incorrect in asserting that the Plaintiffs cannot show materiality with respect to their California, Michigan, and New York claims.  See Certification Reply at 31.  The Plaintiffs assert that, in California, "'no evidence of materiality is necessary for purposes of class certification' where alleged misrepresentations are common to the class."  Certification Reply at 31 (quoting In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig., 422 F. Supp. 3d 194, 252 (D.D.C. 2019)(Huvelle, J.)).  The Plaintiffs also attest that the same is true under New York and Michigan law.  See Certification Reply at 32 (citing In re FCA US LLC Monostable Electronic Gearshift Litig., 334 F.R.D. 96, 116-17 (E.D. Mich. 2019)(Lawson, J.)).  Further, the Plaintiffs contend that their expert, Dr. Dewhirst, attests that the "Defendants' marketing employed common marketing techniques" and that their expert, Dr. Pearson, attests that "many American adults erroneously believe that 'natural' or 'additive-free' cigarettes are or may be less harmful than other brands."  Certification

Reply at 33 (no citation for quotations).  The Plaintiffs contend that, at this stage, the Plaintiffs do not need to prove materiality, but that they need to prove only that common proof will answer common questions.  See Certification Reply at 33 (citing Broomfield v. Craft Beer Alliance, Inc., 2018 WL 4952519, at *11).  The Plaintiffs also cite to an FDA report, the Defendants' internal documents, and their own expert, Dr. Van Liere's, survey evidence to attest that they are able to demonstrate materiality.  See Certification Reply at 34-36.

The Plaintiffs also contend that, with regard to the Nationwide Menthol Subclass, New Mexico's choice-of-law rules apply and, therefore, the Court should apply New Mexico law to the breach-of-express-warranty claims.  See Certification Reply at 37.  The Plaintiffs contend that New Mexico law should apply, because, during the relevant time period:

> (1) SFNTC was a New Mexico corporation; (2) SFNTC was headquartered at Santa Fe, New Mexico; (3) the 'employees and decision makers tasked with the development and execution of product labeling, marketing and advertising are located primarily at Santa Fe's headquarters in New Mexico"; and, (4) events during the relevant [time period] to the allegations in the Consumer Actions took place in New Mexico.

Certification Reply at 38 (quoting Consolidated Complaint, filed January 12, 2017 (Doc. 82)).  The Plaintiffs also note that the Supreme Court of New Mexico has adopted the Restatement (Second) test for multi-state class actions so that the law of the State with the most significant contacts applies; the court need not apply several States' laws.  See Certification Reply at 38-39.

Finally, the Plaintiffs argue that they have sufficiently demonstrated a method to calculate class members' damages.  See Certification Reply at 39.  The Plaintiffs contend that their expert, Dr. Dubé,[17] has proffered a method to calculate class-wide economic damages.  See Certification Reply at 41.  Dr. Dubé proposes a damages model based on a conjoint analysis,

---

[17]Dr. Dubé is an expert whom the Plaintiffs proffer to opine on how the Court may determine damages on a class-wide basis.

which, the Plaintiffs attest, other cases have upheld.  See Certification Reply at 41 (citing Price v. L'Oréal USA, Inc., No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *9 (S.D.N.Y. Aug. 15, 2018)(Schofield, J.), and Goldenberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. 374, 394 (S.D.N.Y. 2016)(Román, J.)).  The Plaintiffs argue that Dr. Dubé has "proposed a model for measuring the price premium and explained how it work," and that Dr. Dubé "suggested there are two separate ways to measure economic damages: a price premium (which Defendants admit is proper) and willingness to pay."  Certification Reply at 42 (emphasis in original). Consequently, the Plaintiffs argue that either damages model is valid.  See Certification Reply at 42-43.

### ii.   **Superiority.**

As to superiority, the Plaintiffs attest that the Defendants' argument that a class action is not a superior form of litigation to individual actions is "nothing more than a recast of their predominance argument."  Certification Reply at 44.  The Plaintiffs contend that, because predominance is met, the class action approach is superior to individual actions and that manageability is reason alone for the Court to decline to certify the class.  See Certification Reply at 44.  The Plaintiffs also note that, in cases where the cost of litigation exceeds the likely recovery, the alternative to a class action is likely no action at all.  See Certification Reply at 44 (citing Anderson Living Trust v. WPX Energy Prod. LLC, 306 F.R.D. at 407).

### c.   **Rule 23(b)(2).**

The Plaintiffs contend that, if the Court were to accept the Defendants' argument that the Plaintiffs "can no longer claim that they risk being deceived into believing NAS Cigarettes may be less harmful since they filed a lawsuit premised on the recognition that NAS Cigarettes are not less harmful than other cigarettes," then injunctive relief could never be available in false

advertising cases.  Certification Reply at 45.  While the Plaintiffs note that the Tenth Circuit has not addressed squarely this issue, the Plaintiffs contend that other circuits have allowed class members to pursue injunctive relief based on false advertising claims.  See Certification Reply at 45 (citing Davidson v. Kimberly Clark Corp., 889 F.3d 956, 969-70 (9th Cir. 2018)).   The Plaintiffs further contend that, without injunctive relief, the Defendants will be free to continue marketing Natural American cigarettes with misleading representations.  See Certification Reply at 47.  The Plaintiffs also argue that their request for injunctive relief is not moot, because the Plaintiffs seek to "pursue an injunction against descriptors *not covered*" by the Court's MTD MOO -- "specifically (1) the use of 'natural' in the 'Natural American Spirits' brand name; (2) the 'organic' descriptor; and (3) the 'tobacco & water' descriptors."  Certification Reply at 49 (no citations for quotations).

### 4.    Motion to Exclude Dr. J. Michael Dennis.

The Defendants filed the Motion to Exclude Dr. Dennis on July 23, 2020.  The Plaintiffs respond.  See Motion to Exclude Dr. Dennis Opposition at 1-30.  The Defendants reply.  See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis, filed November 19, 2020 (Doc. 321)("Motion to Exclude Dr. Dennis Reply").

### a.    Motion to Exclude Dr. Dennis.

The Defendants begin their motion by noting that Dr. Dennis is a rebuttal expert whom the Plaintiffs intend to present to opine on the testimony of the Defendants' expert, Dr. Kent D. Van Liere, which details consumer perception of Natural American cigarettes.  See Motion to Exclude Dr. Dennis at 1.  The Defendants contend that Dr. Dennis' testimony and report does not pass the Daubert test.  Motion to Exclude Dr. Dennis at 1-2.  The Defendants contend that

Dr. Dennis' testimony and report are not helpful to the Court, and that Dr. Dennis does not use reliable methods to draw his conclusions. See Motion to Exclude Dr. Dennis at 1-2.

The Defendants first note that Dr. Van Liere designed and conducted a survey to determine consumers' perceptions about the descriptors on Natural American cigarettes. See Motion to Exclude Dr. Dennis at 3-4. Dr. Van Liere conducted a double-blind[18] survey of "438 consumers who bought NAS cigarettes between 2010 and 2015." Motion to Exclude Dr. Dennis at 4. Dr. Van Liere also used direct questions in his survey, to which respondents provided answers. See Motion to Exclude Dr. Dennis at 4. Dr. Van Liere's study concludes:

> • Only 8 percent said they first purchased NAS because they thought that NAS was healthier, safer, or not addictive, and most of these respondents identified additional reasons for first purchase.
>
> • Only 7 percent who chose NAS as their regular/usual brand, or 3 percent of all respondents, mentioned healthier or safer as a reason for ongoing purchase, and of these, most identified additional reasons for choosing NAS as their regular/usual brand.
>
> • Only 4 percent who smoked NAS occasionally (2 percent overall) mentioned healthier or safer as a reason for their occasional purchases; none mentioned "not addictive." These respondents also usually identified additional reasons.

Motion to Exclude Dr. Dennis at 6 (internal citations omitted)(no citation for quotation). Based on the survey data that Dr. Van Liere collected, Dr. Van Liere formed the following expert conclusions:

> (1) consumers purchase NAS for a variety of reasons unrelated to harm misperceptions; less than 10% mention any health misperception as a reason for purchase, and most of them mention other reasons for purchase too; (2) NAS purchasers have varying interpretations of the NAS descriptors; and (3) many

---

[18]A double-blind study "is one in which neither the participants nor the experimenters know who is receiving a particular treatment. This procedure is utilized to prevent bias in research results." Kendra Cherry, Double-Blind Studies in Research (April 2, 2020), https://www.verywellmind.com/what-is-a-double-blind-study-2795103.

> NAS consumers say they did not pay a price premium over other brands for NAS; and those that do, did so for a variety of reasons unrelated to health misperceptions.

Motion to Exclude Dr. Dennis at 7.

The Defendants attest that Dr. Dennis does not criticize or challenge any of Dr. Van Liere's survey methodology.  See Motion to Exclude Dr. Dennis at 7.  Further, the Defendants contend that, typically, Dr. Dennis conducts his own survey to form the basis of his expert opinions, and this case is the first time in which Dr. Dennis did not conduct a survey to rebut another expert's survey results.  See Motion to Exclude Dr. Dennis at 7.  The Defendants also argue that Dr. Dennis has no data to refute Dr. Van Liere's survey, has not found any data inconsistent with Dr. Van Liere's survey, and has not reviewed any data or literature concerning why Natural American cigarette consumers purchase Natural American cigarettes.  See Motion to Exclude Dr. Dennis at 8.

First, the Defendants take issue with Dr. Dennis' opinion that "Dr. Van Liere should have used a conjoint rather than direct question design."  Motion to Exclude Dr. Dennis at 8.  The Defendants attest that, in the past, Dr. Dennis has used direct question surveys to answer questions akin to Dr. Van Liere's survey.  See Motion to Exclude Dr. Dennis at 8-9.  The Defendants contend that, in fact, Dr. Dennis never has used conjoint question design to identify consumers' reasons for purchasing an item, or to measure consumers' attitudes, opinions, beliefs, about a product.  See Motion to Exclude Dr. Dennis at 9.

Second, the Defendants challenge Dr. Dennis' opinion that Dr. Van Liere's survey "is unreliable because its methods introduced possible recall bias.[19]"  Motion to Exclude Dr.

---

[19]Recall bias

Dennis at 9.  The Defendants contend that Dr. Dennis states only that recall bias "'*could* be problematic'" when Dr. Van Liere asked consumers in 2019 about their purchasing habits between 2010-2015.  Motion to Exclude Dr. Dennis at 9 (quoting Deposition of Dr. Dennis at 164:3-9 (taken January 16, 2020), filed July 23, 2020 (Doc. 277-3)("Dennis Depo.")(emphasis in Motion to Exclude Dr. Dennis but not in Dennis Depo.).  The Defendants argue, however, that Dr. Dennis has taken surveys similar to Dr. Van Liere's in which he asked participants to recall purchases they made thirteen to seventeen years before taking the survey.  See Motion to Exclude Dr. Dennis at 10.

Third, the Defendants contend that Dr. Dennis' opinion that "Dr. Van Liere wrongly used open-ended questions to ask about purchase reasons" is improper.  Motion to Exclude Dr. Dennis at 10.  The Defendants contend that Dr. Dennis opines that Dr. Van Liere's open-ended-question use was inappropriate, but that Dr. Dennis concedes that "'it would be irresponsible for me to say what those differences would be without actually collecting the information' about his preferred methodology."  Motion to Exclude Dr. Dennis at 10-11 (quoting Dennis Depo. at 94:6-95:6). The Defendants also take issue with Dr. Dennis' conclusion that survey respondents made a poor effort to answer the open-ended questions, because Dr. Dennis' conclusion is based on the fact that many respondents gave less than three-word responses and Dr. Dennis admitted that criteria was "'entirely arbitrary.'"  Motion to Exclude Dr. Dennis at 10-11 (quoting Dennis Depo. at

---

is a systematic error that occurs when participants do not remember previous events or experiences accurately or omit details: the accuracy and volume of memories may be influenced by subsequent events and experiences. Recall bias is a problem in studies that use self-reporting, such as case-control studies and retrospective cohort studies.

Recall Bias, Catalogue of Bias, https://catalogofbias.org/biases/recall-bias/ (last visited April 21, 2022).

252:4-10).

Fourth, the Defendants challenge Dr. Dennis' opinion that "Dr. Van Liere wrongly used closed-ended questions to ask about NAS descriptors and whether respondents paid for NAS compared to other brands they purchased." Motion to Exclude Dr. Dennis at 11. Dr. Dennis contends that closed-ended question in Dr. Van Liere's survey's -- asking "if respondents paid more for NAS than other cigarettes they purchased" -- is unreliable, because Dr. Van Liere does not provide a justification why a consumer accurately can answer that question. Motion to Exclude Dr. Dennis at 11. The Defendants contend, however, that Dr. Dennis "has no data to support his opinion." Motion to Exclude Dr. Dennis at 11.

Finally, the Defendants take issue with Dr. Dennis' opinion that "Dr. Van Liere failed to pre-test his survey questions." Motion to Exclude Dr. Dennis at 12. Dr. Dennis contends that Dr. Van Liere does not follow generally accepted survey protocol, because he did not pre-test his questionnaire. See Motion to Exclude Dr. Dennis at 12. The Defendants argue that Dr. Dennis has no basis for his conclusion and that Dr. Dennis conceded that "the form of pretesting is a judgment call." Motion to Exclude Dr. Dennis at 12 (citing Dennis Depo. at 54:9-17; id. at 347:14-350:20).

The Defendants contend that Dr. Dennis' opinions are unreliable and that, therefore, the Court should exclude his opinion under rule 702 of the Federal Rules of Evidence. See Motion to Exclude Dr. Dennis at 16; Fed. R. Evid. 702. First, the Defendants contend that Dr. Dennis did not consider sufficient materials to opine on Dr. Van Liere's survey, because he did not read the Complaint, any case documents, any deposition transcripts, or literature on "'reasons why NAS consumers purchase NAS cigarettes,'" and did not conduct any survey work of his own. Motion to Exclude Dr. Dennis at 16-17 (quoting Dennis Depo. at 89:12-90:1). Consequently, the

Defendants contend that Dr. Dennis relies solely on his own experience in survey design and does not adequately explain how his experience led to his conclusions.  See Motion to Exclude Dr. Dennis at 18 (citing United States v. Medina-Copete, 757 F.3d 1092, 1104 (10th Cir. 2014)).  Second, the Defendants contend that Dr. Dennis' opinions are not the product of reliable principles and methods.  See Motion to Exclude Dr. Dennis at 19.  The Defendants argue that Dr. Dennis misunderstands the core allegations behind the Plaintiffs' Complaint and, therefore, cannot accurately opine on the veracity of Dr. Van Liere's survey.  See Motion to Exclude Dr. Dennis at 19-20.  The Defendants attest that Dr. Dennis' opinion that Dr. Van Liere should have used a conjoint survey is based on the premise that Dr. Van Liere's survey was designed to measure the economic value that consumers place on Natural American cigarette product descriptors, when Dr. Van Liere's survey was not designed to measure the economic value consumers place on descriptors, but was designed to measure consumers' reasons for purchasing Natural American cigarettes, including whether the product descriptors drove consumer decisions to purchase Natural American cigarettes at a higher price.  See Motion to Exclude Dr. Dennis at 20.  The Defendants also attest that Dr. Dennis has never used a conjoint survey to ask consumers about past purchases and that he has used a conjoint survey only to ask consumers about present purchases.  See Motion to Exclude Dr. Dennis at 21.  Next, the Defendants argue that Dr. Dennis' contention that Dr. Van Liere's survey is flawed because of consumers' recall bias is an untested hypothesis and that Dr. Dennis does not cite to anything to support his contention.  See Motion to Exclude Dr. Dennis at 21-22.  The Defendants also argue that Dr. Dennis has conducted a survey similar to Dr. Van Liere under similar conditions of consumer recall, so he cannot proffer legitimately the opinion that the survey is flawed because of recall bias.  See Motion to Exclude Dr. Dennis at 23.  The Defendants further contend that Dr. Dennis'

contention that Dr. Van Liere should not have used open-ended questions is based only on an untested hypothesis and speculation.  See Motion to Exclude Dr. Dennis at 27.  The Defendants contend that, in fact, open-ended questions are the preferred survey method for measuring what first comes to a respondent's mind.  See Motion to Exclude Dr. Dennis at 27.  The Defendants argue, moreover, that, because Dr. Dennis did not conduct his own survey, Dr. Dennis cannot speak to how closed-ended questions would have changed the survey results, and that Dr. Dennis admits that open-ended and closed-ended questions are both appropriate survey methods.  See Motion to Exclude Dr. Dennis at 27.  The Defendants also attest that Dr. Dennis has no scientific basis for alleging that Dr. Van Liere improperly coded the open-ended responses or that respondents gave "'poor effort'" in their responses.   Motion to Exclude Dr. Dennis at 29 (quoting Dennis Depo. at 245:4-247:19).

The Defendants next contend that "Dr. Dennis' opinions criticizing the . . . survey's closed-ended questions are unreliable because they rest on a mistaken understanding of the questions and their purpose."  Motion to Exclude Dr. Dennis at 30.  The Defendants argue that Dr. Dennis assumes that Dr. Van Liere used closed-ended survey questions to determine the meaning of the descriptors "organic tobacco" and "natural tobacco" in isolation, but Dr. Van Liere used the questions to measure whether the two descriptors have the same or different meanings.   Motion to Exclude Dr. Dennis at 31.   The Defendants argue that Dr. Dennis' interpretation is contrary to the question's plain meaning.  See Motion to Exclude Dr. Dennis at 31.  The Defendants further contend that Dr. Dennis improperly challenges Dr. Van Liere's conclusion that many Natural American cigarette consumers did not pay a price premium for Natural American cigarettes, and those that paid a price premium bought Natural American cigarettes for reasons unrelated to conceptions about health.  See Motion to Exclude Dr. Dennis

at 33.   The Defendants contend that Dr. Dennis does not provide any scientific basis for his challenge on Dr. Van Liere's conclusion.   See Motion to Exclude Dr. Dennis at 33.

The Defendants also argue that "Dr. Dennis' opinions about the failure of Dr. Van Liere to pre-test his survey instrument are unreliable because they are based on a false premise that Dr. Van Liere did no such pre-testing."   Motion to Exclude Dr. Dennis at 33.   The Defendants contend, however, that Dr. Van Liere pre-tested his survey.   See Motion to Exclude Dr. Dennis at 33-34.   The Defendants also opine that Dr. Dennis conceded that Dr. Van Liere used a valid form of pre-testing his survey and, therefore, Dr. Dennis' cannot argue that Dr. Van Liere's pre-test was inadequate.   See Motion to Exclude Dr. Dennis at 34.

Finally, the Defendants contend that the Court should exclude Dr. Dennis' testimony, because his "opinions do not fit the facts at issue, do not logically advance material aspects of the case, and are not helpful to the Court on class certification or to the jury."   Motion to Exclude Dr. Dennis at 34.   The Defendants argue that Dr. Dennis cannot say how any of the issues that he raised with Dr. Van Liere's survey affected the results and, therefore his testimony is not helpful to the Court or the jury.   See Motion to Exclude Dr. Dennis at 34.   The Defendants further contend that "Dr. Dennis does not assist the fact finder; he merely offers 'an analysis that suggests a myriad of potential problems' but that does not identify any of them as manifesting in fact."   Motion to Exclude Dr. Dennis at 36 (quoting Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *19 (D.N.M. Sept. 26, 2006)(Browning, J.)(emphasis added in Motion to Exclude Dr. Dennis, but not at Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC).   The Defendants conclude that Dr. Dennis' opinions are not reliable, and will not be helpful to the Court or a jury.   See Motion to Exclude Dr. Dennis at 37.

<b>b.</b>      <b><u>Motion to Exclude Dr. Dennis Opposition</u>.</b>

The Plaintiffs contend that Dr. Dennis' testimony should be allowed to challenge Dr. Van Liere's survey design with respect to the survey's recall bias, use of open-ended survey questions, and biased closed-ended response options.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 4.  Further, the Plaintiffs argue that the Court should allow Dr. Dennis to challenge Dr. Van Liere's survey pre-testing methods.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 6. The Plaintiffs also note that they have asked the Court to exclude Dr. Van Liere's testimony, and if the Court does so, then the Dr. Dennis' testimony would be irrelevant.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 8.  The Plaintiffs also attest that Dr. Dennis is a qualified expert, because he has a Ph.D. from the University of Chicago, has worked in survey design and research for private industry, and has designed and conducted hundreds of statistical surveys over the past eighteen years.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 9.

The Plaintiffs argue that Dr. Dennis' testimony is reliable.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 10.  The Plaintiffs contend that, when a survey is admissible, rebuttal opinion testimony that highlights the survey's deficiencies is admissible.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 11.  Moreover, the Plaintiffs attest that "'rebuttal expert witnesses may criticize other experts' theories and calculations *without offering alternatives*.'"   Motion to Exclude Dr. Dennis Opposition at 12 (quoting <u>Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.</u>, 829 F. Supp. 2d at 834 (emphasis in Motion to Exclude Dr. Dennis Opposition, but not in <u>Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.</u>).  Consequently, as the Plaintiffs argue, Dr. Dennis need not have conducted his own survey to opine on Dr. Van Liere's flawed methodology.  <u>See</u> Motion to Exclude Dr. Dennis Opposition at 13.

Next, the Plaintiffs argue that Dr. Dennis considered sufficient facts and data to form his opinions.  See Motion to Exclude Dr. Dennis Opposition at 13.  The Plaintiffs argue that "[a] witness may acquire expertise on a subject based on experience in that field," Motion to Exclude Dr. Dennis Opposition at 13 (quoting United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *8 (D.N.M. November 19, 2014)(Browning, J.)), and that Dr. Dennis has expertise based on his twenty years of experience working in survey research, see Motion to Exclude Dr. Dennis Opposition at 13.  Moreover, the Plaintiffs contend that Dr. Dennis points to research that supports his opinion that Dr. Van Liere's survey suffers from recall bias, that he inappropriately used open-ended questions, and inadequately used closed-ended questions.  See Motion to Exclude Dr. Dennis Opposition at 14.  The Plaintiffs also contend that the Defendants are incorrect in asserting that Dr. Dennis needed to review the pleadings, depositions transcripts, and expert reports to be a qualified expert.  See Motion to Exclude Dr. Dennis Opposition at 15.  The Plaintiffs contend that the pleadings, depositions, and other expert reports are irrelevant to Dr. Dennis' testimony, because Dr. Dennis opines only on Dr. Van Liere's survey methodology and the opinions he derives from his survey.  See Motion to Exclude Dr. Dennis Opposition at 16.

### c.   **Motion to Exclude Dr. Dennis Reply**.

In the Motion to Exclude Dr. Dennis Reply, the Defendants first argue that Dr. Dennis' opinions are unfounded and unreliable, because he did not conduct any surveys, review any pleadings, or review any documents.  See Motion to Exclude Dr. Dennis Reply at 3.  Second, the Defendants contend that Dr. Dennis' theoretical criticisms of Dr. Van Liere are unreliable, because Dr. Dennis misunderstands what Dr. Van Liere was measuring, Dr. Dennis' opinions in this case contradict his past testimony in similar cases, Dr. Dennis does not identify a methodological flaw in Dr. Van Liere's use of open-ended questions or his coding of the open-

ended questions, Dr. Dennis misunderstands Dr. Van Liere's use of closed-ended questions, and Dr. Dennis does not identify a methodological flaw in Dr. Van Liere's pretesting method.  <u>See</u> Motion to Exclude Dr. Dennis Reply at 8, 10, 13, 15, 17.  Third, the Defendants argue that Dr. Dennis' criticisms of Dr. Van Liere are theoretical and, therefore, will not assist the Court or a jury.  <u>See</u> Motion to Exclude Dr. Dennis Reply at 17.  Consequently, the Defendants conclude that the Court should exclude Dr. Dennis' testimony.  <u>See</u> Motion to Exclude Dr. Dennis Reply at 18.

### 5.     <u>Motion to Exclude Charles D. Garner.</u>

The Plaintiffs filed the Plaintiffs' Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D., DABT.  <u>See</u> Plaintiffs' Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D., DABT, filed July 23, 2020 (Doc. 282)("Motion to Exclude Dr. Garner").  The Defendants respond.  <u>See</u> <u>generally</u> Motion to Exclude Dr. Garner Opposition.  The Plaintiffs reply. <u>See</u> Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Charles D. Garner, filed November 19, 2020 (Doc. 326)("Motion to Exclude Dr. Garner Reply").

### a.     <u>Motion to Exclude Dr. Garner.</u>

The Plaintiffs ask the Court to exclude Dr. Charles Garner's testimony that the Defendants do not add menthol to the tobacco of Natural American cigarettes.  Motion to Exclude Dr. Garner at 1.  First, the Plaintiffs argue that Dr. Garner's opinion that Natural American cigarettes are "additive-free" is unreliable, because it contradicts directly federal law and executives at Santa Fe Tobacco's testimony.  Motion to Exclude Dr. Garner at 9.  The Plaintiffs argue that Dr. Garner is not qualified to render an opinion on whether menthol is an additive, because he "has no special qualifications by training, education or experience in what

constitutes an 'additive' as that term is used by Santa Fe in marketing and labeling NAS menthol cigarettes as 'additive-free.'"  Motion to Exclude Dr. Garner at 10.  The Plaintiffs also argue that Dr. Garner's opinions are based only on his own opinion and do not have any basis in reliable support.   See Motion to Exclude Dr. Garner at 11-12.  For example, the Plaintiffs protest Dr. Garner's testimony that he does not agree with the FDA's definition of additive and stating: "'I think I like my definition better.'"  Motion to Exclude Dr. Garner (quoting Deposition of Charles Garner, PhD at 119:21-120:4 (taken January 16, 2020), filed July 23, 2020 (Doc. 279-12)(Garner)("Garner Depo.").   See Garner Depo. at 119:10-11 (Garner)(defining a tobacco additive as "a chemical or chemical mixture that is added to the tobacco").  The Plaintiffs further argue that, by defining additive in the face of the FDA's legal definition of additive, Dr. Garner is attempting to provide an impermissible legal conclusion.  See Motion to Exclude Dr. Garner at 12.  The Plaintiffs also contend that Dr. Garner's testimony that, if menthol is added to a cigarette, the menthol will migrate to the tobacco undermines his testimony that the Defendants do not add additives to their cigarettes.  See Motion to Exclude Dr. Garner at 13 (citing Garner Depo. 56:15-25; 57:13-17).   The Plaintiffs argue that, because Dr. Garner's opinion is contradictory, it is inherently unreliable and is not based on scientific principles.  See Motion to Exclude Dr. Garner at 14.

Second, the Plaintiffs argue that Dr. Garner's opinion that menthol cigarettes do not present increased harm to smokers is unreliable.  See Motion to Exclude Dr. Garner at 15.  The Plaintiffs contend that Dr. Garner did not explain how he came to this factual conclusion, and that no scientific or medical journal, or evidence supports his opinion.  See Motion to Exclude Dr. Garner at 15.  The Plaintiffs argue that Dr. Garner's opinion is "nothing more than his own *ipse dixit*" and that his opinion is "against the great weight of scientific evidence supported by

the FDA."  Motion to Exclude Dr. Garner at 16.

      **b.**        **Motion to Exclude Dr. Garner Opposition.**

The Defendants argue that the Court should consider Dr. Garner's testimony, because Dr. Garner's opinions are based on undisputed facts in the case, relevant peer-reviewed literature, scientific data, and industry practice.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 1. Specifically, the Defendants make four arguments.  First, the Defendants argue that Dr. Garner is qualified to testify as an expert, and that his opinions are reliable, because Dr. Garner "holds a Ph.D. in toxicology, has worked for decades in the field of tobacco product evaluation and harm reduction," and publishes work on differences in risk between tobacco products.  Motion to Exclude Dr. Garner Opposition at 9-10.  The Defendants also contend that Dr. Garner's methodology is reliable, because he has "reviewed peer-reviewed literature, government reports, and industry and regulatory practice."  Motion to Exclude Dr. Garner Opposition at 10.  Second, the Defendants contend that the Plaintiffs ask the Court to "exclude two opinions that Dr. Garner does not hold": (i) that "'Dr. Garner opines that mentholated NAS cigarettes are "additive-free"'"; and (ii) that Dr. Garner "'opines that because menthol is not added directly into the tobacco in NAS cigarettes, it is not an 'additive.'"  Motion to Exclude Dr. Garner Opposition at 10 (quoting Motion to Exclude Dr. Garner at 2, 9).  Third, the Defendants argue that Dr. Garner's opinion "that menthol in mentholated NAS cigarettes is a filter additive and cigarette additive -- but *not* a tobacco additive -- is reliable, helpful, within Dr. Garner's expertise, and not an impermissible legal opinion."  Motion to Exclude Dr. Garner Opposition at 12 (emphasis in original).  The Defendants contend that the parties do not dispute that menthol is added only to the filter of Natural American cigarettes rather than the tobacco.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 12.  Moreover, the Defendants argue that the parties do not dispute that,

after manufacturing, menthol from the filter migrates to the tobacco.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 14.  The Defendants also contend that the menthol on the filter of Natural American cigarettes is placed on a sepiolite,[20] which inhibits the menthol from migrating from the filter to other parts of the cigarette.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 15.  The Defendants further contend that Dr. Garner's conclusion that menthol in the filter of a Natural American cigarette is not a "tobacco additive" is reliable and relevant, and that Dr. Garner's opinion is consistent with FDA regulations mandating that manufacturers report whether menthol is added to a filter or to tobacco.  Motion to Exclude Dr. Garner Opposition at 16.  Fourth, the Defendants contend that "Dr. Garner's opinion that there is no increased harm due to the migration of some menthol in NAS cigarettes to the tobacco is reliable."  Motion to Exclude Dr. Garner Opposition at 24.  The Defendants contend that peer-reviewed studies support Dr. Garner's conclusion that menthol cigarettes do not pose increased risk to smokers.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 25.  Consequently, the Defendants contend that Dr. Garner's opinions that menthol is not a tobacco additive, and that migration of menthol from the filter to the tobacco does not increase harm to smokers are admissible, because they are based in fact, supported by review of scientific data, and are relevant to disputed issues in the case.  <u>See</u> Motion to Exclude Dr. Garner Opposition at 29.

### c.  <u>Motion to Exclude Dr. Garner Reply</u>.

In their Motion to Exclude Dr. Garner Reply, the Plaintiffs make two arguments.  <u>See</u> Motion to Exclude Dr. Garner Reply at 1, 3.  First, the Plaintiffs contend that Dr. Garner's opinions should be excluded because they are not helpful to the trier of fact.  <u>See</u> Motion to

---

[20]A sepiolite is a "clay-like substance meant to inhibit the migration of menthol from the filter to other parts of the cigarette."  Motion to Exclude Dr. Garner Opposition at 15.

Exclude Dr. Garner Reply at 1.  The Plaintiffs contend that Dr. Garner's testimony is not helpful, because his "attempt to draw a distinction between a filter additive and tobacco additive is confusing and misleading."  Motion to Exclude Dr. Garner Reply at 2.  The Plaintiffs also argue that Dr. Garner's testimony is not helpful in light of the Court's previous determination that "'an additive-free cigarette cannot have menthol.'"  Motion to Exclude Dr. Garner Reply at 3 (quoting MTD MOO at 184).  Second, the Plaintiffs argue that Dr. Garners opinions should be excluded, because Dr. Garner is not qualified.  See Motion to Exclude Dr. Garner Reply at 3.  Specifically, the Plaintiffs contend that Dr. Garner "is not qualified to opine on whether menthol is an additive," because his "lengthy employment at Reynolds' merely highlights his bias and reinforces his lack of impartiality in his own research" and his opinions on menthol have not been tested or subject to peer-review.  Motion to Exclude Dr. Garner Reply at 3.  The Plaintiffs also attest that Dr. Garner's opinion that menthol does not increase harm from cigarettes is mere guesswork and that this conclusion is unsupported by research.  See Motion to Exclude Dr. Garner Reply at 3.

### 6.    Motion to Exclude Dr. Kent Van Liere.

The Plaintiffs ask the Court to exclude the opinions and testimony of Defendants' expert, Dr. Kent Van Liere.  See Motion to Exclude Dr. Van Liere at 25.  The Defendants respond.  See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Kent Van Liere, filed October 8, 2020 (Doc. 314)("Motion to Exclude Dr. Van Liere Opposition").  The Plaintiffs reply.  See Plaintiffs' Reply in Support of Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Kent Van Liere, filed November 19, 2020 (Doc. 327)("Motion to Exclude Dr. Van Liere Reply").

a.      **Motion to Exclude Dr. Van Liere.**

The Plaintiffs argue that Dr. Van Liere's testimony is irrelevant, unreliable, and inadmissible.  <u>See</u> Motion to Exclude Dr. Van Liere at 6.  The Plaintiffs contend that the Court should exclude Dr. Van Liere's testimony for three reasons.  <u>See</u> Motion to Exclude Dr. Van Liere at 6, 12.  First, the Plaintiffs argue that Dr. Van Liere's survey "does not logically advance any material aspect of the case."  Motion to Exclude Dr. Van Liere at 6.  The Plaintiffs attest that Dr. Liere's survey, which analyzes consumers' motives and intent in purchasing Natural American cigarettes, is not relevant to the Court at the class certification stage.  <u>See</u> Motion to Exclude Dr. Van Liere at 8.  The Plaintiffs argue also that Dr. Van Liere's survey does not measure materiality, meaning that Dr. Van Liere's study does not measure whether the Defendants' advertisements that Natural American cigarettes are "'100% additive-free,' 'natural,' and 'organic'" were material to the consumer.  Motion to Exclude Dr. Van Liere at 11 (no citation for quotations).  Second, the Plaintiffs contend that Dr. Van Liere's opinions are not based on "'good grounds.'"  Motion to Exclude Dr. Van Liere at 12 (no citation for quotation).  The Plaintiffs argue that Dr. Van Liere's conclusions are the "product of methodological distortions," and that Dr. Van Liere miscoded the survey results.  Motion to Exclude Dr. Van Liere at 12-13.  Namely, the Plaintiffs allege that Dr. Van Liere did not properly code responses that included health reassurance terms, such as not categorizing the word "natural" as "healthy."  Motion to Exclude Dr. Van Liere at 13-14.  The Plaintiffs contend also that Dr. Van Liere's opinions are "based on an ignorance of market realities."  Motion to Exclude Dr. Van Liere at 18.  The Plaintiffs also take issue with Dr. Van Liere's failure to control for recall bias and argue that undermines the reliability of Dr. Van Liere's study and opinions.  <u>See</u> Motion to Exclude Dr. Van Liere at 19.  Further, the Plaintiffs argue that Dr. Van Liere uses open-ended questions

inappropriately and against industry standards, because coding open-ended answers introduces interviewer and coder variance.  See Motion to Exclude Dr. Van Liere at 22.  Third, the Plaintiffs argue that conjoint analysis is the appropriate methodology for a survey like the one Dr. Van Liere conducted, because conjoint analysis involves less risk of recall bias and would have been more accurate at measuring the reasons why consumers purchased Natural American cigarettes.  See Motion to Exclude Dr. Van Liere at 24.

### b.  Motion to Exclude Dr. Van Liere Opposition.

The Defendants contend that Dr. Van Liere's survey, findings, and opinions are admissible.  See Motion to Exclude Dr. Van Liere Opposition at 14.  The Defendants make two primary arguments.  See Motion to Exclude Dr. Van Liere Opposition at 15, 19.  First, the Defendants argue that Dr. Van Liere's survey findings are relevant to the Certification Motion, because the findings address the issue whether Plaintiffs can demonstrate on a class-wide basis that consumers pay more for Natural American cigarettes based on Natural American cigarettes health representations.  See Motion to Exclude Dr. Van Liere Opposition at 15.  The Defendants contend that, at the class certification stage, the Plaintiffs must demonstrate that materiality can be inferred on a class-wide basis, and Dr. Van Liere's survey supports the Defendants' argument that materiality cannot be inferred on a class-wide basis.  See Motion to Exclude Dr. Van Liere Opposition at 16.  The Defendants also contend that Plaintiffs are incorrect in asserting that Dr. Van Liere's survey does not measure materiality, because Dr. Van Liere only testified that "it is for the Court, not him, to determine whether the *legal requirement* of materiality is satisfied."  Motion to Exclude Dr. Van Liere Opposition at 17 (emphasis in original).  Second, the Defendants argue that Dr. Van Liere's survey methodology is reliable.  See Motion to Exclude Dr. Van Liere Opposition at 19.  The Defendants contend that Dr. Van Liere's survey

methodology is generally accepted within the relevant medical and scientific community.  See Motion to Exclude Dr. Van Liere Opposition at 19.  Specifically, the Defendants attest that Dr. Van Liere conducted a sample survey, used double-blind techniques, sampled the relevant population -- United States consumers who were twenty-one years or older during the class period who purchased one or more variety of Natural American cigarettes during the class period -- prevented respondents from guessing by instructing respondents not to guess and providing options for a respondent to select that they did not know the answer or could not recall the answer, used both open- and closed-ended questions, and pretested the survey, and followed best practices in coding the data.  See Motion to Exclude Dr. Van Liere Opposition at 19-23. The Defendants take issue with the Plaintiffs' argument that Dr. Van Liere improperly coded responses to the open-ended "'reasons for purchase'" question, arguing that Dr. Van Liere's methods were sound and the Plaintiffs only object to Dr. Van Liere not treating "a host of themes as implicitly representing a health misperception, even if a response did not mention a belief that NAS cigarettes are healthy/healthier/safe/safer."  Motion to Exclude Dr. Van Liere Opposition at 24-25 (no citation for quotation).  The Defendants also contend that Dr. Van Liere's survey reflects market realities, and that the survey is relevant to this litigation.  See Motion to Exclude Dr. Van Liere Opposition at 26.  The Defendants further argue that Plaintiff's contention that recall bias renders Dr. Van Liere's survey unreliable is inapposite, because the Plaintiff's own expert, Dr. Dennis, identifies recall bias only as a potential source of error.  See Motion to Exclude Dr. Van Liere Opposition at 28.  The Defendants also attest that Dr. Van Liere's use of open-ended questions is acceptable practice.  See Motion to Exclude Dr. Van Liere Opposition at 29.  Finally, the Defendants contend that the Plaintiffs' argument that Dr. Van Liere should have performed a conjoint analysis is "predicated on a misunderstanding of Dr. Van Liere's purpose

in conducting his survey, and calls into question neither the survey's relevance nor its reliability."  Motion to Exclude Dr. Van Liere Opposition at 31.  Consequently, the Defendants argue that Dr. Van Liere's survey and opinions are admissible and will assist the Court at the class certification stage.

**c.**      <u>**Motion to Exclude Dr. Van Liere Reply.**</u>

In their Motion to Exclude Dr. Van Liere Reply, the Plaintiffs argue that the "central issue" with Dr. Van Liere's report is that Dr. Van Liere "simply decided, without justification, to code certain ambiguous responses which admit of a health reassurance interpretation as something other than a health reassurance belief" and then failed to address the coding decisions' effect on his conclusion.   Motion to Exclude Dr. Van Liere Reply at 2.  The Plaintiffs make two primary arguments in the Motion to Exclude Dr. Van Liere Reply.  <u>See</u> Motion to Exclude Dr. Van Liere Reply at 4, 13.  First, the Plaintiffs argue that the methodological defects involved in Dr. Van Liere's survey render his opinion unreliable.  <u>See</u> Motion to Exclude Dr. Van Liere Reply at 4.  Specifically, the Plaintiffs contend that Dr. Van Liere never considered the coding decisions' effects in his report, his opinion was reached for the litigation's purposes, and his report rests entirely on anecdotal evidence, because he "literally just asked respondents an open-ended question about why they purchased NAS."  Motion to Exclude Dr. Van Liere Reply at 6.  Further, the Plaintiffs contend that Dr. Van Liere's failure to address the coding ambiguities issue renders his survey unreliable.  <u>See</u> Motion to Exclude Dr. Van Liere Reply at 8.  Second, the Plaintiffs argue that Dr. Van Liere's testimony and report "fail the Rule 403 balancing test." Motion to Exclude Dr. Van Liere Reply at 13.  The Plaintiffs argue also that Dr. Van Liere did not test for materiality, but that the "Defendants have demonstrated their intent to hugely extrapolate from these limited (and questionable) findings and conclusions and treat Dr. Van

Liere's study as an actual materiality study."  Motion to Exclude Dr. Van Liere Reply at 15. Consequently, the Plaintiffs attest that the Court should exclude Dr. Van Liere's report and testimony.  See Motion to Exclude Dr. Van Liere Reply at 17.

**7.**     **Motion to Exclude Dr. Joannes Evangelista Steenkamp.**

The Plaintiffs ask the Court to exclude Dr. Joannes Evangelista Steenkamp's testimony. See Motion to Exclude Dr. Steenkamp at 27-28.  The Defendants respond.  See generally Motion to Exclude Dr. Steenkamp Opposition.  The Plaintiffs reply.  See Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Exclude the Expert Testimony of Dr. Joannes Evangelista Steenkamp, filed November 19, 2020 (Doc. 328)("Motion to Exclude Dr. Steenkamp Reply").

**a.**     **Motion to Exclude Dr. Steenkamp.**

The Plaintiffs ask the Court to exclude Dr. Steenkamp's opinions that:

1.     NAS packaging has never implied that NAS products are safer or healthier than other cigarettes (Steenkamp Report at 8-9 ¶¶ 1-3, 81-82, 85-91);

2.     Market shares of NAS and other brands of cigarettes with similar descriptors demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (id. at 9-10 ¶ 5-6, 72-76, 93-96);

3.     NAS sales have been driven by a group of brand attributes such as authenticity, environmental initiatives, and personal selling efforts (id. at 9-10 ¶¶ 4 & 7, 25-51, 57-59, 70-72, 75-77, 80, 96-97);

4.     Dr. Dewhirst incorrectly concludes that descriptors such as "additive free," "natural," and "organic" are drivers of NAS sales (id. at 9-10 ¶¶ 5-7, 63-70, 79-81, 84, 90-93);

5.     The price premium for NAS products are not the result of descriptors such as "additive free" and "natural" (id. at 9-10 ¶ 5-6, 91-93);

6.     Dr. Dewhirst incorrectly concludes that "academic research has found that the natural product descriptor is associated with being more

nutritious, healthier, safer, etc., and consumers express a willingness to pay more for such products." (id. at 81-82); and

7.  Dr. Pearson incorrectly concludes that there is an association between descriptors such as "additive free" and "natural" and health (Steenkamp Report at 83-84).

Motion to Exclude Dr. Steenkamp at 3.  The Plaintiffs make five primary arguments.  See Motion to Exclude Dr. Steenkamp at 8, 14, 16, 24.  First, the Plaintiffs contend that Dr. Steenkamp's "sole basis" for his opinion that Santa Fe's marketing does not represent that Natural American cigarettes are healthier is based on the FDA required disclaimer on the side of Natural American cigarettes that states that no additives does not mean a safer cigarette, Motion to Exclude Dr. Steenkamp at 9, and a conclusion "driven by an expert's own purported common sense is inadmissible," Motion to Exclude Dr. Steenkamp at 10.  Consequently, the Plaintiffs attest that there "is no reliable basis for Dr. Steenkamp's opinion that the NAS disclaimer is effective" or "that the terms 'additive free' and 'natural' do not mislead consumers regarding the safety of NAS products."  Motion to Exclude Dr. Steenkamp at 14 (no citation for quotation). Additionally, the Plaintiffs contend that Dr. Steenkamp's opinions "will not help the Court to determine whether class certification is appropriate."  Motion to Exclude Dr. Steenkamp at 14.

Second, the Plaintiffs contend that the Court should exclude Dr. Steenkamp's opinion that the "small market shares of two other tobacco companies that sell products with similar descriptors" demonstrates that the terms "additive free" and "natural" do not impact sales. Motion to Exclude Dr. Steenkamp at 14.  The Plaintiffs argue that Dr. Steenkamp's theory ignores the numerous factors that "could affect a company's market share."  Motion to Exclude Dr. Steenkamp at 15.  The Plaintiffs further contend that Dr. Steenkamp's opinion is unreliable, because he did not perform any financial or business analysis of the other two tobacco

companies.  See Motion to Exclude Dr. Steenkamp at 15.

Third, the Plaintiffs argue that the Court should exclude Dr. Steenkamp's opinion that Natural American cigarettes sales result from "an amorphous group of 'brand attributes,'" Motion to Exclude Dr. Steenkamp at 17 (quoting Steenkamp Report at 96), because Dr. Steenkamp does not provide any evidence that the brand attributes, either individually or collectively, resulted in increased sales, see Motion to Exclude Dr. Steenkamp at 18.  The Plaintiffs contend that Dr. Steenkamp merely cites to anecdotal evidence that there is a consumer trend in purchasing "authentic" products, but that Dr. Steenkamp does not provide scientific evidence to support this theory.  Motion to Exclude Dr. Steenkamp at 18.  The Plaintiffs also argue that Dr. Steenkamp contends that environmental initiatives drove Natural American cigarette sales, but does not cite to any causal evidence to support the assertion.  See Motion to Exclude Dr. Steenkamp at 19.  Dr. Steenkamp also asserts that the Defendants used "'personal selling'"[21] to sell Natural American cigarettes, but the Plaintiffs contend that Dr. Steenkamp cannot identify any personal selling materials, training manuals, or what quantity of consumers the personal selling experiences reached.  Motion to Exclude Dr. Steenkamp at 21.

Fourth, the Plaintiffs ask the Court to exclude Dr. Steenkamp's opinion that "the price premium for NAS products is not the result of 'additive-free' or 'natural' descriptors."  Motion to Exclude Dr. Steenkamp at 24.  The Plaintiffs attest that Dr. Steenkamp "suggests that authenticity is the reason for the price premium," but that he "admits that there is no data that supports his assertion that authenticity contributed to a price premium."  Motion to Exclude Dr. Steenkamp at 24.  Consequently, the Plaintiffs conclude that Dr. Steenkamp's opinion on Natural

---

[21]"Personal selling" includes "direct spoken or written communications between sellers and potential retail customers."  Motion to Exclude Dr. Steenkamp at 21.

American cigarettes' price premium is unreliable.  <u>See</u> Motion to Exclude Dr. Steenkamp at 25.

Fifth, and finally, the Plaintiffs argue that the Court should exclude Dr. Steenkamp's rebuttal of Dr. Dewhirst's and Dr. Pearson's opinions regarding the associations between "additive-free" and "natural" and health.  Motion to Exclude Dr. Steenkamp at 25.  The Plaintiffs argue that Dr. Steenkamp is not qualified to opine on marketing research on how consumers interpret messages, because he is not an expert on marketing research.  <u>See</u> Motion to Exclude Dr. Steenkamp at 25-26.  Moreover, the Plaintiffs assert that Dr. Steenkamp does not cite to any scientific support to rebut Dr. Dewhirst or Dr. Pearson's opinions and, therefore, his opinions are unreliable.  <u>See</u> Motion to Exclude Dr. Steenkamp at 26.

> **b.**     <u>**Motion to Exclude Dr. Steenkamp Opposition.**</u>

The Defendants make three arguments that the Court should not exclude Dr. Steenkamp's opinions.  <u>See</u> Motion to Exclude Dr. Steenkamp Opposition at 11, 19, 29.  First, the Defendants argue that Dr. Steenkamp uses reliable methodology to analyze Natural American cigarette sales, because he "conducted a comprehensive review of Santa Fe's advertisements."  Motion to Exclude Dr. Steenkamp Opposition at 11.  Specifically, the Defendants note that Dr. Steenkamp reviewed "available data, company documents, marketing literature," and has "over thirty-five years of experience," which he uses to determine the attributes that played a role in Natural American cigarettes' successful sales.  Motion to Exclude Dr. Steenkamp Opposition at 12.  The Defendants also attest that Dr. Steenkamp applied generally accepted practices to form his opinions about authenticity, environmental initiatives, and personal selling being instrumental to Natural American cigarette sales, because he reviews and cites published marketing research results and consumer survey data.  <u>See</u> Motion to Exclude Dr. Steenkamp Opposition at 15.

Second, the Defendants contend that "Dr. Steenkamp employed a reliable methodology

to assess the role of the descriptors and disclaimers, and the alleged health implications of them, in Santa Fe's marketing." Motion to Exclude Dr. Steenkamp Opposition at 19. The Defendants assert that Dr. Steenkamp has reviewed extensively Santa Fe's marketing materials, the information provided to consumers, the Plaintiffs' expert reports, published literature, and survey data to draw his conclusions, and they are, therefore, reliable. See Motion to Exclude Dr. Steenkamp Opposition at 20. The Defendants also assert that Dr. Steenkamp relies on marketing science principles based on various studies and data to determine that the Defendants' disclaimers were effective. See Motion to Exclude Dr. Steenkamp Opposition at 24. Third, the Defendants argue that "Dr. Steenkamp employed a reliable methodology to analyze and rebut Plaintiffs' claim that the price premium for NAS products are the result of descriptors such as 'additive-free' and 'natural.'" Motion to Exclude Dr. Steenkamp Opposition at 29 (no citation for quotation).

c.  <strong><u>Motion to Exclude Dr. Steenkamp Reply.</u></strong>

The Plaintiffs make five arguments in their reply. See Motion to Exclude Dr. Steenkamp Reply at 2. First, the Plaintiffs contend that Dr. Steenkamp's opinions that the descriptors additive-free and natural do not mislead consumers, and that disclaimers are ineffective, directly contradicts FDA studies that find the contrary. See Motion to Exclude Dr. Steenkamp Reply at 3. Further, the Plaintiffs contend that Dr. Steenkamp relies properly on scientific studies and appropriate data when forming his opinions. See Motion to Exclude Dr. Steenkamp Reply at 4-5. Second, the Plaintiffs argue that, in forming his opinion that the additive-free and natural descriptors did not contribute to Natural American cigarette sales, Dr. Steenkamp relied on only two other tobacco brands with similar descriptors who have small market shares and that he does not consider any other factors that impact market share. See Motion to Exclude Dr. Steenkamp

Reply at 7.    Third, the Plaintiffs argue that Dr. Steenkamp does not rely on scientific methodology or on actual data in opining that Natural American cigarette sales are the result of the Defendants' branding Natural American cigarette products as authentic, on the Defendants' environmental initiatives, or on the Defendants' personal selling tactics and, therefore, Dr. Steenkamp's opinion is unreliable.    See Motion to Exclude Dr. Steenkamp Reply at 9-14. Moreover, the Plaintiffs attest that Dr. Steenkamp cannot opine that "segmentation"[22] drove sales, because he cannot identify any "materially distinct messaging that was sent to a particular segment," and because there is no scientific evidence that segmentation led to increased sales. Motion to Exclude Dr. Steenkamp Reply at 14.    Fourth, the Plaintiffs contend that the Court should exclude Dr. Steenkamp's opinion that the price premium for Natural American cigarettes is not the result of the additive-free or natural descriptors, because Dr. Steenkamp never controlled for any variables that might cause a price premium, nor did he ask the Defendants about their pricing decisions.    See Motion to Exclude Dr. Steenkamp Reply at 17.    Fifth, the Plaintiffs ask the Court to exclude Dr. Steenkamp's rebuttal of Dr. Dewhirst and Dr. Pearson, because Dr. Steenkamp does not provide any support for his conclusion that surveys on consumer perceptions of food descriptors are inapplicable to cigarettes.    See Motion to Exclude Dr. Steenkamp Reply at 17.    Moreover, the Plaintiffs contend that "[t]his is an opinion outside of his area of expertise."    Motion to Exclude Dr. Steenkamp Reply at 18.    The Plaintiffs also argue that Dr. Steenkamp misunderstands Dr. Pearson's report and that, therefore, his criticisms of Dr. Pearson are misguided.    See Motion to Exclude Dr. Steenkamp Reply at 18.

---

[22]Segmentation is "a marketer's efforts to divide markets into segments by 'identify[ing] and profil[ing] distinct groups of buyers that demand different products.'"    Motion to Exclude Dr. Steenkamp Reply at 14 (quoting Dr. Steenkamp Report at 12)(alteration in Motion to Exclude Dr. Steenkamp Reply and not in Dr. Steenkamp Report).

8. **Motion to Exclude Dr. David J. Teece.**

The Plaintiffs ask the Court to exclude the Defendants' expert, Dr. David J. Teece.  See Motion to Exclude Dr. Teece at 30-31.  The Defendants respond in opposition.  See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. David J. Teece, filed October 8, 2020 (Doc. 312)("Motion to Exclude Dr. Teece Opposition").  The Plaintiffs reply.  See Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed November 19, 2020 (Doc. 324)("Motion to Exclude Dr. Teece Reply").

a. **Motion to Exclude Dr. Teece.**

The Defendants offer Dr. Teece as an expert in the fields of economics and business strategy.  See Motion to Exclude Dr. Teece at 1.  The Plaintiffs contend that Dr. Teece's expert report and opinions do not satisfy the standards for expert testimony.  See Motion to Exclude Dr. Teece at 1.  Specifically, the Plaintiffs seek to exclude seven of Dr. Teece's opinions:

- The market share of various cigarette brands demonstrates that descriptors such as "additive free" and "natural" are not drivers of sales of Natural American Spirit ("NAS") products (Teece Report at 4-14);

- The lack of a decrease in NAS market share after disclaimers were added to NAS packaging or after certain descriptors were removed from NAS packaging demonstrates that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 14-20);

- Wholesale and retail pricing of NAS products demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 20-34);

- The premium pricing of NAS products was the result of NAS brand equity and defendants' marketing efforts (Teece Report at 35-51);

- There is variability among NAS product users with respect to the reasons for their purchases and the product attributes they value (Teece Report at 51-54); and

- The methodology of the proposed conjoint analysis of Plaintiffs' expert, Dr. Jean-Pierre Dubé, is unreliable or improper (Teece Report at 66-81)[.]

Motion to Exclude Dr. Teece at 1-2.  The Plaintiffs make seven primary arguments that the Court should exclude Dr. Teece's testimony.  Motion to Exclude Dr. Teece at 10, 17, 22, 24, 25, 26, 28.  First, the Plaintiffs contend that "Dr. Teece, by his own admission, used non-scientific methods when he looked at brand market shares to conclude that descriptors such as 'additive free' and 'natural' are not drivers of sales."  Motion to Exclude Dr. Teece at 10 (no citation for quotation).  The Plaintiffs contend that Dr. Teece's opinion that health descriptors are not drivers of sales is unreliable, because he did not perform financial or business analysis of other brands who use similar health descriptors.  See Motion to Exclude Dr. Teece at 10-11.  Further, the Plaintiffs attest that Dr. Teece's "opinions on consumer perceptions resulting from marketing efforts are beyond the scope of his expertise and should not be admitted."  Motion to Exclude Dr. Teece at 13.

Second, the Plaintiffs ask the Court to exclude Dr. Teece's testimony on disclaimers, because it is unreliable.  See Motion to Exclude Dr. Teece at 17.  According to the Plaintiffs, Dr. Teece's opinion is unreliable, because he "offers no scientific evidence or analysis of any causal connection (or lack thereof)" regarding Natural American cigarettes' changes in market share after the Defendants added the disclaimer.  See Motion to Exclude Dr. Teece at 18.  Moreover, the Plaintiffs contend that "Dr. Teece admits that he is not an expert on disclaimers . . . , or on consumer perceptions of advertising and marketing."  Motion to Exclude Dr. Teece at 18.  The Plaintiffs also criticize Dr. Teece's consideration of market share as a metric, because, as the Plaintiffs attest, Dr. Teece conflates market share with sales, despite that cigarette sales have declined continually in the United States.  See Motion to Exclude Dr. Teece at 21.

Third, the Plaintiffs ask the Court to exclude Dr. Teece's opinion that "wholesale and retail pricing demonstrate that alleged implied health claims are not drivers of sales," because Dr. Teece has not performed "scientific or econometric analysis" to reach this conclusion.  Motion to Exclude Dr. Teece at 22.  The Plaintiffs argue that, because Dr. Teece relies only on anecdotal evidence, his opinion is unreliable.  See Motion to Exclude Dr. Teece at 24.  Fourth, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion "that NAS's premium pricing was the result of NAS brand equity and Santa Fe's marketing strategy."  Motion to Exclude Dr. Teece at 24.  The Plaintiffs attest that Dr. Teece's opinion is based on "Santa Fe's own self-promoting narrative as a socially and environmentally conscious company."  Motion to Exclude Dr. Teece at 24.  The Plaintiffs contend, furthermore, that Dr. Teece is not "an expert on marketing or advertising," and, accordingly, Dr. Teece is not qualified to opine on the Defendant's marketing or advertising strategies.  Motion to Exclude Dr. Teece at 24.  The Plaintiffs allege that Dr. Teece's opinion is "nothing but inadmissible *ipse dixit*."  Motion to Exclude Dr. Teece at 25.

Fifth, the Plaintiffs contend that the Court should exclude Dr. Teece's opinion that "there is variability among NAS product users with respect to the reasons for their purchases and the attributes they value," because Dr. Teece does not "perform any type of statistical or econometric analysis with respect to his opinion on the variability of consumers."  Motion to Exclude Dr. Teece at 25.  The Plaintiffs attest that "Dr. Teece is not an expert on consumer behavior or the mental processes of individuals," and that Dr. Teece's opinion is based merely on speculation and anecdotal evidence.  Motion to Exclude Dr. Teece at 26.  Sixth, the Plaintiffs ask the Court to exclude Dr. Teece's opinions on Dr. Dubé's expert report, because Dr. Teece attacks Dr. Dubé's conjoint analysis methodology, and because Dr. Teece is "not an expert in conjoint

analysis." Motion to Exclude Dr. Teece at 26. The Plaintiffs further attest that Dr. Teece's opinions with respect to Dr. Dubé are "legal arguments in the guise of expert opinion," because, in his conclusions, Dr. Teece cites district court opinions to opine that Dr. Dubé's conjoint analysis model is not the appropriate measure of damages. Motion to Exclude Dr. Teece at 27.

Seventh, and finally, the Plaintiffs argue that "Dr. Teece has a long history of providing expert opinions based on little more than baseless assumptions and his own *ipse dixit*." Motion to Exclude Dr. Teece at 28. The Plaintiffs argue that Dr. Teece's work is based primarily on the work of "underlings" with whom he does not work closely. Motion to Exclude Dr. Teece at 28. Furthermore, the Plaintiffs bolster their argument that Dr. Teece's testimony is unreliable by citing to Burton v. Am Cyanamid, No. 07-CV-0303, No. 07-CV-0441, No. 10-CV-0075, 2018 WL 3954858, at *9-10 (E.D. Wis. August 16, 2018)(Adelman, J.), a case in which the Honorable Lynn Adelman, United States District Judge in the United States District Court for the Eastern District of Wisconsin, excluded Dr. Teece's testimony, because Dr. Teece's opinions were not based on reliable principles and methods. Motion to Exclude Dr. Teece at 29 (citing Burton v. Am Cyanamid, 2018 WL 3954858, at *9-10). Consequently, the Plaintiffs request that the Court exclude the aforementioned opinions of Dr. Teece. See Motion to Exclude Dr. Teece at 30.

### b.      Motion to Exclude Dr. Teece Opposition.

The Defendants argue that the Court should deny the Plaintiffs' Motion to Exclude Dr. Teece. See Motion to Exclude Dr. Teece Opposition at 1. The Defendants make four primary arguments. See Motion to Exclude Dr. Teece Opposition at 13, 26, 28, 32. First, the Defendants contend that Dr. Teece "employed a reliable methodology in refuting Plaintiffs' position that NAS' commercial success is driven by health misperceptions linked to the descriptors." Motion to Exclude Dr. Teece Opposition at 13. The Defendants concede that Dr. Teece has not

performed an econometric analysis, but the Defendants argue that Dr. Teece's conclusions are still scientific.  See Motion to Exclude Dr. Teece Opposition at 14.  Namely, the Defendants argue:

> Dr. Teece (1) identified other cigarettes brands that used descriptors like those at issue here; (2) analyzed the market-share data of those brands and of NAS over time; (3) examined the effect on market share when some of these brands added disclaimers or removed certain descriptors; and (4) assessed whether price discounting could provide an alternative explanation for NAS' success.

Motion to Exclude Dr. Teece Opposition at 14-15.  The Defendants contend, therefore, that Dr. Teece's methodology is data-driven and reliable.  See Motion to Exclude Dr. Teece Opposition at 15.  The Defendants also attest that the Plaintiffs' assertion that Dr. Teece's testimony that other brands who used descriptors similar to Natural American cigarettes had a lower market share contradicts the Plaintiffs' claim that the health descriptors were the reason for Natural American cigarettes' success.  Further, the Defendants argue that the Plaintiffs' assertion relies on the idea that Dr. Teece was required to "prove that no *other* factor affected each of the comparator brands' performance."  Motion to Exclude Dr. Teece Opposition at 16 (emphasis in original).  Further, the Defendants attest that Dr. Teece's opinions are within his expertise, because he opines only that "the economic data do not support Plaintiffs' claim that NAS' success is explained by any perception, derived from the descriptors, that NAS cigarettes are safer," and does not opine on consumer perception from marketing, which would fall outside of his expertise's scope.  Motion to Exclude Dr. Teece Opposition at 17-18.  The Defendants argue, furthermore, that Dr. Teece's conclusion that Natural American cigarettes' success is "attributable to a successful and well-executed business strategy" is sound, because the analysis is "well within Dr. Teece's capability as a preeminent expert on strategic management."  Motion to Exclude Dr. Teece Opposition at 21.  Specifically, the Defendants contend that Dr. Teece

reviewed company materials, internal documents, the Defendants' advertising strategies, and business plans to conclude that Natural American cigarettes success was largely a result of the Defendants' investments in advertising, in branding the company as having high-quality and environmentally conscious products, and the Defendants' ability to sell Natural American cigarettes in many retailers.  See Motion to Exclude Dr. Teece Opposition at 21-24.

Second, the Defendants contend that Dr. Teece "employed a reliable methodology in concluding that NAS consumers vary significantly in the reasons they purchase NAS and the NAS attributes they value."  Motion to Exclude Dr. Teece Opposition at 26.  The Defendants attest that Dr. Teece reviewed internal company marketing research and the Plaintiffs' deposition testimony to assess whether consumers have common reasons for purchasing Natural American cigarettes.  See Motion to Exclude Dr. Teece Opposition at 26.  The Defendants argue that the Plaintiffs do not demonstrate that Dr. Teece necessarily needed statistical analysis to opine that the Plaintiffs' testimony is inconsistent with the Plaintiffs' claims.  See Motion to Exclude Dr. Teece Opposition at 27-28.  Third, the Defendants attest that "Dr. Teece employed a reliable methodology in concluding that the hypothetical survey proposed by Plaintiffs' damages expert would not yield data capable of measuring classwide damages."  Motion to Exclude Dr. Teece Opposition at 28.  The Defendants concede that Dr. Teece is not an expert on survey methods, but the Defendants argue that Dr. Teece's expertise in economics is sufficient for him to opine whether data that Dr. Dubé used is useful in calculating consumer damages.  See Motion to Exclude Dr. Teece Opposition at 29.  Further, the Defendants argue that an expert may testify regarding ultimate issues in the case, and that "given his expertise in economics, Dr. Teece is well-positioned to address whether Dr. Dubé's proposed analysis would accurately capture the damages attributable to Plaintiffs' theories of liability."  Motion to Exclude Dr. Teece

Opposition at 30.   The Defendants also argue that Dr. Teece's opinion regarding Dr. Dubé's conjoint analysis is not premature, because the Plaintiffs must demonstrate that there is a valid means for calculating class-wide damages at the class certification stage.   See Motion to Exclude Dr. Teece Opposition at 31.

Fourth, the Defendants contend that the Plaintiffs have not demonstrated any basis in Dr. Teece's past testimony that justifies the Court limiting his testimony in this case.   See Motion to Exclude Dr. Teece Opposition at 32.   The Defendants argue that other courts' decisions on Dr. Teece's past testimony and opinions do not bear on his testimony and opinions here, because his opinions are reliable and relevant in this litigation.   See Motion to Exclude Dr. Teece Opposition at 32.   Consequently, the Defendants ask the Court to deny the Plaintiffs' Motion to Exclude Dr. Teece.   See Motion to Exclude Dr. Teece Opposition at 32-33.

### c.      **Motion to Exclude Dr. Teece Reply.**

In their Motion to Exclude Dr. Teece Reply, the Plaintiffs argue that the Court should exclude six of Dr. Teece's opinions.   See Motion to Exclude Dr. Teece Reply at 3, 7, 9, 12, 14, 17.   First, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that "the market share of various tobacco companies demonstrates that alleged implied health claims are not drivers of sales," because the Plaintiffs attest that this opinion is not reliable.   Motion to Exclude Dr. Teece Reply at 3.   The Plaintiffs argue that this opinion is not reliable, because Dr. Teece did not consider any factors other than market share in reaching his conclusion.   See Motion to Exclude Dr. Teece Reply at 3.   Additionally, the Plaintiffs argue that Dr. Teece does not provide evidence of a causal link between "any attribute (or lack thereof) and the market shares of NAS and comparator brands."   Motion to Exclude Dr. Teece Reply at 6.   The Plaintiffs also request that the Court exclude Dr. Teece's opinion, because the Plaintiffs attest that Dr. Teece is not "an

expert on marketing, advertising, or consumer perceptions." Motion to Exclude Dr. Teece Reply at 7. The Plaintiffs refute the Defendants' argument that, because Dr. Teece is an economist, he can proffer opinions on subjects relating to economics, business, or mathematics by stating that the Defendants are overstretching the reach of Dr. Teece's expertise. See Motion to Exclude Dr. Teece Reply at 8.

Second, the Plaintiffs argue that the Court should exclude Dr. Teece's testimony "regarding disclaimers," because his opinion is based on the assumption that "nothing else could affect market share during the relevant time period," and because "he assumes the effectiveness of the effectiveness of the disclaimer." Motion to Exclude Dr. Teece Reply at 9. Third, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that pricing demonstrates that health claims are not drivers of sales, because Dr. Teece relies on anecdotal evidence, and "assumes a simple correlative effect between descriptors and market share without considering any other factors." Motion to Exclude Dr. Teece Reply at 12. Fourth, the Plaintiffs ask the Court to exclude Dr. Teece's opinion that "NAS's premium pricing was the result of NAS brand equity and Santa Fe's marketing strategy," because he did not perform scientific or economic analysis to form this conclusion, and because he is not an expert on marketing or advertising. Motion to Exclude Dr. Teece Reply at 12. Fifth, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that "there is variability among NAS product users with respect to the reasons for their purchases and the attributes they value," because the Defendants acknowledge that this opinion is based only on "a summary of marketing and consumer surveys that are not economic in nature . . . ; Dr. Teece's own speculation; and testimony of individual plaintiffs." Motion to Exclude Dr. Teece Reply at 14-15. Sixth, and finally, the Plaintiffs contend that the Court should exclude Dr. Teece's opinions on Dr. Dubé, because Dr. Teece does

not have experience in conjoint analysis, and his expertise in economics does not make him qualified to testify on conjoint analysis.  See Motion to Exclude Dr. Teece Reply at 17.

### 9. **Motion to Exclude Dr. W. Kip Viscusi.**

The Plaintiffs ask the Court to exclude Dr. W. Kip Viscusi's[23] opinions and testimony.  See Motion to Exclude Dr. Viscusi at 15.  The Defendants oppose the Plaintiffs' motion.  See generally Motion to Exclude Dr. Viscusi Opposition.  The Plaintiffs reply.  See Plaintiffs' Reply to Defendant's Opposition to Exclude the Opinions and Testimony of W. Kip Viscusi, filed November 19, 2020 (Doc. 325)("Motion to Exclude Dr. Viscusi Reply").

### a. **Motion to Exclude Dr. Viscusi.**

The Plaintiffs argue that the Court should exclude Dr. Viscusi's opinions, because they are litigation-driven and, therefore, unreliable.  See Motion to Exclude Dr. Viscusi at 10.  The Plaintiffs attest that Dr. Viscusi's opinions that "people are not deceived by Santa Fe's Natural American Spirit ("NAS") brand descriptors -- 'natural,' 'additive-free,' and 'organic,'" Motion to Exclude Dr. Viscusi at 1, and "that consumers overestimate the health risks of smoking," Motion to Exclude Dr. Viscusi at 1, are not reliable, because he cites to only his own work to support these claims, and rejects "numerous peer-reviewed studies and the FDA's commissioned consumer perception study," Motion to Exclude Dr. Viscusi at 12.  Moreover, one of the sources

---

[23]Dr. Viscusi is Defendant's expert, whom Defendants proffer to opine on:

(1) how consumers evaluate health risk information regarding cigarettes and how those beliefs impact actual cigarette purchase decisions, both generally and regarding Natural American Spirit ("NAS") cigarettes specifically, (2) other factors that consumers consider in their purchasing process, and (3) whether the challenged NAS descriptors -- 'natural,' 'additive-free,' and 'organic' tobacco -- play any meaningful role in those purchasing decisions.

Motion to Exclude Dr. Viscusi Opposition at 1.

to which Dr. Viscusi cites -- his own book, <u>Smoking: Making the Risky Decision</u> -- lawyers heavily involved in tobacco litigation at the time reviewed, and the Plaintiffs suggest that lawyers defending tobacco companies likely influenced the book.  <u>See</u> Motion to Exclude Dr. Viscusi at 13-14.  The Plaintiffs also attest that two other courts have rejected Dr. Viscusi's unreliable methodology and opinions that consumers overestimate the risks of smoking: <u>Discount Tobacco City & Lottery, Inc. v United States</u>, 674 F.3d 509 (noting that "Viscusi admitted at trial in [*United States v.*] *Philip Morris*, [449 F. Supp. 2d 1 (D.D.C. 2006)(Kessler, J.)] that his conclusions are largely based on research commissioned by tobacco-industry law firms specifically for use in litigation," and that "myriad independent studies contradict Viscusi's position"), and <u>United States v. Philip Morris USA, Inc.</u>, 449 F. Supp. 2d at 578 (rejecting Viscusi's opinion that consumers know the health risks of smoking and holding that "[m]ost people do not possess a meaningful knowledge of the adverse health effects of smoking" and that "most people have only a superficial awareness that smoking is dangerous"). <u>See</u> Motion to Exclude Dr. Viscusi at 11.

### b.      **Motion to Exclude Dr. Viscusi Opposition.**

The Defendants oppose the Plaintiffs' Motion to Exclude Dr. Viscusi.  <u>See</u> Motion to Exclude Dr. Viscusi Opposition at 1.  The Defendants attest that the Plaintiffs do not challenge Dr. Viscusi's opinions that: (i) "there is substantial variation in the factors that influence individual smoking and cigarette purchase decisions . . . , and consumers differ significantly in their risk beliefs, risk tolerance, and the importance of various product attributes"; and (ii) "the perceived competitive advantages of NAS cigarettes over competing brands are not a consequence of misleading consumers about relative product risk."  Motion to Exclude Dr. Viscusi Opposition 2.  The Defendants make two arguments that the Court should not exclude

Dr. Viscusi's testimony.  See Motion to Exclude Dr. Viscusi Opposition at 20, 21.  First, the Defendants argue that the Plaintiffs' Motion to Exclude Dr. Viscusi "fails to undertake a proper analysis of Dr. Viscusi's opinions under any *Daubert* standards."  Motion to Exclude Dr. Viscusi Opposition at 20.  The Defendants argue that Dr. Viscusi is qualified, that Dr. Viscusi's opinions are relevant to issues in this case, that Dr. Viscusi relies on reliable data, and that Dr. Viscusi followed accepted protocols.  See Motion to Exclude Dr. Viscusi Opposition at 20.  The Defendants contend that "the mere fact that a survey was done in connection with litigation says nothing about its quality or admissibility."  Motion to Exclude Dr. Viscusi Opposition at 21. Second, the Defendants contend that the Plaintiffs' argument that Dr. Viscusi's methodology is biased lacks merit.  See Motion to Exclude Dr. Viscusi Opposition at 21.  The Defendants attest that the Plaintiffs' assertions that tobacco lawyers read and influenced Dr. Viscusi's book are unfounded, and that Dr. Viscusi testified that he did not make any changes to the book in response to lawyers' comments.  See Motion to Exclude Dr. Viscusi Opposition at 23. Moreover, the Defendants argue that only two of the five surveys on which Dr. Viscusi relies were prepared for litigation, see Motion to Exclude Dr. Viscusi Opposition at 24, and that all of the surveys on which Dr. Viscusi relies have been subjected to peer-review, see Motion to Exclude Dr. Viscusi Opposition at 27.  The Defendants contend that Dr. Viscusi's work is reliable and, therefore, Dr. Viscusi's opinions and testimony are admissible.  See Motion to Exclude Dr. Viscusi Opposition at 30.

      c.      **Motion to Exclude Dr. Viscusi Reply.**

The Plaintiffs argue that their Motion to Exclude Dr. Viscusi is a proper *Daubert* motion, and that "Dr. Viscusi's biased and litigation-driven analysis is the precise type of expert testimony that *Daubert* seeks to exclude."  Motion to Exclude Dr. Viscusi Reply at 1.  The

Plaintiffs argue that Dr. Viscusi's opinions are unreliable, because he relies on litigation-driven surveys, and because he sought comment and review of his book from tobacco lawyers.  See Motion to Exclude Dr. Viscusi Reply at 1.  Moreover, the Plaintiffs allege that Dr. Viscusi's "work is so entangled with tobacco industry litigation that it's all done with the purpose of testifying."  Motion to Exclude Dr. Viscusi Reply at 2.  The Plaintiffs argue that, because attorneys for litigation commissioned two of the surveys on which Dr. Viscusi relies, Dr. Viscusi's methodology is unreliable.  See Motion to Exclude Dr. Viscusi Reply at 3. Consequently, the Plaintiffs ask the Court to exclude Dr. Viscusi's opinions and testimony.  See Motion to Exclude Dr. Viscusi Reply at 4.

### 10.   Motion to Exclude Dr. Jennifer Pearson.

The Defendants ask the Court to exclude Dr. Pearson's testimony and opinions.[24]  See Motion to Exclude Dr. Pearson at 37.  The Plaintiffs respond.  See Plaintiffs' Response in Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Dr. Jennifer Pearson, filed October 8, 2020 (Doc. 309)("Motion to Exclude Dr. Pearson Opposition").  The Defendants reply.  See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. Jennifer Pearson, filed November 19, 2020 (Doc. 323)("Motion to Exclude Dr. Pearson Reply").

### a.   Motion to Exclude Dr. Pearson.

The Defendants ask the Court to exclude in their entirety Dr. Pearson's expert report and opinions.  See Motion to Exclude Dr. Pearson at 1.  The Defendants argue that Dr. Pearson's opinions are not reliable, and therefore, do not meet Daubert's standard.  See Motion to Exclude

---

[24]Dr. Pearson is the Plaintiffs' expert in consumer behavior and perceptions.  See Plaintiffs' Response in Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Dr. Jennifer Pearson at 1, filed October 8, 2020 (Doc. 309).

Dr. Pearson at 1.   The Defendants also argue that the Court should exclude Dr. Pearson's opinions, because they are not relevant to the Certification Motion.   <u>See</u> Motion to Exclude Dr. Pearson at 3.   The Defendants make three primary arguments in support of their Motion to Exclude Dr. Pearson.   <u>See</u> Motion to Exclude Dr. Pearson at 11, 21, 35.   First, the Defendants argue that Dr. Pearson's methodology and analyses are unreliable, because she selectively disclosed certain surveys and methodology in forming her opinion.   <u>See</u> Motion to Exclude Dr. Pearson at 11.   The Defendants argue that Dr. Pearson "has repeatedly omitted data and findings that are inconsistent with her preferred conclusions, in violation of the established survey research standards to which she purports to adhere."   Motion to Exclude Dr. Pearson at 11.   The Defendants argue that, after they subpoenaed survey data for two surveys on which Dr. Pearson relies, they discovered that Dr. Pearson "did not disclose to Defendants or the scientific community data and findings that directly bear on and undermine her opinions in this case and the conclusions of her published studies."   Motion to Exclude Dr. Pearson at 12.   ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████



The Defendants argue that, because Dr. Pearson "suppressed data that undercut her opinion," Dr. Pearson's opinions are unreliable and should be excluded.  Motion to Exclude Dr. Pearson at 18.  Moreover, the Defendants assert that Dr Pearson's "selective disclosure of studies, data and findings violates generally accepted survey research standards that she claims to follow."  Motion to Exclude Dr. Pearson at 19-20.

Second, the Defendants argue that the Court should exclude Dr. Pearson's report and opinions, because Dr. Pearson makes "unfounded extrapolations from the studies to her conclusions" which "render her analyses and opinions unreliable."  Motion to Exclude Dr.

Pearson at 21.  The Defendants assert that, even ignoring the data for which Dr. Pearson did not account, the data on which she relies does not support her conclusions.  See Motion to Exclude Dr. Pearson at 21.  The Defendants contend that Dr. Pearson relies only on a single study that addresses the minority of Natural American cigarette smokers who smoke Natural American cigarettes as their usual brand, and that Dr. Pearson does not have data on the majority of Natural American purchasers who do not smoke it as their usual brand.  See Motion to Exclude Dr. Pearson at 23-24.  The Defendants contend that Dr. Pearson cannot extrapolate reliably this study to non-usual Natural American cigarette smokers, as she purports to do in her expert report.  See Motion to Exclude Dr. Pearson at 24.  Furthermore, the Defendants assert that Dr. Pearson relies on studies that "fail to test NAS descriptors as they actually appear, including with the disclaimer that appeared on every pack and advertisement, making extrapolation to real-world NAS purchasers unfounded and reliable."  Motion to Exclude Dr. Pearson at 26.  The Defendants contend that Dr. Pearson improperly relied on studies that mimic Natural American cigarette products, with products or advertisements that did not include the disclaimer on Natural American cigarettes.  See Motion to Exclude Dr. Pearson at 27.  The Defendants also challenge Dr. Pearson's conclusion that disclaimers did not offset health misperceptions, because the study on which she relies concludes the opposite.  See Motion to Exclude Dr. Pearson at 28.  The Defendants also contend that Dr. Pearson extrapolates from a study which asks "only whether respondents believe NAS cigarettes *might be* safer than other brands" that Natural American cigarettes "*are* safer than other brands."  Motion to Exclude Dr. Pearson at 30 (emphasis in original).  The Defendants further argue that "the sole study Dr. Pearson cites in support of her opinion that alleged misperceptions affect consumers' intention to buy NAS cigarettes refutes any such effect, leaving her opinion without foundation."  Motion to Exclude Dr. Pearson at 33.

The Defendants argue that the study on which Dr. Pearson relies to conclude that people perceive natural or additive-free cigarettes as less harmful refutes that proposition, and that the study demonstrates that such misperceptions were not correlated with intent to purchase.  See Motion to Exclude Dr. Pearson at 24.

Third, and finally, the Defendants argue that Dr. Pearson's opinions "lack a valid scientific connection to the disputed facts in this case" and are, therefore, not helpful to the Court in deciding the Certification Motion.  Motion to Exclude Dr. Pearson at 35.  The Defendants argue that, even if the Court concludes that Dr. Pearson's opinions are reliable, the analysis that Dr. Pearson offers "is not tethered to the issues in this case."  Motion to Exclude Dr. Pearson at 35.  The Defendants contend that Dr. Pearson cannot speak on the core question she purports to address -- "whether consumers are misled into buying[/]paying more for NAS cigarettes based on a misperception of those cigarettes as healthier, safer, or less addictive than alternatives" -- because she does not account properly for data or conclusions that might refute conclusions which are at odds with her own.  Motion to Exclude Dr. Pearson at 35.  Consequently, the Defendants ask the Court to exclude Dr. Pearson's testimony and opinions in their entirety.  See Motion to Exclude Dr. Pearson at 35-36.

### b.    Motion to Exclude Dr. Pearson Opposition.

The Plaintiffs oppose the Defendant's Motion to Exclude Dr. Pearson.  See Motion to Exclude Dr. Pearson Opposition at 1.  The Plaintiffs argue that the Defendants' arguments apply only to the weight of Dr. Pearson's opinions rather than to their admissibility.  See Motion to Exclude Dr. Pearson Opposition at 1.  The Plaintiffs characterize the Defendants' Motion to Exclude Dr. Pearson as improperly asking the Court "to parse through the empirical research and literature, make a factual determination on whether her opinions are correct, and, on that basis to

exclude Dr. Pearson's opinions at the class certification stage." Motion to Exclude Dr. Pearson Opposition at 1. The Plaintiffs make five primary arguments in their Motion to Exclude Dr. Pearson Opposition. See Motion to Exclude Dr. Pearson Opposition at 10, 12, 16, 20, 29.

First, the Plaintiffs argue that Dr. Pearson's methodology is reliable. See Motion to Exclude Dr. Pearson Opposition at 10. The Plaintiffs argue that Dr. Pearson's theories can be tested and Dr. Pearson has tested her theories, and that her collection and analysis of nationally representative data "follows the established scientific analysis for surveying consumer perceptions." Motion to Exclude Dr. Pearson Opposition at 11. The Plaintiffs also argue that Dr. Pearson's theories were subject to peer-review, publication, and statistical analyses, see Motion to Exclude Dr. Pearson Opposition at 11, and that Dr. Pearson's theories "have been subject to controlling standards which test the theory against different variables," Motion to Exclude Dr. Pearson Opposition at 11. The Plaintiffs attest that the publication of her studies in peer-reviewed journals is "proof that the relevant scientific community accepts her methodologies." Motion to Exclude Dr. Pearson Opposition at 12.

Second, the Plaintiffs argue that Dr. Pearson did not selectively identify or purposefully omit data in drawing her conclusions. See Motion to Exclude Dr. Pearson Opposition at 12. The Plaintiffs assert that Dr. Pearson addressed and refuted in her deposition the Defendants' concerns with the studies which the Defendants attest Dr. Pearson improperly left out of her consideration. See Motion to Exclude Dr. Pearson Opposition at 12. The Plaintiffs contend that Dr. Pearson did not see the data from the GfK Study, and that she did not have access to it until two weeks before her deposition. See Motion to Exclude Dr. Pearson Opposition at 13-14. The Plaintiffs also note that Dr. Pearson testified at her deposition, see Video Recorded Deposition of Jennifer Pearson, MPH, Ph.D., filed October 8, 2020 (Doc. 309-1)("Pearson Depo.") that she

was not able to see or discuss data from the Truth Initiatives Study, filed July 23, 2020 (Doc. 303-14), in her Pearson in Preparation manuscript, because it belonged to Truth Initiatives.  See Motion to Exclude Dr. Pearson Opposition at 14.  See also Pearson Depo. 26:9-12 (Pearson).

Third, the Plaintiffs contend that the Defendants' criticisms of Dr. Pearson's report and opinions selectively disclosing data goes to the weight of her opinions rather than to their admissibility.  See Motion to Exclude Dr. Pearson Opposition at 16.  The Plaintiffs argue that the Tenth Circuit is clear that "so long as 'a logical basis exists for [the] expert's opinion . . . the weaknesses in the underpinnings of the opinion[] go to the weight and not the admissibility of the testimony.'"  Motion to Exclude Dr. Pearson Opposition at 17 (quoting Compton v. Subaru of America, Inc., 82 F.3d 1513, 1518 (10th Cir. 1996)).  Here, the Plaintiffs contend that the Defendants' allegation that Dr. Pearson cherry-picked data is grounds for the Court to consider the weight of her opinions, and that reliable data supports her opinions, so the Court should not exclude them.  See Motion to Exclude Dr. Pearson Opposition at 18-20.

Fourth, the Plaintiffs argue that Dr. Pearson's opinions are "reasonably and reliably extrapolated from the studies cited in her expert report."  Motion to Exclude Dr. Pearson Opposition at 20.  The Plaintiffs contend that the Defendants' arguments related to Dr. Pearson extrapolating from studies goes to the weight, not the admissibility, of Dr. Pearson's opinions. See Motion to Exclude Dr. Pearson Opposition at 20.

The Plaintiffs argue that it is permissible for experts to extrapolate from existing data. See Motion to Exclude Dr. Pearson Opposition at 21 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146).  The Plaintiffs also argue that it was relevant for Dr. Pearson to consider the perceptions of people who do not regularly smoke Natural American cigarettes, because they are potential Natural American cigarette consumers.  See Motion to Exclude Dr. Pearson Opposition at 21.

The Plaintiffs respond to the Defendants' argument that Dr. Pearson relies on studies that use inaccurate packaging by explaining that the study on which Dr. Pearson relies increased the size of the disclaimer on packaging to test whether an obvious disclaimer would offset health perceptions from the Natural American cigarette descriptors.  See Motion to Exclude Dr. Pearson Opposition at 22.  Moreover, the Plaintiffs note that several FDA studies support Dr. Pearson's conclusion from this study -- that the disclaimer is ineffective at mitigating health misperceptions from the descriptors.  See Motion to Exclude Dr. Pearson Opposition at 23.  The Plaintiffs also respond to the Defendants' criticism that Dr. Pearson relied on a study, which asks whether respondents believed Natural American cigarettes might be safer than other cigarettes and concluded that consumers believe they are safer than other cigarettes, by explaining that Dr. Pearson provides the opinion that, from a public health perspective, there is little difference between the idea that a consumer might believe something and a consumer believing it.  See Motion to Exclude Dr. Pearson Opposition at 25.  Further, the Plaintiffs argue that Dr. Pearson's opinions do not suffer from a lack of foundation, as the Defendants assert, because her work has been peer-reviewed, published in prestigious journals, and corroborated by other peer-reviewed and published studies with very similar findings.  See Motion to Exclude Dr. Pearson Opposition at 26.

Fifth, the Plaintiffs argue that "Dr. Pearson's testimony is directly relevant to disputed issues in this case and helpful to the Court in deciding whether to certify the class."  Motion to Exclude Dr. Pearson Opposition at 29.  The Plaintiffs assert that Dr. Pearson will assist the Court in understanding how consumers are misled by the Natural American cigarette descriptors.  See Motion to Exclude Dr. Pearson Opposition at 29.  Further, the Plaintiffs contend that the question whether Natural American cigarette descriptors mislead consumers is a question which the Court

must decide is common to all class members and that Dr. Pearson's expert opinions can aid the Court in that analysis.  See Motion to Exclude Dr. Pearson Opposition at 29.  Consequently, the Plaintiffs ask the Court not to exclude Dr. Pearson's expert report and opinions.  See Motion to Exclude Dr. Pearson Opposition at 30.

      c.      **Motion to Exclude Dr. Pearson Reply.**

The Defendants reply to the Plaintiffs' Motion to Exclude Dr. Pearson Opposition.  See Motion to Exclude Dr. Pearson Reply at 1.  The Defendants make three primary arguments in their reply.  See Motion to Exclude Dr. Pearson Reply at 2, 9, 18.  First, the Defendants argue that "Dr. Pearson failed to account for findings from her own studies that are at odds with her opinions in this case, which departs from established standards (including her own) and renders her methodology unreliable and subject to exclusion under *Daubert*."  Motion to Exclude Dr. Pearson Reply at 2.  The Defendants argue that Dr. Pearson adheres to standards which require a "'full reporting of all relevant findings, *including any that may seem contradictory or unfavorable*.'"  Motion to Exclude Dr. Pearson Reply at 2 (quoting AAPOR, Best Practices for Survey Research, tinyurl.com/AAPOR-BestPractices)("AAPOR Best Practices")(emphasis in Motion to Exclude Dr. Pearson Reply, but not in AAPOR).[25]  Moreover, the Defendants argue that Daubert requires "a full disclosure of relevant data" and that failure to address contrary data renders an experts' opinion unreliable.  Motion to Exclude Dr. Pearson Reply at 3.  The Defendants contend that, because Dr. Pearson does not consider studies that refute her conclusions, her opinions are unreliable.  See Motion to Exclude Dr. Pearson Reply at 4-5.  The Defendants also contend that the Plaintiffs are incorrect to assert that any shortcomings in Dr.

---

[25]At the time of this opinion's publication, the AAPOR Best Practices website no longer contains the quote to which the Defendants cite.

Pearson's opinions are a matter of weight rather than admissibility, because "an expert must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  Motion to Exclude Dr. Pearson Reply at 9 (quoting Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. at 147).

Second, the Defendants argue that Dr. Pearson's conclusions rely on extrapolations from the studies on which she relies, which renders her opinions unreliable.  See Motion to Exclude Dr. Pearson Reply at 9.  The Defendants contend that

> "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Motion to Exclude Dr. Pearson Reply at 10 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. at 146). The Defendants contend that Dr. Pearson's conclusion that Natural American cigarette descriptors have an effect on purchasing behavior is an impermissible extrapolation, because the study on which she relies concludes the opposite.  See Motion to Exclude Dr. Pearson Reply at 10.  The Defendants also contend that Dr. Pearson impermissibly extrapolates conclusions based on studies that do not address the population of Natural American smokers, see Motion to Exclude Dr. Pearson Reply at 11, and that Dr. Pearson cannot extrapolate data based on studies of cigarette packaging that do not include Natural American cigarettes' disclaimer, see Motion to Exclude Dr. Pearson Reply at 13.  The Defendants also assert that, when Dr. Pearson concludes that consumers believe Natural American cigarettes are safer where the study shows that consumers believe Natural American cigarettes might be safer, Dr. Pearson states an "exaggerated conclusion that she *knew* her study did not support."  Motion to Exclude Dr. Pearson Reply at 16.

Finally, the Defendants contend that "Dr. Pearson's opinions lack a valid scientific connection to the facts of the case and thus are irrelevant and inadmissible." Motion to Exclude Dr. Pearson Reply at 18. The Defendants argue that the studies on which Dr. Pearson rely do not relate to the population of consumers at issue in this case and do not account for the disclaimers that have been present on the Natural American cigarette packages during the class period. See Motion to Exclude Dr. Pearson Reply at 18. The Defendants specifically argue that Dr. Pearson's opinions are not connected to the case because of "her consistent over-reading of the studies she interprets." Motion to Exclude Dr. Pearson Reply at 18. Consequently, the Defendants urge the Court to exclude Dr. Pearson's testimony and opinions. See Motion to Exclude Dr. Pearson Reply at 18-19.

### 11. Motion to Exclude Dr. Jean-Pierre Dubé.

The Defendants ask the Court to exclude Dr. Dubé's expert report and opinions in their entirety.[26] See Motion to Exclude Dr. Dubé at 36. The Plaintiffs oppose the Motion to Exclude Dr. Dubé. See generally Motion to Exclude Dr. Dubé Opposition. The Defendants reply. See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. Jean-Pierre Dubé, filed November 19, 2020 (Doc. 322)("Motion to Exclude Dr. Dubé Reply").

### a. Motion to Exclude Dr. Dubé.

The Defendants ask the Court to exclude Dr. Dubé's opinions and testimony entirely, because the Defendants contend that Dr. Dubé's report is "irrelevant, terminally vague, and the details it does contain are error-filled," rendering it unreliable. Motion to Exclude Dr. Dubé at 1.

---

[26]Dr. Dubé is the Plaintiffs' expert on determining damages on a class-wide basis. See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Jean-Pierre Dubé at 1, filed October 8, 2020 (Doc. 311).

The Defendants make three primary arguments.  See Motion to Exclude Dr. Dubé at 13, 26, 30.

First, the Defendants argue that "Dr. Dubé proposes to measure the wrong thing at the wrong

time, and thus his report, opinions and proffered testimony are irrelevant and unhelpful to the

trier of fact."  Motion to Exclude Dr. Dubé at 13.  Namely, the Defendants assert that Dr. Dubé's

proposed damages model is not tailored to the Plaintiffs' theories of liability.  See Motion to

Exclude Dr. Dubé at 13.  The Defendants note that, under Comcast Corp. v. Behrend, 569 U.S.

27 (2013), the "Plaintiffs must produce a damages model that can calculate classwide damages in

a manner consistent with their remaining theories of liability."  Motion to Exclude Dr. Dubé at

13 (citing Comcast Corp. v. Behrend, 569 U.S. at 35).  The Defendants identify two "fatal"

errors with Dr. Dubé's analysis:

> (i) Dr. Dubé does not propose to determine what damages result from Plaintiffs'
> theories of liability, and thus he cannot answer the question Comcast poses; and
> (ii) his proposed analysis cannot distinguish between allegedly false beliefs
> implied by a given descriptor and legitimate, non-actionable beliefs, which would
> necessarily overstate damages and thus overcompensate Plaintiffs.

Motion to Exclude Dr. Dubé at 14-15.

Namely, the Defendants assert that Dr. Dubé's proposed survey will estimate damages

based on a value that "respondents ascribe to descriptors other than a belief that NAS cigarettes

are safer."  Motion to Exclude Dr. Dubé at 19 (emphasis in original).    The Defendants

acknowledge that the Tenth Circuit has not spoken directly on this issue, but argue that other

jurisdictions have upheld such a requirement.  See Motion to Exclude Dr. Dubé at 16 (citing In

re ConAgra Foods, Inc., 302 F.R.D. at 579, and In re ConAgra Foods, 90 F. Supp. 3d at 1024-

25).  Moreover, the Defendants argue that Dr. Dubé's assertion that he will conduct his survey

after class certification is improper, because participants reasonably will have seen one of the

disclaimers that Natural American cigarettes are not safer.  See Motion to Exclude Dr. Dubé at

18.  The Defendants also attest that Dr. Dubé's proposed survey will not measure adequately the Plaintiffs' theory that, "by labeling the tobacco in NAS menthol cigarettes 'Additive-Free' and 'Natural,' Defendants mislead consumers because menthol is an additive, and some of the menthol placed in the filter when those cigarettes are made migrates to the tobacco by the time of purchase."  Motion to Exclude Dr. Dubé at 20 (no citation for quotation).  The Defendants criticize Dr. Dubé's proposed survey, because the Defendants assert that it does not "distinguish between a hypothetical cigarette with tobacco that contains no additives except natural or organic menthol that migrated from the filter after manufacture, and a cigarette with tobacco to which untold other additives, including artificial or synthetic additives, were applied intentionally during manufacturing."  Motion to Exclude Dr. Dubé at 20.  Moreover, the Defendants assert that Dr. Dubé's survey improperly will yield only one damages estimate regarding the premium consumers paid from the additive-free descriptor, when the Plaintiffs allege two misleading inferences from that descriptor: (i) that Natural American cigarettes are safer; and (ii) a belief that no menthol placed in the filter migrated to the additive-free tobacco in the cigarette.  See Motion to Exclude Dr. Dubé at 20.  The Defendants also assert that Dr. Dubé's survey will assess damages from "claims the Court has dismissed," because Dr. Dubé's survey does not "ensure that respondents do not ascribe value to the 'Natural' and 'Tobacco + Water' descriptors based on the unprocessed-cigarette theory." Motion to Exclude Dr. Dubé at 21.   The Defendants also contend that Dr. Dubé's proposed survey is flawed, because "it cannot reliably measure damages sustained during the class period based on the preferences of consumers surveyed a decade or more later."  Motion to Exclude Dr. Dubé at 22.

Second, the Defendants argue that Dr. Dubé's proposed conjoint analysis "is so skeletal that it leaves many fundamental questions without answers," because Dr. Dubé has not yet

determined important aspects of his proposed analysis, such as: (i) "what cigarette brand/styles to test"; (ii) "what prices to use"; (iii) "what product images to use"; (iv) "what 'distractors' to use to avoid bias that can arise when respondents focus too heavily on tested attributes"; (v) "how large a sample is required to yield valid statistical results for each putative class or subclass"; (vi) "how to ensure the sample is a random sample of each putative class or subclass or is otherwise representative of them"; and (vii) "what instructions will be given to survey respondents." Motion to Exclude Dr. Dubé at 27. The Defendants assert that other courts have found testimony inadmissible where an expert does not specify basic aspects of a damages model. See Motion to Exclude Dr. Dubé at 29 (citing In re ConAgra, 302 F.R.D. at 552, and Saavedra v. Eli Lilly & Co., No. 2:12-cv-9366-SVW, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014)(Wilson, J.)). Third, the Defendants contend that "Dr. Dubé's proposed methodologies will yield the wrong measure of damages because they focus on subjective consumer preferences instead of market prices, and thus his report and testimony are irrelevant." Motion to Exclude Dr. Dubé at 30. The Defendants contend that Dr. Dubé's analysis will measure the average consumer's willingness to pay for Natural American cigarettes and that the proper analysis would measure the price premium: "the difference in the market price for the product with and without the alleged misperception." Motion to Exclude Dr. Dubé at 30. The Defendants contend that Dr. Dubé's "willingness to pay" analysis is improper, because it considers only consumer demand and ignores sellers' willingness to sell, and that other courts have excluded his testimony on these grounds. Motion to Exclude Dr. Dubé at 32-33 (citing Simply Orange Orange Juice Mktg & Sales Practices Litig., No. 4:12-md-02361-FJG, 2017 WL 3142095, at *7 (W.D. Mo. July 24, 2017)(Gaitan, J.)). Consequently, the Defendants argue that Dr. Dubé's report and testimony "is unmoored to Plaintiffs' allegations," and that the Court should exclude his report and testimony

in their entirety.  Motion to Exclude Dr. Dubé at 35-36.

      **b.**      **Motion to Exclude Dr. Dubé Opposition.**

The Plaintiffs oppose the Defendants' Motion to Exclude Dr. Dubé.  <u>See</u> Motion to Exclude Dr. Dubé Opposition at 1.  The Plaintiffs argue that Dr. Dubé's proposed methodology is tied to the Plaintiffs' theory of injury and that his methodology is able to calculate consumer damages on a class-wide basis, using methods that others in the field generally accept.  <u>See</u> Motion to Exclude Dr. Dubé Opposition at 1-2.  The Plaintiffs make six primary arguments in support of their Opposition Motion.  <u>See</u> Motion to Exclude Dr. Dubé Opposition at 13, 21, 27, 29, 34, 35.  First, the Plaintiffs argue that Dr. Dubé's methodology is tied to the Plaintiffs' theories of liability.  <u>See</u> Motion to Exclude Dr. Dubé Opposition at 13.   The Plaintiffs contend that Dr. Dubé's "method isolates the economic damages associated with removing the Challenged Claims from the labels to determine the economic value of the Challenged Products to Class members, but for the Challenged Claims."  Motion to Exclude Dr. Dubé Opposition at 13.  Moreover, the Plaintiffs assert that this methodology is a "standard conceptual approach" to measuring economic damages, and that such methodology has been approved by numerous courts.  Motion to Exclude Dr. Dubé Opposition at 13.  The Plaintiffs also attest that Dr. Dubé's "proposed method will isolate the associated economic damages by determining economic value to class members but for the Challenged Claims, claims which should be excised from Defendants' labels because they are misleading to reasonable consumers."  Motion to Exclude Dr. Dubé Opposition at 14-15.  The Plaintiffs assert that Dr. Dubé is measuring "the price that is charged *and* the value of the product delivered to the consumer," and therefore, that his method measures both willingness-to-pay and the price premium.   Motion to Exclude Dr. Dubé Opposition at 15 (emphasis in original).  The Plaintiffs also attest that other courts have accepted

the same conjoint analysis methodology.  See Motion to Exclude Dr. Dubé Opposition at 16 (citing Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9).

Second, the Plaintiffs argue that Dr. Dubé "need not perform the actual conjoint analysis in order to assist the Court in its class certification determination."  Motion to Exclude Dr. Dubé Opposition at 21.  The Plaintiffs argue that there is no dispute that conjoin methodology is reliable and that courts have routinely recognized "conjoint analyses as a reliable methodology for classwide damage calculations."  Motion to Exclude Dr. Dubé Opposition at 22 (citing In re MyFord Touch Consumer Litig., 291 F. Supp. 3d 936, 971 (N.D. Cal. 2018)(Chen, J.) and Fitzhenry-Russell v. Dr. Pepper-Snapple Grp., Inc., 326 F.R.D. 592, 604 (N.D. Cal. 2018)(Cousins, J.)).  Moreover, the Plaintiffs assert that Dr. Dubé explains in detail how he will conduct his conjoint analysis survey, the details he provides are sufficient to demonstrate that he can perform a reliable conjoint analysis, and nothing more is required of Dr. Dubé before he runs the actual conjoint survey.  See Motion to Exclude Dr. Dubé Opposition at 23.  That is, at the class-certification stage the Plaintiffs only need "'present a likely method for determining class damages, though it is not necessary to show that [the] method will work with certainty at this time.'"  Motion to Exclude Dr. Dubé Opposition at 24 (quoting Brown v. Hain Celestial Grp., Inc., No. C 11-03082 LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014)(Beeler, J.) (alteration in Motion to Exclude Dr. Dubé Opposition only)).

Third, the Plaintiffs argue that "[t]he time period in which a consumer survey will be conducted is irrelevant."  Motion to Exclude Dr. Dubé Opposition at 27.  The Plaintiffs contend that the Defendants' argument that the conjoint analysis is improper, because it will take part after the time period of class, because "every time a conjoint survey is conducted it will occur after the purchase at issue occurred."  Motion to Exclude Dr. Dubé Opposition at 27.  Moreover,

the Plaintiffs argue that the time period argument goes to the weight rather than to the admissibility of Dr. Dubé's conjoint analysis.  See Motion to Exclude Dr. Dubé Opposition at 27-28.  The Plaintiffs note that courts routinely have held that "'using current research results to draw inferences about past consumer behavior is a regular practice in litigation.'"  Motion to Exclude Dr. Dubé Opposition at 28 (quoting Kurtz v. Kimberly-Clark Corporation, 321 F.R.D. 482, 551 (E.D.N.Y. 2017)(Weinstein, S.J.)).

Fourth, the Plaintiffs argue that the Defendants are incorrect in their assertion that Dr. Dubé's measure of class-wide damages "fails to account for the supply side of the market." Motion to Exclude Dr. Dubé Opposition at 29.  The Plaintiffs state that Dr. Dubé's analysis incorporates the supply side of the market, because, in his survey, consumers will "face a choice set comprising competing brands, each with a different price and differentiating sets of product features," which "reflects the supply-side factors."  Motion to Exclude Dr. Dubé Opposition at 29.  The Plaintiffs assert that Dr. Dubé "did in fact properly account for the supply side and was not solely looking at willingness to pay a premium."  Motion to Exclude Dr. Dubé Opposition at 32.

Fifth, the Plaintiffs contend that Dr. Dubé measuring consumer's willingness to pay is a proper measure of economic damages.  See Motion to Exclude Dr. Dubé Opposition at 34.  The Plaintiffs attest that "classwide economic damages represent the difference between the aggregate economic value that Class Members perceived to receive when they made their purchase decisions and the economic value that they actually received once the misrepresentation was revealed."  Motion to Exclude Dr. Dubé Opposition at 34.  The Plaintiffs note that a price premium model "would only compensate a class member if she would purchase the Challenged Products 100% of the time but for the Challenged Claims on the labels," whereas the appropriate

measure of damages -- willingness to pay -- "depends on the manner in which class members derive economic value from the Challenged Products."  Motion to Exclude Dr. Dubé Opposition at 34.  Sixth, the Plaintiffs argue that Dr. Dubé's methodology "is feasible and has been tested."  Motion to Exclude Dr. Dubé Opposition at 35.  The Plaintiffs note that several other courts have accepted similar methodologies in other cases and, therefore, the Plaintiffs ask the Court to deny the Defendants' Motion to Exclude Dr. Dubé.  Motion to Exclude Dr. Dubé Opposition at 35.

c.   <u>Motion to Exclude Dr. Dubé Reply</u>.

The Defendants reply to the Plaintiffs' Motion to Exclude Dr. Dubé Opposition.  <u>See</u> Motion to Exclude Dr. Dubé Reply at 1.  The Defendants make three primary arguments in their reply.  <u>See</u> Motion to Exclude Dr. Dubé Reply at 2, 10, 12.  First, the Defendants argue that "Dr. Dubé's damages model is irrelevant and unhelpful to the trier of fact."  Motion to Exclude Dr. Dubé Reply at 2.  The Defendants argue that Dr. Dubé's proposed model is untethered from the Plaintiffs' theories of liability and that it overstates the Plaintiffs' claimed damages.  <u>See</u> Motion to Exclude Dr. Dubé Reply at 3.  The Defendants contend that the Plaintiffs' reliance on previous cases that have approved Dr. Dubé's conjoint analysis models is misplaced, because such decisions show "only that Dr. Dubé's approach *could* be appropriate in a case in which a representation is wholly and literally false in a manner that deprives consumers of a clearly represented benefit."  Motion to Exclude Dr. Dubé Reply at 6 (emphasis in original).  The Defendants argue that the same analysis is improper here, where the Plaintiffs concede that the challenged descriptors carry other, non-actionable meanings.  <u>See</u> Motion to Exclude Dr. Dubé Reply at 7.  The Defendants also argue that Dr. Dubé "has no way of accounting for changes in consumer preferences that have occurred over the course of the class period."  Motion to Exclude Dr. Dubé Reply at 8.  The Defendants acknowledge the Plaintiffs' point that using current

- 137 -

research results to draw inferences about past behavior is common practice in litigation, but argue that this application is appropriate only when preferences for a product remained stable over time.  See Motion to Exclude Dr. Dubé Reply at 9.  The Defendants argue that Natural American cigarettes' brand recognition has increased, the retail availability of Natural American cigarettes has increased, and Natural American cigarettes receive a larger portion of the market share in the last ten years.  See Motion to Exclude Dr. Dubé Reply at 9.  The Defendants contend that, because consumer awareness of and preferences for Natural American cigarettes have changed over the past decade, Dr. Dubé's model cannot measure accurately preferences that consumers held a decade ago.  See Motion to Exclude Dr. Dubé Reply at 10.

Second, the Defendants argue that "Dr. Dubé has not determined key components of his proposed conjoint analysis, such that his proposal amounts to 'no damages model at all.'" Motion to Exclude Dr. Dubé Reply at 10 (no citation for quotation).  The Defendants again assert that Dr. Dubé has not yet designed his analysis and that even the most basic aspects of his analysis remain undetermined.  See Motion to Exclude Dr. Dubé Reply at 10.  Namely, the Defendants assert that Dr. Dubé has not determined what prices to use, what product images to use, what distractors to use, how large of a sample he needs to obtain statistically significant results, how to ensure the sample is a random sample, or what instructions will be given to survey respondents.  See Motion to Exclude Dr. Dubé Reply at 11.

Third, the Defendants contend that "Dr. Dubé's proposed methodology will yield the wrong measure of damages."  Motion to Exclude Dr. Dubé Reply at 12.  The Defendants acknowledge the Plaintiffs' assertion that Dr. Dubé's use of willingness-to-pay is proper, but argue that "courts have consistently held that willingness to pay is *not* the appropriate legal standard for calculating damages in consumer-fraud cases like this one."  Motion to Exclude Dr.

Dubé Reply at 12 (emphasis in original).  The Defendants again assert that Dr. Dubé's model does not account for the market's supply-side and that Dr. Dubé accounting for competing products and their process does not adequately account for supply-side determinations that affect Natural American cigarettes' prices.  See Motion to Exclude Dr. Dubé Reply at 14.   The Defendants contend, therefore, that Dr. Dubé's proposed analysis would "confer a windfall on many class members."  Motion to Exclude Dr. Dubé Reply at 16.  Furthermore, the Defendants assert that Dr. Dubé does not contend that he could make determinations "needed to identify the proper measure of damages for each consumer."  Motion to Exclude Dr. Dubé Reply at 17.  Consequently, the Defendants ask the Court to exclude Dr. Dubé's opinions in their entirety.  See Motion to Exclude Dr. Dubé Reply at 18.

## CONCLUSIONS OF LAW

Having made its findings of fact, the Court issues its legal conclusions.  First, the Court outlines the applicable law.  The Court then analyzes the applicable facts at hand.

## RELEVANT LAW REGARDING EXPERT TESTIMONY

1.      "Since the Supreme Court of the United States decided Daubert . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."  United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology."  United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.   "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound."  United States v. Gutierrez-Castro, 805

F. Supp. 2d at 1224.[27]

### 1.   Rule 702.

---

[27]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. See, e.g., United States v. Begay, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.)) to argue for admitting expert testimony); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

Nowhere is the need to research the presiding judge more important than in the Daubert area. Given Daubert's and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); Montoya v. Sheldon, 286 F.R.D. 602 (D.N.M. 2012). Cf. Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 21 ("Appellate courts increasingly insist that even when no Daubert hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the new expert's report. Lawyers should research their judge thoroughly through Lexis and Westlaw. In the 21st century, litigants can know their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future partner, would swing by the University of New Mexico School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges. The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library. The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, etc. Some binders got so large that they got dividers to divide the opinions by specific judges. The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm. The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting mostly other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively. In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched. With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

2.      Rule 702 of the Federal Rules of Evidence governs the admissibility of expert

testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> > **(a)** the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact in
> > issue;
> >
> > **(b)** the testimony is based on sufficient facts or data;
> >
> > **(c)** the testimony is the product of reliable principles and methods; and
> >
> > **(d)** the expert has reliably applied the principles and methods to the facts
> > of the case.

3.      Fed. R. Evid. 702.[28]  Rule 702 thus requires the trial court to "determine whether

---

[28]Rule 702's most prominent hurdle is the sufficiency of basis.  Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases. The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility.  Compare David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)), with Bernstein & Lasker, supra, at 33 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting Milward v. Acuity Speciality Prods. Grp. 639 F.3d 11, 22 (1st Cir. 2011)).  There should not be a conflict.  Rule 702 states that these are questions of admissibility.  Yet many courts treat them as questions of weight.  See, e.g., Bernstein & Lasker, supra, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest.  The divergence suggests that Daubert and rule 702 are too academic.  Daubert and rule 702 write better than they work in the courtroom and in practice.  Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases.  Cf. Bernstein & Lasker, supra, at 33 (2015)("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the

the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that

(2) will assist the trier of fact to understand or determine a fact in issue."   United States v.

Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).   Rule 702 uses a liberal definition of "expert."

Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this

rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and

architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or

landowners testifying to land values.").   An expert is "required to possess such skill, experience

or knowledge in that particular field as to make it appear that his opinion would rest on

_____

methodology the expert employed.'" (quoting Manpower, Inc. v. Ins. of Pa., 732 F.3d 796, 806
(7th Cir.)); Ronald J. Allen, Esfand Fafisi, Daubert and its Discontents, Brooklyn L.R., 131, 147
(2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).
        The Court is concerned that the federal courts will overact to the wayward opinions that
have created a split whether sufficiency of basis and application of methods is for the court or
goes to the evidence's weight.   The Court is concerned that the federal courts are going in the
direction of new rules.   There is thus a built-in institutional bias towards more rules and
amendments.   The Judicial Conference runs the federal judiciary through committees.
See About the Judicial Conference, U.S. Cts., https://www.uscourts.gov/about-federal-
courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The
Conference operates through a network of committees . . . ").   The Judicial Conference has a
Standing Committee on Rules.   The Standing Committee has five Advisory Committees: (i) Civil
Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate.   See How
the Rulemaking Process Works, U.S. Cts., https://www.uscourts.gov/rules-policies/about-
rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019).   Each of these
advisory committees has a reporter, almost always a prominent professor.   See Overview for the
Bench, Bar, and Public, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-
process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5,
2019).   The reporter position is more prestigious if the reporter can get new rules promulgated.
They have to justify their existence.   There is thus a very smart, likeable, and well-liked person
putting pressure on the committee to amend the rules.   While judges are more conservative about
promulgating new rules, they too often succumb to the reporter's pressure.   The result is that the
federal judiciary and the bar gets a host of new rules almost every year.   The development of
new rules burdens the federal judiciary and the bar -- all of which are overworked -- with
mandatory changes each year, often constituting little more than stylistic changes.   Everyone has
to get new rule books every year.   The burden of new rules often does not justify the meager
benefits of the changes.

substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[29] See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a

---

[29]The Court is clipping the wings of experts all the time. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis). Attorneys ask experts to do too much, and experts try to do too much. The experts are being paid; they are trying to be helpful to the attorney. Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L. Rev. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty. Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias."). The experts will often do anything. They toss statements into their reports to be helpful. Too many attorneys release the report as written -- without editing and without trimming. This failure to edit and to trim creates unnecessary litigation. Many expert reports contain statements that the proponent attorney does not need or even want. The reports draw Daubert motions or rule 702 challenges. The proponent is then forced to defend the statements that he or she does not even need or want.

witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

4.     Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").  "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

2.      **The Standard in Daubert.**

5.      In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[30]  The

---

[30]The current law -- and its trajectory -- are casting serious shadows over using expensive experts.  This is particularly true in cases involving jury trials.  It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts, and distrust juries.  See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data.").  Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006)("After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior.  The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion.").  Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries.  Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries.  Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials.  Juries often expressly state that they disregarded the parties' experts.  The Court often hears comments like the "expert arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors.  Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts.  The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading.  Jurors question everything.  If the Court tells them to go in one door, they want to use another.  Whereas jurors used to complement the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions.  Modern American jurors do not like to think that they are being told what to do.  And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[31] See Daubert, 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  Bitler v. A.O. Smith Corp., 391

---

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated. This phenomenon raises many concerns. One concern is the sheer prevalence of Daubert motions. Cf. Cynthia Lynne Pike, The Impact of Revised MRE 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating, "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings."). Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings. The costs of Daubert motions, to the court and the parties, is staggering. The time-consuming nature of Daubert motions is overwhelming.

[31]Federal courts are obsessed with reliability problems. This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert. See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement, and stating that rule 401 already requires evidence to be relevant).

> F.3d 1114, 1120 (10th Cir. 2004)(quoting <u>Daubert</u>, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  <u>Id.</u>  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  <u>Id.</u>  (quoting <u>Daubert</u>, 509 U.S. at 592 . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  <u>Daubert</u>, 509 U.S. at 597 . . . .

<u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the <u>Daubert</u> analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 884 n.2 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); <u>Daubert</u>, 509 U.S. at 591).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 884.  In <u>Kumho Tire Co. v. Carmichael</u>, the Supreme Court expanded the rules under <u>Daubert</u> to non-scientific expert testimony.  <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 141 ("We conclude that <u>Daubert</u>'s general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting <u>Carmichael v. Samyang Tires, Inc.</u>, 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)).  The Supreme Court recognized in <u>Kumho Tire Co. v. Carmichael</u> that the factors from <u>Daubert</u> will not apply to all cases:

> Our emphasis on the word "may" thus reflects <u>Daubert</u>'s description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

6.    In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the

> district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

7.     An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d

1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3. Necessity of Evaluating an Issue Under Daubert.

8.     The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the *Frye*[32] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").  "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

9.     "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Att'y Gen. of

---

[32]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[33] and in fact some courts have indicated their acceptance of it.").[34]

_____

[33]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments.  Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[34]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms.  The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community.  The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods.  See Executive Office of the President President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009).  There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests.  See, e.g., President's Council of Advisors on Science and Technology, supra, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, supra, at 42-48.
The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence.  The Court is not a big fan of addressing the topic of forensic evidence through rulemaking.  No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions.  There is also no reasonable degree of certainty.  These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor, in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"
The nation does not need another rule.  An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases).  See Fed. R. Evid. 701-06.  If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.
The Court is concerned with what a new rule would look like.  The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note.  The PCAST report does not propose a change to the Evidence Rules.  Rather, PCAST proposes a best procedures manual.  See President's Council of Advisors on Science and Technology, supra, at 145.  It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery.  See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/

## LAW REGARDING EXPERT TESTIMONY ON ULTIMATE ISSUES

10.     Rule 704 of the Federal Rules of Evidence states:

**(a)     In General -- Not Automatically Objectionable.**   An opinion is not objectionable just because it embraces an ultimate issue.

**(b)     Exception.**   In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.   Those matters are for the trier of fact alone.

Fed. R. Evid. 704.   "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact."   Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).   "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury."   Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).   The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished.   See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).   Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b)

_____

(last visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019).   Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders that come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule.   The first difficulty with any rule on forensic evidence will be determining to whom it should apply.   A new rule would presumably apply to forensic witnesses' testimony.   Such witnesses include people testifying about evidence through scientific means, by comparing patterns, or by "experimental or scientific analysis."   See Evidence, Black's Law Dictionary (10th ed. 2014).   After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined.   An expert must already satisfy all of rule 702's requirements.   Under a new rule, the expert will also need to satisfy all of the new requirements.   With more handles, the chances of exclusion or limiting are enhanced.   Rule 702's requirements, however, are enough, and the law should not require more.

expressed, regarding testimony on ultimate issues.  More specifically, the Tenth Circuit has stated that "'a expert may not state legal conclusions drawn by applying the law to the facts.'" United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008)(quoting A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., 936 F.2d 472, 476 (10th Cir. 1991)).

11.     "Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting United States v. Barile, 286 F.3d at 760).  In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  See United States v. Perkins, 470 F.3d at 158.  The Court has addressed this issue in various contexts.  See, e.g., Sec'y & Exch. Comm'n v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *1, *44 (D.N.M. May 10,

2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations and omissions," expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material" and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); United States v. Rodella, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); United States v. Gould, No. CR 03-2274 JB, 2007 WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred" (citing Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (10th Cir. 2005)); Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005); Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527 (D.N.M. July 31, 2005)(Browning, J.).

## LAW REGARDING RULE 23 CLASS ACTIONS

12.     Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all rule 23(a) requirements; and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b).  The plaintiff[35] bears the burden of showing that the requirements are met.

---

[35]Technically, the movant bears the burden of proof; defendants may also move for a denial of class certification and will bear the burden of proof for such a motion.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed. 2017).  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

See Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.). In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[36] See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996))). "'In determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" Anderson v. City of Albuquerque, 690 F.2d 796, 799(10th Cir. 1982)(quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)). See Vallario v. Vandehey, 554 F.3d 1259, 1267(10th Cir. 2009)("We, of

---

[36]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to a complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1097, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178). Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues. Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013). This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); Newberg § 7.21 (5th ed. 2017)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

course, adhere to the principle that class certification does not depend on the merits of a suit.").

Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that

the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.   We recognized in General Telephone Co. of the Southwest v. Falcon [457 U.S. 147 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart, 564 U.S. at 350-52.  In a subsequent admonition, the Supreme Court cautioned

district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).  The Court will find

facts for the purposes of class certification by the preponderance of the evidence, but will allow

the parties to challenge these findings during the subsequent merits stage of this case.  See

Menocal v. GEO Group, Inc., 882 F.3d at 926 n.17 (considering facts relevant to the merits only

to the extent necessary for class certification).  This approach is analogous to preliminary

injunction practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp.,

725 F.3d at 810; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 313; Gariety v. Grant

Thornton, LLP, 368 F.3d at 366.  In taking evidence on the question of class certification, the

Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson Living Tr. v. WPX

Energy Prod. LLC, 306 F.R.D. at 378 n.39 ("The Court concludes that the Federal Rules of

Evidence apply [to a class certification hearing.]. . . [R]ealistic[ally,] the judge [should] consider

all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any

evidentiary infirmity into the weight he or she gives them.")

13.     All classes must satisfy the prerequisites of rule 23(a):

(1)     the class is so numerous that joinder of all members is
impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are
typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect
the interests of the class.

Fed. R. Civ. P. 23(a).  These four requirements are often referenced as numerosity, commonality,

typicality, and adequacy, respectively.  See Fed. R. Civ. P. 23(a).  "A party seeking to certify a

class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v.

Bowen, 849 F.2d at 1309.  "Although the party seeking to certify a class bears the burden of

proving that all the requirements of Rule 23 are met, the district court must engage in its own

'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El

Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457

U.S. at 161, and citing Reed v. Bowen, 849 F.2d at 1309).

### 1.   **Numerosity.**

14.     Rule 23(a)(1) provides for class certification where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).   See Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). "[R]ule 23(a)(1) is concerned with manageability, i.e., the Court's ability to handle the case as a non-class action; this purpose is obvious from the rules text, which calls for 'joinder . . . [being] impracticable.'" Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436 (quoting Fed. R. Civ. P. 23(a)(1)), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.).   "[T]he numerosity requirement . . . is [second] concerned with protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation." Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436.  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d at 436).

15.     Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d at 1162.  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436).   Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class meets

the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable."   Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.) (quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.)).   See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous" (citing Senter v. General Motors Corp., 532 F.2d 511, 523 n. 24 (6th Cir. 1976))); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."); 1 Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels, § 3.05, at 141-42 (2d ed. 1985).

16.    "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required."   Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993).   See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible.").   The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement.   Lowery v. City of Albuquerque, 273 F.R.D. 668, 682-83 (D.N.M. 2011)(Browning, J.).   At the other end of the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable.   See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.).   See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class

seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

        2.    **Commonality**.

      17.    Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.). See Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996) and quoting Adamson v. Bowen, 855 F.2d at 676)).

      18.    The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store

managers' discretion.   See 564 U.S. at 343-45.   The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 564 U.S. at 345.   The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).   For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157].  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)).  In EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011)(Diaz, J., joined by Keenan and Wilkinson, JJ.), the United States Court of Appeals for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citing Adair v. EQT Prod. Co., No. 1:10-CV-00037, 2013 WL 5429882, at *38-39 (W.D. Va. Sept. 5, 2013)(Sargent, M.J.)).

19.    In Wal-Mart, the Honorable Antonin Scalia, then Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  564 U.S. at 366.  Scalia concluded from this observation:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 564 U.S. at 367.  "Thus, the common question or questions cannot be 'incidental,' nor can the plaintiff submit a long list of 'incidental' questions or issues, and say that they predominate over the real issues."  Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 382.

### 3.   Typicality.

20.    Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994).  "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 622 (citing Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1320 (11th Cir. 2008)).

21.    The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(Blackburn, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In

determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")); Adamson v. Bowen, 855 F.2d at 676.  "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010).  Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d at 676.  See DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1199 (citing Adamson v. Bowen, 855 F.2d at 676 ("Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality.")); Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

22.     Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  On the other hand, "it is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'"  In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 687 (D. Colo. 2014)(Brimmer, J.)(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 599 (3d Cir. 2012)).  "[A] lead plaintiff's unique defense is detrimental to the class . . . [because] the lead plaintiff 'might devote time and effort to the defense at the expense of issues that are common

and controlling for the class.'"   In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Beck v.

Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006)).   See Genesee Cty. Employees' Ret. Sys. v.

Thornburg Mortg. Sec. 825 F. Supp. 2d 1082, 1214 (D.N.M. 2011)(Browning, J.).

    **4.**    **Adequacy.**

23.    Rule 23(a)(4) requires that "representative parties will fairly and adequately

protect the interests of the class."   Fed. R. Civ. P. 23(a)(4).   "The requirement of typicality

dovetails into the requirement of adequacy of representation."   Edgington v. R.G. Dickinson &

Co., 139 F.R.D. 183, 189 (D. Kan. 1991)(Crow, J.)(quoting Penn v. San Juan Hospital, Inc., 528

F.2d at 1189).   See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at

1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to

merge'" (quoting Wal-Mart, 564 U.S. at 349 n.5)).   The adequacy requirement protects the

interests of unnamed proposed class members -- who are bound by any judgment in the action.

See Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process

requires that the Court 'stringently' apply the competent representation requirement because

putative class members are bound by the judgment (unless they opt out), even though they may

not actually be aware of the proceedings." (citing Albertson's, Inc. v. Amalgamated Sugar Co.,

503 F.2d 459, 463-64 (10th Cir. 1974)).   "The requirement of fair and adequate representation is

perhaps the most important of the criteria for class certification set forth in Rule 23(a)."   Miller

ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).   See Cobb

v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the

representative is of monumental importance since representation demands undiluted loyalty to

the class interests . . . .").

24.     The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Intra-class conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315-16 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees, who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees, whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- where some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).  On the other hand, "[t]hough a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class

members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit." Lowery v. City of Albuquerque, 273 F.R.D. at 680 (quoting 1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed. 2002)). "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A Wright, Miller & Kane, supra § 1768, at 389-93.

25. Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, see Lopez v. City of Santa Fe, 206 F.R.D. at 289-90, this analysis has now been moved to rule 23(g). The 2003 amendment to rule 23 created rule 23(g), entitled "class counsel." Fed. R. Civ. P. 23(g). This subsection contains its own adequacy-of-counsel analysis. See Fed. R. Civ. P. 23(g)(1)-(2). The advisory committee notes advise that rule 23(g) should replace the analysis of class counsel under rule 23(a)(4); these notes describe that rule 23(g)

> responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

Fed. R. Civ. P. 23(g) advisory committee notes to the 2003 amendment.  See Lyall v. City of Denver, 319 F.R.D. 558, 565 (D. Colo. 2017)(Martinez, J.)(addressing the named plaintiffs' adequacy under rule 23(a)(4) and the counsel's adequacy under rule 23(g)); Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 628 ("Rule 23(g) now sets forth a specific set of factors relevant to the appointment of class counsel.").  Cf. Martin v. Blessing, 571 U.S. 1040, 1040 (2013)(stating, while denying a writ of certiorari, that rule 23(g) orders a district court to consider the adequacy of class counsel in determining whether to grant class certification).

**5.    Rule 23(b).**

26.    Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)."  Adamson v. Bowen, 855 F.2d at 675.  See DG ex rel. Stricken v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

(b)    Types of Class Actions.  A class action may be maintained if Rule 23(a) is satisfied and if:

(1)    prosecuting separate actions by or against individual putative class members would create a risk of:

(A)    inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or

(B)    adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests

of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)    the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   The matters pertinent to these findings include:

(A)    the putative class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, No. CIV 09–0520 JB/RLP, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

27.    The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class

actions under (b)(1) can be certified only in very particular circumstances.  Class actions under

(b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and

not damages.  Far and away the most controversial class action category, (b)(3), can be brought

for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class

actions under (b)(3) always require notice to all proposed class members of certification of the

class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed.

R. Civ. P. 23(c)(2)(B), (c)(3)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e

hold that due process requires at a minimum that an absent plaintiff be provided with an

opportunity to remove himself from the class by executing and returning an 'opt out' or 'request

for exclusion' form to the court.").  The other class action categories, however, are ordinarily

mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P.

23(c)(2)(B), (c)(3)(A).  The Court will focus on the most important form of class action, the

(b)(3) damages class action.[37]

---

[37]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but the situation does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing" in which, for example, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.  Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally or logically -- incompatible

---

judgments.  Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it, or pursue his or her own individual claim.  Accordingly, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).  Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . .In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See Newberg § 4:26.  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she

28.    To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) "the class members' interest in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any

---

can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to <u>Brown v. Board of Education,</u> [349 U.S. 294 (1955),] once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of 5 individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

<u>Newberg</u> § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

litigation concerning the controversy already begun by or against members of the class"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." _Gonzales v. City of Albuquerque_, 2010 WL 4053947, at *11 (citing _Carpenter v. Boeing, Co._, 456 F.3d at 1187 (stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

### a.  __Predominance.__

29.  Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those questions that are individualized.  See Fed. R. Civ. P. 23(b)(3).  A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member." Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.")(quoting Amchem Prods.,

Inc. v. Windsor, 521 U.S. 591, 623-24 (1997).  As the Tenth Circuit, addressing a Title VII claim, put it:

> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.
>
> . . . The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

30.     The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires.  See 569 U.S. at 35-38.  The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates.  569 U.S. at 31.  The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis."  569 U.S. at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave.  Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities.  The model calculated damages of $875,576,662.00 for the entire class.  As Dr. McClave acknowledged, however, the model did not

> isolate damages resulting from any one theory of antitrust impact. The District
> Court nevertheless certified the class.

569 U.S. at 31-32 (citations omitted).

31.    The United States Court of Appeals for the Third Circuit affirmed the district

court decision. The Third Circuit concluded that the plaintiffs "'provided a method to measure

and quantify damages on a classwide basis,' finding it unnecessary to decide 'whether the

methodology was a just and reasonable inference or speculation.'" 569 U.S. at 32 (quoting 655

F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question "[w]hether

a district court may certify a class action without resolving whether the plaintiff class had

introduced admissible evidence, including expert testimony, to show that the case is susceptible

to awarding damages on a class-wide basis." Comcast Corp. v. Behrend, 567 U.S. 933, 933

(2012). Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the

plaintiffs' damages model "simply because those arguments would also be pertinent to the merits

determination." Comcast Corp. v. Behrend, 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents'
> model falls far short of establishing that damages are capable of measurement on
> a classwide basis. Without presenting another methodology, respondents cannot
> show Rule 23(b)(3) predominance: Questions of individual damage calculations
> will inevitably overwhelm questions common to the class.

569 U.S. at 34. Justice Scalia stated that, under the Third Circuit's logic, "at the class-

certification stage, *any* method of measurement is acceptable so long as it can be applied

classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce

rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 35 (emphasis in original).

32.    It is clear that Comcast Corp. v. Behrend applies to classwide damages. It is less

clear that Comcast Corp. v. Behrend's language applies to the determination of individual

damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.  Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.  Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things which apply to classwide damages.  As to the first option, while much could be said for limiting Justice Scalia's opinion to classwide damages -- even from the opinion's language and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damage awards.  Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual.  While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards.  On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damage calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  Comcast Corp. v. Behrend, 569 U.S. at 42 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  See Menocal v. GEO Group, Inc., 882 F.3d at 927 (stating that the determination of individualized damages does not

defeat class certification).   Accordingly, different amounts of damages for plaintiffs and class members, and separate calculations of damages do not defeat class certification.

33.    What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.   See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 ("[T]he district court should consider the extent to which material differences in damages determinations will require individualized inquiries.").   A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage.   Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.   In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.   Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.   The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.   The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual

ones.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220

(describing that individualized damages issues might destroy predominance).

34.    A defendant's desire to assert individual counterclaims[38] does not typically defeat

predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v.

Exxon Corp., 333 F.3d 1248, 1259-60 (11th Cir. 2003).  A defendant's desire to assert individual

affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile

Sys., Inc., 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status

under Rule 23(b)(3) simply because affirmative defenses may be available against individual

members."),[39] but this statement is less true after Wal-Mart.  Affirmative defenses may be

---

[38]Generally speaking, counterclaims, even common ones, are not permitted against absent class members.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985).

[39]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.  Even if the question is individual -- for example, if a class is defined as encompassing only preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

considered as one factor in the class certification calculus.  See Donaca v. Dish Network, LLC., 303 F.R.D. 390, 400 (D. Colo. 2014)(Jackson, J.)(describing that affirmative defenses are relevant considerations for class certification); Miller v. Farmers Ins. Grp., No. CIV-10-466-F, 2012 WL 8017244, at *16 (W.D. Okla. March 22, 2012)(Friot, J.)(describing that affirmative defenses are relevant to the class certification inquiry and stating that Wal-Mart clarifies that the question for class certification "is whether it can fairly and lawfully be said that plaintiff's win, if he wins *his* case, can fairly and lawfully be replicated for every member of the class")(emphasis in original); Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 629-30 (D.N.M. 2007)(Vazquez, J.)("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification.").  Other recurring issues present serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[40] (ii) differences in the applicable law in a multi-state, state-law-based

---

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg, § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

    [40]The advisory committee's notes to rule 23 state that

    a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes to the 1966 amendment (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

class action,[41] see Castano v. Am. Tobacco Co., 84 F.3d at 741; and (iii) the need to determine individual personal injury damages, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

---

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg, supra, § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)(listing Courts of Appeals that "have held that oral misrepresentations are presumptively individualized"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[41]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast Corp. v. Behrend, states:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold

_____

that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.   Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.   Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.
>
> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.
>
> . . . .
>
> When courts think of efficiency, they should think of market models rather than central-planning models.
>
> Our decision in In re Rhone-Poulenc Rorer, Inc., made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d [1293,] 1299][(1995)] will yield the information needed for accurate evaluation of mass tort claims.
>
> . . . .

There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

35.     There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance.  The Honorable Richard A. Posner, former United States Circuit Judge for United States Court of Appeals for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013).  Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate

---

        No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court.  See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

288 F.3d at 1018-20.

mold and affirmed the district court's certification of the same class to pursue a claim that the

machines' control units were defective.  See 702 F.3d at 360-61, 363-64.  The Seventh Circuit

certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-

warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).  But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different classes of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions

pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck

& Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v.

Behrend."   Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013).   On

reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by

Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.  That's incorrect.  An issue "central to

the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.  [Wal-Mart, 564 U.S. at 338].  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001)[(O'Malley)], we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability.  Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of classes.  See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012] (10 classes).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[42]

---

[42]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.  Comcast was an antitrust suit, and the Court said that "if [the

plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages.  [569 U.S. at 37] (emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."  (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . .[the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine

- 185 -

36.     The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[43]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently.  This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.)(noting that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs).  Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted).  That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

--------------------

damages on a class-wide basis.  As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[43]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim."  Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. *See Amgen* [Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. at 471 ]. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 107 (2009)). That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." *Id.* Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation." *Id.* at 1196 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 . . . (1997)).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013). The Sixth Circuit and Seventh Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with the styling a leading class action treatise gave many years earlier:

[A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted)(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)).

37.     Although the Sixth Circuit and the Seventh Circuit may agree about the definition of predominance, the Third Circuit, the Tenth Circuit, and the United States Court of Appeals for the Eleventh Circuit stake out a different test.

> 'Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.'  *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).  Common issues of fact and law predominate if they '"ha[ve] a *direct impact* on every class member's effort to establish liability" *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member.'  *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d [1256,] 1270 [(11th Cir. 2009)](emphasis added)(quoting *Klay* [*v. Humana, Inc.*], 382 F.3d [1241,] 1255 [(11th Cir. 2004)]).  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."  *Klay* [*v. Humana, Inc.*], 382 F.3d at 1255.  In practical terms, while "[i]t is not necessary that all questions of fact or law be common," *id.* at 1254 (citation omitted), "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." *Id.* at 1255 (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (emphasis in original)(first, eighth, tenth, and eleventh alterations in original).[44]  See Menocal v.

---

[44]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and, in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170; Vega v. T-Mobile USA, Inc., 564 F.3d at 1270; Klay v. Humana, Inc., 382 F.3d at 1255.  In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

GEO Group, Inc., 882 F.3d at 915; CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087-88;

Marcus v. BMW of N. Am., LLC, 687 F.3d at 600.  The Eleventh Circuit, however, imposes a

different, more rigorous, second step: the district court's trial plan must spend more time

adjudicating the common questions than it does adjudicating the individual questions.  See

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170.  The

Eleventh Circuit's test may not be best -- the Court sees little reason why negative-value cases

---

An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co . . .  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Id. ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'")(quoting Klay v. Humana, Inc., 382 F.3d at 1255); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).
    The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

    We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

that can be fairly and efficiently adjudicated via class action should not be certified[45] -- but it is

commendable in that it is a test that district courts can use, rather than yet another meaningless

---

[45]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater quantity or importance; preponderate." Predominate, The American Heritage Dictionary of the English Language, (5th ed. 2019), https://www.ahdictionary.com/word/search.html?q=predominate (last visited September 12, 2019). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of an economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even these classes had not been allowed, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. Certification Order, at 8 n.12, 18 n.22. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation, § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc.,

---

165 F.R.D. 623, 630 (D. Kan. 1996)[(Theis, J.)]("The potential for numerous different subclasses weighs against a finding of predominance of common issues.").  Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." *Broussard* 155 F.3d at 340.  Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." *Broussard* 155 F.3d at 344.  The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience.  *Id.* at 340.  The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party.  Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment.  By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d at 1279, of such unlawful results, and thereby abused its discretion.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Company case, deciding the issue in a way one might expect:

Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action.  A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. See *In re N.D. Cal. Dalkon Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)(balancing severed issues against the remaining individual issues) . . .; *see also Jenkins* [*v. Raymark Indus. Inc.*], 109 F.R.D. [269,] 278

---

[(E.D. Tex. 1985)(Parker, J.)](comparing state of the art defense to individual questions of exposure and degree of injury in a class action certified only on the common issue of the state of the art defense).  Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

Castano v. Am. Tobacco Co. 84 F.3d at 745 n.21.  This logic is hardly unassailable.  Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be "automatic certification in every case where there is a common issue," because superiority must still be satisfied.  Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21.  If a proposed class action is superior -- e.g., if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5), then it is not clear why certification "could not have been intended" by the rule.  Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate the "likely difficulties in managing a class action."  Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D).  Because rule 23 directs that "[t]he matters pertinent to these findings of [predominance and superiority] include: . . .likely difficulties in managing a class action," the Court, if it were writing on a clean slate, would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended," Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21.  The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole.  According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

—————————————————

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. [Am.] Tobacco Co., 84 F.3d [at ]745 n.21 . . . .

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part).  Despite Judge Niemeyer's concern with creating a circuit split, disagreement among Courts of Appeals exist.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001)(stating that the district court abused its discretion in not considering partial certification); Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001)(discussing subclasses); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999)(treating "[d]ivided certification" as "worth consideration").  The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d . . .446-47 . . .(Niemeyer, J.,  dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d [at] 745 n.21 . . .("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").  We did not directly address the legality of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d . . .898 . . ., with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling that plaintiffs

recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087 ("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" (quoting Roper U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 406 n.11 (1980)), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

38.     The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases.  Accordingly, the issues disputed in this case are not unusual.  And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate.  Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not.  Stated another

---

did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88 (emphasis in original). See

Menocal v. GEO Group, Inc., 882 F.3d at 915 (reiterating the test that the Tenth Circuit

articulates in CGC Holding Co., LLC v. Broad & Cassel); Anderson Living Tr. v. WPX Energy

Prod., LLC, 306 F.R.D. at 397 (distinguishing the Tenth Circuit test from other circuits' tests).

### b.  **Superiority.**

39.  The second requirement for certifying a (b)(3) class is superiority, which means

that a class action would be superior to -- not merely just as good as or more convenient than --

all other available procedural mechanisms, including: (i) individual actions by class members;

(ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C.

§ 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether

cases. The superiority requirement thus sets a high bar, but there are two ways that a proposed

class can get an immediate leg up on certification, both of which involve rendering the

aforementioned procedural devices impractical for the task at hand.

40.     First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation.   These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.   A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).   The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

41.     Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.   While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

42.     In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.   See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria."). The first factor, "the class members' interests in individually controlling the prosecution or

defense of separate actions," closely tracks the individual cases' money value.  Fed. R. Civ. P. 23(b)(3)(A).  When individual actions are practical, they are preferred; the United States has a "'deep-rooted historic tradition that everyone should have his own day in court,'" and adjudicating individual disputes is our federal judicial system's core activity.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, et al., Federal Practice Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).  The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003)(Duggan, J.).  Courts should also consider the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[46]  See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(Dimitrouleas, J.)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").

43.     Such questions arise particularly where the statute under which a plaintiff sues provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions or by granting statutory damages

---

[46]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation --- from an individual action than he would from his proportional share of the class recovery.  If the number of proposed class members likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$), then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

to individual plaintiffs while requiring class plaintiffs to prove actual damages.  See, e.g., Fair

Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at

$1,000.00 and class action damages at $500,000.00); Truth in Lending Act, 15 U.S.C. § 1640(a)

(capping individual damages at $5,000.00 and class action damages at $500,000.00).  Although

claims under these statutes may be more lucratively brought as individual actions, courts should

assess the real-world likelihood that class members would bring their own actions.  As the

Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New

York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that
> potential requires assuming that each putative class member is "aware of her
> rights, willing to subject herself to all the burdens of suing and able to find an
> attorney willing to take her case."  *Mace v. Van Ru Credit Corp.*, 109 F.3d [at]
> 344 . . . .  Those transaction costs are not insubstantial and have prompted other
> courts in this Circuit to conclude that litigating as a class is superior

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, C.J.).

See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at

*11 (D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are

not likely to know their rights and are therefore not likely to pursue these claims on their own.").

44.     The second enumerated (b)(3) factor, "the extent and nature of any litigation

concerning the controversy already begun by . . . class members," is closely linked to the first

factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to

consider the interests of individual members of the class in controlling their own litigations and

carrying them on as they see fit.  In this connection the court should inform itself of any

litigation actually pending by or against the individuals."  Fed. R. Civ. P. 23 advisory

committee's notes (citations omitted).  This passage suggests that the extent to which proposed

class members -- or individuals who would otherwise be proposed class members but for being specifically excluded from the definition by virtue of their individual claims -- have already filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial and indicates a higher "interest[] in individually controlling the prosecution."  Fed. R. Civ. P. 23(b)(3)(A).  It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

45.     In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B).  The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this

reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

46.     The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun."  Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Pa.  2013)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[47]  See Newberg § 4:70 ("[I]f a *class action* case is already pending, certification of

_____

[47]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the federal court system.  It is less clear how to handle a proposed class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members.  Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis.  The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, 28 U.S.C. § 2283, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action.  See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").  There are possible exceptions, however, including that, pursuant to the All Writs

Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement.  See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002).  In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem.  As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control."  In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 337 (2d Cir. 1985).  See also Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered.").  The in rem analogy may help to bring into focus what makes these cases stand apart.  In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached."  Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922).  Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction.  See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts").  What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case."  Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12.  See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the legality of the federal class action").  Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- who also were defendants in a federal multidistrict suit -- from entering any settlements that contained any release of claims under South Carolina law, thereby "clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it").  But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.

another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)).   Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[48]

---

Liability Litig., 134 F.3d 133 (3d Cir. 1998)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments"). See Dibble v. Wells Fargo Bank, Nat'l Ass'n, 226 F. Supp. 3d 1226, 1229 (D.N.M. 2016)(Browning, J.)(explaining that the three situations in which state proceedings have ended under the Rooker-Feldman doctrine are: (i) the highest court in the state has affirmed judgment below and all matters are resolved, (ii) neither party seeks further action in the state action, and (iii) the state court proceedings have resolved all federal matters but left state law or factual questions unresolved)(citing Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17, 26 (1st Cir. 2005)); Calvert v. Safranek, Nos. 06–1051, 06–1123, 2006 WL 3735508 at *1 (10th Cir. Dec. 20, 2006) (affirming that the Rooker–Feldman doctrine removes the district court's jurisdiction to grant relief that would effectively negate a state court's judgement). In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, many of the questions raised relating to competing state and federal class actions, CAFA's passage has obviated and has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008).

[48]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.  The already certified class action's claims could be asserted in the proposed class action only by individuals excluded from the already certified class' definition.  The entirety of the proposed class,

47.     The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.   Fed. R. Civ. P. 23(b)(3)(C).   The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.   See Newberg § 4:71.   The second prong is whether the particular court at issue is a desirable forum for the litigation.   Some issues that reliably influence the determination of this prong include: (i) the parties', witnesses', and class counsel' geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; (ii) the harm's locus, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Arterton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).   "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.   For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d at 1271; if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23

---

including those individuals who are also members of the already certified class, could assert claims not included in the already certified class action.

(E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority, see Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 411.

48.     The fourth, final, and most important[49] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.   The principal concern in a manageability inquiry is individualization.  A proposed class's size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d at 660-61.  Accordingly, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> [T]he predominance analysis has a "tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims," Klay v. Humana, Inc., 382 F.3d at 1269, both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability, *see* Fed. R. Civ. P. 23(b)(3)(D).

---

[49]Newberg writes that the "manageability factor . . .is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184.

See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

     49.    When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism."   Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).  Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[50] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute the damages among the class can be addressed with less formality.[51]

---

[50]"Vertical" polyfurcation, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages. Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence.  "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side.  "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial.  Fed. R. Crim. P. 14(a), 12(b)(3)(D).

[51]Defendants have a due-process right to have any damages against them proven in court. The question of how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect

_____

damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages. The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially when the alternative is denying certification. One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

> The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class." Black's Law Dictionary 444 (9th ed. 2009). It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts. M. Redish, P. Julian, & S. Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: a Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).

. . ..

> The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d at 1230-31 (citations omitted). See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. at 1105-12 (denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values). The Tenth Circuit has never discussed cy pres relief in detail, see Tennille v. W. Union Co., 809 F.3d 555, 560 (10th Cir. 2015)(describing a fact pattern with a cy pres fund but not discussing the legal implications of the cy pres doctrine); United States v. New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103, 153-154 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C. § 2072, or both. See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.). The Court would be more likely to let unused or

50.    Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart, 564 U.S. at 367.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See Wal-Mart, 564 U.S. at 367.  For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.  Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[52]  The defendants might put on their own

_____

undisbursable funds escheat to the state or revert to the defendant --- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief.  If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.

Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100.00 in damage receives the same distribution as another class member who sustained $800.00 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[52]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.  See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm;  Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval;  Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence

sample, attack the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample. The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[53]

51.    The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven. See Wal-Mart, 564 U.S. at 367.[54]  When issues are truly common, multiple

---

level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of $^+/-$ 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a $^+/-$ 8% margin of error and a 99% confidence level, or a $^+/-$ 1% margin of error and a 90% confidence level.  The use of a 95% confidence level, however, is a scientific and industry standard.

[53]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00.  The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class.  That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.

[54]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics

class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action. Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.[55] In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment. The Seventh Amendment contains two clauses:

---

effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the United States Constitution. See Wal-Mart, 564 U.S. at 367 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

[55]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the plaintiffs' economic convenience, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually. If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification. For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parole evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses. In the Court's opinion, the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply. In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result. Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources if the 1,000 suits were brought individually. That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens. In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts. The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law. The Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

52.   These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation which post-dates the Founding -- violates the trial-by-jury clause.  Whatever the merits of this argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.  It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance.  All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.  Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure.  It does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931)(citing Herron v. S. Pac. Co., 283 U. S. 91 (1931); Walker v. N.M. & S. Pac. R., 165 U. S. 593, 596 (1897); In re Peterson, 253 U. S. 300, 309 (1920)).  The only restriction that the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal and equitable issues -- the former of which must be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them[, as] the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122 (quoting Beacon Theatres, Inc. v. Westover, 359

U.S. at 510-511).

53.     The reexamination clause presents more formidable difficulties to polyfurcation.

Relatively few appellate judges have invalidated lower-court judgments or class-management

plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class.  Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts.  And a decision to employ the procedure is reviewed deferentially.  However, as we have been at pains to stress recently, the district judge must carve at the joint.  Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries.  The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation.  But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country.  The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact.  This would be obvious if the second finder of fact were a judge.  But it is equally true if it is another jury.  In this limited sense, a jury verdict can have collateral estoppel effect.

> The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or $n$th jury.  The first jury will not determine liability.  It will determine merely whether one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs.  But it will not decide them with regard to the other class members.  Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh case, such issues as comparative negligence -- did any class members knowingly continue to

use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence.  Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.  Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant.  It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence.  A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus.  How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

54.     By and large, other courts have not accepted Judge Posner's Seventh Amendment concerns with polyfurcation.  The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation.  The Court nonetheless concludes it can make three statements confidently on the issue.  First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial.  See In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated.").  Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[56]

---

[56]The Seventh Amendment defines collateral estoppel's contours.  See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

This requirement does not imply a need to "carve at the joint" -- whatever that means[57] -- but merely to do as the Seventh Amendment says, and prevent "reexamination."  Third, most minor reexamination issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings.  See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000); See also Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 686 (D.N.M. 2016)(Browning, J.).

## ANALYSIS

55.     The Plaintiffs seek damages from the Defendants based on consumer protection, warranty, and unjust enrichment claims.  See Certification Motion at 5.  The Plaintiffs seek to certify twenty-one classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico Class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina

---

[57]The Tenth Circuit has never used this term.  It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements $A$ through $E$, but the "joint" is between $C$ and $D$, then the case cannot be bifurcated into a trial on $A$ and $B$ and a separate trial on $C$ through $E$.  Maybe the Court is reading too much into the metaphor.  In the Court's view, however, separate trials for $A$ and $B$ and $C$ through $E$ would be acceptable, so long as the $C$-through-$E$ jury respects the prior jury's findings on $A$ and $B$.

Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass.  See Certification Motion at 6.  The Plaintiffs seek specific state menthol subclasses certification only in the alternative to the Nationwide Menthol Subclass.  See Certification Motion at 6 n.3.  The Plaintiffs contend that the Defendants' labeling on Natural American cigarettes conveys to consumers that Natural American cigarettes are less harmful than other cigarettes.  See Certification Motion at 3.

56.     The Plaintiffs contend that they present common questions whether: (i) the Defendants' marketing and labeling of Natural American cigarettes was uniform and commonly presented to class members; and (ii) the Defendants' labelling misled reasonable consumers that Natural American cigarettes may be less harmful than other cigarettes.  See Certification Motion at 4.  The Plaintiffs also contend that they present common evidence to the issues at hand and that the common questions predominate over any individualized issues.  See Certification Motion at 4.  Moreover, the Plaintiffs argue that class-wide damages can be calculated based on a common methodology for each class member.  See Certification Motion at 4.

57.     The Defendants contend that the Court should not certify the Plaintiffs' proposed classes for several reasons.  First, the Defendants assert that, independent of rule 23, four claims are not eligible for certification.  See Certification Opposition at 17.  Specifically, they argue: (i) that the Court dismissed the New Jersey classes' unjust enrichment claim; (ii) that the IUDTPA does not allow the Illinois classes' injunctive relief and monetary damages claims; (iii) that the Court dismissed the Ohio class' claim for failure to satisfy the OCSPA's notice requirement, and (iv) that the NMFAA does not provide a private right of action for the New Mexico classes' NMFAA claims.  See Certification Opposition at 17-19.  Second, the Defendants assert that two additional claims are ineligible for certification under rule 23(b)(3).

See Certification Opposition at 19.  Specifically, they argue that: (i) the CCPA bars monetary damages for class actions under Colorado law; and (ii) the NMUPA provides named plaintiffs with different damages than unnamed class members, precluding a damages class' certification. See Certification Opposition at 19.  According to the Defendants, "this leaves thirteen statutory causes of action under the laws of nine States, the ten unjust-enrichment claims, and the nationwide express-warranty claim."  Certification Opposition at 19-20.  Third, the Defendants assert that the Plaintiffs cannot meet rule 23(a)'s commonality and typicality requirements, or rule 23(b)(3)'s predominance and superiority requirements for the remaining classes.  See Certification Opposition at 20, 24.  Finally, the Defendants argue that the Court should not certify the Plaintiffs' proposed classes under rule 23(b)(2), because their request for injunctive relief is moot and the named Plaintiffs do not have standing.  See Certification Opposition at 84, 86.  The Defendants do not dispute that the Plaintiffs satisfy rule 23(a)'s numerosity and adequacy requirements.  See Certification Opposition at 20.

## I.   THE COURT WILL NOT CERTIFY THE NATIONWIDE MENTHOL SUBCLASS.

58.   The Plaintiffs' proposed Nationwide Menthol Subclass "seeks to represent a nationwide subclass of NAS Menthol Cigarette purchasers in the U.S." and "seeks recovery for Defendants' breach of express warranty."  Certification Motion at 80 (citing SAC ¶ 127, at 43; id. ¶¶ 451-59, at 103-05).  Because the Plaintiffs seek the individual state menthol subclasses' certification as an alternative to the Nationwide Menthol Subclass's certification, the Court will consider first the Nationwide Menthol Subclass.  The Court determines that the Plaintiffs have established that the Nationwide Menthol Subclass satisfies rule 23(a)'s requirements, but that the have not shown that the Nationwide Menthol Subclass satisfies rule 23(b)(3)'s requirements.

Accordingly, the Court will not certify the Nationwide Menthol Subclass under rule 23(b)(3).

### A. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S NUMEROSITY REQUIREMENT.

59.     The Plaintiffs assert that their proposed classes "readily meet" rule 23(a)'s numerosity requirement. Certification Motion at 43. A proposed class meets rule 23(a)'s numerosity requirement when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436). The Court previously has found that joinder of "several hundred tenants and homeowners" is impracticable, and thus that the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. at 682-83.

60.     Here, the Plaintiffs have presented evidence that the "Defendants sold over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018." Certification Motion at 43 (citing Natural American Spirit Market Share and Financial Information (dated June 29, 2018), filed July 23, 2020 (Doc. 280-2)). See Dewhirst Report at 17; Proctor Report at 61. In 2018, Santa Fe Tobacco had thirteen million people on its active mailing list. See Huyett Depo. at 163:15-16 (Huyett). Accordingly, the Plaintiffs assert that "there are millions of class members; surely there are, at minimum, tens of thousands of class members in each state for which Plaintiffs seek certification." Certification Motion at 44. Given a standard twenty-cigarette pack, 5.8 billion cigarettes sold is equivalent to approximately 290 million cigarette packs sold in 2018. That number is enough for more than

794,500 people to purchase one pack per day.  Using an even distribution of smokers among the fifty States, this number would be enough for more than 15,890 people to purchase a one pack per day in each State.  At least until 2016, menthol cigarettes generated seven percent of Natural American cigarette sales.  See Dubé Report at 14-15.  Extending the Court's rough calculations, these sales numbers suggest that the Defendants sold approximately 406 million menthol cigarette sticks, or 20.3 million menthol cigarette packs, a number sufficient for 1,112 people in each State to have purchased one pack of menthol cigarettes per day.  These estimates exceed the "several hundred tenants and homeowners" whose joinder the Court previously has concluded is impracticable.  Lowery v. City of Albuquerque, 273 F.R.D. at 682-83.  Although the Plaintiffs do not estimate specifically how many customers purchased Natural American cigarettes in each State per year, the Court concludes that the joinder of each individual class member is "impracticable."  Fed. R. Civ. P. 23(a)(1).  For these reasons, and because the Defendants do not dispute that the Plaintiffs have met rule 23(a)'s numerosity requirement, see Certification Opposition at 20, the Court concludes that the Nationwide Menthol Subclass is sufficiently numerous to satisfy rule 23(a)(1).

### B.    THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S COMMONALITY REQUIREMENT.

61.    Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  While "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist," In re Intelcom Grp. Sec. Litig., 169 F.R.D. at 148, the common question must be "central to the validity of each claim," Wal-Mart v. Dukes, 564 U.S. at 350, and must be able to "'generate common *answers* apt to drive the resolution of litigation,'" Wal-Mart v.

Dukes, 564 U.S. at 350 (quoting Nagareda, <u>Class Certification in the Age of Aggregate Proof</u> at 132)(emphasis added in <u>Wal-Mart v. Dukes</u>).  "[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do."  <u>Wal-Mart v. Dukes</u>, 564 U.S. at 359 (quoting Nagareda, <u>The Preexistence Principle and the Structure of the Class Action</u>, 103 Colum. L. Rev. 149, 176 n.110 (2003))(first alteration added).  The Court previously has noted that, in light of <u>Wal-Mart v. Dukes</u>, "[f]or better or for worse, the commonality inquiry now focuses on quality rather than quantity."  <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 306 F.R.D. at 437.

62.    The Plaintiffs assert that their proposed classes, including the Nationwide Menthol Subclass, satisfy rule 23(a)'s commonality requirement, because they have "identified questions with common answers that 'would "resolve an issue that is central to the validity of each of one of the claims in one stroke."'"  Certification Motion at 44 (quoting <u>Menocal v. GEO Grp., Inc.</u>, 822 F.3d at 916 (quoting <u>Wal-Mart v. Dukes</u>, 564 U.S. at 350)).  They assert that false advertising claims meet the commonality requirement because

> (1) whether Defendants' statements are false, deceptive, or misleading can be determined without having to consider Plaintiffs' individual circumstances; (2) Plaintiffs will be able to prove Defendants' violations of law through common evidence; (3) Defendants' conduct and scienter will not vary by Plaintiffs and class members; and (4) the amount of any improper premiums incorporated into an item's price (i.e. Plaintiffs' injuries) will not vary by Plaintiffs and class members.

Certification Motion at 45 (citing <u>Daye v. Cmty. Fin. Serv. Ctrs., LLC</u>, 313 F.R.D. at 178).  Specifically, the Plaintiffs suggest that the following questions are both common and central to resolving their claims:

- Defendants' practices in labeling and marketing NAS Cigarettes as "natural" and "additive-free" tends to mislead reasonable consumers into believing that NAS Cigarettes may be less harmful than other cigarettes;

- Defendants engaged in deceptive or misleading acts or practices by labeling NAS Cigarettes as "natural" and "additive-free";

- NAS Menthol Cigarettes are in fact "additive-free" given that they contain the additive menthol;

- NAS Cigarettes are less harmful than other cigarettes;

- As a result of Defendants' misrepresentations, class members suffered an ascertainable loss;

- Class members either paid a price premium for the NAS Cigarettes that they would not have paid but for the false labeling and marketing of the NAS Cigarettes or would not have purchased them at all.

- Defendants should be enjoined from continuing to sell NAS Cigarettes as currently labeled.

Certification Motion at 45-46.

63.    The Defendants dispute that the Plaintiffs' proposed classes satisfy rule 23(a)(2)'s commonality requirement, instead insisting that "Plaintiffs' claims hinge on individualized issues." Certification Opposition at 20. They argue that the Plaintiffs' seven suggested common questions are neither "'central'" to the claims' validity nor "'capable of a common answer.'" Certification Opposition at 21 (citing Payne v. Tri-State CareFlight, 332 F.R.D. at 659). The Defendants argue that the first, second, fifth, and sixth questions "can be resolved only individually," for example, "by assessing what representations each putative class member actually saw over time," among other factual inquiries. Certification Opposition at 21. They then argue that the third and fourth questions are not "'central to the validity'" of the Plaintiffs' claims, in part because the Defendants "do not dispute Plaintiffs' contention that NAS cigarettes are not safer than other cigarettes," and because the "Plaintiffs can prevail only by establishing that consumers were *actually* misled into purchasing NAS cigarettes *based on* a belief . . . that menthol is *not* an additive . . . ." Certification Opposition at 21 (emphasis in original).

64.     In response, the Plaintiffs state that "[a]t the heart of Plaintiffs' claims is the question of whether Defendants' *uniform* marketing representations are false, deceptive, or misleading to a *reasonable consumer*."  Certification Reply at 4 (emphasis in original).  Further, the Plaintiffs assert that "substantial common evidence will *answer*," among other questions, "whether Defendants uniformly market NAS Cigarettes; whether Defendants' marketing leads a reasonable consumer to understand that NAS Cigarettes may be less harmful than other cigarettes; and whether and in what amount are economic damages attributable to Defendants' misrepresentations."  Certification Reply at 4 (emphasis in original).  The Plaintiffs also critique as inapposite the caselaw upon which Defendants rely, asserting that "[t]he facts of . . . employment discrimination cases are completely contrary to the facts of this consumer fraud case and, thus, not helpful."  Certification Reply at 5.  They refer specifically to the Defendants' reliance on Zuniga v. Bernalillo Cnty., 319 F.R.D. 640, arguing that it denied class certification on the basis of a policy that allowed discretion over employment matters.  See Certification Reply at 4.  Instead, the Plaintiffs call the Court's attention to cases that "mak[e] it clear that misrepresentations that evoke a common theme, including with varying words or images, can satisfy the commonality requirement."  Certification Reply at 5 (citing Miller v. Basic Rsch., LLC, 285 F.R.D. 647, 651-52 (D. Utah 2010)(Stewart, J.); Broomfield v. Craft Brew All., Inc., 2018 WL 4952519, at *1-2, *6).

65.     For the commonality analysis' purposes, the Court concludes that the Plaintiffs have made a showing sufficient to support the Nationwide Menthol Subclass' commonality.  The Court acknowledges the Defendants' argument that individual concerns undercut the Court's

ability to apply common answers to these questions[58]; however, that argument's consideration is more appropriate for the Court's predominance analysis, which it undertakes below. Instead, at this stage in its analysis, the Court considers whether there is "'[e]ven a single'" common question capable of generating a common answer that is central to the Nationwide Menthol Subclass' breach-of-express-warranty claim. Wal-Mart v. Dukes, 564 U.S. at 359 (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action at 176 n.110). "An express warranty generally consists of affirmations of fact or of promises by the seller to the buyer that relate to the goods and become part of the basis of the bargain, including sales by description . . . ." Defense Against a Prima Facie Case § 3:1 (Thomson Reuters rev. ed. 2022). In this action and throughout the class period, the Defendants marketed Natural American cigarettes using common descriptions and themes. See Findings of Fact, supra ¶ 35, at 9 ("Natural American's PPOD, at least until 2017, has been '100% additive-free natural tobacco' and, for its organic line, 'organic.'"); id. ¶ 36, at 10 ("[O]ther elements of Natural American labels and advertising . . . include themes like 'Made with Organic Tobacco,' 'Tobacco and Water,' and 'Grown on American Soil.'"); id. ¶ 40, at 11 ("Santa Fe Tobacco used the phrase '100% additive-free natural tobacco' on its packaging to describe the tobacco used in Natural American cigarettes from 1985 until 2017."). Because the Defendants displayed these descriptions and themes uniformly on the Natural American cigarette packaging and advertisement, see Findings of Fact, supra ¶ 46, at 12 ("The labels did not, and do not, vary from state to state."); id. ¶ 38, at 11 ("During the class periods, Santa Fe has uniformly labeled every

---

[58]In their predominance analysis, the Defendants assert that the Court must consider the breach-of-express-warranty claims under the laws of each State in which a class member purchased Natural American Spirit cigarettes -- for a nationwide class, all fifty States -- and, thus, there is no common answer whether the Defendants created an express warranty when they printed certain representations on the cigarette packaging. See Certification Opposition at 66.

pack of Natural American cigarettes as 'natural,' including in the brand name -- Natural American Spirit Cigarettes -- and corporate name -- Santa Fe Natural Tobacco Company."), the Court can look at these representations and determine in a single stroke, for example, whether they would mislead a reasonable consumer or whether a reasonable buyer would rely on them in purchasing Natural American cigarettes over other brands. These are "questions of law or fact" that are central to the Plaintiffs' breach-of-express-warranty claim at this stage of the rule 23(a) analysis, even if individualized concerns ultimately predominate upon the Court's rule 23(b)(3) analysis. Fed. R. Civ. P. 23(a)(2). Accordingly, the Court concludes that the Nationwide Menthol Subclass meets rule 23(a)(2)'s commonality requirement.

### C. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S TYPICALITY REQUIREMENT.

66.     Rule 23(a)(3) requires that the representative parties' claims or defenses be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. If a representative plaintiff "is subject to a unique defense that is likely to become a major focus of the litigation," however, that representative is not typical for rule 23(a)(3)'s purposes. In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599). With that exception in mind, however, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. See Milonas v. Williams, 691 F.2d at 938 ("In determining whether the typicality . . . requirement[] ha[s] been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")).

67.     The Plaintiffs argue that "[t]ypicality is satisfied when commonality is satisfied." Certification Motion at 47 (citing Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 382-83).  They assert further that the "Plaintiffs' claims are typical of the class members' claims because they are all based on the same underlying conduct and legal theories."  Class Certification Moton at 47.  They argue that the Plaintiffs were regular purchasers of Natural American cigarettes, which the Defendants labelled and marketed uniformly, and that this labelling and marketing conveyed to the Plaintiffs that Natural American cigarettes are less harmful than other brands.  See Certification Motion at 47.  The Plaintiffs also assert that they were unfamiliar with the menthol cigarette manufacturing process or whether menthol is a tobacco additive.  See Certification Motion at 47.

68.     The Defendants dispute that the Plaintiffs meet the typicality requirement, instead echoing their commonality argument and asserting that the named Plaintiffs' claims hinge on individualized issues.  See Certification Opposition at 22.  The Defendants additionally assert that several of the named Plaintiffs are "'subject to one or more unique defenses that likely will be central to the litigation.'"  Certification Opposition at 22 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 697.  Although they discuss several of the named Plaintiffs, two, Robert Litwin and Joshua Horne, stand as proposed representatives for the Nationwide Menthol Subclass.  See Certification Opposition at 23; SAC ¶ 127, at 43.  The Defendants argue that Litwin and Horne "admitted facts undermining their claim that they were misled into purchasing NAS cigarettes at a premium price.  These individuals' interests are not 'sufficiently aligned' with those of the class members . . . ."  Certification Opposition at 23 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 661).    The Defendants argue that Litwin and Horne "acknowledged that they have continued purchasing NAS cigarettes even after filing suit in this

litigation -- expressly acknowledging their belief that NAS cigarettes are not healthier or safer than others," and that, thus, "[t]hese named Plaintiffs cannot claim to have been misled into purchasing NAS cigarettes on the basis of a health misperception," which puts them in opposition to the proposed class, whom Plaintiffs argue "*were* misled into purchasing NAS cigarettes . . . ."   Certification Opposition at 23 (emphasis in original).   Additionally, the Defendants assert that Litwin "acknowledged that the 'majority of the time' he did not pay a premium for NAS because he used coupons."  Certification Opposition at 24 (quoting Deposition Transcript of Robert Litwin at 96:15-98:7 (taken May 23, 2018), filed July 23, 2020 (Doc. 287-14)(Biersteker, Haberman, Litwin))  Accordingly, the Defendants argue that Litwin and Horne's interests are not aligned with the other proposed class members.  See Certification Opposition at 24.

69.     The Plaintiffs in reply argue that their recovery theory, namely that, on the basis of common evidence, "*reasonable consumers* were misled by NAS Cigarettes' labeling such that they suffered economic damage . . . does not require inquiry into the subjective thinking of individual consumers."  Certification Reply at 6-7 (emphasis in original).  They argue that the Plaintiffs' claims are typical, because "the named Plaintiffs assert the same causes of action as the absent Class Members, and their claims are all based on the purchase of NAS Cigarettes, whose marketing implies to a reasonable consumer that they may be less harmful than other cigarettes . . . ."  Certification Reply at 7.  With respect to the Defendants' arguments that Horne and Litwin are atypical class representatives, the Plaintiffs argue that "the fact that consumers may have *continued* smoking NAS Cigarettes after having been deceived by Defendants does not mean that their claims are atypical," and that Litwin's belief that he "did not pay a price premium is irrelevant . . . because a price premium is the difference between what the consumer actually

paid and what they would have paid in the but-for world in which Defendants had not fraudulently marketed the product."  Certification Reply at 8.  The Plaintiffs also note that Horne and Litwin are not the sole named Plaintiffs in the Nationwide Menthol Subclass, and that, if the Court to determines that their claims are atypical, the Defendants have not challenged remaining representatives' typicality.  See Certification Reply at 8-9 nn. 4-5.[59]

70.    The Court concludes that the Nationwide Menthol Subclass satisfies rule 23(a)(3)'s typicality requirement.  The Court determines above that the Nationwide Menthol Subclass satisfies rule 23(a)(2)'s commonality requirement, and acknowledges that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  Thus, the Court looks primarily to whether Horne or Litwin, the two proposed named Plaintiffs whose typicality the Defendants have disputed, are "subject to a unique defense that is likely to become a major focus of the litigation."  In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599).

71.    Regarding the Defendants' first argument, that Horne and Litwin continued to smoke Natural American cigarettes after commencing this litigation, the Court concludes that this contention does not bear on whether their claims -- i.e., that, at some point prior to this litigation and during the proposed class period, Natural American cigarettes' marketing and labelling deceived them into purchasing the product on the basis that it was healthier than other brands -- are typical or atypical for absent class members.  If these Plaintiffs never had learned that Natural American cigarettes were, in fact, not healthier than other cigarettes, they never would have felt deceived, and, thus, presumably never would have brought this action before the

---

[59]The Plaintiffs also have requested that, should the Court determine that any of the proposed named Plaintiffs' claims are atypical, the Court grant leave to substitute new class representatives.  See Class Certification Reply at 9 n. 6.

Court to begin with.

72.     Regarding the Defendants' second argument, that Litwin often paid for his cigarettes using coupons and, thus, did not pay a price premium for the product, the Court disagrees that this defense is one that would render Litwin an atypical class representative.  As Dr. Dubé notes, "[t]he Price Premium measures the difference between the price that Class Members actually paid for the Challenged Products and the price they would have paid but for the Challenged Claims on the labels."  Dubé Report ¶ 23, at 9.  See Certification Reply at 8.  Thus, that Litwin may have paid less than other class members because he used coupons does not detract from the Plaintiffs' claims.  Under Dr. Dubé's price premium theory, the price that Litwin paid -- using a coupon -- for a package of Natural American cigarettes with the allegedly misleading statements still is higher compared to what he would have paid -- using a coupon -- for a package of Natural American cigarettes that did not contain the allegedly misleading statements.  Accordingly, the Court concludes that "all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances," DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1199, and that neither Horne nor Litwin are subject to a unique defense that would become one of the litigation's major focuses, see In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599).  The Court, therefore, determines that "a sufficient nexus exists between the claims of the named representatives and those of the class at large," Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 622 (citing Busby v. JRHBW Realty, Inc., 513 F.3d at 1320), and concludes that the named Nationwide Menthol Subclass members satisfy rule 23(a)(3)'s typicality requirement.

### D.   THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S ADEQUACY REQUIREMENT.

73.    The final rule 23(a) prerequisite that the Court must consider is whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).   The Tenth Circuit has identified two questions relevant to the adequacy-of-representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.   See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  The Defendants do not dispute that the representative parties satisfy rule 23(a)(4)'s adequacy requirement.  See Certification Opposition at 20.  Nevertheless, because intra-class conflicts "may negate adequacy under Rule 23(a)(4)," Langbecker v. Elec. Data Sys. Corp., 476 F.3d at 315-16 (holding that the district court erred in certifying a class without evaluating intra-class conflicts), the Court will evaluate the Plaintiffs' assertions that the proposed Nationwide Menthol Subclass representatives represent adequately the proposed class.[60]

---

[60]Traditionally, the adequacy-of-counsel analysis formed a part of the rule 23(a)(4) inquiry; however, rule 23(g) now encompasses this analysis instead.  See Fed. R. Civ. P. 23(g) (permitting courts, in addition to considering certain required factors, to "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class").  Upon amending rule 23 in 2003 to add subparagraph (g), the Advisory Committee on Rules of Civil Procedure stated:

> Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4).  This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process.  Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision.

74.     The Plaintiffs asserts that they "all share the same interests as the proposed classes they seek to represent because they all have the same claims."  Certification Motion at 48.  Specifically, "they paid money for NAS Cigarettes that they would not have paid but for Defendants' false, deceptive, and misleading advertising and breach of warranty."  Certification Motion at 48.  The Plaintiffs avow that their interests are "wholly aligned" with the unnamed class members' interests, and that "they are committed to prosecuting this action for the benefit of the class as a whole."  Certification Motion at 49 (citing Declaration of Melissa S. Weiner in Support of Plaintiffs' Motion for Class Certification at 9-10, filed July 23, 2020 (Doc. 280)).  The Plaintiffs state that they have "g[iven] depositions, produced documents, answered interrogatories, and are prepared to testify at trial," and that they are, therefore, adequate representatives.  Certification Motion at 49.  The Defendants do not dispute that the representative parties satisfy rule 23(a)(4)'s or rule 23(g)'s adequacy requirement.  See Certification Opposition at 20.

75.     The Court concludes that the Nationwide Menthol Subclass' named Plaintiffs represent adequately the unnamed class members.  First, as discussed above, the Court considers the named Plaintiffs to present common questions that are typical of the questions that the class

---

Fed. R. Civ. P. 23(g) Advisory Committee Notes to the 2003 Amendment.  This note suggests that the rule 23(a)(4) adequacy-of-class-representative analysis is distinct from the rule 23(g) adequacy-of-counsel analysis.  See Benedict v. Altria Grp., Inc., 241 F.R.D. 668, 673 (D. Kan. 2007)(O'Hara, M.J.)(" In 2003 . . . , Rule 23 was amended to add subparagraph (g) which governs the manner in which courts should supervise the appointment of class counsel.  Thus, the court will analyze separately the adequacy of counsel and of . . . the named plaintiff.").  Rule 23(a)(4)'s language, which refers to the "representative parties," however, has not changed in the versions previous to and after the 2003 amendment.  Fed. R. Civ. P. 23(a)(4).  Accordingly, although the Tenth Circuit issued its opinion in Rutter & Wilbanks Corp. v. Shell Oil Co. in 2002, before rule 23(g)'s addition, the Court will continue to apply the Tenth Circuit's two-factor test to determine the representative class members' adequacy.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

members present.   The Defendants have not asserted, and that Court on its own has not identified, any conflicts between the named Plaintiffs and the unnamed class members.   See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.   Second, the Court acknowledges that the named Plaintiffs have participated in the litigation process and are prepared to testify at trial.   In the absence of contrary evidence, the Court considers that the named Plaintiffs will remain engaged in further proceedings and will vigorously prosecute the action on the class' behalf.   See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88. Accordingly, the Court concludes that the Nationwide Menthol Subclass' named Plaintiffs have satisfied rule 23(a)(4)'s adequacy requirement.   See Fed. R. Civ. P. 23(a)(4); Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

### E.    THE NATIONWIDE MENTHOL SUBCLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT.

76.    Having determined that the Nationwide Menthol Subclass satisfies all four rule 23(a) requirements, the Court turns to the additional rule 23(b)(3) predominance and superiority requirements.   Regarding predominance for all of the proposed classes, the Plaintiffs note that they must show that the underlying cause of action presents common questions of law or fact, and then that class "damages are 'measurable on a class-wide basis through use of a common methodology.'"   Certification Motion at 50 (quoting Comcast Corp. v. Behrend, 569 U.S. at 30). The Plaintiffs argue that "predominance is satisfied[] when the driving issues in the case relate to the defendants' conduct or can be determined with respect to the class as a whole based on an objective standard."   Certification Motion at 51.   They note that materiality, for example, "is an objective question based on the reasonable person standard, and thus, it 'can be proved through evidence common to the class.'"   Certification Motion at 51 (quoting Amgen Inc. v. Conn. Ret.

Plans & Tr. Funds, 568 U.S. at 467).  They assert that "the elements [for every State's consumer protection laws] are substantially the same -- and in every instance, established by proof common to the class as a whole -- common issues predominate."  Certification Motion at 51.  The Plaintiffs also state that their "evidence focuses on Defendants' conduct and . . . will apply to all claims to prove objective issues . . . .  There is no need for any Plaintiffs or class members to present evidence regarding their individual circumstances to prove any of the claims."  Certification Motion at 53.

77.    With respect to the Nationwide Menthol Subclass, the Plaintiffs state that the Nationwide Menthol Subclass "seeks recovery for Defendants' breach of express warranty."  Certification Motion at 80.  They state further that, "[b]ecause this is a diversity action," the Court should use New Mexico's choice-of-law rules to determine which forum's law should apply to the nationwide claim.  See Certification Motion at 80.  They argue that, because the breach-of-express-warranty claims sound in contract, New Mexico applies the most-significant-relationship test "'to determine which state has the most significant relationship to the transaction and to the parties.'"  Certification Motion at 81 (quoting Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 55, 144 N.M. 405, 421, 188 P.3d 1156, 1172).  In addition to asserting that breach-of-express-warranty claims rely on the same "core elements" in any State, the Plaintiffs assert that New Mexico State contract law should apply to the claims, because New Mexico has the most significant relationship to the transaction.  Certification Motion at 81-82.  Accordingly, they argue that, under New Mexico law, "'[a] breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description,'" and, thus, individualized questions will not predominate.  Certification Motion at 83 (quoting Nowell v. Medtronic, Inc., 372 F. Supp. 3d 1166, 1222 (D.N.M. 2019)(Browning, J.)(quoting Badilla v. Wal-Mart Stores E.

Inc., 2015-NMSC-029, ¶ 21, 357 P.3d 936, 941)).

78.     The Plaintiffs also assert that they will prove class-wide damages.  Certification

Motion at 53.   They argue that "individualized questions about damages [do not] defeat

predominance."  Certification Motion at 53 (citing Naylor Farms, Inc. v. Chaparral Energy, LLC,

923 F.3d 779, 798 (10th Cir. 2019)).  They note that "Courts routinely certify consumer class

actions under Rule 23(b)(3) when the plaintiff presents expert testimony based on conjoint

analysis designed to isolate the portion of the payment attributable to the misrepresented product

attribute."  Certification Motion at 54 (citing Hadley v. Kellogg Sales Co., 324 F. Supp. 3d 1084,

1103-06 (N.D. Cal. 2018)(Koh, J.); In re Arris Cable Modem Consumer Litig., 327 F.R.D. 334,

366-70 (N.D. Cal. 2018)(Koh, J.); Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., 326

F.R.D. at 601, 614-16; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D. 326, 331-

33 (D.N.H. 2017)(McAuliffe, J.); Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529, 538-39

(S.D. Fla. 2015)(Dimitrouleas, J.); Khoday v. Symantec Corp., 93 F. Supp. 3d 1067, 1082 (D.

Minn. 2015)(Tunheim, J.)).  The Plaintiffs state that they have submitted the Dubé Report, which

concludes that "conjoint analysis can be used to determine class-wide economic damages."

Certification Motion at 56 (citing Dubé Report ¶ 3, at 4).  According to the Plaintiffs, conjoint

analysis involves surveying cigarette smokers and allows Dr. Dubé to calculate price premiums

and consumers' willingness to pay to estimate damages.  See Certification Motion at 57-58

(citing Dubé Report ¶¶ 17-50, at 8-21).

79.     The Defendants argue that the Plaintiffs have not satisfied the predominance

requirement for several reasons.  First, they argue that Plaintiffs have not demonstrated "an

administratively feasible method of proving who purchased the products," and assert that "such

proof would require individualized litigation."  Certification Opposition at 25 (citing Abraham v.

WPX Prod. Prods., LLC, 317 F.R.D. at 254).  Second, they argue that, even if the class members readily are ascertainable, questions regarding which class members saw what representations predominate, particularly regarding those class members who saw pre-October 1, 2017 descriptors and those who saw descriptors after that date, as well as who within each time period saw which descriptors.  See Certification Opposition at 30-32.  Additionally, they argue that the Plaintiffs cannot show that even those class members who saw the same messaging "understood those messages in the same way."  Certification Opposition at 42.  Third, regarding specifically the Nationwide Menthol Subclass, the Defendants argue that the relevant choice-of-law rules require the Court to apply each transferor jurisdiction's choice-of-law rules, which support applying the place of purchase's substantive law.  See Certification Opposition at 66-68.  The Defendants argue that these choice-of-law rules point to the express warranty laws of each of the fifty States, which the Defendants assert contain material variations, thus defeating predominance.  See Certification Opposition at 69 (citing MTD MOO at 231-39).  They argue further that, even if New Mexico law applies, New Mexico's express warranty requirements do not turn entirely on objective considerations, but turn also on the existence of the seller's assertion that form "'part of the basis of the bargain,'" which the Defendants assert the Plaintiffs cannot show.   Certification Opposition at 70-71 (quoting N.M.S.A. § 55-2-313(1)(a)-(b)).  Finally, the Defendants argue that the Plaintiffs have not put forth a valid damages calculation method that aligns with their liability theories.  See Certification Opposition at 72.  Specifically, they contend that this failure is because the methods do not measure damages attributable to the alleged deceptions -- i.e., instead of measuring the price premium attributable to the belief that natural cigarettes are safer, it measures the price premium attributable to all of the word natural's associations, such as its eco-friendly connotations -- and because willingness-to-pay is not a

valid damages measure in consumer-fraud cases.  See Certification Opposition at 73-79.

80.    The Plaintiffs maintain that all their proposed classes are readily identifiable, and that the "class definitions show class membership is based on . . . objective criteria -- specifically: (i) whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the . . . product(s), and (iii) when they purchased the . . . product(s)."  Certification Reply at 11 (citing Kumar v. Salov N. Am. Corp., No 14-cv-2411 YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016)(Rogers, J.)).  They also argue that the class members all saw "substantially similar" representations that conveyed the same core marketing message and that the class members' subjective understandings are irrelevant. Certification Reply at 14.  See id. at 13-19.  Regarding the Nationwide Menthol Subclass, the Plaintiffs argue that "the only relevant forum state is New Mexico" and that its choice-of-law rules apply.  Certification Reply at 37.  They also assert that the Defendants are incorrect that, "even if New Mexico substantive law applies, individualized inquiries will predominate," because New Mexico law "presumes that a representation is 'part of the basis of the bargain' when a reasonable consumer would rely on it in purchasing the product."  Certification Reply at 39 (no citation given for quotation).  They cite to the Court's MTD MOO for the proposition "that 'Natural American's additive-free descriptor on menthol cigarettes . . . misleads a reasonable consumer' and that the commingling of the menthol with the tobacco 'makes the menthol modifier inherently misleading.'"  Certification Reply at 39 (quoting In re Santa Fe Nat. Tobacco, 288 F. Supp. 3d at 1241).  Finally, they reiterate that their proposed damages model aligns with their liability theories and relies on common evidence, and that the willingness-to-pay and price-premium models are valid.  See Certification Reply at 39-43.

1.   **The Nationwide Menthol Subclass Members Are Readily Ascertainable Using Objective Criteria, but Administrative Feasibility Concerns Tilt Against a Conclusion that the Nationwide Menthol Subclass Satisfies Rule 23(b)(3)'s Predominance Requirement.**

81.   The Defendants contend that, because the Plaintiffs have not proposed an administratively feasible method to ascertain class members, and because the class members' identities can be proven only on an individual basis, they have not met the ascertainability prerequisite to class certification.   See Certification Opposition at 25-26 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254).   Specifically, they assert that consumers purchase cigarettes from retailers, and not from the Defendants, and that the Defendants do not have information that identifies cigarette purchasers.   See Certification Opposition at 26.   According to the Defendants, this lack of information means that each class member must prove on an individual basis that he or she purchased the product for which that class member seeks damages, "focusing on evidence from each separate claimant."   Certification Opposition at 26-27.   They argue that, "where no objective records can reliably identify the purchasers of the retail product at issue . . . the ascertainability requirement is unsatisfied."   Certification Opposition at 27 (citing In re Tropicana Orange Juice Mktg. & Sales Practices Litig., 2018 WL 497071, at *11 (D.N.J. January 22, 2018)(Martini, J.); Ault v. J.M. Smucker Co., 310 F.R.D. 69, 64-65 (S.D.N.Y. 2015) (Crotty, J.); In re Wellbutrin XL Antitrust Litig., 308 F.R.D. 134, 150 (E.D. Pa. 2015) (McLaughlin, J.); Bello v. Beam Glob. Spirits & Wine, Inc., 2015 WL 3613723, at *11 (D.N.J. June 9, 2015)(Hillman, J.); Randolph v. J.M. Smucker Co., 313 F.R.D. 679, 689-90 (S.D. Fla. 2014)(Bloom, J.).   The Defendants note that, while the Plaintiffs have discussed a consumer mailing list, that list does not identify who purchased specifically which brands of Natural American cigarettes.   See Certification Opposition at 28.   Finally, the Defendants assert that a

"non-trial, post-litigation administrative process" would be inconsistent with Walmart Stores, Inc. v. Dukes' requirement that each class member's claim be proved, avoiding trials by formula. Certification Opposition at 29 (citing Walmart Stores, Inc. v. Dukes, 564 U.S. at 367).

82.     The Plaintiffs respond that requiring an "'administratively feasible method of proving who purchased the products'" is a heightened ascertainably requirement which courts "routinely find . . . inconsistent with Rule 23." Certification Reply at 9 (quoting Certification Opposition at 25). They argue that the class "need only be readily identifiable according to objective criteria" and assert that their proposed classes are so identifiable. Certification Reply at 9. The Plaintiffs argue that, instead of requiring a heightened ascertainability requirement, Tenth Circuit law "has instead emphasized that the district court has significant discretion to determine the method for trial of a case based on its particular facts, including to certify classes as appropriate," and note that other Courts of Appeals are in accord with giving the district courts such discretion. Certification Reply ay 10 (citing Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999); Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1123 (9th Cir. 2017); In re Petrobras Sec., 862 F.3d 250, 268 (2d Cir. 2017); Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 995-96 (9th Cir. 2016); Rikos v. Procter & Gamble Co., 799 F.3d 497, 525 (6th Cir. 2015); Mullins v. Direct Digital, LLC, 795 F.3d 654, 658 (7th Cir. 2015)). The Plaintiffs highlight the Third Circuit as being one of "a few courts" to have imposed an administratively-feasible requirement, Certification Reply at 10 (citing Byrd v. Aaron's Inc., 784 F.3d 154 (3d Cir. 2015)), and note that the Honorable Daniel D. Crabtree, United States District Judge for the United States District Court for the United States District of Kansas has "'predict[ed] that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of rule 23 requiring certification movants to satisfy the more

stringent ascertainability standard adopted by the Third Circuit,'" Certification Reply at 10 (quoting In re EpiPen Mktg., Sales Practices & Antitrust Litig., No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *11 (D. Kan. March 10, 2020)(Crabtree, J.))(alteration added in Certification Reply).  The Plaintiffs argue that class member identification, "as in similar class actions, can take place at the claims administration stage with self-identification using, *inter alia*, sworn affidavits, claim forms, receipts, and other purchase records."  Certification Reply at 11.  The Plaintiffs advocate against giving ascertainability "'absolute priority,'" as a heightened standard will be redundant to the other explicit rule 23 requirements.  Certification Reply at 11 (quoting Mullins v. Direct Digital, LLC, 795 F.3d at 658).  Finally, the Plaintiffs assert that the Defendants' reliance on Walmart Stores, Inc. v. Dukes is misplaced, because they have not proposed to use a sampling method to prove the class members' claims, which was the method with caused the Supreme Court to deny the use of trial by formula.  See Certification Reply at 12; Walmart Stores, Inc. v. Dukes, 564 U.S. at 367.  They also distinguish the Defendants' reliance on the Court's opinion in Abraham v. WPX Production Productions, LLC, given that there will be no "tracing problem" in identifying who purchased Natural American cigarettes, contrary to the difficult task of determining which leases' gas had been processed at which processing plants.  Certification Reply at 12-13 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 255).

83.     As both the Plaintiffs and the Defendants have noted, the Court previously has used both the "objective criteria" and the "administratively feasible" standards in evaluating whether a proposed class is readily ascertainable.  See Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58.  In Abraham v. WPX Production Productions, LLC, the Court explains the ascertainability requirement's objectives:

First, it eliminates "serious administrative burdens that are incongruous with the efficiencies expected in a class action" by insisting on the easy identification of class members.  Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (quoting Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa.2000) (Van Antwerpen, J.)).  Second, it protects absent class members by facilitating the "best notice practicable" under rule 23(c)(2) in a rule 23(b)(3) action.  See Manual for Complex Litigation, § 21.222 (4th ed. 2004).  Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.  See Xavier v. Phillip Morris USA, Inc., 787 F.Supp.2d 1075, 1089 (N.D.Cal.2011)(Alsup, J.)("Ascertainability is needed for properly enforcing the preclusive effect of final judgment.  The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment . . . ."); 1 William B. Rubenstein et al., Newberg on Class Actions, § 3:1 (5th ed.).

Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254.  The Court notes in Abraham v. WPX Production Productions, LLC, that the proposed class "raises problematic ascertainability issues," notably that the plaintiffs could not identify which leases' gas had been delivered to certain processing plants for natural gas liquid extraction and marketing, because some gas was not processed at all, and some gas was collected and, in some cases, redirected to more than one plant.  317 F.R.D. at 254-257.  The Court concludes in Abraham v. WPX Production Productions, LLC that the Court's inability to "determine where one substantial category of gas flowed renders the class unascertainable."  317 F.R.D. at 257 & n.63 (distinguishing Anderson Living Trust v. WPX Energy Production, LLC, 306 F.R.D. 312, where "individual issues surrounding which gas was processed did not prevent class certification," because the plaintiffs in that case did not "tie their class definition to the gas being processed at certain plants").  Additionally, the Court in Abraham v. WPX Production Productions, LLC notes that determining whether gas flowed through certain gathering systems would not be "'administratively feasible,'" which the Court defined as "'mean[ing] that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'"

317 F.R.D. at 258 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013)).  The Court cites additionally to EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2014), noting that the Fourth Circuit did not certify the proposed class on the basis of ascertainability, because, although "some class members were easy to identify . . . others 'could be determined by reference to local land records.'"   Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359).  Further, even though the plaintiffs feasibly could have combed through the land records, "the Fourth Circuit concluded that it would 'be a complicated and individualized process,' which 'pose[s] a significant administrative barrier to ascertaining the ownership classes.'"   Abraham v. WPX Production Productions, LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359)(alteration added in Abraham v. WPX Prod. Prods., LLC).

84.    A split has developed among the Courts of Appeals whether to apply an administrative feasibility requirement for a proposed class.[61]  The Third Circuit developed its ascertainability analysis first in Marcus v. BMW of N. Am., LLC, 687 F.3d 583, where it insisted on administrative feasibility and the need for "easy identification of class members." 687 F.3d at 593 (citing Sanneman v. Chrysler Corp., 131 F.R.D. at 446).  This requirement is  a more stringent standard than that which other courts use to determine ascertainability.  See C. Wright & A. Miller, Federal Practice & Procedure § 1760 & n.13 (4th ed. 2023)(calling the Third Circuit's requirement "enhanced").  The Third Circuit, in remanding the case, cautioned "against approving a method that would amount to no more than ascertaining by potential class members' say so . . . .  Forcing [defendants] to accept as true absent persons' declarations that

---

[61]The United States Court of Appeals for the D.C. Circuit and the United States Court of Appeals for the Federal Circuit have not addressed whether to include an administrative feasibility requirement in the ascertainability analysis.

they are members of the class, without further indicia of reliability, would have serious due process implications."  Marcus v. BMW of N. Am., LLC, 687 F.3d at 594.  "'Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'"  Carrera v. Bayer Corp., 727 F.3d at 307-08 (quoting Newberg on Class Actions § 3:3).  The Third Circuit in Carrera v. Bayer Corp. rejected the plaintiff's arguments that: (i) the claims' low value would mean that class members likely would not submit fraudulent affidavits; (ii) determining a fixed liability amount would prevent prejudice to the defendant and, thus, the Third Circuit should relax the ascertainability requirement; and (iii) screening methods could weed out unreliable affidavits.  See 727 F.3d at 309-12.  The First Circuit cited Carrera v. Bayer Corp. positively, noting that, "[a]t the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members.  The court may proceed with certification so long as this mechanism will be 'administratively feasible' . . . ."  In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)(quoting Carrera v. Bayer Corp., 727 F.3d at 307).  As mentioned above, the Fourth Circuit previously vacated and remanded the district court's class certification, because the certified class was not ascertainable.  See EQT Prod. Co. v. Adair, 764 F.3d at 359-60.  In explaining the ascertainability standard, the Fourth Circuit cited Wright & Miller's Federal Practice & Procedure for the proposition that "'[t]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.'"  EQT Prod. Co. v. Adair, 764 F.3d at 358 (quoting Federal Practice & Procedure § 1760).  See Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019)("The goal is not to 'identify every class member at the time of certification,' . . . but to define a class in such a

way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." (quoting <u>EQT Prod. Co. v. Adair</u>, 764 F.3d at 358)).

85.     Other Courts of Appeals, on the other hand, have opted not to apply an administrative feasibility requirement.  The Seventh Circuit, for example, has specifically rejected heightening the ascertainability requirement, stating that the administratively feasible requirement "erect[s] 'a nearly insurmountable hurdle' for class certification," and "'does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements . . . .  The stringent version of ascertainability effectively bars low-value consumer class actions, at least where plaintiffs do not have documentary proof of purchases, and sometimes even when they do.'"  <u>Federal Practice & Procedure</u> § 1760 (quoting <u>Mullins v. Direct Digital, LLC</u>, 795 F.3d 654, 662 (7th Cir. 2015), <u>cert. denied</u> 136 S. Ct. 1161).  Other Courts of Appeals also have rejected the heightened requirement.  For example, the Second Circuit notes that "creating [an administrative feasibility prerequisite] would upset the careful balance of competing interests codified in the explicit requirements of Rule 23.  In declining to adopt an administrative feasibility requirement, we join a growing consensus that now includes the Sixth, Seventh, Eighth, and Ninth Circuits."  <u>In re Petrobras Secs.</u>, 862 F.3d at 265, 268 (citing <u>Briseno v. ConAgra Foods, Inc.</u>, 844 F.3d at 1123 (stating that "[w]e have never interpreted Rule 23 to require such a showing [of administrative feasibility], and, like the Sixth, Seventh, and Eighth Circuits, we decline to do so now," but also noting that administrative feasibility is a factor to consider in determining predominance and superiority); <u>Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.</u>, 821 F.3d at 995-96 ("Since <u>Ihrke [v. N. States Power Co.</u>, 459 F.2d 566 (8th Cir.1972)], this court has not addressed ascertainability as a separate,

preliminary requirement.  Rather, this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" (quoting Ihrke v. N. States Power Co., 459 F.2d at 573 n.3)); Rikos v. Procter & Gamble Co., 799 F.3d at 525 ("We see no reason to follow Carrera, particularly given the strong criticism it has attracted from other courts."), cert. denied, 136 S. Ct. 1493 (2016); Mullins v. Direct Digital, LLC, 775 F.3d at 657-58 (stating that "[w]e decline to [apply an administrative feasibility requirement] and will stick with our settled law.  Nothing in Rule 23 mentions or implies this heightened requirement under Rule 23(b)(3), which has the effect of skewing the balance that district courts must strike when deciding whether to certify classes," and noting that rule 23's existing requirements "already address the balance of interests that Rule 23 is designed to protect"); Byrd v. Aaron's Inc., 784 F.3d at 177 (Rendell, J., concurring)(suggesting that the Third Circuit eliminate the administrative feasibility prong)).

86.    The Fifth Circuit has applied the administrative feasibility standard in some cases, but not in others.  In Seeligson v. Devon Energy Production Co., 761 F. App'x 329 (5th Cir. 2019), the Fifth Circuit concludes that the lower court "did not abuse its discretion in determining that the class . . . was ascertainable."  761 F. App'x at 334.  In reaching that conclusion, the Fifth Circuit states that it "has not adopted [the Third Circuit's] heightened standard" in Carrera v. Bayer Corp., although the standard to which the Fifth Circuit refers states that a plaintiff must show, "'by a preponderance of the evidence, that the class is '*currently* and readily ascertainable based on objective criteria.'"  Seeligson v. Devon Energy  Prod. Co., 761 F. App'x at 334 (quoting Carrera v. Bayer Corp., 727 F.3d at 306 (quoting Marcus v. BMW of N. Am., 687 F.3d at 593))(emphasis added in Seeligson v. Devon Energy Prod. Co.).  The Fifth Circuit also notes that it is "not convinced" by the defendant's argument "that Plaintiffs'

proposed alternative -- reviewing property and title records -- is not administratively feasible and therefore fails to satisfy Rule 23's ascertainability requirements."   Seeligson v. Devon Energy Prod. Co., 761 F. App'x at 334 n.22.   More recently, however, the Fifth Circuit stated that, "[u]ltimately, 'the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.''"   A.A. by and through P.A. v. Phillips, No. 21-30580, 2013 WL 334010, at *2 (5th Cir. January 20, 2023)(quoting Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015)(quoting Federal Practice & Procedure, supra § 1760)).[62]   The Fifth Circuit in A.A. by and through P.A. v. Phillips, however, did not determine that the proposed class was not ascertainable on administrative feasibility grounds, but because the district court's class definition was "too vague to identify class members."   2023 WL 334010, at *3.

87.   Finally, the Tenth Circuit only tangentially has referred to the Third Circuit's heightened standard.   In In re Urethane Antitrust Litigation, 768 F.3d 1245 (10th Cir. 2014), for example, the defendant cited Carrera v. Bayer Corp. in asserting "an interest in the allocation of damages to ensure that all class members are bound by the judgment."   In re Urethane Antitrust Litig., 768 F.3d at 1269.   The Tenth Circuit states that Carrera v. Bayer Corp. is inapplicable in that context:

> Carrera v. Bayer Corp. likewise involved a class-wide judgment with an uncertain binding effect.  727 F.3d 300, 310 (3d Cir. 2013).  The class there had been decertified because there was insufficient evidence of an ascertainable class.  As a result, the class members could argue that they were not bound by the judgment.  Id.
>
> Unlike the defendants in . . . Carrera, Dow has not identified any reason

---

[62]The Second Circuit issued its opinion in Brecher v. Republic of Argentina in 2015, two years before its opinion in In re Petrobras Secs., where it explicitly declined to apply the administrative feasibility requirement.  See In re Petrobras Secs., 862 F.3d at 265

to believe that the judgment here would fail to bind all class members.

768 F.3d at 1269. The only other case in which the Tenth Circuit has referenced the administrative feasibility requirement is in Davoll v. Webb, in which it concludes that the district court did not abuse its discretion in determining that "the individualized consideration required to determine whether each class member was disabled under the ADA rendered the proposed definition 'untenable.'" 194 F.3d at 1146 (quoting Davoll v. Webb, 160 F.R.D. 142, 146 (D. Colo. 1995)(Kane, Sr. J.)). The Tenth Circuit notes that "'[t]he district court has broad discretion to determine whether the class description is sufficiently definite,'" Davoll v. Webb, 194 F.3d at 1146 (quoting Moore's Federal Practice § 23.21[5] at 23-61), and, accordingly, "it was within the district court's discretion to decide that determining class membership under the proposed definition would be administratively infeasible," 194 F.3d at 1146. Thus, although the Tenth Circuit has not adopted the Third Circuit's administrative feasibility requirement, it has made clear that the district courts do not err when they determine that individualized inquiries render class certification administratively infeasible.

88.    As the Court notes above, it has considered ascertainability once before this case, in Abraham v. WPX Prods. Prod., LLC, where the Court concluded that the class was not ascertainable, because "no existing database can identify the proposed class. Moreover, it is not feasible for the Court to identify which wells' gas was processed in each year. Doing so is an individual and time-consuming inquiry."[63]  317 F.R.D. at 258. Within the Tenth Circuit, several

---

[63]On reconsideration, the plaintiffs submitted a new proposed class definition, which the Court determined was ascertainable, because "the Defendants appear to have records showing who they pay on the keep-whole methodology, [and so] there is 'a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified.'"  Abraham v. WPX Energy Prod., LLC, 322 F.R.D. 592, 642 (D.N.M. 2017)(Browning, J.)(quoting Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006)).

district courts -- in addition to the Court -- have addressed whether to apply the administrative feasibility requirement.   In Smith v. LifeVantage Corp., 341 F.R.D. 82 (D. Utah 2022), the Honorable David B. Barlow, United States District Judge for the United States District Court for the United States District of Utah, reviewed the same Court of Appeals split that the Court has reviewed above.   See 341 F.R.D. at 91-96.   Judge Barlow states that "the court need not resolve the issue [of which ascertainability standard to apply and whether ascertainability is required] because the substance of those concerns either are not present here or are relevant to and addressed by the predominance and superiority requirements."   341 F.R.D. at 94.   Although he does not adopt the administrative feasibility requirement, Judge Barlow considers any administrative feasibility question to be inherent to the predominance and superiority analysis, stating:

> [T]he court finds that whether identifying which distributors meet the class criterion of financial loss at the damages stage is administratively feasible depends on whether it can be done without destroying the predominance of common issues or the superiority of the class action mechanism.   If common issues predominate and a class action would be superior despite the need for individualized damages determinations, the court would be reluctant to declare those individualized determinations an administratively infeasible method for ascertaining class membership.   On the other hand, if the individualized damages determinations needed to identify class members destroy the predominance of common issues and superiority of the class action, identifying class members would be de facto administratively infeasible.
>
> Therefore, whether the proposed class is ascertainable will rise or fall with the court's findings regarding predominance and superiority.   For that reason, the court declines to deny certification in this case on grounds of ascertainability alone.

341 F.R.D. at 96.   In Evans v. Brigham Young University, Case No. 1:20-CV-100-TS, 2022 WL 596862 (D. Utah February 28, 2022), however, the Honorable Ted Stewart, United States District Judge for the United States District Court for the United States District of Utah,

acknowledges the different requirements between the Third and Seventh Circuits, but concludes that the plaintiffs in that case did not demonstrate ascertainability under either an administrative-feasibility theory or under an objective-criteria theory.  See 2022 WL 596862, at *3-*4.  In Lavigne v. First Community Bancshares, Inc., No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018), the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the United States District of New Mexico, states that, "[f]or a class definition to be ascertainable, identifying class members must be administratively feasible," but concluded that ascertaining the proposed class members in that case was administratively feasible.  2018 WL 2694457, at *7.  Courts within each of Oklahoma's three judicial districts also have applied the administrative feasibility requirement.  See Cline v. Sunoco, Inc., 333 F.R.D. 676, 688 (E.D. Okla. 2019)(Gibney, J.)(citing Federal Practice & Procedure, supra § 1760; Carrera v. Bayer Corp., 727 F.3d at 306-07); In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig., No. 12-ML-2048-C, 2014 WL 104964, at *2 (W.D. Okla. January 9, 2014)(Cauthron, J.)(quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)); Cole v. ASARCO Inc., 256 F.R.D. 690, 696 (N.D. Okla. 2009)(Frizzell, J.)(quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.); Cherokee Nation of Oklahoma v. United States, 199 F.R.D. 357, 360 (E.D. Okla. 2001)(Seay, J.)).  Finally, the Honorable Nancy D. Freudenthal, Chief United States District Judge for the United States District Court for the District of Wyoming, has cited Carrera v. Bayer Corp. for the proposition that a class must be readily ascertainable, "such that the Court can easily understand who and what is in, or our of, the class," and has offered plaintiffs seeking class certification an opportunity to revise the class definition "to be sufficiently precise and objective so that it is administratively feasible for the Court to ascertain" who are the class members.  Belmont v. BP

Am. Prod. Co., No. 13-CV-0063, 2015 WL 11019026, at *5 (D. Wyo. January 8, 2015) (Freudenthal, C.J.)(citing Carrera v. Bayer Corp., 727 F.3d at 305-12).

89.     When determining whether identifying a proposed class' members is administratively feasible, the Third Circuit has stated that "[a]ffidavits from potential class members, standing alone, without 'records to identify class members or a method to weed out unreliable affidavits,' will not constitute a reliable and administratively feasible means of determining class membership." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 441 (3d Cir. 2017)(quoting Byrd v. Aaron's Inc., 784 F.3d at 171). "Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (citing Clavell v. Midland Funding LLC, No. 10–3593, 2011 WL 2462046, at *4 (E.D. Pa. June 21, 2011)(Dalzell, J.); Sadler v. Midland Credit Mgmt., Inc., No. 06–C–5045, 2008 WL 2692274, at *5 (N.D. Ill. July 3, 2008)(Pallmeyer, J.); In re Wal–Mart Stores, Inc. Wage & Hour Litig., No. C 06–2069 SBA, 2008 WL 413749, at *8 (N.D. Cal. February 13, 2008)(Armstrong, J.); Deitz v. Comcast Corp., No. C 06–06352 WHA, 2007 WL 2015440, at *8 (N.D. Cal. July 11, 2007)(Alsup, J.)). In Meyer v. BMW of North America, LLC, the Third Circuit concluded that a class definition of BMW owners whose tires had gone flat and been replaced was not administratively feasible, given that BMW did not have records of all BMW owners whose tires fit that definition, because not all BMW owners went to the dealership to replace their tires. 687 F.3d at 593-94. The Third Circuit also "caution[s] . . . against approving a method that would amount to no more than ascertaining by potential class members' say so. For example, simply having potential class members submit affidavits that their Bridgestone RFTs have gone flat and been replaced may not be 'proper or just.'" Meyers v. BMW of N.

Am., LLC, 687 F.3d at 594 (citing Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)(Alsup, J.)(concluding that the plaintiffs' proposed class definition was not ascertainable, because, "[u]nlike in many cases, there are no defendant records on point to identify class members," and because individual affidavits regarding the number of cigarettes a potential class member has smoked are unreliable)).  That a defendant does not have reliable records with which plaintiffs can identify readily the proposed class members does not relieve those plaintiffs of their burden to meet the ascertainability requirement.  See Hayes v. Wal-Mart Stores, Inc., 725 F.3d at 356.

90.     As the Seventh Circuit has noted, the administrative feasibility requirement erects a high barrier for potential class actions, particularly in the low-value consumer class action context.  See Mullins v. Direct Digital, LLC, 795 F.3d at 662 ("[S]ome courts have used [the administrative feasibility] requirement to erect a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims.").  This assertion has proven true in several consumer class actions regarding products like orange juice, see In re Tropicana Orange Juice Mktg. & Sales Practices Litig., 2018 WL 497071, at *11 (rejecting a proposed class, because several orange juice retailers did not maintain adequate records regarding who purchased their products), cooking oil, see Ault v. J.M. Smucker Co., 310 F.R.D. at 64-65 (concluding that a proposed class of consumers who purchased a certain cooking oil brand was not ascertainable where defendant did not sell its products to end users and defendant sold multiple brands with different labels at different times), and beverages, see Bello v. Beam Glob. Spirits & Wine, Inc., 2015 WL 3613723, at *9-12 (rejecting the use solely of claim forms without verifiable records or documents, and asserting that "acceptance of receipts as evidence of purchase would not necessarily prevent the

submission of fraudulent claims").   The Seventh Circuit notes that, although courts "must consider 'the likely difficulties in managing a class action,' . . . in doing so [they] must balance countervailing interests to decide whether a class action 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'"   Mullins v. Direct Digital, LLC, 795 F.3d at 658 (quoting Fed. R. Civ. P. 23(b)(3)).

91.    Judges within the Third Circuit have echoed the Seventh Circuit's concerns that requiring plaintiffs to meet an administrative feasibility requirement "undermines the 'very core' of cases that the class action device was designed to bring to court: cases where many consumers have been injured, but none have suffered enough to make individual actions possible."  City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring); Byrd v. Aaron's Inc., 784 F.3d at 172 (Rendell, J., concurring).  The Honorable Julio M. Fuentes, United States Circuit Judge for the Third Circuit, has argued that administrative feasibility is not necessary to serve the values which the Third Circuit in Marcus v. BMW of N. Am., LLC recognized -- namely "absent plaintiffs' opt-out rights and interest in not having future claims diluted," "a defendant's due process rights," and "the efficiency of the class action mechanism" -- because rule 23's existing predominance and superiority requirements already protect those values sufficiently.  City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring).  Judge Fuentes notes first that the concern that false or fraudulent claims will dilute absent class members' recovery is misaligned with class administration's reality, because: (i) the number of eligible class members who submit claims in most consumer cases is low, so fraudulent claims are unlikely to dilute class members' recovery; (ii) "'[t]he chances that someone would, under penalty of perjury, sign a false affidavit stating that he or she bought Bayer aspirin for the sake of receiving a windfall of $1.59 are far-fetched at

best,'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Byrd v. Aaron's Inc., 784 F.3d at 175 (Rendell, J., concurring))(alteration in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., but not in Byrd v. Aaron's Inc.)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130); (iii) courts have tools to screen fraudulent claims, such as claims administrators, audits, random sampling to detect fraud, and follow-up notices, among other techniques; and (iv) the Third Circuit accepts cy pres remedies in class actions, which allow "the distribution of unclaimed class action damages to non-class members," City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Briseno v. ConAgra Foods, Inc., 844 F.3d at 1129)(citing Mullins v. Direct Digital, LLC, 795 F.3d at 667; Newberg on Class Actions § 12:32; In re Baby Prod. Antitrust Litig.y Prod. Antitrust Litig., 708 F.3d 163, 172 (3d Cir. 2013); Geoffrey C. Shaw, Note, Class Ascertainability, 124 Yale L.J. 2354, 2371 (2015)).

92.     Second, Judge Fuentes asserts that the arguments that an administrative feasibility requirement protects defendants by identifying clearly those plaintiffs whom the final judgment binds and by securing the defendant's due process right to raise individual defenses are flawed. See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446.  Judge Fuentes asserts that the existing objective-criteria requirement, which demands that "a class must be defined in reference to objective criteria, already allows courts to determine whether a plaintiff in a future action was a member of a prior class and thus is precluded from relitigation."  City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446 (Fuentes, J., concurring)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130 n.9).  Additionally, he asserts that a defendant may challenge individual class members and individual damages later in the litigation, and "does not have a due process right to the most 'cost-effective' method for

challenging individual claims . . . and these challenges are more appropriately addressed after certification." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(citing Mullins v. Direct Digital, LLC. 795 F.3d at 671 (italics added in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.); Briseno v. ConAgra Foods, Inc., 844 F.3d at 1132; Wal-Mart Stores Inc. v. Dukes, 564 U.S. at 364-65).

93.    Judge Fuentes asserts finally that rule 23(b)'s superiority requirement addresses already any efficiency concerns.  "Specifically, Rule 23(b)(3) requires that the class device be 'superior to other available methods for fairly and efficiently adjudicating the controversy' and considers 'the likely difficulties in managing a class action.'   Thus, imposing a separate manageability requirement within ascertainability 'renders the manageability criterion of the superiority requirement superfluous.'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(quoting Fed. R. Civ. P. 23(b); Mullins v. Direct Digital, LLC, 795 F.3d at 663 (citing Daniel Luks, Note, Ascertainability in the Third Circuit: Name That Class Member, 82 Fordham L. Rev. 2359, 2395 (2014))).  Judge Fuentes notes that courts must "weigh the costs *and* benefits of certification," and that placing the administrative feasibility requirement in the ascertainability analysis as a prerequisite "forces courts to consider the costs 'in a vacuum' without considering the realistic alternatives available to plaintiffs for bringing their claims." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(quoting Mullins v. Direct Digital, LLC, 795 F.3d at 663)(emphasis in original).  Judge Fuentes asserts that district courts are capable of managing their cases at the claims administration stage, and should be permitted to wait until the claims administration process has begun, "'when much more may be known about available records, response rates, and other relevant factors'" to determine whether to decertify a class, in the event that the class

becomes unmanageable.  City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at

448 (Fuentes, J., concurring)(quoting Mullins v. Direct Digital, LLC, 798 F.3d at 664)(citing

Carrera v. Bayer Corp., Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation

at 7-8; Byrd v. Aaron's Inc., 784 F.3d at 175).

94.     While an administrative feasibility requirement is not an express requirement in

rule 23's language, it is built into 23(b)(3)(D).  Rule 23(b)(3) states:

> The matters pertinent to [the predominance and superiority] findings include
>
> > (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).    Determining whether a proposed class's members will be

administratively feasible is a question inherent to the Court's consideration of "the likely

difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  Further, although the

ascertainability requirement threatens to block some low-value consumer classes from

certification, it by no means blocks all -- just some.  The choice is really between considering the

difficulties in managing a class action now and the difficulty of identifying class members now,

or kicking the issue down the road to the claim administration stage -- which is after the case has

been certified.  This gives plaintiffs the advantage of trying to secure a settlement without the

district court ever deciding the difficulties in managing a class action.  While plaintiffs prefer not

to bother about the difficulties of managing a class action, the rule requires the district court to

consider difficulties at class certification, and not just postpone them.

95.     An administrative-feasibility requirement does not endanger all low-value consumer classes.  In many low-value consumer cases, the consumer is readily ascertainable and administratively feasible to identify.  The requirement only endangers classes where the consumers are not ascertainable.  Many times, the defendant knows its customers, and the information can be ascertained from the defendant's documents.  It is only cases where the actual consumer cannot be ascertained that this requirement creates problems.  And when it does create problems, the question is why the class action -- largely manufactured by attorneys -- should go forward when the actual victims cannot be determined.

96.     On a clean slate, as the Court did in Abraham v. WPX Production Productions, LLC, the Court would adopt the Third Circuit's administrative-feasibility requirement.[64]  Given, here, the extensive debate in the Court of Appeals, the Court does not believe the Tenth Circuit will follow the Third Circuit's rule.  The Court determines that it is more likely that the Tenth Circuit will conclude that administrative feasibility is a part of the rule 23(b)(3)(A)-(D) considerations, and, accordingly, weigh administrative feasibility in its analysis of rule 23(b)(3)'s

---

[64]The Court would adopt the Third Circuit's rule for similar reasons that the Third Circuit identified in announcing the rule.  See Marcus v. BMW of N. Am., LLC, 687 F.3d at 593.  First, an administrative-feasibility requirement ensures that the Court and the parties easily can identify class members.  Engaging in prolonged class certification litigation only to end up with a claims administration process that struggles to identify class members without engaging in individualized inquiries is not an efficient use of time and resources.  Second, an administrative feasibility requirement protects class members' rights, because such a requirement limits fraudulent claims and ensures that only valid class members obtain relief, which is important particularly where defendants are ordered to pay a lump-sum judgment of which each class member takes a share.  Third, an administrative feasibility requirement protects defendants' rights, because requiring clear records and documentation avoids "mask[ing] individual issues" and enables defendants to exercise their rights under the Seventh Amendment to challenge individual claimants.  Carrera v. Bayer Corp., 727 F.3d at 307.

predominance and superiority analysis, but not view administrative feasibility as a prerequisite

the failure of which dooms a proposed class.[65]   The Defendants raise their administrative

---

[65]In this regard, the Court predicts that the Tenth Circuit will align with the Eleventh Circuit's formulation of this rule, and determine that ascertainability requires a class definition that relies on objective criteria, but that the 23(b)(3) predominance and superiority analyses encompass the administrative feasibility determinations.  See Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir. 2004)(listing "identifiability" as one of rule 23(b)(3)'s elements); Cherry v. Dometic Corp., 986 F.2d 12996, 1301-05 (11th Cir. 2021).  In Cherry v. Dometic Corp., the Eleventh Circuit concludes that ascertainability is a rule 23(a) prerequisite and that administrative feasibility is not relevant to ascertainability, but rather is a part of a court's consideration under rule 23(b)(3)(D)'s manageability criteria.  See 986 F.3d at 1303-05.  The Eleventh Circuit notes that it previously applied an administrative feasibility requirement in Karhu v. Vital Pharms., Inc., 621 F. App'x 945, 946 (11th Cir. 2015)(citing Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014)), but that this line of cases is unpublished and therefore not binding precedent.  See Cherry v. Dometic Corp., 986 F.3d at 1302.  In walking back from its previous analysis, the Eleventh Circuit states:

> Our ascertainability precedents though do not mandate proof of administrative feasibility.  A class is "clearly ascertainable" if we are certain that its membership is "capable of being" determined.  *Ascertain*, *Webster's New International Dictionary* (3d ed. 1993); *Ascertainable*, *Webster's New International Dictionary* (3d ed. 1993).  But membership can be capable of determination without being capable of *convenient* determination.  Administrative feasibility is not an inherent aspect of ascertainability.

> . . . .

> Administrative feasibility does not follow from the text of Rule 23(a).  Unlike traditional ascertainability, administrative feasibility does not bear on the ability of a district court to consider the enumerated elements of that subsection.  A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class *after* certification.  *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 396-97 (3d Cir. 2015).  The plaintiff satisfies this requirement if the district court concludes that the proposed process will be manageable and successful.  *Byrd*, 784 F.3d at 163-64.  But neither foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives, the practicability of joinder of all members, or the existence of common questions of law or fact.  Fed. R. Civ. P. 23(a).  Because administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry.

_____

Nor does a requirement of administrative feasibility follow from Rule 23(b). To be sure, administrative feasibility has relevance for Rule 23(b)(3) classes, in the light of the manageability criterion of Rule 23(b)(3)(D). *See* Rubenstein, 2 *Newberg on Class Actions* § 4:76, at 301 (5th ed. 2012). Rule 23(b)(3)(D) instructs the district court, in deciding whether "a class action [would be] superior to other available methods for fairly and efficiently adjudicating the controversy," to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). A difficulty in identifying class members is a difficulty in managing a class action. *See Briseno*, 844 F.3d at 1126. But because Rule 23(b)(3) requires a balancing test, it does not permit district courts to make administrative feasibility a requirement. The manageability inquiry focuses on whether a class action "will create relatively more management problems than any of the alternatives," not whether it will create manageability problems in an absolute sense. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 . . . (2008). And the district court must balance its manageability finding against other considerations. Fed. R. Civ. P. 23(b)(3). So administrative difficulties -- whether in class-member identification or otherwise -- do not alone doom a motion for certification. Indeed, we have made clear that manageability problems will "rarely, if ever, be in [themselves] sufficient to prevent certification." *Klay*, 382 F.3d at 1272.

Cherry v. Dometic Corp., 986 F.3d at 1303-04 (emphasis and alterations in original). This formulation is a variance from the Court's earlier writing on the subject in Abraham v. WPX Production Productions, LLC, in which the Court determined that administrative feasibility issues in identifying which gas was processed in which processing plants prevented the proposed class from meeting the ascertainability requirement. See Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58. In its analysis in that case, the Court references rule 23(c)'s requirement that the Court "'define the class and the class claims, issues, or defenses.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Fed. R. Civ. P. 23(c)). The Court next asserts that "[a]nother 'essential' prerequisite to a rule 12(b)(3) class action is that the 'class must be currently and readily ascertainable based on objective criteria.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93). The objective criteria which the Court references stand in opposition to subjective criteria, such as a class composed of individuals "'who 'believe' they were discriminated against." Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Chiang v. Veneman, 385 F.3d 256, 271 (3d Cir. 2004)). The Court finally states that, "'[i]f class members are impossible to identify without extensive and individualized factfinding or 'mini-trials,' then a class action is inappropriate.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 593). The Court's subsequent analysis includes a reference to Carrera v. Bayer Corp.'s administrative-feasibility language alongside a consideration of the administrative difficulties in identifying which gas flowed to which wells, at the conclusion of which the Court states that "identify[ing] which wells' gas was processed in each year . . . is an individual and time-consuming inquiry." Abraham v. WPX Prod. Prods, LLC, 317 F.R.D. at 258. Although the

feasibility argument under the predominance umbrella, see Certification Opposition at 25, and so the Court here considers administrative feasibility as part of its predominance analysis, rather than as part of the ascertainability prerequisite.

---

Court frames its analysis in Abraham v. WPX Production Productions, LLC, as an ascertainability question, given the extensive review of the caselaw the Court has performed in the text above, the Court concludes that the Tenth Circuit would find that administrative feasibility is more appropriately a predominance and superiority analysis, investigating whether identifying which wells' gas was processed where would be an individualized and time-consuming inquiry, such that the individualized questions predominate over any common questions, and whether the class action is the superior vehicle for the plaintiffs to bring their claims. Although the Court now believes the Tenth Circuit would consider the Court's analysis in Abraham v. WPX Production Productions, LLC, to be an analysis under rule 23(b)(3) -- predominance and superiority -- rather than 23(c) -- ascertainability -- the Court would have reached the same conclusion in that case, given the overwhelming administrative difficulties in identifying the processed gas's source wells.

While the Court still thinks that the Third Circuit's rule is the best, the Court believes the Tenth Circuit will not adopt that rule, so the Court clarifies here the basic analysis for a proposed rule 23(b)(3) class that it believes the Tenth Circuit will use. Rule 23(c) requires the Court to "define the class" in its class certification order. Fed. R. Civ. P. 23(c)(1)(B). When identifying definiteness, "Courts generally treat the requirement as a precursor to Rule 23 and therefore examine the implicit requirements before proceeding to the Rule's explicit requirements." Newberg on Class Actions § 3:3. Additionally, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria. A class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness." Newberg on Class Actions § 3:3. After determining the proposed class' definiteness -- because the class is or is not ascertainable on the basis of objective criteria -- the Court examines the explicit rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. See Fed. R. Civ. P. 23(a). Once the Court has determined that the proposed class satisfies the rule 23(a) criteria, the Court turns to the rule 23(b)(3) predominance and superiority requirements, which direct the Court to consider, among other factors, "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). In analyzing the likely difficulties in managing the class action, the Court considers whether it will be administratively feasible for each proposed class member to prove that they are a class member. Even where a proposed class relies on objective criteria for its definition -- in Abraham v. WPX Production Productions, LLC, whether gas was processed at a particular plant -- determining whether an individual proposed class member satisfies those objective criteria may be so burdensome or require significant individualized inquiry such that the individualized inquiries predominate over common questions or the class action is not superior to other adjudication methods -- the case in Abraham v. WPX Production Productions, LLC, where the Court determined that identifying where each wells' gas was processed would have been "an individual and time-consuming inquiry. Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258.

- 255 -

97.     The Defendants assert that consumers purchase cigarettes from retailers, and not from the Defendants and that the Defendants do not have information that identifies cigarette purchasers.  See Certification Opposition at 26.  According to the Defendants, this lack of information means that each class member must prove on an individual basis that he or she purchased the product for which that class member seeks damages.  See Certification Opposition at 26-27.  The Defendants note that, while the Plaintiffs have discussed a consumer mailing list, that list does not identify who purchased specifically which brands of Natural American cigarettes.  See Certification Opposition at 28.  The Plaintiffs argue that class member identification, "as in similar class actions, can take place at the claims administration stage with self-identification using, *inter alia*, sworn affidavits, claim forms, receipts, and other purchase records."  Certification Reply at 11 (italics in original).  They also distinguish the Defendants' reliance on the Court's opinion in Abraham v. WPX Production Productions, LLC, given that there will be no "tracing problem" in identifying who purchased Natural American cigarettes, contrary to the difficult task of determining which leases' gas had been processed at which processing plants.  Certification Reply at 12-13 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 255).

98.     Courts which use administrative feasibility in determining whether to grant class certification are hesitant to rely solely on potential class members' "say-so" without "further indicia of reliability."  Marcus v. BMW of N. Am., 687 F.3d at 594.  Class members ideally would be able to refer to the defendant's records and documents, such as call logs or sales records.  For example, the Third Circuit, which applies administrative feasibility as a threshold requirement for class certification, has noted:

Affidavits from potential class members, standing alone, without "records

to identify class members or a method to weed out unreliable affidavits," will not constitute a reliable and administratively feasible means of determining class membership. *Byrd*, 784 F.3d at 171. However, *Marcus* and our other cases do not imply "*no* level of inquiry as to the identity of class members can ever be undertaken." *Id.* Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard. *Id.* at 170-71.

City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 441. In that case, the records at issue consisted of the defendant's customer database from which the defendants identified targets to send faxes. See City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 437. The Third Circuit determined that the database "defines a limited set of potential claimants," even though not every dealership in the database received a fax, and that the only subsequent factual inquiry, therefore, was whether a dealership received the fax on the class dates. City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 442. "A plaintiff proposing ascertainment via self-identification, then, must establish how the self-identification method proposed will avoid the potential problems [of requiring mini-trials or infringing on a defendant's due process rights]." Karhu v. Vital Pharms., Inc., 621 F. App'x at 949. "A plaintiff might establish that self-identification-based ascertainment is administratively feasible and otherwise unproblematic by proposing a case-specific and demonstrably reliable method for screening each self-identification." Karhu v. Vital Pharms., Inc., 621 F. App'x at 949 n.5 (citing Carrera v. Bayer Corp., 727 F.3d at 311).

99.    The Plaintiffs, other than asserting that proposed class members will be able to demonstrate their class membership by use of sworn affidavits, claim forms, receipts, or purchase records, have not demonstrated that any class members have retained receipts or purchase records. Similarly, they have not identified a method or model which would allow the Defendants or the Court to screen affidavits for authenticity, and have not suggested that such a

method or model even exists. Additionally, the Court concludes that it is unlikely that the proposed class members will have retained purchase records, particularly given the proposed class period's extensiveness, with the earliest period beginning in 2009 and the most recent period beginning in 2013. See Stewart v. Beam Glob. Spirits & Wine, Inc., 2014 WL 2920806, at *7 ("Without any independently verifiable proof of purchase through receipts, retail records, or otherwise, the Court finds it unlikely that putative class members will accurately remember every . . . purchase they made during the class period, let alone where these purchases were made and the prices they paid each time."); Tucios v. Carma Lab'ys, Inc., 296 F.R.D. 638, 649 (N.D. Cal. 2014)(Bernal, J.)("[I]t is highly unlikely that class members have kept their receipts for the product at issues . . . . Plaintiff has not presented the Court with any method of verifying the self-identified class members suffered the alleged injury, or the amount of damages to which each class member is entitled."); Defendants' FOFs ¶ 22, at 7; Plaintiffs' FOFs ¶ 3, at 1-2; Certification Motion at 3, n.1. Accordingly, the Court concludes that the proposed National Menthol Subclass will face substantial administrative difficulties at the claims administration stage. This conclusion alone does not doom the proposed class, however, see Cherry v. Dometic Corp., 986 F.3d at 1305, and the Court continues its predominance analysis below to identify whether individualized questions predominate over common inquiries.

### 2. If an Objective Standard Applies to All Class Members' Claims, That Class Members Have Seen Different Representations Does Not Mean that Individualized Inquiries Will Predominate Over Common Questions.

100. The Defendants next argue that individualized inquiries predominate over common questions, because "[a] class action alleging fraudulent advertising depends on the existence of common representations; otherwise, the need for individual inquiries to determine

who received what message would necessarily defeat predominance."  Certification Opposition at 30 (citing Goldenberg v. Johnson & Johnson Consumer Co., 317 F.R.D. at 389).   The Defendants first assert that potential class members saw different Natural American advertising and product descriptors before October 1, 2017, and after October 1, 2017, which is the date that Natural American products no longer used the word natural and additive-free, and began containing language that "Natural American Spirit cigarettes are not safer than other cigarettes." Certification Opposition at 31.  Accordingly, the Defendants assert that "[t]here was no common classwide representation" and that individualized inquiries will be the only method to determine which consumers purchased cigarettes in which time period.  See Certification Opposition at 31.

101.   The Defendants further assert that, even within each time period, the class members will differ in "[w]hether they were able to see, before purchasing NAS cigarettes, Santa Fe's disclaimers dispelling the notion that NAS cigarettes are safer than other cigarettes." Certification Opposition at 31.  They cite the Court's MTD MOO, which explains that the disclaimers may not have been visible to all consumers before purchasing the product, and argue that "consumers who saw [the natural and organic labels] in conjunction with a health disclaimer differ considerable from those who saw *only* the descriptors."  Certification Opposition at 31 (emphasis in original)(citing MTD MOO at 170-172).  Additionally, the Defendants note that, with respect to the additive-free label, the Court concluded previously that a reasonable consumer who saw the disclaimer that additive-free does not mean a safer cigarette "'would understand . . . that the lack of additives does not make Natural American cigarettes healthier.'" Certification Opposition at 33 (quoting MTD MOO at 170-172 and citing Trujillo v. Apple Computer, Inc., 581 F. Supp. 2d 935, 938 (N.D. Ill. 2008)(Kennelly, J.), Fermin v. Pfizer Inc., 215 F. Supp. 3d 209, 212 (E.D.N.Y. 2016)(Johnson, J.))(ellipsis in Certification Opposition, but

not in MTD MOO).  The Defendants state that, since March 31, 2010, all Natural American advertising has included a disclaimer explaining that organic tobacco does not mean a safer cigarette, and that Santa Fe Tobacco adjusted its disclaimer again in 2017, stating that "'Natural American Spirit cigarettes are not safer than other cigarettes.'"  Certification Opposition at 33 (no citation given for quotation).  The Defendants argue that, accordingly, "no consumer who saw [this disclaimer] could reasonably claim to be deceived by *any* descriptor," and that the Plaintiffs have not explained how a consumer who saw this disclaimer reasonably could have believed -- on the basis of a representation from Santa Fe Tobacco -- that Natural American cigarettes are or could be safer than other cigarettes.  Certification Opposition at 33 (emphasis in original).  The Defendants argue that consumers make no distinction between additive-free and other descriptors, like natural, which the pre-2017 disclaimer does not address, and that the disclaimer that additive-free cigarettes are not safer than other cigarettes therefore disabuses consumers of the notion that other descriptors imply a healthier cigarette.  See Certification Opposition at 34 (citing Van Liere Report at ¶¶ 65-66, tables 13-14).  Finally, the Defendants argue that, even where consumers distinguish the natural descriptor from the additive-free descriptor, language indicating that additive-free cigarettes are not safer should give those consumers pause before concluding that any packaging descriptors meant that the cigarettes are safer.  See Certification Opposition at 34.  The Defendants assert that this mix of representations means that it is necessary to determine which, if any, disclaimer a proposed class members saw before purchasing a cigarette pack, and that such a determination requires "claimant-by-claimant inquiries that would overwhelm any common issues."  Certification Opposition at 35 (citing Tucker v. Pac. Bell Mobile Servs., 208 Cal. App. 4th 201, 225 (2012)).

102.    The Defendant next argue that, even if all class members saw the same text, the

allegedly misleading inference is open to multiple interpretations, and the Plaintiffs have not shown that the representations are subject to a uniform definition among class members, thus requiring individualized inquiries into the misleading statements' nature.  See Certification Opposition at 32 (quoting Astiana v. Kashi Co., 291 F.R.D. 493, 508 (S.D. Cal. 2013)(Huff, J.) and citing Jones v. ConAgra Foods, Inc., 204 WL 2702726, at *17).  The Defendant argue that, here, "the alleged misunderstandings derived *not* from Defendants actually claiming health benefits, but from consumers' *inferences* based on their individual understandings of the benefits of natural, additive-free, or organic tobacco," which vary based on a consumer's subjective beliefs regarding the supposed benefits of natural, additive-free, or organic tobacco.  Certification Opposition at 32 (emphasis in original).  The Defendants highlight two of the Plaintiffs' theories: the safer-cigarette theory, and the menthol theory.  See Certification Opposition at 35-42.  The Defendants argue that, under both theories, the Plaintiffs must show that a "'significant portion of the general consuming public . . . , acting reasonably in the circumstances, could be misled'" and that it is insufficient that Plaintiffs assert a cause of action that relies on an objective standard for deception.  Certification Opposition at 36 (quoting Becerra v. Dr. Pepper/Seven Up, Inc., 945 F.3d 1225, 1228-29 (9th Cir. 2019), and citing Certification Motion at 59-80).

103.   The Defendants assert that the Plaintiffs' safer-cigarette theory does not contend that the descriptors are untrue, "but that consumers' own beliefs about 'natural' products and additives generally will be applied to tobacco -- a product known to be hazardous to health -- and lead them to incorrect inferences."  Certification Opposition at 35 (citing Certification Motion at 4).  According to the Defendants, this theory means that the descriptors at issue could mislead only individuals who hold that belief and that the packaging would not deceive other consumers.

See Certification Opposition at 36.  The Defendants assert that the challenged descriptors do not carry a uniform meaning of comparative safety, and that the Court has stated that words like natural are context dependent.  See Certification Opposition at 37 (quoting MTD MOO at 176). They note that some of the Plaintiffs' witnesses could not provide a definition of natural and that those named Plaintiffs who could provide a definition provided varying definitions.  See Certification Opposition at 37-38 (citing Haskal Depo. at 94:10-19 (Haksal); Blevins Depo. at 201:1-20 (Blevins); Chavez Depo. at 27:7-22 (Chavez); Hebert Depo. at 82:17-93:9 (Hebert); Murphy Depo. at 128:22-129:5 (Murphy)).  The Defendants also criticize the Plaintiffs for changing their theory from an allegation that the statements misled consumers into believing that Natural American cigarettes "are" safer to an allegation that the statements misled consumers into believing that Natural American cigarettes "may be" safer, highlighting that there may be many interpretations of the descriptors' meaning.  Certification Opposition at 38.  Finally, the Defendants argue that the Plaintiffs' experts, Dr. Pearson and Dr. Cummings, who assert that the descriptors cause consumers to misperceive Natural American cigarettes' health risks, have not tested the disclaimers properly, and that the Defendants expert, Dr. Van Liere, demonstrates that the majority of surveyed consumers believe that Natural American cigarettes are at least as harmful as other brands.  See Certification Opposition at 39-40.  The Defendants argue that, accordingly, the Plaintiffs "cannot show that 'a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled' by the challenged descriptors into believing that NAS cigarettes are (or 'may be') safer than other cigarettes."  Certification Opposition at 40 (quoting Becerra v. Dr. Pepper/Seven Up, Inc., 945 F.3d 1225 at 1228-29).

104.    The Defendants assert that the Plaintiffs' menthol theory is that "consumers are

misled because menthol is a *tobacco* additive by virtue of some menthol 'migrating' from the filter of NAS menthols (where it is placed at the time of manufacture) 'into the tobacco in the cigarette rod.'"   Certification Opposition at 40-41 (quoting Certification Motion at 35-36)(emphasis in original).  The Defendants acknowledge that the Court previously has concluded that this comingling "'makes the menthol modifier inherently misleading,'" but argue that the Plaintiffs admit that the proposed menthol plaintiffs lacked any belief regarding the menthol's location in the cigarette.  Certification Opposition at 41 (quoting MTD MOO at 184 and citing Certification Motion at 40-41 & n.13).  The Defendants insist that, because the class members had no opinion on the menthol's location, they could not have been misled, and argue that the Plaintiffs have not attempted to show that class members held a common understanding that the cigarettes' tobacco was menthol free.  See Certification Opposition at 41.  The Defendants critique Dr. Pearson's report, which they assert does not offer an opinion on "how consumers interpreted 'additive-free' in connection with NAS menthol cigarettes."  Certification Opposition at 41 (citing Pearson Report at 3).  The Defendants admit that the Plaintiffs have pointed to a Natural American focus group study for the proposition that consumers are misled, because they do not know what menthol is, but argue that Dr. Van Liere has critiqued the use of focus group studies to make conclusions about the broader populations, and that the focus group study which the Plaintiffs cite reports additionally that "participants 'don't know, or care, how the menthol and the tobacco come together to create a menthol cigarette,'" language which the Defendants asserts refutes the Plaintiffs' assertion that the additive-free language misleads consumers.  Certification Opposition at 42 (citing Summary of Learning (dated June 27, 2012) at 5, filed September 23, 2020 (Doc. 281-32)).

   105. The Plaintiffs argue in response that the Defendants' argument -- that differences

in class members' subjective understandings defeat predominance -- ignores the case's basis, namely "that Defendants' marketing, *in toto*, gave the impression to reasonable consumers of health reassurance, *i.e.*, that NAS Cigarettes may be less harmful than other cigarettes." Certification Reply at 13.  The Plaintiffs argue that this reasonable-consumer standard is an objective test.  See Certification Reply at 13-14 (citing Proctor Report; Pearson Report; Dewhirst Report; In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233-34; Disc. Tobacco & Lottery, Inc. v. United States, 674 F.3d 509, 536 (6th Cir. 2012)).  The Plaintiffs also assert that "courts in consumer protection cases will 'presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging.'" Certification Reply at 14 (quoting Davidson v. Apple, Inc., 2018 WL 2325426, at *18.  The Plaintiffs assert that all of the alleged misrepresentations "are all the same or substantially similar," and that the "Defendants uniformly marketed their NAS Cigarettes as 'natural' and 'additive-free,' and in some cases 'organic,'" descriptors which the Plaintiffs argue "are effectively the same and all convey to the reasonable consumer the same core marketing message: NAS Cigarettes may be less harmful than other brands of cigarettes."  Certification Reply at 14 (quoting Certification Motion at 10-15, 23-28, 52, 62-63, and citing Broomfield v. Craft Brew Alliance, Inc., 2018 WL 4952519, at *11-12).

106.     The Plaintiffs reassert that they "present common evidence showing that the reasonable consumer's understanding of Defendants' misrepresentations connotes a cigarette that may be less harmful, *including that such understanding is not impacted by any disclaimer*." Certification Reply at 15 (citing Certification Motion at 25-31)(emphasis in original).  The Plaintiffs criticize the Defendants' reference to the packaging's disclaimers as a "red herring," and argue that the Defendants contend that individual understandings prevent consumers from

understanding Natural American cigarette labels as presenting a common message about the cigarettes' relative harmlessness, but simultaneously contend that these individualized consumers "nevertheless all saw and understood the product disclaimers, which changed over time." Certification Reply at 15 n.11. The Plaintiffs note that the FDA previously has "concluded that Defendants' disclaimer on their NAS Cigarette packages did not mitigate the effects of 'health reassurance conveyed by the packages' affirmative claims.'" Certification Reply at 15 (citing Motion at 1, 4; Davidson v. Apple, Inc., 2018 WL 2325426, at *18).

107. The Plaintiffs also assert that they "do not need to prove their entire case at class certification. Rather, they need only present evidence to show that these issues can be adjudicated together." Certification Reply at 15 (citing Rikos v. Procter & Gamble Co., 2014 WL 11370455, at *3; Elkies v. Johnson & Johnson Servs., Inc., No. CV 17-7320-GW(JEMX), 2018 WL 11223465, at *8-9 (C.D. Cal. Oct. 18, 2018)(Wu, J.)). Put differently, the Plaintiffs argue that, at the class certification stage, the relevant inquiry is "whether there is common evidence in support of [consumers' health reassurance] understanding -- which there indisputably is." Certification Reply at 15 (citing Rikos v. Procter & Gamble Co., 2014 WL 11370455, at *3). The Plaintiffs quote Hadley v. Kellogg Sales Co. for the proposition that

> "deception and materiality . . . are governed by an objective 'reasonably consumer' test . . . . Plaintiff 'has no burden to establish that there is a uniform understanding among putative class members as to the meaning of 'the challenged health statements, 'or that all or nearly all of [the class members] shared any specific belief.' [] Plaintiff need only make 'an objective showing of a probability that a "significant portion" of the relevant consumers acting reasonably "could be misled""'

Certification Reply at 16 (quoting Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1116-18) (ellipses in Certification Reply but not in Hadley v. Kellogg Sales Co.; first alteration in Hadley v. Kellogg Sales Co.).

108.    The Plaintiffs next turn to the Defendants' arguments about the disclaimer's effect and the Defendants' critiques of the Plaintiff's safer-cigarette and menthol theories.    See Certification Reply at 16.  The Plaintiffs argue that the Defendants "focus on dicta" in the MTD MOO, and that the MTD MOO instead "emphasized that the 'additive-free' disclaimer 'says nothing about the natural or organic descriptors . . . [--] two terms [that] have an independent connotation that a product is healthier or safer . . . .  *The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer*.'"  Certification Reply at 16 (quoting In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233-34)(emphasis, second alteration, and ellipses in Certification Reply, but not in In re Santa Fe Nat. Tobacco Co.).  The Plaintiffs also note that the Court has stated that, "because tobacco products are often purchased without the ability of the consumer to inspect the product package, 'the Court cannot conclude that the package's [additive-free disclaimer] would cure a deception inflicted upon a reasonable consumer.'"  Certification Reply at 17 (quoting In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233).  The Plaintiffs next argue that the Defendants' citations to Dr. Van Liere's report and to Plaintiff testimony, and the Defendants' postulation whether consumers would be able to see disclaimers at point of purchase, are merits challenges and not attacks on the predominance of the Plaintiffs' proposed class claims.  See Certification Reply at 17.  The Plaintiffs further argue that the "Defendants' misrepresentations in the Challenged Claims are *affirmative*," and that, "consistent with the Court's discussion on the 'additive-free' disclaimer not being sufficiently specific to meet such affirmative misrepresentations, the visibility of the disclaimer at the point of sale . . . is actually irrelevant as a matter of law to the reasonable consumer's understanding of the Challenged Claims . . . ."  Certification Reply at 18 (emphasis in original).

109.    The Plaintiffs next argue that the Defendants have ignored common evidence that

the Defendants leveraged the idea of natural tobacco being less harmful to build their brand identity, and that consumers view natural and additive-free descriptors as conveying that meaning.  See Certification Reply at 18.  They assert that the relevant inquiry for their State law claims is the reasonable consumer test, "'which requires a plaintiff to show that a "reasonable consumer" is likely to be deceived by the business practice or advertising at issue.'" Certification Reply at 18 (quoting Kosta v. Del Monte Foods, Inc., 308 F.R.D. 217, 224 (N.D. Cal. 2015)(Thrash, J.)(quoting Williams v. Gerber Prods., 552 F.3d 934, 938 (9th Cir. 2008)), and citing United States v. Easley, 911 F.3d 1074, 1081 (10th Cir. 2018)).  They argue that the United States District Court for the Southern District of New York, on whose case the Defendants rely, has explained that the Plaintiffs do not need to assert a definition of natural, but that a fact finder must determine whether the natural label is misleading to a reasonable consumer.  See Certification Reply at 18-19 (quoting Petrosino v. Stearn's Prods., Inc., No. 16-CV-7735 (NSR), 2018 WL 1614349, at *7 (S.D.N.Y. March 30, 2018)(Roman, J.), and citing United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.); Disc. Tobacco & Lottery v. United States, 674 F.3d at 536).  The Plaintiffs conclude by arguing that the Defendants "are improperly asking to strip the trier of fact of the opportunity to consider Plaintiffs' experts' conclusions about the effect of Defendants' product claims, and instead substitute in Defendants' experts' conclusion."  Certification Reply at 19 (citing Certification Opposition at 39-40; Singleton v. Fifth Generation, Inc., No. 515CV474BKSTWD, 2017 WL 5001444, at *18 (N.D.N.Y. September 27, 2017)(Sannes, J.)).

110.   At the outset, the Court notes that the Plaintiffs bring a breach-of-express-warranty claim on the Nationwide Menthol Subclass's behalf and argue under the menthol theory that the Defendants warranted that Natural American menthol cigarettes are additive-free

despite that they contain menthol, a substance that, although placed originally in the cigarette filter, migrates to the tobacco because of its volatility.  See Certification Motion at 83.  In the MTD MOO, the Court concludes, based on the Plaintiffs' allegations, that "Natural American's additive-free descriptor on menthol cigarettes . . . misleads a reasonable consumer."  MTD MOO at 173.  The Plaintiffs define the Nationwide Menthol Subclass as "[a]ll persons who purchased Natural American Spirit menthol cigarettes in the United States . . . ."  Complaint ¶ 126, at 43.  The proposed class period for the Nationwide Menthol Subclass runs from September 30, 2009, to the present -- July 23, 2020, the date on which the Plaintiffs filed the Certification Motion.  See Certification Motion at 3 n.1.  This period includes, therefore, the time frame within which the Defendants ceased using the additive-free language, pursuant to the Memo. Of Agreement with the FDA.  See Findings of Fact, supra ¶ 93, at 21 (citing Memo. of Agreement ¶¶ 1-3, at 1; Defendants FOFs ¶ 37, at 9; Plaintiffs' FOFs ¶ 31, at 8; id. ¶ 104, at 23).  Accordingly, consumers who purchased Natural American cigarettes before the 2017 change will have seen the additive-free language, while consumers who purchased Natural American cigarettes after the 2017 change will not have seen that language.  Even if the Court uses an objective standard for the Nationwide Menthol Subclass's breach-of-express-warranty claim, an analysis which the Court undertakes below, it will need to determine whether each proposed class member made his or her purchase before or after 2017 to determine whether the Defendants expressly warranted that their product was additive-free.

111.   In their discussion on the relevance of certain disclaimers, the Plaintiffs assert that, "[e]ven if the 2017 disclaimer were deemed sufficiently significant, that issue could easily be resolved by subclassing; specifically, there can be a subclass for consumers who purchased NAS Cigarettes before the 2017 disclaimer appeared, and one for those who purchased after."

Certification Reply at 16.  A similar logic applies to the additive-free descriptor's disappearance from the packaging.  In other words, the Plaintiffs could subdivide the Nationwide Menthol Subclass into those who purchased cigarettes with the additive-free language before 2017 and those who purchased cigarettes without such language, or the Plaintiffs could redefine the Nationwide Menthol Subclass class period to exclude consumers who purchased menthol cigarettes after 2017, because their current proposed class definition includes those consumers "who purchased Natural American Spirit menthol cigarettes in the United States," which does not limit the class to those who saw additive-free language.  Complaint ¶ 126, at 43.

112.    The Court also has discretion to redefine the Nationwide Menthol Subclass to reflect this change.  See Diaz v. Romer, 961 F.2d 1508, 1511 (10th Cir. 1992)("This court has previously recognized that 'the district court may redefine the class to include several subclasses.'" (quoting Sears v. Atchison, Topeka & Santa Fe Ry., 749 F.2d 1451, 1456 (10th Cir. 1984), and citing Fed. R. Civ. P. 23(c)(4)(B)[66])).  Although the Tenth Circuit has not held that the district courts may redefine a proposed class without creating new subclasses -- here, limiting the Nationwide Menthol Subclass to those consumer who purchased Natural American cigarettes before the Defendants removed the additive-free language from the packaging, as opposed to creating a subclass of menthol smokers who purchased Natural American cigarettes before 2017 and a subclass of menthol smokers who purchased them after 2017 -- based on the Plaintiffs' argument that the Defendants harmed the proposed Nationwide Menthol Subclass members by asserting that their tobacco products were additive-free when they in reality contained menthol, the Court will redefine the Nationwide Menthol Subclass period to include only purchasers

---

[66]The rule 23 language which the Tenth Circuit cites in Diaz v. Romer is located today in rule 23(c)(5), which states: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."  Fed. R. Civ. P. 23(c)(5).

before October 1, 2017, when the Defendants stopped using the additive-free language.  See
Calderon Decl. ¶ 15, at 4.  Because the Plaintiffs' breach-of-express-warranty claim is premised
on the Defendants' objective use of this language and that the goods do not conform to the
affirmation that they are additive-free, see Certification Motion at 83, this change means that the
individualized question whether a proposed class member purchased Natural American cigarettes
with this label does not predominate over other common questions.[67]  The Court turns next,
however, to its analysis whether determining that an objective standard is the correct standard for
the Nationwide Menthol Subclass's breach-of-express-warranty claim is a common question.

### 3. The Transferor Courts' Choice-of-Law Rules Require That the Laws of All Fifty States Apply to the Nationwide Menthol Subclass' Breach-of-Express-Warranty Claim.

113.  The Plaintiffs assert that New Mexico law should apply to the Nationwide
Menthol Subclass' express warranty claims, because this is a diversity action and the Court
should look to the forum state's -- i.e., New Mexico's -- choice-of-law rules.  See Certification
Motion at 80 (quoting Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138,
1150 (D.N.M. 2009)(Browning, J.)).  They argue that, under New Mexico law, the express
warranty claim sounds in contract and that New Mexico uses the most-significant-relationship
test to determine which state's substantive law to apply.  See Certification Motion at 80-81
(citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 15, 144 N.M. 405, 413, 188 P.3d 1156,
1164; Robey v. Parnell, 2017-NMCA-038, ¶¶ 12-18, 392 P.3d 642, 648-49).  The Plaintiffs
assert that there are certain "core elements of an express warranty claim in any state,"
specifically:

---

[67]The Court analyzes the effect of the disclaimers on the Plaintiffs' Safer-Cigarette
Theory in its analysis of the classes to which that theory applies below.

> An express warranty arises where there is an affirmation of fact or promise to the buyer of goods, which includes any description of the goods that becomes a part of the benefit of the bargain.  N.M. Stat. § 55-2-313.  When the goods do not conform to that promise, affirmation, or description, there is a breach of express warranty.  *Nowell v. Medtronic Inc.,* 372 F. Supp. 3d 1166, 1222 (D.N.M. 2019)(Browning, J.).

Certification Motion at 81.  The Plaintiffs argue that, even if there are conflicts between the various State laws on breach of express warranty, the Court nevertheless should apply New Mexico law, because New Mexico has the most significant relationship to the claim, because Santa Fe Tobacco is headquartered in New Mexico, most decision-making takes place in the State, and relevant events took place in the State.  See Certification Motion at 82.  The Plaintiffs argue that, accordingly, the Court should apply New Mexico law to the Nationwide Menthol Subclass' claims.  See Certification Motion at 82 (citing Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46, 53 (E.D.N.Y. 2000)(Weinstein, Sr. J.)).

114.    The Defendants dispute that the Court should apply a standard choice-of-law framework for diversity cases, asserting instead that multidistrict litigation ("MDL") cases have special rules in determining that forum state.  See Certification Opposition at 66 (quoting In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012)).  They assert that, "[i]n such cases, 'courts typically apply the choice of law rules of each of the transferor courts.'"  Certification Opposition at 66 (quoting In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d at 17, and citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 244 n.8 (1981)).  The Defendants note that the case presently before the Court includes cases with named plaintiffs that transferred from New Mexico, North Carolina, and Florida, as well as cases without named plaintiffs from California, the District of Columbia, New York, and the Virgin Islands.  See Certification Opposition at 66 & n.49.

115.    The Defendants argue that, applying New Mexico, North Carolina, and Florida's choice-of-law rules, each state would apply the law of each place of purchase.  See Certification Opposition at 66-68.  The Defendants argue that, because the claim covers all fifty States, the Court would have to consider each State's express warranty laws, which "vary in meaningful ways."  Certification Opposition at 69.  They note that the Court has recognized that the States' laws differ in its MTD MOO, where it dismissed express-warranty claims brough under Florida, Illinois, and New York law, see Certification Opposition at 69 (citing MTD MOO at 231-39), and that some States have differing reliance requirements, including Colorado and North Carolina, which require reliance, New York, which "may not" require reliance, and California, which requires reliance "only where privity is lacking," see Certification Opposition at 69 (citing Porcell v. Lincoln Wood Prods., Inc., 713 F. Supp. 2d 1305, 1318 (D.N.M. 2010)(Armijo, J.); Prichard Enters. v. Adkins, 858 F. Supp. 2d 576,585 (E.D.N.C. 2012)(Dever, J.); Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. 504, 547 (C.D. Cal. 2012)(Morrow, J.)).  They argue that "[b]oth 'the prima facie element of reliance' and 'differences in the applicable law in a multi-state, state-law-based class action' 'present serious challenges to predominance.'"  Certification Opposition at 69 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 669-70).

116.    The Defendants argue further that, even if New Mexico law governs the nationwide express warranty claim, the Plaintiffs cannot prove their theory with common evidence, because New Mexico express warranty claims "do[] not turn entirely on objective considerations," but rather require that the allegedly incorrect affirmation "be 'part of the basis of the bargain.'"  Certification Opposition at 70-71 (quoting Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 36, 99 N.M. 645, 642, 662 P.2d 646, 653, and citing Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1211 (D.N.M. 2011)(Browning, J.); Lovington Cattle

Feeders, Inc. v. Abbott Lab'ys, 1982-NMCA-027, ¶ 18, 97 N.M. 564, 567-68, 642 P.2d 167, 170-71).  The Defendants assert that determining whether being additive-free tobacco is part of the consumers' bargain is a "subjective fact question" and that the Plaintiffs cannot demonstrate that all class members considered the tobacco's additive-free qualities as part of the bargain, and do not address how consumers understood the additive-free label and, therefore, "what they understood themselves to be bargaining for."  Certification Opposition at 71.  Accordingly, the Defendants assert that, even under the Plaintiffs' preferred choice-of-law analysis, individual questions predominate.  See Certification Opposition at 71.

117.    The Plaintiffs reassert that, because New Mexico is the forum state, using New Mexico's choice-of-law rules and the relevant-contacts test leads to a conclusion that New Mexico law should apply.  See Certification Reply at 38.  They argue that the Defendants' reliance on where the sales took place is an application of the First Restatement of Conflict of Laws' place-of-contracting rule, which the Supreme Court of New Mexico expressly has rejected for multi-state contract actions.  See Certification Reply at 38 (citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 57, 144 N.M. at 422, 188 P.3d at 1173).  Particularly, the Plaintiffs note that such a rule would create manageability problems contrary to the policy behind class actions.  See Certification Reply at 38 (citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 52, 144 N.M. at 421, 188 P.3d at 1172).  The Plaintiffs also contend that the Defendants' concern that the Court will have to review every transaction to determine whether the representations were a part of the bargain is unfounded.  See Certification reply at 39.  They argue instead that "[t]he law presumes that a representation is 'part of the basis of the bargain' when a reasonable consumer would rely on it in purchasing the product."  Certification Reply at 39 (no citation given for quotation).  The Plaintiffs argue that they "meet all elements of the model rule, as approved by the New Mexico

Supreme Court, as to all class members without the need for individualized proof," Certification Reply at 39 (citing N.M.R.A. Rule 13-1428), and note that the Court already has determined that the additive-free descriptor is misleading when it appears on menthol cigarettes, see Certification Reply at 39 (quoting In re Santa Fe Nat. Tobacco, 288 F. Supp. 3d at 1234, 1241).

118.    The Plaintiffs are incorrect in their assertion that, because the Court ordinarily applies the forum state's choice-of-law rules in diversity actions, the Court should look only to New Mexico choice-of-law rules.  Instead, as the Defendants note, special considerations arise in the multidistrict litigation context.  The Judicial Panel on Multidistrict Litigation ("JPML") has noted that, "[w]hile in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court."  In re Delta Dental Antitr. Litig., 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020)(citing In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17-18 (1st Cir. 2012)).  See In re Dow Co. Sarabond Prods. Liab. Litig., 664 F. Supp. 1403, 1405-06 (D. Colo. 1987)(Kane, J.)("'Cases commenced in other districts are treated as if they are pending in those other districts . . . .'")(quoting In re Agent Orange Prod. Liab. Litig., 580 F. Supp. 690, 695 (E.D.N.Y. 1984)(Weinstein, C.J.), and citing In re Nucorp Energy Secs. Litig., 772 F.2d 1486, 1491-921 (9th Cir. 1985); In re E. Airlines, Inc., Engine Failure, 629 F. Supp. 307, 315-16 (S.D. Fla. 1986)(Davis, J.); Sentner v. Amtrak, 540 F. Supp. 557, 559 n.5 (D.N.J. 1982)(Whipple, S.J.); In re Haven Indus., Inc., 462 F. Supp. 172, 179 (S.D.N.Y. 1978)(Gagliardi, J.)).  Accordingly, the Court first must determine which district courts are the transferor courts for the nationwide menthol subclass.  The SAC and the Certification Motion do not identify specifically which of the consolidated claims arise from

which cases out of which federal judicial districts,[68] but a review of the seventeen consolidated actions reveals twelve cases which have sought to certify a nationwide class: (i) Okstad v. Santa Fe Nat. Tobacco Co., No. CIV 16-0323 JB/LF (M.D. Fla.), which brings claims for fraud, negligent misrepresentation, unjust enrichment, and injunctive relief on a nationwide class' behalf; (ii) Hebert v. Santa Fe Nat. Tobacco Co., No CIV 16-1394 JB/LF (M.D.N.C.), which brings a claim for breach of express warranty on a nationwide menthol subclass' behalf; (iii) Waldo v. Santa Fe Nat. Tobacco Co., No. CIV 16-0324 JB/LF (M.D. Fla.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; (iv) Dunn v. Santa Fe Nat. Tobacco Co., No. CIV 15-1142 JB/LF (D.N.M.), which brings claims for violations of the New Mexico Unfair Trade Practices Act, N.M.S.A. § 57-12-1 ("NMUTPA"), negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (v) Haksal v. Santa Fe Nat. Tobacco Co., No. CIV 15-1163 JB/LF (D.N.M.), which brings claims for intentional misrepresentation, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (vi) Sproule v. Santa Fe Nat. Tobacco Co., No. CIV 0296 JB/LF (S.D. Fla.), which brings claims for violations of the FDUTPA, fraud, negligent misrepresentation, unjust enrichment, injunctive relief, aiding and abetting, and vicarious liability on a nationwide class' behalf; (vii) White v. Santa Fe Nat. Tobacco Co., No. CIV 16-0209 JB/LF (D.N.M.), which brings claims for violations of the NMUTPA, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (viii) Cuebas v. Santa Fe Nat. Tobacco Co., No. CIV

---

[68]Although the Plaintiffs filed the SAC directly in the master docket, which contains all of the filings related to the multidistrict litigation, the Court considers this filing to be immaterial for purposes of determining which State's choice-of-law rules apply.  See, e.g., In re Conagra Peanut Butter Prods. Liab. Litig., 251 F.R.D. 689, 694-95 (N.D. Ga. 2008) (Thrash, J.)(concluding that the master complaint is a procedural device only, and that the choice-of-law rules of the states in which the parties originally filed their actions should apply).

16-0320 JB/LF (S.D.N.Y.), which brings claims for fraud, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (ix) Cole v. Santa Fe Nat. Tobacco Co., No. CIV 16-0810 JB/LF (M.D.N.C.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; (x) Johnston v. Santa Fe Nat. Tobacco Co., No. CIV 16-0474 JB/LF (S.D. Fla.), which brings a claim for unjust enrichment on a nationwide class' behalf; (xi) Ruggiero v. Santa Fe Nat. Tobacco Co., No. CIV 16-0329 JB/LF (D.D.C.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; and (xii) Grandison v. Santa Fe Nat. Tobacco Co., No. CIV 16-0319 JB/LF (E.D.N.Y.), which brings claims for unjust enrichment on a nationwide class' behalf.  Of these twelve cases, two have class representatives that are named Plaintiffs in the SAC: (i) Okstad v. Santa Fe Nat. Tobacco Co., which has Blevins and Litwin as named plaintiffs; and (ii) Hebert v. Santa Fe Nat. Tobacco Co., which has Chavez, Horne, and Lopez as named Plaintiffs.

119.    The Court concludes that it must look to the choice-of-law rules of each State in which the Plaintiffs propose a nationwide class.  The Supreme Court has explained:

> Parties may elect to file a "master complaint" and a corresponding "consolidated answer," which supersede prior individual pleadings.  In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings.  *In re Refrigerant Compressors Antitrust Litigation*, 731 F.3d 586, 590–592 (C.A.6 2013).  No merger occurs, however, when "the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs."  *Id.*, at 590.

Gelboim v. Bank of America Corp., 574 U.S. 405, 413 n.3 (2015).  Here, there is no indication that the Plaintiffs intended the master complaint -- here, the SAC -- to merge all of the individual class actions, as opposed to serving as "an administrative summary of the claims brought by all the plaintiffs."  Gelboim v. Bank of America Corp., 574 U.S. at 413 n.3.  Indeed, the SAC states

in its caption: "This Document Relates To All Actions," which the Court interprets as indicating that the original actions remain active.  SAC at 1 (capitalization in original).  Accordingly, the Court will consider the choice-of-law rules of the forum States in which the Plaintiffs filed each original action -- here, Florida, North Carolina, New Mexico, New York, and the District of Columbia -- to determine which State's or States' substantive law applies to the Nationwide Menthol Subclass' express-warranty claim.[69]

120.    Florida courts "traditionally have applied the doctrine of *lex loci contractus* and held that the law of the state where the contract was made or to have been performed governs the interpretation of the contract."  U.S. Fidelity & Guar. Co. v. Liberty Surplus Ins. Grp., 550 F.3d 1031, 1033 (11th Cir. 2008).  See David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1315-16 (S.D. Fla. 2009)(Gold, J.)(noting that the plaintiff's express warranty claim sounds in contract and that Florida law therefore would apply the law of the State in which the contract was executed).  Under this standard, the Court would have to apply all fifty States' express-warranty laws.  See Karhu v. Vital Pharms., Inc., 2014 WL 815253, at *7 (S.D. Fla. 2014)(Cohn, J.)("In the case of a consumer product, the place of contracting is generally where the consumer purchased the product." (quoting David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d at 1316)), aff'd, 621 F. App'x 945 (11th Cir. 2015).  North Carolina applies the

---

[69]Only one of these cases, Hebert v. Santa Fe Nat. Tobacco Co., brings a claim that is identical to the claim in the SAC, i.e., a breach-of-express-warranty claim on a nationwide menthol subclass' behalf.  Because the Plaintiffs have included named Plaintiffs from Okstad v. Santa Fe Nat. Tobacco Co., which does not bring a menthol-related nationwide claim, and otherwise have not indicated that they are discarding the other Plaintiffs' claims who are not named in the SAC, the Court does not limit its review only to North Carolina's choice-of-law rules.  The Court notes, however, that even if it did limit its review to North Carolina, its conclusion below that North Carolina law requires the Court to look at each of the fifty States' breach-of-express-warranty and therefore tilts against concluding that common questions predominate would remain unchanged.

most-significant-relationship test to warranty claims.  See Cochran v. Volvo Grp. N. Am., LLC, No. 1:11-CV-927, 2013 WL 1729103, at *3 (M.D.N.C. April 22, 2013)(Eagles, J.).   North Carolina's most-significant-contacts test similarly requires applying each of the fifty States' express-warranty laws.  See Boudreau v. Baughman, 322 N.C. 331, 338, 368 S.E.2d 849, 855-86 (1988)("Applying this [most-significant-relationship] analysis to the case at bar, we find Florida -- the place of sale, distribution, delivery, and use of the product, as well as the place of injury -- to be the state with the most significant relationship to the warranty claims.").

121.   The analysis does not change if the Court expands its analysis to the choice-of-law rules of the other transferor districts with nationwide claims -- New Mexico, New York, and the District of Columbia -- because the Court concludes that each district's choice-of-law rules point to the substantive law of the States in which the proposed class member purchased the product.  As the Plaintiffs note, New Mexico applies the Restatement (Second) of Conflict of Laws' most-significant-relationship test to multistate contract actions, which directs courts to consider "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties.'"  Ferrell v. Allstate Ins. Co, 2008-NMSC-042, ¶ 55, 144 N.M. at 421-22. 188 P.3d at 1172-73.  Although New Mexico State courts have not considered this test's application to express warranty claims, the Court of Appeals of New Mexico has required plaintiffs in a breach-of-contract action to address the laws of "each state included within the proposed class definition" to determine whether the laws conflict.  Berry v. Federal Kemper Life. Assur. Co., 2004-NMCA-116, ¶ 80,

136 N.M. 454, 476, 99 P.3d 1166, 1188.[70]  Specifically, the Court of Appeals of New Mexico

states:

> Plaintiffs bear the burden of demonstrating that a case is appropriate for class treatment.  It is the plaintiffs' responsibility in the first instance to provide the district court with appropriate law surveys for each state included within the proposed class definition.  The surveys should be detailed enough to show the current state of the law in each state with regard to the legal claims subject to certification.  If the law is not uniform and consistent with New Mexico law, plaintiffs must catalog the differences and provide the district court with a plan for managing the differences through trial.  If defendants disagree with the plaintiffs' survey results, or interpretations, it is incumbent on defendants to inform the district court of any errors they perceive.  The district court cannot be faulted if "clearly established" contradictory law is not brought to its attention. [*Sun Oil Co. v.*] *Wortman*, 486 U.S. [717,] 730–31 . . . [(1988)].  Generalizations about the general state of the law will not do, whether presented by plaintiffs or defendants.[[71]]

Berry v. Federal Kemper Life Assur. Co., 2004-NMCA-116, ¶ 80, 136 N.M. at 475-76, 99 P.3d

at 1187-88.  The Court concludes, therefore, that a New Mexico State court considering a

multistate breach-of-express-warranty claim would look first to laws of each place of purchase.

122.    The Court has not identified a New York State court case that applies its choice-

of-law framework specifically to express warranty claims.  Nevertheless, New York courts apply

a "center of gravity" or "grouping of contract" approach to resolving conflicts-of-laws issues in

contract cases.  Babcock v. Jackson, 12 N.Y.2d 473, 481, 191 N.E.2d 279, 283 (1963).  Federal

---

[70]Berry v. Federal Kemper Life Assurance Co. is a Court of Appeals of New Mexico case.  The Court predicts, however, that the Supreme Court of New Mexico would follow the Court of Appeals of New Mexico's rule, because the Supreme Court of New Mexico has cited with approval Berry v. Federal Kemper Life Assurance Co.'s process of determining whether State laws conflict in multistate class actions.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 37, 144 N.M. at 418, 188 P.3d at 1169 ("We agree . . . that *Berry* sets forth the preferable analysis.").

[71]The Court notes that the Plaintiffs have not provided a survey regarding every State's express warranty laws.  Thus, to the extent that the Plaintiffs advocate for the application of New Mexico's choice-of-laws rules, they have not met the burden for plaintiffs seeking class certification which New Mexico imposes.

courts applying this New York standard to express warranty claims in consumer actions have determined that the State of purchase governs these claims, because they are "the places of contracting and performance." In re Frito-Law N. Am., Inc. All Nat. Litig., No. 12-MD-2413 (RRM)(RLM), 2013 WL 4647512, at *19 (E.D.N.Y. August 29, 2013)(Mauskopf, J.). See Solak v. Hain Celestial Grp., Inc., 3:17-CV-0704 (LEK/DEP), 2018 WL 1870474, at *10 (N.D.N.Y. April 17, 2018)(Kahn, J.).

123.    The District of Columbia cites favorably the Restatement (Second) of Conflict of Laws, and "conduct[s] a 'governmental interest' analysis to determine which jurisdiction's law controls the interpretation and enforcement" of a contract. Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d 617, 620 (D.C. 2008)(citing Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 157 n.2 (D.C. 2005); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 202 (D.C. 1997)). "This analysis requires us to consider several factors, including: (1) the place of contract; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; [and] (5) the residence and place of business of the parties . . . ." Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d at 620 (citing Restatement (Second) of Conflict of Laws §§ 188, 193 (1971); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d at 200-03). These factors similarly point to consumers' place of purchase as the applicable State law.

124.    Thus, no matter which transferor State's choice-of-law rules the Court applies, the Court will have to consider the elements of all fifty States' express-warranty laws, which, as the Defendants note, and as the Court also has decided, differ in the terms of pre-litigation notice, privity, and reliance requirements. See MTD MOO at 231-39 (explaining, e.g., that, "in every state but Illinois" plaintiffs must provide notice for breach-of-express-warranty claims, and that

Florida and Illinois require privity, while New York does not); Certification Opposition at 69

(citing MTD MOO at 231-39; <u>Cox House Moving, Inc. v. Ford Motod Co.</u>, 2006 WL 3230757,

at *6 (D.S.C. November 6, 2006)(Herlong, J.); <u>Porcell v. Lincoln Wood Prods., Inc.</u>, 713

F. Supp. 2d at 1318; <u>Prichard Enters. v. Adkins</u>, 858 F. Supp. 2d at 585; <u>Keegan v. Am. Honda

Motor Co., Inc.</u>, 284 F.R.D. at 547). These problems accompany nationwide consumer class

actions frequently,[72] and the Court concludes that common questions do not predominate over

---

[72]Judge Easterbrook has been critical of the manageability challenges that nationwide
consumer class actions present at the certification stage where those class actions implicate the
laws of each of the fifty States. <u>See</u> <u>In re Bridgestone/Firestone, Inc.</u>, 28 F.3d at 1019-21.
Specifically, he states:

> The district judge did not doubt that differences within the class would
> lead to difficulties in managing the litigation. But the judge thought it better to
> cope with these differences than to scatter the suits to the winds and require
> hundreds of judges to resolve thousands of claims under 50 or more bodies of
> law. Efficiency is a vital goal in any legal system -- but the vision of "efficiency"
> underlying this class certification is the model of the central planner. Plaintiffs
> share the premise of the ALI's *Complex Litigation Project* (1993), which devotes
> more than 700 pages to an analysis of means to consolidate litigation as quickly as
> possible, by which the authors mean, before multiple trials break out. The authors
> take as given the benefits of that step. Yet the benefits are elusive. The central
> planning model -- one case, one court, one set of rules, one settlement price for all
> involved -- suppresses information that is vital to accurate resolution. What is the
> law of Michigan, or Arkansas, or Guam, as applied to this problem? Judges and
> lawyers will have to guess, because the central planning model keeps the
> litigation far away from state courts . . . . And if the law were clear, how would
> the facts (and thus the damages per plaintiff) be ascertained? One suit is an all-or-
> none affair, with high risk even if the parties supply all the information at their
> disposal. Getting things right the first time would be an accident. Similarly
> Gosplan [the Soviet Union's economic planning committee] or another central
> planner may hit on the price of wheat, but that would be serendipity. Markets
> instead use diversified decisionmaking to supply and evaluate information.
> Thousands of traders affect prices by their purchases and sales over the course of
> a crop year. This method looks "inefficient" from the planner's perspective, but it
> produces more information, more accurate prices, and a vibrant, growing
> economy. See Thomas Sowell, *Knowledge and Decisions* (1980). When courts
> think of efficiency, they should think of market models rather than central-
> planning models.

individualized inquiries with regard to the Nationwide Menthol Subclass.

>    **4.**    **The Plaintiffs' Proposed Damages Model Is Not an Adequate Fit with the Plaintiffs' Safer-Cigarette Theory, but Is an Adequate Fit with the Plaintiffs' Menthol Theory.**

125.    The Defendants' final argument in opposition to the Plaintiffs' assertion that common inquiries predominate over individualized inquiries concerns the Plaintiffs' proposed damages model.  See Certification Opposition at 72-82.  The Plaintiffs' expert, Dr. Dubé, has proposed to use a conjoint analysis to determine class-wide economic damages.  See Certification Motion at 56 (citing Dubé Report ¶ 3, at 4).  The Plaintiffs assert that Dr. Dubé's model will control for differences in competitors' pricing on the market's supply side, "can be used to implement a marketplace simulation to measure the price premium paid by consumers, which will account for the oligopoly competition between Defendants and other supply-side competitors," and can measure consumers' willingness to pay.  Certification Motion at 57 (citing

------

.  .  .  .

>    No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court.  See *BMW v. Gore*, 517 U.S. at 568-73 . . . ; *Szabo*[*v. Bridgeport Machines, Inc.*, 249 F.3d at 672] (reversing a nationwide warranty class certification); *Spence v. Glock, G.m.b.H.*, 227 F.3d 308 (5th Cir.2000)(reversing a nationwide tort class certification); Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L.Rev. 547, 579 (1996); Linda S. Mullenix, *Mass Tort Litigation and the Dilemma of Federalization*, 44 DePaul L.Rev. 755, 781 (1995); Robert A. Sedler, *The Complex Litigation Project's Proposal for Federally–Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty*, 54 La. L.Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 613 . . . (1997).

In re Bridgestone/Firestone, Inc., 288 F.3d at 1019-21.

- 282 -

Dubé Report ¶¶ 17-20).   The Plaintiffs assert that Dr. Dubé will calculate a price premium, which "measures the difference between the price class members actually paid for NAS Cigarettes and the price they would have paid but for the Challenged Claims," and the class members' willingness to pay, "which measure the incremental economic value class members perceive from the Challenged Claims."  Certification Motion at 57-58 (citing Dubé Report ¶¶ 23, 25-27, at 9-10).   The Plaintiffs assert that Dr. Dubé intends to create his model using surveys which presents survey respondents with a variety of products, product profiles, labels, and prices, and evaluates which product the respondent would purchase.   See Certification Motion at 58 (citing Dubé Report ¶¶ 34-43, 50, 52-54).

126.   The Defendants contend that Dr. Dubé's methodology does not fit the Plaintiffs' liability theories and that, therefore, the Plaintiffs cannot use his model to determine classwide damages without relying on individualized inquiries, thus defeating predominance.   See Certification Opposition at 72.  Regarding the Safer-Cigarette Theory, the Defendants argue that the Plaintiffs do not measure the value of the alleged belief that Natural American cigarettes are safer, and regarding the Menthol Theory, the Defendants argue that the Plaintiffs "disdain any effort to measure the price effect of the allegedly mistaken beliefs about menthol."  Certification Opposition at 72.  They argue that, under Comcast v. Behrend, "'[a] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [the operative] theory [of liability].'"  Certification Opposition at 72 (quoting Comcast v. Behrend, 569 U.S. at 35)(emphasis, second and third alterations in Certification Opposition, but not in Comcase v. Behrend).  The Defendants argue that Dr. Dubé's model does not measure only those damages attributable to the Plaintiffs' specific theories of liability, that his model would yield an invalid measure of damages, and that he has not determined how he will design the conjoint

survey.[73]  See Certification Opposition at 73.

127.   The Defendants' first argument is that Dr. Dubé's model does not measure the damages which are attributable to the specific statements that the Plaintiffs have alleged are deceptive.   See Certification Opposition at 73-79.   They argue that district courts applying Comcast v. Behrend have required damages models to calculate only those damages that are directly attributable to the specific liability theories that plaintiffs put forward, and have rejected models that do not isolate why a given statement creates a price premium.   See Certification Opposition at 73 (quoting In re ConAgra Foods, Inc., 302 F.R.D. at 579; In re POM Wonderful LLC, No. ML 10–02199 DDP (RZx), 2014 WL 1225184, at *5 (C.D. Cal. March 25, 2014)(Pregerson, J.)).   Put differently, they argue that, "[u]nder Comcast, Plaintiffs' model must quantify the price premium that resulted from the specific false beliefs that the descriptors allegedly induced."   Certification Opposition at 74.   For the Safer-Cigarette Theory, the Defendants assert that this standard requires the "Plaintiffs' damages model [to] identify how much the price of NAS Cigarettes was inflated by a belief that NAS cigarettes are or may be safer and healthier -- and nothing else."   Certification Opposition at 75.   The Defendants argue that Dr. Dubé's model instead will "estimate the *entire* value of each descriptor -- without accounting for how much of that value is attributable to other, perfectly permissible, reasons that a consumer may value a product's being 'natural,' or being made solely from tobacco with no additives (*e.g.*, quality, taste, eco-conscious farming practices, etc.)."   Certification Opposition at 75 (emphasis in original).   They assert that this inability to distinguish between the various

---

[73]The Defendants include this last deficiency to argue that the Court should exclude Dr. Dubé's report and opinions.   See Certification Opposition at 73 n.52.   The Court has considered this argument above and has determined that it will not exclude Dr. Dubé's report or opinions.

beliefs that contribute to a price premium based on certain descriptors could "compensate class members for an injury that this Court has deemed uncompensable," namely that the natural descriptor leads consumers to believe incorrectly that Natural American cigarettes are unprocessed.  Certification Opposition at 76-77 (citing MTD MOO at 132).  The Defendants argue that the issue is similar with the Menthol Theory, in that the model will calculate a price premium for all of the values attributable to the additive-free descriptor, but will not be able to isolate a price premium for the specific harmful belief that the Plaintiffs have alleged.  See Certification Opposition at 78.  The Defendants argue that the Menthol Theory gives rise to an additional deficiency, because the phrase has two allegedly misleading meanings: (i) "that NAS cigarettes are safer"; and (ii) that, in Natural American menthol cigarettes, "no menthol has migrated to the cigarette's tobacco."  Certification Opposition at 78-79 (citing Dubé Depo. at 159:19-162:13; Teece Report ¶ 88, at 68).

128.    The Plaintiffs assert that the Defendants make these same arguments in the Motion to Exclude Dr. Dubé and incorporate by reference the Motion to Exclude Dr. Dubé Opposition.  See Certification Reply at 40.   There, they argue that Dr. Dubé's proposed measurement fits with their damages theory, because the Plaintiffs' other experts, including Drs. Pearson, Proctor, and Cummings, provide opinions that the challenged descriptors are false, misleading, or deceptive, and that Dr. Dubé starts with that assumption and "isolates the economic damages associated with removing the Challenged Claims from the labels to determine the economic value of the Challenged products to Class members, but for the Challenged Claims."  Motion to Exclude Dr. Dubé Opposition at 13.  In response to the Defendants' argument that other beliefs associated with the challenged descriptors could have contributed to the price premium, and that Dr. Dubé's model does not isolate these variables, the Plaintiffs

argue that, because their other experts "establish that reasonable consumers interpret the Challenged Claims to mean that NAS Cigarettes may be less harmful than other cigarettes," it therefore is "not necessary to decompose the effect of the Challenged Claims into a component that created economic damages and a component that did not."  Motion to Exclude Dr. Dubé Opposition at 14.  The Plaintiffs assert that Dr. Dubé and other experts have submitted this methodology or similar methodologies in other consumer class actions, and that courts have accepted these methodologies in certifying those classes.  See Motion to Exclude Dr. Dubé Opposition at 15-17 (citing Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. at 393-96; Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9; Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1106; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D. at 335; Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., 326 F.R.D. at 606; Broomfield v. Craft Brew All., Inc., No. 17-01027, 2018 WL 4952519, at *19; Krommenhock v. Post Foods, LLC, 334 F.R.D. 552, 576 (N.D. Cal. 2020)(Orrick, J.); Kurtz v. Kimberly-Clark Corp., 321 F.R.D. at 524; Martinelli v. Johnson & Johnson, No. 15-01733, 2019 WL 1429653, at *4 (E.D. Cal. March 29, 2019)(England, J.); Hilsley v. Ocean Spray Cranberries, Inc., No. 17-2335, 2018 WL 6300479, at *15 (S.D. Cal. November 29, 2018)(Curiel, J.)).  The Plaintiffs contend that the defendants in these cases, like the Defendants here, "argued that consumers attribute multiple benefits to the challenged representations."  Motion to Exclude Dr. Dubé Opposition at 17-18.  The Plaintiffs dispute that it is a problem that Dr. Dubé does not consider alternative interpretations of the challenged representations, because Dr. Dubé assumes that the challenged representations are false and then "'calculat[es] the economic damages associated with claims that should not have appeared on the labels.'"  Motion to Exclude Dr. Dubé Opposition at 18 (quoting Dubé Aug. 1 Depo. at 181:10-21).  The Plaintiffs argue that their use of an objective theory of liability -- that

the challenged representations mislead a reasonable consumer -- ensures that Dr. Dubé's model

fits their theory of liability, because "[b]oth the but-for market-clearing price and Plaintiffs'

theory of liability are based on what the Challenged Claims mean to the reasonable consumer."

Certification Reply at 41-42.

129.    The Court concludes that Dr. Dubé's conjoint analysis is not an adequate fit with

the Plaintiffs' Safer-Cigarette liability theory, because it incorporates all possible values which

consumers may associate with the challenged labels and which may contribute to Natural

American cigarettes' price premium, as opposed to isolating the understandings which the

Plaintiffs allege the challenged labels cause Safer-Cigarette Theory, but that the model is an

adequate fit with the Plaintiffs' Menthol Theory.  The Plaintiffs' liability theories are premised

on the assertion that the Defendants' labeling practices are misleading to a reasonable consumer,

convincing them either that Natural American cigarettes are safer than other cigarettes when they

are not or that Natural American menthol cigarettes do not contain additives, when they contain

menthol, an additive.  First, the Court notes, as do the Plaintiffs, that courts often have allowed

experts' use of conjoint analysis -- and Dr. Dubé's conjoint analysis methodology

specifically -- to calculate classwide damages in consumer class actions.  See, e.g., Goldemberg

v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. at 392-96.

130.    The Defendants argue that Dr. Dubé's methodology does not account for

differences in the subjective meaning which consumers attribute to these labels.  See

Certification Opposition at 73.  As an initial matter, the Court agrees with the Defendants that, if

the challenged labels have many possible meanings, such as "natural" or "organic" meaning

"ecologically friendly," then potential class members who purchased Natural American

cigarettes on the basis of their belief that they were more ecologically friendly have not been

injured in the same way as those consumers who believed the cigarettes were safer. Accordingly, a conjoint analysis or other methodology must identify a way to isolate the specific belief that the cigarettes were safer than others.  See In re ConAgra Foods, Inc., 302 F.R.D. at 578-79 ("Plaintiffs' specific theory of liability . . . is that the '100% Natural' label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients.  Under *Comcast*, therefore, Weir must be able to isolate the price premium associated with misleading consumers in that particular fashion.").

131.   Although the Plaintiffs cite to several cases in which courts have permitted conjoint analyses to assess classwide damages for misleading-labeling claims, see Motion to Exclude Dr. Dubé Opposition at 15-17, most of those cases are not helpful here.  Some do not consider Comcast v. Behrend's requirement that the conjoint analysis be linked to the plaintiffs' theories of liability at all.  See Martinelli v. Johnson & Johnson, 2019 WL 1429653, at *3-4 (concluding that the conjoint analysis was appropriate for a claim that a food product contained "No Trans Fats" when it necessarily contained trans fats); Kurtz v. Kimberly-Clark Corp., 321 F.R.D. at 551 (acknowledging conjoint analysis as an appropriate methodology, but concluding that the methodology was "beside the point," because the claim involved statutory damages); Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1103-06 (considering only whether the conjoint analysis addressed adequately supply-side factors, although the plaintiff argued that the conjoint analysis isolated the challenged claims in a case where the plaintiff's theory of liability was that cereal products made specific, misleading health-related claims that induced consumers to pay more).  Other cases involve misleading labels that do not rely on the consumers' interpretation of the label such that the plaintiffs' damages model needs to worry about different categories of harm.  See Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at *2, *13-15

(permitting conjoint analysis where the plaintiffs' claim was that a juice's label indicated it contained "No artificial flavors or preservatives" and that she "would not have purchased the Products if she had known they contained artificial ingredients," and focusing instead on Comcast v. Behrend's requirement that conjoint analysis consider supply-side market factors); Broomfield v. Craft Brew All., Inc., 2018 WL 4952519, at *14-16 (considering -- in a case about beer whose label misled consumers into paying a price premium, because they believed defendant brewed the beer in Hawaii -- the model's connection to the plaintiff's theory of harm, but only insofar as the defendants criticized its methodology -- e.g., whether the expert should have shown survey respondents labels instead of bare statements, whether the survey should have used a different reference for mainland brewing locations, and whether it would award damages to all consumers instead of awarding damages only to those who actually believed the product was brewed in Hawaii); In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D at 327, 333 (explaining that a damages model "'must control for product features other than the [challenged claim] when calculating the price premium,'" and permitting conjoint analysis where the plaintiffs' theory of liability was that the plaintiffs "were damaged . . . because they paid a price premium attributable to the falsely claimed product features," namely that the soap product had antibacterial properties)(quoting In re Scotts EZ Seed Litig., 304 F.R.D. at 412); Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9 (permitting conjoint analysis where the challenged shampoo products stated they contained keratin where they did not, and the plaintiffs would not have purchased the products if they had known they did not contain keratin).

132.   Notable among this latter group of cases is the Plaintiffs' citation to Goldemberg v. Johnson & Johnson Consumer Cos.   In that case, the "Plaintiffs challenge ninety different Aveeno products bearing the Active Naturals label that 'contain unnatural, synthetic ingredients,'

which in their view renders the Active Naturals label false, deceptive, and misleading to consumers since the products are, in fact, 'not natural.'" 317 F.R.D. at 382.  The plaintiffs in that case argue that they were harmed, because they would not have paid a price premium or purchased the products at all had they known that the products were not natural.  See 317 F.R.D. at 383.  Dr. Dubé also was involved in proposing a conjoint analysis in that case, and his "purported damages methodology assumes that the inclusion of the Active Naturals label on packaging or in advertising is *in and of itself* objectively misleading."  317 F.R.D. at 387 (emphasis in original).  Although that case bears similarities to the Plaintiffs' case here, namely that both sets of plaintiffs bring suit on the basis of a product's being labeled natural, the key difference is that the plaintiffs in Goldemberg v. Johnson & Johnson Consumer Cos. argue that they were harmed, because the challenged products, despite their natural label, are not in fact natural, see 317 F.R.D. at 383, while the Plaintiffs here argue that they have been harmed, because the challenged products, despite their natural label, are not in fact safer to consume, see SAC ¶ 4, at 2 ("By uniformly using the terms 'Natural' and 'Additive-Free' . . . , Defendants intentionally and successfully convey to reasonable consumers that Natural American Spirit cigarettes are safer and healthier to smoke than other competing cigarettes.  But smoking any cigarette is dangerous and hazardous to health . . . .").  Thus, the issue here is not merely that the cigarettes are not natural or additive-free, and thus that Dr. Dubé can rely on expert assertions that the packaging is objectively misleading to conduct a conjoint analysis that surveys consumers on their preferences for products with and without those labels, but that these labels connote certain meanings, some of which suggest that the cigarette may be healthier, and some of which may suggest that the cigarette has other desirable qualities.

133.    The Plaintiffs cite to two cases which consider specifically and reject the

defendants' assertions that the plaintiffs' proposed conjoint analyses calculate price premiums associated with all of a challenged label's possible values.  First, in <u>Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.</u>, the Honorable Nathaniel M. Cousins, United States Magistrate Judge for the United States District Court for the Northern District of California, notes, in a case involving claims that the defendant, Dr. Pepper Snapple Group, Inc., sold Canada Dry Ginger Ale with the misleading label that it is "Made From Real Ginger," 326 F.R.D. at 598, that:

> The most interesting argument Dr. Pepper presents against the price premium survey under predominance is that "it does not match [plaintiffs'] theory of liability.  The survey purports to calculate a price premium associated with misleading consumers to believe the drink contains powdered or chopped ginger, but it does not do so -- it calculates the premium associated with all possible meanings of the claim."

326 F.R.D. at 614-15 (internal record cites omitted).  Magistrate Judge Cousins explains that, although Canada Dry contains some ginger-based flavoring compounds, the plaintiffs' argument is that the label presents an "actionable misrepresentation because even if it is literally true that Canada Dry has ginger in it, the ginger is not what a reasonable consumer would expect."  326 F.R.D. at 615.  Accordingly, Magistrate Judge Cousins concludes that "what plaintiffs' price premium measures is how much the 'Made From Real Ginger' claim is worth" and that the challenged claim's worth "will only matter in the future if a jury does find that the claim is misleading (i.e., the jury will determine what the meaning of 'Made From Real Ginger' is), based on the allegedly microscopic amount of ginger root in Canada Dry."  326 F.R.D. at 615.  Because it does not matter what the "Made From Real Ginger" label's possible interpretations were -- because the jury would decide whether the ginger in Canada Dry was what a reasonable consumer would expect -- Magistrate Judge Cousins determines that the damages model fits the plaintiffs' theory of liability.  326 F.R.D. at 615.  Here, however, even if a jury determines that

Natural American's labels mislead a reasonable consumer to believe that the cigarettes are safer, other interpretations of the label nevertheless may contribute to the cigarettes' price premium.

134.    The Plaintiffs also cite to Krommenhock v. Post Foods, LLC, which considers forty-one challenged claims, based on the cereal products' sugar content.  See 334 F.R.D. at 560. The defendant, Post Foods, argued that, "because plaintiffs challenge only the implication of healthiness from the Challenged Statements, plaintiffs cannot challenge the many other truthful or non-actionable statements on the Products," and that "the model fails because plaintiffs' experts did not try and isolate and test the Challenged Statements separate and apart from the value of the unchallenged or truthful statements."  334 F.R.D. at 575.  The Honorable William H. Orrick, United States District Judge for the Northern District of California, rejects this argument as an "overreach[]."  334 F.R.D. at 575.  Judge Orrick concludes that, because the "question under California law is whether the Challenged Statements are false or misleading to an objective reasonable consumer," the plaintiffs' consumer impact model is "an appropriate starting point for a damages model," because it assumes that statement is true.  334 F.R.D. at 575 (citing Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008); Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1106).  The Court here disagrees that a damages model that does not isolate the challenged claims' meaning is adequate, even where the legal question presented is whether the claims mislead a reasonable consumer.  While the answer to that legal question does not require a fact finder to look beyond the challenged claim's misleading nature, the analysis is not the same for purposes of calculating damages based on a price premium, because allowing a model to calculate a price premium without isolating the challenged claims may allow for an inflated damage amount depending on the value associated with the unchallenged or truthful claims.

135.    The Court is not alone in requiring Dr. Dubé's conjoint analysis to distinguish between the price premium of the term natural or additive-free generally and the meanings associated with those terms specifically is not an insurmountable task.  In In re ConAgra Foods, Inc., for example, the Honorable Margaret Morrow, United States District Judge for the United States District Court for the Central District of California, examined an expert's proposed hedonic regression analysis of the term "100% Natural."   302 F.R.D. at 578.   The plaintiffs' theory of liability in that case was that the natural label "misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients," and the expert, Dr. Weir, conceded that the phrase all natural "'has many implications,'" which additional studies confirmed.  302 F.R.D. at 578-79 (quoting Hawk Decl. at 66).   Because Dr. Weir proposed only to calculate the price premium attributable to the label and all of its connotations, Judge Morrow determined that "[t]his does not suffice under Comcast," and, in addition to other problems, determined that the plaintiffs had not satisfied rule 23(b)(3)'s predominance requirement.[74]   302 F.R.D. at 579.

---

[74]Later in the case, the plaintiffs filed an amended motion for class certification which included a hybrid damages model.  See In re ConAgra Foods, Inc., 90 F. Supp. 919, 1023-31 (C.D. Cal. 2015)(Morrow, J.)("ConAgra II").   First, the plaintiffs re-proffered Dr. Weir's hedonic regression analysis of the "100% Natural" label which Judge Morrow previously had rejected and which she again concludes "does not satisfy Comcast because it does not isolate the price premium attributable to consumers' belief that ConAgra's products did not contain GMOs." ConAgra II, 90 F. Supp. 3d at 1024-25 (citing Vaccarino v. Midland Nat. Life Ins. Co., No. 2:11-cv-05858-CAS (MANx), 2014 WL 572365, *7 (C.D. Cal. February 3, 2014)(Snyder, J.)).   What the plaintiffs did differently in ConAgra II, however, was to incorporate an additional analytical step: in addition to using Dr. Weir's hedonic regression analysis to determine that total price premium attributable to the 100% Natural label, the plaintiffs proposed that a second expert, Dr. Howlett, would conduct a conjoint analysis to determine how much of that total price premium could be explained by consumers' belief that the label meant that the product was GMO-free.  See ConAgra II, 90 F. Supp. 3d at 1025.   In essence, Dr. Howlett

136.    The problem with Dr. Dubé's conjoint analysis does not apply to both theories equally, however.  Both theories argue that the Defendants acted deceptively by labelling their products as natural and as additive-free when the products were not natural and contained additives.   Under the Safer Cigarette Theory, the "Defendants can and do charge a price premium for Natural American Spirit cigarettes because consumers believe that they are healthier and safer."  SAC ¶ 89, at 36.  The Plaintiffs assert that they and Dr. Dubé rely on their other experts' conclusions that these labels are misleading in the specific ways that give rise to this liability theories here.[75]  See Motion to Exclude Dr. Dubé Opposition at 14.  This assertion

_____

proposes to take the total price premium calculated by Weir and multiply it by the percentage derived from her conjoint analysis.  Such a calculation would necessarily produce a damage figure attributable *solely to ConAgra's alleged misconduct* -- i.e., misleading consumers to believe that Wesson Oils contain no GMOs by placing a "100% Natural" label on the products.

90 F. Supp. 3d at 1025 (emphasis in original).  With this new, hybrid methodology in place, Judge Morrow determines that the plaintiff's damages model satisfies Comcast v. Behrend's requirement that the damages model fit the plaintiffs' theory of liability.  ConAgra II, 90 F. Supp. 3d at 1031.  See Briseno v. ConAgra Foods, Inc., 674 F. App'x 654, 657 (9th Cir. 2017)(determining on appeal that Judge Morrow did not abuse her discretion in concluding that the hybrid model tracked the plaintiffs' theory of liability under Comcast v. Behrend).  The Plaintiffs here do not add another expert to make this additional analytical step, so the faults with Dr. Dubé's conjoint analysis remain.

[75]Specifically, the Plaintiffs assert that "Drs. Pearson, Proctor, and Cummings opine that the reasonable consumer interprets the Challenged Claims to mean NAS Cigarettes may be less harmful than other brands of cigarettes."  Certification Reply at 40.  Of these three experts, the Defendants have moved under Daubert to exclude Dr. Pearson's expert report and opinions in their entirety.  See Motion to Exclude Dr. Pearson at 1-42.  The Defendants argue that Dr. Pearson's opinions are not reliable under Daubert for two reasons, namely that: (i) she does not report objectively and accurately the findings of the studies which she has conducted and of others' published works, and instead acts as an advocate instead of a scientist; and (ii) she relies on "'unfounded extrapolation[s]'" that make her methodology and conclusions unreliable.  Motion to Exclude Dr. Pearson at 1-3 (quoting White v. Town of Hurley, No. CIV 17-0983 JB/KRS, 2019 WL 1411135, at *28 (D.N.M. March 28, 2019)(Browning, J.)).    Further, regarding Daubert's relevance prong, the Defendants argue that Dr. Pearson's opinions are not helpful to the Court, because the studies which she cites "do not identify or analyze data on NAS

_____

consumers," who are the relevant consumers in this case.  Motion to Exclude Dr. Pearson at 3-4.

Regarding their first reliability argument, the Defendants argue that Dr. Pearson "consistently fails to disclose data and findings that conflict with her position, and instead cherry-picks data that she views as supporting it -- violating both the basic requirements of the scientific method and authoritative survey research standards."  Motion to Exclude Dr. Pearson at 10.  They pose two arguments in support of this assertion, that: (i) Dr. Pearson has omitted data and studies that are inconsistent with her preferred conclusions; and (ii) her analyses are results-driven and therefore are contrary to the scientific method and the survey standards on which she purports to rely.  See Motion to Exclude Dr. Person at 11-21.  In support of their first argument, the Defendants assert that the scientific method demands objectivity and that establishing first a firm conclusion, and then conducting research to reach that conclusion, is antithetical to the scientific method and a clear example of applying a methodology unreliably.  See Motion to Exclude Dr. Person at 11 (quoting In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II), 892 F.3d 624, 634 (4th Cir. 2018); Pueblo de Jemez v. United States, 430 F. Supp. 3d at 1162; United States v. Rodriguez, 125 F. Supp. 3d 1216, 1233-34 (D.N.M. 2015)(Browning, J.)).  Similarly, they assert that the American Association for Public Opinion Research's Best Practices for Survey Research, which Dr. Pearson has offered as authoritative, directs researchers to report contradictory or unfavorable findings.  See Motion to Exclude Dr. Person at 11 (quoting AAPOR, Best Practices for Survey Research, and citing Pearson Depo. at 92:23-93:8).  The Defendants assert that Dr. Pearson: ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████

The Plaintiffs counter that "that Defendants disagree with Dr. Pearson's opinions, and believe they should have been based on other data, is not grounds to exclude her testimony."  Motion to Exclude Dr. Pearson Opposition at 10 (citing General Elec. Co. v. Joiner, 522 U.S. at 146).  They argue that Dr. Pearson's opinions satisfy the Daubert criteria, including that her theories and techniques have been tested and follow established standards, that her theories have been subject to peer-review and statistical analysis, and that the scientific community accepts her methodologies.  See Motion to Exclude Dr. Pearson Opposition at 10-12.  With respect to the Defendants' first argument, the Plaintiffs contend that Dr. Pearson did not omit data selectively, and that any concerns regarding the data's completeness go towards its weight and not to its admissibility.  See Motion to Exclude Dr. Pearson Opposition at 10-17.  ███████████ ███████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

   The Court concludes that Dr. Pearson's omissions are not fatal to the Pearson Report's reliability on the grounds that they do not comport with the methodologies which the AAPOR establishes as best practices.  The Defendants are correct that Dr. Pearson endorses the AAPOR's set of best practices for survey research, see Pearson Depo. at 83:14-20 (Pearson, Reisman), but the Defendants' reliance on the AAPOR's best practices is misplaced here.  Those standards apply to designing and conducting surveys, and then to communicating the data obtained from those surveys.  See Best Practices for Survey Research.  Thus, if Dr. Pearson had conducted a survey study and purposely had omitted questionnaires from respondents whose responses did not align with her desired conclusion, for example, she would have violated these best practices. The Defendants do not attack, however, the underlying studies on which Dr. Pearson relies, but argue that she did not discuss certain studies or survey results in completing the Pearson Report. Dr. Pearson did not conduct novel survey research in creating the Pearson Report, but rather "was asked to render opinions on what the research to date shows . . . ."  Pearson Report at 3.  In other words, she engages in a form of meta-analysis, in which she compiles various studies and summarizes their conclusions.  See Pearson Report at 1-25.  That the Defendants assert that she has omitted studies or survey data in reaching her conclusions on what the scientific literature says is not an attack on Dr. Pearson's adherence to the AAPOR's survey standards.

   What is troubling, however, is that the Pearson Report does not explain Pearson's methodology for collecting these studies, such as whether she limited her search in terms of scope or time, or whether she focused broadly on the impacts of cigarette labeling in the industry at large or specifically on Natural American's labeling practices.  The Defendants' assertion that Dr. Pearson omits relevant studies is particularly concerning given that the Pearson Report's sole focus is to summarize the studies that academics have conducted in the field.  Regarding the three studies with which the Defendants take issue, however, only ██████ Study is of concern. Dr. Pearson does not omit the 2019 study and Pearson in Preparation from the Pearson Report, and discusses their findings.  See Pearson Report at 6, 12.  To the extent that the Defendants disagree with Dr. Pearson's presentation of the studies' conclusions or believe that she has not summarized them accurately, such concerns are appropriate grounds for cross-examination, but do not weigh on her opinion's admissibility.  The Court acknowledges that the Pearson Report does not include ██████ Study's results, but accepts Dr. Pearson's deposition testimony that she did not have access to the study's preliminary analyses before submitting the Pearson Report. See Pearson Depo. at 56:11-25 (Pearson, Reisman, Schultz).  Accordingly, the Court will not exclude Dr. Pearson's opinions on this ground.

   The Defendants argue next that, setting aside any study data which Dr. Pearson did not disclose, "even the data and studies on which she 'relies' do not support her conclusions," because she extrapolates excessively, and there is too large of an analytical gap between the data and her conclusions.  Motion to Exclude Dr. Pearson at 21 (citing White v. Town of Hurley, 2019 WL 1411135, at *28; Dodge v. Cotter Corp., 328 F.3d 1212, 1221-22 (10th Cir. 2004)). They argue that, of the studies on which she relies, only two report data that is specific to Natural American smokers, and that they stem from a single study that used as its subjects individuals

who smoke Natural American cigarettes as their usual brand.  See Motion to Exclude Dr. Pearson at 22.  They analogize her extrapolations to cases in which courts have excluded expert opinions that extrapolate animal test results to humans, and assert that "'[a] court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."'"  Motion to Exclude Dr. Pearson at 22 (quoting Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1162 (quoting General Elec. Co. v. Joiner, 522 U.S. at 146, and citing Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)), and citing Hollander v. Sandoz Pharma. Corp., 289 F.3d 1193, 1207-09 (10th Cir. 2002)).  The problem with this extrapolation, the Defendants assert, is that the proposed classes -- and sixty-percent of Natural American smokers -- are not limited to those who usually smoke Natural American cigarettes, and that Dr. Pearson uses studies that focus only on usual Natural American smokers and studies that do not report conclusions regarding Natural American smokers at all.  See Motion to Exclude Dr. Pearson at 23-25.  They also argue that the studies which Dr. Pearson cites do not test Natural American descriptors as they actually appear, and that it is too great of an analytical leap to extrapolate from a study which evaluated whether consumers thought Natural American cigarettes "*might*" be safer to a conclusion that consumers believe Natural American cigarettes "*are*" safer.  Motion to Exclude Dr. Pearson at 30 (emphasis in original).  See id. at 26-30.  Finally, they argue that the study which Dr. Pearson cites to support her opinion that these misperceptions impact consumers' purchasing behavior refutes that conclusion.  See Motion to Exclude Dr. Pearson at 33.

The Plaintiffs respond that what the Defendants view as improper extrapolation is really a disagreement with Dr. Pearson's conclusions, and argue that, "[i]f an opposing party perceives weaknesses in the factual basis of an expert's opinion, the testimony is nevertheless admissible and should instead be the subject of cross-examination."  Motion to Exclude Dr. Pearson Opposition at 20 (citing Hertz Corp. v. Gaddis-Walker Elec., Inc., 125 F.3d 862 (table), 1997 WL 606800 (10th Cir. October 2, 1997); Duke Energy Field Serv., LP v. Gandy Corp., Nos. CV 05–1342 WPL/RLP, CV 06–0318 WPL/CEG, 2006 WL 5186540, at *3 (D.N.M. December 27, 2006)(Lynch, M.J.)).  They argue that extrapolation is common in scientific research and that Dr. Pearson's extrapolation here is reasonable.  See Motion to Exclude Dr. Pearson Opposition at 21-22 (citing Joiner, 522 U.S. at 146; Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999)).  They argue that "the perceptions of people who do not smoke NAS are relevant because all, and particularly smokers of other brands, are potential NAS consumers . . . ."  Motion to Exclude Dr. Pearson Opposition at 21.

The Court concludes that Dr. Pearson's extrapolations are not unreasonable and that, to the extent that the Defendants disagree with her ultimate conclusions based on those extrapolations, they may interrogate them on cross-examination.  The extrapolations that courts have concluded create too great of an analytical gap often involve untested hypotheses and the importing of animal-test results into the human context.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1162 (citing Norris v. Baxter Healthcare Corp., 397 F.3d at 887; In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.); Gen. Elec. Co. v. Joiner, 522 U.S. at 146; Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d at 1244, and citing Hollander v. Sandoz Pharma. Corp., 289 F.3d at 1207-09).  Although the cases which Dr. Pearson cites may not focus specifically on the exact cigarette-smoker whom the Defendants contend should be at issue here, the Court does not conclude that Dr. Pearson's extrapolations of these survey data to

- 297 -

does not rebut the Defendants' argument that consumers may be willing to pay a price premium based on the non-health-related implications of labels like natural, organic, and additive-free. Indeed, the Defendants note that Dr. Dubé concedes that his model does not consider other possible interpretations of the label's language.  See Certification Opposition at 75 (quoting Dubé Depo. at 175:20-175:20).

137.   Regarding the Menthol Theory, however, the Plaintiffs argue that, "[c]ontrary to the explicit claim on every label that Natural American Spirit cigarettes contain 'additive-free natural tobacco,' Defendants add additive to Natural American Spirit menthol cigarettes."  SAC ¶ 68, at 31.   In the Certification Reply, the Plaintiffs frame this theory as arguing that the "Defendants warranted that the Menthol NAS Cigarettes were additive-free.  There is substantial common evidence that this representation is false, and therefore actionable, as well as misleading to a reasonable consumer."  Certification Reply at 42.  This theory aligns more closely with the group of cases which the Court discusses above that involve misleading labels which do not rely on the consumers' interpretation of the label such that the plaintiffs' damages model needs to worry about different categories of harm.  See Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at *2, *13-15; Broomfield v. Craft Brew All., Inc., No. 17-01027, 2018 WL 4952519, at *14-16; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D at 327, 333; Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9.  The Defendants' effort to argue that the Menthol Theory fails under Comcast v. Behrend, because additive-free could stand for a belief that menthol is not an additive and that the cigarettes are free of other, non-menthol additives, goes too far.  See Certification Opposition at 78.  The Court already has concluded that the

---

interpret other smokers' and non-smokers' behavior and beliefs renders her conclusions unreliable.  Accordingly, the Court denies the Motion to Exclude Dr. Pearson.

additive-free description on Natural American's menthol products plausibly misleads a reasonable consumer and notes that menthol is an additive. See MTD MOO at 173. Thus, to the extent that consumers believed that Natural American menthol cigarettes did not contain additives based on the additive-free label's assertion to that effect, Dr. Dubé's model is designed to calculate the price premium associated with that label. See Dubé Report ¶ 46(iii), at 19. Accordingly, the Court concludes that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette theory, but is an adequate fit for their Menthol Theory.

138.   The Defendants' second argument is that, even if Dr. Dubé's model is tied to the Plaintiffs' liability theories, it measures willingness-to-pay, which the Defendants assert is not a valid measure of damages in consumer-fraud cases. See Certification Opposition at 79-82. The Defendants assert that, instead, the appropriate damages measure should be "'determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices.'" Certification Opposition at 79 (quoting In re 5-Hour Energy Mktg. & Sales Pracs. Litig., 2017 WL 2559615, at *10). The Defendants assert that, to calculate this value, Dr. Dubé must consider supply-side variables -- namely, the market's willingness-to-sell -- in addition to consumers' willingness-to-pay, which is a demand-side variable. See Certification Opposition at 80. The Defendants acknowledge that Dr. Dubé has proposed a marketplace simulation to address the supply-side variables, but argue that his calculations will not fit the Plaintiffs' liability theories, and criticize his assertion that he has not reviewed Santa Fe's cost data but instead will infer those data as lacking support. See Certification Opposition at 81.

139.   The Plaintiffs assert that Dr. Dubé has suggested two ways to measure economic damages: (i) the price premium; and (ii) willingness-to-pay. See Certification Reply at 42 (citing

Dubé Report ¶¶ 29-33, at 11-13).  They assert that willingness-to-pay is "the relevant measure of compensation to consumers."  Certification Reply at 43 (citing Dubé Report ¶ 21, at 8).  The Plaintiffs also assert that Dr. Dubé accounts for supply-side factors, because he acknowledges that competitor brands sell and differentiate their products based in part on price and incorporates this phenomenon in his model.  See Certification Reply at 43 (citing Dubé Report ¶¶ 17, 27, 33, at 8. 10, 13).

140.    In the Dubé Report, Dr. Dubé asserts that there are two components to economic damages that misled consumers confront: (i) a price premium, because the product's price would have been lower but-for the misleading labels; and (ii) willingness-to-pay, because consumers do not receive the full value for which they paid.  See Dubé Report ¶ 22, at 9.  He asserts that he will compute both values to determine the damages applicable to the Plaintiffs' proposed class members.  See Dubé Report ¶¶ 25, 29, at 9, 11.  According to Dr. Dubé, calculating the price premium involves conducting a marketplace simulation that simulates a market in which competitors compete on price, and assumes "that each firm sets its prices to maximize the profits from the sale of its brands in this competitive marketplace."  Dubé Report ¶ 25, at 9-10.  The Court agrees with the Plaintiffs that this methodology considers supply-side willingness-to-sell and addresses adequately the Defendants' concerns that his calculations do not consider the supply-side in calculating the market price.

141.    Although the Defendants contend that this marketplace simulation is an inadequate fit to the Plaintiffs' liability theories, the Court has considered this argument above and determined that Dr. Dubé's proposed methodology is an adequate fit for class certification purposes.  The Defendants argue further that Dr. Dubé has not reviewed cost data and instead will make inferences about those data.  See Certification Opposition at 81.  That Dr. Dubé has

not reviewed this data yet is not relevant to the Court's predominance analysis, as it does not bear on whether individualized inquiries predominate over common questions and, in any event, the Plaintiffs do not need to be able to calculate each class member's damages at the class certification state.  See In re Rail Freight Fuel Surcharge Antitr. Litig., 292 F. Supp. 3d 14, 142 (D.D.C. 2017)(Friedman, J.).  To the extent that Santa Fe produces cost data through discovery, Dr. Dubé will be able to review it, addressing the Defendants' concerns.  Further, the Court above has permitted Dr. Dubé's methodology in the face of the Defendants' Daubert challenge, and, if Santa Fe's cost data is not discoverable, has accepted the methodology with which Dr. Dubé plans infer Santa Fe's cost data.  Accordingly, the Defendants' argument on this point does not disrupt the Court's conclusion above that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette theory, but is an adequate fit for their Menthol Theory.

142.   In summary, the Court concludes with respect to the Nationwide Menthol Subclass' predominance inquiry that: (i) the Nationwide Menthol Subclass members are readily ascertainable using objective criteria; (ii) administrative feasibility concerns tilt against a conclusion that common questions predominate; (iii) if an objective standard applies to all class members' claims, that class members may have seen different representations does not mean that individualized inquiries will predominate over common questions with respect to the express-warranty claim, because the Court limits the Nationwide Menthol Subclass period to 2017, when the Defendants ceased using additive-free labels on their cigarette products; (iv) the transferor courts' choice-of-law provisions direct the Court to apply the express-warranty laws of each State in which class members purchased Natural American cigarettes, which tilts against a conclusion that common questions predominate; and (v) to the extent that the Plaintiffs bring their claims for the Nationwide Menthol Subclass under the Menthol Theory and not the Safer-

Cigarette Theory, Dr. Dubé's proposed damages model does not require individualized inquiries that will predominate over common questions. The Court has serious concerns regarding the Nationwide Menthol Subclass' administrative feasibility, and because the Nationwide Menthol Subclass requires the application of the laws of each State in which consumers purchase Natural American cigarettes, concerns which, in addition to implicating "the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), lead the Court to conclude that common questions do not predominate over individualized inquiries. Accordingly, the Nationwide Menthol Subclass does not satisfy rule 23(b)(3)'s predominance requirement, and the Court will not certify the Nationwide Menthol Subclass.

### F. THE NATIONWIDE MENTHOL SUBCLASS DOES NOT SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT.

143. Rule 23(b)(3)'s second requirement is that the proposed class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides a non-exhaustive list of factors to consider, including:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Both parties agree that manageability is the most important factor for the superiority analysis. See Certification Motion at 84 (quoting Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 173); Certification Opposition at 82 (quoting Payne v. Tri-State

CareFlight, 332 F.R.D. at 682).  The Plaintiffs assert that negative-value class actions establish superiority and that each of these factors support additionally a conclusion that the nationwide menthol class action is a superior litigation vehicle.  See Certification Motion at 84-85. Specifically, they state that: (i) litigation costs dwarf each class members' claim; (ii) because of this cost imbalance, class members have little interest in controlling the actions, and if they had a greater interest, they could opt out of the class; (iii) there are no similar matters pending outside of this multidistrict litigation; (iv) concentrating the class members' claims is desirable, because it provides economies of scale; and (v) trial is manageable, because the cases will return to their transferor courts or otherwise will be consolidated.  See Certification Motion at 84-85 (citing Fed. R. Civ. P. 23(b)(3); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407; Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 171).  The Defendants argue that the presence of individualized issues that predominate over common questions suggests that the class action also will be a less desirable vehicle to resolve the class members' claims.  See Certification Opposition at 82 (quoting Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1184).  They point to the same factors which they raised in the predominance inquiry -- that the classes are not readily ascertainable, that class members received different information, that the class members suffered different injuries -- to argue that they also make the litigation unmanageable, even where negative-value claims are at stake.  See Certification Opposition at 82-83.   The Defendants also attack the Nationwide Menthol Subclass' express-warranty claim, because certification requires applying the laws of all fifty States.  See Certification Opposition at 83 (quoting Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 948 (6th Cir. 2011), and citing In re OnStar Contract Litig., 278 F.R.D. 352, 386 (E.D. Mich. 2011)(Cox, J.)).

144.    The Court previously has recognized two factors which give the Plaintiffs a "leg up" in establishing superiority: (i) that these claims are negative-value claims, meaning that they individually would not be worth pursuing; and (ii) that the class consists of so many similar cases and potential individual plaintiffs that the judiciary would struggle to handle them all separately. Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407.  The first factor is part of "[t]he policy at the very core of the class action mechanism . . . ."  Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 617).

145.    The Court additionally reviews the four factors that rule 23(b)(3) provides, beginning with the class members' interest in controlling the litigation individually.  See Fed. R. Civ. P. 23(b)(3)(A).  In analyzing this factor, the Court considers the likelihood that class members would bring their own claims or that they would be savvy enough to know that they can bring their claims in the first place.  See Hicks v. Client Servs., Inc., 257 F.R.D. at 701.  The Court agrees with the Plaintiffs that, for the Nationwide Menthol Subclass, litigation costs dwarf the value of each class members' individual express-warranty claims, see Certification Motion at 84, and considers it likely that most individual plaintiffs would not know that they have an actionable express-warranty claim in the first place.  The Plaintiffs also are correct that, because they move to certify the Nationwide Menthol Subclass, if the Court were to certify the class, rule 23(c)(2)(B)(v) directs the Court to, in providing notice to potential class members, inform them that they may opt out of the class.  See Fed. R. Civ. P. 23(c)(2)(B)(v).  Thus, to the extent that individual class members have a particularly strong interest in controlling the litigation, they may opt out of the Nationwide Menthol Subclass and pursue their claims individually.  Cf. In re Petrobras Secs., 862 F.3d at 268 n.19 (noting that "due process concerns regarding notice to

absent class members," which rule 23(b)(2)(B) addresses, properly fall under a court's superiority analysis).

146.     Regarding the second and third factors -- the extent to which class members have begun similar litigation elsewhere and the desirability of concentrating litigation in this district -- the JPML addressed these considerations to some extent already when it consolidated these actions before the Court.  See Transfer Order at 1, filed April 11, 2016 (Doc. 1)("[W]e find that these actions involve common questions of fact, and that centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.").  The Defendants have not demonstrated that any potential class members have begun litigation elsewhere, and the Court has not identified such ongoing litigation.  The Court notes, however, that twelve of the seventeen consolidated class actions propose some form of nationwide class.  See supra, at 283-84 (listing the consolidated actions which propose a nationwide class).  Thus, to the extent that the Court will remand some or all of these class actions at the certification process' conclusion, there will be several ongoing classes, although it does not appear that any of them are individual actions.  Nevertheless, the Court determines the JPML's consolidation of a total of seventeen class actions and tag-along actions to be a strong indicator of the desirability of consolidating these claims.  Even if the JPML had not taken such action, the Court would determine that it is desirable to consolidate these claims, because, as it notes in its discussion on numerosity, there are potentially millions of class members.  Assuming that every potential class member would bring his or her claim individually, the millions of claims would overwhelm the courts, and consolidating the individual claims into class actions avoid that result.

147.     The Defendants assert, however, that many of the same issues that implicate

predominance make the class action a less-superior means of adjudicating the proposed class members' claims.  See Certification Opposition at 82-83.  These issues include that the classes are not readily ascertainable, that class members received different information, that the class members suffered different injuries and that, regarding the Nationwide Menthol Subclass' express-warranty claim, certification requires applying the laws of all fifty States.  See Certification Opposition at 82-83 (quoting Pilgrim v. Universal Health Card, LLC, 660 F.3d at 948, and citing In re OnStar Contract Litig., 278 F.R.D. at 386).  The Court concludes above that the information that class members received and their differing injuries are not individualized inquiries that will predominate over common questions and, for the same reasons, does not consider that these issues make the Nationwide Menthol Subclass an inferior litigation vehicle.

148.    The Court also concludes above, however, that there are serious administrative feasibility concerns in identifying proposed class members, and that applying the law of all fifty States regarding express-warranty claims tilts against concluding that common questions predominate over individualized inquiries.  In reaching this conclusion, the Court notes that those concerns implicate "'the likely difficulties in managing a class action.'"  Supra, at 299 (quoting Fed. R. Civ. P. 23(b)(3)(D)).  The need to apply each of the fifty States' express-warranty laws tilts especially against a conclusion that the Nationwide Menthol Subclass is manageable, and other courts have concluded that nationwide class actions are unmanageable where many jurisdictions' laws apply and where the plaintiffs have not shown conclusively that those laws do not conflict.  See In re Bridgestone/Firestone, Inc., 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); Powers v. Lycoming Engines, 272 F.R.D. 414, 427 (E.D. Pa. 2011)(Savage, J.)(citing In re Bridgestone/Firestone, Inc., 288 F.3d at 1018; In re Am. Medical

Sys., Inc., 75 F.3d at 1085); <u>Cole v. Gen. Motors Corp.</u>, 484 F.3d 717, 724-25 (5th Cir. 2007)(establishing that the plaintiffs burden to demonstrate predominance in a nationwide class action includes demonstrating that different jurisdictions' laws do not differ meaningfully). The Plaintiffs here have not made this demonstration. Because the "manageability factor . . . is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication," Newberg and Rubenstein on Class Actions § 4:72 that the Court determines that the Plaintiffs have not shown that the Nationwide Menthol Subclass is manageable leads the Court to conclude that the Nationwide Menthol Subclass is not a superior vehicle for litigating these claims, even though this action consists of negative-value claims. In addition to the Court's determination above that the Plaintiffs have not demonstrated that common claims predominate over individualized inquiries, the Court concludes that, because the Plaintiffs have not demonstrated that the Nationwide Menthol Subclass is a superior litigation method, it will not certify the Nationwide Menthol Subclass for that reason. Because the Plaintiffs move for class certification for a variety of State menthol subclasses in the alternative to the Nationwide Menthol Subclass, the Court will consider those subclasses in its analysis on each of the State classes below.

## II. THE COURT CERTIFIES UNDER RULE 23(B)(3) THE CALIFORNIA MENTHOL SUBCLASS TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY BUT DOES NOT CERTIFY THE CALIFORNIA CLASS OR THE CALIFORNIA MENTHOL SUBCLASS TO THE EXTENT THAT IT IS <u>PREMISED ON THE SAFER-CIGARETTE THEORY</u>.

149.  The Court turns to the Plaintiffs' proposed California Class and California Menthol Subclass (the "California Classes"). The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and

superiority requirements.  Because the California Class members and the California Menthol Subclass members seek injunctive relief, the Court also will consider whether the proposed classes satisfy rule 23(b)(2)'s requirements.

### A.   THE   CALIFORNIA   CLASSES   SATISFY   RULE   23(a)'S REQUIREMENTS.

150.    The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.   See Fed. R. Civ. P. 23(a).   The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20. Accordingly, the Court focuses its analysis here on the commonality and typicality requirements.

### 1.   The California Classes Satisfy Rule 23(a)'s Commonality Requirement.

151.    Neither the Plaintiffs nor the Defendants raise any commonality arguments that are unique to the California Classes.  In considering whether the Nationwide Menthol Subclass satisfies rule 23(a)'s commonality requirement, the Court discusses whether common questions exist that go to the resolution of the express-warranty claim which the Nationwide Menthol Subclass alleges.  Here, the California Classes bring four claims: (i) a violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 ("CLRA"), alleging that the Defendants used deceptive representations with respect to Natural American cigarettes under Cal. Civ. Code §§ 1770(a)(4)-(5), (7), which they knew likely were to mislead consumers to believe that the cigarettes were healthier than other brands and that they did not contain additives, see SAC ¶¶ 136-50, at 46-49; (ii) a violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), alleging that the Defendants labeled, marketed, or disseminated information

through public advertising that was deceptive and misleading, <u>see</u> SAC ¶¶ 151-60, at 49-50; (iii) a violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), alleging that the Defendants' deceptive conduct constitutes an unfair and fraudulent business practice, <u>see</u> SAC ¶¶161-70, at 50-53; and (iv) a claim for unjust enrichment, alleging that, as a result of the Defendants' conduct, they obtained unjust benefits, <u>see</u> SAC ¶¶ 171-76, at 53-54.

152.    The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). For example, whether the Defendants' labels misrepresented the cigarettes' qualities or ingredients, whether the labels likely were to deceive a reasonable consumer, and whether the Defendants knew that these labels likely were to mislead the public, are all questions capable of generating common answers that are central to the Plaintiffs' California State-law claims. <u>See</u> <u>Wal-Mart v. Dukes</u>, 564 U.S. at 350; <u>Kumar v. Salov N. Am. Corp.</u>, 2016 WL 3844334, at *4 (noting that, under the CLRA, UCL, and FAL, "[t]he central question here is whether [the] labels were likely to deceive a reasonable consumer"). Given the CLRA, UCL, and FAL's reliance on a reasonable consumer standard, <u>see</u> <u>Kumar v. Salov N. Am. Corp.</u>, 2016 WL 3844334, at *4, the Court is not concerned at the commonality stage with the Defendants' argument that individual consumers may have understood and interpreted the labels differently. <u>See</u> Certification Opposition at 20. The California Classes' unjust enrichment claim similarly is predicated on the Defendants' deceptive conduct under the CLRA, UCL, and FAL. <u>See</u> SAC ¶ 172, at 53. Accordingly, similar questions are central to that claim's resolution. The Court concludes, therefore, that the Plaintiffs' proposed California Classes satisfy rule 23(a)'s commonality requirement.

**2.     The California Classes Satisfy Rule 23(a)'s Typicality Requirement.**

153.    As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the California Classes. See Certification Opposition at 22-24.  Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the California Classes.  Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the California Classes satisfy rule 23(a)'s typicality requirement.  Adamson v. Bowen, 855 F.2d at 676.

**B.     THE CALIFORNIA CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT, AND THE CALIFORNIA MENTHOL SUBCLASS SATISFIES IN PART RULE 23(b)(3)'S REQUIREMENTS.**

154.    Having determined that the California Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the California Classes' claims.

**1.     The California Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement, But the California Menthol Subclass Satisfies the Predominance Requirement to the Extent that Its Claims Are Premised on the Menthol Theory.**

155.    The Defendants raise a number of objections to the Plaintiffs' assertion that the

California Classes satisfy rule 23(b)(3)'s predominance requirement, specifically that: (i) the proposed class members are not readily ascertainable; (ii) the proposed class members may have seen different labels and representations, and their interpretations of those labels and representations may differ; (iii) the Plaintiffs' statutory and unjust enrichment claims require proof that the labels misled each class member, and, where materiality is at issue, the Plaintiffs have not shown classwide materiality; and (iv) the Plaintiffs' liability theories do not align with their proposed method for proving classwide damages.  See Certification Opposition at 25-82. The Court has analyzed some of these objections in considering the Nationwide Menthol Subclass above.  There, the Court concludes that: (i) the proposed Nationwide Menthol Subclass members are identifiable by objective criteria but that administrative feasibility concerns tilt against a conclusion that the Nationwide Menthol Subclass satisfies the predominance requirement; (ii) to the extent that the Nationwide Menthol Subclass relies on an objective standard for determining liability, how individuals interpreted the labels does not defeat predominance[76]; and (iii) the Plaintiffs' proposed damages methodology is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, but is an adequate fit with the Plaintiffs' Menthol Theory.  The Court also redefines the Nationwide Menthol Subclass period to include only purchasers before 2017, when the Defendants stopped using the additive-free language.  The Court concludes that, for the same reasons it applies to the Nationwide Menthol Subclass, administrative feasibility concerns tilt against a conclusion that the California Classes satisfy predominance and that the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the California Classes -- but that it is

---

[76]The Court concludes, however, that, because the Nationwide Menthol Subclass requires the application of all fifty States' express-warranty laws, determining the answer to this question raises individualized questions and makes the Nationwide Menthol Subclass unmanageable.

an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the California Menthol Subclass.  The Court considers here in more depth the Defendants' arguments that: (i) the proposed class members may have seen different labels and representations, and their interpretations of those labels and representations may differ; and (ii) the Plaintiffs' statutory and unjust enrichment claims require proof that the labels misled each class member, and, where materiality is at issue, the Plaintiffs have not shown classwide materiality.

156.    First, regarding whether the proposed class members saw different labels, the Court reiterates its agreement with the Defendants' assertion that needing to determine which class members saw Natural American cigarette packaging before October 1, 2017, and which class members saw the packaging after October 1, 2017, when it no longer contained the natural and additive-free labels aside from the brand name, would require individualized inquiry that would tilt against a finding of predominance.  See Certification Opposition at 31.  The Court notes, however, that it has shortened the class periods to end on October 1, 2017, simplifying this determination and reducing the impact of individualized inquiries.  The Court turns, therefore, to the Defendants' argument that, because different consumers may or may not have seen the disclaimers on the cigarettes' packaging and advertisements, whether an individual saw a disclaimer is an individualized question that defeats predominance.  See Certification Opposition at 30.

157.    The Court agrees that whether an individual consumer saw a disclaimer before purchasing a pack of Natural American cigarettes affects whether that consumer is entitled to damages.  The Court summarizes its relevant conclusions in the MTD MOO, namely that: (i) Natural American cigarettes include a disclaimer that "No additives in our tobacco does NOT mean a safer cigarette," MTD MOO at 172 (quoting FTC Consent Order at 4); (ii) this disclaimer

appears both on advertisements and on the cigarettes' packaging; (iii) reasonable consumers would have seen and understood the disclaimer on an advertisement, but often would not have seen the disclaimer on a cigarette package before purchase, because of the disclaimer's location on advertisements as compared to on packaging, as well as the packages' location in a store; (iv) reasonable consumers who saw the disclaimer would understand that a lack of additives does not make Natural American cigarettes healthier; (v) the disclaimer does not cure a reasonable consumer's understanding that the natural label implies that Natural American cigarettes are safer; and (vi) the disclaimer does not cure a reasonable consumer's understanding that menthol is not an additive.  See MTD MOO at 171-75.

158.    These conclusions create a number of different possible consumers.  Under the Safer-Cigarette Theory, the natural label deceives a reasonable consumer into thinking that Natural American cigarettes are healthier than other cigarettes, regardless whether they saw the disclaimer on advertising or packaging.  Also under the Safer-Cigarette Theory, the additive-free label deceives reasonable consumers who purchase Natural American cigarettes without seeing the disclaimer, which might happen if they purchase a pack in the store, into believing that Natural American cigarettes are healthier than other cigarettes, but which would not happen if they first saw the disclaimer on an advertisement before purchasing a pack.  Under the Menthol Theory, the additive-free label would mislead a reasonable consumer into believing that menthol is not an additive, regardless whether they saw the disclaimer on advertising or packaging.  Accordingly, the Safer-Cigarette Theory's applicability to a proposed class member depends on whether they purchased Natural American cigarettes based on the package's natural or additive-free representation, and, if based on the additive-free representation, whether they saw the disclaimer before purchase, because the labeling would not have misled a reasonable consumer

who purchased Natural American cigarettes based on believing that the additive-free label indicated that the cigarettes were healthier if the reasonable consumer also saw the disclaimer before purchase.   Accordingly, applying the Safer-Cigarette Theory requires individualized questions which tilt against a conclusion that common questions predominate.   Because the Menthol Theory does not hinge on whether a reasonable consumer viewed the disclaimer, however, it does not require individualized inquiries.[77]

159.   The Court next considers whether each of the California Classes' statutory and unjust enrichment claims satisfy the predominance requirement.   Regarding the UCL, FAL, and CLRA claims, the Plaintiffs argue that courts consider these claims together and that they focus on whether the challenged labeling likely would deceive a reasonable consumer.   See Certification Motion at 60 (citing Fitzhenry-Russel v. Dr. Pepper Snapple Grp., Inc., 345 F. Supp. 3d at 1115; Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *4).   They further argue that the statutory claims do not require individualized showings of materiality or reliance. See Certification Motion at 61 (citing Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *7). The Plaintiffs assert that "[p]roof of materiality requires showing that 'a reasonable consumer would attach importance' to the representations at issue, or that 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'"   Certification Motion at 61 (quoting Kumar v.

_____

[77]The Defendants further argue regarding the Menthol Theory that class members do not hold uniform understandings of the additive-free label's meaning and that some class members lack any belief entirely about the location of menthol in a cigarette.   See Certification Opposition at 40-42.   To the extent that the Plaintiffs rely properly on objective standards for the California Menthol Subclasses' claim, however, the Court has concluded that the additive-free label misleads a reasonable consumer in this way, see MTD MOO at 173, and will not preclude the California Menthol Subclass from certification on this ground.

Salov N. Am. Corp., 2016 WL 3844334, at *7 (quoting Hinojos v. Kohl's Corp., 718 F.3d 1098, 1107 (9th Cir. 2013))). The Plaintiffs argue that, because they can establish reliance and materiality using objective standards, the California statutory claims are suited to a conclusion that common questions predominate. See Certification Motion at 62-64.

160. The Defendants agree that the Plaintiffs must show materiality on a class-wide basis, but argue that the Plaintiffs have not made this showing. See Certification Opposition at 58. They argue that "[t]his inquiry unavoidably overlaps with the merits of Plaintiffs' claims." Certification Opposition at 59. They argue that the Plaintiffs have not shown evidence that they can show materiality on a class-wide basis under either of their theories of liability. See Certification Opposition at 60-65.

161. First, the Court considers whether the UCL, FAL, and CLRA are subject to class-wide proof. The UCL prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]." Cal. Bus. & Prof. Code § 17200. The FAL, meanwhile, makes it unlawful to disseminate in any advertising device any statement which is known to be untrue or misleading in connection with the selling of products. See Cal. Bus. & Prof. Code § 17500. The CLRA makes unlawful a list of activities, including advertising goods or services with the intent not to sell them as advertised, among other "unfair or deceptive acts or practices." Cal. Civ. Code § 1770(a)(9). These statutes apply a reasonable-consumer test which asks whether "'members of the public are likely to be deceived.'" Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008)(quoting Freeman v. Time. Inc., 68 F.3d 285, 289 (9th Cir. 1995)). Under the UCL and FAL, "this inquiry does not require 'individualized proof of deception, reliance and injury.'" Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 986 (quoting In

re Tobacco II Cases, 46 Cal. 4th 298, 320, 93 Cal. Rptr. 3d 559, 027 P.3d 20 (Cal. 2009)).

Regarding the CLRA, the Ninth Circuit explains:

> A CLRA claim warrants an analysis different from a UCL claim because the CLRA requires each class member to have an actual injury caused by the unlawful practice. *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155-56, 104 Cal. Rptr.3d 329, 337 (2010). But "[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." [In re Vioxx Class Cases], 180 Cal. App. 4th [116,] 129, 103 Cal. Rptr. 3d [83,] 95 [(Cal. Ct. App. 2009)]; *see also Vasquez v. Superior Court*, 4 Cal. 3d 800, 814, 484 P.2d 964, 973, 94 Cal. Rptr. 796, 805 (1971); *Steroid*, 181 Cal. App. 4th at 156-57, 104 Cal. Rptr. 3d at 338 . . . .
>
>> Under California law, a misrepresentation or omission is material
>>
>> if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.
>
> *Steroid*, 181 Cal. App. 4th at 157, 104 Cal. Rptr. 3d at 338-39 (internal quotation marks omitted); s*ee also Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 938 P.2d 903, 919, 64 Cal. Rptr. 2d 843, 859 (1997).

Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022-23 (first alteration in Stearns v. Ticketmaster Corp., but not in In re Vioxx Class Cases). Because California law permits a reasonable-consumer standard to satisfy all of the UCL, FLA, and CLRA's elements, they are susceptible to common proof, tilting in favor of a finding of predominance.

162. Second, the Court concludes that, to the extent that the Defendants argue that the Plaintiffs have not proven that the alleged misrepresentations in fact were material on a class-wide basis, this assertion is not a barrier to a finding of predominance as long as the claims themselves are susceptible to class-wide proof. The Court considers the Supreme Court's conclusion in Amgen Inc. v. Conn. Ret. Plan & Tr. Funds instructive:

The District Court did not err, we agree with the Court of Appeals, by disregarding Amgen's rebuttal evidence in deciding whether Connecticut Retirement's proposed class satisfied Rule 23(b)(3)'s predominance requirement. The Court of Appeals concluded, and Amgen does not contest, that Amgen's rebuttal evidence aimed to prove that the misrepresentations and omissions alleged in Connecticut Retirement's complaint were immaterial.   [Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.,] 660 F.3d[ 1170,] 1177 [(9th Cir. 2011)](characterizing Amgen's rebuttal evidence as an attempt to present a "'truth-on-the-market' defense," which the Court of Appeals explained "is a method of refuting an alleged misrepresentation's materiality").   See also Reply Brief 17 (Amgen's evidence was offered to rebut the "materiality predicate" of the fraud-on-the-market theory).   As explained above, however, the potential immateriality of Amgen's alleged misrepresentations and omissions is no barrier to finding that common questions predominate . . . .   If the alleged misrepresentations and omissions are ultimately found immaterial, the fraud-on-the-market presumption of classwide reliance will collapse.   But again, as earlier explained . . . individual reliance questions will not overwhelm questions common to the class, for the class members' claims will have failed on their merits, thus bringing the litigation to a close.

Amgen Inc. v. Conn. Ret. Plan & Tr. Funds, 568 U.S. at 481 (internal cross-references omitted).

Here, too, to the extent that the Defendants argue that the Plaintiffs' experts have not proven that all Natural American consumers construed the challenged labels to imply health benefits, or that the Defendants' experts demonstrate instead that health was not a factor in the majority of purchases, see Certification Opposition at 62 (citing Van Liere Report ¶ 59, at 38-39), these assertions are rebuttal evidence.  If the factfinder concludes that the majority of consumers do not associate the challenged labels with health benefits, or that a reasonable consumer would not have interpreted the labels in that way, the Plaintiffs will not prevail on their claims.  As the Supreme Court explains, "just as a plaintiff class's inability to prove materiality creates no risk that individual questions will predominate, so even a definitive rebuttal on the issue of materiality would not undermine the predominance of questions common to the class."  Amgen Inc. v. Conn. Ret. Plan & Tr. Funds, 568 U.S. at 481.  Accordingly, to the extent that a State's consumer protection statute's materiality requirement permits common evidence, that the

Defendants contest that the Plaintiffs have not shown at this stage that they definitively have satisfied that requirement is not an obstacle to a finding of predominance.

163.   The Defendants next argue that the California Classes' unjust enrichment claims fail, because they require individualized proof.   See Certification Opposition at 43-44.   The Defendants argue that, under California law, "certification is inappropriate where the unjustness of a defendant's retention of a benefit will depend on individual circumstances."   Certification Opposition at 51 (citing Savaglio v. Wal-Mart Stores, Inc., No. C-835687, 2003 WL 25676640; In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II), 2012 WL 379944, at *29, 32 (D.N.J. February 6, 2012)(Salas, J.)).   The Plaintiffs, conversely, argue that unjust enrichment or quasi-contract claims, require common proof of the Defendants' conduct, and involve common legal issues for all class members.   See Certification Motion at 62 (quoting Astiana v. Kashi Co., 291 F.R.D. 493, 505 (S.D. Cal. 2013)(Huff, J.)).

164.   In Astiana v. Kashi Co., the Honorable Marilyn L. Huff, United States District Judge for the United States District Court for the Southern District of California, concludes that common issues predominate regarding a class suit based on quasi-contract claims over a product labeled "Nothing Artificial."   291 F.R.D. at 505.   Judge Huff concludes that "quasi-contract claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members."   291 F.R.D. at 505 (citing Keilholtz v. Lennox Hearth Prods., Inc, 268 F.R.D. 330, 344 (N.D. Cal. 2010)(Wilken, J.); Cartwright v. Viking Indus., Inc., No. 2:07-CV-02159, 2009 WL 2982887, at *12-13 (E.D. Cal. September 14, 2009)(Damrell Jr., J.)).   Here, that the California Classes rely wholly on objective standards to determine whether the Defendants' labelling was deceptive suggests that their claims are amenable to common proof and raise common legal issues for the proposed class

members in determining whether each class member's purchase occurred under unjust circumstances.  See Astiana v. Kashi Co., 291 F.R.D. at 505.  Accordingly, the Court concludes that the Plaintiffs' unjust enrichment claims will not cause individualized inquiries to predominate over common questions.

165.   In summary, the Court concludes first that administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the California Classes satisfy predominance. Second, the Court concludes that the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the California Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the California Menthol Subclass.  Third, the Court concludes that answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the California Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the California Menthol Subclass' claim based on the Menthol-Theory.  Fourth, the Court concludes that the California Classes' statutory and unjust enrichment claims do not tilt against a finding of predominance.  Accordingly, because the Court's only concern with the California Menthol Subclass is its administrative feasibility, Cherry v. Dometic Corp., 986 F.3d at 1303-04 ("[M]anageability problems will 'rarely, if ever, be in [themselves] sufficient to prevent certification.'" (quoting Klay v. Humana, Inc., 382 F.3d at 1272)), the Court concludes that the California Menthol Subclass satisfies rule 23(b)(3)'s predominance requirement to the extent that it brings its claims under the Menthol Theory, but concludes that the California Menthol Subclass does not satisfy the predominance requirement with respect to the Safer-Cigarette Theory, and that the California Class does not satisfy the predominance

requirement.

### 2. The California Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

166.     The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the California Classes.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the California Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the California Classes, which rely solely on California law, the only manageability difficulty that remains is the administrative feasibility question.   As the Court notes in its conclusion regarding the California Classes' predominance, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the California Classes' claims.  Because the Court concludes above, however, that only the California Menthol Subclass satisfies rule 23(b)(3)'s predominance requirement to

the extent that its claims are premised on the Menthol Theory, the Court certifies under rule 23(b)(3) only the California Menthol Subclass to the extent that its claims are premised on the Menthol Theory, does not certify the California Class, and does not certify the California Menthol Subclass to the extent that its claims are premised on the Safer-Cigarette Theory.

### C.   THE CALIFORNIA CLASSES DO NOT SATISFY RULE 23(b)(2)'S REQUIREMENTS.

167.   The Plaintiffs also move to certify the California Classes under rule 23(b)(2), because "'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"  Certification Motion at 85 (quoting Fed. R. Civ. P. 23(b)(2)). Specifically, under the California Classes' statutory claims, they seek: (i) under the CLRA, "an order enjoining Defendants' unlawful business practices as alleged herein," SAC ¶ 147, at 48; (ii) under the FAL, "injunctive relief to compel Defendant to stop advertising Natural American Spirit cigarettes as natural and additive free to prevent Defendants from engaging in these wrongful acts in the future," SAC ¶ 160, at 50; and (iii) under the UCA, "an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair, and deceptive business practices and any other act prohibited by law, including those set forth in this Complaint," SAC ¶ 169, at 52.  The Supreme Court notes in <u>Wal-Mart</u>:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, 84 N.Y.U.L. Rev., at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

<u>Wal-Mart</u>, 564 U.S. at 360.  The Tenth Circuit has stated:

> By its terms . . . , Rule 23(b)(2) imposes two independent but related requirements. In the first place, the defendants' actions or inactions must be based on grounds generally applicable to all class members. The second requirement is more restrictive . . . . The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for *the class as a whole*.

Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso, 543 F.3d 597, 604 (10th Cir. 2008)(emphasis in original).

168.    The Plaintiffs argue that injunctive relief is necessary, because the Defendants' marketing continues to deceive and mislead consumers. See Certification Motion at 87. They argue that the Defendants continue to use misleadingly: (i) the term natural in Natural American's brand name; (ii) the term organic; and (iii) the phrase Ingredients: Tobacco & Water in lieu of additive-free, and assert that this deception will continue without an injunction. See Certification Motion at 87 (citing Philip Morris, 449 F. Supp. 2d at 938. Specifically, they argue that this advertising conveys a reduced risk of harm, even after the Defendants removed the additive-free descriptor, and that the disclaimer which the Defendants included on Natural American cigarettes' packaging in 2017 is inadequate, because it applies only to the additive-free descriptor and not the natural descriptor. See Certification Motion at 88. The Defendants contest that injunctive relief is appropriate and argue instead that injunctive relief is moot given the Defendants' adjustments to their labels and disclaimers, and that the named Plaintiffs do not have standing, because the Defendants' past misrepresentations do not impose a continuing injury or threat of future harm. See Certification Opposition at 83-90.

169.    The Court considers first the Defendants' argument that the Plaintiffs' requested injunctive relief is moot. The Defendants argue that the Court's MTD MOO indicates that the Defendants' Memo. of Agreement with the FDA would moot the Plaintiffs' request to enjoin the use of natural and additive-free descriptors, and that the Plaintiffs accordingly seek to enjoin

only the use of the word natural in Natural American's brand name, as well as the organic and tobacco-and-water labels.  See Certification Opposition at 84-85 (citing MTD MOO at 242). With respect to those descriptors, the Defendants assert that, since 2017 and in response to the FTC Informal Guidance, every Natural American package and advertisement "representing in any terms that NAS cigarettes 'ha[ve] no additives or chemicals,' has included a disclaimer stating, without qualification, that 'Natural American Spirit cigarettes are not safer than other cigarettes.'"  Certification Opposition at 85 (quoting Calderon Decl. ¶¶ 17-18, and citing Memo. of Agreement ¶ 2; FTC Information Guidance at 3).  They note that the disclaimer with which the Plaintiffs take issue is the disclaimer associated with the additive-free language, and that the Defendants' new disclaimer is not tied to a particular descriptor and states unequivocally that there are no health benefits associated with Natural American cigarettes.  See Certification Opposition at 85.  Regarding the word natural in Natural American's brand name, the Defendants argue that the new disclaimer mitigates any misleading effect associated with the brand names.  See Certification Opposition at 85 n.56.

170.  The Plaintiffs reply that the Defendants misinterpret the Court's MTD MOO's conclusion on mootness and reassert that the labels against which they seek injunctive relief are labels which the MTD MOO does not cover.  See Certification Reply at 49.  The Plaintiffs also dispute that the Defendants' new disclaimer moots the Plaintiffs' injunctive relief request.  See Certification Reply at 49-50.  They argue that their "request for certification is in regard to the reasonable consumer's understanding of NAS Cigarettes' labeling," and contend that the Defendants' current labeling and advertising continues to mislead consumers regarding the cigarettes' relative health benefits despite the disclaimer's presence.  Certification Reply at 50. Finally, they assert that the Ninth Circuit has concluded that the threat of future harm can be the

consumer's plausible allegation that he or she will not be able to rely on a company's advertising in the future, or that he or she could purchase the product in the future believing it had been improved.  See Certification Reply at 50 (quoting Davidson v. Kimberly Clark Corp., 889 F.3d at 969-70).

171.    The Court first restates its conclusions in the MTD MOO regarding mootness.  In the MTD MOO, the injunctive relief at issue was the Plaintiffs' "request [for] an injunction prohibiting the Defendants from advertising Natural American cigarettes as natural and additive free."  MTD MOO at 239 (citing First Amended Complaint ¶ 159, at 50; id., Prayer for Relief ¶ C, at 105).  There, the Court concludes that the Memo. of Agreement "would render moot the Plaintiffs' requested injunctive relief, except for an injunction on the term Natural in the brand name."  MTD MOO at 242 (citing Utah Animal Rts. Coalition v. Salt Lake City Corp., 371 F.3d at 1257).  The Court explains that, without the Memo. of Agreement in place -- the validity of which then-ongoing litigation threatened -- the Defendants could not show that they would not reimplement the challenged labels.  See MTD MOO at 242.  Here, the Plaintiffs seek injunctive relief on the basis of the word natural as used in Natural American's brand name as well as the organic and tobacco-and-water descriptors.  See Certification Motion at 87.  Accordingly, to the extent that the Memo. of Agreement moots injunctive relief against the use of additive-free and natural in non-brand-name locations, it does not moot the Plaintiffs' requested injunctive relief here.

172.    Regarding whether the new disclaimer -- regardless what descriptors the labels, branding, and advertising may use -- indicates that Natural American cigarettes are not healthier than other cigarettes, the Court does not conclude that this disclaimer's presence moots the Plaintiffs' request for injunctive relief.  In the MTD MOO, the Court concludes that the Plaintiffs

showed plausibly that the terms natural, organic, and additive-free mislead reasonable consumers to believe that Natural American cigarettes are healthier than others.  See MTD MOO at 166-67. Further, the Court concludes in the MTD MOO that, although the additive-free disclaimer would dispel a reasonable consumer's misled belief, the disclaimer would not have that effect for the natural and additive-free labels, and would not have that effect for consumers who could not read the disclaimer before purchasing it.  See MTD MOO at 170-72.  The Plaintiffs have shown evidence that some consumers interpret the natural, organic, and tobacco-and-water labels to convey health benefits.  See Certification Motion at 24-26 (citing Pearson Report at 3, 10-16; Cummings Report at 5); id. at 21 (citing Dewhirst Report at 31; Creative Testing at 3; Work In Progress: Additive Free and Organic at 9, filed July 23, 2020 (Doc. 281-27)(demonstrating that the tobacco-and-water label has similar connotations to additive-free)).  Because there remain situations in which a reasonable consumer would not have the chance to read the disclaimer, that the disclaimer may dispel some consumers' mistaken beliefs is not sufficient to moot the Plaintiffs' requests for injunctive relief.  Accordingly, the Court will not deny certification on mootness grounds.

173.    The Defendants next argue that injunctive relief is not appropriate, because the named Plaintiffs do not have standing, because they are not suffering a continuing injury or facing an imminent threat of injury.  See Certification Opposition at 86 (quoting DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1197).  The Defendants argue that the Plaintiffs refer to deceptions as they affect class members, people, or reasonable consumers, but do not refer to the named Plaintiffs' risks.  See Certification Opposition at 86.  The Defendants argue that, because the named Plaintiffs have filed a lawsuit on the basis that Natural American cigarettes are not in fact safer than other cigarettes, they cannot represent that they continue to be misled or are at risk

of being misled in the future, and that past harm cannot serve as the basis for standing.  See Certification Opposition at 86-87 (citing Baca v. Colo. Dep't of State, 935 F.3d 887, 911 (10th Cir. 2019), rev'd on other grounds, 140 S. Ct. 2316 (2020)).  The Defendants anticipate the Plaintiffs' citation to the Ninth Circuit's opinion in Davidson v. Kimberly-Clark Corp., which allows some consumers to bring injunctive false advertising claims even after they learn the truth, and contend that, even under that standard, the named Plaintiffs do not have standing, because they have not testified that they no longer purchase Natural American cigarettes out of an inability to rely on their branding, and because they now know that Natural American cigarettes are not safer and cannot be made safer.  See Certification Opposition at 89-90.

174.    The Plaintiffs argue that such a narrow view of standing would mean that courts could never grant injunctive relief in false advertising cases.  See Certification Reply at 45.  They argue, therefore, that the Court should adopt the Ninth Circuit's conclusion in Davidson v. Kimberly-Clark Corp.  See Certification Reply at 45 (quoting Davidson v. Kimberly-Clark Corp., 889 F.3d at 969-70).[78]  They argue that the Ninth Circuit in Davidson v. Kimberly-Clark Corp. does not limit injunctive relief only to the two scenarios which the Defendant contest, but instead uses those two scenarios as examples of when injunctive relief would be available.  See Certification Reply at 46.  The Plaintiffs assert that, by focusing on whether the named Plaintiffs have stopped buying Natural American cigarettes or know that they are not safer, the Defendants mischaracterize the Plaintiffs' argument, which is that the Defendants' labeling and advertising mislead reasonable consumers.  See Certification Reply at 46-47 (citing SAC ¶ 82, at 34;

---

[78]The Plaintiffs also point to an opinion from the United States District Court for the District of Kansas, which allows injunctive relief after the named plaintiffs became aware of the alleged misrepresentation.  See Certification Reply at 45-46 (citing In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitr. Litig., 336 F. Supp. 3d 1256, 1340-41 (D. Kan. 2018)(Crabtree, J.)).

Davidson v. Kimberly-Clark Corp., 889 F.3d at 969).  The Plaintiffs argue that injunctive relief is important, because without injunctive relief, there is nothing to stop the Defendants from continuing to use the current language or similarly misleading language in the future, and because the Defendants are likely to continue using such language.  See Certification Reply at 47-48 (citing United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 1, for the proposition that cigarette deception will continue).

175.    The Court concludes that the named Plaintiffs do not have standing to bring their injunctive relief claim.   Although the Court acknowledges the Plaintiffs' argument that injunctive relief Could serve government interests, see MTD MOO at 190, and play an important role in addressing misleading advertising in the tobacco industry, the named plaintiffs in a class action seeking injunctive relief nevertheless must have standing to bring the action, see DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1197 (citing Warth v. Seldin, 422 U.S. 490, 502 (1975); Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)).  To show standing "[t]o seek prospective relief, the [named Plaintiffs] must be suffering a continuing injury or be under a real and immediate threat of being injured in the future."  Tandy v. City of Wichita, 380 F.2d at 1283 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)).  "The threatened injury must be 'certainly impending' and not merely speculative."  Tandy v. City of Wichita, 380 F.2d at 1283 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 190 (2000)).  The Court agrees with the Defendants that, because the named Plaintiffs in this case are aware that Natural American cigarettes are not safer than other cigarettes, see SAC ¶ 60, at 29 ("Natural American Spirit cigarettes are not safer or healthier than other cigarettes, a truth that Defendants do not deny.  Nor can they."), Natural American cigarettes' labeling is not likely to continue misleading the named Plaintiffs, despite the Plaintiffs' argument that it will continue

mislead reasonable consumers.  Accordingly, any future harm to the named Plaintiffs resulting from the Defendants' labeling practices is merely speculative.  See Tandy v. City of Wichita, 380 F.2d at 1283.

176.    The Court declines the Plaintiffs' invitation to adopt the Ninth Circuit's analysis and holding in Davidson v. Kimberly-Clark Corp., 889 F.3d at 969.  In Davidson v. Kimberly-Clark Corp., the plaintiff alleged that the defendants had deceived her by marketing certain brands of wipes as flushable when they were not flushable.  See 889 F.3d at 964-65.  In response to the district court's conclusion that the plaintiff did not have standing, because she alleged that she had no intention of purchasing the wipes again, the Ninth Circuit concludes that the plaintiff "properly alleged that she faces a threat of imminent or actual harm by not being able to rely on Kimberly-Clark's labels in the future, and that this harm is sufficient to confer standing to seek injunctive relief."  889 F.3d at 967.  The Ninth Circuit explains that "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future," and posits that, "[i]n some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not be able to purchase the produce although she would like to," while in other cases, the future harm "may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved."  889 F.3d at 969-70 (citing Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 533 (N.D. Cal. 2012) (Seeborg, J.); Lilly v. Jamba Juice Co., No. 13-cv-02998 KST, 2015 WL 1248027, at *4 (N.D. Cal. March 18, 2015)(Tigar, J.); Richardson v. L'Oreal, 911 F. Supp. 2d  181 194-95 (D.D.C. 2013)(Bates, J.)).

177.     The Court disagrees with the Ninth Circuit's characterization of these potential future injuries as "'actual and imminent, not conjectural or hypothetical.'"   Davidson v. Kimberly-Clark Corp., 889 F.3d at 969 (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)).   Where the plaintiff's claim alleges that the defendant's product has misled him or her, that plaintiff carries that knowledge going forward.   The Ninth Circuit contends that present knowledge that a product's label is false is not the same as knowledge that the product's label will remain false into the future.   See Davidson v. Kimberly-Clark Corp., 889 F.3d at 969.   This assertion demonstrates the problem: a plaintiff who asserts that a product's label has misled him or her cannot predict whether the label will change or stay the same, or whether the product will change or stay the same.   This uncertainty is conjectural or hypothetical, and not actual or imminent.   The Ninth Circuit notes that, if it denies standing in these cases, defendants could defeat State consumer protection suits for injunctive relief by removing cases to federal court and then moving to dismiss for lack of standing.   See Davidson v. Kimberly-Clark Corp., 889 F.3d at 970.   The Court disagrees, because courts may remand cases removed from State courts in lieu of dismissing them.   See Buscema v. Wal-Mart Stores East LP, 485 F. Supp. 3d 1319, 1331 (D.N.M. 2020)(Vasquez, J.)(remanding the case to State court, because the plaintiff, who had learned of the defendant's "false and deceptive conduct," no longer had standing to pursue injunctive relief).   Additionally, the Court's decision not to grant standing for injunctive relief in these cases does not mean that misleading advertisements can never be addressed.   First, damages claims and awards can and do cause defendants to alter behavior.   Second, the Defendants' responses to the Memorandum of Agreement and the FTC Informal Guidance are examples of processes through which product labels change to become more honest.   State laws also may provide avenues for injunctive relief; in Davidson v. Kimberly-Clark Corp., for

example, the Ninth Circuit notes that "California law also permits [a consumer who pays extra for a falsely labeled product] to seek a court order requiring the manufacturer of the product to halt its false advertising." 889 F.3d at 960-61.  Accordingly, the Court concludes that the named Plaintiffs in this case do not have standing to bring their claims for injunctive relief under rule 23(b)(2) and will not certify any of the classes seeking certification under that rule.

## III.  THE COURT DOES NOT CERTIFY THE COLORADO CLASS AND THE COLORADO MENTHOL SUBCLASS.

178.   The Court turns to the Plaintiffs' proposed Colorado Class and Colorado Menthol Subclass (the "Colorado Classes").  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.  Because the Colorado Classes do not seek injunctive relief, the Court will not consider whether the proposed classes satisfy rule 23(b)(2)'s requirements.

179.   Before beginning the rule 23(a) and (b)(3) analyses, the Court first considers the Defendants' challenge that the Colorado Classes are ineligible for certification under rule 23(b)(3). The Plaintiffs seek certification for the Colorado Classes on two counts: (i) for a violation of the CCPA, Col. Rev. Stat. § 6-1-101; and (ii) for unjust enrichment.  See SAC ¶¶ 177-194, at 54-57.  The Defendants argue that the CCPA bars money damages in class actions.  See Certification Opposition at 19 (quoting Friedman v. Dollar Thrifty Auto. Grp., Inc., 2015 WL 4036319, at *6); Colo. Rev. Stat. § 6-1-113(2); Davidson v. Apple, Inc., 2018 WL 2325426, at *10-11).  In the Certification Reply, the Plaintiffs state that they "preserve their right to appeal dismissal of their . . . Colorado Consumer Protection Act monetary damage claims, but are not seeking certification of classes for those claims at this time."  Certification Reply at 3 n.2.

See Certification Reply at 8 n.4 ("Per footnote 2, Colorado Count I . . . [is] not being pursued for class certification at this time.").  The Court agrees with the Defendants that the CCPA bars money damages in class actions.  See MTD MOO at 216 ("The CCPA's statutory language, however, expressly prohibits class action recovery for damages.")(citing Colo. Rev. Stat. Ann. § 6-1-113(2); Friedman v. Dollar Thrifty Auto. Grp. Inc., 2015 WL 4036319, at *3-6; Martinez v. Nash Finch Co., 886 F. Supp. 2d 1212, 1218-19 (D. Colo. 2012)(Krieger, J.)).  Accordingly, the Court considers whether to certify only the Colorado Classes' unjust enrichment claim.

### A.   THE COLORADO CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

180.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Colorado Classes' unjust enrichment claim.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  Accordingly, the Court focuses its analysis here on the commonality and typicality requirements.

### 1.   The Colorado Classes Satisfy Rule 23(a)'s Commonality Requirement.

181.   The Defendants do not raise any issues related to commonality that are unique to the Colorado Classes.   The Court acknowledges the Defendants' later argument that individualized questions regarding unjust enrichment claims predominate over common questions, but for purposes of rule 23(a)'s commonality analysis, considers whether there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer.  Fed. R. Civ. P. 23(a)(2).  The Court concludes that such questions are present here.  For example, whether the Defendants misrepresented the facts concerning the health

benefits of Natural American cigarettes is necessary to determine whether unjust enrichment supplies a remedy.  See SAC ¶ 193, at 57.  Similarly, whether the Defendants' marketing practices benefitted unjustly from their misleading marketing is a question amenable to a common answer.  See SAC ¶ 191, at 57.  Accordingly, because there are questions of law or fact that are central to the validity of the Colorado Classes' unjust enrichment claim, the Court concludes that the Colorado Classes satisfy rule 23(a)'s commonality requirement.

## 2.    The Colorado Classes Satisfy Rule 23(a)'s Typicality Requirement.

182.    As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of whom -- Horne -- represents the Colorado Menthol Subclass.  See Certification Opposition at 22-24; SAC ¶ 120, at 42.  The Defendants argue that Horne "expressly acknowleg[ed his] belief that NAS cigarettes are not healthier or safer than others," because he continued smoking Natural American cigarettes after commencing this lawsuit.  Certification Opposition at 23 (citing Deposition of Joshua Horne at 34:5-35:3 (taken June 12, 2018), filed October 8, 2020 (Doc. 315-6)(Horne)("Horne Depo.").  The Defendants argue that, because Horne has continued to buy Natural American cigarettes despite knowing now that they are not safer than other brands, he cannot represent that he purchased them based on a health misperception, unlike the unnamed proposed class members.  See Certification Opposition at 23.  The Plaintiffs counter that typicality requires that the class representative's claims by "'reasonably co-extensive with those of absent class members,'" and that the claim which Horne brings on the Colorado Menthol Subclass' behalf is premised on the

- 332 -

theory that Natural American's labeling misled reasonable consumers such that they suffered economic damage.  Certification Reply at 6 (quoting 1 Newberg on Class Actions § 3:29 (5th ed.)).

183.   The Court previously has stated:

Class representatives, however, can still have factual circumstances that differ from those of the bulk of the absent portion of the class, or their claims could be subject to defenses that do not apply to many absent class members, and, in extreme cases, this dissimilarity might make the proposed class representatives unsuitable under rule 23(a)(3).  This inquiry is necessarily an imprecise, "eye-test" standard, in which the Court tries to discern whether the putative class counsel has made a reasonable effort to collect class representatives who fairly reflect the absent class members' posture in the litigation.

Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 440-41.  That Horne continued to smoke Natural American cigarettes after learning that they are not healthier than other cigarettes does not make his claims atypical, because his claims nevertheless are based on the same legal theory as the rest of the class, namely, that Natural American's labeling led him to believe that the cigarettes were safer.  Particularly given cigarettes' highly addictive nature, see Proctor Report at 9, the Court is unwilling to conclude that, because a consumer continued to smoke a certain brand after learning that those cigarettes did not contain certain desirable qualities, he or she no longer has claims that are typical of the remaining class members.  The Court concludes that whether Horne continued smoking Natural American cigarettes after learning that they were not healthier than other brands is not such an extreme case as to warrant his claims atypical of the rest of the Colorado Menthol Subclass.  Additionally, the Defendants do not raise any specific issues regarding Benson, the Colorado Class representative.  Accordingly, the Court concludes that the Colorado Classes satisfy the typicality requirement.

**B. THE COLORADO CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DO NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENTS.**

184. The Court next considers whether the Colorado Classes satisfy rule 23(b)(3)'s predominance and superiority requirements. The Court concludes that the Colorado Classes do not satisfy the predominance requirement, based on the Court's concerns regarding administrative feasibility, the Plaintiffs' proposed damages model, whether individuals have seen certain disclaimers, and whether unjust enrichment will require individualized inquiries. The Court concludes that the Colorado Classes satisfy the superiority requirement.

**1.      The Colorado Classes Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement.**

185. As with the California Classes above, the Defendants raise four arguments to support their contention that individualized inquiries predominate over Colorado Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; (iii) the unjust enrichment claims require individualized inquiries to prove that each class member was misled; and (iv) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The arguments on the issues of ascertainability, differing representations and disclaimers, and the damages model are not unique to the California class, and the parties have not raised arguments unique to Colorado on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Colorado Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Colorado Classes satisfy predominance;

(ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Colorado Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Colorado Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Colorado Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Colorado Menthol Subclass' claim based on the Menthol-Theory. Because the parties raise specific arguments whether Colorado law requires individualized inquiries for unjust enrichment claims, the Court considers those arguments here.

186. The Plaintiffs contend that Colorado law requires a party alleging unjust enrichment to prove that "'(1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." Certification Motion at 65 (quoting Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008)). They assert that unjust enrichment claims are well suited to class certification, because they focus on the Defendants' wrongdoing and on objective elements, and note that the Tenth Circuit previously has upheld the certification of a Colorado unjust enrichment claim. See Certification Motion at 65-66 (citing Menocal v. GEO Grp., Inc., 882 F.3d at 925).

187. The Defendants contend that determining whether a defendant's receipt of a benefit is unjust is a fact-intensive inquiry that will require extensive factual findings. See Certification Opposition at 51-52 (quoting Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 445 (Colo. 2000)(en banc), and Lewis v. Lewis, 189 P.3d at 1140). They argue that, accordingly, unjust enrichment claims based on misleading advertising are not susceptible to

class treatment, because courts will have to conduct individualized inquiries into the motivations behind each class member's purchase.  See Certification Opposition at 52 (quoting In re ConAgra Foods, Inc., 90 F. Supp. 3d at 990).  The Plaintiffs dispute the Defendants' citation to In re ConAgra Foods, Inc., because they assert that the Tenth Circuit's opinion in Menocal v. GEO Group, Inc. addresses the district court's concerns in the former.  See Certification Reply at 26-27.

188.    The Tenth Circuit's opinion in Menocal v. GEO Group, Inc. is not a blanket authorization to grant any unjust enrichment class certification motions; there, the Tenth Circuit explains that "the unjust enrichment class members intend to rely on facts that are shared amongst the class and thus are susceptible to class-wide proof."  882 F.3d at 925.  Specifically, the plaintiffs in that case argued that "GEO's retention of the benefit is unjust because GEO utilized a policy [of] paying extremely low wages to workers who were all detained, uniquely vulnerable as immigrants, and subject to GEO's physical control."  882 F.3d at 925 (citation to record omitted)(alteration in Menocal v. GEO Grp., Inc.).  There are some uniformities in this case, such as what labels Natural American cigarettes used in a given time period.  The Court nevertheless concludes that individualized inquiries will predominate, particularly around the third unjust enrichment prong under Colorado law, that the circumstances make it unjust for the Defendants to retain the benefit without compensation.  See Lewis v. Lewis, 189 P.3d at 1141. The Colorado Classes comprise many possible class members who purchased a pack of cigarettes with the allegedly misleading labels, but not all of these purchases occur in unjust circumstances.  For instance, individuals may have purchased Natural American cigarettes not based on the challenged labels, or may not have believed that they were healthier or that Natural American menthol cigarettes did not contain additives.  In those circumstances, it is not clear that

a jury would determine that those purchases are unjust such that purchasers in those circumstances have met the standards of an unjust enrichment claim. Accordingly, a jury would have to review the facts surrounding each purchase to determine whether its circumstances were unjust, in spite of the common questions that the Plaintiffs seek to present. These individualized inquiries would overwhelm the common inquiries and thus tilt against a finding of predominance. Accordingly, based on the Court's concerns regarding administrative feasibility, the Plaintiffs' proposed damages model, whether individuals have seen certain disclaimers, and whether unjust enrichment will require individualized inquiries, the Court concludes that the Colorado Classes do not satisfy rule 23(b)(3)'s predominance requirement.

### 2. The Colorado Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

189. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Colorado Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class, and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Colorado Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles.

Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Colorado Classes, which rely solely on Colorado law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Colorado Classes' unjust enrichment claim.  Because the Court concludes, however, that the Colorado Classes have not satisfied rule 23(b)(3)'s predominance requirement, the Court will not certify the Colorado Class or the Colorado Menthol Subclass.

## IV.   THE COURT DOES NOT CERTIFY THE FLORIDA CLASS AND CERTIFIES IN PART THE FLORIDA MENTHOL SUBCLASS.

190.   The Court next considers the Plaintiffs' proposed Florida Class and Florida Menthol Subclass (the "Florida Classes").  The Florida Classes allege two claims: (i) a violation of the FDUTPA; and (ii) an unjust enrichment claim.  See SAC ¶¶ 195-216, at 58-62.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[79]

### A.   THE FLORIDA CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

191.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and

---

[79]The Florida Classes seek injunctive relief on their FDUTPA claim.  See SAC ¶ 209, at 60-61.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the Florida Classes, and the Court concludes that the named Plaintiffs for the Florida Classes do not have standing to pursue injunctive relief, and it will not certify the Florida Classes for that purpose.

adequacy requirements with respect to the Florida Classes' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20.

###### 1.    The Florida Classes Satisfy Rule 23(a)'s Commonality Requirement.

192.    The parties do not raise any arguments related to commonality that are unique to the Florida Classes. The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). For the FDUTPA claim, for example, the Plaintiffs allege that the Defendants' labels and statements constitute deceptive acts or practices, and that they employed these acts or practices with the intent that consumers rely on their statements. See SAC ¶¶ 200-201, at 58. The Plaintiffs also allege that these deceptive acts or practice likely were to deceive and in fact deceived reasonable consumers. See SAC ¶ 203, at 59. Similarly, the Florida Classes' unjust enrichment claim asks whether the Defendants benefitted from purchases of the misleadingly labelled products. These questions are central to the Plaintiffs' claims and are capable of generating common answers. The Court concludes therefore that the Florida Classes satisfy rule 23(a)'s commonality requirement.

###### 2.    The Florida Classes Satisfy Rule 23(a)'s Typicality Requirement.

193.    As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of

whom -- Horne -- represents the Florida Menthol Subclass.  <u>See</u> Certification Opposition at 22-24; SAC ¶ 121, at 42.  The Defendants' argument with respect to Horne is the same argument which they raise in disputing that his claims are typical of the Colorado Menthol Subclass, namely, that he continued purchasing Natural American menthol cigarettes after knowing that they are not safer than other brands and therefore cannot represent that he purchased the cigarettes based on a health misperception.  <u>See</u> Certification Opposition at 23 (citing Horne Depo. at 34:5-35:3 (Horne).  The Court, in considering that argument, concludes that whether Horne continued smoking Natural American cigarettes after learning that they were not healthier than other brands is not such an extreme case as to warrant his claims atypical of the rest of the Colorado Menthol Subclass, because his claims are premised on the same legal theories -- that the Defendants' labeling practice was deceitful-- and the Court is unwilling to penalize Plaintiffs for continuing to use a highly addictive product even after they learn of its health effects.  <u>See</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 306 F.R.D. at 440-41.  Because the Defendants have not raised arguments specific to Horne's representing the Florida Menthol Subclass, and because they do not raise any arguments with respect to Sproule, the Florida Class representative, the Court concludes that the Florida Classes satisfy rule 23(a)'s typicality requirement.

   **B.    THE FLORIDA MENTHOL SUBCLASS' FDUTPA CLAIM SATISFIES RULE 23(b)(3)'S REQUIREMENTS TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY, AND THE FLORIDA CLASS SATISFIES RULE 23(b)(3)'S TYPICALITY REQUIREMENT BUT NOT THE RULE'S PREDOMINANCE REQUIREMENT.**

   194.    The Court next considers whether the Florida Classes satisfy rule 23(b)(3)'s predominance and superiority requirements.  The Court concludes that common inquiries predominate for the Florida Classes' FDUTPA claim but not for their unjust enrichment claim.

After considering other arguments regarding predominance, the Court concludes that the Florida Class does not satisfy the predominance requirement, and that the Florida Menthol Subclass' FDUTPA claim, but not the unjust enrichment claim, satisfies the predominance requirement to the extent that the FDUTPA claim is premised on the Menthol Theory and not on the Safer-Cigarette Theory.   The Court concludes that the Florida Classes satisfy the superiority requirement.

### 1. The Florida Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the Florida Menthol Subclass' FDUTPA Claim Satisfies the Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.

195.   The Court first considers whether the Florida Classes satisfy rule 23(b)(3)'s predominance requirement.  As with the proposed State classes above, the Defendants raise four arguments to support their contention that individualized inquiries predominate over the Florida Classes' common questions.   Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; (iii) the statutory and unjust enrichment claims require individualized inquiries; and (iv) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Florida on those issues.  Accordingly, the Court adopts its conclusions above in its considerations of the Florida Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Florida Classes satisfy predominance;  (ii) the Plaintiffs' proposed damages model is not an adequate fit with the

Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Florida Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Florida Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Florida Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol-Theory.  Because the parties raise specific arguments whether Florida law requires individualized inquiries for the Florida Classes' statutory and unjust enrichment claims, the Court considers those arguments here.

196.    With regard to the FDUTPA, the Plaintiffs assert that they must establish three objective elements: "'(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'"  Certification Motion at 66 (quoting Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985-86 (11th Cir. 2016)).  They contend that courts have certified classes bringing FDUTPA claims.  See Certification Motion at 67 (citing Carriuolo v. Gen. Motors Co., 823 F.3d at 985-89; Nelson v. Mead Jonson Nutrition Co., 270 F.R.D. 689, 697 (S.D. Fla. 2010)).

197.    The Defendants argue that the FDUTPA requires individualized proof of causation or why consumers purchased the challenged products.  See Certification Opposition at 45 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294-95; Green v. McNeil Nutritionals, LLC, 2005 WL 3388158, at *8).  The Defendants cite to Philip Morris USA Inc. v. Hines to suggest that whether a smoker received the benefits he or she thought that he or she was getting from cigarettes marketed as light or low-tar depended on how the smoker smoked the cigarette, and what that smoker chose the product in question, thus requiring individualized inquiries.  See Certification Opposition at 45 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294-95).  The Defendants also dispute that the Plaintiffs' citations to Carriuolo v. Gen. Motors Co. and

Nelson v. Mead Johnson Nutrition Co. are apposite, because those cases rely on David v. Powertel, Inc., 776 So. 2d 971, 973 (Fla. Dist. Ct. 2000), a fraudulent omissions case in which consumers all purchased phones with reduced market value due to a common deceptive practice. See Certification Opposition at 45 n.30 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294; Black Diamond Props., Inc. v. Haines, 940 So. 2d 1176, 1179 (Fla. Dist. Ct. 2006); Pop's Pancakes, Inc. v. NuCO2, Inc., 251 F.R.D. 677, 686-87 (S.D. Fla. 2008)(Graham, J.)).   The Defendants argue that "[t]he better reading of Florida law is that Plaintiffs cannot evade the causation requirement in this case centered on *affirmative* misrepresentations."   Certification Opposition at 45-46 n.30 (emphasis in original).

198.   The Plaintiffs rebut that they base their claims on the objective reasonable consumer standard and an objective price premium model, such that the Florida Classes satisfy predominance even if some proposed class members did not believe that the cigarettes were less harmful or did not believe they were paying a price premium.  See Certification Reply at 19-20. They distinguish the Defendants' citation to Philip Morris USA Inc. v. Hines, arguing that the plaintiffs in that case alleged that the plaintiffs would not have purchased the defendant's cigarettes at all if they had known the light cigarettes were not safer than other cigarettes, and that those plaintiffs sought a return of the purchase price, because they did not receive what they paid for.  See Certification Reply at 20 (citing Philip Morris USA Inc. v. Hines, 883 So 2d at 293).  The Plaintiffs also contest the Defendants' citation to Green v. McNeil Nutritionals, LLC, because the plaintiff there did not have any causation theory, and argue that the case instead supports class certification under FDUTPA.  See Certification Reply at 20 (citing Green v. McNeil Nutritionals, LLC, 2005 WL 3388158, at *3, 7).  The Plaintiffs assert that the Defendants' cases "simply stand for the proposition that a plaintiff must prove that pecuniary

injury was caused by the alleged practice," a showing that they argue they have made. Certification Reply at 20 n.19.

199.    The Court concludes that common questions predominate under the FDUTPA claim to the extent that it is premised on the Menthol Theory.  The Eleventh Circuit repeatedly has explained that rule 23(b)(3)'s predominance requirement is not a barrier to classes asserting a claim under the FDUTPA.  See Tershakovec v. Ford Motor Co., -- F.4th --, 2023 WL 4377585, at *6 (11th Cir. July 7, 2023)("Dispositively here, 'a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue.'  Because a FDUTPA plaintiff needn't prove that he or she relied on any alleged misstatement, Ford's reliance-based predominance objection fails.")(quoting Carriuolo v. Gen. Motors Co., 823 F.3d at 983); Carriuolo v. Gen. Motors Co., 823 F.3d at 985-86 (stating that "General Motors is incorrect to suggest that the plaintiffs must prove that every class member saw the sticker and was subjectively deceived by it.  Instead, under FDUTPA, the plaintiff must only establish three *objective* elements . . . ," and noting that, "because the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amendable to class-wide resolution")(emphasis in original).  In a consumer-goods case involving yogurt labels that suggested health benefits, the Eleventh Circuit explains that, "should the class prevail on the liability issue, each putative class member would only need to show that he or she paid a premium for YoPlus to be entitled to damages under the FDUTPA."  Fitzpatrick v. Gen. Mills, Inc., 635 F.3d 1279, 1283 (11th Cir. 2011).  Contrary to the Defendants' suggestion, the Court does not read Davis v. Powertel, Inc. as limiting its holding only to fraudulent-omissions cases such that it does not apply to affirmative misrepresentations.  There, the District Court of Appeals of Florida for the First Judicial District states that "[a] party asserting a deceptive trade

practice claim need not show actual reliance on the <u>representation or omission</u> at issue." <u>Davis</u> <u>v. Powertel, Inc.</u>, 776 So. 2d at 973 (emphasis added). Accordingly, the Court concludes that <u>Davis v. Powertel, Inc.</u>'s holding applies as well to affirmative representations, and the Eleventh Circuit's citations thereto are not inapposite here. Thus, to the extent that the Plaintiffs' damages model measures the price premium associated with a challenged claim -- which the Court has addressed in-depth above in determining that the damages model appropriately is tailored only as to the Menthol Theory -- the Court concludes that the FDUTPA claim will not require individualized inquiries that will predominate over common analysis.

200.    Regarding unjust enrichment, the Plaintiffs assert that they can establish an unjust enrichment claim by showing that there is "'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" Certification Motion at 66-67 (quoting <u>Fla. Power Corp. v. City of Winter Park</u>, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)). They contend that courts have certified classes bringing unjust enrichment claims. <u>See</u> Certification Motion at 67 (citing <u>In re Checking Account Overdraft Litig.</u>, 307 F.R.D. 656, 675 (S.D. Fla. 2015)(King, J.); <u>In re Terazosin Hydrochloride Antitrust Litig.</u>, 220 F.R.D 672, 698 (S.D. Fla. 2004)(Seitz, J.)).

201.    The Defendants argue that, because unjust enrichment claims are fact-specific, they generally are not suitable for class certification. <u>See</u> Certification Opposition at 52 (quoting <u>Kunzelmann v. Wells Fargo Bank, N.A.</u>, 2013 WL 139913, at *9; <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d at 1274; <u>Justice v. Rheem Mfg. Co.</u>, 318 F.R.D. 687, 697-98 (S.D. Fla. 2016)(Dimitrouleas, J.)). The Defendants argue that the cases which the Plaintiffs cite are inapposite, because the courts in those cases made specific findings that there were no

differences among class members relevant to the unjustness analysis.  See Certification Opposition at 52 n.39 (citing In re Checking Account Overdraft Litig., 307 F.R.D. at 676; In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D at 698).  The Plaintiffs assert that there are no relevant difference among the class members, because "[w]hat matters to the 'unjustness analysis' is *Defendants' uniform conduct* designed to mislead consumers."  Certification Reply at 27 (emphasis in original)(citing In re Terazosin Hydrochloride, 220 F.R.D. at 698).

202.    The Court concludes, as it has concluded above, that determining whether the Defendants' retention of any benefit is unjust requires individualized inquiry, and therefore the Florida Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement.  The caselaw to which the parties cite indicates that unjust enrichment claims are suitable for class certification where the court does not have to review the plaintiffs' actions, because the benefit's unjustness is apparent from the defendant's conduct alone.  See Vega v. T-Mobile USA, Inc., 564 F.3d at 1274-75 (rejecting lower court's certification of an unjust enrichment claim where the defendants presented evidence that different employees had different levels of awareness regarding the challenged compensation scheme, such that determining whether the scheme was unjust as to each employee depended on how much that employee knew about the scheme); In re Checking Account Overdraft Litig., 307 F.R.D. at 675-676 (approving certification for an unjust enrichment claim and noting that the defendant concealed its overdraft fee policies and systems from its customers, and that none of the customers had learned about the alleged scheme); In re Terazosin Hydrochloride, 220 F.R.D. at 698 (approving certification for an unjust enrichment claim where the defendant used invalid patents and attempted to block generic competition, increasing the price of medications for end-payers); Muzuco v. Re$ubmitIt, LLC, 297 F.R.D. 504, 521 (S.D. Fla. 2013)(Scola, J.)(certifying an unjust enrichment claim

where the defendants' business practices were the same to all members of the class, and the defendants collected fees in the same manner for each class member).   As the Court has discussed, even though the Defendants' marketing was uniform, to determine whether the retention of the benefit resulting from a given purchase was unjust requires answering whether an individual consumer believed that a given label meant that Natural American cigarettes were safer or healthier or that menthol was not an additive, and whether that consumer purchased the cigarettes on that basis.   Accordingly, determining whether an individual consumer has a valid unjust enrichment claim requires individualized analyses that will predominate over common questions.   Accordingly, the Court concludes that the Florida Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement.

203.   In   summary,   the   Court   concludes   that:   (i) administrative   feasibility concerns -- namely   difficulties   in   determining   whether   an   individual   purchased   Natural American cigarettes -- tilt against a conclusion that the Florida Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Florida Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Florida Menthol Subclass; (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Florida Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol Theory; (iv) the FDUTPA claim will not require individualized inquiries to the extent that the Plaintiffs' damages model can calculate the price premium associated with each challenged claim, which tilts in favor of a finding of predominance for the Florida Menthol Subclass but against a finding of predominance for the Florida Class; and (v) the Florida Classes'

unjust enrichment claims require individualized inquiries, tilting against a finding of predominance.

### 2. The Florida Classes Satisfy Rule 23(b)(3)'s Typicality Requirement.

204. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Florida Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Florida Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Florida Classes, which rely solely on Florida law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Florida Classes' statutory and unjust enrichment claims. Because the Court has concluded that only the Florida Menthol Class satisfies predominance to the extent that its claims are premised on the Menthol Theory,

however, the Court certifies the Florida Menthol Class' FDUTPA claim to the extent that it is premised on the Menthol Theory, and will not certify the Florida Class, the Florida Menthol Class to the extent that its claims are premised on the Safer-Cigarette Theory, or the Florida Menthol Class' unjust enrichment claim.

## V.   THE COURT CERTIFIES ONLY THE ILLINOIS MENTHOL SUBCLASS' IUDTPA CLAIM TO THE EXTENT THAT IT IS BASED ON THE MENTHOL THEORY.

205.   The Court next considers the Plaintiffs' proposed Illinois Class and Illinois Menthol Subclass (the "Illinois Classes").  The Illinois Classes allege three claims: (i) a violation of the ICFA; (ii) a violation of the IUDTPA; and (iii) unjust enrichment.  See SAC ¶¶ 217-249, at 62-68.  In the MTD MOO, the Court dismisses the Plaintiffs' Illinois ICFA and IUDTPA claims "to the extent that they are premised on the theory that the terms 'natural' and 'additive-free' in the Defendants' advertising" -- but not its labeling -- "mislead a reasonable consumer into believing that Natural American cigarettes are safer or healthier than other cigarettes." MTD MOO at 201.  See id. at 244.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[80]

---

[80]Although the Illinois Classes have alleged claims for injunctive relief under the ICFA and the IUDTPA, they seek certification for injunctive relief on their ICFA claim only.  See SAC ¶ 232, at 65; id. ¶ 242, at 67.  In its MTD MOO, the Court dismisses the Plaintiffs' IUDTPA claim for injunctive relief, because the Plaintiffs cannot allege likelihood of future harm to themselves.  See MTD MOO at 202, 244.  Accordingly, the Plaintiffs note that they do not seek certification for injunctive relief on that claim, but preserve their right to appeal its dismissal. See Certification Reply at 3 n.2.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive relief claims.  The parties have not made arguments unique to the Illinois Classes, and the Court concludes that the named

206.    Before beginning the rule 23 analysis, however, the Court considers the Defendants' argument that the IUDTPA does not permit money damages and that, because the Court has dismissed the Plaintiffs' injunctive IUDTPA claim, there is no claim left for class certification under the IUDTPA.  See Certification Opposition at 18 (quoting Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd., 909 N.E.2d 848, 857 (Ill. App. Ct. 2009)).  The Plaintiffs first dispute that this assertion is correct, arguing that the ICFA authorizes the recovery of damages for IUDTPA violations.  See Certification Reply at 2-3 (quoting Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1014-15 (N.D. Ill. 1993)).  The Plaintiffs argue additionally that, even if the IUDTPA does not authorize damages, that assertion "is a defense that . . . would be applicable to *all* Class Members and, thus, does not undermine certification of the Illinois Class."  Certification Reply at 2 (citing Thrope v. State of Ohio, 173 F.R.D. 483, 490 (S.D. Ohio 1997))(emphasis in original).

207.    The IUDTPA § 3 states: "A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief . . . ," but is silent as to damages remedies. 815 Ill. Comp. Stat. Ann. 510/3.  Although § 3 does not authorize damages relief explicitly, it notes that "[t]he relief provided in this Section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State."  815 Ill. Comp. Stat. Ann. 510/3.  The ICFA, meanwhile, authorizes courts to award damages to "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person . . . ."  815 Ill. Comp. Stat. Ann. 505/10a.  The ICFA incorporates the IUDTPA in its definition of "[u]nfair methods of competition and unfair or deceptive acts or practices," which

---

Plaintiffs for the Illinois Classes do not have standing to pursue injunctive relief and that it will not certify the Illinois Classes for that purpose.

includes "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce . . . ."  815 Ill. Comp. Stat. Ann. 505/2.  Although the Defendants are correct that the IUDTPA does not itself permit damages remedies, the Court will not decline to certify the Illinois Classes' IUDTPA claims on that ground, because the Court agrees with the Plaintiffs that what remedy, if any, the IUDTPA provides is a question common to the whole class.

A.    THE ILLINOIS CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

208.    The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Illinois Classes' statutory and unjust enrichment claim.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers in more detail below whether the Illinois Classes satisfy the commonality and typicality requirements.

1.    The Illinois Classes Satisfy Rule 23(a)'s Commonality Requirement.

209.    The parties do not raise any arguments related to commonality that are unique to the Illinois Classes.  The Plaintiffs assert that the ICFA requires the Plaintiffs to show "'(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (iii) the deceptive act occurred in a course of conduct involving trade or commerce; and  (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act.'"  Certification Motion at 67-68 (quoting Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co., 771 F.3d 391, 402 (7th Cir. 2014)).  The Plaintiffs also assert that the IUDTPA claim prohibits

deceptive practices, "including representing that products have benefits they do not have, representing that products are of a particular standard or quality when they are not, advertising products with the intent not to sell them as advertised, or engaging in other conduct that creates a likelihood of confusion."  Certification Motion at 68 (citing 815 Ill. Comp. Stat. 510/2(a)(5), (7), (9), (12)).  Finally, the Plaintiffs assert that an unjust enrichment claim "arises when a 'defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment.'"  Certification Motion at 68 (quoting People ex rel. Hartigan v. E & E. Hauling, Inc., 607 N.E.2d 165, 177 (Ill. 1992), and citing HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 679 (Ill. 1989)).

210.   The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer.  Fed. R. Civ. P. 23(a)(2).  For the ICFA claim, these questions include whether the advertising was deceptive and whether the Defendants intended the Plaintiffs to rely on the deception in purchasing their products.  For the IUDTPA claim, these questions include whether the Defendants' labels represented benefits that the cigarettes did not have or whether their conduct created a likelihood of confusion.  For the unjust enrichment claim, common questions include whether the Defendants received a benefit from the allegedly misleading labeling.  Because there exist common questions that are central to the Plaintiffs' claims and that are capable of generating common answers, the Court concludes that the Illinois Classes satisfy the commonality requirement.

### 2.   The Illinois Classes Satisfy Rule 23(a)'s Typicality Requirement.

211.   As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs'

- 352 -

showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Illinois Classes.  See Certification Opposition at 22-24.  Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Illinois Classes. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Illinois Classes satisfy rule 23(a)'s typicality requirement.  Adamson v. Bowen, 855 F.2d at 676.

**B.  THE ILLINOIS CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE ILLINOIS MENTHOL SUBCLASS SATISFIES IN PART THE PREDOMINANCE REQUIREMENT.**

212.  Having determined that the Illinois Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the Illinois Classes' claims.

**1.  Only the Illinois Menthol Subclass' IUDTPA Claim Satisfies Rule 23(b)(3)'s Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.**

213.  The Court first examines whether common questions predominate over individualized inquiries.  The Defendants, having argued above that the Plaintiffs' IUDTPA claim is not suitable for certification, because it does not admit damages remedies, and because the Court dismisses the Plaintiffs' request for injunctive relief under the IUDTPA, do not dispute whether the Plaintiffs can prove their IUDTPA claim with predominately common evidence. The Defendants raise arguments, however, against the Plaintiffs' showing of predominance for their ICFA and unjust enrichment claims.  See Certification Opposition at 46, 53.  Because the

Court does not decline to certify the IUDTPA claim based on the Defendants' argument, it considers whether common questions predominate for all three claims.

214.    First, the Court concludes that the ICFA claims do not satisfy rule 23(b)(3)'s predominance requirement.  The Plaintiffs argue that the ICFA focuses on objective elements and that the Defendants' conduct makes the claims amenable to class certification.  See Certification Motion at 68 (citing Rikos v. Procter & Gamble Co., 799 F.3d 497, 514-15 (6th Cir. 2015); In re ConAgra Foods, Inc., 90 F. Supp. 3d at 1001; Clark v. TAP Pharm. Prods., Inc., 343 Ill. App. 3d 538, 548-49, 798 N.E.2d 123, 131-32 (Ill. Ct. App. 2003); Morse v. Bankers Life & Cas. Co., No 99 C 0193, 2000 WL 246245, at *1 (N.D. Ill. February 24, 2000); Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 499 (N.D. Ill. 1998)).  The Defendants contest that an ICFA claimant must allege that her or she was deceived.  See Certification Opposition at 46 (quoting Oliveira v. Amoco Oil Co., 201 Ill. 2d 134, 155, 776 N.E.2d 151, 164 (Ill. 2002)).  They argue that the Seventh Circuit has relied on that proposition in denying certification of a class which included members who were not deceived and therefore had no ICFA grievance.  See Certification Opposition at 46 (citing Oshana v. Coca-Cola Co., 472 F.3d at 514; Langendorf v. Skinnygirl Cocktails, LLC, 3060 F.R.D. 574, 582 (N.D. Ill. 2014)(Shah, J.); Price v. Philip Morris, Inc., 219 Ill.2d 182, 269-71, 848 N.E.2d 1, 52-53 (Ill. 2005)).  They contend that the caselaw which the Plaintiffs cite suggests that ICFA claims do not require individualized inquiries in every case, including where a defendant makes uniform representations, but that the Seventh Circuit nevertheless has concluded that similar cases require individualized inquiry.  See Certification Opposition at 46 n.31.

215.    The Plaintiffs rebut the Defendants' arguments, asserting that the Supreme Court of Illinois in Oliveira v. Amoco Oil Co. dismissed the plaintiff's complaint, because he did not

allege that the defendant's advertisements had deceived him at all and that the Supreme Court of Illinois did not reach the class certification issue.  See Certification Reply at 21 (quoting Oliveira v. Coca-Cola Co., 776 N.E.2d at 155, 165).  The Plaintiffs also argue that the Seventh Circuit in Oshana v. Coca-Cola Co. declined certification, because of typicality concerns, and limited its holding on class certification to that case only.  See Certification Reply at 21 (quoting Pella Corp. v. Saltzman, 606 F.3d 391, 393 (7th Cir. 2010)).  The Plaintiffs argue that they can show causation under the ICFA by showing that "there is a uniform material representation seen by class members (materiality being determined by the reasonable consumer standard), and that class members paid more for the product at issue as a result."  Certification Reply at 21 (citing In re ConAgra Foods, Inc., 90 F. Supp. 3d at 996, 998; In re Dial Complete Mktg. & Sales Practices Litig., 312 F.R.D. 36, 65-66 (D.N.H. 2015); Rikos v. Procter & Gamble Co., 799 F.3d at 514-15; S37 Mgmt., Inc. v. Advance Refrigeration Co., 356 Ill. Dec. 172, 961 N.E.2d 6, 16 (Ill. App. Ct. 2011)).

216.    The Court agrees with the Seventh Circuit's reasoning in Oshana v. Coca-Cola Co., 472 F.3d at 513-15.[81]  There, the plaintiff brought a class action arguing that the Coca-Cola Company advertised that Diet Coke contained only aspartame as a sweetener, but that fountain Diet Coke contained both aspartame and saccharin, thereby tricking people into believing that bottled Diet Coke and fountain Diet Coke contained the same ingredients.  See 472 F.3d at 509. The plaintiff's proposed class "required only the purchase of a fountain Diet Coke from March

---

[81]The Plaintiffs argue that the Seventh Circuit references Oshana v. Coca-Cola Co., stating that it does not hold that consumer fraud cases never are appropriate for class certification, and instead denies certification on typicality grounds.  See Certification Reply at 21 (quoting Pella Corp. v. Saltzman, 606 F.3d at 393).  This interpretation of the Seventh Circuit's holding in Oshana v. Coca-Cola Co. is correct; however, the Court concludes that the Seventh Circuit's interpretation of the Illinois statutory scheme and its requirements is persuasive, and relies on it here.

12, 1999, forward." 472 F.3d at 514. As the Seventh Circuit explains, "a damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception." 472 F.3d at 513-14 (quoting <u>Oliveira v. Amoco Oil Co.</u>, 267 Ill. Dec. 14, 776 N.E.2d at 164 (citing <u>Zekman v. Direct Am. Marketers</u>, 182 Ill. 2d 359, 231 Ill. Dec. 80, 695 N.E.2d 853 (Ill. 1998)). The Seventh Circuit concludes, therefore:

> Such a class could include millions who were not deceived and thus have no grievance under the ICFA. Some people may have bought fountain Diet Coke *because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin. Countless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception. *See Oliveira*, 267 Ill. Dec. 14, 776 N.E.2d at 164 (holding that those who "knew the truth" do not have valid ICFA claims because they cannot claim to have been deceived).

<u>Oshana v. Coca-Cola Co.</u>, 472 F.3d at 514 (emphasis in original). The Seventh Circuit concludes that the plaintiff's claims are not typical of the proposed class, because she alleged that she was deceived and injured. <u>See</u> 472 F.3d at 514.

217.    The Court concludes that, although the Seventh Circuit concludes that the ICFA's requirement that plaintiffs prove they were deceived results in the named plaintiff's claims being atypical of the class' claims, the same concerns are relevant to the predominance argument. Here, the Plaintiffs seek certification for a class of all purchasers of Natural American cigarettes and menthol cigarettes in Illinois in the relevant time period. <u>See</u> SAC ¶¶ 110, 122, at 40, 42. The Illinois Classes as defined includes individuals whom the labels did not deceive, because they knew that the cigarettes were not safer or knew that menthol was an additive, or who did not purchase Natural American cigarettes based on the challenged labels. As the Supreme Court of Illinois has stated, "to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the [ICFA], a plaintiff must allege that he was, in

some manner, deceived." Oliveira v. Amoco Oil Co., 776 N.E.2d at 155. Although the Plaintiffs contend that these differences do not matter, because they are relying on objective standards for deception, that the ICFA requires proof of deception for each plaintiff means that each class member will have to demonstrate deception to substantiate his or her ICFA claim. Accordingly, the Court concludes that the ICFA's proximate cause requirement tilts against a finding of predominance. Similarly, "the Seventh Circuit has recognized that where, as here, an unjust enrichment claim is based on the same alleged wrongdoing that forms the basis for an ICFA claim, the 'unjust enrichment claim will stand or fall with the related [ICFA] claim.'" In re ConAgra Foods, Inc., 90 F. Supp. 3d at 1000 (quoting Cleary v. Philip Morris, Inc., 656 F.3d 511, 517 (7th Cir. 2011)). See Oshana v. Coca-Cola Co., 472 F.3d at 515 ("Oshana cannot show Coke was unjustly enriched unless she shows that Coke benefitted to her detriment . . . . [I]n this case Coke cannot have been unjustly enriched without proof of deception."). Accordingly, the Court concludes that the Illinois Classes' unjust enrichment claim, like their ICFA claim, requires individualized inquiries that tilt against a finding of predominance.

218. Second, the Court concludes that the IUDTPA claims satisfy rule 23(b)(3)'s predominance requirement. Unlike the ICFA, the IUDTPA's language refers solely to a defendant's conduct. See, e.g., 815 Ill. Comp. Stat. Ann. 510/2(a)(12) ("A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person . . . engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.") "In order to prevail in an action under this Act, a plaintiff need not prove . . . actual confusion or misunderstanding." 815 Ill. Comp. Stat. Ann. 510/2(b). Because the IUDTPA focuses on a defendant's conduct and does not require proof that any plaintiff was

misled, the IUDTPA claim's common questions predominate.[82]

219.    As with the proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Illinois Classes' common questions.   Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.   See Certification Opposition at 25-83.   The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Illinois on those issues.   Accordingly, the Court adopts its conclusions above in its considerations of the Illinois Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Illinois Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Illinois Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Illinois Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Illinois Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol-Theory.   Because the Court concludes that individualized inquiries will predominate over common questions for the ICFA and unjust enrichment claims, the Court concludes that only the Illinois Menthol Class' IUDTPA claim

_____

[82]As discussed above, although the Defendants are correct that the IUDTPA claim does not allow for damages relief, what relief is available under the IUDTPA is a common question and thus does not defeat predominance.

satisfies the predominance requirement to the extent that it is premised on the Menthol Theory.

### 2. The Illinois Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

220.    The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Illinois Classes.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Illinois Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Illinois Classes, which rely solely on Illinois law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Illinois Classes' statutory and unjust enrichment claim.  Because the Court concludes above that only the Illinois Menthol Class' IUDTPA claim satisfies the predominance requirement to the extent that it is premised on the Menthol Theory, the Court certifies only the Illinois Menthol Class' IUDTPA claim to the

extent that it is premised on the Menthol Theory and does not certify the Illinois Class, the Illinois Menthol Class' ICFA and unjust enrichment claims, or the Illinois Menthol Class' IUDTPA claim to the extent that it is premised on the Safer-Cigarette Theory.

## VI.    THE COURT DOES NOT CERTIFY THE MASSACHUSETTS CLASS.

221.    The Court next considers the Plaintiffs' proposed Massachusetts Class.   The Massachusetts Class alleges two claims: (i) an unfair and deceptive business practices claim under Mass. Gen. Law ch. 93A, §§ 2 and 9 ("Chapter 93A"); and (ii) an unjust enrichment claim. See SAC ¶¶ 250-266, at 69-71.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.   The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[83]

### A.    THE MASSACHUSETTS CLASS SATISFIES RULE 23(a)'S REQUIREMENTS.

222.    The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Massachusetts Class' statutory and unjust enrichment claim.   See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers

---

[83]The Massachusetts Class seeks injunctive relief on its Chapter 93A claim.  See SAC ¶ 259, at 70.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.   The parties have not made arguments unique to the Massachusetts Class, and the Court concludes that Hebert, the named Plaintiff for the Massachusetts Class, does not have standing to pursue injunctive relief, and the Court will not certify the Massachusetts Class for that purpose.

in more detail below whether the Massachusetts Class satisfies the commonality and typicality requirements.

### 1. The Massachusetts Class Satisfies Rule 23(a)'s Commonality Requirement.

223.   The Court concludes that both of the Massachusetts Class' claims satisfy the commonality requirement.   As the Plaintiffs note, a Chapter 93A claim "requires showing (1) that the defendant committed an unfair or deceptive act or practice, (2) a loss of money or property suffered as a result, and (3) a 'causal connection' between the two."   Certification Motion at 69 (quoting Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 820, 17 N.E.3d 1066, 1074-75 (Mass. 2014)).   Additionally, under Massachusetts law, an unjust enrichment claimant "'must establish not only that the defendant received a benefit, but also that such a benefit was unjust, "a quality that turns on the reasonable expectations of the parties."'"   Certification Motion at 69 (quoting Metro. Life Ins. Co v. Cotter, 464 Mass. 623, 644, 984 N.E.2d 835, 850 (Mass. 2013)(quoting Global Investors Agent Corp. v. Nat'l Fire Ins. Co., 76 Mass. App. Ct. 812, 826, 927 N.E.2d 480, 494 (Mass. App. Ct. 2010))).   Accordingly, whether the Defendants' conduct here was deceptive or unfair is a common question apt to drive the litigation's resolution, and, as the Court has concluded above with other unjust enrichment claims, whether the Defendants' allegedly misleading labeling caused them to derive a benefit also is a common question central to the litigation.   The Court concludes, therefore, that the Massachusetts Class satisfies rule 23(a)'s commonality requirement.

### 2. The Massachusetts Class Satisfies Rule 23(a)'s Typicality Requirement.

224.   As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."

Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Massachusetts Class. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Massachusetts Class. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Illinois Classes satisfy rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

## B. THE MASSACHUSETTS CLASS SATISFIES RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT.

225. Having determined that the Massachusetts Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the Massachusetts Class' claims.

### 1. The Massachusetts Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.

226. The Plaintiffs contend that their Chapter 93A claim focuses on objective elements and the Defendants' conduct and is therefore suitable for class treatment. See Certification Motion at 70 (citing Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 42 (1st Cir. 2003); Hebert v. Vantage Travel Serv., Inc., 334 F.R.D. 362, 373 (D. Mass. 2019); Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 20-21 (D. Mass. 2010); Aspinall v. Philip Morris Co., 442 Mass. 381, 813 N.E.2d 476 (Mass. 2004)). The Defendants contest that the Plaintiffs' citation to

Aspinall v. Philip Morris Co. is apposite, because, although Chapter 93A claims do not require proof of reliance, they require proof of causation, an analysis which requires individualized proof into whether each of the challenged labels caused class members to purchase Natural American cigarettes. See Certification Opposition at 47 (citing Markarian v. Conn. Mut. Life. Ins Co., 202 F.R.D. 60, 69 (D. Mass. 2001)(Wolf, J.); Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 73 (D. Mass. 2019)(Casper, J.); Kwaak v. Pfizer, Inc., 881 N.E.2d 812, 8188 (Mass. App. Ct. 2008)). They argue that, although Aspinall v. Philip Morris Co. asserted that misleading advertising causes a per-se injury on purchasers, the Supreme Judicial Court of Massachusetts has moved away from this standard and now require plaintiffs to establish identifiable harms linked to the deceptive act that are distinct from the violation. See Certification Opposition at 47 (citing Rule v. Ft. Dodge Animal Health, Inc., 607 F.3d 250, 254 (1st Cir. 2010); Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017)). The Plaintiffs contend that it is sufficient to show that a product bears a uniform, misleading label, see Certification Reply at 22 (citing Aspinall v. Philip Morris Co., 442 Mass. at 402, 813 N.E.2d at 492), that they do not need to show actual reliance on the misleading statements, see Certification Reply at 22 (citing Int'l Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 850 (Mass. 1983)), that they must show a causal relationship between the misrepresentation and their injury, see Certification Reply at 22 (citing Fraser Eng'g Co. v. Desmond, 26 Mass. App. Ct. 99, 104 (Mass. App. Ct. 1988)), and that a price-premium theory of causation is cognizable, see Certification Reply at 22 (citing Lee v. Conagra Brands, Inc., 958 F.3d at 80-81; Allen v. Conagra Foods, Inc., 331 F.R.D. at 667).

227.   The Court concludes that, given its determination that the Plaintiffs' damages model is not an adequate fit with its theory of liability, the Massachusetts Class' Chapter 93A

claims does not satisfy predominance to the extent that the Massachusetts Class relies on a price-premium theory of damages to establish causation.  The Supreme Judicial Court has explained that its

> recent decisions generally establish the following.  The invasion of a consumer's legal right (a right, for example, established by statute or regulation), without more, may be a violation of G.L. c. 93A, § 2, and even a per se violation of § 2, but the fact that there is such a violation does not necessarily mean the consumer has suffered an injury or a loss entitling her to at least nominal damages and attorney's fees; instead, the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself.  *See Rhodes v. AIG Dom. Claims, Inc.*, 461 Mass. 486, 496 n.16, 961 N.E.2d 1067 (2012)(*Rhodes*); *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 504-505, 952 N.E.2d 908 (2011)(*Casavant*); *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 632-633, 888 N.E.2d 879 (2008)(*Iannacchino*); *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 801-802, 840 N.E.2d 526 (2006)(*Hershenow*).  To the extent that the quoted passage from *Leardi* can be read to signify that "invasion" of a consumer plaintiff's established legal right in a manner that qualifies as an unfair or deceptive act under G.L. c. 93A, § 2, automatically entitles the plaintiff to at least nominal damages (and attorney's fees), we do not follow the *Leardi* decision.   Rather, as the *Rhodes*, *Casavant*, *Iannacchino*, and *Hershenow* decisions indicate, a plaintiff bringing an action for damages under c. 93A, § 9, must allege and ultimately prove that she has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself.

Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503, 984 N.E.2d 737, 745-46 (Mass. 2013).  In Bellermann v. Fitschburg Gas & Elec. Light Co., 475 Mass. 67, 54 N.E.3d 1106 (Mass. 2016), the Supreme Judicial Court of Massachusetts states: "We stated clearly . . . that to meet the injury requirement under G.L. c. 93A, § 9(1) or 11, a plaintiff must have suffered a 'separate, identifiable harm arising from the [regulatory] violation' that is distinct 'from the claimed unfair or deceptive conduct itself.'"  Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass. at 73, 54 N.E.3d at 1111 (quoting Tyler v. Michaels Stores, Inc., 464 Mass. at 503, 984 N.E. at 745).  The Court acknowledges that the First Circuit has allowed the "classic benefit-of-the-bargain injury," or an injury "for which the measure of damages is 'the monetary difference between the

actual value of the product at the time of purchase and what its value would have been if the representations had been true,'" to satisfy Chapter 93A's causation requirement.  Lee v. Conagra Brands, Inc., 958 F.3d at 80-81 (quoting Aspinall v. Philip Morris Co., 813 N.E.2d at 490). Nevertheless, the Court has concluded that the Plaintiffs do not present a damages model that can measure that difference in value adequately.  Accordingly, the Court concludes that the Massachusetts Class has not satisfied Chapter 93A's causation requirement and therefore would require individualized inquiries whether each class member suffered injury from the alleged deception.  The Court concludes, therefore, that the Massachusetts Class' Chapter 93A claim does not satisfy rule 23(b)(3)'s predominance requirement.

228.    Regarding the Massachusetts Class' unjust enrichment claim, the Court repeatedly has expressed its skepticism above that common questions related to these claims predominate over individualized inquiries.  Similarly, the Court concludes that the Massachusetts Class' unjust enrichment claim does not satisfy the predominance requirement.  As the Plaintiffs note, "[w]hether the enrichment or detriment is unjust 'equates with the defeat of someone's reasonable expectations.'"  Certification Motion at 69 (quoting Metro. Life Ins. Co. v. Cotter, 984 N.E.2d at 850).  "[S]omeone's reasonable expectations," Metro. Life Ins. Co. v. Cotter, 984 N.E.2d at 850, are the individual class members' reasonable expectations and not some generalized reasonable expectation, and the Plaintiffs cannot rely on common proof or a showing that the Defendants' labels are misleading to a reasonable consumer to prove with common evidence that each class member's reasonable expectations were that they were purchasing a relatively healthy product when they purchased Natural American cigarettes.  The Plaintiffs would need to demonstrate that each class member expected reasonably that they were buying a product they did not receive.  This is an individualized inquiry that overtakes any common

questions.  Accordingly, the Court concludes that the Massachusetts Class' unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.

229.    As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Massachusetts Class' common questions.  Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Massachusetts on those issues.  Accordingly, the Court adopts its conclusions above in its considerations of the Massachusetts Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Massachusetts Class satisfies predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to the Massachusetts Class -- but that it is an adequate fit with the Plaintiffs' Menthol Theory, which is not applicable here, because the Plaintiffs do not seek certification for a Massachusetts Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Massachusetts Class' claims based on the Safer-Cigarette Theory.  Because the Court also concludes that the Massachusetts Class' claims do not satisfy the predominance requirement to the extent that it is premised on the Menthol Theory, the Court concludes that the Massachusetts Class does not satisfy rule 23(b)(3)'s predominance requirement.

2.     **The Massachusetts Class Satisfies Rule 23(b)(3)'s Superiority Requirement.**

230.    The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Massachusetts Class.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Massachusetts Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles.  Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Massachusetts Class, which relies solely on Massachusetts law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Massachusetts Class' statutory and unjust enrichment claims.  Nevertheless, given the Court's conclusion on the Massachusetts Class' predominance, the Court does not certify the Massachusetts Class.

## VII.   THE COURT DOES NOT CERTIFY THE MICHIGAN CLASS.

231.    The Court next considers the Plaintiffs' proposed Michigan Class.  The Michigan Class alleges two claims: (i) a violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-922 ("MCPA"); and (ii) an unjust enrichment claim.  See SAC ¶¶ 267-289, at 71-76.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[84]

### A.    THE MICHIGAN CLASS SATISFIES RULE 23(a)'S REQUIREMENTS.

232.    The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Michigan Class' statutory and unjust enrichment claims.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers in more detail below whether the Michigan Class satisfies the commonality and typicality requirements.

### 1.    The Michigan Class Satisfies Rule 23(a)'s Commonality Requirement.

233.    The Court concludes that the Michigan Class' claims satisfy the commonality requirement.   Under the MCPA, "[u]nfair, unconscionable, or deceptive methods, acts, or

---

[84]The Michigan Class seeks injunctive relief on its MCPA claim.  See SAC ¶ 278, at 74. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the Michigan Class, and the Court concludes that the named Plaintiff for the Michigan Class does not have standing to pursue injunctive relief.  Accordingly, the Court will not certify the Michigan Class for that purpose.

practices in the conduct of trade or commerce are unlawful," and include, among other acts, "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Mich. Comp. Laws § 445.903(1)(e). Under Michigan law, an unjust enrichment claimant must show: "'(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.'"  Certification Motion at 71 (quoting Landstar Express Am., Inc.. v. Nexteer Auto. Corp., 900 N.W.2d 650, 657 (Mich. Ct. App. 2017)).  These standards are similar to the statutory and common-law standards the Court has examined below, and there are similar common questions that are central to each claim, such as whether the Defendants have engaged in trade practices that are unfair, unconscionable, or deceptive, and whether the Defendants have received a benefit from the Plaintiffs.  Accordingly, the Court concludes that the Michigan Class satisfies rule 23(a)'s commonality requirement.

### 2. The Michigan Class Satisfies Rule 23(a)'s Typicality Requirement.

234.    As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Michigan Class.  See Certification Opposition at 22-24.  Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Michigan Class. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the

Michigan Class satisfies rule 23(a)'s typicality requirement.  Adamson v. Bowen, 855 F.2d at 676.

> **B.      THE  MICHIGAN  CLASS  SATISFIES  RULE  23(b)(3)'s  SUPERIORTY REQUIREMENT, BUT DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT.**

235.    Having determined that the Michigan Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the Michigan Class' claims.

> **1.      The Michigan Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.**

236.    The  Court  first  turns  to  whether  the  Michigan  Class  satisfies  rule  23(b)(3)'s predominance requirement.  To establish a claim for misrepresentation, "a plaintiff must establish: 1) that the defendant made a material misrepresentation that was false; 2) the defendant knowingly made the false representation with the intent that the plaintiff would act upon it; 3) that the plaintiff acted in reliance upon it; and 4) resulting damages."  In re OnStar Contract Litig., 278 F.R.D. 352, 376 (E.D. Mich. 2011)(Cox, J.)(citing Baker v. Arbor Drugs, Inc., 215 Mich. App. 198, 544 N.W.2d 727 (Mich. Ct. App. 1996)).  The Supreme Court of Michigan has held "that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations.  It is sufficient if the class can establish that a reasonable person would have relied on the representation."  Dix v. Am. Bankers Life Assur. Co. of Fla., 429 Mich. 410, 418, 415 N.W.2d 206, 209 (Mich. 1987).  The Court of Appeals of Michigan has interpreted the MCPA consistently with common-law fraud, which requires that the misrepresentation be material.  See Zine v. Chrysler Corp., 236 Mich. App. 261,

283, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999)(citing Mayhall v. A.H. Pond Co., 129 Mich.

App. 178, 182-83, 341 N.W.2d 268 (1983); Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich.

330, 336, 247 N.W.2d 813 (Mich. 1976)).  "[A] material fact for purposes of the MCPA

would . . . be one that is important to the transaction or affects the consumer's decision to enter

into the transaction." Zine v. Chrysler Corp., 236 Mich. App. at 283, 600 N.W.2d at 398.  In

interpreting common-law fraud's elements under Michigan law, the Honorable Thomas J.

Tucker, United States Bankruptcy Judge for the United States District Court for the Eastern

District of Michigan, explains that "the [jury] instruction that defines what a 'material fact' is

states, in pertinent part, that . . . '[a] material fact must be of enough importance in the matter

that a reasonable person would be likely to rely on it.'" In re Pixley, 456 B.R. 770, 782 (E.D.

Mich. 2011)(Tucker, J.)(quoting Mich. Standard Civ. Jury Instruction 128.10)(alteration in In re

Pixley but not in Civ. Jury Instruction 128.10).  See also Speerly v. Gen. Motors, LLC, 343

F.R.D. 493, 521 (E.D. Mich. 2023)(Lawson, J.)(concluding that the MCPA's materiality

requirement is susceptible to classwide proof)(citing Mich. Comp. Laws § 445.903(1)(s); Zine v.

Chrysler Corp., 236 Mich. App. at 284, 600 N.W.2d at 398).  The Honorable Sean F. Cox,

United States District Judge for the United States District Court for the Eastern District of

Michigan, notes, however, that, "[w]ith respect to class actions . . . , the damages that may be

recovered by a class member are limited to the 'actual damages' caused by the violation of the"

MCPA.  In re OnStar Contract Litig., 278 F.R.D at 378-79 (quoting Mich. Comp. Laws

§ 445.911(3))(agreeing with the defendants "that determining whether any given member of the

proposed class can establish actual damages, and what such damages would be, would require

inherently individual inquiries").

237.    The Court concludes that the MCPA allows for common proof as to its first three

elements, i.e., whether the Defendants made a misleading statement, whether the Plaintiffs relied on that statement, and whether the statement was material.[85]  With regards to damages, the Court concludes that the Plaintiffs have not shown that common questions will predominate.  To the extent that the Plaintiffs suggest that all Natural American misleading labels harmed all consumers on the basis of a price-premium, the Court has concluded above that the Plaintiffs' current damages model does not align with the Safer-Cigarette Theory of liability.  Accordingly, with respect to the Safer-Cigarette Theory, the Plaintiffs have not shown that they can demonstrate damages on a classwide basis, and the Court concludes that the MCPA claim does not predominate.

238.   Regarding unjust enrichment, the Plaintiffs assert that Michigan law "requires '(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.'"  Certification Motion at 71 (quoting Landstar Express Am. Inc. v. Nexteer Auto. Corp., 900 N.W.2d at 657).  Whether an unjust enrichment claim satisfies the predominance requirement depends on each case's facts. See In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. at 698 (certifying an unjust enrichment claim where the defendant delayed the labeling of generic medication resulting in increased profits); Jackson v. Wal-Mart Stores, Inc., 2005 WL 3191394, at *5 (denying certification of an unjust enrichment claim where the claim's success depended on why individual employees missed rest or meal breaks).  As the Court has discussed, whether an individual consumer's purchase was unjust hinges on the reasons why they purchased Natural American cigarettes, and whether they would have been willing to pay the same price without

---

[85]The Court reiterates its conclusion from its analysis on the California Classes that whether the Plaintiffs ultimately will prove classwide materiality to a factfinder is a merits issue and does not preclude a finding of predominance.

the allegedly misleading labeling or with knowledge that the cigarettes were not safer or contained additives.  Accordingly, the Court concludes that the Michigan Class' unjust enrichment claim involves individualized inquiries which preclude a finding of predominance.

239.  As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Michigan Class' common questions.  Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Michigan on those issues.  Accordingly, the Court adopts its conclusions above in its considerations of the  Michigan Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Michigan Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, applicable to the Michigan Class; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Michigan Class' claims based on the Safer-Cigarette Theory.  Having additionally determined that the Michigan Class' claims do not predominate, the Court concludes that the Michigan Class does not satisfy the predominance requirement.

## 2.      **The  Michigan  Class  Satisfies  Rule  23(b)(3)'s  Superiority Requirement.**

240.     The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Michigan Class.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Michigan Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Michigan Class, which rely solely on Michigan law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Michigan Class' statutory and unjust enrichment claim.  Because the Court concludes above, however, that the Michigan Class does not satisfy the predominance requirement, the Court does not certify the Michigan Class.

VIII.  **THE COURT CERTIFIES THE NEW JERSEY MENTHOL SUBCLASS TO THE EXTENT THAT ITS CLAIMS ARE BASED ON THE MENTHOL THEORY, AND DOES NOT OTHERWISE CERTIFY THE NEW JERSEY MENTHOL SUBCLASS OR THE NEW JERSEY CLASS.**

241.   The Court next considers the Plaintiffs' proposed New Jersey Class and New Jersey Menthol Subclass (the "New Jersey Classes").  The New Jersey Classes allege three claims: (i) a violation of the NJCFA; (ii) a violation of the TCCWNA; and (iii) an unjust enrichment claim.  See SAC ¶¶ 290-315, at 76-81.  As the Defendants note, the Court dismissed the New Jersey Classes' unjust enrichment claim in its MTD MOO, and the Plaintiffs do not seek certification on that claim.  See Certification Opposition at 17 (citing MTD MOO at 223-24); Certification Reply at 3 n.2.  Accordingly, the Court considers only the New Jersey Classes' statutory claims.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[86]

A.   **THE NEW JERSEY CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.**

242.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New Jersey Classes' statutory claims.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the

---

[86]The New Jersey Classes seek injunctive relief on their NJCFA claim.  See SAC ¶ 298, at 78.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the New Jersey Classes, and the Court concludes that the named Plaintiffs for the New Jersey Classes, Litwin and Emmons, do not have standing to pursue injunctive relief.  Accordingly, the Court will not certify the New Jersey Classes for that purpose.

Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers in more detail below whether the New Jersey Classes satisfy the commonality and typicality requirements.

### 1.   The New Jersey Classes Satisfy Rule 23(a)'s Commonality Requirement.

243.   The Plaintiffs assert that, under the NJCFA, "'[a] consumer who can prove (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees.'"  Certification Motion at 72 (quoting Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011).  Section 56:8-2 makes "any commercial practice that is unconscionable or abusive, deception, fraud . . . , [or] misrepresentation . . . an unlawful practice."  N.J. Stat. § 56:8-2.  Thus, whether the Defendants' labeling practices constitute deception or misrepresentation is a common question central to the Plaintiffs' NJCFA claim. The Plaintiffs additionally assert that the TCCWNA requires a showing that "(1) the defendant was a seller; (2) the defendant offered or entered into a written consumer contract; (3) that writing contained a provision that violated 'any clearly established legal right of a consumer or responsibility of a seller'; and (4) the plaintiff is an 'aggrieved consumer.'"  Certification Motion at 72 (quoting Kauffman v. New England Fitness S., Inc., No. A-1789-17T1, 2019 WL 1752922, at *2 (N.J. Super. Ct. App. Div. April 17, 2019)).  The TCCWNA itself provides:

> No seller . . . shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller . . . as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

N.J. Stat. § 56:12-15.   Thus, whether the Defendants' labeling constituted a written consumer warranty, notice, or sign, and whether it included a provision that violated a consumer's clearly established legal right, are common questions central to the New Jersey Classes' claims. Accordingly, the Court concludes that the New Jersey Classes' statutory claims satisfy rule 23(a)'s commonality requirement.

## 2.   The New Jersey Classes Satisfy Rule 23(a)'s Typicality Requirement.

244.   As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, two of whom -- Emmons and Litwin -- represent the New Jersey Class and the New Jersey Menthol Subclass, respectively.  See Certification Opposition at 22-24; SAC ¶¶ 113, 123, at 40, 42.  The Defendants challenge Emmons' typicality, because she "acknowledged that she did not pay more for NAS than other brands and in all events never paid more based on a belief that NAS cigarettes are somehow better."  Certification Opposition at 23-24 (citing Deposition of Abigail Emmons (taken July 10, 2018) at 187:25-191:5, filed October 8, 2020 (Doc. 315-8)(Emmons, Gallucci, Reisman)("Emmons Depo.")).  Similarly, they challenge Litwin's typicality, because he paid for Natural American cigarettes using coupons and therefore did not pay full price.  See Certification Opposition at 24 (quoting Deposition of Robert Litwin (taken May 23, 2018) at 96:15-98:7, filed October 8, 2020 (Doc. 315-7)(Haberman, Litwin, Marker)("Litwin Depo.").  They also challenge Litwin's typicality, because he continued smoking Natural American cigarettes after commencing this litigation, and therefore cannot represent that he has been misled.  See Certification Opposition at 23 (citing Litwin Depo. at 101:21-103:8 (Litwin,

Marker)).

245.    Regarding Litwin, that he continued to smoke Natural American cigarettes after learning that they are not healthier than other cigarettes does not make his claims atypical, because his claims nevertheless are based on the same legal theory as the rest of the class, namely, that Natural American's labeling led him to believe that the cigarettes were safer.[87] Additionally, as the Court discusses above in considering the Nationwide Menthol Subclass, that he used coupons to purchase his cigarettes does not mean he did not pay more for those cigarettes than he otherwise would have if they did not bear the allegedly misleading labels. Although the Court has concluded that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, it nevertheless suggests that there is a price premium associated with the Defendants' challenged labels.  Dubé Report ¶ 23, at 9.  For the same reason, the Court does not conclude that Emmons' assertion that she did not pay more for Natural American cigarettes compared to other cigarettes, Emmons Depo. at 188:19-189:5 (Emmons, Reisman), undercuts the Plaintiffs' argument that Natural American cigarettes commanded a price premium compared to what they would have been valued without the challenged labels. Accordingly, the Court concludes that Litwin's and Emmons' claims rest on the same legal theory as the proposed class members, and concludes that their differing factual circumstances do not defeat typicality.  See Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class

---

[87]Litwin notes that, after commencing this action, Natural American cigarettes no longer constituted the majority of the cigarettes that he smokes.  See Litwin Depo. at 102:6-12 (Litwin, Marker).  As the Court has noted, given cigarettes' highly addictive nature, see Proctor Report at 9, the Court is unwilling to conclude that, because a consumer continued to smoke a certain brand after learning that those cigarettes did not contain certain desirable qualities, he or she no longer has claims that are typical of the remaining class members.

representative and class members are based on the same legal or remedial theory.").  The Court therefore concludes that the New Jersey Classes satisfy rule 23(a)'s typicality requirement.

### B.   THE NEW JERSEY CLASSES SATISFY IN PART RULE 23(b)(3)'S REQUIREMENTS.

246.   Having determined that the New Jersey Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.   The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the New Jersey Classes' claims.

### 1.   **The New Jersey Class and the New Jersey Menthol Subclass -- to the Extent That Its Claims Are Based on the Safer-Cigarette Theory -- Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the New Jersey Menthol Subclass Satisfies Rule 23(b)(3)'s Predominance Requirement to the Extent that Its Claims Are Based on the Menthol Theory.**

247.   The Plaintiffs argue that "[t]he test for deception turns on the reasonable consumer."  Certification Motion at 72 (citing Barry v. Arrow Pontiac, Inc., 494 A.2d 804, 810 (N.J. 1985)).  Accordingly, they contend that the NJCFA focuses on objective elements and the Defendants' conduct and therefore is suitable for class treatment.  See Certification Motion at 73. The Defendants contend that "the NJFCA 'essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss,'" and that the Plaintiffs must also demonstrate a causal link between the unlawful conduct and the Plaintiffs' ascertainable loss.  Certification Opposition at 48 (quoting Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 389, 929 A.2d 1076, 1086 (N.J. 2007)("Local No. 68")).  They note that New Jersey courts have declined to certify other cigarette class actions, because success on the claim would require individual inquiries into each smoker's reasons for choosing the challenged brand.  See Certification Opposition at 48 (citing

Stern v. Philip Morris USA, Inc., 2007 WL 4841057, at *13 (N.J. Super. Ct. November 16, 2007)).   The Plaintiffs rebut that they need only show a causal relationship, which does not require individual reliance and which requires only that the Plaintiffs suffered an ascertainable loss due to the Defendants' conduct.   See Certification Reply at 23 (citing Lee v. Carter-Reed Co., 203 N.J. 496, 528, 4 A.3d 561, 580 (N.J. 2010)).   The Plaintiffs assert that they demonstrate ascertainable loss on a class-wide basis, because the challenged labels cause Natural American cigarettes to be more expensive than they would be without the claims.   See Certification Reply at 23 (citing Hudock v. LG Elecs. USA, Inc., No. 16-1220, 2018 WL 626527, at *4 (D. Minn. January 30, 2018); Dzielak v. Whirlpool Corp., No. 12-89, 2017 WL 6513347, at *9-10 (D.N.J. December 20, 2017)).

248.   The parties are in agreement that the NJCFA requires a showing of causation linking the Defendants' conduct with the Plaintiffs' ascertainable loss.   The Court agrees with this assertion.   See Loc. No. 68, 192 N.J. at 389, 929 A.2d at 1086; Lee v. Carter-Reed Co., 203 N.J. at 528, 4 A.3d at 580.   The Supreme Court of New Jersey has suggested that a benefit-of-the-bargain claim can prove the Plaintiffs' ascertainable loss, but notes that claim's viability hinges on the proof's quality.   See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 253 n.8, 872 A.2d 783, 795 n.8 (N.J. 2005)("We do not suggest that a benefit-of-the-bargain claim cannot support an ascertainable loss sufficient to allow a CFA claim to proceed to the factfinder; rather, it is the quality of the proofs that will determine a claim's viability.").   As the Court discussed above with the Massachusetts Classes' Chapter 93A claim, however, the Plaintiffs' damages model does not measure the price premium associated with the belief that the challenged labels signified health benefits, and the Plaintiffs have not shown, therefore, that this price premium is identifiable, undercutting their showing of causation.   Accordingly, the Court

concludes that the Plaintiffs' NJCFA claim is susceptible to individualized inquiries, tilting against a finding of predominance for the Plaintiffs' NJCFA claim premised on the Safer-Cigarette Theory.

249.    Regarding the TCCWNA the Plaintiffs assert again that focuses on objective elements and the Defendants' conduct and therefore is suitable for class treatment.  See Certification Motion at 73 (citing United Consumer Fin. Servs. Co. v. Carbo, 982 A.2d 7, 23 (N.J. Ct. App. 2009)).  The Defendants contest that the Plaintiffs have shown legal authority that a TCCWNA claim is susceptible to common proof, and argue that the Plaintiffs' citation to United Consumer Fin. Servs. Co. v. Carbo is inapposite, because the appellants contested only that they were not involved in the case, and did not challenge the TCCWNA class' certification in particular.  See Certification Opposition at 49 (citing United Consumer Fin. Servs. Co. v. Carbo, 982 A.2d at 15).  The Plaintiffs point to the statute and argue that it includes no reliance requirement and that they do not need to prove individualized causation.  See Certification Reply at 24 (citing Browne v. Capital One Bank (USA), N.A., 2020 WL 4045271, at *7; Korrow v. Aaron's Inc., No CIV.A. 10-6317 MAS, 2013 WL 5811496, at *13(D.N.J. July 31, 2013)).

250.    To bring a TCCWNA claim, a plaintiff must be an "aggrieved consumer," and, "[i]n the absence of evidence that the consumer suffered adverse consequences as a result of the defendant's regulatory violation, a consumer is not an 'aggrieved consumer' for purposes of the TCCWNA."  Spade v. Select Comfort Corp., 232 N.J. 504, 524, 181 A.3d 969, 981 (N.J. 2018).[88]  This statute, therefore, contains a causation requirement, i.e., that the Defendants'

_____

[88]Although the parties have not raised the issue, the Court also notes that it is not clear that the TCCWNA is the appropriate vehicle to address a seller's deceptive-labeling practice. The statute provides: "No seller . . . shall . . . offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty,

violation caused the Plaintiffs to suffer adverse consequences.  To the extent that the Plaintiffs assert that they have demonstrated class-wide causation on the basis of Dr. Dubé's price-premium analysis, the Court reiterates its conclusion that the Plaintiffs have not shown that this analysis will identify the price-premium associated with the Safer-Cigarette Theory, but that it is sufficient for the Menthol Theory.  The Plaintiffs therefore must rely on individualized inquiries to determine whether a given class member is an aggrieved consumer under the TCCWNA.

---

notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller."  N.J. Stat. § 56:12-15.  As the Supreme Court of New Jersey notes:

> The TCCWNA is intended "to prevent deceptive practices in consumer contracts."  Dugan v. TGI Fridays, Inc., 231 N.J. 24, 67, 171 A.3d 620 (2017)(quoting Kent Motor Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 457, 25 A.3d 1027 (2011)).  When it enacted the TCCWNA in 1981, the Legislature acknowledged the presence of legally invalid provisions in "[f]ar too many consumer contracts, warranties, notices and signs," which acted to "deceive[ ] a consumer into thinking [the provisions] are enforceable," and deterred consumers from enforcing their legal rights.  Sponsor's Statement to A. 1660 2 (1980).

Spade v. Select Comfort Corp., 232 N.J. at 515, 181 A.3d at 975-76.  The types of writings that have been the subject of litigation under the TCCWNA generally include provisions in written contracts, see Spade v. Select Comfort Corp., 232 N.J. at 511, 181 A.3d at 973; Shelton v. Restaurant.com, Inc., 214 N.J. 419, 443, 70 A.3d 544, 559 (N.J. 2013); Annecharico v. Raymour & Flanigan, 2016 WL 7015615, at *6 (D.N.J. November 30, 2016)(Wolfson, J.).  The Supreme Court of New Jersey has expressed skepticism towards other writings with which consumers interact.  See Dugan v. TGI Fridays, Inc., 231 N.J. at 74, 171 A.3d at 650 ("Moreover, even if a menu lacking beverage prices were to constitute a 'contract,' 'warranty,' 'notice' or 'sign' within the meaning of the TCCWNA, it is far from clear that the statute was intended to apply as plaintiffs contend that it should.").  The Superior Court of New Jersey has concluded explicitly that the TCCWNA does not cover labels on food products.  See Cameron v. Monkey Joe's Big Nut Co., 2008 WL 6084192, at *3-5 (N.J. Super. Ct. Law Div. August 4, 2008)(concluding that food labels are not included in the TCCWNA's plain language and are not a warranty or notice for the TCCWNA's purposes).  The Court has not identified any cases, and the parties have not provided the Court with any cases, in which a court has certified a TCCWNA class on the basis of an allegedly misleading product label.  If the parties had raised this issue, the Court would conclude that the Supreme Court of New Jersey likely would not permit a TCCWNA claim for the Plaintiffs' factual situation, but, because the parties do not raise this issue, the Court reaches only its conclusion on predominance.

Accordingly, the Court concludes that the New Jersey Classes' TCCWNA claim does not satisfy the predominance requirement as to the Safer-Cigarette Theory, but that, to the extent that the TCCWNA applies to product-labeling claims, the New Jersey Classes' Menthol Theory satisfies the predominance requirement.

251.   As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New Jersey Classes' common questions.  Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New Jersey on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New Jersey Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New Jersey Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New Jersey Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New Jersey Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New Jersey Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New Jersey Menthol Subclass' claim based on the Menthol Theory.  These conclusions are in addition to the Court's conclusions

above that the New Jersey Classes' statutory claims do not satisfy predominance insofar as they are based on the Safer-Cigarette Theory, but that they satisfy predominance insofar as they are based on the Menthol Theory.  Accordingly, the Court concludes that the New Jersey Class does not satisfy the predominance requirement, but that the New Jersey Menthol Class satisfies the predominance requirement to the extent that its claims are based on the Menthol Theory.

### 2.    The New Jersey Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

252.    The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the New Jersey Classes.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New Jersey Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles.  Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the New Jersey Classes, which rely solely on New Jersey law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent

class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New Jersey Classes' statutory claims.  Because the Court concludes that the New Jersey Class does not satisfy the predominance requirement, but that the New Jersey Menthol Class satisfies the predominance requirement to the extent that its claims are based on the Menthol Theory, the Court certifies the New Jersey Menthol Subclass to the extent that its claims are based on the Menthol Theory, but does not certify the New Jersey Menthol Subclass to the extent that its claims are based on the Safer-Cigarette Theory, and does not certify the New Jersey Class.

## IX.    THE COURT CERTIFIES THE NEW MEXICO MENTHOL SUBCLASS NMUPA CLAIM TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY.

253.    The Court next considers the Plaintiffs' proposed New Mexico Class and New Mexico Menthol Subclass (the "New Mexico Classes").  The New Mexico Classes allege three claims: (i) violations of the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26 ("NMUPA"); (ii) violations of the NMFAA, N.M.S.A. §§ 57-15-1 to -10; and (iii) an unjust enrichment claim.  See SAC ¶¶ 316-342, at 81-86.  Before examining whether the New Mexico Classes' claims satisfy rule 23's requirements, the Court addresses the Defendants' arguments that the Plaintiffs may not pursue a class action under their two statutory claims.  The Defendants argue that the Plaintiffs may not bring their NMFAA claim, because the NMFAA does not authorize a private right of action.  See Certification Opposition at 18-19 (citing Ahlgrim v. Keefe Grp., LLC, 2016 WL 9819520, at *4.  The Plaintiffs contend that the NMFAA authorizes a private right of action on behalf of similarly situated individuals and that the Defendants' argument does not undermine certification even if it is correct.  See Certification Reply at 3 (citing Thrope v. Ohio, 173 F.R.D. at 490; Fiser v. Dell Computer Corp, 2008-NMSC-046, ¶¶ 9-

10, 144 N.M. at 467-68, 188 P.3d at 1218).

254.    The Plaintiffs are correct that the Supreme Court of New Mexico in Fiser v. Dell Computer Corp. acknowledges a private right of action for certain remedies under the NMFAA. See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶¶ 9-10, 144 N.M. at 467-68, 188 P.3d at 1218.  In Fiser v. Dell Computer Corp., however, the NMFAA section for which the Supreme Court of New Mexico acknowledges a private right applies only to injunctive relief claims.  See 2008-NMSC-046, ¶ 10, 144 N.M. at 467-68, 188 P.3d at 1218 (citing N.M.S.A. § 57-15-5). Section 57-15-5 is titled "Injunctions to prevent violation," and provides that "a private citizen may bring an action in the name of the state against any person to retrain and prevent any violation of this act.  Any proceeding initiated under this section by a private citizen shall be initiated on his behalf on all others similarly situated."  N.M.S.A. § 57-15-5.  Section 57-15-8, meanwhile, provides that, "[i]n order to promote the uniform administration of [the NMFAA] in New Mexico, the attorney general is to be responsible for its enforcement, but he may in appropriate cases delegate this authority to the district attorneys of the state . . . ."  N.M.S.A. § 57-15-8.

255.    The NMFAA's statutory scheme contrasts, for example, with the NMUPA, which includes a section titled "Private remedies" which authorizes that "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars . . . ."  N.M.S.A. § 57-12-10.  That the New Mexico Legislature authorized private remedies explicitly under the NMUPA but provided only private injunctive remedies under the NMFAA indicates that the New Mexico Legislature did not intend to permit a private right of action for damages under the NMFAA.  Accordingly, the Court

- 386 -

concludes that the NMFAA does not provide the Plaintiffs here with a private right of action to bring a damages claim against the Defendants. The Court will not certify, therefore, the New Mexico Classes' NMFAA claims for damages. The Court will review only whether the proposed classes' NMUPA and unjust enrichment claims satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, as well as rule 23(b)(3)'s predominance and superiority requirements.[89]

## A.   THE NEW MEXICO CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

256.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New Mexico Classes' NMUPA and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the New Mexico Classes satisfy the commonality and typicality requirements.

---

[89] The New Mexico Classes seek "all other proper and just relief available under N.M. Stat. Ann. § 57-12-10," SAC ¶ 328, at 83, for their NMUPA claim, and bring their NMFAA claim under N.M.S.A. § 57-15-5 "to restrain and prevent violations of" the NMFAL, SAC ¶ 333, at 84. Section 57-12-10 authorizes the Court to grant a injunctive relief to "[a] person likely to be damaged by an unfair or deceptive trade practice . . . ." N.M.S.A. § 57-12-10(A). As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the New Mexico Classes, and the Court concludes that the named Plaintiffs for the New Mexico Classes, Haksal and Horne, do not have standing to pursue injunctive relief and, to the extent that the New Mexico Classes seek injunctive relief, the Court will not certify the New Mexico Classes for that purpose.

1.   **The New Mexico Classes Satisfy Rule 23(a)'s Commonality Requirement.**

257.   The NMUPA makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."  N.M.S.A. § 57-12-3. The NMUPA defines unfair or deceptive trade practices to be

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . .

N.M.S.A. § 57-12-2(D).  The Supreme Court of New Mexico has indicated that there are four elements required to establish a claim under the NMUPA:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading.  Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts."  Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce.  Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (quoting Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 107 N.M. 100, 101, 753 P.3d 346, 347, overruled on other grounds by Gonzales v. Surgidev Corp., 1995-NMSC-036, 120 N.M. 133, 899 P.2d 576).  Regarding unjust enrichment, New Mexico law requires a plaintiff to show that "'(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Southwest Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 442-43, 260 P.2d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M.

200, 3 P.3d 695).

258.     The Court concludes that there are common questions central to the New Mexico Classes' NMUPA and unjust enrichment claims.  Regarding the NMUPA claim, whether the Defendants' labels contained false or misleading representations, and whether they knowingly made those false or misleading representations, are questions susceptible to common proof that are central to the NMUPA claim.  Regarding the unjust enrichment claim, whether the Defendants benefitted at the Plaintiffs' expense is a common question central to the unjust enrichment claim's resolution.  See Menocal v. GEO Grp. Inc., 882 F.3d at 924.  Because there are common questions central to the New Mexico Classes' claims, the Court concludes that the New Mexico Classes satisfy rule 23(a)'s commonality requirement.

## 2.     The New Mexico Classes Satisfy Rule 23(a)'s Typicality Requirement.

259.     As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, two of whom -- Haksal and Horne -- represent the New Mexico Class and the New Mexico Menthol Subclass, respectively.  See Certification Opposition at 22-24; SAC ¶¶ 114, 124, at 41-42.  They contend that both Haksal and Horne continued smoking Natural American cigarettes after having initiated this lawsuit, and therefore cannot represent that they were misled into purchasing Natural American cigarettes based on a health misperception.  See Certification Opposition at 23 (citing Deposition of Ceyhan Haksal (taken July 9, 2018) at 66:21-68:1, filed October 8, 2020 (Doc. 315-5)(Haksal, Reisman); Horne Depo. at 34:5-35:3 (Biersteker, Haberman, Horne)).

260.     As the Court has discussed, that named Plaintiffs continued to smoke Natural

American cigarettes does not make their claims atypical, because the claims nevertheless are based on the same theory that Natural American's labeling led them to believe the cigarettes were safer in the first instance.  The Court also has been unwilling to penalize these named Plaintiffs for continuing to smoke Natural American cigarettes given their highly addictive nature.  See supra n.87.  Accordingly, the Court concludes that whether Haksal and Horne continued smoking Natural American cigarettes after commencing this litigation is not such an "extreme case[]" as to render their claims atypical.  Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 440-41.  The Court therefore concludes that the New Mexico Classes satisfy rule 23(a)'s typicality requirement.

> **B.   THE NEW MEXICO CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE NEW MEXICO MENTHOL SUBCLASS' NMUPA CLAIM SATISFIES THE PREDOMINANCE REQUIREMENT TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY.**

261.   Having determined that the New Mexico Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the New Mexico Classes' claims.

> **1.   The New Mexico Class and the New Mexico Menthol Subclass -- to the Extent That Its Claims Are Premised on the Safer-Cigarette Theory -- Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the New Mexico Menthol Subclass' NMUPA Claim Satisfies the Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.**

262.   The Court first considers whether common questions will predominate over individualized inquiries.  The Plaintiffs assert that common issues will predominate under their NMUPA and unjust enrichment claims.  See Certification Motion at 73-74 (citing Payne v. Tri-

State CareFlight, LLC, 332 F.R.D at 710; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 38, 142 N.M. 557, 569, 168 P.3d 129, 141; Yazzie v. Ray Vickers' Special Cars, Inc., 180 F.R.D. 411, 416-17 (D.N.M. 1998)(Vasquez, J.)).   The Defendants contest the Plaintiffs' assertion.  See Certification Opposition at 43-44.

263.   The Court previously has noted that the NMUPA does not require proof of detrimental reliance to sustain a claim.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170 (D.N.M. 2010)(Browning, J.)(citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35 142 N.M. 437, 444, 166 P.3d 1091, 1098; Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. 265, 270-71, 87 P.3d 545, 550-51).  Nevertheless, "the UPA . . . require[s] proof of a causal link between conduct and loss . . . ."  Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. at 271, 87 P.3d at 551 (citing N.M.S.A. § 57-12-10(B)).  See N.M.S.A. § 57-12-10(B) (authorizing damages for "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act")(emphasis added).  The Plaintiffs seek to show class-wide causation using Dr. Dubé's analysis, arguing that the Defendants were able to sell Natural American cigarettes at a higher price point as a result of misleading consumers into believing that their cigarettes contained health benefits and were therefore worth more than they otherwise would have been without those benefits.  See Certification Motion at 35.  As the Court has explained, however, the Plaintiffs model does not fit adequately with their Safer-Cigarette Theory of injury, because it calculates a price premium associated with all possible interpretations of labels like natural and organic.  The Plaintiffs therefore have not demonstrated a method of determining causation on a class-wide basis, and would need to engage in individualized inquiries to determine whether a given consumer purchased Natural American

cigarettes for more than he or she otherwise would have paid if he or she had known the cigarettes were not actually safer or healthier.  The Court has concluded that Dr. Dubé's model fits adequately with the Menthol Theory.  To the extent that the Plaintiffs bring a claim under the NMUPA based on the Menthol Theory, therefore, causation is susceptible to class-wide proof.  Accordingly, the Court concludes that the New Mexico Class' NMUPA claim and the New Mexico Menthol Subclass' NMUPA claim -- to the extent it is based on the Safer-Cigarette Theory -- do not satisfy predominance, but that the New Mexico Menthol Subclass' NMUPA claim satisfies predominance to the extent that it is premised on the Menthol Theory.

264.    Regarding the New Mexico Classes' unjust enrichment claim, the Plaintiffs assert that several courts, including the Court, have certified unjust enrichment claims in New Mexico, and that the predominating presence of objective, common questions counsels certification here.  See Certification Motion at 74 (citing Payne v. Tri-State CareFlight, LLC, 332 F.R.D at 710; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 38, 142 N.M. 557, 569, 168 P.3d 129, 141).  The Court first notes that its opinion in Payne v. Tri-State CareFlight, LLC concerns a different issue than the issue present here.  In Payne v. Tri-State CareFlight, LLC, the Court concludes that the plaintiffs' unjust enrichment claim satisfies predominance to the extent that the Court would need to answer only whether a fourteen-hour duty day is unlawful.  See 332 F.R.D at 707-08 (noting that determining whether a fourteen-hour duty day is unlawful is a question that "may even be resolved on a summary judgment motion," but asserting that, "[t]o the extent that the Plaintiffs aver that the Defendants actually contemplated a duty day of twelve hours, individualized issues predominate").  Similarly, while it may be a straightforward and common question to determine whether the Defendants' labels were misleading, determining whether an individual consumer's purchase renders the Defendants' retention of the benefit

unjust requires individualized inquiries, because an individual consumer may have many reasons for purchasing Natural American cigarettes or even for paying a higher price for Natural American cigarettes.  Accordingly, the Court concludes that the New Mexico Classes' unjust enrichment claims do not satisfy the predominance requirement.

265.   As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New Mexico Classes' common questions.  Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New Mexico on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New Mexico Classes, specifically that:  (i) administrative feasibility concerns -- namely  difficulties  in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New Mexico Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New Mexico Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New Mexico Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New Mexico Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New Mexico Menthol Subclass' claim based on the Menthol Theory.  Given its additional analysis on the New Mexico Classes'

statutory and unjust enrichment claims, the Court concludes that the New Mexico Class and the New Mexico Menthol Subclass' unjust enrichment claim do not satisfy rule 23(b)(3)'s predominance requirement, that the New Mexico Menthol Subclass' NMUPA claim does not satisfy the predominance requirement to the extent that it is premised on the Safer-Cigarette Theory, and that the New Mexico Menthol Subclass' NMUPA claim satisfies the predominance requirement to the extent that it is premised on the Menthol Theory.

### 2.   The New Mexico Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

266.   The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  Unlike the other classes, the Defendants raise a superiority argument unique to the New Mexico Classes.  See Certification Opposition at 19.  Specifically, they argue that, because the NMUPA provides named plaintiffs with the greater of actual damages or statutory damages, as well as treble damages if the deception is willful, but provides unnamed class members only with actual damages, it is less fair to absent class members to pursue a class action under the NMUPA, and the class action is not a superior vehicle for litigating the absent class members' claims.  See Certification Opposition at 19 (quoting Brooks v. Norwest Corp., 2004-NMCA-134, ¶ 45, 136 N.M. 599, 613, 103 P.3d 39, 53; Mulford v. Altria Grp., Inc., 242 F.R.D. at 631).

267.   The Plaintiffs assert correctly that the Court previously has rejected the proposition that a class action is not superior where statutes provide higher damages for named plaintiffs compared to unnamed class members.  See Certification Reply at 3 (citing Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 171; Tullie v. Quick Cash, Inc., No. 14-0491, 2014 WL 12782961, at *4 (D.N.M. December 2, 2014)(Vidmar, M.J.)).  In Daye v. Community

Financial Service Centers, LLC, the Court, in considering the class members' individual interest in controlling the litigation, states:

> Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates another factor the court should consider: the likelihood that proposed class members know they have a claim and whether they are savvy enough to pursue it. *See Hicks v. Client Servs., Inc.*, 257 F.R.D. 699, 701 (S.D. Fla. 2009)(finding superiority, because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters"). As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote,
>
>> while the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case. Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior.
>
> *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 464 (S.D.N.Y.2007). *See Jancik v. Cavalry Portfolio Servs., LLC*, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

Daye v. Cmty. Fin. Servs. Ctrs., LLC, 313 F.R.D. at 171 (alteration in Daye v. Cmty. Fin. Servs. Ctrs., LLC, but not in Hicks v. Client Servs., Inc.). The Court agrees that it may be unfair to some unnamed class members who will receive lower damages amounts than they would if they were to bring similar litigation on their own. Additionally, the Court of Appeals of New Mexico has emphasized that the New Mexico Legislature envisioned individual plaintiffs bringing low-value claims when it enacted the NMUPA, and that the NMUPA provides for attorney fees and costs to successful litigants, minimizing the burden of bringing claims with low damages values. See Brooks v. Norwest Corp., 2004-NMCA-134, ¶ 45, 136 N.M. at 613, 103 P.3d at 53. The

Court notes, nevertheless, that a class action brought under rule 23(b)(3) requires that unnamed class members have the option to opt out of the class.  See Fed. R. Civ. P. 23(c)(2)(B)(v).  Thus, to the extent that unnamed class members are aware that they have a potential claim and wish to seek the benefit of a larger damages amount, they have the opportunity to opt out of the class mechanism and pursue their claims individually.  Accordingly, the Court concludes that the difference in damages which the NMUPA awards named plaintiffs compared to unnamed class members does not make the New Mexico Classes' NMUPA claim inferior.

268.    Additionally, in concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New Mexico Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles.  Because the inordinate difficulties of applying each of the fifty States' laws are not present for the New Mexico Classes, which rely solely on New Mexico law, the only manageability difficulty that remains is the administrative feasibility question.  As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification.  See Cherry v. Dometic Corp., 986 F.3d at 1303-04.  Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New Mexico Classes' NMUPA and unjust enrichment claims.  Consistent with the Court's conclusions regarding predominance,

however, the Court certifies the New Mexico Menthol Subclass' NMUPA claim to the extent that it is premised on the Menthol Theory, but does not certify the New Mexico Class, and does not certify the New Mexico Menthol Subclass' unjust enrichment claim, or its NMUPA claim to the extent that it is premised on the Safer-Cigarette Theory.

## X.   THE COURT CERTIFIES ONLY THE NEW YORK MENTHOL SUBCLASS' STATUTORY CLAIMS TO THE EXTENT THAT THEY ARE PREMISED ON THE MENTHOL THEORY.

269.   The Court next considers the Plaintiffs' proposed New York Class and New York Menthol Subclass (the "New York Classes").  The New York Classes allege three claims: (i) a violation of New York General Business Law § 349; (ii) a violation of New York General Business Law § 350; and (iii) an unjust enrichment claim.  See SAC ¶¶ 343-374, at 86-91.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[90]

### A.   THE NEW YORK CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

270.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New York Classes' statutory and unjust enrichment claims.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed

---

[90]The New York Classes seek injunctive relief on their § 349 and § 350 claims.  See SAC ¶¶ 352-53, 364-65, at 87-89.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the New York Classes, and the Court concludes that the named Plaintiffs for the New York Classes do not have standing to pursue injunctive relief.  Accordingly, the Court will not certify the New York Classes for that purpose.

classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers

in more detail below whether the New York Classes satisfy the commonality and typicality

requirements.

### 1.     The New York Classes Satisfy Rule 23(a)'s Commonality Requirement.

271.    Section § 349 of New York's General Business Law declares unlawful

"[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ."  N.Y.

Gen. Bus. Law § 349(a).  Additionally, any person who suffers injury "by reason of any violation

of this section" is entitled to actual damages.  N.Y. Gen. Bus. Law § 349(h).  Section 350,

meanwhile, declares unlawful "[f]alse advertising in the conduct of any business, trade or

commerce . . . ."  N.Y. Gen. Bus. Law § 350.  The Court of Appeals of New York has explained

that "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or

practice was consumer-oriented; second, that it was misleading in a material way; and third, that

the plaintiff suffered injury as a result of the deceptive act."  Stutman v. Chemical Bank, 95

N.Y.2d 24, 29, 731 N.E.2d 608, 611 (N.Y. 2000)(citing Oswego Laborers' Local 214 Pension

Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25, 647 N.E.2d 741 (1995); Gaidon v. Guardian

Life Ins. Co., 94 N.Y.2d 330, 344, 725 N.E.2d 598 (1999); Small v. Lorillard Tobacco Co., 94

N.Y.2d 43, 55-56, 720 N.E.2d 892 (1999)).  The elements for a claim under § 350 are identical

to the elements for a § 349 claim.  See Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir.

2015)(quoting Koch v. Acker, Merrall & Candit Co., 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967

N.E.2d 675 (N.Y. 2012)).  A claim for unjust enrichment requires a plaintiff to establish: "1) that

the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience'

require restitution."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)(quoting Dolmetta v.

Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983)).

272.    The Court concludes that the New York Classes' statutory and unjust enrichment claims satisfy rule 23(a)'s commonality requirement.   Under the statutory claims, there are common questions surrounding whether the labels were misleading in a material way.   See Orlander v. Staples, Inc., 802 F.3d at 300 ("As for the 'materially misleading' prong, '[t]he New York Court of Appeals has adopted an objective definition of "misleading," under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."'")(quoting Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007)(quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741)).   Regarding unjust enrichment, a common question is whether the Defendants benefitted as a result of their allegedly deceptive practices.   Each of these questions are central to the Plaintiffs' claims and can be answered in a single stroke. Accordingly, the Court concludes that the New York Classes have satisfied the commonality requirement.

## 2.    The New York Classes Satisfy Rule 23(a)'s Typicality Requirement.

273.    As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."   Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.   The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of whom -- Litwin -- represents the New York Menthol Subclass.   See Certification Opposition at 22-24; SAC ¶ 125, at 42.   The Court has addressed the Defendants' challenges to Litwin's typicality -- that he paid with coupons and continued to smoke Natural American cigarettes after commencing this litigation -- in analyzing the New Jersey Classes above.   The Defendants do not

raise any other arguments regarding Litwin or regarding Hebert, the New York Class representative.  The Court therefore concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the New York Classes satisfy rule 23(a)'s typicality requirement.  Adamson v. Bowen, 855 F.2d at 676.

**B.    THE NEW YORK CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE NEW YORK MENTHOL SUBCLASS' STATUTORY CLAIMS SATISFY RULE 23(b)(3)'S PREDOMANCE REQUIREMENT TO THE EXTENT THAT THEY ARE PREMISED ON THE MENTHOL THEORY.**

274.    Having determined that the New York Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the New York Classes' claims.

**1.    Only The New York Menthol Subclass' Statutory Claims Satisfy Rule 23(b)(3)'s Predominance Requirement to the Extent That They Are Premised on the Menthol Theory.**

275.    The elements for a claim under § 350 are identical to the elements for a § 349 claim, and courts consider the two claims using the same language.  See Orlander v. Staples, Inc., 802 F.3d at 300 (quoting Koch v. Acker, Merrall & Candit Co., 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675).  As the Court mentions above, the Court of Appeals of New York has explained that "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  Stutman v. Chemical Bank, 95 N.Y.2d at 29, 731 N.E.2d at 611 (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 25, 647 N.E.2d 741; Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 725 N.E.2d 598; Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55-56, 720

N.E.2d 892).  To state a § 349 claim, "a plaintiff must allege that the defendant has engaged 'in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof.'"  Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55, 720 N.E.2d at 987 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 25, 647 N.E.2d 741).  Regarding the materially misleading prong, "'[t]he New York Court of Appeals has adopted an objective definition of "misleading," under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."'"  Orlander v. Staples, Inc., 802 F.3d at 300 (quoting Cohen v. JP Morgan Chase & Co., 498 F.3d at 126 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741)).  See Hasemann v. Gerber Prods. Co., 331 F.R.D. 239, 274 (E.D.N.Y. 2019)(Brodie, J.)("'The materiality of potentially deceptive representations is similarly subject to objective proof.'")(quoting Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D at 389).  The Court of Appeals of New York has noted that intent to defraud and justifiable reliance are not element of a claim under § 349, but that "proof  that 'a material deceptive act or practice *caused actual, although not necessarily pecuniary, harm*' is required to impose compensatory damages."  Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55, 720 N.E.2d at 987 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 647 N.E.2d 741)(emphasis added in Small v. Lorillard Tobacco Co.).  "Payment of a price premium serves as proof of injury under the laws of" New York.  Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D. at 393.

276.    The Court concludes that §§ 349 and 350 allow for common and class-wide proof, including as to damages, but that, as the Court has discussed, the Plaintiffs damages model does not fit adequately with their Safer-Cigarette Theory.  The Court recognizes the Second Circuit's

conclusion that "it is still 'clear that individualized monetary claims belong in Rule 23(b)(3),'" Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 88 (2d Cir. 2015)(quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. at 362, but notes, as does the Second Circuit, that "'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability,'" Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d at 88 (quoting Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013)). The Court has concluded above that the Plaintiffs' damages model does not show how their damages stem from the Safer-Cigarette Theory, but that it is an adequate fit with the Menthol Theory. Accordingly, the Court concludes that §§ 349 and 350 predominate with respect to the Plaintiffs' Menthol Theory, but not with respect to their Safer-Cigarette Theory.

277.    Regarding unjust enrichment, the Court concludes that common questions will not predominate. As the Court explains above, a claim for unjust enrichment requires a plaintiff to establish: "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." Kaye v. Grossman, 202 F.3d at 616 (quoting Dolmetta v. Uintah Nat'l Corp., 712 F.2d at 20). To state a claim for unjust enrichment, a plaintiff must also make an "allegation that the benefits that the members of the plaintiffs' class received were less than what they bargained for." Vigiletti v. Sears, Roebuck & Co., 838 N.Y.S.2d 785, 785, 42 A.D.3d 497, 498 (N.Y. App. Div. 2007)(citing Smith v. Chase Manhattan Bank, USA, 293 A.D.2d 598, 600, 741 N.Y.S.2d 100 (N.Y. App. Div. 2002)). As the Court has discussed, determining whether equity and good conscience require restitution, because the Plaintiffs did not receive the value for which they bargained, necessitates individualized inquiry. The Court agrees with the reasoning of the Honorable Denise Cote, United States District Judge for the United States District Court for the Southern District of New York, who concludes that

individualized inquiries predominate in a class action suit regarding a beverage labeled using "All Natural":

> [P]laintiffs do not address the issue of how they would prove, on a class-wide basis, whether the benefits that putative class members received were "less than what they bargained for." Individualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of [high fructose corn syrup ("HFCS")] in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs concerning HFCS. Such individual issues would also dwarf any issues of law or fact common to the class. Thus, plaintiffs have failed to show that the Rule 23(b)(3) predominance requirement is satisfied with respect to their unjust enrichment claim.

Weiner v. Snapple Beverage Corp., 2010 WL 3119452, at *11.  For similar reasons, the Court concludes that it is unlikely that common questions predominate where the Court will have to inquire as to each consumer's state of mind when purchasing Natural American cigarettes. Accordingly, the Court concludes that the New York Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement.

278.    As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New York Classes' common questions.  Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories.  See Certification Opposition at 25-83.  The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New York on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New York Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in

determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New York Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New York Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New York Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New York Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New York Menthol Subclass' claim based on the Menthol Theory.  In combination with its conclusions regarding the New York Classes' statutory and unjust enrichment claims, the Court concludes that the New York Class does not satisfy the predominance requirement, the New York Menthol Subclass' unjust enrichment claim does not satisfy the predominance requirement and its statutory claims do not satisfy the requirement to the extent that they are premised on the Safer-Cigarette Theory, and the New York Menthol Subclass' statutory claims satisfy the predominance requirement to the extent that it is premised on the Menthol Theory.

### 2.      The New York Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

279.    The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims.  See Fed. R. Civ. P. 23(b)(3).  The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the New York Classes.  In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol

Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New York Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the New York Classes, which rely solely on New York law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New York Classes' statutory and unjust enrichment claims. Given the Court's conclusion regarding predominance, however, the Court certifies only the New York Menthol Subclass' statutory claims to the extent that they are premised on the Menthol Theory, and does not certify the New York Class, the New York Subclass' unjust enrichment claim, or the New York Subclass' statutory claims to the extent that they are premised on the Safer-Cigarette Theory.

## XI.    THE COURT WILL NOT CERTIFY THE NORTH CAROLINA CLASS AND NORTH CAROLINA MENTHOL SUBCLASS.

280.    The Court next considers the Plaintiffs' proposed North Carolina Class and North Carolina Menthol Subclass (the "North Carolina Classes"). The North Carolina Classes allege two claims: (i) a violation of the NCUDTPA; and (ii) an unjust enrichment claim. See SAC ¶¶ 375-395, at 91-95. As the Plaintiffs note in their Certification Reply, however, they "are not

at this time pursuing the certification of a class asserting a North Carolina Unfair and Deceptive Trade Practices Act Claim." Certification Reply at 31 n.25. Accordingly, the Court considers certification for only the North Carolina Classes' unjust enrichment claim. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[91]

## A.   THE NORTH CAROLINA CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

281.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the North Carolina Classes' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the North Carolina Classes satisfy the commonality and typicality requirements.

### 1.   The North Carolina Classes Satisfy Rule 23(a)'s Commonality Requirement.

282.   The Court concludes that both the North Carolina Classes' unjust enrichment

---

[91]Although the Plaintiffs note that they are not seeking certification of an NCUDTPA class, see Certification Reply at 31 n.25, in the SAC, the North Carolina Classes seek injunctive relief for their § 75-1.1(a) claim. See SAC ¶ 386, at 93. To the extent that the North Carolina Classes seek injunctive certification on this claim, the Court refers to its conclusion in consideration of the California Classes' injunctive relief claim that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the North Carolina Classes, and the Court concludes that the named Plaintiffs for the North Carolina Classes, Miller and Blevins, do not have standing to pursue injunctive relief. Accordingly, the Court will not certify the North Carolina Classes for that purpose.

claim presents common questions that are central to their claims.  To demonstrate an unjust enrichment claim, the Supreme Court of North Carolina has stated that: (i) "a party must have conferred a benefit on the other party"; (ii) "[t]he benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances"; (iii) "the benefit must not be gratuitous"; (iv) the benefit "must be measurable"; and (v) "the defendant must have consciously accepted the benefit."  Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (N.C. 1988).  Thus, whether consumers conferred a benefit on the Defendants from their purchases and whether that benefit is measurable are common questions.  The Court therefore concludes that the North Carolina Classes satisfy rule 23(a)'s predominance requirement.

### 2.       **The North Carolina Classes Satisfy Rule 23(a)'s Typicality Requirement.**

283.       As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the North Carolina classes.  See Certification Opposition at 22-24.  Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the North Carolina Classes.  Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the North Carolina Classes satisfy rule 23(a)'s typicality requirement.  Adamson v.

Bowen, 855 F.2d at 676.

###    B.    THE NORTH CAROLINA CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DO NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT.

284.    Having determined that the North Carolina Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a class action is a superior method of litigating the North Carolina Classes' claims.

###    1.    The North Carolina Classes Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement.

285.    Regarding the unjust enrichment claim, the Defendants contend that North Carolina courts have recognized "that certification is inappropriate where the unjustness of a defendant's conduct will depend on individual circumstances."  Certification Opposition at 56 (citing Harrison v. Wal-Mart Stores, Inc., 2004 WL 5202760 at ¶¶ 32-33.  The Plaintiffs assert that all the class members were exposed to the same challenged claims on Natural American labels in the same context.  See Certification Reply at 30-31 (citing Pitts v. Am. Sec. Ins. Co., 144 N.C. App. 1, 5, 550 S.E.2d 179, 184 (2001), aff'd, 356 N.C. 292, 569 S.E.2d 647 (2002)).[92]

---

[92]The Court notes that the Supreme Court of North Carolina did not issue an opinion affirming the Plaintiffs' cited case on the merits, writing:

> Justices ORR, WAINWRIGHT, and EDMUNDS did not participate in the consideration or decision of this case.  The remaining members of the Court were equally divided, with two members voting to affirm the decision of the Court of Appeals and two members voting to reverse.  Therefore, the decision of the Court of Appeals is left undisturbed and stands without precedential value.

Pitts v. Am. Sec. Ins. Co., 356 N.C. at 293, 569 S.E.2d at 647.  The Court recognizes that the Court of Appeals of North Carolina's opinion may have persuasive value, but the Court does not treat it as having precedential value.

The Court agrees that determining whether each consumer's purchase occurred under unjust circumstances requires individualized inquiries into why each consumer purchases Natural American cigarettes. As the Court has discussed above, if a consumer was willing to pay a price premium based on the belief that Natural American cigarettes were ecologically friendly, for example, that purchase is not necessarily unjust. Because proving the North Carolina Classes' unjust enrichment claim requires individualized inquiry, the Court concludes that the unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.[93]

286.    As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the North Carolina Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered

---

[93]Although the Plaintiffs do not seek certification of any class under the NCUDTPA, the Court notes that the Supreme Court of North Carolina has explained that the Plaintiffs must demonstrate reliance on the misrepresentation to satisfy the NCUDTPA's proximate-cause requirement. See Bumpers v. Comm. Bank of N. Va., 367 N.C. 81, 88, 747 S.E.2d 220, 226 (N.C. 2013)("Such a requirement has been the law of this state for quite some time."). Further, the Supreme Court of North Carolina explains: "In the context of a misrepresentation claim brought under section 75-1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." Bumpers v. Comm. Bank of N. Va., 367 N.C. at 90, 747 S.E.2d at 227 (citing Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 308 (M.D.N.C. 1988)(Gordon, S.J.); Tucker v. Boulevard at Piper Glen LLC, 150 N.C. App. 150, 154, 564 N.E.2d 248, 251 (N.C. Ct. App. 2002)). The Plaintiffs have not demonstrated using class-wide proof that each class member took the allegedly misleading statements into account when deciding whether to purchase a pack of Natural American cigarettes, and the Court doubts that such proof could exist on a class-wide basis. Because the Plaintiffs cannot show a violation under the NCUDTPA without examining each consumer's motivations for purchasing Natural American cigarettes, if the Plaintiffs were to seek certification on this claim, the Court would conclude that the North Carolina Classes' NCUDTPA claim does not satisfy rule 23(b)(3)'s predominance requirement.

above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to North Carolina on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the North Carolina Classes, specifically that: (i) administrative feasibility concerns -- namely, difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the North Carolina Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the North Carolina Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the North Carolina Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the North Carolina Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the North Carolina Menthol Subclass' claim based on the Menthol Theory. Given the Court's additional conclusions that neither of the North Carolina Classes' claims satisfy the predominance requirement, the Court concludes that the North Carolina Class and the North Carolina Menthol Subclass do not satisfy rule 23(b)(3)'s predominance requirement.

### 2. The North Carolina Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

287. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the North Carolina Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in

favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions, and other manageability difficulties. For the North Carolina Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the North Carolina Classes, which rely solely on North Carolina law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the North Carolina Classes' unjust enrichment claims. Nevertheless, because the Court concludes that the North Carolina Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement, the Court does not certify the North Carolina Class and does not certify the North Carolina Menthol Subclass.

## XII.   **THE COURT DOES NOT CERTIFY THE OHIO CLASS.**

288.   The Court next considers the Plaintiffs' proposed Ohio Class. The Ohio Class alleges three claims: (i) a violation of the OCSPA; (ii) a violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code ch. 4165 ("ODTPA"); and (iii) an unjust enrichment claim. See SAC ¶¶ 396-427, at 95-99. In its MTD MOO, the Court: (i) dismisses the Plaintiffs' OCSPA claim without prejudice, because the Plaintiffs did not satisfy the OCSPA's pre-suit notice

requirement, <u>see</u> MTD MOO at 206, 244; (ii) dismisses the Plaintiffs' ODTPA claim with prejudice, because the ODTPA does not provide standing for consumers to sue, <u>see</u> MTD MOO at 209, 244; and (iii) dismisses the Plaintiffs' unjust enrichment claim with prejudice, because the Plaintiffs did not have a direct economic transaction with the Defendants, <u>see</u> MTD MOO at 223, 244.  In their Certification Motion, the Plaintiffs seek certification only for the Ohio Class' OCSPA claim.  <u>See</u> Certification Motion at 77.  In their Certification Reply, however, the Plaintiffs assert that the "Plaintiffs preserve their right to appeal dismissal of their . . . Ohio Consumer Sales Practices Act . . . claim[], but are not seeking certification of classes for [that] claim[] at this time."  Certification Reply at 3 n.2.  Because the Plaintiffs are not seeking certification of any claims for the Ohio Class, the Court does not certify the Ohio Class.[94]

## XIII.   **THE COURT DOES NOT CERTIFY THE WASHINGTON CLASS.**

289.   The Court finally considers the Plaintiffs' proposed Washington Class.  The Washington Class alleges two claims: (i) a violation of the WCPA; and (ii) an unjust enrichment claim.  <u>See</u> SAC ¶¶ 428-450, at 99-103.  The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[95]

---

[94]The Ohio Class seeks injunctive relief on its OCSPA and ODTPA claims.  <u>See</u> SAC ¶¶ 409, 418, at 97-98.  As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the Ohio Class, and the Court concludes that the named Plaintiff for the Ohio Class, Hebert, does not have standing to pursue injunctive relief, and the Court will not certify the Ohio Class for that purpose.

[95]The Washington Class seeks injunctive relief on its WCPA claim.  <u>See</u> SAC ¶¶ 443, 418, at 102.  As the Court discusses with respect to the California Classes' proposed injunctive

A.   **THE WASHINGTON CLASS SATISFIES RULE 23(a)'S NUMEROSITY REQUIREMENT.**

290.   The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Washington Class' statutory and unjust enrichment claims.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements.  See Certification Opposition at 20.  The Court considers in more detail below whether the Washington Class satisfies the commonality and typicality requirements.

1.   **The Washington Class Satisfies Rule 23(a)'s Commonality Requirement.**

291.   The Plaintiffs assert that, "'[t]o prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (5) injury to a person's business or property, and (5) causation.'"  Certification Motion at 79 (quoting Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d 27, 37, 204 P.3d 885, 889 (Wash. 2009)).  The Plaintiffs assert that "[u]njust enrichment occurs when '(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment.'"  Certification Motion at 79 (quoting Young v. Young, 164 Wash. 2d 477, 484-85, 191 P.3d 1258, 1262 (Wash. 2008)).  Whether the Defendants' actions were unfair or deceptive,

---

relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims.  The parties have not made arguments unique to the Washington Class, and the Court concludes that the named Plaintiffs for the Washington Class, Murphy and Pontusson, do not have standing to pursue injunctive relief; the Court will not certify the Washington Class for that purpose.

and whether they affect the public interest are common questions central to the Plaintiffs' WCPA claim, and, as the Court has concluded above, whether the Defendants' received a benefit from their labeling practices is a common question central to the Plaintiffs' unjust enrichment claim. Accordingly, the Court concludes that the Washington Class' claims satisfy rule 23(a)'s commonality requirement.

### 2. The Washington Class Satisfies Rule 23(a)'s Typicality Requirement.

292.    As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Washington Class. See Certification Opposition at 22-24.  Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Washington Class.  Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Washington Class satisfies rule 23(a)'s typicality requirement.  Adamson v. Bowen, 855 F.2d at 676.

### B. THE WASHINGTON CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT, BUT IT SATISFIES RULE 23(b)(3)'S SUPERIORITY REQUIREMENT.

293.    Having determined that the Washington Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements.  The Court first considers whether individual questions will predominate over common issues.  Next, the Court considers whether a

class action is a superior method of litigating the Washington Class' claims.

### 1.    The Washington Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.

294.    The Plaintiffs argue that the Washington Class' WCPA claim's common questions predominate over individual inquiries, because determining whether a statement is deceptive relies on a reasonable consumer standard, and because the WCPA does not require a showing of individualized requirement.  See Certification Motion at 79 (citing Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d at 37, 204 P.3d at 889; Schall v. AT&T Wireless Servs., Inc., 171 Wash. 2d 260, 277, 259 P.3d 129, 137 (Wash. 2011)).  They contend that, instead, they need to show only that the injury which they assert would not have happened but for the Defendants' violative acts.  See Certification Motion at 79 (quoting Schnall v. AT&T Wireless Servs., Inc., 171 Wash. 2d at 277, 259 P.3d at 137 (quoting Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 162 Wash. 2d 59, 82, 170 P.3d 10, 21 (Wash. 2007)("Indoor Billboard")))).  The Defendants argue that the WCPA requires proof of causation for each claimant and that, "'[a]bsent a showing that 'but for' the Defendant's alleged deceptive practices a class member would not have purchased light cigarettes, causation would fail in this case.'"  Certification Opposition at 50 (quoting Davies v. Philip Morris U.S.A., Inc., 2006 WL 1600067, at *2-3 (Wash. Super. Ct. May 26, 2006), and citing Kelley v. Microsoft Corp., 251 F.R.D. at 558; Indoor Billboard, 170 P.3d at 23).  The Plaintiffs argue that a price-premium theory of causation is an adequate method of showing class-wide causation for a WCPA class. See Certification Reply at 24-25 (citing Kelley v. Microsoft Corp., 251 F.R.D. at 557-59; Blough v. Shea Homes, Inc., No. 2:12-CV-01493-RSM, 2013 WL 6276450, at *8-9 (W.D. Wash. December 4, 2013)(Martinez, J.)).

295.   The Supreme Court of Washington has "firmly rejected the principle that reliance is necessarily an element of the plaintiff's case." Schnall v. ST&T Wireless Servs., Inc., 171 Wash. 2d at 277, 259 P.3d at 137 (referencing Indoor Billboard, 162 Wash. 2d at 82, 170 P.3d at 10).   The Supreme Court of Washington explains that "[t]he plaintiff must merely show that the 'injury complained of . . . would not have happened' if not for defendant's violative acts." Schnall v. ST&T Wireless Servs., Inc., 171 Wash. 2d at 278, 259 P.3d at 137 (referencing Indoor Billboard, 162 Wash. 2d at 82, 170 P.3d at 10).   To the extent that the Plaintiffs assert that they can prove a but-for injury using the price-premium theory of harm, the Court reiterates its conclusion that Dr. Dubé's model does not demonstrate an ability to ascertain the price premium associated with the belief that the challenged labels imply health benefits.   The Court concludes therefore that the Plaintiffs have not demonstrated that they can prove class-wide causation based on their price-premium theory.   Accordingly, the Court concludes that the Plaintiffs' WCPA claim is subject to individualized inquiries which tilt against a determination of predominance.

296.   Regarding the Washington Class' unjust enrichment claim, the Defendants argue that the case which the Plaintiffs cite as having certified an unjust enrichment claim, Kelley v. Microsoft Corp., "noted that the outcome would differ '[i]f the inequity is that Microsoft deceived consumers' -- in which case 'the trier of fact will need to inquire whether Microsoft actually deceived consumers (an individualized inquiry) to determine whether any benefit conferred on Microsoft was unjust.'"   Certification Opposition at 57 (quoting Kelley v. Microsoft Corp., 251 F.R.D at 559, and citing Converse v. Vizio, Inc., 2020 WL 729804, at *8 (W.D. Wash. February 13, 2020)(Settle, J.)).   The Plaintiffs contend that the facts in Kelley v. Microsoft Corp. are similar to those here.   See Certification Reply at 31.

297.   The Honorable Marsha J. Pechman, United States District Judge for the United

States District Court for the Western District of Washington, explains:

> If the inequity is that Microsoft deceived consumers, the trier of fact will need to inquire whether Microsoft actually deceived consumers (an individualized inquiry) to determine whether any benefit conferred on Microsoft was unjust. Common issues will not predominate on that type of unjust enrichment claim. *See Oshana*, 225 F.R.D. at 586. But for the same reasons as explained in regards to Plaintiffs' CPA claim, Plaintiffs may maintain an unjust enrichment claim on the theory that Microsoft's marketing campaign artificially inflated the demand for and price of "Windows Vista Capable" PCs. Common issues -- whether Microsoft retained a benefit (increased or sustained XP license sales), whether Microsoft knew of that benefit, and whether Plaintiffs paid more than they should have -- will predominate.

Kelley v. Microsoft Corp., 251 F.R.D. at 559. The Court agrees, as it has discussed above, that unjust enrichment claims based on a deception theory require individualized inquiries to determine whether a plaintiff was in fact deceived. As the Court notes regarding the Washington Class' WCPA claim, the Plaintiffs have not put forward a method of computing the price-premium associated specifically with the belief that Natural American cigarettes are healthier. The Plaintiffs therefore must rely on individualized inquiries into whether each consumer's purchase took place under unjust circumstances. The Court concludes, therefore, that the Washington Class' unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.

298.    As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Washington Class' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages

model, and the parties have not raised arguments unique to Washington on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Washington Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Washington Class satisfies predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to the Washington Class; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Washington Class' claims based on the Safer-Cigarette Theory. Having determined additionally that the Washington Class' WCPA and unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement, the Court concludes that the Washington Class similarly does not satisfy rule 23(b)(3)'s predominance requirement.

### 2. The Washington Class Satisfies Rule 23(b)(3)'s Superiority Requirement.

299.    The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Washington Class. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of

the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Washington Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Washington Class, which rely solely on Washington law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Washington Class' statutory and unjust enrichment claims. Because the Court has concluded that the Washington Class does not satisfy rule 23(b)(3)'s predominance requirement, however, the Court will not certify the Washington Class.

      **IT IS ORDERED** that: (i) the Plaintiffs' Motion for Class Certification, filed July 23, 2020 (Doc. 278), is granted in part and denied in part; (ii) the Court adopts the following class definitions: (a) the California Class, defined as all persons who purchased Natural American Spirit cigarettes in California; (b) the Colorado Class, defined as all persons who purchased Natural American Spirit cigarettes in Colorado; (c) the Florida Class, defined as all persons who purchased Natural American Spirit cigarettes in Florida; (d) the Illinois Class, defined as all persons who purchased Natural American Spirit cigarettes in Illinois; (e) the Massachusetts Class, defined as all persons who purchased Natural American Spirit cigarettes in Massachusetts; (f) the Michigan Class, defined as all persons who purchased Natural American Spirit cigarettes in Michigan; (g) the New Jersey Class, defined as all persons who purchased Natural American Spirit cigarettes in New Jersey; (h) the New Mexico Class, defined as all persons who purchased

Natural American Spirit cigarettes in New Mexico; (i) the New York Class, defined as all persons who purchased Natural American Spirit cigarettes in New York; (j) the North Carolina Class, defined as all persons who purchased Natural American Spirit cigarettes in North Carolina; (k) the Ohio Class, defined as all persons who purchased Natural American Spirit cigarettes in Ohio; (l) the Washington Class, defined as all persons who purchased Natural American Spirit cigarettes in Washington; (m) the California Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in California; (n) the Colorado Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Colorado; (o) the Florida Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Florida; (p) the Illinois Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Illinois; (q) the New Jersey Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New Jersey; (r) the New Mexico Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New Mexico; (s) the New York Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New York; (t) the North Carolina Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in North Carolina; and (u) the Nationwide Menthol Class, defined as all persons who purchased Natural American Spirit menthol cigarettes in the United States; (iii) the Court adopts the following class periods: (a) September 30, 2009, to October 1, 2017, for the Nationwide Menthol Class, the New York Class, the New York Menthol Subclass, the New Mexico Class, the New Mexico Menthol Subclass, the New Jersey Class, the New Jersey Menthol Subclass, the Michigan Class, and the Massachusetts Class; (b) September 30, 2010, to October 1, 2017, for the Illinois Class and the

Illinois Menthol Subclass; (c) September 30, 2011, to October 1, 2017, for the California Class, the California Menthol Subclass, the Florida Class, the Florida Menthol Subclass, and the Washington Class; (d) September 30, 2012, to October 1, 2017, for the Colorado Class and the Colorado Menthol Subclass; (e) September 30, 2013, to October 1, 2017, for the Ohio Class; (iv) the Court does not certify under rule 23(b)(2) of the Federal Rules of Civil Procedure (a) the California Class, (b) the California Menthol Subclass, (c) the Florida Class, (d) the Florida Menthol Subclass, (e) the Illinois Class, (f) the Illinois Menthol Subclass, (g) the Massachusetts Class, (h) the Michigan Class, (i) the New Jersey Class, (j) the New Jersey Menthol Subclass, (k) the New Mexico Class, (l) the New Mexico Menthol Subclass, (m) the New York Class, (n) the New York Menthol Subclass, (o) the North Carolina Class, (p) the North Carolina Menthol Subclass, (q) the Ohio Class, and (r) the Washington Class; (v) the Court does not certify under rule 23(b)(3) the Nationwide Menthol Class; (vi) the Court (a) certifies under rule 23(b)(3) the California Menthol Subclass to the extent that its claims are premised on the Menthol Theory, and (b) does not certify the California Class or the California Menthol Subclass to the extent that its claims are premised on the Safer-Cigarette Theory; (vii) the Court does not certify under rule 23(b)(3) the Colorado Class and the Colorado Menthol Subclass; (viii) the Court (a) certifies under rule 23(b)(3) the Florida Menthol Subclass' statutory claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the Florida Class, the Florida Menthol Subclass' unjust enrichment claim, and the Florida Menthol Subclass' statutory claim to the extent that it is premised on the Safer-Cigarette Theory; (ix) the Court (a) certifies under rule 23(b)(3) the Illinoi Menthol Subclass' Illinois Unfair and Deceptive Trade Practices Act claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the Illinois Class, the Illinois Menthol Subclass' Illinois Consumer Fraud Act and unjust enrichment claims, and

the Illinois Menthol Subclass' Illinois Unfair and Deceptive Trade Practices Act claim to the extent that it is premised on the Safer-Cigarette Theory; (x) the Court does not certify under rule 23(b)(3) the Massachusetts Class; (xi) the Court does not certify under rule 23(b)(3) the Michigan Class; (xii) the Court (a) certifies under rule 23(b)(3) the New Jersey Menthol Subclass to the extent that its claims are premised on the Menthol Theory, and (b) does not certify the New Jersey Class and the New Jersey Menthol Subclass to the extent that its claims are based on the Safer-Cigarette Theory; (xiii) the Court (a) certifies under rule 23(b)(3) the New Mexico Menthol Subclass' New Mexico Unfair Practices Act claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the New Mexico Class, the New Mexico Menthol Subclass' New Mexico False Advertising Act and unjust enrichment claims, and the New Mexico Menthol Subclass' New Mexico Unfair Practices Act claim to the extent that it is premised on the Safer-Cigarette Theory; (xiv) the Court (a) certifies under rule 23(b)(3) the New York Menthol Subclass' statutory claims to the extent that they are premised on the Menthol Theory, and (b) does not certify the New York Class, the New York Menthol Subclass' unjust enrichment claim, and the New York Menthol Subclass' statutory claims to the extent that they are premised on the Safer-Cigarette Theory; (xv) the Court does not certify under rule 23(b)(3) the North Carolina Class and the North Carolina Menthol Subclass; (xvi) the Court does not certify under rule 23(b)(3) the Ohio Class; (xvii) the Court does not certify under rule 23(b)(3) the Washington Class; (xviii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 277), is denied; (xix) the Plaintiff's Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D, DABT, filed July 23, 2020 (Doc. 282), is denied; (xx) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr.

Joannes Evangelista Steenkamp, filed July 23, 2020 (Doc. 283), is granted in part and denied in part; (xxi) the Court excludes Dr. Steenkamp's opinions that: (a) Natural American Spirit's packaging has never implied that Natural American Spirit products are safer or healthier than other cigarettes, and (b) the brand attribute of authenticity has driven Natural American Spirit cigarettes' sales; (xxii) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed July 23, 2020 (Doc. 284), is granted in part and denied in part; (xxiii) the Court excludes Dr. Teece's opinion that Dr. Dubé's opinion and methodologies are not reliable; (xxiv) the Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Kent Van Liere, filed July 23, 2020 (Doc. 286), is denied; (xxv) the Plaintiffs' Motion to Exclude the Opinions and Testimony of W. Kip Viscusi, filed July 23, 2020 (Doc. 290), is denied; (xxvi) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jennifer Pearson and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 303), is denied; and (xxvii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jean-Pierre Dubé and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 291), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Scott P. Schlesinger
Jonathan Gdanski
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

  *Attorneys for Plaintiffs Justin Sproule, Steve Okstad, Michael Anderson, Brooke Balocca,
  Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos
  Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton
  Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King,*

*Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorney for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Kas Gallucci
Law Officers of Ronald A. Marron
San Diego, California

-- and --

Melissa Weiner
Pearson Warshaw, LLP
Wayzata, Minnesota

-- and --

Nancy Ruth Long
Longer, Komer & Associates
Santa Fe, New Mexico

-- and --

Richard W. Hughes I
Rothstein Law Firm
Santa Fe, New Mexico

-- and --

Katherine Meyer
Meyer, Glitzenstein & Eubanks, LLP
Washington, D.C.

> *Attorneys for Plaintiffs Anthony Dunn, Ceyhan Haksal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Justin Sproule, Patrick Scott, Russel Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer, Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Maggie Harris, Charles Honse, Clinton Horton, Collin Jass, Cristopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Scott Johnston, Jason Cole, Rachael King, Jacques-Rene Hebert, Sara Benson, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, and Abigail Emmons*

Jonathan D. Woods
Prince, Schmidt, Korte & Baca, LLP
Santa Fe, New Mexico

> Attorneys for Plaintiff Shannon White

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Charles D Moore
Halunen Law
Minneapolis, Minnesota

--and--

Michael Robert Reese
Carlos Ramirez
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich LLC
Albuquerque, New Mexico

 *Attorneys for Plaintiff Anthony Dunn*

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

 *Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael*
  *Yang, Doug Pyle, and Nick Vadis*

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

 *Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

 *Attorney for Theodore Rothman*

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

     *Attorney for Theodore Rothman, Danae Grandison, Michael Laboon, and Dave Moyer*

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

     *Attorney for Plaintiff Russell Brattain*

Daniel L. Warshaw
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

     *Attorneys for Plaintiff Shannon White*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

     *Attorney for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

John Allen Yanchunis, Sr.
Scott W. Weinstein
Keith R. Mitnik
Marisa Kendra Glassman
Morgan & Morgan, PA
Fort Myers, Florida
Orlando, Florida
Tampa, Florida

     *Attorneys for Plaintiff Ashley Waldo*

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

     *Attorney for Plaintiff Timothy Ruggiero*

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Islands

     *Attorney for Plaintiff Desire Gudmundson*

Matthew David Schultz
Levin Papantonio Thomas P.A.
Pensacola, Florida

     *Attorney for Plaintiff Scott Johnston*

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

     *Attorney for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

David B. Alden
David M. Monde
Sharyl Reisman
Mark R. Seiden
Debra R. Belott
Feder Meir
Charles R. A. Morse
David Craig Kiernan
Michael Fraser Stoer
Jennifer Bunting-Graden
William D Coglianese
Jon Gregory Heintz
Troy A. Fuhrman
Jones Day
San Francisco, California
Washington, DC
Atlanta, Georgia
Miami, Florida
Tampa Florida
New York, New York
Cleveland, Ohio

*Attorneys for the Defendants*